1
2          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
3
   Civil Action No. 18-cv-02914-JLK-MEH
4
   TRACY HOUSTON,
5
        Plaintiff,
6
   vs.
7
   THE UNITED STATES OF AMERICA,
8
        Defendant.
   _____
9

10                    **REPORTER'S TRANSCRIPT**
                   TRIAL TO COURT – DAY ONE
11
   _____
12
        Proceedings before the HONORABLE JOHN L. KANE, JR.,
13
   Senior Judge, United States District Court for the District of
14
   Colorado, commencing at 9:01 a.m., on the 21st day of
15
   September, 2020, via Video Teleconference.
16                   **A P P E A R A N C E S**
17          STEVEN A. SHAPIRO, MICHAEL JON OGBORN, and AMANDA R.
18   PFEIL HOOD, Attorneys at Law, Ogborn Mihm, LLP, 1700 Lincoln
19   Street, Suite 2700, Denver, Colorado, 80203, appearing for the
20   Plaintiff.
21          JANE ELIZABETH BOBET and VICTOR WILLIAM SCARPATO, III,
22   Attorneys at Law, 1801 California Street, Suite 1600, Denver,
23   Colorado, 80202, appearing for the Defendant.
24          THERESE LINDBLOM, Official Reporter
             901 19th Street, Denver, Colorado 80294
25        Proceedings Reported by Mechanical Stenography
             Transcription Produced via Computer

2

# P R O C E E D I N G S

1

2          (In open court at 9:01 a.m.)

3          *THE COURT:*  Thank you.  Please be seated, everyone.

4          I will take something like roll call after I get rid

5    of my mask.  There is only two people -- three people in the

6    courtroom today, and we're all socially distanced, so the mask

7    isn't necessary.

8          But present are representing the plaintiff, Ms. Hood,

9    Mr. Ogborn, and Mr. Shapiro; and representing the defendant are

10   Ms. Bobet and Mr. Scarpato.  The courtroom deputy is Bernique

11   Abiakam, and she is present in the courtroom.  And my court

12   reporter, Terri Lindblom, is reporting this remotely.  So I

13   think we're all set.

14         Is the plaintiff ready to proceed?

15         *MR. SHAPIRO:*  Yes, sir.  Your Honor.

16         *THE COURT:*  All right.  And is the defense ready?

17         *MS. BOBET:*  Yes, Your Honor.

18         *THE COURT:*  Okay.  I'll hear opening statements from

19   the plaintiff.  If the defendant, then, wants to make an

20   opening statement, that's fine; and, otherwise, if you want to

21   reserve it, that's entirely up to you.  After we hear the

22   opening statement, and depending upon the time, we'll go

23   directly into having the first witness.

24         Ms. Lindblom, I want you to tell me if you need a

25   break at any time, because you're the one that is doing the

1   hard work of doing the reporting.  And otherwise I plan on

2   taking a quick recess every day at as close to 10:15 as we can

3   until 10:30, and then from noon until 1:00, and then another

4   break at 3:15 to 3:30.  And then this is the idiosyncratic rule

5   I have, which nobody has ever objected to, and that is at any

6   time after 4:30, whoever the attorney is who is at the

7   lectern -- in this case, it would be whoever is conducting the

8   examination or cross-examination -- between 4:30 and 5:00 has

9   the right to call the recess for the evening.  So when you

10  think after 4:30, and you're at the lectern, is this a good

11  place to stop, then we'll stop; and we'll come back and start

12  again at 9:00 o'clock on the following morning.

13          Any questions about the procedure?

14          *MR. SHAPIRO:*  No, sir.

15          *THE COURT:*  All right.  Here we go.

16          Please go ahead.

### OPENING STATEMENT

18          *MR. SHAPIRO:*  Good morning, Your Honor.

19          Thank you for giving us this unique opportunity to

20  conduct a trial completely teleconference.  I never thought I'd

21  see this in my life, and this should be entertaining for all of

22  us.

23          Catastrophic life-changing injury.  Dr. Cota will tell

24  that this was a catastrophic life-changing injury.  He'll

25  testify that that means that Ms. Houston will never function

1    the way she did ever again.  She cannot be returned to

2    baseline.

3            This case is about valuing a catastrophic

4    life-changing injury.  The United States has admitted

5    liability, and the only issue for this court is causation and

6    the amount of damages.

7            Why are we here?  You will hear testimony about why we

8    are here, and it's simply due to the significant daily residual

9    problems that impact Ms. Houston every single day all day.  It

10   has to do with what Ms. Houston will need for the rest of her

11   life to try to function at a significantly reduced level

12   regardless of what is done.

13           There is not a day that has gone by since this crash

14   that Ms. Houston has not been impacted by what occurred on

15   December 1, 2016, as a result of the negligence of Ms. Terrell,

16   a postal worker, acting within the course and scope of her

17   employment.  Significant chronic pain, cognitive difficulties,

18   psychological difficulties are the norm for Ms. Houston day in

19   and day out.  Doctors' appointments, therapy appointments are

20   generally going to determine how she's going to be able to

21   accomplish what she can in a day.  Her right leg, lower leg,

22   foot, ankle, and knee were damaged severely in this crash; and

23   every single day they are at the top of her thoughts and

24   activities.

25           This crash occurred, Your Honor, on December 1, 2016,

5

1    a little after 10:00 a.m. on 24 Road and H Road.  Ms. Terrell

2    was working for the post office, and either failed to stop at a

3    stop sign or pulled out from a stop sign directly in front of

4    the vehicle driven by Ms. Houston, traveling -- who was

5    traveling at approximately 40 miles an hour.  There was nothing

6    that Ms. Houston could do, and she hit Ms. Terrell's vehicle at

7    a high rate of speed.

8          You will hear -- you will see photographs of the crash

9    and the vehicles involved.  It was a high-velocity crash, as

10    evidenced by the damage to the vehicles and the amount of

11    distance both vehicles traveled after the collision.  The

12    vehicles were stopped not by the end of momentum but by hitting

13    the buildings on the property where the crash occurred.  You

14    will see those photographs, as well.

15          Ms. Houston was 54 years old at the time, with a birth

16    date of October 30, 1961.  She is now 58 years old.  You will

17    hear testimony about her life expectancy being 26.4 additional

18    years.

19          Ms. Houston is a college graduate who further went on

20    to receive a master's degree, all while working, running her

21    own businesses, raising a young daughter as a single mother

22    after a divorce.  She also managed to find time to do charity

23    work and give back to the Adams County community where she is

24    from.

25          You will hear Ms. Houston say she is a dryland wheat

6

1   land farmer from Adams County.  As somebody from Brooklyn, New

2   York, I didn't have any understanding of what that meant, Your

3   Honor; but Ms. Houston has educated me over the years about

4   what it takes to grow crops without any -- to grow wheat

5   without any water.  And she told me about her farm -- family

6   farm, in Adams County where the new courthouse is.  They had

7   approximately 320 acres.  And that background, that growth,

8   really taught her work ethic, physicality, take nothing from

9   anyone, make everything happen on your own.  It's who she was,

10  it's who she is, based on how she was raised and what she was

11  taught about growing up in a rural background on her farm with

12  all of the work that she had to do.  She simply loved what

13  being a farm girl gave her.

14          The issues for this court is to determine what it will

15  take to provide balance for what Ms. Houston has lost and to

16  provide her with compensation to bring her back, hopefully,

17  from where she is or where she was from a financial loss

18  perspective.  We only wish the Court had the power to fix the

19  serious injuries and permanent disabilities that Ms. Houston

20  continues to have.

21          In any case like this, what is important is, who was

22  Ms. Houston, who is Ms. Houston, and what makes her tick?

23          She was a strong -- and still is -- a strong,

24  independent physical woman.  Her physical abilities and her

25  loss of utilizing those physical abilities and tools are what

 1   made her who she was and gave her a sense of purpose and

 2   meaning.

 3           She moved to Grand Junction probably a little over --

 4   about a year before this crash occurred.  She wanted to get

 5   back to her rural roots, and she moved from the Denver

 6   metropolitan area for quiet and for getting her back to the

 7   land.  She had not yet developed a support network in the

 8   community, but was absolutely thrilled to be back in a farm

 9   community.  She wanted to get back to that farming foundation,

10   and was able to purchase 5 acres out in the country with land

11   that produced hay and had a rental apartment that she could use

12   for vacationers in the area.  Ms. Houston will explain what

13   being able to be physical and have a strong work ethic went to

14   making her who she was and hopefully can become again.

15           Ms. Houston was running a consulting business with

16   placing people on corporate boards and assisting with career

17   growth.  She also found a passion later in life for hiking in

18   and out of the Grand Canyon.  And it was not the money that she

19   would make taking people in and out, which she hadn't done yet,

20   but it was showing people the majesty, the beauty, and what

21   that place did for people when they were there and checked out

22   of the reality of life.  She called the Grand Canyon a

23   cathedral.  She loved these hikes.  She'll explain -- or

24   attempt to explain -- to you what those hikes did for her.

25   These hikes were seven miles down and seven miles out and would

8

1    take two days, hauling in 30-pound packs.  Ms. Houston loved

2    the physicality and the -- the freedom that she felt when she

3    was doing these hikes.

4          For almost eleven years prior to this crash, there are

5    very little if any medical records for Ms. Houston.  She had

6    prior to this crash no disabilities, limitations, or physical

7    or mental issues that required any treatment.  You will hear

8    about prior medical records from over ten years prior to the

9    crash regarding a situational depression regarding a divorce

10   before the time of this crash in 2005.  You will also hear that

11   as a child, her mother left when she was 11 years old; and she

12   became an adult rather quickly.  You will also hear about years

13   of therapy in her 20s at her church, and you will hear about

14   physical and emotional abuse by her mother that made it very

15   difficult for her, and she worked through it in her 20s by

16   counseling at her church, period.

17         There is also a sentence in those records from 2005

18   about sexual abuse.  There was no sexual abuse, and we don't

19   know how that got there, and Ms. Houston will explain that to

20   this court.

21         There are no prior records indicating cognitive

22   issues, beyond one mention in a record eleven years ago, prior

23   to the crash, where it talks about fatigue.  There are

24   certainly no chronic pain issues or any issues related to her

25   right leg or right knee.

1           You will hear testimony that discusses a person's

2    predisposition or vulnerability when trauma impacts them

3    earlier in life.  When someone has trauma in their background,

4    they are predisposed or vulnerable to more significant problems

5    such as post-traumatic stress disorder and residual cognitive

6    problems from a traumatic brain injury.  The issues surrounding

7    Ms. Houston eleven years and twenty plus years prior to this

8    crash certainly led her to have a vulnerability or a

9    predisposition.  There were no pre-existing conditions, as

10   there was no care at the time of the crash or need for care at

11   the time of the crash.  No condition was ongoing, and she was

12   functioning at a very high level.

13          What did the crash cause?  We certainly have doctors

14   describing to you the specifics of what occurred and what

15   happened to Ms. Houston's lower right leg.  But the bottom line

16   is, she had a shattered, dislocated right ankle and foot that

17   needed to be reconstructed on two occasions.  She is left with

18   screws and plates to hold her right ankle together.  She also

19   had a fractured right kneecap.  That injury also required

20   plates and screws to put her kneecap back together again.  The

21   injury or the surgery on her lower right leg was very

22   significant and required two surgeries to put back together

23   again.  The trauma was so significant that her fibula was

24   sticking through the skin down by her heel as a result of the

25   significant impact of the crash.  You will hear from Dr. Cota

10

1   that these were significant injuries, and it was difficult to

2   put her back together again.

3        One surgery was necessary to repair the right kneecap.

4   Her right kneecap continues to have minor symptoms, but nothing

5   like the problems she has with her lower right leg.

6        She continues to suffer from nerve pain, mechanical

7   joint pain due to the severity of the damaged ankle and foot.

8   Traumatic arthritis, and complex regional pain syndrome and

9   sympathetic nerve pain, which is pain that is out of the

10  ordinary due to the way her body reacted, which causes her

11  nerves to fire at an abnormal rate and cause more pain for her.

12  You will hear from numerous doctors about what these problems

13  are and why they occur.

14       She continues to take 1800 milligrams of gabapentin a

15  day, 600 milligrams three times a day, because of significant

16  nerve pain, mechanical joint pain, complex regional pain

17  syndrome, and the sympathetic nerve pain.  She started taking

18  the gabapentin on a prescription from Dr. Cota five days after

19  the second surgery and has not been able to reduce that dosage

20  since.  She has tried; and each time she reduces the dosage,

21  the pain increases.

22       What is causing the majority of the pain will be a

23  question that a lot of the doctors will be asked; and most of

24  them will say, all of the items that we mentioned.

25       She was hospitalized for twelve days.  Because she

 1    lives alone, she was sent to rehabilitation for ten more days

 2    and then had significant home healthcare for some time.  She

 3    also had the --

 4          Your Honor, the officer just jumped on, and I think we

 5    need to change that.

 6          THE COURT:  This is kind of a sequestration order.  Is

 7    that what you're asking for?

 8          MR. SHAPIRO:  Yes.

 9          THE COURT:  Okay.  Officer Shiflet, we're going to

10    take you off of the video at this time and call you back.  I

11    appreciate your being here and being ready to go.  You will be,

12    I think, the first witness called; but we have to have the

13    opening statement made outside your presence.  And then if the

14    defendant wants to call you, they will have to do the same.

15          MR. SHAPIRO:  I don't think he heard you.

16          Thank you.  Ms. Houston was hospitalized for twelve

17    days and then went to rehab for ten days.  She then had home

18    healthcare and then had the help of neighbors and friends.  She

19    was in a wheelchair for a while, crutches for a longer period

20    of time before she was able to walk with a cane.  She was

21    unable to walk independently for ten months from the date of

22    the crash.  She continues to this day to have problems with her

23    gait.  She will always have problems with her gait.  She

24    clearly is a chronic pain patient with pain levels of between a

25    four out of ten to a seven out of ten everyday, despite the

1    medication and treatment that she has.

2          Shortly after the accident and the surgeries,

3    Ms. Houston began noticing problems with how her brain was

4    functioning; her cognitive abilities were not there.  She

5    mentioned something to Dr. Cota and then started seeking

6    assistance.  This occurred on May 17, 2017, almost -- a little

7    over five months after the crash occurred.  She was having

8    problems with her memory, processing of information, and was

9    just very slow in her mentation.  She was still suffering from

10   nightmares and reliving the crash in question.

11         You will hear testimony about the diagnosis of

12   post-traumatic stress disorder, depression, anxiety, and also

13   traumatic brain injury.  All of these problems, in addition to

14   the chronic pain and the use of gabapentin, can all cause

15   cognitive issues.  The label of what it is that is causing her

16   cognitive issues is not the issue; the impact on function from

17   these problems is.

18         You will hear testimony from Dr. Gustavson, a

19   neuropsychologist that Ms. Houston has -- that says that

20   Ms. Houston has post-traumatic stress disorder but not a

21   traumatic brain injury.  He will testify that she has brain

22   dysfunction, but due to the post-traumatic stress disorder, and

23   it presents just like a traumatic brain injury.  He'll testify

24   that post-traumatic stress disorder causes a physiological

25   change in how the brain functions.  He will also testify that

1    chronic pain restructures the brain, just like post-traumatic

2    stress disorder.  The similarity between post-traumatic stress

3    disorder, chronic pain, and traumatic brain injury is

4    significant.  Ms. Houston may have all three, but she certainly

5    has cognitive issues that are definitely related to this crash.

6           Her cognitive issues are attention and concentration

7    problems, speed of processing issues, memory, fatigue, anxiety,

8    and depression.  All of the doctors for the plaintiffs and the

9    defendants will testify that as a result of the crash,

10   Ms. Houston has cognitive deficits.  You will hear from some of

11   the doctors that this is due to post-traumatic stress disorder,

12   chronic pain, or medications for chronic pain.  All of these

13   problems cause cognitive issues.  Some of the doctors will tell

14   you that her cognitive issues are due to a traumatic brain

15   injury stemming from the crash in question.  No one will say

16   that these cognitive problems are from anything other than the

17   crash and the injuries sustained by Ms. Houston.

18          You will have an opportunity, due to the stipulation

19   between the parties, to review the medical literature that

20   support changes to the brain's physiology due to post-traumatic

21   stress disorder or chronic pain.  Certainly, there is a change

22   in the brain's physiology due to a traumatic brain injury.  All

23   of these articles specifically indicate that there is brain

24   damage or brain change because of these conditions.

25          These cognitive deficits are significant, real, and

1    impact everything Ms. Houston does on a day-to-day basis.

2    These cognitive deficits were proven during the

3    neuropsychological testing done by the defense of Ms. Houston.

4    Prior to that, she only had a short test done by a disability

5    doctor by the name of Dr. Jacobs.

6           What has Ms. Houston tried in order to recover and get

7    her function back from these catastrophic injuries?  Due to the

8    significant decrease in her physical abilities and cognitive

9    abilities, she has tried a lot of modalities and providers.

10   Ms. Houston is a non-traditional healthcare consumer, she is a

11   thinker and a contemplator and a researcher, she researches

12   every single modality or treatment that she could get to help

13   her, and she prefers non-traditional care.

14          Every doctor that has seen Ms. Houston has made it

15   very clear that she's highly motivated and only wants to

16   recover and get her function back.  They will also testify that

17   they wish at times she would just do what they tell her to do,

18   as opposed to continuing to ask questions and question what

19   else could be available to her that is less invasive.

20          Her medical bills thus far total $257,000.  You will

21   hear testimony from all of the providers that the bills

22   incurred were reasonable, necessary, and causally related to

23   the crash and injuries in question.

24          She has had two orthopedic surgeries on her lower leg,

25   and you will hear why.  She had one surgery to repair the

 1   fractured kneecap; two-week stay at St. Mary's Hospital;

 2   ten-day stay at Larchwood Rehabilitation that was necessary

 3   because she was non-weight bearing and lived alone; ten months

 4   to get herself back to independent walking.   The home

 5   healthcare was very helpful to getting her back acclimated at

 6   home.

 7        She continues to take medication.   She took narcotic

 8   pain medications, which she doesn't taken anymore.   She takes

 9   the gabapentin.   She is also taking a psychostimulant that is

10   called Adderall that is used off label for brain injury or

11   cognitive issues; and that has really assisted her focus,

12   concentration, and speed of processing.   She tried a

13   traditional antidepressant, Cymbalta, finally and ended up with

14   an adverse reaction that created either a seizure or a syncope

15   episode that required her to go to the emergency room and also

16   to see a neurologist.   Because of that, she ceased taking that

17   antidepressant and has not continued taking an antidepressant

18   at this point.

19        She has received psychological counseling for

20   post-traumatic stress disorder and her cognitive issues, as

21   well as her anxiety and depression from Dr. Gustavson and

22   Dr. Johnston, who you will both hear from.   She continues to

23   treat with Dr. Johnston and will be working in the future with

24   Dr. Gustavson regarding a trial spinal stimulator,

25   psychological counseling at the request of Dr. Lewis, who is a

1    pain management doctor.  She has seen two pain management

2    doctors, Dr. James and Dr. Lewis, for the chronic pain that she

3    has, the complex regional pain, and the arthritis.

4         Dr. Lewis has performed sympathetic nerve blocks and a

5    trial spinal stimulator.  The sympathetic nerve blocks worked

6    very well for a period of three to four months and then wore

7    off, and the spinal stimulator only gave her 50 percent

8    improvement.  So the permanent stimulator was not implanted.

9    Dr. Lewis is recommending continued sympathetic nerve blocks,

10   another trial of the stimulator once the legal proceedings are

11   over and, quite frankly, the pandemic emotional response is

12   over.  He's also suggesting injections into the joint where the

13   problems in the joint lie that you will see during the

14   testimony of Dr. Cota.

15        She was also seen by another orthopedic surgeon by the

16   name of Dr. Khan-Farooqi.  She saw him for a second opinion on

17   whether an orthopedic procedure would be necessary or helpful.

18   He did not recommend one.  Dr. Cota, on the other hand, you'll

19   hear testimony has recommended either an ankle fusion or an

20   ankle replacement at some point in the future, due to the

21   traumatic degenerative arthritis that exists.

22        She has also seen a physical medicine and rehab doctor

23   by the name of Dr. Ellen Price, who has assisted our life care

24   planner in providing a plan for the future.  Also sent her to a

25   cognitive or speech therapist.  Now, she also works with

1    Dr. Lewis but is more holistic than traditional.  She did

2    physical therapy for some time early in her recovery and now is

3    working with a physical therapist that specializes in chronic

4    pain.  She's seeing the occupational speech therapist, Lisa

5    Jacobson, who you'll hear from, who is giving her compensatory

6    strategies to help her work with the cognitive issues that she

7    has.

8         She has seen two neurologists, one due to the syncope

9    or seizure episode and another to determine if she had a brain

10   injury of not.  She also had a thermography, which looks at the

11   heat in the lower leg to assist with the diagnosis of complex

12   regional pain syndrome.  That test was negative.  She's had

13   numerous X rays and CAT scans of the right lower extremity, and

14   she frequently sees Dr. Lynn Price for medications, advice,

15   ideas, physical therapy, and anything else that can assist her.

16        You will hear from almost all of these providers.

17   Despite everything that has been done and Ms. Houston's best

18   efforts, she has not recovered; she will not recover from these

19   catastrophic injuries; she will have a significant permanent

20   disability and residual problems and medical needs the rest of

21   her life.

22        You will hear from our life care planner, Francine

23   Mazone, who spoke to many of these providers and obtained what

24   they believed to be her future needs.  These needs will then be

25   translated for inflation -- increased for inflation and

 1    decreased for economy by economist Jeff Opp.

 2           What problems is she left with for the rest of her

 3    life?  She's left with horrible chronic pain that gets worse as

 4    she does more or as the day goes on.  The pain is

 5    multifactoral:  Nerve, sympathetic nerve, complex regional

 6    pain, traumatic arthritic pain, with pain levels between four

 7    out of ten and seven.  It limits her function and impacts her

 8    cognition.  She has lost who she was and who she wanted to be,

 9    because she has no way to use her physical tools and strengths

10    any longer.

11           It was very important to who she was and who she is,

12    and she's lost that and is struggling.  She has not yet grieved

13    the loss.  Grieving the loss means she's given up, and she has

14    not given up.  She is still trying and pushing to get better.

15           It has impacted her confidence and self-esteem in a

16    major way, and it's impacted her decision-making.  And she's

17    not comfortable making decisions because of how long it takes

18    her to process and think through issues.  She becomes

19    overwhelmed.  Reading and comprehension is problematic.

20    Emotionally or psychologically, she's depressed and anxious;

21    and her losses continue to this day.  They have not stopped.

22           Her life expectancy is 26 years.  As we said, you're

23    going to hear from a life care planner.  There are few other

24    things that are in that life care plan that are different, are

25    in their infancy.  Platelet-rich plasma therapy and stem cell

 1   therapy are in there as an opportunity for her to heal or try

 2   to heal or try to reduce the pain without an ankle replacement

 3   or a fusion of her ankle.  These are things that are real.

 4   There is also home health aide assistance to help her with her

 5   daily struggles at home and help her when she's not able to do

 6   things as she gets older.  She is not very happy about that

 7   being there because she is so strong and independent, but she

 8   also realizes -- she's very concerned about how she's going to

 9   function.

10          Ms. Houston's future medical needs are somewhere

11   between 515,000 and 858,000, depending on what she uses and

12   what works.  But that will also depend, Your Honor, on how

13   medicine progresses and what additional options are made

14   available to her.

15          As an example, gabapentin -- which is generic for

16   Neurontin -- is something that has been in vogue for a number

17   of years now.  That will likely change, and new medications

18   will be available.  Adderall may turn into some other options

19   down the road.  New procedures with regard to ankle

20   replacements might be much better.  Stem cells and PRP will

21   likely progress, and who knows what else can be developed.

22          Permanent physical impairment is a significant element

23   of damages that you will hear testimony about.  There are

24   multiple pieces of evidence that you will hear about this

25   permanent physical impairment for you to consider.  Every day

1  she is in chronic, significant pain that limits what she can

2  do.  Everything that she does comes at a cost and then time for

3  a recovery after.  Every day she has significant cognitive

4  issues that impact what she can do and what she cannot.  Every

5  day she has significant issues that make her think about

6  whether she can try to do something or not.  Every single day

7  when she gets up and she puts her feet on the ground, she is

8  reminded about what happened.  The pain, the stiffness, the

9  scarring, all look right back at her the minute she puts her

10 feet on the ground.

11        She also has significant sleep difficulty due to the

12 pain and has had to work around that, as well.  It even reminds

13 her of the issues when she's sleeping because she's feeling the

14 pain.  The struggles with sleep continue, and they continue

15 every day.

16        The only thing Ms. Houston wants is to be what she

17 was.  That is not going to happen, and she has to learn to cope

18 and manage her new self.  What gets her balanced?  What gets

19 her to what she was?  The only thing this court can do and the

20 only thing this system can provide is money.  We will be asking

21 for a significant amount of money for these catastrophic

22 injuries and the result.  The elements we're asking you to

23 consider are non-economic past and future, economic damages

24 past and future, and permanent physical impairment past and

25 future.  We will be asking this court for an award of

1    $2 million for the catastrophic changes caused by Ms. Terrell's

2    actions while working for the Postal Service.

3           Your Honor, defense counsel, thank you for your time

4    and consideration.

5           THE COURT:  I have just one question for you.  And

6    it's -- I have -- in your concluding remarks, you used an

7    acronym, and those are the bane of my existence.  And you said

8    it was PRP.  I just don't know what that means.  Can you tell

9    me?

10          MR. SHAPIRO:  Yes.  Plasma-rich platelet therapy.  And

11   the other acronym that I didn't use was complex -- CRPS,

12   complex regional pain syndrome.

13          THE COURT:  I got that one.  Thank you.

14          MR. SHAPIRO:  You're welcome.

15          COURTROOM DEPUTY:  Counsel, can you give us just a few

16   seconds?  We have to make adjustments on our end.

17          MR. SCARPATO:  Yes.

18          THE COURT:  Go ahead, please, Mr. Scarpato.

19                          **OPENING STATEMENT**

20          MR. SCARPATO:  Thank you.

21          Good morning, Your Honor, counsel, and may it please

22   the Court.

23          This trial will focus on medical evidence.  It will

24   focus --

25          THE COURT:  Excuse me just a minute.

1          I need more volume on this.

2          Okay.

3          *MR. SCARPATO:*  It will focus on what the medical

4    evidence shows, about Ms. Houston's condition since the

5    accident, and what it says about treatments she'll need in the

6    future.

7          The United States admits liability for this

8    unfortunate accident, which caused Ms. Houston to suffer a

9    severe ankle injury and an injury to her knee.

10         The evidence will show that she suffered pain but is

11   substantially recovered and has lived an active life since the

12   accident.  We extend our best wishes to Ms. Houston as --

13   toward her continued recovery.

14         The main damages issue in dispute is not about whether

15   Ms. Houston was in pain -- which she was -- or about whether

16   her past medical expenses were reasonable -- which they mostly

17   were.  Ms. Houston has needed about 180 to $190,000 in past

18   treatment.  That includes several things, like her surgeries

19   and her occupational physical therapy and some mental health

20   treatment.  And we're prepared to pay for the damages this

21   accident has caused.

22         The main issue for the Court in this trial is what

23   Ms. Houston's condition has been since the accident and what

24   treatments she needs in the future.  To answer those questions,

25   we've asked experts with significant experience in the relevant

1    fields to review the medicine in Ms. Houston's case.  One is a

2    physical medicine and rehabilitation doctor, and the other is a

3    neuropsychologist.  These highly competent experts will present

4    testimony that is well supported by the evidence and is

5    reasonable.  Those experts agree that Ms. Houston has some

6    continuing pain.  For future care, they have determined that

7    Ms. Houston will need some ongoing management for residual

8    ankle pain and psychological symptoms, treatments like physical

9    therapy, pain medication, and antidepressant medication.  The

10   United States is prepared to compensate Ms. Houston for all of

11   that.

12        We also expect you will hear from a life care planner

13   hired by plaintiff.  She is not an expert in the conditions

14   Ms. Houston has.  Instead, she is a nurse who hasn't practiced

15   in a clinical setting since about 1990.  And we expect that

16   life care planner to tell you what she thinks Ms. Houston will

17   need.  But the evidence will show that, in fact, the life care

18   planner's opinions are not supported by the evidence and are

19   not reasonable.  In fact, as we'll explain, the life care

20   planner recommends treatments that Ms. Houston doesn't need or

21   treatments for conditions she doesn't have.

22        So in this opening, I'd like to address two issues.

23   The first is functioning.  What level of functioning has

24   Ms. Houston achieved since the accident?  The second is

25   treatment.  What kind of treatment does she need?

1          We believe that the evidence in this case -- in

2     particular, the medical evidence -- will show that Ms. Houston

3     has made a substantial recovery and that the Government's

4     experts have reasonably assessed her condition and determined

5     the medical care that would be best for Ms. Houston in the

6     future.

7          So how will the evidence show that?  The first

8     question is, what level of functioning has Ms. Houston achieved

9     since the accident?  Put simply, how has she been since the

10    accident; and what activities has she been able to do?

11         You'll hear from Ms. Houston's treating orthopedist,

12    Dr. Cota.  He'll tell you about how her injuries healed.

13    You'll hear about how much of her range of motion she's

14    regained in the months since the accident.  You'll hear she's

15    recovered all of the range of motion in the knee.  Other

16    evidence, too, will show that her pain has diminished and that

17    she can do more.

18         You'll see the records from her physical therapist.

19    We'll show you how that treatment decreased her pain and

20    increased her functioning.  And you'll see the medical billing

21    records.  They'll show that Ms. Houston hasn't had an in-home

22    skilled nursing visit since January of 2017, the month after

23    the accident.

24         You're also going to hear from Ms. Houston herself

25    about her life since the accident.  She'll tell you that her

 1    routine has included riding her bike and going for walks of an

 2    hour or more.  It's included going to the gym for one or two

 3    hours a day -- or at least it did before COVID-19 hit.  And her

 4    gym has included lifting weights and using exercise machines

 5    like the StairMaster.  She no longer needs a wheelchair or a

 6    walker or a cane.  She hasn't taken any type of opioid pain

 7    medication since shortly after the accident.  And she does

 8    day-to-day chores on her own, as well.  She cooks, she cleans

 9    the house, she goes to the grocery store, she manages her own

10    finances, and she does her own driving.

11          Now, Mr. Shapiro mentioned that before the accident,

12    Ms. Houston had taken multi-day trips to the Grand Canyon.  And

13    to be clear, this case isn't about whether the Grand Canyon is

14    a majestic place to visit.  But, in fact, Ms. Houston hadn't

15    been on one of those trips for several years before this

16    accident happened.

17          Now, while Ms. Houston is living an active life as a

18    fully independent and self-sufficient person, you'll hear that

19    she still has some effects from her ankle injury.  She does

20    still have symptoms.  She may not be doing all of the

21    activities she may have been accustomed to doing at some point

22    in her life before the accident.  She has reduced ankle range

23    of motion and some residual ankle pain and fatigue.  She also

24    still has some ongoing psychological symptoms, most notably

25    from post-traumatic stress disorder and depression.  We don't

1  dispute that she has some physical symptoms and psychological

2  effects.

3       First, it's undisputed that she's needed medical care.

4  In terms of her past medical expenses, the United States

5  doesn't dispute most of those.  Ms. Houston's claiming about

6  $260,000 for her past medical care.  About $180,000 of that --

7  or maybe a little bit more -- was for her surgeries,

8  post-operative care, pain medicine, physical therapy, and

9  rehabilitation, for which Ms. Houston should be compensated.

10 And the United States will compensate her for that.  Most of

11 the rest is for care that the medicine won't support, as I'll

12 discuss in depth in a few minutes.  But first I'd like to

13 discuss what treatment she needs going forward.

14      As I've mentioned before, for the future, the United

15 States is prepared to pay for the care that Ms. Houston really

16 needs for her physical and psychological condition.  So that

17 leads us to the second question, which is, what kind of

18 treatment does Ms. Houston need?

19      Let me start on the psychological side.  You'll hear

20 from Dr. Stephen Kalat on this, who is the United States'

21 neuropsychologist expert.  Dr. Kalat has been a psychologist

22 for 40 years and a neuropsychologist for 25 years.  He's a

23 fellow of the National Academy of Neuropsychology and a past

24 president of the Colorado Neuropsychological Society.  And he

25 meticulously reviewed Ms. Houston's case, he reviewed the

1  record, and he did an in-person examination.

2       You'll hear from Dr. Kalat that Ms. Houston needs an

3  antidepressant.  Dr. Kalat will tell you that antidepressants

4  are a well-accepted frontline treatment for PTSD and

5  depression.  In fact, you'll see records and hear testimony

6  from treating providers who have already prescribed Ms. Houston

7  antidepressant medication on a few separate occasions.  But

8  despite all of this, Ms. Houston unfortunately hasn't taken an

9  antidepressant on any regular basis other than for a couple of

10 weeks in the early part of this year.

11      Mr. Shapiro noted plaintiff's seizure or a syncope.

12 In January of this year, Ms. Houston again got a prescription

13 for an antidepressant.  This one is called Cymbalta.  She

14 started taking it, and she was doing better.  Then one day in

15 late February, she had an episode while she was getting a laser

16 treatment.  And Ms. Houston believes that this was caused by

17 the Cymbalta, and so she stopped it.  But this evidence does

18 not show that Ms. Houston shouldn't take an antidepressant.

19      First, there is no evidence that this single episode

20 was actually a seizure.  Second, the neurologist she saw for it

21 made no recommendation that she stop the Cymbalta.  And,

22 finally, third, there are many other antidepressant medications

23 that aren't Cymbalta that Ms. Houston could try anyway.  And

24 yet, still, Ms. Houston hasn't been on any antidepressant since

25 February.

1        You'll also here that in addition to an

2   antidepressant, Dr. Kalat, the neuropsychology expert, believes

3   that Ms. Houston would benefit from cognitive behavioral

4   therapy or exposure therapy.  This is the gold standard

5   treatment for PTSD, and it has been for 40 years.

6        Now, you'll hear that Ms. Houston is seeing a

7   rehabilitation counselor.  The counselor is working with her on

8   grief therapy, to come to terms with her supposedly permanent

9   limitations.  But Dr. Kalat will explain to you why this isn't

10  the sort of sustained systematic therapy that would actually

11  help Ms. Houston get better.  In fact, the counselor's

12  treatment is actually hindering Ms. Houston's recovery, because

13  she's focusing on this treatment instead of approaches proven

14  effective to help with PTSD and depression.

15       Next let me talk about future care on the physical

16  medicine side and Ms. Houston's physical condition and

17  symptoms.  On this subject, you'll hear from Dr. Bart Goldman.

18  Dr. Goldman is a physical medicine and rehabilitation physician

19  with 30 years of experience in the field.  And Dr. Goldman will

20  lay out a menu of simple progressive options to help with

21  Ms. Houston's physical condition.

22       You'll hear that Ms. Houston will need some things to

23  help with her ankle range of motion and pain.  Dr. Goldman

24  recommends more physical therapy of the sort that's already

25  helped Ms. Houston, about 15 visits over the next two years.

1    He'll also recommend several common sense items to help

2    Ms. Houston become more active.  These include orthotics for

3    her shoes and special bike pedals to reduce the stress on her

4    joints.  They include some more follow-up visits with her

5    rehabilitation doctor and continued non-opioid pain medication.

6            These treatments have several benefits.  They have the

7    benefit of being well established, non-invasive, and proven to

8    work for the conditions Ms. Houston actually has.  And the

9    United States, importantly, is prepared to pay for all of them.

10   So that's what Ms. Houston needs going forward.  We expect

11   you'll hear the total cost for this treatment regimen is in the

12   range of $30,000.

13           But we expect you'll hear from Ms. Houston's experts

14   that she also needs and has needed treatment for two other

15   conditions they claim she has:  Traumatic brain injury -- or

16   TBI -- and complex regional pain syndrome -- or CRPS.  These

17   conditions make up a lot of Ms. Houston's damages claims, but

18   the medicine won't support either of these diagnoses.

19           So we expect plaintiff's experts to tell you she needs

20   treatment for a traumatic brain injury she suffered in the

21   accident, but there is not a single medical professional who

22   will testify that they've diagnosed her with a TBI.  You'll

23   hear from Dr. Kalat, the United States' neuropsychology expert

24   on this subject.  Dr. Kalat specializes in brain injury.  And

25   what Dr. Kalat will tell you is that Ms. Houston doesn't have a

1    traumatic brain injury.  What you'll hear is, Ms. Houston

2    doesn't present with ordinary traumatic brain injury symptoms.

3    He'll also explain that there is no evidence she had a head

4    injury at the time of the accident, and that's consistent with

5    the record.  You'll hear from the EMT, you'll see his records

6    and the records from the emergency department, which Your

7    Honor's already admitted into evidence.  They'll show you that

8    Ms. Houston had no headache, was fully oriented, and denied

9    having hit her head or having lost consciousness at the time of

10   the accident.  In fact, what you'll learn is, no brain injury

11   diagnosis shows up anywhere in the records until nearly a year

12   after the accident.  It was then that Ms. Houston self-reported

13   to her new primary care doctor that she had suffered a

14   closed-head injury in the accident.  In other words Ms. Houston

15   self-diagnosed this injury.

16          Now, that might seem surprising; but Dr. Kalat will

17   explain to you that patients can commonly mistake diagnosed

18   psychological illnesses for undiagnosed physical ones.  Here,

19   Ms. Houston has mistaken her diagnosis of depression and

20   post-traumatic stress disorder for an undiagnosed traumatic

21   brain injury.  And that's not to fault Ms. Houston; this sort

22   of thing happens to a lot of people.  But this confusion has

23   led to thousands of dollars in unnecessary treatment for

24   traumatic brain injury.  That treatment has included speech

25   therapy and an amphetamine prescription, Adderall, all while

1    distracting from the psychological care Ms. Houston actually

2    needs, like exposure therapy and antidepressant medicine

3    regimen.  So that's traumatic brain injury.

4            Now, we expect Ms. Houston's experts to tell you she

5    also has a rare neurological pain condition called complex

6    regional pain syndrome, or CRPS.  We think those experts will

7    also say that she should get hundreds of thousands of dollars

8    in past and future treatment for CRPS.  But the medicine will

9    show she doesn't have that condition.

10           On this point, you'll hear from several sources.

11   You'll hear from Ms. Houston's pain doctor -- that's the --

12   Dr. Lewis that Mr. Shapiro mentioned in his opening statement.

13   He's billed -- he, Dr. Lewis -- has billed for tens of

14   thousands in CRPS treatment for Ms. Houston.  We expect that

15   Dr. Lewis will explain to you that he treats CRPS without first

16   ruling out other diagnoses.  And he'll tell you that he has

17   tried all of his CRPS treatments on Ms. Houston and that they

18   have all failed.  And now that they've failed, Dr. Lewis now

19   agrees that Ms. Houston's pain is predominantly mechanical and

20   not a neuropathically mediated condition like CRPS.

21           You'll also hear on this topic from Dr. Goldman, the

22   United States' physical medicine expert.  Dr. Goldman has

23   decades of experience diagnosing and treating CRPS.  As a

24   professor at CU Medical School, Dr. Goldman trained Colorado

25   doctors on this diagnosis for nearly a quarter century.  And he

1    evaluated Ms. Houston's case in depth, including reviewing

2    hundreds of pages of medical records and conducting an

3    in-person examination.

4         So what was Dr. Goldman's conclusion?  Ms. Houston

5    doesn't have CRPS, because she just doesn't meet the diagnostic

6    criteria for it.  You'll see records from Ms. Houston's

7    treating rehabilitation doctor that say the same thing.  The

8    evidence at trial will show that Ms. Houston's CRPS treatments

9    are meant for a condition she doesn't have.  And that's

10   important, because without the right diagnosis, you can't

11   arrive at the right treatment.

12        So it's -- we expect CRPS and TBI to be significant

13   portions of Ms. Houston's damages claims; and we expect her

14   experts to endorse that she needs even more for other unproven,

15   unsupported treatments.  And so where do those requests come

16   from?  They come from Francine Mazone, the life care planner

17   that I mentioned at the beginning of his opening statement.

18        Ms. Mazone's plan, when you hear it, will not be

19   credible, because it doesn't reflect a careful, reasonable

20   medical assessment of Ms. Houston's actual medical needs.  As I

21   noted before, Ms. Houston is not -- excuse me -- Ms. Mazone is

22   not an expert in the conditions at issue in this case.  She's a

23   registered nurse who hasn't practiced in a clinical setting for

24   nearly 30 years.  Ms. Mazone will tell you that she didn't

25   actually talk to any of the treating providers; instead, she

just had some of them fill out a short form about what treatment would be needed in the future.  She'll tell you she didn't have any follow-up conversations with the providers to clarify what they wrote, and she never met Ms. Houston in person.

So to give you a preview of how speculative Ms. Mazone's testimony will be, I'll highlight a few of the largest line items that she said she'll include.  She'll call for hundreds of thousands of dollars for more CRPS treatments than what Ms. Houston has already tried and that have already failed to work, she'll call for over half a million dollars for in-home skilled nursing visits that Ms. Houston hasn't had or needed for over three and a half years, and she'll call for over one and a half million dollars -- or at least that was the figure that she's given to the United States -- one and a half million dollars for three physical therapy appointments a week every week for the rest of Ms. Houston's expected life span. That's over 4,000 PT visits, with no allowance for any improvement or the effects of aging.

To be clear, Ms. Houston would benefit from more physical therapy, and the United States will argue for that, but she won't need anywhere near that much, especially if it's working.  And if all of that were not enough, we expect Ms. Mazone to tell you that Ms. Houston will also need unproven experimental treatments like platelet-rich plasma and stem cell

1   therapies.   In sum, Ms. Mazone's testimony will be unsupported;

2   and almost all of the costs she'll lay out will be for future

3   medical treatments that aren't actually needed.

4          At the end of the trial, the Court will have to take

5   into account all of the medical evidence and assess the medical

6   experts to decide the fair and reasonable number that

7   Ms. Houston needs to be made whole.   This will include some

8   compensation for pain and suffering.   And the United States

9   intends to show that Ms. Houston is entitled to about 180 to

10  $190,000 for her past treatment and about $30,000 for future

11  treatment.

12         But the most important issue for the Court in this

13  trial is a medical assessment of plaintiff.   The United States

14  believes that it will present a fair, clear picture of her

15  condition, her diagnoses, and the care she reasonably needs.

16  And the United States will rely on the best medical evidence in

17  recommending a reasonable figure for the Court to award

18  Ms. Houston.

19         Thank you, Your Honor.

20         *THE COURT:*  Thank you.

21         Call your first witness, please.

22         *MR. OGBORN:*  Good morning.   Mike Ogborn.   We are

23  calling Mike Shiflet from the Grand Junction Police Department.

24         *THE COURT:*  He's appearing here.   Can you administer

25  the oath now?

Myles Shiflet – Direct

1        *COURTROOM DEPUTY:*  Yes.

2        Can the witness hear the Court?

3        *MR. OGBORN:*  Officer Shiflet, are you able to hear?

4    He's unable to hear us.

5        There we go.  I can hear you, Officer Shiflet.

6        *COURTROOM DEPUTY:*  Can you hear me?  Test.

7        Can you hear the Court?

8        I'm going to ask that you raise your right hand.

9        (**MYLES SHIFLET, PLAINTIFF'S WITNESS, SWORN**)

10       *COURTROOM DEPUTY:*  Please state and spell your full

11  name for the record.

12       *THE WITNESS:*  It is Myles Shiflet.  Myles is spelled

13  M-Y-L-E-S; and Shiflet is S-H-I-F, as in Frank, L-E-T, as in

14  Tom.

15                   **DIRECT EXAMINATION**

16  *BY MR. OGBORN:*

17  *Q.*  Thank you, Officer Shiflet, for joining us on video for

18  this trial.

19       You're a police officer with the Grand Junction Police

20  Department; correct?

21  *A.*  Correct.

22  *Q.*  Tell us a little bit -- have your duties changed since

23  2016, or are they very similar today?

24  *A.*  In 2016, I was assigned to the traffic unit for the City of

25  Grand Junction Police Department.  Now I am our role as a field

Myles Shiflet – Direct

1    training officer.

2    Q.   When you were assigned to the traffic division, help us

3    understand a little bit about your job duties.

4    A.   Traffic unit, I was in -- assigned to take anything from

5    minor accidents to major accidents, accident reconstruction,

6    and traffic enforcement within the city.

7    Q.   How long have you been a police officer?

8    A.   I've been a police officer with the City of Grand Junction

9    for 18 years.

10   Q.   Any specialized training as it relates to -- to car

11   collisions?

12   A.   I'm a level 2 accident investigator.

13   Q.   What does that mean?

14   A.   I'm able to do some formulas, reconstructing anything from

15   minor to major accidents.

16   Q.   Officer Shiflet, we're going to ask you to talk about a car

17   collision that occurred on December 1, 2016, involving the

18   plaintiff in this case, Tracy Houston.  Do you recall that

19   collision?

20   A.   I do.

21   Q.   I'm guessing you had a radio call to show up to that car

22   collision; is that fair?

23   A.   I did.  Yes.

24   Q.   Tell us what you observed as you came upon the scene.

25   A.   I observed -- well, it's an intersection of just a -- rural

Myles Shiflet – Direct

1    roads.  There is one lane going in each direction for both

2    roads, 24 Road and H Road, in the city of Grand Junction.

3    H Road has stop signs on it, and 24 Road does not, so they have

4    the right of way there.  When I arrived there, I saw two

5    vehicles that had crashed into two separate buildings.

6    Q.  Officer Shiflet, I'm going to have you go to Exhibit 41.

7         It's been previously stipulated admitted.  We'll pop

8    that up on the screen.  There are two pages to this exhibit.

9         I'm going to start on page 1 of Exhibit 41.

10   A.  Okay.

11   Q.  Do you have that in front of you?

12   A.  I do.

13   Q.  Does this appear to be an overhead view of the two highways

14   you were just describing to us?

15   A.  It is.

16   Q.  What kind of an area is this?

17   A.  It's a rural area northwest of town.  You know, you could

18   see the farming -- just the mixture of different people living

19   in that area.  So . . .

20   Q.  If you go to page 2 of Exhibit 41, Officer.  You were

21   talking about H Road.  Is this a picture of H Road?

22   A.  It is.

23   Q.  You were talking about one road having a stop sign.  Did

24   the other one -- the intersecting road, Road 24, I believe,

25   does that have a stop sign?

Myles Shiflet - Direct

1   A.   24 Road does not have a stop sign.   No.

2   Q.   Can you tell us what direction we're looking from page 2 of

3   Exhibit 41?

4   A.   You're looking east.

5   Q.   And is this the direction of travel that the defendant was

6   coming from, Ms. Terrell?

7   A.   Yes, it is.

8   Q.   This is what she would have seen as she approached that

9   stop sign?

10  A.   Yes.

11  Q.   And if I have you go, please, to -- let me ask you to tell

12  me about the volume of traffic at this intersection.

13  A.   Light.   You know, the -- our peak hours over here are just

14  a little bit different.   You know, just around the 7 and

15  8 o'clock hours, and then towards the end of the day, 4 to 5,

16  sometimes 6 o'clock.   It's not heavy, by any means, at really

17  any time.   The heavy times that I'm talking about, if they do

18  have heavy times -- down the road to the west of this location

19  is a -- is an elementary school.   So for, really, picking up

20  kids during that time, it would be the heaviest.   But this

21  intersection, I've never heard of it ever being heavy enough to

22  matter.   But, you know, light to moderate volumes.

23  Q.   Have you go to page 3, please, of Exhibit 41.

24  A.   Yes.

25  Q.   I take this is the same view that we saw on page 2, it's

Myles Shiflet - Direct

1    just closer to the stop sign.  Does that appear to be correct

2    to you?

3    A.  Correct.

4    Q.  On page 3, is that the view -- the same view that would

5    have been apparent back on December 1, 2016?

6    A.  I believe so.  Yes.

7    Q.  Are there any unique issues at this intersection that

8    you're aware of?

9    A.  To your left -- so -- yeah, to the driver's left is a

10   building that you can see in Item No. 2.  It's a red -- kind of

11   a brown with windows -- yes.  That is really -- when I was at

12   the scene, I remember looking to see kind of what -- what took

13   place, and that building kind of is fairly close to 24 Road and

14   can obstruct a driver's view that is going eastbound wanting to

15   proceed forward.  Once you stop at the stop sign, it behooves

16   you to inch out just a little bit, because the speed limit

17   there is 45; so vehicles can come around that corner of the

18   building there pretty easily.

19   Q.  I'm going to have you go all the way to Exhibit 1, please,

20   Officer.

21          This has also been admitted into evidence by

22   stipulation.

23   A.  Okay.

24   Q.  Do you recognize this document?

25   A.  I do.

Myles Shiflet – Direct

1    Q.   What is this?

2    A.   It is the state form for motor vehicle accidents that I

3    completed for this accident.

4    Q.   There are a couple of boxes here that I want you to educate

5    us a little bit about.

6    A.   Okay.

7    Q.   From the right inside column, there is a box marked N and

8    P?

9    A.   Okay.

10   Q.   What do those -- did you fill out the information in those

11   boxes?

12   A.   I did.

13   Q.   Tell us what N is, please.

14   A.   N is the speed limits for that area.

15   Q.   And the boxes right underneath that, what is P?

16   A.   P is the estimated speed at the time of accident.

17   Q.   So the first box would represent the speed of which

18   vehicle?

19   A.   The violator vehicle, which is always placed on the left

20   side, where Ms. Terrell is.

21   Q.   The box underneath that, whose speed does that represent?

22   A.   It represents traffic unit No. 2, the person on the right.

23   Q.   That's Ms. Houston?

24   A.   Yes.

25   Q.   Okay.  And those are just estimates that you came up with

Myles Shiflet – Direct

1   based on what you saw at the scene?

2   A.  I'm sorry.  I mistakenly said 45 miles an hour, but the

3   speed limit there is 40.  So those were taken off -- you know,

4   you can find those on the City website.  But those are 40 miles

5   an hour for north, southbound vehicles, and then 35 miles an

6   hour for east and westbound.

7   Q.  On page 2 of Exhibit 1, you have a -- do you know what this

8   is?

9   A.  Yes, I do.

10  Q.  What is this?

11  A.  This is the diagram and narrative for the accident.

12  Q.  Did you fill this out?

13  A.  I did.

14  Q.  Tell us based on this diagram what you observed at the

15  scene to have occurred.

16  A.  Just where you could see where the two vehicles had

17  collided, and then they -- after the collision, TU2, Ms. -- I'm

18  sorry -- I want to make sure I get my names straight --

19  Ms. Houston, drove -- her vehicle drove out of control and into

20  that larger rectangle in the diagram of 7 -- I think it's 796

21  24 Road.

22  Q.  Officer --

23  A.  And then --

24  Q.  Ms. Houston's vehicle, let's focus on that for one minute.

25  A.  Okay.

Myles Shiflet – Direct

1   Q.  From the point of impact in the intersection to that

2   building, can you estimate the length of distance that the car

3   traveled?

4   A.  You could see that building in the -- in one of your

5   first -- what is it?  41.  But page -- No. 2.  It's the white

6   building there to the southeast of the intersection.  But --

7   you're talking maybe 80 to 100 feet.

8   Q.  All right.  And what did you see about Ms. Terrell's

9   vehicle, or traffic unit 1?

10  A.  Traffic unit 1 also after the collision drove out of

11  control and continued down and struck the other building there

12  at 796 24 Road.

13  Q.  There you go.  And if you could, Officer, could you

14  estimate to the best of your ability the length of travel

15  between the point of intersection -- point of impact in the

16  intersection to that building, please?

17  A.  I would say around 250 feet.

18  Q.  I'm going to have you go to Exhibit 2.  These are not

19  stipulated admitted, so we're going to walk through some of

20  these photos.  Okay?

21  A.  Okay.

22  Q.  On Exhibit 2, starting on page 3, do you recognize what

23  this picture depicts?

24  A.  Yes.

25  Q.  Do you know who took this picture?

Myles Shiflet – Direct

1    *A.*  Another officer.

2    *Q.*  Were you on scene when these pictures were being taken?

3    *A.*  I was.

4    *Q.*  Were you -- what picture -- were you directing what picture

5    should be taken?

6    *A.*  I somewhat was.  Yes.

7    *Q.*  On Exhibit 2, page 3, whose vehicle is that vehicle?

8    *A.*  In this picture, it's Ms. Houston's vehicle.

9    *Q.*  Does that picture appear to accurately depict what you saw

10   on the day of the collision?

11   *A.*  Yes.

12        *MR. OGBORN:*  I move the admission of Exhibit 2,

13   page 3, Your Honor.

14        *THE COURT:*  Yes, it's admitted.

15        (Exhibit 2, page 3 admitted.)

16   *BY MR. OGBORN:*

17   *Q.*  I'm going to have you go to Exhibit 2, page 4, please,

18   Officer Shiflet.

19   *A.*  Okay.

20   *Q.*  Does that picture appear to depict the other side of

21   Ms. Houston's vehicle on the day of the collision?

22   *A.*  Yes.

23   *Q.*  Does it appear to be accurate?

24   *A.*  Yes.

25        *MR. SHAPIRO:*  Move for the admission of Exhibit 2,

Myles Shiflet - Direct

1   page 4, Your Honor.

2           THE COURT:  It's admitted.

3           (Exhibit 2, page 4 admitted.)

4   BY MR. OGBORN:

5   Q.  And then on Exhibit 2, page 5, Officer Shiflet, is that an

6   accurate depiction of what you observed on the day of this

7   collision?

8   A.  Yes.

9           MR. OGBORN:  Move for the admission, Your Honor, of

10  Exhibit 2, page 5.

11          THE COURT:  It's admitted.

12          (Exhibit 2, page 5 admitted.)

13  BY MR. OGBORN:

14  Q.  Go ahead, Officer.  I'm sorry.

15  A.  I just kind of noticed something there that -- in

16  Exhibit 41, page 3, it's the Google Map image of that.  But you

17  can see in the white building there, there is a section of tan

18  siding that was replaced; and that's right where the collision

19  happened.  So if you were trying to get an idea of the distance

20  traveled from the middle of that intersection to -- so I

21  believe that panel is where -- what was replaced on the

22  building there.

23  Q.  Thank you.  What is -- what was this building -- is this

24  just -- was there framing behind this?  Tell us a little bit

25  about the construction of this building.  Was it just thin

45

Myles Shiflet – Direct

1    metal on the outside, like a shed?

2    A.  Yes.

3    Q.  Do you know if there was framing on the inside?

4    A.  It was.  We had looked -- the fire department and I went

5    inside just to make sure the structure was -- would be

6    supported even though there was damage to the building.

7    Q.  Why did that become a concern for you, the structural

8    integrity of the building?

9    A.  Well, the impact to the building that it took from the car

10   was -- you know, it was pretty decent.  I mean, you're looking

11   at maybe a couple of feet of intrusion on the building.  So you

12   never know, you know, from -- just from -- even though a

13   building is standing tall and looking good on the outside, you

14   don't know what was -- what was damaged on the inside.

15   Q.  I'm going to keep going here and take you to pages 6, 7, 8,

16   and 9 of Exhibit 2, Officer Shiflet.  If you will look at those

17   for me, please.

18        I'm going to ask you the same questions.  Do those

19   accurately depict what you personally observed on December 1,

20   2016, as it relates to Ms. Terrell's car?

21   A.  Yes.

22        MR. OGBORN:  Your Honor, move for the admission of

23   Exhibit 2, pages 6, 7, 8, and 9.

24        THE COURT:  They're admitted.

25        (Exhibit 2, pages 6,7,8,9 admitted.)

Myles Shiflet - Direct

1    *BY MR. OGBORN:*

2    *Q.*  When you arrived on the scene, Officer Shiflet, what did

3    you do?

4    *A.*  I believe the fire department had been there before -- you

5    know, got there before I did, so I just tried to aid them any

6    way we could, and then just be their support initially, and

7    then try to piece together when we had time of what actually

8    happened.

9    *Q.*  You indicated that you went into the building that was hit

10   by Ms. Houston's vehicle.  Did you also go in the building that

11   was hit by Ms. Terrell's vehicle?

12   *A.*  Yes.

13   *Q.*  If you could turn the page -- to page 10 of Exhibit 2.

14   *A.*  Yes.

15   *Q.*  What is that depicting?

16   *A.*  It is depicting the kitchen of that building and the

17   intrusion on the wall there from -- there is a piece of --

18   looks like wainscot -- siding for the interior.  It's lying on

19   the ground that was popped off by the collision.

20   *Q.*  And that's actually inside the house.  So the vehicle

21   actually punched through from the exterior to the interior?

22   *A.*  Yes.  And there is also -- looks like a wall stud that was

23   broken.

24   *Q.*  And I'll have you turn to page 1 of Exhibit 2.  What is

25   that depicting?

Myles Shiflet – Direct

1    *A.*   That is the aftermath of what Ms. Terrell's vehicle had

2    done.

3           *MR. OGBORN:*   Move for the admission of page 1 and

4    page 10 of Exhibit 2, Your Honor.

5           *THE COURT:*   They're admitted.

6           (Exhibit 2, pages 1 and 10 admitted.)

7    *BY MR. OGBORN:*

8    *Q.*   When you were there looking at the impact from this

9    collision, Officer Shiflet, how would you describe that for us?

10   *A.*   Pretty significant impact -- accident.   There is -- I'm

11   going to -- on the ones that I've been to, I've seen collisions

12   like that to where people have died.   So a pretty good crash.

13   We were concerned about both ladies' injuries initially, so --

14   yeah.

15   *Q.*   Did you involve yourself in the treatment of Ms. Houston at

16   all?

17   *A.*   No.

18   *Q.*   Is -- why is that?

19   *A.*   Because I'm not a professional in that area.   You wouldn't

20   want me helping you if -- I could do minor stuff, band-aids,

21   maybe.

22   *Q.*   Did she have a professional assisting her while you were

23   there?

24   *A.*   I'm sorry?

25   *Q.*   Did she have a professional assisting her while you were

Myles Shiflet - Cross

1   there?

2   A.  Yes.  In the form of several firefighters.

3   Q.  Did you have an opportunity to speak to plaintiff -- to

4   either of the people involved in the collision while you were

5   there?

6   A.  No, I did not.

7   Q.  Is there a reason for that?

8   A.  They were being attended to by the fire department and were

9   removed from the vehicles and loaded into ambulances and

10  transported to the hospital.

11  Q.  Very good.  Officer Shiflet, I don't have any further

12  questions for you.  I think one of the United States attorneys

13  is going to ask you some questions.

14          Thank you very much for your time.

15          MR. SCARPATO:  Your Honor, may I inquire?

16          THE COURT:  Yes, please.

17          MR. SCARPATO:  You anticipated my request, Ms. Waller.

18  Thank you.

19                      **CROSS-EXAMINATION**

20  BY MR. SCARPATO:

21  Q.  Good morning, Officer Shiflet.  Thank you for being with us

22  today.  Do you know the plaintiff in this matter, Tracy

23  Houston?

24  A.  Just in this -- I -- I couldn't pick her out of a lineup,

25  no.

Myles Shiflet - Cross

1  *Q.*  So --

2      *COURTROOM DEPUTY:*  Counsel, we're going to need to

3  pause for just a minute.

4      Mr. Scarpato, your volume is really low; so I have to

5  keep adjusting the volume when you speak just to balance it out

6  on this end.  So everyone else is super loud because I have to

7  turn the volume up when you speak, so you all need to turn your

8  volume up on your end.

9      *MR. SCARPATO:*  Thank you.  I might be able to fix it

10  if I try from a different spot in the room.  Let me try that.

11      *THE COURT:*  Okay.

12      *MR. SCARPATO:*  Is this position better?

13      *COURTROOM DEPUTY:*  I'm going to ask the witness to

14  just say something.  Just say A,B,C,D,E,F,G.

15      *THE WITNESS:*  A,B,C,D.

16      *COURTROOM DEPUTY:*  Mr. Scarpato, please say something.

17      Judge, how is that volume?

18      *THE COURT:*  I can hear them both now.

19      *COURTROOM DEPUTY:*  Okay.  We'll go with that.

20      *MR. SCARPATO:*  Thank you.

21      May I proceed, Your Honor?

22      *THE COURT:*  Yes, please.  Go ahead.

23  *BY MR. SCARPATO:*

24  *Q.*  So, Officer Shiflet, you have no knowledge of Ms. Houston

25  other than your responding to this accident in December of

Myles Shiflet - Cross

1    2016; correct?

2    A.  Correct.

3    Q.  And in your work, you don't typically follow a car accident

4    case once your investigation of the accident is complete; is

5    that true?

6    A.  Correct.

7    Q.  And you completed your accident report on the day of the

8    accident, December 1, 2016; true?

9    A.  I believe so.  Yes.

10   Q.  And you have no knowledge of Ms. Houston's post-accident

11   medical care; correct?

12   A.  No.

13   Q.  And no knowledge of Ms. Houston's post-accident level of

14   functioning; true?

15   A.  No.

16          MR. SCARPATO:  Thank you.  Those are my questions,

17   sir.

18          THE COURT:  Any redirect?

19          MR. OGBORN:  No redirect, Your Honor.

20          Thank you very much, Officer Shiflet.

21          We'd ask he be excused from his subpoena, Your Honor.

22          THE COURT:  Yes.  Any objection to the officer being

23   excused?

24          MR. SCARPATO:  No objection, Your Honor.  Thank you.

25          THE COURT:  Officer, thank you very much for your time

Kenyon Henricks – Direct

1   and your participation.  And if it gives you anything at all at

2   the station house to talk of that, you've made history.  You're

3   the first witness on a video teleconference trial.

4   Congratulations.

5           THE WITNESS:  That's what I understand, Your Honor.

6           THE COURT:  We'll be in recess about 15 minutes.

7           (Recess at 10:35 a.m.)

8           (In open court at 10:53 a.m.)

9           THE COURT:  Thank you.  Next witness, please.

10          MR. OGBORN:  Your Honor, plaintiff calls Kenyon

11  Hendricks, an emergency medical technician from Grand Junction.

12          Mr. Hendricks, if I could have you begin, please, by

13  stating your name --

14          Judge, I'm sorry.

15          THE COURT:  I'm going to have the clerk swear in the

16  witness first.

17              (**KENYON HENRICKS, PLAINTIFF'S WITNESS, SWORN**)

18          COURTROOM DEPUTY:  Please state your name and spell

19  your first and last name for the record.

20          THE WITNESS:  Kenyon Hendricks.  H-E-N-D-R-I-C-K-S.

21                          **DIRECT EXAMINATION**

22  BY MR. OGBORN:

23  Q.  Thank you, Mr. Hendricks.  How are you employed?

24  A.  I'm a firefighter with the City of Grand Junction.

25  Q.  Do you have any medical training?

Kenyon Henricks – Direct

1   *A.*  Yes, sir.  I hold a certificate of emergency medical

2   technician.

3   *Q.*  What does that mean?  What do you have to do to become an

4   emergency medical technician?

5   *A.*  It's a certification process.  I'm not sure how many hours;

6   but, essentially, I took a semester-long class at CMU here in

7   town to obtain it.

8   *Q.*  Just so we can do a comparison and contrast, here, what is

9   the difference between an emergency medical technician and a

10  paramedic?

11  *A.*  An EMT is considered basic life support.  So he can do CPR,

12  trauma sorts of stuff.  I guess it would be -- paramedics, they

13  can do cardiac rhythms, diagnose those, and they can give

14  medications in those situations.

15  *Q.*  Mr. Hendricks, how long have you been an emergency medical

16  technician?

17  *A.*  I'm working on nine years.

18  *Q.*  And how long have you been a firefighter?

19  *A.*  Same amount of time.

20  *Q.*  How often when you're on duty are you dealing with car

21  collisions?

22  *A.*  Quite frequently.

23  *Q.*  Like every day is going to have at least one or two?

24  *A.*  Maybe not every day; but at least once a cycle of our

25  shifts, if you will, we'll each have one.

Kenyon Henricks - Direct

1  *Q.*  I want to talk about one in specific that happened on

2  December 1, 2016, involving Tracy Houston.  Is that one that

3  you have some recollection about?

4  *A.*  Yes.

5  *Q.*  Tell us, if you will, please, what you observed when you

6  arrived at the scene of the collision.

7  *A.*  When I first arrived on scene, I -- it was a two-vehicle

8  accident.  One vehicle was into a building there at the corner

9  of the intersection, with one patient still inside at that

10  time.  And I -- that's -- yeah.

11  *Q.*  Do you know approximately how long after the collision you

12  arrived?

13  *A.*  I -- within eight minutes -- eight, ten minutes was our

14  response time.

15  *Q.*  And the person that you observed that was still in the

16  vehicle, who was that?

17  *A.*  I believe it was Ms. Houston.

18  *Q.*  What did you do to assist the people who were involved in

19  the collision?

20  *A.*  My ambulance was assigned to Ms. Houston as our patient.

21  So we went over and did our first rapid assessment of her

22  injuries and then was formulating a plan for transport beyond

23  that.

24  *Q.*  I want to talk to you a little bit about this rapid

25  assessment.  What is the purpose of that?

Kenyon Henricks – Direct

1    *A.*  Our first initial rapid assessment is to assess any major

2    life threats that she may have.

3    *Q.*  So you're talking about airway, things like that?

4    *A.*  Yes, sir.  Airway, breathing, any bleeding, any compromise

5    to the vehicle that caused significant injury.

6    *Q.*  And what did you learn in doing your rapid assessment?

7    *A.*  The first rapid assessment learned that she was awake and

8    conscious, as well as having a right open fracture to her

9    ankle.

10   *Q.*  And when you say "open fracture," describe what that is and

11   what you mean when you say that, please.

12   *A.*  Yes, sir.  An open fracture would be that the bone has

13   pierced through the skin.  So the bone is outside of her leg,

14   there.

15   *Q.*  So it's not only fractured, but it's gone through -- it's

16   broken through the skin, and you can see it; is that fair?

17   *A.*  Yes, sir.

18   *Q.*  In your rapid assessment, you're looking for blood loss.

19   Was there any significant blood loss that caused you concern

20   during your rapid assessment?

21   *A.*  There was blood loss, again, due to that open fracture;

22   however, her vital signs showed that she was compensating for

23   it okay.  So I wasn't significantly concerned with her blood

24   loss at that time.

25   *Q.*  Mr. Hendricks, were you able to observe whether air bags

Kenyon Henricks – Direct

1    had deployed in Ms. Houston's vehicle?

2    *A.*  I -- I can't remember off the top of my head; but if I can

3    look at my report, I'd be able to answer that question.

4    *Q.*  You did a report right after the incident?

5    *A.*  Yes, sir.

6    *Q.*  Would it help you if you looked at that to recall?

7    *A.*  Yes, sir.

8    *Q.*  Go ahead and look at the report to refresh your

9    recollection, and then I'll ask you the question again.

10   *A.*  Yes, sir.

11   *Q.*  Did you discover whether air bags deployed?

12   *A.*  Yes, sir.

13   *Q.*  Mr. Hendricks, were you able to -- in your exam of the

14   vehicle, the surroundings around Ms. Houston, were you able to

15   determine whether she hit her head on anything?

16   *A.*  Not that -- nothing that I could easily see.  There was no

17   starring on the windshield, nothing else that stood out to me

18   that she got hurt bad.

19   *Q.*  After doing your initial assessment, do you do a brief

20   neurologic exam?

21   *A.*  Yes, sir.  Once the patient is extricated from the vehicle

22   and she's on the gurney, we can do more of a focused

23   assessment, where I can go over neurologic issues.

24   *Q.*  When you say "neurologic issues," what would you be

25   referring to?

Kenyon Henricks – Direct

1   *A.*  Neurologic issues that I would be referring to would be any

2   one-sided paralysis, any numbness or tingling that would denote

3   either a spinal injury, as well as her mentation, and how is

4   she mentating?

5   *Q.*  After doing that assessment, did you find anything of note?

6   *A.*  As far as any compromise to her spinal cord, no, I did not.

7   I did find that she was A and O times four -- awake and

8   oriented to person, place, time, and event.  But I did note

9   that she was slow to respond to my questions.

10  *Q.*  When you say "slow to respond," what do you mean by that?

11  *A.*  Sir, I mean, like, as you and I are conversing now, you're

12  asking a question, I'm able to come up with an answer right

13  away and have a conversation, versus asking a question -- you

14  know, do you know your name -- there being a long pause, that

15  would be abnormal for her -- or the patient to be thinking of

16  their name.

17  *Q.*  Was she complaining of any specific problems that she

18  thought she was having as a result of the collision?

19  *A.*  May I look at my report again?

20  *Q.*  If it will help you remember, look at your report; and I'll

21  reask the question.

22  *A.*  Thank you, sir.

23  *Q.*  Does that help you remember?

24  *A.*  Yes, sir.

25  *Q.*  Was Ms. Houston making any complaints to you about any

Kenyon Henricks – Direct

1   condition she might have after the collision?

2   A.  Yes, sir.  She was complaining of light-headedness, as well

3   as feeling lethargic, which she stated was abnormal for her.

4   She was also complaining of pain in that right ankle, as well

5   as her right hand as being -- said to be stiff.

6   Q.  One more series of questions here, Mr. Hendricks.  What --

7   you've arrived on scene at a car collision.  Did you get a

8   sense of the impact involved in this?

9   A.  Yes, sir.  Looking just at the front of her vehicle, there

10  was moderate damage to it; and the speed limit on that road

11  right there is about 35 miles an hour, I believe.  So just

12  combining those factors together to kind of give an idea of the

13  mechanism of injury that could have been sustained.

14  Q.  Arriving on the scene, seeing a bone sticking out of her

15  leg, you said -- you indicated earlier in your testimony that

16  you had taken her vitals.  Were her vitals indicative of

17  Ms. Houston being in shock after that kind of collision?

18  A.  No, sir, they were not.  They were all stable, within their

19  normal ranges.  But the vital signs you'd be looking at more of

20  like a physiological shock, either response to blood loss or

21  some sort of injury that I was unable to detect.  Her vital

22  signs were stable at that time.

23      MR. OGBORN:  I have no further questions,

24  EMT Hendricks.  You're doing a really good job for your first

25  testimony.

Kenyon Henricks – Cross

1          *THE WITNESS:*  Thank you, sir.

2          *MR. OGBORN:*  The USAO is going to ask you some

questions now.

4          *THE WITNESS:*  Thank you.

5                      **CROSS-EXAMINATION**

6    *BY MS. BOBET:*

7    *Q.*  Good morning.

8          *COURTROOM DEPUTY:*  You need to increase your volume on

your end or speak closer to your mike.

10         *MS. BOBET:*  We're as close as we can get.

11         *THE COURT:*  I can hear you now.

12         *MS. BOBET:*  I'll try to project.

13   *BY MS. BOBET:*

14   *Q.*  I'd like to turn your attention to a document that has been

marked as Exhibit 52, which is stipulated and has been

16   admitted.

17         Ms. Robinson, can you pull up Exhibit 52 on this page.

18         Do you recognize this?

19   *A.*  Nothing is showing on my screen --

20         *THE COURT:*  I have it now.

21   *BY MS. BOBET:*

22   *Q.*  Do you recognize this?

23   *A.*  Still nothing.

24         There we go.  It's really pixelated.

25   *Q.*  Sorry about that.  We're doing what we can with the

Kenyon Henricks - Cross

1    technology.

2    *A.*  No worries.

3    *Q.*  Are you able to see it sufficiently to recognize it?

4    *A.*  Yes, ma'am.  I believe it's the house.

5              *MS. BOBET:*  It should be Exhibit 2.

6              Plaintiff's counsel, are you possibly still sharing

7    your screen?  If so, can you take that down so we can share

8    ours?

9              *THE WITNESS:*  We do have a hard copy of it.

10             *MS. BOBET:*  Should be a copy of an EMS patient care

11   report.

12             *MR. OGBORN:*  We have Exhibit 52 up on our screen.  Is

13   that what you're showing?

14             *MS. BOBET:*  Yes.

15             *MR. OGBORN:*  Okay.

16             *MS. BOBET:*  Everybody can see it okay?

17   *BY MS. BOBET:*

18   *Q.*  Mr. Hendricks, can you see it all right?

19   *A.*  No, ma'am.  We're still looking at Exhibit 2, but I do have

20   a hard copy of my PCR with me.

21   *Q.*  I'll ask you to use the hard copy for expediency sake.

22   I'll try to be clear about what part of that I'm talking about.

23             Do you recognize this as the report you wrote in

24   connection with this accident?

25   *A.*  Yes, ma'am.

Kenyon Henricks – Cross

1    Q.   Okay.  I'd like to refer you to page 2 of that document.

2    Towards the middle of the page, under the treatments and

3    assessments section -- and I think you might have mentioned

4    this before, but it went by me a little fast.  I want to make

5    sure that I have it.  I see the acronym, AVPU, awake and alert.

6    Did I read that correctly?

7    A.   Yes, ma'am.  The AVPU would be awake, verbal, painful

8    stimuli, or unresponsive is that acronym that it's stating

9    there.

10   Q.   So Ms. Houston was awake and alert?

11   A.   Yes, ma'am.

12   Q.   And on that same document, page 3, in the paragraph that

13   begins with an L, and then a colon.

14   A.   Yes, ma'am.

15   Q.   About halfway through that paragraph, I see another

16   acronym, which is HEENT.  It says "clear without signs of any

17   trauma."  Do you see that?

18   A.   Yes, ma'am.

19   Q.   What does HEENT refer to?

20   A.   Head, eyes, ears, nose, and throat.

21   Q.   So if a person has -- where it says here, "HEENT, clear

22   without any signs of trauma," what does that refer to?

23   A.   During my assessment, feeling around the top of her head,

24   at that time I was unable to tell any depressions, hematomas,

25   or any sustained trauma to her head.

Kenyon Henricks – Cross

1    Q.   Okay.  So you didn't see any trauma to Ms. Houston's head?

2    A.   No, ma'am.

3    Q.   In the same place in the report, the next phrase, "Eyes,

4    PERRL at MM."  Did I read that right?

5    A.   Yes, ma'am.  It was a typo.  There is supposed to be a

6    number in front of at MM, which stands for millimeters.

7    Q.   What does PERRL stand for, first?

8    A.   Pupils equal, reactive to light -- round and reactive to

9    light.

10   Q.   And what is that used to assess?

11   A.   We can assess -- excuse me -- we use it to assess whether

12   there would be a head injury.  A good indication of a severe

13   head trauma would be either pupils not reacting to light,

14   they're round, or you could have what we call a blown pupil,

15   where one is significantly larger than the other side.  So

16   those are all things that we can look for for very severe head

17   trauma.

18   Q.   And you didn't see any of those for Ms. Houston; right?

19   A.   According to my report, ma'am, no.

20   Q.   Okay.  And I just want to be clear.  You didn't find --

21   when you examined Ms. Houston shortly after the accident, you

22   didn't find any evidence of neurological deficits; is that

23   right?

24   A.   Other than her being slow to respond to questions that I

25   was asking, no.

Kenyon Henricks - Cross

1  Q.  Okay.  I see in the report here that you filled out, the

2  sentence that we've highlighted here, "no neuro deficits

3  noted."  Did I read that correctly?

4  A.  Yes, ma'am.

5  Q.  Okay.  On that same page, the paragraph that begins with

6  "S."  What information is in this paragraph?

7  A.  That would be subjective, so anything that I was told.

8  Q.  So information in this paragraph are things that

9  Ms. Houston told you?

10 A.  Yes, ma'am.

11 Q.  Okay.  About halfway or a third of the way through that

12 paragraph I see a phrase, "states that she did not hit her head

13 or have a LOC."  Did I read that right?

14 A.  Yes, ma'am.

15 Q.  So shortly after the accident, Ms. Houston told you that

16 she did not hit her head; right?

17 A.  Yes, ma'am.

18 Q.  Also looks like she told you that she did not have a loss

19 of consciousness?

20 A.  Uh-huh.

21 Q.  One moment, please.

22        She was able to respond to your questions verbally;

23 right?

24 A.  Yes, ma'am.

25 Q.  That's where all the information in this S paragraph came

Kenyon Henricks - Cross

1   from, was Ms. Houston verbally responding to your questions?

2   A.  Yes, ma'am.

3   Q.  All right.  And after December 1, 2016, did you treat

4   Ms. Houston again ever?

5   A.  I do not believe so.

6   Q.  So you don't have any knowledge of her condition after the

7   date of her accident?

8   A.  No, ma'am.

9   Q.  Or functioning after the date of the accident?

10  A.  No, ma'am.

11  Q.  That's all I have.  Thank you very much.

12  A.  Thank you.

13          MR. OGBORN:  Your Honor, I have no redirect.

14          THE COURT:  Thank you very much for your testimony.

15          And may this witness be excused?

16          MR. OGBORN:  We would ask that the witness be excused,

17  Your Honor.

18          THE COURT:  Does the government agree?

19          MS. BOBET:  No objection, Your Honor.

20          THE COURT:  All right.  You're excused.  Thank you

21  very much for your cooperation in this case.  I know it's

22  difficult dealing with this on teleconference, but we all have

23  to put up with it, and I appreciate your effort.  Thank you.

24          THE WITNESS:  Thank you, sir.

25          MR. SHAPIRO:  Your Honor, we are now calling Dr. Adam

Adam Cota, M.D. - Direct

64

1   Cota.

2           THE WITNESS:  Hello.

3           MR. SHAPIRO:  Can you hear us, Dr. Cota?

4           THE WITNESS:  I can hear you.  Can you hear me?

5           MR. SHAPIRO:  We can.

6           THE WITNESS:  Perfect.

7           THE COURT:  Will you swear him in, please.

8           (**ADAM COTA, M.D., PLAINTIFF'S WITNESS, SWORN**)

9           COURTROOM DEPUTY:  Please state your name and spell

10  your first and last name for the record.

11          THE WITNESS:  It's Adam Gary Cota.  Last name is

12  spelled C-O-T-A.

13          MR. SHAPIRO:  May I proceed, Your Honor?

14          THE COURT:  Yes.

15                      **DIRECT EXAMINATION**

16  BY MR. SHAPIRO:

17  Q.  Dr. Cota, thank you for doing this in this unusual and

18  unique way.  And this is your first time testifying, isn't it?

19  A.  Yes, it is.

20  Q.  Well, it will be a little different next time.

21          Can you tell us your professional address, please.

22  A.  Yeah.  It's 627 25 1/2 Road, Grand Junction, Colorado.

23  Q.  What is your profession, sir?

24  A.  I'm an orthopedic trauma surgeon based out of St. Mary's

25  Hospital in Grand Junction, Colorado.

Adam Cota, M.D. - Direct

1   *Q.*  How long have you been an orthopedic surgeon, Doctor?

2   *A.*  Four years.

3   *Q.*  When did you complete your fellowship training to be an

4   orthopedic surgeon?

5   *A.*  That was the end of July 2016.

6   *Q.*  Can you describe your practice, what your practice entails.

7   *A.*  Yes.  In a typical week, I cover day call as well as

8   evening call at the hospital.  So that's for any acute trauma

9   patients that come in, I'm responsible for assessing those and

10  managing those as they arrive.  I also have roughly two days of

11  clinical practice, where I'm seeing new patients that are

12  non-urgent, as well as performing clinical follow-up.

13  *Q.*  What specialties do you have within orthopedic surgery?

14  *A.*  My subspecialty focus is orthopedic trauma, as well as foot

15  and ankle pathology.

16  *Q.*  How much foot and ankle -- how much does foot and ankle

17  care make up your practice?

18  *A.*  So within the realm of trauma, it's fairly substantial.

19  You know, for all the traumatic injuries I see, it's probably

20  close to 40 percent that I'm dealing with traumatic injuries to

21  the foot and ankle.  For an elective foot and ankle practice,

22  it's probably, you know, around 5 to 10 percent of what I do.

23  *Q.*  Can you provide your educational background, please.

24  *A.*  Yes.  So I -- I'll start with medical school.  I completed

25  medical school at the University of British Columbia in 2009.

Adam Cota, M.D. - Direct

1    Did my orthopedic surgery residency, which I completed in 2014,

2    at McGill University in Montreal, Canada.  I did a six-month

3    fellowship in foot and ankle surgery at Mount Sinai Hospital in

4    New York.  I did a one-year fellowship in orthopedic trauma at

5    OrthoIndy in Indianapolis, Indiana.  And then I've been working

6    at my current job since I finished fellowship.

7    Q.   And that was in 2016?

8    A.   That's correct.

9    Q.   Has your practice changed at all since 2016?

10   A.   No.  The relative proportions of what I do and my roles and

11   responsibilities remain the same.

12   Q.   Are you board certified?

13   A.   Yes.  I'm board certified in the United States and in

14   Canada.

15   Q.   And what are you board certified in?

16   A.   Board certified in orthopedic surgery in both countries.

17   Q.   Are there any board certifications with regard to foot and

18   ankle, or is that just included within?

19   A.   That's included.  There is no subspecialty certifications.

20        *COURTROOM DEPUTY:*  I'm sorry to interrupt.  But

21   somebody is not muted.  We hear a lot of laughing in the

22   background.  So people need to check their microphones.  If

23   you're not speaking, you need to be on mute.

24        I'm sorry, counsel, go ahead.

25

Adam Cota, M.D. – Direct

1  *BY MR. SHAPIRO:*

2  *Q.* With regard to the board certification, I'm not sure we

3  caught that.  So is there no specialty or board certification

4  with regard to foot and ankle?

5  *A.* No.  There is no further certification for either

6  orthopedic trauma or foot and ankle surgery.

7  *Q.* How did you become involved in the care of Ms. Houston?

8  *A.* Ms. Houston initially came to our facility as a trauma

9  patient.  She was evaluated and managed by a colleague of mine.

10 Her care was then handed over to myself, as I was -- had the

11 most expertise in the foot and ankle region, to provide

12 definitive management for her injuries.  So it was a relatively

13 standard handover, as how to our trauma service works.

14 *Q.* And who was the colleague that handed her over to you?

15 *A.* That was Dr. Mary Beth Deering.

16 *Q.* And when did that occur, if the accident was on the 1st of

17 December, 2016?

18 *A.* Essentially, the same day I received an email note,

19 indicating the details of her injury and asking if I would take

20 over management.

21      *MR. SHAPIRO:* At this time, Your Honor, I'd move the

22 admission of Dr. Cota as an expert in medicine with a specialty

23 in orthopedic surgery and a subspecialty in orthopedic foot and

24 ankle pathology.

25      *THE COURT:* Any questions you have for voir dire?

Adam Cota, M.D. - Direct

1          *MR. SCARPATO:*  No objection, Your Honor.  No.

2          *THE COURT:*  Okay.  The witness is qualified as an

3     expert in the fields of orthopedic surgery, with a subspecialty

4     in foot and ankle pathology.

5          *MR. SHAPIRO:*  Thank you, Your Honor.

6     BY MR. SHAPIRO:

7     *Q.*  Dr. Cota, I had asked you to bring an ankle and foot model.

8     Do you have that?

9     *A.*  Yes, I do.

10    *Q.*  Great.  Could you give us a little bit of an anatomy lesson

11    as it relates to what happened with regard to Ms. Houston?

12    *A.*  Sure.  I don't know how well this is going to show up.

13          So this is, basically, a foot and ankle model.  The

14    inside portion of the ankle is here, the outside is here, so

15    this is the tibia bone.  This is the fibula bone here.  And

16    this bone here is the talus, so this is the bottom part of the

17    ankle joint, and this space in here is the ankle joint.

18          Essentially, what happened with Ms. Houston is, there

19    was a load into the bottom of her foot, and her foot moved in,

20    basically, to the inside this way, which you'll see on the

21    X rays.  So you can see these two bones contacted each other.

22    And there is pulling on the ligaments on this side, which

23    caused the skin to fail, and it opened.  That's when you read

24    about the open fracture, the skin got pulled on so hard that it

25    failed in tension.  And the ligaments on this side got

Adam Cota, M.D. - Direct

1   basically pulled so hard that they failed, as well.  So that

2   was the primary motion that occurred at the time of her injury,

3   if that's helpful.

4   Q.  Keep that in front of you for a second.  I want to ask you,

5   where were the fractures?  I know we're going to see the

6   X rays.  And if you can, put it more to the middle of the

7   screen.

8   A.  Okay.  How's that?

9   Q.  Can you --

10  A.  Yeah.  So there is -- the primary fractures were over here,

11  a lot on this side on the talus.  So the wall on this side of

12  the joint was basically shaved off or sheared off and

13  comminuted, which means lots of small pieces.  And that

14  primarily occurred in this region.  And then this bone -- this

15  is the medial malleolus, or the inside.  That is just the

16  anatomic description of this bone.  And when these two

17  collided, this got broken into small pieces; and that's

18  primarily what I fixed with the plates and the screws.  So the

19  majority of the bony injuries were on the inside of the medial

20  side.

21  Q.  Explain if you would the cartilage and the ligament damage

22  and where that was and how that occurred.

23  A.  So ligament damage was on both sides here.  So if you look

24  on the outside, there is -- ligaments hold two bones together

25  so they don't move apart, the two main ligaments on the

Adam Cota, M.D. - Direct

1    outside, as the foot moved inwards, they got pulled apart and

2    torn, essentially.  On the inside part here, again, was the

3    ligament that joins these bones together.  As this moved up and

4    all of those bones got broken, the ligaments attached onto the

5    bone.  And because the bone was broken, those ligaments

6    essentially got injured at the same time.

7            The cartilage injuries, the lining of the joint

8    injury, was primarily along the inside part of the talus here,

9    as well as part of the inside of the medial malleolus on this

10   side.

11   Q.  Was the cartilage torn off of the bone?

12   A.  It was you can call it sheared off or shaved off.  Mary

13   Beth kind of comments on that.  And certainly when I look at

14   it, you basically have bare bone with none of that white smooth

15   lining over it.  That is what was removed at the time of the

16   injury.

17   Q.  Can you explain to the Court what the purpose of cartilage

18   and ligament is so that we have an understanding of sort of how

19   it all comes together and what it's supposed to do?

20   A.  Sure.  So ligaments join two bones together to prevent them

21   from moving apart and holding them in a normal anatomic

22   alignment.  So when you start to damage the ligaments, then you

23   start to get more play between the bones, and they can move

24   into positions that they aren't supposed to.

25           Cartilage is the lining of the joints, so on this

Adam Cota, M.D. - Direct                                            71

1    model, it would be the top of the talus here and the bottom

2    part of the tibia, here, as well as the sides here, which are

3    the smooth lining of the joints.  So there are cells that live

4    on the top of the bone that provide for a smooth gliding

5    between the two bones to allow your joints to function

6    correctly.

7    Q.  Does it allow the cartilage for padding or shock

8    absorption?

9    A.  There is a degree of that within the cartilage, but it's

10   not sort of -- thick enough to act as a primary shock

11   absorption mechanism, but certainly does play a role of that.

12   Q.  Okay.  Explain what happens in a high-speed crash to the

13   foot when it's on a gas pedal like happened here.

14   A.  Yeah.  So as the vehicle decelerates and the occupant moves

15   forward in the vehicle -- typically in head-on-type collisions,

16   you also get intrusion of the firewall and the dash into the

17   driver's space.  So as that happens, the foot pushes down.

18   Depending on what position the foot adopts is typically how we

19   get different injury patterns.  So as the foot pushes down on a

20   brake, if it folds over or goes, you know, basically in --

21   sorry -- inwards like this, and as the force keeps going, then

22   you're basically going to force the foot to keep moving inwards

23   as the occupant moves forward.  So it's a very kind of violent

24   mechanism.  You know, if you just do this stepping off the

25   curb, you're going to end up with an ankle sprain.  If you're

Adam Cota, M.D. - Direct

1    doing it with the forces involved with a motor vehicle

2    collision, then it's a quite more substantial force.  That's

3    what happened for her.  The foot would have turned inward.

4    Again, I don't know if it's on the pedal where it happened, but

5    it just continued to get pressed on enough, you know, that the

6    subsequent injuries occurred.

7    Q.  By any chance, does that model that you have with you go up

8    to the knee?

9    A.  Yes, it does.

10   Q.  Great.  Good.  Can you show us the kneecap mechanism or

11   patella anatomy and what occurred?

12   A.  Yeah.  So, basically, I have half a knee, unfortunately.

13   Q.  Okay.

14   A.  But this is the bottom part of your knee joint, and you can

15   see the kneecap, your patella right here.  So you can imagine

16   the end of your femur would be sitting up here.  There is a

17   tendon that attaches onto the kneecap and one that attaches

18   here.  It basically acts as a fulcrum.  So when you bend your

19   knee and the muscles pull on this bone, it actually increases

20   the amount of leverage that you can generate.  So that's its

21   role.  It's basically contained in a tendon and helps amplify

22   the force that your muscles apply to your knee joint.

23   Q.  What happened to the patella or kneecap in this crash to

24   Ms. Houston?

25   A.  She had -- I'm sorry.  My apologies.

Adam Cota, M.D. - Direct

1          So she had a transverse or a fracture that basically

2     came across.  These injuries typically are what we call

3     dashboard injuries, when you start to get injuries at the level

4     of the knee.  And they can present in a variety of different

5     fracture patterns or injury patterns.  I suspect she had direct

6     contact with her patella on some aspect of the vehicle's

7     interior.  That was enough force to cause this transverse

8     fracture to her patella, this kind of crossways failure of the

9     bone.

10    Q.  Okay.  Thank you.

11    A.  Yes.

12    Q.  When did you first see Ms. Houston?  We know the crash was

13    on the 1st?

14    A.  Yes.

15    Q.  We know Dr. Deering saw her the first day, and I'm going to

16    ask you about that.  But when did you actually first see her?

17    A.  I believe it was the morning of surgery.  I'd have to check

18    my notes.  I don't think I saw her on the 5th.  I think I saw

19    her on the day of surgery, which is typically how patients get

20    handed over.  So it's -- to see how the swelling is, because

21    that's the prime driver after injuries that are this severe, as

22    to when the skin -- soft tissues around the bones are ready to,

23    you know, proceed to the final surgery, the definitive surgery.

24    So I would have seen her just shortly before surgery, and

25    that's to make sure that she was ready to proceed.

Adam Cota, M.D. - Direct

1   *Q.*  And that would have been on December 5, 2016?

2   *A.*  I believe, yes, it was.

3   *Q.*  So roughly four to five days post-crash?

4   *A.*  Correct.

5   *Q.*  Okay.  Did you review the records from the initial ER

6   hospitalization and surgery?

7   *A.*  Yes.

8   *Q.*  Did you rely upon those records in your evaluation and

9   assessment of Ms. Houston?

10  *A.*  Yes.

11  *Q.*  What did Dr. Deering do, and why did she do what she did?

12  *A.*  So when these types of injuries present -- and what I mean

13  by "these types of injuries," I'm talking about a high-energy

14  injury to some part of the musculoskeletal system.  In this

15  case, it was at the level of the ankle -- there is also failure

16  of the soft tissues over the bone.  So we have a traumatic cut

17  in the skin that goes down and communicates with broken bone,

18  so that's what we call an open fracture.  We used to call them

19  compound fractures.  So for that particular scenario, the

20  standard of care is to basically reduce the joint.  So if you

21  look at the X rays, her foot had moved to such a position that

22  the ankle joint was dislocated, so it's what we call a

23  fracture -- broken bone -- plus a dislocation, which means the

24  joint is moved out of place.  The standard of care is to reduce

25  that joint, hold it in that position with an external frame.

Adam Cota, M.D. - Direct

1    So we know if we try and put this in a splint or a cast, there

2    is higher rates of the skin dying, and there is also higher

3    rates of the joint re-dislocating.  So that's the reason we use

4    these external frames.  That's standard of care.

5         We also go in and wash up the joint, because that

6    traumatic wound went into the ankle joint, so we want to wash

7    out any contamination of that.  And at the same time, if there

8    is exposed bone that has been broken, we want to clean that up

9    and decontaminate that, as well.  That's essentially what

10   Dr. Deering did in her initial surgery.

11   Q.  And why did you have to wait four to five days before you

12   went in?

13   A.  If you look at the orthopedic literature comparing early

14   treatment of these injuries to delayed or staged treatment,

15   where you put a frame on and then you wait for the inflammation

16   to come out of the limb and then proceed with your definitive

17   surgery, there is lower rates of wound-healing complications.

18   So if you try to operate on something that is really swollen,

19   that's just been injured, it's very difficult to get the skin

20   to heal well or in a sort of normal fashion.  It's often

21   delayed with higher rates of infection.  So that's the reason

22   for the delay.  We just know from experience and from studies

23   that have been performed that the outcomes are better in terms

24   of soft tissue healing when these surgeries are delayed until

25   it's ready.

Adam Cota, M.D. - Direct

1   Q.  What is Ms. Houston doing during those four to five days?

2   What position is she in?  What is going on?

3   A.  She's hospitalized so we can give her antibiotics, manage

4   her pain, and watch how her skin -- her soft tissue envelope

5   evolves during that period of time.  For the majority of the

6   time, she's in bed, elevating the limb as much as possible,

7   icing to try and promote resolution of the swelling so that we

8   can get on with her definitive surgery.

9   Q.  Would you explain the degree of severity of this injury to

10  the right foot and ankle.

11  A.  In terms of degree of severity, I would call it severe.

12  It's --

13  Q.  Why?

14  A.  -- a substantial, high-energy injury to the foot and ankle

15  region with, you know, injury to the cartilage, soft tissue

16  structures around the ankle, as well as an open traumatic wound

17  overlying the joint and fractures.

18  Q.  How about the injury to her right knee?

19  A.  In terms of severity classification, I would classify that

20  as moderate.

21          MR. SHAPIRO:  Let's look at Exhibit 15.

22          Your Honor and defense, this is sort of a summary of

23  the X rays that we sent over to the Court.  And I believe

24  Dr. Cota has the ability to bring those up and go through those

25  for us.

Adam Cota, M.D. - Direct

1          THE WITNESS:  Yes.

2          MR. SHAPIRO:  And I believe -- and I want to make

3   sure, Mr. Scarpato -- I think these have been agreed to be

4   admitted into evidence.

5          MR. SCARPATO:  Yes.  These are stipulated.

6          THE COURT:  Admitted.  Please go ahead.

7          (Exhibit 15 admitted.)

8          MR. SHAPIRO:  Thank you?

9          THE WITNESS:  I have Exhibit 15, so I can just open

10  that up here.

11         Can you see this?

12  BY MR. SHAPIRO:

13  Q.  We can.

14  A.  Okay.

15  Q.  All right.  What is the date on that X ray?  And that is

16  15, page 1.

17  A.  Yes.  So this is December 1, 2016 --

18  Q.  Let me ask this question:

19         Your Honor and defense, can you guys see this, as

20  well?

21         THE COURT:  Us guys can see it well.  Thank you.

22         MR. SHAPIRO:  Thank you.  Sorry, Your Honor.

23         Defense, can you see it, Bill?

24         MR. SCARPATO:  We do have it.  Yes.  Thank you.

25         MR. SHAPIRO:  Thank you very much.

78

Adam Cota, M.D. - Direct

1   *BY MR. SHAPIRO:*

2   *Q.*  Please, Doctor, can you explain, what's the date and when

3   was this?

4   *A.*  Yes.  This was December 1, 2016, at 11:14 a.m.  So pages 1,

5   2, and 3 here are the initial X rays that were taken when

6   Ms. Houston came into the emergency department.  And these are

7   documenting primarily her ankle injury.

8        So this first page is looking at it from the side.  So

9   hopefully you can see my mouse pointer.  So the toes are down

10  here, this is the heel here, you can see the soft tissue

11  outlined here, and we're looking at the foot from the side.  So

12  this is kind of the model I was showing.  Here is the end of

13  the tibia.  The fibula is overlapped in behind this, and you

14  can see kind of the overall shape of the talus.  That's the

15  bone that makes up the bottom part of the ankle.

16       So what I see here is the ankle joint is not looking

17  normal.  There should be a nice space through here, and we'll

18  see it on later X rays.  There is all of these little pieces of

19  bone, here, here, here.  So this has an abnormal-looking

20  appearance to it, looking from the side.  The other thing is

21  this dark area here is gas in the soft tissue.  So that means

22  you have an opening in the soft tissues, and air has gotten

23  in -- somehow into the skin and fat overlying the joint.

24       Can I proceed with the next two?

25  *Q.*  Certainly, Doctor.  Thank you.

Adam Cota, M.D. – Direct

1   *A.*   Okay.  This view I think is a little more useful.  So this

2   is December 1, 2016, 11:10 a.m.  This is looking at it from the

3   front.  So here is your tibia.  This is that medial malleolus

4   that I was talking about, the one that got injured.  Here is

5   the fibula, so that is the small bone on the outside.  You can

6   see a little flake of bone here.  Okay.  Her traumatic wound

7   was basically over here, I think 8 centimeters, as Dr. Deering

8   described.  That communicated with the joint and with this

9   little piece here.

10         The big thing is, this is her talus.  This surface

11   right here should parallel this surface here.  You can see it's

12   turned counterclockwise almost 70 degrees, and that is the

13   dislocation part.  This is the top of the bone.  It should be

14   under here, so you can see how far her foot is turned in.  And

15   then on this side, this is just kind of crunched here.  You can

16   see all the little pieces, pieces here, pieces here, pieces

17   here.  So this bone has come up and hit the medial malleolus

18   and crushed it, and that's why it's comminuted -- or has small

19   fragments.  You can imagine the ligaments that attach these two

20   bones, they normally attach way down here.  So they've

21   obviously gotten stretched to the point of failure because of

22   how far this bone has moved in.

23         I'll just go to the last one.  It's, again, similar

24   kind of picture.  It's just a little bit different rotation.

25   But, again, you can see how the talus has basically rotated

Adam Cota, M.D. - Direct

1    almost 90 degrees.  And this is the joint surface of her

2    ankle -- the bottom part of her ankle, which should be here.

3    And, again, it just lets you see all of these little small bone

4    pieces.  You can see the fracture through here on the medial

5    malleolus.  And, again, there is all these little pieces that

6    are inside the ankle joint.  And these came off the talus, as

7    was described in Dr. Deering's operative note.

8    Q.  Is this a challenging day for you, when you have to put

9    this back together again?

10   A.  Yeah, this is a challenging case.  That's primarily why

11   these come to me to fix, because you're looking at several

12   considerations.  This isn't just a pure bony injury; there is

13   also soft tissue injuries around that.  So there is defects in

14   the skin that you need to get closed and healed.  There is

15   ligamentous damage, so those ligaments need to get repaired and

16   restored to provide stability to the joint itself.

17   Q.  Okay.  Let's go to the next page, which would be page 4 in

18   Exhibit 15.

19   A.  Yeah.  So this is dated December 1, 2016, at 11:51 a.m.  So

20   this is a side view of the knee.  On my model, I had this bone

21   here, the top of the tibia, and then kneecap here.  And then

22   this is what we're missing on my model, so this is the end of

23   the femur.

24        But you can see, here is the kneecap here.  It has

25   cartilage on the back side of it.  So there is cartilage on

Adam Cota, M.D. - Direct

1    this surface of the knee joint.  So there is actually -- you

2    consider it a joint between your patella and the femur.  They

3    both have cartilage here.  And you can see this dark area right

4    here.  That's the break in the bone.  That's the fracture

5    through there.  So you can see it's kind of distracted or

6    displaced.  There is a bit of a gap there.  And then there is

7    this -- the shadow here is a tendon that attaches the bottom

8    part of the patella to the tibia, and your quadricep muscles

9    would attach onto the top pole of this bone.

10   Q.  I have a question about the cartilage underneath the

11   patella.  Can you tell if it's damaged by looking at this, or

12   can you tell us if it was damaged when you repaired it?

13   A.  It will be damaged and was damaged at the area where the

14   fracture, the break, is.  You can imagine as this comes

15   through, there is substantial injury to break the bone.  The

16   cartilage on either sides of this break get injured, so they

17   get -- you know, it's a traumatic disruption.  It's not a nice

18   gentle mechanism, so the edges will get peeled off the bone to

19   some degree.  For a lot of these, it's still adherent, so it

20   still sticks on the bone, but you're going to have a crack or a

21   fissure in the cartilage even after surgery.  Typically what

22   will happen is that will fill in with a scar type of cartilage,

23   hyaline cartilage.  But that's not as durable as what you were

24   born with.  It's not as strong as your native cartilage, with

25   that lining.

Adam Cota, M.D. - Direct

1    So, yeah, these will get injured to some degree.

2  Sometimes if it's higher energy, the cells that make up the

3  cartilage can get injured beyond just where the fracture is.

4  You know, you can get a lot of inflammation, a lot of energy

5  goes into those, and those cells just don't survive over time.

6  Q.  What is the significance of that cartilage damage

7  clinically or function-wise for a person?

8  A.  Depending on the degree of how much cartilage is damaged

9  from the initial injury, that dictates a lot of what the early

10  consequences are.  For this type of injury, you know, where

11  you've just got a crack through the cartilage, people do

12  typically quite well.  If it's a really higher energy injury

13  than what we see here for the kneecap injury and you're missing

14  lots of cartilage, then those types of patients typically don't

15  have a very good post-operative course because they have

16  early -- early pain or, you know, early chronic anterior knee

17  pain that just doesn't go away.  Cartilage loss, any time

18  you're talking injury to cartilage in a joint, the more it's

19  injured, I would say the worse the prognosis is long-term.

20  Q.  Okay.  Let's move on to the next page -- what are we at, 4?

21  A.  This would be 5.

22  Q.  All right.

23  A.  This is another view, X ray of the knee.  It's a little bit

24  hard to see there.  I don't think it's necessarily as useful.

25  But here is the kneecap.  And you can see there is this dark

Adam Cota, M.D. - Direct

1   line -- I don't know if this shows up for you -- that's where

2   that fracture, that break, goes through the bones.  We're

3   looking at this from the front, as if Ms. Houston is facing us.

4   It's just the bones overlap here, so it's a little bit harder

5   to see that fracture.

6   Q.  Thank you.  Page 6.

7   A.  So these are the X rays taken from Dr. Deering's surgery.

8   So this is December 1, 2016, at 1:49 p.m.  And she's got the

9   external fixator or the external frame on already and reduced

10  the ankle joint.  So this is more normal appearing.  It's still

11  abnormal, but you can see the position of the talus here.  So

12  this is the joint surface, and now it's sitting up under here.

13          Can I go back to one of the earlier ones, like No. 2?

14  Q.  Sure.

15  A.  Just to highlight the difference.  So if I scroll up, you

16  can kind of see the position of the bone here.  This is the

17  top -- right -- which should be under here.  So if you look at

18  the position of this bone, and this is the top, and we go back

19  down after Dr. Deering has put the frame on it, the top is now

20  under this bone.  So she's basically rotated the foot almost

21  90 degrees and reduced the joint.

22          That little piece of the fibula that we saw earlier is

23  basically right here.  And you can see once you get the joint

24  lined up, these bony pieces tend to want to go back to where

25  they belong.  But over here, I'd like to see this space

Adam Cota, M.D. - Direct

1    continue.  And as we get down here, there is little bone

2    fragments here, there is bone fragments here, there is bone

3    fragments here; and the shape of this medial malleolus is not

4    normal.  The curve is rather appropriate, but the bottom part

5    seems to be missing, and that's these little pieces down here.

6    Q.  Show the external fixator in that so that we have an

7    understanding of what --

8    A.  Yeah.  This -- this big black thing is basically the clamps

9    and pins that went into the bottom part of the foot.  You can

10   see these kind of two shadows here that look like bars.  Those

11   are carbon fiber bars, and they were connected to two pins up

12   in the tibia.  So there would have been -- if I go back to this

13   film -- if we go back up the leg a little bit, there would be

14   two pins that go from front to back through the tibia, a little

15   high up.  You can see this carbon fiber bar here.  That's what

16   those attach to.  So you're basically applying force along

17   those bars and distract this or pulling on it to get the ankle

18   joint to reduce and keep it in the correct position.

19        And now when we look at it from the side, which is

20   this view, we can see we've got more space through the ankle

21   joint, as opposed to the initial films, where it was

22   dislocated.  And this is in a good position, and now we just

23   wait for the soft tissues to heal.

24   Q.  Okay.  If we can go to the next page.  This is now when you

25   got involved and your work on the 5th; correct?

Adam Cota, M.D. - Direct                                                                     85

 1   *A.*  Correct.  So this is December 6, 2016, at 4:28 p.m.  So,

 2   again, this is the front view of the ankle.  So here is the

 3   fibula, here is the tibia, and here is the talus.  So, again,

 4   we've got good position of the talus.  And now you can see a

 5   little bit of the difference from the last film.  This space

 6   here, this is joint space.  This is the gutter, this is

 7   cartilage in here, and we want to see that the same distance

 8   all the way across.  And now we have a gutter back on the

 9   medial side.  So those little pieces of bone that were sitting

10   down here, I lifted those up.  And there is very small plate

11   and screws, which is what this is, holding those broken pieces

12   here.

13           This little dark-appearing object is a suture anchor,

14   so it actually acts like a dart that goes into the bone.  These

15   little tabs here prevent it from being pulled out, these little

16   barbs.  And there is suture, so string that comes off of that,

17   that's nonabsorbable.  This, I needed to use to repair the

18   ligaments on the lateral side, this outside.  So there is a

19   ligament that runs from the fibula to the talus.  That was

20   repaired with this.  There is another one that runs from the

21   tip of the fibula down to the heel bone, the calcaneus.  That I

22   repaired directly with suture that does not go away.  So it's,

23   you know, string that will not be resorbed by the body.  On

24   this side, it was plate and screws to correct the bone, clean

25   out any little bits of bone in this joint.  And then the

Adam Cota, M.D. - Direct

1  ligaments that join the medial malleolus to the talus, I

2  directly repaired those.  So I took suture and sewed those so

3  they were back in their normal spot.

4  Q.  When you're putting in the plate and the screws, how do you

5  do that?

6  A.  So we basically are making a separate incision over this

7  area.  These get challenging because of the small pieces.  So I

8  actually use like a dental pick, like you use when you get your

9  teeth cleaned, to manipulate those pieces, because they're so

10 small.  The tiny little wires that are, you know, a millimeter

11 in diameter, they hold all of those pieces together.  And

12 that's temporary.  And then we basically fashion this plate, so

13 I bend this plate to the position that I want, put the screws

14 in to hold all those little pieces, and then take those

15 temporary wires out.

16        On this side, primarily working through the open

17 laceration that was already there, with additional incisions as

18 needed to get it in the correct position.

19 Q.  Are you using a drill or a screwdriver?

20 A.  Yep.  So these will be drilled first and then inserted with

21 a screwdriver, basically, pliers to bend the plate.  This has

22 its own insertion device, so it's basically a handle, you drill

23 a hole and push that in, and then the handle releases, you have

24 suture with needle attached to it so that you can sew up the

25 ligaments on this side.

Adam Cota, M.D. - Direct

1    Q.  Where was the cartilage damage you had to repair?

2    A.  So the primarily damaged areas were on this medial side

3    here.  Okay?  So this -- this was not able to be repaired.  So

4    Dr. Deering removed some of these free fragments here.  When

5    the cartilage is sheared off the bone, and the bone isn't

6    attached to the cartilage, and it's not big enough that you can

7    stick the bone piece with the cartilage over the top onto

8    something, then it's going to get basically removed.  And she

9    basically sheared off the cartilage, it's separated or

10   delaminated from the bone, and those pieces get removed.  If

11   they're left in the joint, they just cause irritation and more

12   damage.  So there is basically an area here where there is just

13   kind of this bare area of bone.

14          The other area was on the inside of this medial

15   malleolus.  This was kind of the area where you're trying to

16   put the bone pieces with the cartilage lining over top back

17   into position, and that is the reason for this fixation, is to

18   try to make this corner smooth again.  There is still some

19   cartilage here, but the bare area here, there is really not

20   treatments for that yet.  There will be scar cartilage that

21   fills in that area, that hyaline cartilage I talked about.

22   But, again, it's not as durable as what was traumatically

23   removed.

24   Q.  Was this a difficult repair?

25   A.  It's challenging.  I guess I see enough of these or things

Adam Cota, M.D. - Direct

88

1   that are a lot more difficult so it's not, you know -- for

2   myself, it's not excessively difficult; but it is -- it's

3   finnicky work, so it is relatively time consuming to get all of

4   these pieces lined up.

5   Q.  What is the effect of removing -- did you have to remove

6   small bone fragments?

7   A.  There would be some that were on this side.  And that's

8   where these two bones contacted and basically crushed each

9   other.  If -- they're not small enough to be fixed, so

10  everything I could fix would have been captured by this

11  construct of plates and screws on the inside.  If you just have

12  small little bits that are floating around, those have to come

13  out.  So those would be removed, and those were removed from

14  the ankle joint.

15  Q.  How does removing those small bone fragments contribute to

16  the development of post-traumatic arthritis?

17  A.  So you're -- any time you're left with a cartilage defect,

18  that's what is going to be one of the primary drivers to

19  developing arthritis in a joint.  So arthritis in a joint is,

20  essentially, the loss of cartilage, the loss of that smooth

21  lining.  So if you have a traumatic injury and you lose the

22  lining of a joint, essentially, you've already started that

23  process of, you know, having an abnormal lining of the joint

24  and abnormal loading mechanics, or how the force goes through

25  the joint.  Now you've got defects where you shouldn't have

Adam Cota, M.D. - Direct

1    defects.  And that increases the contact pressure that the

2    surviving cartilage sees as you go about your day-to-day life.

3            So, yes, that will fill in with some type of scar

4    tissue, scar cartilage, but that's not durable, and it doesn't

5    behave the same way as the native cartilage in the joint.  So

6    any time you have these injuries where the cartilage is lost,

7    you have bony loss in a joint, then the forces as they come

8    through the joint are no longer what we consider normal; and

9    that contributes to excessive wear and tear on the remaining

10   cartilage of the joint.

11   Q.  How long did the surgery take?

12   A.  Honestly, I don't remember.  I don't remember.

13   Q.  Okay.  Let's go to the next slide.

14   A.  Okay.  So I'm going to skip this.  This one is, again,

15   during the surgery; but it's before I repaired the lateral

16   side.  So that's No. 9.

17           This is No. 10.  So this is looking at the ankle from

18   the side.  So you can kind of see the shape, this T plate, the

19   suture anchor.  And then you can see here we've got a good arc

20   to the joint back.  So this is where there is cartilage, this

21   is that space here, and it's nice and symmetric all the way

22   through.  We kind of lose it on the X ray here, but we have

23   good restoration of the ankle joint itself.  If we look at

24   other joints in the foot and ankle here, this is the subtalar

25   joint -- so it's the joint below the ankle joint -- we have

90

Adam Cota, M.D. - Direct

1    good space through here.  Again, that's what we want to see.

2    And in front of the talus, again, we have good space through

3    the joint here.

4    Q.  Will you, please, with the alignment and how things came

5    back together.

6    A.  Yes.  These get challenging because you're dealing with all

7    of the small pieces.  So I felt that I -- you know, what was

8    given to me to work with, I got those pieces in good position.

9    I had good fixation of those pieces.  They were stable.  If you

10   look at the reduction or alignment of the ankle joint, I

11   thought that came back together really well, so we have good

12   space on all three sides.  And when you look at it from the

13   side, the talus -- this bone here -- sits underneath the tibia

14   like it should.  And I felt that the stability of the joint had

15   been restored with the ligament repaired so there is no play,

16   you know, between this bone and this bone.

17   Q.  Okay.  Can we go to the next slide.

18   A.  So this is December 6, 2016, at 2:35 p.m.  This is the

19   X rays I took during surgery for repair of the patella

20   fracture.  So this is that front view.  So it gets a little bit

21   hard to see; but, you know, the kneecap is essentially here.

22   And that break in the kneecap went across this way.  And you

23   can see I've got three screws here.  So these you'll notice

24   have threads on only one end.  The idea is those threads engage

25   in the superior pole, or this half of the bone.  And then this

91

Adam Cota, M.D. - Direct

1   part where it's smooth is allowed to slide and compress in this

2   half.  And then you can generate compression between the two

3   bones halves, which bones like.  It encourages their healing,

4   so that's the rationale for that.

5          What you can't see is, there is a thing called

6   TigerTape -- we used to use wire.  But it's heavy

7   nonabsorbable -- you can think of it like suture or tape.  It

8   goes inside these screws on the inside and outside and crosses

9   over.  It's what we call a tension band construct.  So as you

10  bend the knee, it tightens and presses against the suture, and

11  it generates additional compression across the fracture.

12         So I'll go to the next one, because you'll kind of see

13  it a little bit better.  This is December 6, 2016, at 2:37 p.m.

14  So this is page 12.

15         So here is our kneecap here.  You can kind of see the

16  fracture line that comes through here.  This dark line here is

17  the back side of the talus.  So we had good reduction on this.

18  That joint surface lined up.  And then you can see the three

19  screws essentially overlap from the side, so they're basically

20  compressing the two halves.  And then I have that tension band,

21  or that heavy suture tape, that goes over the front surface of

22  the patella.  So, again as the knee is bent, it causes

23  compression to develop across the fracture site.  Additional

24  kind of way to promote healing.

25  Q.  What damage or lack of damage did you see on the underside

92

Adam Cota, M.D. - Direct

1   of the patella to the cartilage?

2   A.  It's not documented in my operative notes, so it would have

3   just been from the fracture line here.  Typically, if there was

4   going to be more extensive document, that is something that I

5   would have documented in my operative notes.  So just would

6   have been, pretty much from what I can recall, the fracture

7   line coming through there and no big delaminated portions,

8   meaning the cartilage hadn't separated.  So essentially just

9   the disruption from where the fracture went through, and that

10  was it.

11  Q.  So her fractured patella wasn't as severe and didn't have

12  the damage that the --

13  A.  No.

14  Q.  -- ankle did?

15  A.  Sorry to interrupt.  No, it's not.  Like I said, this is

16  moderate severity, in that it required surgery to repair this.

17  But it's not -- not the same type of energy transmitted in this

18  fracture as to what happened with the foot and ankle.

19  Q.  Can we go to the last page.

20  A.  Yeah.

21  Q.  Tell us what that is and why it is different.

22  A.  Yeah.  So this is one slice from her CT scan that was

23  ordered by Dr. Waqqar Khan-Farooqi.  So this is dated March 5,

24  2019.  So, you know, this is a high-resolution 3-D image of the

25  foot and ankle.  And what I've done is, you know, we take

Adam Cota, M.D. - Direct

 1    slices every few millimeters, so this is one slice.  It's a

 2    little easier to see.  So it looks like the X ray.  You can see

 3    here the heel is here; the toes are down here at this end; and,

 4    again, we're looking at it from the side.  So this is the front

 5    of the tibia.  You can see the space that we saw earlier,

 6    that's the ankle joint.  This is that bone, the talus, that

 7    makes up the bottom part of the ankle.  You can see that

 8    subtalar joint I talked about earlier, which is underneath the

 9    ankle joint, and this talonavicular joint.  This really bright

10    white stuff here are my surgical implants.  So they're very,

11    very dense, so they show up like very dense bone, which is also

12    white, on these views.

13        The reason I chose this particular section or slice of

14    the imaging is because of what it shows in the ankle joint, as

15    well as the subtalar joint here -- I don't know if I can make

16    this a bit bigger.

17        What I'm looking at and what the radiologist comments

18    on is, you can see the distance here in the joint.  So, again,

19    there is cartilage there.  That's why we have that space.

20    You'll see as we move towards the front that the space here

21    gets narrower, so we're losing space here.  And that's

22    characteristic of arthritic change.  So it doesn't mean that

23    you've lost all the cartilage, but it starts thinning out and

24    getting thinner.  And so you'll start to see this asymmetric

25    narrowing of the joints.  So it's wider here, we have good

Adam Cota, M.D. - Direct

1    cartilage, healthy cartilage here.  As we're getting towards

2    the front of the joint, you'll start to see that narrowing.

3    And so that's, you know, evidence of -- radiographic evidence

4    of arthritic change in the joint.  The cartilage is narrowed

5    here.

6         We go down to the subtalar joint here, you'll see the

7    same thing that's happening.  So those prior X rays I showed

8    from during the surgery, we had good space through here.  Now,

9    if you see the space at the front of the subtalar joint, as we

10   get towards the back, we're getting narrower and narrower and

11   narrower, and you're getting some irregularity here.  So she's

12   already starting to develop at this point narrowing or, you

13   know, cartilage loss, cartilage thinning, consistent with

14   post-traumatic arthritis in this subtalar joint, as well as in

15   the anterior aspect, or front portion, of the ankle joint, as

16   well.

17        And I think the radiologists were commenting here,

18   this talonavicular joint here, you can see the space here,

19   space here.  And as we get up towards the top, it really

20   narrows here.  You can see as the bone comes over and we're

21   losing cartilage here.  So that was -- you know, we're not

22   quite two and a half years after injury, and we're already

23   starting to see arthritic changes in the joints around the

24   ankle, in keeping with post-traumatic arthritis.

25             *MR. SHAPIRO:*  Your Honor, I see the time is high noon.

Adam Cota, M.D. - Direct

1    I wanted to see what the Court would like to do.

2           THE COURT:  Let's take our noon recess, and come back

3    at 1:00.  We'll be in recess.

4           (Recess at 12:00 p.m.)

5           (In open court at 1:07 p.m.)

6           THE COURT:  Thank you very much.  Please resume.

7           MR. SHAPIRO:  Thank you, Your Honor.  Forgot to

8    unmute.

9    BY MR. SHAPIRO:

10   Q.  Dr. Cota, I wanted to continue and talk about your

11   post-operative plan for Ms. Houston.  What was your

12   post-operative plan?

13   A.  So initially after surgery, there is a degree of

14   immobilization that is required.  It's a little more extended

15   in her case, due to the need to prepare the ligaments to

16   stabilize the ankle, so that limits how much motion you get

17   early on.  She was non-weight bearing for essentially six

18   weeks, and the plan was to immobilize her initially in a splint

19   and then a cast for the six weeks.  At that point, she started

20   looking at doing some weight bearing and motion.

21   Q.  Did she need to go to rehab -- rehabilitation?

22   A.  Yeah.  You know, due to the degree of injury to her foot

23   and ankle, as well as her knee, and then the difficulty for her

24   to mobilize with the combined injuries, the physical therapist

25   at the hospital recommended that she go there for a time to

Adam Cota, M.D. – Direct

1   allow her ongoing rehabilitation prior to heading home.

2   Q.  Was she able to take care of herself?

3   A.  Prior to going home it was extremely difficult for her to

4   mobilize independently and safely, which is why there was a

5   recommendation for her to go to rehabilitation.  Patient needs

6   to be discharged, no risk for falls, able to manage their

7   activities of daily living.  If that's not the case, the

8   physical therapist, occupational therapist make

9   recommendations.

10  Q.  How much was the need for rehabilitation because she lived

11  alone?

12  A.  That obviously creates a higher need for rehabilitation

13  services.  If somebody lives independently, doesn't have people

14  to help them at home, then there is a higher rate of our

15  patients that end up going to inpatient rehab or a nursing

16  facility like Larchwood prior to going home, just because they

17  don't have adequate help.

18  Q.  What were your biggest concerns in the first few weeks

19  after the surgery?

20  A.  The initial concerns are healing and watching for

21  infection.  Any time you have a traumatic wound, meaning the

22  skin on the outside was basically pulled apart, those types of

23  injuries to the skin can be slow to heal, because typically

24  they go across the flow of blood.  So we see some degree of

25  skin necrosis, meaning the skin edges don't survive.  That's

Adam Cota, M.D. - Direct

1    usually the thing I focus on most early on, is to get the skin

2    to heal and watch for any signs of infection for the first

3    couple of weeks.

4    Q.  How do you do that?  How do you prevent that necrosis of

5    skin?

6    A.  It's -- part of it is how you address it at surgery.  The

7    other thing is just having the patient be sort of cooperative

8    with weight-bearing restrictions, minimizing motion, having

9    them elevate the limb as much as possible to decrease swelling,

10   or edema, in the foot.  You can imagine if you have an incision

11   closed, a lot of swelling, trying to pull the skin edges apart,

12   that can delay the healing.  Part of it is compliance with the

13   restrictions that we place afterwards.

14   Q.  How painful was this process for Ms. Houston?

15   A.  Very painful.  Extremely painful.  If you look at our

16   notes, I think we had comments about difficulty managing the

17   pain immediately after injury and after surgery.  Required

18   multimodal pain medications.  That means using different pain

19   medications from different classes, and she required a fair

20   amount of different strategies to try to keep her comfortable.

21   Q.  How long was she hospitalized?

22   A.  That I don't recall.

23   Q.  Somewhere around two weeks?

24   A.  Prior to her discharge to Larchwood would probably be about

25   two weeks.

Adam Cota, M.D. - Direct

1    *Q.*  How long at Larchwood for rehabilitation?

2    *A.*  Two or three weeks.

3    *Q.*  Did she need home healthcare when she was able to go home?

4    *A.*  Yeah.  And that's part of the discharge plan from the

5    rehabilitation facility.  So, again, they looked at the

6    functional abilities of the patient and if they are going to

7    require help at home because they don't have anybody there to

8    help them.  Most services can be arranged in the community,

9    which is home nursing care, home physical therapy care to

10   ensure they're safely able to be discharged.

11   *Q.*  Did she need assistance in the hospital and in rehab and at

12   home with her activities of daily living, such as bathing,

13   toileting, sustenance, et cetera?

14   *A.*  Yes.  Given the non-weight-bearing restrictions on her leg,

15   you know, those types of activities of daily living were

16   something that she required assistance with.  Again, she

17   required a high level of assistance, which is why the

18   recommendation was made to go to a rehabilitation facility like

19   Larchwood, because she would have a higher degree of nursing

20   care there to engage in those activities, get them completed.

21   *Q.*  I want to talk about the visits that you had with

22   Ms. Houston after she was out of rehab and continuing her

23   rehab.  How long did you continue to treat her?  Do you have

24   your file in front of you, or do you know?

25   *A.*  My last visit with her was December 13, 2017.

Adam Cota, M.D. - Direct

1    Q.  So almost a year of treatment?

2    A.  A year, yes.

3    Q.  All right.  I want to talk about how she was doing over

4    those visits.  How did she progress in your estimation, and

5    what issues came up?

6    A.  So if you look at -- we'll start with her patella fracture,

7    her knee injury.  You know, I think she progressed as expected

8    from that.  Near the end of my visits with her, I was recording

9    a shift in the range of motion.  It wasn't a complaint at that

10   time.  Her visits with me primarily focused on her ankle.  But

11   she got her motion back.  Wasn't really concerned about ongoing

12   pain, from my recollection in my notes, so -- I think that went

13   on to heal, you know, as expected.

14        With regards to her ankle, which was the more severe

15   injury, again, it's -- that was primarily the focus of our

16   visits.  She had very slow improvement in her range of motion

17   of the ankle joint, slower than I would like to see, but not in

18   keeping with the injuries she sustained.  She, you know, had

19   consistent complaints of stiffness around the joint and with

20   that, some degree of pain.  And she found all of the

21   combination of things functionally limiting even to some degree

22   at our last visit, you know, a year from treatment.

23   Q.  How long was she still using, to your recollection, a

24   crutch, a cane, any device that aided her walking?

25   A.  That, I can't remember specifically.

Adam Cota, M.D. - Direct

1  Q.  Okay.  I want to ask you something we discussed when I was

2  talking to you in preparation.  Was this a catastrophic leg

3  injury?

4  A.  Yes.  If you look at -- if you look at the orthopedic

5  literature in terms of studies that have been done -- there is

6  not many around fractures, dislocation around the ankle

7  joint -- we know outcomes are poor.  Significant levels of

8  impairment, high levels of pain and stiffness, and it's

9  something that you would discuss with a patient.  This is a

10 life-changing injury, which I think speaks to the degree of

11 severity of what she sustained.

12 Q.  Did she report to you that she was feeling foggy in her

13 head, she didn't feel like she had clear thinking, or slow

14 mentation?

15 A.  Yes, she did.

16 Q.  When was that?

17 A.  That's documented in my follow-up notes.  The -- the

18 difficulty I guess for me in, you know, trying to figure out

19 the mechanism I would have attributed at the time to her

20 gabapentin medication, that's a pain medication that started

21 primarily from nerve-type pain.  That started during her

22 hospitalization after surgery, and that was continued in the

23 post-operative period.  One of the chief side effects of that

24 medication is foggy-headedness and, you know, inability to

25 think clearly.  So that's what I would have attributed that to.

Adam Cota, M.D. - Direct

1    *Q.*  Do you remember what date that was in?

2    *A.*  Not offhand.

3    *Q.*  May 17, 2017?

4    *A.*  Yeah.  You have to give me a second.  You may want to read

5    that to me, because --

6    *Q.*  Let's see if we can find it.  Thank you.  We'll go back to

7    that if we can.

8    *A.*  Okay.

9    *Q.*  When did you start her on gabapentin; do you recall?

10   *A.*  From the hospital notes, it was within two or three days

11   after surgery, started by our physical assistant.  The

12   complaints at that time in the hospital were burning-type pain,

13   which is typically nerve-type pain, and that's the reason it

14   would have been started.  It's not surprising, considering the

15   extent of her injury, the injury to the peripheral nerves, the

16   small nerves around the level of her injury that were causing

17   her problems at that time.  That was part of the multiple modal

18   pain control I alluded to.

19   *Q.*  That started very -- just five days after the surgery sound

20   about right?

21   *A.*  Yeah.  It was during her hospitalization it was started,

22   and she was discharged on that medication.

23   *Q.*  Do you know how much gabapentin you started her on?

24   *A.*  No, not offhand.

25   *Q.*  What is the usual dose of gabapentin that you would start

Adam Cota, M.D. - Direct

1    somebody at?

2    A.  Typically, we start low and go up.  So a lot of times we'll

3    start fairly low, at something like 100 milligrams twice to

4    three times a day, go up from there.  You can have very high

5    doses, you know, 900 milligrams, two, three times a day.  The

6    upper level is around 3,600 milligrams a day, which is quite

7    high.  Sort of a slow start and titrate up, because of the side

8    effects.

9    Q.  She is now taking 1,800 milligrams a day, 600 milligrams

10   three times a day.  How would you describe that dose?

11   A.  That's a high dose, I think, from my experience.

12   Q.  What do you mean by multimodal pain control?

13   A.  So that's basically the strategy of using different pain

14   medications from different classes to try and get a better

15   therapeutic effect for a patient.  That's things -- we start

16   with Tylenol, acetaminophen, non-steroidal anti-inflammatory

17   pain medication, typically a morphine-derived drug or narcotic.

18   After that, you look at adding on neuro focused pain,

19   gabapentin.  So you're trying to use different classes of

20   medications to provide relief, as opposed to relying on

21   something like opioids.

22   Q.  Were you using all of those modalities for Ms. Houston?

23   A.  Yes, we were.

24        MR. SHAPIRO:  Ms. Waller is going to put up the record

25   from May 17, 2017, to share.  And that would be identified as

Adam Cota, M.D. - Direct

1    Bates label --

2              What label is that, Ms. Waller?  That would be Rocky

3    Mountain Ortho 032.  If you could scroll up a little bit.  All

4    right.

5    *BY MR. SHAPIRO:*

6    *Q.*  Can you take a look at that, see if that refreshes your

7    recollection.

8    *A.*  Yeah.  You can see from my documentation of the impression

9    and plan, she gets a bit foggy in the head.  Adjust gabapentin

10   doses to perhaps weaning off somewhat to see if she improves.

11   Then she is going to see a psychologist in July to talk about

12   some issues.  So -- I'm done.

13   *Q.*  Did you think that this initial complaint was just

14   gabapentin, or could it have been something else impacting her

15   cognition?

16   *A.*  So there may have been something else, which is why I

17   included going to see a psychologist in July to help talk

18   through some issues.  As well, I'm alluding to avoidance

19   behaviors, asking about post-traumatic stress disorder.  Which,

20   again, I'm not an expert in; but I would ask her about that.

21   That's why that's included in impression and plan.  So, yes,

22   I'm likely primarily concerned about her gabapentin; but I'm

23   obviously asking about seeing a psychologist and asking her

24   questions about post-traumatic stress disorder during that

25   visit.  So there -- you know, obviously concerned about other

Adam Cota, M.D. - Direct

1    etiologies.

2    *Q.*   Is it unusual for other things to develop after a serious

3    injury like the one she had and the procedures she had to go

4    through, or is that fairly common?

5    *A.*   So I don't know if "developed" would be the right word.

6    There is some things that are recognized later after traumatic

7    injury.   Typically, a lot of these sort of cognitive changes

8    can be picked up later.   From the orthopedic literature, we do

9    a poor job of identifying them early.

10           There is also a term we use called distracting-type

11   injuries.   And, basically, that means at the time of a trauma,

12   the most impressive injury is the one that gets all the focus.

13   And that for her was her injury to her ankle.   Once that's

14   treated, and as the pain subsides, patients will often

15   recognize other areas of pain or potentially that they're

16   having cognitive difficulties or other things that aren't

17   normal for their appropriate baseline.   And these can come to

18   fruition once we've addressed the primary what we call

19   distracting injury and get that under control.   So it's not

20   that, you know, these things were -- these things were present

21   from the initial injury, but they're not being recognized till

22   later down the road as her care progresses.

23   *Q.*   Is five months an unusual period of time, or would you feel

24   that that would be reasonable, unreasonable?   What do you

25   think?

Adam Cota, M.D. - Direct

1   A.   What are you alluding to?

2   Q.   For other things to come up that would have been there.

3   A.   I think for -- you're kind of alluding to cognitive issues,

4   that -- I'm not an expert in that area.  That may be

5   reasonable.  I'd defer to the neurologist and psychiatrists and

6   psychologists as to the appropriateness of that.  The things we

7   see like other orthopedic injuries seem to be caught earlier

8   on, in that time period.

9   Q.   When you were done with your care in December, where was

10  she at, how would you say she progressed, and what was still

11  going?

12  A.   So I think her knee was doing well; her ankle was still a

13  source of concern for her.  But we discussed, she had tried to

14  return to some activities like hiking, and was doing some

15  hiking, you know, limited to an hour, still having some

16  functional impairments, though, and was not at her baseline.

17  So at that point, you know, it's -- the discussion is, well,

18  we'll just watch you for development of post-traumatic

19  arthritis.  And you keep going with the exercises; and I'll see

20  you basically as needed, any time you want.

21  Q.   What were her pain levels like at that year period?

22  A.   I don't have any recollection of specific numerical scores.

23  It was still functionally limiting for her, so I'm not sure

24  what that would score out of ten, but she was definitely not

25  pain free.

Adam Cota, M.D. - Direct

1    Q.  How was her range of motion, and what was limited?

2    A.  She managed to get the plantar flexion back, so the

3    ability -- you know, if you look at 90 degrees, her foot to go

4    down, was getting pretty well established.  The difficulty was

5    coming up.  So there is some almost degree of loss in that

6    motion from her previous visits.  But that's the one that

7    people after ankle trauma, whether it's surgically addressed or

8    not, tend to have a hard time with, just due to scarring and

9    contracture around the joint and a really hard time of bringing

10   their foot back up.  That makes it difficult to walk, because

11   you lose that mobility at the ankle joint.  That was, you know,

12   primarily her main sort of functional limitation as concerns

13   range of motion.

14   Q.  Was that unexpected or expected by you?

15   A.  I would say expected.  You know, the -- my hope as a

16   treating surgeon is somebody gets completely back to baseline

17   by one year.  Given her degree of injury, it's not unexpected.

18   And the literature would -- you know, what does exist, would

19   back that up if you look at patients who have a fracture plus a

20   dislocation of the ankle at the same time.  Just having the

21   dislocation, if you look at functional scores at three years

22   after injury, they're substantially lower than people who

23   didn't sustain the dislocation.  So the loss of function, range

24   of motion, higher pain, is not -- is not unexpected or -- you

25   know, it's certainly reasonable, given her initial injury.

Adam Cota, M.D. - Direct

1    *Q.* So she was still having problems or issues with her gait?

2    *A.* Yeah.  She -- you know, at that point she still didn't feel

3    like she was ambulating at her baseline.  I think one of the

4    main drivers for that was just the stiffness around the joint

5    and the loss of the ability of the foot to come up.  It gets

6    very difficult if the foot can't come up when you're walking.

7    It really affects how somebody mobilizes.

8    *Q.* Was she still in physical therapy, and was it important for

9    her to continue with physical therapy?

10   *A.* Yeah.  The physical therapy, we talked about -- you know,

11   after traumas like this, we'll do these initial sessions.  And

12   then some people, they'll be out of physical therapy in three

13   months.  Severe injuries, going beyond one year of physical

14   therapy is reasonable, especially if you're on your own,

15   because there is only certain things you can do on your own at

16   home.  Having an additional person available to manipulate a

17   limb and provide some feedback is important.  And so, yeah, she

18   was continuing with that.

19   *Q.* And how about the need to use physical therapy going

20   forward, is that necessary?  And why is that necessary to

21   maintain the recovery?

22   *A.* Yeah.  It's -- so we do see this for more severe traumatic

23   injuries.  If you look at what you do in your day-to-day life,

24   the majority of us have very limited ranges of motion.  We get

25   up, we sit down in a chair, we walk around a little bit.  The

Adam Cota, M.D. – Direct

1    majority of people don't engage in full ranges of motion in

2    their day-to-day life.  As well, it gets very difficult to do

3    some, you know, focused rehabilitation on a limb by yourself.

4    There are certain exercises you can do at home, but that's

5    something she would likely need to continue for the rest of her

6    life, to some degree.  But at some point, you know, things can

7    get stagnant; and then you require an additional set of hands

8    to help either regain some lost motion, to have a formal

9    evaluation by a professional to shift focus on new things to

10   try to encourage mobility.  So having that additional person

11   help her with her rehab I think is warranted.

12   Q.  Did you speak to our life care planner or provider our life

13   care planner with your suggestions and recommendations for the

14   rest of her life?

15   A.  Could you repeat that?

16   Q.  Did you provide our life care planner with the

17   recommendations for the rest of her life that you believe she

18   would need in treatment and in therapy?

19   A.  I believe that was the testimonial I completed.

20   Q.  Yes.  Were you pleased in December of 2017 with the

21   recovery, or were you disappointed?

22   A.  So I'd say I was pleased, but not -- you know, my

23   expectations or my goals for patients would be to have a

24   complete functional recovery by twelve months.  She didn't

25   reach that.  Given the degree of injury, she healed her skin

Adam Cota, M.D. – Direct

1  well, we had no post-traumatic infections.  She had, you know,

2  this primarily limiting functional result.  So, you know, from

3  how she progressed, I think it was good.  I was satisfied with

4  that.  Would I have liked it to have been better?  Certainly.

5  But given the degree of injury, you know, I've just come to

6  experience, not everybody gets to where you want them to be.

7  But I think for her outcome at one year, she was doing well.

8  Q.  What did --

9         THE COURT:  Just a minute.  Sorry.

10        COURTROOM DEPUTY:  Our court reporter needs a quick

11 break.

12        THE COURT:  The court reporter has to take a quick

13 break, so we'll be in recess --

14        (Recess at 1:32 p.m.)

15        (In open court at 1:43 p.m.)

16        THE COURT:  Thank you.  I'm sorry for the delay.  Are

17 we all ready to proceed now?

18        MR. SHAPIRO:  Yes, sir.

19        THE COURT:  Please continue.

20 BY MR. SHAPIRO:

21 Q.  Doctor, we were talking about at the end of your treatment

22 in December of 2017.  Besides physical therapy, which you

23 talked about and we'll talk about in more specifics later, what

24 did you suggest for her to do in order to assist with her

25 continued recovery or maintaining her recovery with regard to

110

Adam Cota, M.D. - Direct

1   her activity level?

2          THE COURT:  Not hearing him.

3          THE WITNESS:  Is that better?

4   BY MR. SHAPIRO:

5   Q.  That's better.

6   A.  I'll switch the mike on.

7          So my recommendation was to encourage her to do as

8   much as possible and try and increase her activity level over

9   time.  And then encourage, again, just to continue with

10  physical therapy, just to work on gait normalizations.  So I

11  think at that point she was having periods where she could

12  walk -- she felt she could walk with a somewhat normal gait.

13  This was not all the time, so the recommendation was to

14  continue with the physical therapy and try and improve that, as

15  well.

16  Q.  Did you encourage walking, hiking, pool, elliptical,

17  biking?

18  A.  Yes.  Yeah.  She had tried hiking, and I thought that was

19  great.  It's a difficult thing to do.  But basically any

20  activities that she would tolerate would be encouraged.

21  Q.  How about yoga?

22  A.  Yeah.  I think everybody should do yoga.

23  Q.  How about going to the gym?

24  A.  I don't remember specifically if I recommended the gym,

25  but --

Adam Cota, M.D. - Direct

1    *Q.* All right.  Let's talk about the residual issues that

2    Ms. Houston has when she was done with your care.  What would

3    those residual issues be?

4    *A.* Primarily, stiffness; limited range of motion around the

5    ankle joint; and, you know, some degree of pain when using her

6    ankle joint.  Those I think were the primary complaints when I

7    last saw her.

8    *Q.* How about scarring?

9    *A.* Yeah.  So it's -- I think that was in my notes, a comment

10   on there was quite a bit of scarring around the ankle joint.

11   At least felt that.  That's to be expected.  Again, physical

12   therapy can help with that.  But when you have these

13   high-energy dislocations of the ankle joint, as it heals, the

14   lining of the joint, the capsule, really wants to scar down and

15   get tight.  And then there is obviously some surgical

16   incisions, there is a traumatic wound, which all have to heal

17   and will develop scar tissue, as well.  So it was another

18   limiting factor.

19   *Q.* Did she have mechanical pain, and what is mechanical pain?

20   *A.* So I felt there was a component of that.  So mechanical

21   pain, my sort of interpretation of what that means, there is a

22   structural problem with a joint or part of the musculoskeletal

23   system.

24            So for her instance, she has abnormalities in the

25   lining of the joint from the time of her injury.  And, yeah, I

Adam Cota, M.D. - Direct

1    took the time to put the bone back where it's supposed to be

2    and repair those ligaments.  But, you know, with all of my

3    effort, you're still going to have some degree of abnormality

4    in the joint in those spaces that she lost the cartilage.

5         When she's walking on it, because the lining of the

6    joint has been disrupted, the joint doesn't load properly.  So

7    the forces are concentrated in some areas but not other areas.

8    And those kind of areas where the force is concentrated will

9    cause what I call mechanical pain.  The joint's not sitting in

10   its normal position, and its response is to cause pain.  As

11   well as areas where the cartilage is thin, you're going to have

12   more force transmitted to the underlying bone, which has pain

13   receptors.  And that's going to, again, cause pain.  So, you

14   know, we would attribute that to arthritic change in the joint

15   or loss of cartilage in the joint.

16   *Q.*  How about nerve pain?

17   *A.*  Sorry.  Is there a question?  Do I think she had nerve

18   pain?

19   *Q.*  Did she have it, and will she continue to have it?

20   *A.*  Yeah.  So --

21        *MR. SCARPATO:*  Objection, Your Honor.  We've had a

22   couple of questions now that I think are getting pretty far

23   outside the field of orthopedics.

24        *THE COURT:*  Well, I think he can identify, since he

25   deals with the nerves and fractures and ligaments, whether or

Adam Cota, M.D. – Direct

1  not there is pain that is neuropathic or some other kind.  So

2  the objection is overruled.  I think he's not acting as a

3  neurologist.  He's acting as orthopedist, and the testimony is

4  taken in that context.

5        Go ahead, please, Doctor.

6        THE WITNESS:  So I think there is likely some --

7  again, some different mechanisms for what is causing her pain.

8  We had her on gabapentin; she continued to be on gabapentin,

9  which provided her relief.  We discussed tapering down those

10  dosages, which wasn't well tolerated.  That pain medication is

11  used to treat nerve pain, so I think there is a component of

12  that.  What kind of nerve pain is outside my area.  I would

13  defer that to the neurologist.  But I think my opinion is that

14  there is a component of nerve pain that was there from her

15  initial injury.  There is also mechanical pain, as the joint

16  was affected and not behaving normally.  That was contributing

17  to her pain.

18  BY MR. SHAPIRO:

19  Q.  What degree of pain did you believe she was left with when

20  you were done with your care in December of 2017?

21  A.  I'm not sure how to answer that in terms of degree of pain.

22  She wasn't pain free.  She still had what I would consider

23  functionally limiting pain; meaning, she couldn't operate at

24  her baseline, if that helps.

25  Q.  Thank you.  When you were done with your care and

114

Adam Cota, M.D. – Direct

1  treatment, how would you describe the limitations -- or

2  functional limitations that she was left with?

3  A.  Again, primarily, it was related to stiffness and loss of

4  range of motion.  That was really what I think was affecting

5  her ability to walk normally, because those hadn't returned.

6  The stiffness can contribute to pain.  I think there was, you

7  know, some underlying mechanical pain just from some changes to

8  the joint that were likely causing her some functional

9  limitation.  But, primarily, it was the loss of range of motion

10  and stiffness.

11  Q.  Within a reasonable degree of medical probability, are her

12  ankle and knee problems permanent?

13  A.  Yes.  At this stage, it's unlikely to see benefit.  So,

14  again, these things are tough to predict long-term outcomes.

15  If you look at the literature around ankle fracture,

16  dislocations, she's likely to have some degree of deficit for

17  the rest of her life.  The knee, again, functionally, I'm not

18  sure where she's at currently.  She could develop

19  post-traumatic arthritis down the road, again, because of that

20  injury, the fracture went through the cartilage.  So I think

21  for her ankle, I'm certainly more certain.  Her knee, the

22  probability exists.

23  Q.  How would you describe Ms. Houston as a patient under your

24  care and treatment?

25  A.  In terms of my interactions with her, I thought she was

Adam Cota, M.D. - Direct

1   very forthcoming.  I thought she was engaged in her recovery,

2   meaning that she listened to recommendations and was active in

3   her -- in the recovery process.  She attended her physical

4   therapy sessions.  She wanted to get better, at least that was

5   my impression, that she legitimately wanted to get back to

6   where she was, because she wanted to live her life like she was

7   prior to the injury.

8   Q.  With regard to physical therapy in the future and what you

9   had told the life care planner -- or provided our life care

10  planner, how often will she need physical therapy over the

11  course of the rest of her life?

12  A.  I think there will be --

13        MR. SCARPATO:  Objection.  Misstates the testimony

14  with regard to the communications between the witness and the

15  life care planner.

16        THE COURT:  Well, rephrase your question, then,

17  counsel.

18  BY MR. SHAPIRO:

19  Q.  What recommendations did you provide for physical therapy,

20  Doctor?

21  A.  I believe I recommended that there may be ongoing

22  requirements for physical therapy over the course of

23  Ms. Houston's life.

24  Q.  Did you provide any specifics?

25  A.  I don't remember offhand.  I'd have to look at that

Adam Cota, M.D. - Direct

1   document.

2   *Q.*   Okay.  We'll bring up that document, if we can, as well.

3   We'll bring that up as we keep going.

4         Within a reasonable degree of medical probability, can

5   you provide your diagnoses?

6   *A.*   Yes.  So, you know, Ms. Houston sustained an open --

7   meaning a defect in the skin -- fracture dislocation of her

8   ankle with disruption of the medial and lateral ankle

9   ligaments, as well as injuries to the cartilage of the talus

10  and the medial malleolus, as well as a closed transverse

11  fracture of her patellar kneecap.

12  *Q.*   Doctor, do you have opinions as to whether or not

13  Ms. Houston has complex regional pain syndrome or sympathetic

14  nerve pain?

15  *A.*   I don't have opinions on that.  It's not within my area.

16  *Q.*   Do you have opinions of whether Ms. Houston has traumatic

17  brain injury or post-traumatic stress disorder?

18  *A.*   No.  Again, it's not within my area.

19  *Q.*   Do you treat any of those injuries or problems?

20  *A.*   No, I do not.

21  *Q.*   Do you defer to the specialists in the fields that do?

22  *A.*   Absolutely.

23  *Q.*   In a reasonable degree of medical probability, what is

24  Ms. Houston's prognosis?

25  *A.*   Over the long-term, with regards to her ankle injury, she's

Adam Cota, M.D. - Direct

1   very likely to require ongoing physical therapy to some degree

2   over the course of her lifetime.  She has what I consider high

3   risk for development of symptomatic post-traumatic arthritis.

4   So we're already seeing some arthritic change on the CT scan

5   that I showed earlier.  There is certainly I think some

6   symptoms coming from that.  She may develop progressive -- I

7   think she's likely to develop progressive symptoms from that,

8   requiring further treatments, including surgical treatments.

9   Q.  Within a reasonable degree of medical probability --

10  Doctor, did you answer the prognosis with regard to her knee?

11  A.  With regards to her knee, again, I think she's at risk for

12  developing post-traumatic arthritis, because cartilage was

13  involved, so that probability exists.  I'd say it would be

14  lower than, you know, what I would expect for her ankle injury.

15  Q.  Within a reasonable degree of medical probability, does

16  Ms. Houston with regard to her right ankle and foot have the

17  probability of needing operative management for the

18  post-traumatic arthritis in the future?

19  A.  Yeah -- yes.  I think, you know, the expectation is, she's

20  going to require non-operative treatments, as well as potential

21  operative treatments for management of her post-traumatic

22  arthritis.

23  Q.  What are the operative treatments that are probable?

24  A.  Currently, the two standard treatments either involve an

25  ankle fusion -- so locking the joint -- which is primarily a

Adam Cota, M.D. – Direct

1    pain relief operation.  So she'd lose the motion of the ankle

2    joint, but it would relieve her arthritic pain.  The second

3    procedure would be a total ankle arthroplasty.  So that would

4    be replacing the joint with a metal prosthesis.  Again, this

5    preserves some motion of the joint; and it also relieves pain.

6    So those would be the two standards with regards to surgical

7    treatments that she would be eligible for.

8    Q.  How effective are those two treatments?

9    A.  They're very effective in relieving pain.

10   Q.  Are they effective in allowing you to have function?

11   A.  So both limit your functional outcome.  So they certainly

12   improve a patient's functional outcome based on their

13   presurgical pain and functional scores; so those do improve.

14   But with an ankle fusion, you're essentially locking the joint.

15   So you have no motion in the ankle joint, it can make it a

16   little more difficult to perform some activities, going

17   upstairs, going up hills, because you don't have any flexion

18   this way.  The other component of that is, once you fuse the

19   ankle joint, the other joints get excessed wear and tear.  So

20   have progressive arthritis in the surrounding joint or adjacent

21   joint disease because you basically immobilize the joint.

22        Ankle arthroplasty, again, you'll restore some of the

23   motion of the ankle joint, or you'll preserve what the patient

24   has.  You get rid of the arthritis in the joint, which provides

25   pain relief; but you're still limited in terms of your function

Adam Cota, M.D. - Direct

1  activities.  So I don't typically recommend any impact

2  activities.  Things like hiking are quite difficult to do after

3  an ankle joint replacement.  So you're fairly limited in terms

4  of low-impact activities, walking, pool, that kind of thing.

5  So both of them have consequences.

6  Q.  How long does a joint replacement last?

7  A.  With the newer generations, we're having survivorship

8  somewhere between 85 to 90 percent at ten to fifteen years.  So

9  we're just getting midterm results or midterm data from the

10  newer generation implants.  Based on those results, Ms. Houston

11  is young.  If she had a joint replacement, she would likely

12  require revision within her lifetime.  Again, that's difficult

13  to predict.

14  Q.  Should she try to avoid the joint replacement, and what

15  other options should she consider instead in the meantime?

16  A.  So for her -- the concerning thing with Ms. Houston's CT

17  scan is she's starting to get arthritic change in the subtalar

18  joint.  So that's the joint below the ankle.  In patients with

19  that scenario, if you start to get symptomatic arthritis in the

20  subtalar joint, the preference is to do an ankle joint

21  replacement, because the only treatment we have for subtalar

22  joint arthritis is to fuse it.  So if you end up fusing the

23  subtalar joint plus the ankle joint, you end up with a very

24  stiff, rigid joint, for which people do not like.  So I think

25  the joint replacement would likely be your better option if she

Adam Cota, M.D. - Direct

 1   develops progressive arthritis in that subtalar joint.  There

 2   is other things that would be classified as joint-sparing

 3   procedures which are still what I would consider experimental.

 4   So these things are done; there is not really good evidence to

 5   support their use.  Things like stem cell injections, there

 6   is -- which is being done, but there is -- at this point, I

 7   don't think there is any good evidence that these are going to

 8   kind of reverse her arthritis.

 9   *Q.*  How about platelet therapy?

10   *A.*  It's been done.  Again, it's not what I would consider a

11   standard of treatment for ankle joint arthritis.

12   *Q.*  Would you recommend that she avoid the joint fusion and

13   joint replacement as long as possible?

14   *A.*  That's my recommendation to my patients, because of the

15   consequences of doing either of those procedures.  So we delay

16   it as long as is reasonable; and that really comes down to the

17   functional abilities of the patient, as well as their pain.  So

18   eventually it gets to a point where our conservative or

19   non-surgical treatment -- so that's activity modification,

20   physical therapy, joint steroid injections, over-the-counter

21   pain medications -- when those -- and bracing would be the

22   other one.  When those can't allow a patient to be active and

23   give them adequate pain control to be active, then it's a

24   consideration to move on to surgery.  So we try and delay the

25   surgery because of the risk of adjacent joint arthritis for the

Adam Cota, M.D. - Direct

1   fusion and failure of the total ankle arthroplasty, requiring

2   revision.

3   *Q.*  Does continuing physical therapy and physical activity

4   allow the joint to continue to have movement and therefore

5   prolong the surgery?

6   *A.*  To some degree.  The -- the physical therapy

7   recommendations, our reason for doing that is to encourage

8   activity with the joint.  So if you look at the orthopedic

9   literature, pain scores for patients with arthritis in a

10  joint -- this is not specifically the ankle joint, but hip and

11  knee, as well -- report lower pain scores the more active and

12  the more mobile they keep a joint.  So I think there is a role

13  for physical therapy, again, to help keep these joints, you

14  know, supple and as -- preserve as much motion as possible to

15  try and decrease pain and encourage function at the same time.

16  *Q.*  Doctor, I would like to put up Plaintiff's Exhibit 13,

17  which is a medical expense summary.  I would like you to take a

18  look at.

19          And the question I have when we put that up is, which

20  of the cares listed on this medical bill summary were

21  reasonable and necessary and causally related; and,

22  importantly, what were you involved with referring her to or

23  providing that care?  And I'll go through with you once we have

24  that up.

25  *A.*  Okay.

Adam Cota, M.D. - Direct

122

 1          MR. SHAPIRO:  Can we start at No. 1, Ms. Waller.

 2     BY MR. SHAPIRO:

 3     Q.  So if we start at No. 1, was No. 1, the anesthesia for the

 4     two procedures, reasonable, necessary, and causally related to

 5     the crash in question?

 6     A.  Yes, it was.

 7     Q.  No. 2, the ambulance ride to your hospital?

 8     A.  Yes, it was.

 9     Q.  No. 3, the emergency physicians?

10     A.  Yes, it was.

11          MR. SCARPATO:  Your Honor, I'm going to have to object

12     at this point.  We haven't qualified Dr. Cota as an expert in

13     medical billing, let alone billing for ambulance services, for

14     anesthesia, and, you know, the other items that it seems like

15     we're going through on this exhibit.

16          THE COURT:  Counsel.

17          MR. SHAPIRO:  Your Honor, I believe the doctor is able

18     to provide us with what is reasonable, necessary, and causally

19     related.  He certainly doesn't participate in the bills, but he

20     does participate in knowing who bills, and that is really the

21     point here.

22          THE COURT:  I think that's the thrust of the question.

23     It's not the reasonableness of the amounts; it's whether or not

24     these were reasonably necessary things to do and for these

25     agencies to do.  And he can testify to that, as it was

Adam Cota, M.D. - Direct                    123

 1   necessary for his treatment of the plaintiff.

 2            So to that extent, the objection is both sustained and

 3   overruled.  Not to the reasonableness of the costs, he's not

 4   testifying to that, but to the reasonableness of requiring the

 5   service.

 6            Go ahead.

 7            MR. SHAPIRO:  Thank you, Your Honor.

 8   BY MR. SHAPIRO:

 9   Q.  No. 4, the crutches?

10   A.  Yes.

11   Q.  The home care services, No. 5?

12   A.  Yes.

13            MR. SHAPIRO:  Okay.  No. 8, Ms. Waller.  Thank you.

14   BY MR. SHAPIRO:

15   Q.  Larchwood Inn, the rehabilitation?

16   A.  Yes.

17   Q.  No. 9, the wheelchair?

18   A.  Yes.

19   Q.  Rocky Mountain Orthopedics, that would be all of your

20   charges under No. 10 and Dr. Deering?

21   A.  Yes.

22   Q.  As well as the physical therapist, Cody Jones?

23   A.  Yes.

24   Q.  And X rays, as well?

25   A.  Yes.

Adam Cota, M.D. – Direct

1    *Q.*  All right.  No. 11, St. Mary's Hospital and Regional

2    Medical Center?

3    *A.*  Yes.

4    *Q.*  The radiology charges on No. 12?

5    *A.*  Yes.

6    *Q.*  Western Medical Associates, I'm not sure what that is.

7    No. 14, Adult and Pediatric Specialists, which is the walker

8    and the bath bench?

9    *A.*  Yes.

10   *Q.*  The -- No. 20, the prescription medications?

11   *A.*  Yeah.  If that's City Market -- yes, that would be

12   expected.

13   *Q.*  RX Outreach, which I believe are some additional

14   prescriptions?

15          *MR. SCARPATO:*  Objection.  Your Honor, we're not

16   hearing what prescriptions these are actually for, and there is

17   a number of prescriptions at issue in this case that I don't

18   believe Dr. Cota will be qualified to testify about.

19          *THE COURT:*  Sustained.

20          *MR. SHAPIRO:*  I would agree.

21          I have no further questions.  Thank you, Dr. Cota.

22          *THE COURT:*  Okay.  Doctor, what I'm trying to do with

23   your testimony, since you've been listed as a witness by both

24   the plaintiff and the defendant, is to have all of your

25   examination done at once so that you don't have to make a

Adam Cota, M.D. - Cross

1    return during the defendant's side of the case.  And to do

2    that, the defense attorney has the right to cross-examine you

3    about your testimony that you have just given and to probe that

4    with leading questions, so forth.  Then to the extent he wants

5    to call you as his own witness, he'll let you and me and

6    opposing counsel know that and then go into his direct

7    examination.  So, in effect, what we're doing is calling you as

8    a witness out of turn for the defense at that part of the

9    testimony.  Is that clear?

10            *THE WITNESS:*  Yes.

11            *THE COURT:*  Okay.  All right.

12            Counsel, you may proceed.

13                      **CROSS-EXAMINATION**

14   *BY MR. SCARPATO:*

15   *Q.*  Good afternoon, Dr. Cota.  We appreciate you being with us

16   this afternoon.  We haven't formally met yet, but my name is

17   Bill Scarpato.  I'm an attorney here on behalf of the United

18   States.

19            You discussed post-traumatic arthritis in your

20   testimony earlier today, and I'd like to ask you a couple of

21   questions about that.

22            The first surgery you recommended or said that may be

23   necessary to treat post-traumatic arthritis is an ankle fusion

24   surgery; am I correct about that?

25   *A.*  Yes.

Adam Cota, M.D. - Cross                                    126

1   *Q.* And the other surgery you said might be necessary for

2   post-traumatic arthritis is an ankle replacement surgery;

3   correct?

4   *A.* Yes.

5   *Q.* And those are the surgeries you could foresee for

6   arthritis; true?

7   *A.* Yes.

8   *Q.* And we took a look at that CT scan from -- well, from the

9   time after the accident, and you spoke about some of the

10  degenerative changes that you observed.  The degenerative

11  changes that you observed in that CT scan of Ms. Houston's

12  ankle are very mild; correct?

13  *A.* Yes.  They're what I could characterize as early changes.

14  *Q.* And arthritis can be a part of the normal aging process;

15  true?

16  *A.* Yes.

17  *Q.* There are non-surgical treatments for post-traumatic

18  arthritis; correct?

19  *A.* Yes.

20  *Q.* Those can include over-the-counter pain medications?

21  *A.* Yes.

22  *Q.* And those can include physical therapy; right?

23  *A.* That is correct.

24  *Q.* And there are post-traumatic arthritis patients who never

25  require surgery; correct?

127

Adam Cota, M.D. – Cross

1   A.   That is correct.

2   Q.   And Ms. Houston might fall into that category.  If she

3   develops post-traumatic arthritis, she might never require

4   surgery; true?

5   A.   That is correct.

6   Q.   And another potential non-surgical treatment that I believe

7   you mentioned earlier today was stem cell therapy; right?

8   A.   Correct.

9   Q.   And I just want to be clear about that, that's not a

10  standard treatment, is it?

11  A.   No.  That would be -- I would consider that experimental at

12  this stage.

13  Q.   And I believe you also discussed platelet-rich plasma; am I

14  right about that?

15  A.   That's correct.

16  Q.   And that's also an experimental therapy; right?

17  A.   Yes.

18  Q.   And speaking generally, there is a fair amount of

19  uncertainty about what kind of treatment a patient will need in

20  the longer term; true?

21  A.   That is my experience.  Yes.

22  Q.   In fact, it's very difficult to predict; right?

23  A.   Yes.

24  Q.   Now, you've concluded that Ms. Houston may need ongoing

25  physical therapy, pain management, and psychological support

Adam Cota, M.D. - Cross

 1  going forward; correct?

 2  *A.*  Yes.

 3  *Q.*  And you're not here to opine on the cost or expected time

 4  frame of any of those; correct?

 5  *A.*  That's correct.

 6  *Q.*  You also don't foresee any additional orthopedic procedures

 7  for Ms. Houston's established injuries; true?

 8  *A.*  Sorry.  Could you repeat that?

 9  *Q.*  Sure.  You also don't foresee -- do not foresee any

10  additional orthopedic procedures for Ms. Houston's established

11  injury; true?

12  *A.*  Outside of what we've discussed for the post-traumatic

13  ankle arthritis, no.

14  *Q.*  And you prepared some responses to questions that were

15  posed to you by Ms. Houston's attorney in this case; am I right

16  about that?

17  *A.*  Yes.

18  *Q.*  You prepared a narrative report?

19  *A.*  Yes.  I believe that was in 2018.

20  *Q.*  And Ms. Houston compensated you for that; true?

21  *A.*  I'm not sure.

22  *Q.*  You were asked to form opinions based on records besides

23  your own; right?

24  *A.*  I thought it was primarily on -- if we're discussing the

25  2018 report, primarily mine; but I may have commented on some

Adam Cota, M.D. - Cross

1  of her other treatments at that time.

2  Q.  She's paying you for your time today; correct?

3  A.  I believe SCL Health is getting paid.

4  Q.  And SCL Health is being paid for your testimony today here;

5  correct?

6  A.  Yes.  That's my understanding.

7  Q.  Your surgery that you performed on Ms. Houston, that

8  surgery was successful; true?

9  A.  Yes.  I think the end result was as expected and went on to

10  heal with no complications.

11  Q.  So before we talk more about Ms. Houston's healing, I'd

12  like to ask you just a couple of questions about the scope of

13  your expertise.  90 to 95 percent of your practice is

14  orthopedic trauma; correct?

15  A.  Yes.

16  Q.  And the rest of your practice is an elective foot and ankle

17  practice; correct?

18  A.  Yes.

19  Q.  So you don't treat cognitive symptoms; true?

20  A.  Right.

21  Q.  And you're -- on that front, you're not opining on whether

22  Ms. Houston suffered a head injury in the December 2016

23  accident; correct?

24  A.  No.

25  Q.  And you're not opining on whether any brain fog that she

Adam Cota, M.D. - Cross

1    may have reported to you might be attributed to a head injury

2    either; correct?

3    A.  No.  I'm not giving an opinion as to the definitive cause

4    of that.

5    Q.  You don't treat chronic pain; true?

6    A.  Correct.

7    Q.  And you're not really familiar with chronic pain as a

8    diagnosis; correct?

9    A.  Correct.

10   Q.  Did you ever have any kind of conversation with an

11   individual named Francine Mazone?

12   A.  I don't recall the name.  I'm not sure.

13   Q.  So you don't recall ever having had a telephone

14   conversation with a Francine Mazone?

15   A.  I'm not sure who that is.  I don't recognize the name.  I

16   may have spoken to her.  I don't know.

17        MR. SCARPATO:  I'd like to -- well, I guess -- I

18   think, Your Honor -- actually, I do have one more section in

19   the cross-examination.  My apologies.

20   BY MR. SCARPATO:

21   Q.  So you followed Ms. Houston's knee and ankle status in the

22   months after her surgery; true?

23   A.  Yes.

24   Q.  And is that your typical course of treatment after surgery?

25   A.  Yes.

Adam Cota, M.D. – Cross

 1   Q.  And you were able to assess the healing of Ms. Houston's

 2   injuries in those visits; true?

 3   A.  Yes.

 4   Q.  And Ms. Houston's injuries healed as expected; correct?

 5   A.  Yes, as I described.  Everything went on to heal to

 6   completion, other than her functional limitations.

 7   Q.  And you were able to assess the range of motion in

 8   Ms. Houston's ankle over the course of those post-operative

 9   visits; true?

10   A.  True.

11   Q.  And there was improvement in that range of motion in her

12   ankle over the course of those visits; correct?

13   A.  Yes.  From initial post-operative to my last visit, we did

14   see improvement.

15   Q.  And I believe you mentioned Ms. Houston was on gabapentin

16   during that time period.  My question to you is, is gabapentin

17   an opioid pain medication?

18   A.  What was the -- could you repeat the question?

19   Q.  Sure.  And I should say, if at any point you have trouble

20   hearing me, please just let me know.  We're all doing our best

21   with the technology.

22          My question to you was, is gabapentin an opioid pain

23   medication?

24   A.  No, it is not.

25   Q.  And I believe you mentioned that you saw Ms. Houston for

Adam Cota, M.D. – Cross

1   her one-year post-op visit in December 2017; do I have that

2   right?

3   A.   That's correct.

4   Q.   And you haven't seen Ms. Houston since that last

5   December 2017 visit; correct?

6   A.   That's correct.

7   Q.   She never reached out to you for any follow-up?

8   A.   No.

9   Q.   And, typically, that's your practice, not to follow a

10  patient after a year post-op; correct?

11  A.   Depending on how a patient is doing.  Sometimes I'm

12  following patients long-term, much longer than not.  But if

13  things are going as expected and the patient is comfortable

14  with that, then I leave it open-ended, so they can see me as

15  needed.

16  Q.   And that's what you did in Ms. Houston's case; correct?

17  A.   That's correct.

18  Q.   So are you aware of the date when she last had a home

19  health aide?

20  A.   No, I'm not.

21  Q.   And you're not a rehabilitation doctor; correct?

22  A.   Correct.

23  Q.   So after that last post-operative visit, you wouldn't be

24  able to comment on a patient's subsequent course of treatment

25  if you don't see them after that date; correct?

Adam Cota, M.D. – Redirect

1    A.  Correct.

2    Q.  And there are things a patient can do that would help them

3    improve after that first twelve-month stand; true?

4    A.  That's correct.

5    Q.  That would be the physical therapy and the pool therapy and

6    those sorts of things that we've discussed already today?

7    A.  Yes.

8    Q.  And that could include cycling?

9    A.  Yes.

10   Q.  And all in all, looking over your treatment of Ms. Houston

11   over the time that you saw her, you'd say that she generally

12   improved; right?

13   A.  Yes.  Over the year I followed her after surgery, there was

14   a general course of improvement.

15   Q.  And last time you saw her, she presented with a mild limp

16   when ambulating; is that correct?

17   A.  I believe that is correct.

18           MR. SCARPATO:  The Court's indulgence for a moment.

19           Those are my questions.  Thank you, Doctor, I

20   appreciate it.

21           THE COURT:  Any redirect?

22           MR. SHAPIRO:  Yes, sir.

23                       **REDIRECT EXAMINATION**

24   BY MR. SHAPIRO:

25   Q.  Dr. Cota, explain when you see post-traumatic arthritis

Adam Cota, M.D. – Redirect

1   what that means for the timing of it increasing.

2   A.  Are you asking how quickly it's going to get worse?

3   Q.  Yes, sir.

4   A.  That -- so, you know, prognosticating or predicting how

5   rapidly an individual is going to develop symptomatic

6   arthritis, it's essentially impossible.  We have, you know,

7   injury patterns that we recognize where there is an extremely

8   high likelihood that they will develop it over the course of

9   their life at some point.  But for me to say it's going to be

10  three or five years from now, I can't do that; I don't have the

11  experience to do that; we don't have any tools that would allow

12  us to do that.  So it basically comes down to, yes, I have a

13  high suspicion that it's going to occur; but I don't know when

14  that will be.

15  Q.  The fact that it's there by the time that the CT scan was

16  done, a little over two years post-crash, what does that

17  indicate to you about your thoughts of how it will progress?

18  A.  So it's a bit early, from my experience, to see those

19  changes.  Again, because it shows up early, saying that it's

20  going to get worse rapidly, I can't say that.  Patients develop

21  early post-traumatic arthritis, and it stays that way for

22  extended periods of time.  So I can't predict how that's going

23  to go for Ms. Houston.  We see it; I don't know when it's going

24  to become symptomatic for her.

25  Q.  Was it a good sign for you to see it early?

Adam Cota, M.D. - Redirect

1    *A.* I don't think it's a good thing to see it at all.  It helps

2    us just for her surveillance moving forward.  Oftentimes we'll

3    just see it on X ray.  The CT is a lot more sensitive of a test

4    than getting an X ray.  But we know it's there now; so moving

5    forward, we've got to be more aware, more proactive about

6    treating potential mechanical pain from that arthritis.

7    *Q.* Do you have access to the report that you wrote at our

8    request answering questions and what date that was?

9    *A.* Yes.  I think that's -- I'm not sure the date.  If that's

10   the report that I typed for you, I think it's maybe the end of

11   2017.

12   *Q.* That is absolutely right, 2017.

13   *A.* I thought it was 2018; but yeah, I have the report here.

14   *Q.* When was the CAT scan that you saw?

15   *A.* The one ordered by Dr. Khan-Farooqi was March 2019.

16   *Q.* So at the time you wrote that report and you were

17   prognosticating, you were not aware of the post-traumatic

18   arthritis; accurate?

19   *A.* Correct.

20   *Q.* And you became aware of the post-traumatic arthritis when

21   you saw the CAT scan when you were preparing for the deposition

22   that the defense wanted to take of you?

23   *A.* That's correct.

24   *Q.* Now, Ms. Mazone is the life care planner they're provided

25   you with documentation to complete.  How did you communicate

136

Adam Cota, M.D. - Redirect

1    with Ms. Mazone to give her what she needed?

2            *MR. SCARPATO:*  Objection, Your Honor.  That misstates

3    the communication between the witness and the life care

4    planner.

5            *THE COURT:*  Overruled.

6            *THE WITNESS:*  So that is who I spoke with in

7    preparation of this report, is -- is my recollection.

8    *BY MR. SHAPIRO:*

9    *Q.*  Now, for the life care plan, did somebody have you complete

10   a form asking you what she would need -- Ms. Houston would need

11   in the future?

12   *A.*  If it's not this -- what I typed out on my Word document,

13   then I don't recall that.

14   *Q.*  Okay.  You have not seen Ms. Houston since December of

15   2017; correct?

16   *A.*  That's correct.

17   *Q.*  In preparation for your deposition, did you pull up the CAT

18   scan from March 5, 2019?

19   *A.*  Yes, I did.

20   *Q.*  You did that on your own, didn't you?

21   *A.*  Yes.

22   *Q.*  Why did you do that?

23   *A.*  Because I didn't know what had progressed since I last saw

24   her, so it was a way of bringing myself up to speed with her

25   clinical course since I last saw her in my practice.

Adam Cota, M.D. - Recross

1    Q.  Was that helpful for you to understand where she was at?

2    A.  Yes.

3            MR. SHAPIRO:  Nothing further.  Thank you.

4            THE COURT:  Doctor, I just have one series of

5    questions relating to one matter.

6            The record shows that at the time of this -- the ankle

7    injury sustained, the plaintiff was 54 years old; and she's now

8    58 years old.  My question is, does the age of the patient have

9    any relationship to the development or the advancement of

10   post-traumatic arthritis?

11           THE WITNESS:  Yes.  So the studies that I've looked at

12   her particular injury, age over 30 is a risk factor for

13   development of post-traumatic arthritis.

14           THE COURT:  So the risk factor increases with age; is

15   that correct?

16           THE WITNESS:  Yes.

17           THE COURT:  Does counsel have any questions based on

18   my questions, for the plaintiff?

19           MR. SHAPIRO:  No, sir.

20           THE COURT:  For the defense?

21           MR. SCARPATO:  Just one question, Your Honor.

22                        **RECROSS-EXAMINATION**

23   BY MR. SCARPATO:

24   Q.  Dr. Cota, you said just now that the risk for

25   post-traumatic arthritis increases with age.  Does that have to

Adam Cota, M.D. - Recross

 1   do with the initial -- the initial sustaining of the

 2   post-traumatic arthritis, or does that have to do with a

 3   worsening course of that arthritis?

 4   A.   That would be a risk factor for the initial development of

 5   it, not its course over the lifetime.

 6            MR. SCARPATO:  Thank you.

 7            THE COURT:  Thank you very much, Doctor.

 8            May this witness be excused?

 9            MR. SHAPIRO:  Yes, sir.  Your Honor.

10            MR. SCARPATO:  Yes, Your Honor.

11            THE COURT:  Thank you, Doctor.  We appreciate your

12   being here.

13            THE WITNESS:  Am I all finished?

14            MR. SHAPIRO:  Thank you for your time.

15            THE COURT:  You're off the list now.

16            MR. SCARPATO:  Thank you for your patience.

17            THE COURT:  Next witness, please.

18            MR. OGBORN:  Plaintiffs are calling Penny Hagel.

19   She's calling in right now, Your Honor.

20            THE COURT:  Please swear in the witness.

21            COURTROOM DEPUTY:  Raise your right hand, please.

22               (**PENNY HAGEL, PLAINTIFF'S WITNESS, SWORN**)

23            COURTROOM DEPUTY:  Please state your name and spell

24   your first and last name for the record.

25            THE WITNESS:  Penny Hagel.  Last name is spelled

Penny Hagel - Direct

1    H-A-G-E-L.

2         THE COURT:  Thank you.  You're going to be asked a

3    serious of questions by plaintiff's counsel, and then you'll be

4    cross-examined by defense counsel.  During your testimony,

5    there may be some objection made, in which case I will have to

6    make a ruling.  But other than that, please just listen to the

7    questions, and we'll continue.

8         Go ahead, please.

9         THE WITNESS:  Okay.

10                      **DIRECT EXAMINATION**

11   BY MS. BOBET:

12   Q.  Good afternoon, Ms. Hagel.  How are you?

13   A.  Doing fine, thanks.

14   Q.  Let me start off by asking you where you live and how long

15   you've lived there.

16   A.  I live in Eckert, Colorado, and I've lived here for --

17   since 2000.  Twenty years.

18   Q.  And where is Eckert in relation to Grand Junction?

19   A.  It is east and a little bit -- east and south.

20   Q.  Okay.  What do you do for a living?

21   A.  I work for the Delta Combined Courts in Delta, Colorado.

22   Q.  What do you do for the Delta Combined Court?

23   A.  I'm a court judicial assistant; and currently, I work

24   mainly front counter.

25   Q.  How long have you been a judicial assistant for the

Penny Hagel – Direct

 1   combined courts?

 2   *A.*   In January it will be 20 years.

 3   *Q.*   Ms. Hagel, let me ask you some questions so you can help us

 4   understand a little bit better about a friend of yours,

 5   Ms. Houston.   You know Ms. Houston?

 6   *A.*   Yes.

 7   *Q.*   How long have you known her?

 8   *A.*   Since we were both in junior high school, and we worked at

 9   a sub shop when we were both about 16 or 17.   Submarine

10   sandwich shop.

11   *Q.*   It was a summer job that you both worked?

12   *A.*   Yes.

13   *Q.*   Have you maintained a friendship with Ms. Houston since

14   your junior high days?

15   *A.*   Yes, I have.   We've met with each other off and on

16   throughout the years, as our schedules -- we could, you know,

17   get together on occasion.   Probably about I would say once or

18   twice a year, at least.

19   *Q.*   And when you're not together and actually meeting face to

20   face, do you stay in contact via any other means?

21   *A.*   Phone calls and -- phone calls are probably about I would

22   say once every three months, maybe.

23   *Q.*   How about email or texting or anything like that?

24   *A.*   Usually holidays, we email each other if we don't get

25   together.

Penny Hagel - Direct

1   *Q.* Did you share any other commonalities, for example,

2   children?

3   *A.* Yes.  We both have daughters that graduated from the same

4   high school the same year.  From Brighton High School.

5   *Q.* And after your daughter graduated from Brighton, is that

6   approximately when you moved out to the west side of the state?

7   *A.* Yes, it is.

8   *Q.* What --

9   *A.* Before that we lived in Brighton.

10  *Q.* Did Ms. Houston eventually join you on the west side of the

11  state?

12  *A.* Yes, she did.  I'm not sure exactly what year it was, but

13  we had -- we had prior to that gone on a backpacking trip to

14  Grand Canyon.  But -- I don't know how many years ago it was,

15  but the first year she was here, we got together to go for a

16  hike, and we helped her when she moved in.

17  *Q.* You mentioned Grand Canyon.  Was that in approximately

18  2012?

19  *A.* Correct.

20  *Q.* Tell us a little bit about that trip, please.

21  *A.* Well, we -- it was myself, Tracy, and three other women.

22  We hiked down from the south rim down into -- down to Phantom

23  Ranch in one day, and then we stayed down at the bottom for a

24  day, and then we took two more days to hike back out.  Very

25  strenuous activity.  Most of the people were in better shape

Penny Hagel - Direct                                                    142

 1   than I was in order to -- I kind of lagged behind a little bit,

 2   so -- but other than that, we had a great trip and, you know,

 3   got to renew our friendship and, you know, get together for --

 4   and exercise.

 5   Q.  Were you --

 6   A.  Excuse me?

 7   Q.  Were you carrying packs?

 8   A.  Yeah.  30-pound packs.

 9   Q.  And is hiking something that you do typically?

10   A.  Yes, I do like to hike.  Most of my hiking is either over

11   on the Monument, or the Grand Mesa has some hiking trails.

12   Q.  How about Ms. Houston, was she a hiker as long as you've

13   known her?

14   A.  Yes.  She's -- she is a very good hiker.  Most times she

15   would have to slow down for me, so --

16   Q.  And are there other hikes you can tell us about that you've

17   been on with her?

18   A.  We did I believe it's called the Wedding Trail over in the

19   Grand Monument -- Colorado National Monument -- I'm sorry.  And

20   it -- its -- the first part of it is relatively flat, before it

21   gets into some up and down and -- so it was -- and she would

22   have to wait on me a few times because I have a medical

23   condition that I have to stop every so often because I get

24   going too quickly.

25   Q.  I'm going to have you draw some distinctions between the

143

Penny Hagel – Direct

1    Tracy Houston kind of pre-collision and post-collision.  But

2    before I get there, Ms. Hagel, tell us how you found out

3    Ms. Houston was involved in a car collision.

4    A.  I found out -- it was on a Thursday, I believe; and I found

5    out the following Monday.  She had -- at some point somebody

6    had went and got her laptop, and she had been able to email

7    me a short email that she had been in an accident and was at

8    St. Mary's.  That night after work, once I read the email, it

9    was, like, I'm going to see Tracy again.

10           When I walked into her hospital room, it was dark.

11   And the shape she was in, I got kind of emotional.  And I had

12   never -- I had never seen her in such a state of, you know,

13   having rods in her legs and stuff like that.  And it kind of

14   scared me, because I didn't know if I was going to lose my

15   friend or not.

16   Q.  Were you able to visit her and help her when she was

17   finally able to go home?

18   A.  Yes.  Yes.  We were able to --

19   Q.  What kind of things were you helping her with?

20   A.  We went over a few times.  And she would ask to -- she

21   asked my husband to help her with her crutches, when she first

22   got her crutches, to help her learn how to use them.  And so we

23   did that.  And there were -- I also took her over at one point

24   to the food bank to get some groceries and stuff.  So -- and

25   she had several neighbors that also help her out.

Penny Hagel - Direct

1   Q.  When you were visiting her when she finally got home, was

2   she able to work at all?

3   A.  No.  She hadn't -- she had not been working.

4   Q.  Was she working as far as you know prior to the collision?

5   A.  Yes.  She's a -- she's a coach, and I think it's a

6   management coach or -- she does that type of lifestyle and

7   management coaching.

8   Q.  Since the collision, Ms. Hagel, have you -- so that you

9   were there quite a number of times right after the collision.

10  Have you continued to maintain contact with Tracy Houston?

11  A.  Well, I've maintained phone contact.  We haven't been able

12  to meet very often because I'm currently taking care of my

13  86-year-old mother who had a fall, and she's requiring more of

14  my time than I usually give.

15  Q.  If I asked you about the pre-collision Tracy Houston and

16  the post-collision Tracy Houston, do you think you'll be able

17  to help us understand a little bit about the differences?

18  A.  Pre-collision, very vibrant, active.  She's very -- I won't

19  say bubbly, but she's very -- she's ready to go and do things,

20  and she's -- if you call her and want to go hiking, she was

21  always up for going hiking.  If you wanted to sit down and have

22  lunch or something, she'd have lunch; and we'd discuss things

23  and talk for a long time.  Usually two to three hours.

24  Q.  How did that change after the collision?

25  A.  The few times that we have been out there, usually we only

Penny Hagel - Direct

1  stayed for an hour, because she would get tired, at the most.

2  I did meet her for lunch, and we went to a restaurant that was

3  relatively quiet, and she seemed tired.

4  Q.  And how -- when you would do this lunch and she still

5  seemed tired, how long after the collision was that lunch?

6  A.  I think that was -- I'm going to say in 2019, but I'm not

7  sure exactly when.

8  Q.  All right.  Did you notice any differences about -- you say

9  tired, are you talking about level of energy or just -- she

10  just gets tired and needs to go take a nap?

11  A.  Level of energy.  And when she's talking to you, it's a

12  little bit slower than she would have in the past.

13  Q.  Help us understand that a little better.  Are you saying

14  post-collision when she talks it's slower?

15  A.  Post-collision, yes.

16  Q.  And when you say her speech is slower, what -- help us

17  understand a little better, what do you mean?

18  A.  It seems like she's trying -- I guess she's trying to form

19  the sentences, more so than -- so trying to get her thought

20  process and the words of what she wants to say and communicate.

21  Q.  And that wasn't something that was occurring before the

22  collision?

23  A.  No.  She usually -- she'd -- you know, if she had questions

24  or anything, she was pretty quick with her thought process.

25  Q.  What about physical abilities, her ability just to walk or

Penny Hagel - Direct

1    to do simple things we do day to day, can you help us

2    understand any differences that may have been --

3    A.  She has a lot slower gait than she used to, with walking.

4    She used to ride a bike quite a bit, and I don't know if she's

5    been back on that bike.

6    Q.  Do you have any sense about her willingness to be involved

7    in activities since the collision?

8    A.  I've invited her to go to church with me in Grand Junction.

9    And because they have a full band at that church, she told me

10   that she would rather not, just because of the loud noises.

11   And I really didn't comprehend what that meant, other than it

12   was probably due to the accident.

13   Q.  Was that something that she would avoid any time from

14   junior high to 2016?

15   A.  No.  We have been in some noisy places.

16   Q.  Do you think this collision has had any impact on your

17   ability to be friends with Ms. Houston?

18   A.  No.

19   Q.  Do you know whether Ms. Houston has gone back or is working

20   near the same level that she was working previously?

21   A.  Probably not, but I -- I can't say for sure.

22   Q.  Okay.

23   A.  I just don't know in my conversations, and she hasn't been

24   working to the degree she was.

25   Q.  Do you know -- after that trip to the Grand Canyon, is that

Penny Hagel - Cross

1    something that Ms. Houston planned to repeat, as far as you

2    knew?

3    A.  I don't know if she did.  I had -- I definitely have

4    considered it, and we had had a discussion at one point about

5    doing the Rim to Rim Trail.  So --

6        MR. OGBORN:  I have no further questions.  I know that

7    the other lawyers will ask you a few.

8        Thank you very much for your time, Ms. Hagel.

9        THE WITNESS:  Thank you.

10       THE COURT:  Cross-examination.

11       MS. BOBET:  Thank you, Your Honor.

12                    **CROSS-EXAMINATION**

13   BY MS. BOBET:

14   Q.  Good afternoon, Ms. Hagel.  Thanks for appearing with us

15   here by video.

16       So one of the -- when was the last time you saw

17   Ms. Houston in person?

18   A.  It was in 2019, and I'm not sure of the exact date.  But it

19   was an afternoon -- right around noon, because I -- should have

20   been on a Saturday -- it was probably on a Saturday, but I'm

21   not sure.

22   Q.  Okay.  So 2019, we're looking at 2020 now, around a year

23   since you've seen her in person?

24   A.  Probably.  It's probably been about a year.

25   Q.  Before that, when you saw her in person in 2019, how long

Penny Hagel - Cross

1    had it been before that when you last saw her in person?

2    A.  I'm going to say -- well, my mom fell in 2018, in August;

3    so it probably would have been either -- it may have been after

4    that, but I don't recall.

5    Q.  Fair to say you hadn't seen her very much at all in person

6    since around I think you said August of 2018, when your mom

7    fell?

8    A.  Correct.

9    Q.  Okay.  And I think you mentioned that you and your husband

10   shortly after the accident went to Ms. Houston's house to help

11   her with some things; is that right?

12   A.  Correct.

13   Q.  How long had it been since you or your husband went to her

14   house to help her with things?

15   A.  It's been -- it's probably been since -- I want to say --

16   the first -- probably January to June that year after her

17   accident, we tried to go by probably about at least once --

18   once a month or once every other month to see if she needed

19   anything.

20   Q.  So that would have been since early 2017 that you or your

21   husband went to her house to help her with anything?

22   A.  Yeah.

23   Q.  Okay.

24   A.  Well -- yeah, it's probably been quite a while since we've

25   been to her house, because the last time was when I had lunch

Penny Hagel - Cross

1    with her.

2    Q.  And just to be clear, I'm talking specifically about, you

3    go to her house to help her with something around the house.

4    How long has it been since you or your husband have done that?

5    A.  It's probably been since -- I'm going to say 2018.

6    Q.  Okay.  So at least a couple of years?

7    A.  Yeah.

8    Q.  And you mentioned a couple of things that you or your

9    husband helped Ms. Houston with shortly after the accident.  I

10   think you mentioned her crutches and then running an errand for

11   her.  When was it that you did either of those things?  We'll

12   start with the crutches.  When was it you helped her with that?

13   A.  I'm going to say crutches was probably May or June after

14   the accident.

15   Q.  At no time since then have you helped her with crutches?

16   A.  No, no.  She was able to manage them somewhat on her own.

17   Q.  How about running errands with her, when was it that you

18   helped her with that?

19   A.  I'm going to say it was within that same time frame that I

20   took her -- it was probably a good year after her accident when

21   I took her to the food bank.

22   Q.  Any other occasions besides those two that you can remember

23   going to her house and helping her with anything?

24   A.  No.  She -- she -- I know she relies on some of her

25   neighbors to help her quite a bit, because they're closer.

Penny Hagel - Cross

 1   *Q.*  Okay.  Now, you mentioned a couple of different hikes that

 2   you went on with Ms. Houston.  I think I'm clear on the timing

 3   on the one in the Grand Canyon.  Was that the only one in 2012

 4   that you did with her?

 5   *A.*  Yes.

 6   *Q.*  And when was the other one you mentioned to the Colorado

 7   Monument?

 8   *A.*  The other one was the year she moved out here -- well, she

 9   moved out here in December, and it was the following fall.

10   *Q.*  What year are you talking about?

11   *A.*  So she moved over -- I'm not sure what year she moved over,

12   but then that fall after -- I don't remember the year, but it

13   was --

14   *Q.*  That's all right.

15   *A.*  I don't know.  She --

16   *Q.*  That's all right.  So you mentioned Ms. Houston's work.

17   Fair to say, you didn't know the details of what kind of work

18   she was doing before the accident; right?

19   *A.*  I don't know a lot of the details.  I do know that she went

20   out of town quite a bit to speaking engagements.

21   *Q.*  You don't know -- sorry.

22   *A.*  I think it was in management training.  I don't know for

23   sure.

24   *Q.*  Okay.  You don't know specifically the types of tasks or

25   things that she was performing when she was working?

Penny Hagel – Examination

1    A.   No.

2    Q.   And you don't know how successful her business was?

3    A.   No, I don't.

4    Q.   Do you know how much money the business was making?

5    A.   No.  That's not something we shared.

6    Q.   Fair enough.

7              One moment.

8              That's all I have.  Thank you for your time.

9              THE WITNESS:  Thank you.

10             THE COURT:  Mrs. Hagel, the other attorney is going to

11   have a chance to ask you some more questions.  But before he

12   does, and before the Government's attorney sits down, in case

13   she has some more questions, I have just a couple I want to ask

14   to bring something out.

15             THE WITNESS:  Okay.

16                          **EXAMINATION**

17   BY THE COURT:

18   Q.   How many miles is it from your house to Ms. Houston's

19   house, approximately?

20   A.   Approximately 55 to 60, I would say.

21   Q.   55 to 60 miles, so it's more than an hour's drive, I would

22   assume; is that correct?

23   A.   Yes.  It's an hour drive from our house to Grand Junction,

24   and then she lives in the Fruita area.

25   Q.   Which is additional time?

Penny Hagel – Examination

1    A.   Yes.

2    Q.   About how much more is it, then?

3    A.   Well, it's -- from the mile marker in Delta, which is about

4    15 miles from Eckert, it says 40 miles to Grand Junction.   And

5    then you have to go through Grand Junction to get out to the

6    Fruita area, which is where she lives.

7    Q.   Okay.   Now, as I understand your testimony, you have

8    indicated that your mother had a bad fall in August of 2018 and

9    that you spent most -- you spent most of your time either

10   working or taking care of your mother; is that correct?

11   A.   Yes, that's correct.   She has also recently had an

12   additional fall, so --

13   Q.   So the point is that you stopped seeing Ms. Houston when

14   your time was taken by a higher priority of taking care of your

15   mother; is that a fair statement?

16   A.   Correct.

17   Q.   Now, in that time -- it's been since 2018, August -- have

18   you had any telephone conversations or internet communication

19   with Ms. Houston?

20   A.   Yes.   Usually we email each other on holidays and various

21   other times, and then I'll call on the phone on occasion, and

22   we'll just chat for a little while.

23   Q.   Okay.   And you're the one that initiates the calls?

24   A.   The calls since her accident, yes.   I have initiated the

25   calls.

153

Penny Hagel - Redirect

1          THE COURT:  Ms. Bobet, if you have more questions, now

2     would be the time to ask them, and then we'll turn them over

3     for redirect.

4          MS. BOBET:  I have just one I neglected to ask, maybe

5     two.

6                    **CROSS-EXAMINATION CONTINUED**

7     BY MS. BOBET:

8     Q.  Ms. Hagel, you don't work in the medical field; right?

9     A.  No.

10    Q.  And you don't have any medical training?

11    A.  No.

12    Q.  Okay.  That's all for me.  Thank you.

13    A.  Okay.

14          THE COURT:  Okay.  Redirect?

15                    **REDIRECT EXAMINATION**

16    BY MR. OGBORN:

17    Q.  Ms. Hagel, one question.  You indicated prior to the

18    collision, telephone calls you have would last an hour or more.

19    Is that still the case post-collision?

20    A.  No.  Usually, it's -- I'm going to say the maximum has been

21    probably about a half an hour.

22    Q.  Is there any particular reason you can discern for the

23    brevity of the calls now?

24    A.  No.  Just that -- probably because I'm busier with my mom

25    and stuff, so I don't have as much time as I had before.

Penny Hagel - Redirect

1        MR. SHAPIRO:  Very good.  I have no further questions,

2    Your Honor.

3        THE COURT:  Can she be excused?

4        MR. OGBORN:  We would ask she be released from her

5    subpoena.

6        THE COURT:  Is that agreeable, Ms. Bobet?

7        MS. BOBET:  Yes, Your Honor.

8        THE COURT:  All right.  You're excused, Ms. Hagel,

9    with the thanks of the Court.  And I'd like to point out that

10   this is the first time in my 43 years on the bench that I've

11   been engaged in trial by videoconference.  I'm sure it's your

12   first time too.

13       THE WITNESS:  Oh, yeah.

14       THE COURT:  Tell the judge in Delta that we've gone

15   into the 21st century.

16       THE WITNESS:  I will do that.

17       THE COURT:  Thank you.

18       THE WITNESS:  Thank you.

19       MR. SHAPIRO:  Your Honor, at this point we have

20   Dr. Price at 3:15.  She is scheduled for 3:15.

21       THE COURT:  Okay.  I'll tell you what, we'll take the

22   recess now and then come back for Dr. Price.

23       Thank you.

24       (Recess at 3:03 p.m.)

25       (In open court at 3:27 p.m.)

Lynn Price – Direct

1          *THE COURT:*  Thank you.

2          Would you swear in the witness, please.

3              (**LYNN PRICE, PLAINTIFF'S WITNESS, SWORN**)

4          *COURTROOM DEPUTY:*  Please state your name and spell

5     your first and last name for the record.

6          *THE WITNESS:*  Lynn Price, P-R-I-C-E.

7          *MR. SHAPIRO:*  May I start, Your Honor?

8          *THE COURT:*  Yes, please do.

9          *MR. SHAPIRO:*  Thank you.

10                        **DIRECT EXAMINATION**

11    *BY MR. SHAPIRO:*

12    *Q.*  Doctor, can you please give us your professional address.

13    *A.*  You mean where I work?

14    *Q.*  Yes.

15    *A.*  Okay.  3150 North Twelfth Street in Grand Junction.

16    *Q.*  And what is your profession?

17    *A.*  I'm a family practice physician.

18    *Q.*  How long have you been a family practice physician?

19    *A.*  I graduated in 2000 -- well, I got my family practice

20    degree in 2002, so since that time.

21    *Q.*  Okay.  Can you tell this court your educational background?

22    *A.*  Well, I can go further back than medical school if you'd

23    like.  But I have a medical degree from the University of Utah,

24    and then I did my residency training at St. Mark's Residency.

25    That's where I did my internship and then my residency.

156

Lynn Price – Direct

1   Q.  I don't think you grew up in Utah.  Can you tell us a

2   little bit more about your background so we understand your

3   charming accent.

4   A.  So I was born in the United Kingdom.  And much to my

5   father's chagrin, I fell in love with a U.S. serviceman, and he

6   dragged me back here.

7   Q.  And what degrees do you have from the United Kingdom?

8   A.  I have a bachelor of science degree in life science, I have

9   a post-graduate education -- post-graduate certificate of

10  education in science teaching, and I have almost a degree in

11  counseling.  I didn't complete that because I was accepted into

12  medical school.

13  Q.  What did you do your residencies and fellowships in?

14  A.  I did my residency in family practice.

15  Q.  Any fellowships --

16  A.  Family medicine, we're supposed to call it.

17  Q.  Excuse me?

18  A.  We're supposed to call it family medicine now, not family

19  practice.

20  Q.  Okay.  Are you board certified in family medicine?

21  A.  Yes, I am.

22  Q.  Can you explain what it is you do as a family medicine

23  specialist?

24  A.  I take care of people from birth, death; I take care of all

25  ages; I've taken care of all of their health problems until

Lynn Price - Direct

1    they become more -- difficult enough that I feel the need to

2    refer to specialists.

3    Q.  Can you provide your employment background for this court

4    so they understand your background?

5    A.  I -- from residency in 2002, I worked at Wasatch Internal

6    Medicine in Salt Lake up until 2016, when I joined this

7    practice.  Both of those are general practices.

8    Q.  Tell me about your practice.  I was quite impressed with

9    how large and what it does.  Can you explain it?

10   A.  Well, we are a primary care practice.  We have -- oh, I

11   don't know -- 16, 20 family practice doctors.  We also have, I

12   don't know, several nurse practitioners.  We have pediatricians

13   downstairs.  We have an after-hours clinic, we have our own

14   lab, we have physical therapy, and we also have an integrated

15   behavioral health treatment.

16   Q.  Do you treat and are you experienced in treating patients

17   with depression and anxiety?

18   A.  Yeah.  That's pretty much my bread and butter.

19   Q.  Can you describe -- do you prescribe antidepressants or

20   other types of psychological medications?

21   A.  Yes, I do.

22   Q.  Do you prescribe pain medications?

23   A.  Yes, I do.

24   Q.  Nerve medications?

25   A.  Yes.

Lynn Price – Direct

1    *Q.*  Do you treat traumatic brain injuries or concussions?

2    *A.*  Yes.

3    *Q.*  Why do you hesitate?

4    *A.*  Well, I treat the symptoms of those problems.  The actual

5    brain injury is actually difficult to treat, but I manage the

6    consequences of brain injury.

7    *Q.*  Do you treat patients with post-traumatic stress disorder?

8    *A.*  Yes.

9    *Q.*  Do you act as a gatekeeper for your patients in managing

10   complex cases to assist them in getting the appropriate care

11   that they need?

12   *A.*  Yes.

13   *Q.*  Explain what that means to sort of act as a gatekeeper in

14   the complex cases.

15   *A.*  So patients sometimes come in asking for a referral to a

16   specialist, in which case I decide the appropriateness of that.

17   But other times you suggest that they see a specialist for a

18   particular problem, and then I refer them for that evaluation

19   and management.

20   *Q.*  Do you educate your patients about their issues and

21   conditions to assist them with their recoveries?

22   *A.*  Yes.

23   *Q.*  Do you treat patients with chronic pain?

24   *A.*  Yes.

25   *Q.*  Complex regional pain syndrome?

Lynn Price - Direct

1   A.  Yes.

2   Q.  Post-traumatic arthritis?

3   A.  Yes.

4   Q.  Are these types of patients common in your practice, or are

5   some more rare than others?

6   A.  So complex regional pain syndrome is pretty rare, so that's

7   not something I treat very commonly.  PTSD -- I mean, it's

8   rarer than, you know, diabetes or hypertension.  So those are

9   rare instances.

10  Q.  Okay.

11  A.  Is that what you asked me?  Sorry.

12  Q.  Yes.  Have you ever testified before as a treating

13  physician or expert for any of your patients that you've been

14  involved in treating?

15  A.  That -- back when I was probably three years into my

16  career, I think I was deposed about a patient.  It was in a

17  lawsuit.  But I think that's the only time.

18       MR. SHAPIRO:  At this time, Your Honor, I'd move the

19  admission of Dr. Price as an expert in medicine with a

20  specialty in family medicine.

21       THE COURT:  Ms. Bobet.

22       MS. BOBET:  No objection, Your Honor.

23       THE COURT:  All right.  The motion is granted, and

24  this doctor is admitted as an expert in family practice

25  medicine.

Lynn Price – Direct

 1   *BY MR. SHAPIRO:*

 2   *Q.*  Doctor, I'd like to spend a little bit of time talking

 3   about your experience in treating patients that have

 4   psychological problems.  How often are you involved in treating

 5   depression, anxiety that causes sleep disruption, difficulties

 6   in concentrating, memory difficulties, and sadness?

 7   *A.*  All the time.  I can't tell you if that's half of my

 8   patients or a third of my patients, but it's probably one of

 9   the most common things that I treat.

10   *Q.*  Do you also have experience in treating traumatic brain

11   injury and prescribing medications, as well as recommending

12   treatment?

13   *A.*  I have less experience in that than treating depression,

14   because I just don't see it as frequently; but I do take care

15   of people with those problems.

16   *Q.*  What is your role in treating patients with psychological

17   problems?

18   *A.*  Usually I'm the sole prescriber of medications.  And then I

19   also use our behavioral health team or other psychologists,

20   depending on the patient's insurance and preference, who does

21   the psychotherapy or behavioral therapy.  But I'm the one

22   prescribing the medications.  And sometimes, infrequently, we

23   will request the assistance of a psychiatrist; but that's very

24   infrequent, especially here in Grand Junction, where

25   specialists are very short.

Lynn Price – Direct

1   Q.  What is your role and what do you do for patients that

2   you're treating that have traumatic brain injuries or

3   concussion?

4   A.  Usually if it's a -- they're a mild concussion, then we

5   just treat by watching and letting the brain rest.  But when we

6   have people with more the post-concussive syndrome or a mild

7   TBI or even a more severe TBI, then I would get the assistance

8   of specialists.

9   Q.  What is your role of treating patients with chronic pain

10  from complex regional pain, post-traumatic arthritis, or other

11  issues?

12  A.  Well, chronic pain, again, is something that I treat quite

13  a lot.  And -- but, again, I use usually -- I would think most

14  patients that I'm treating that alone.  But more complex

15  patients that aren't responding to my management will -- I will

16  get the help of the -- the specialists -- the chronic pain

17  specialists.  In chronic regional pain syndrome, it is such --

18  it is something that I so rarely see that I would always get

19  the assistance of a specialist in helping direct care.

20  Q.  Are the symptom representations for psychological problems,

21  traumatic brain injuries, concussion or brain injury, complex

22  regional pain, or other chronic pain issues somewhat similar?

23  Do you get similar presentations with those?

24  A.  Can you repeat the entities?  You're saying depression,

25  complex pain --

Lynn Price - Direct

1    Q.   Traumatic brain injuries or even chronic pain issues?

2    A.   Yeah.  I mean, there is certainly crossover in all of those

3    entities.  And often -- well, you didn't ask me that question,

4    so I won't answer it.

5    Q.   What did you mean by -- you were going to say "often"?

6    A.   Well, traumatic brain injury leads to cognitive effects and

7    issues with sleep disruption and distractibility, and all of

8    those things, which you can also see in depression.  You can --

9    and so often you are -- it comes with traumatic brain injury.

10   You are -- you can't really treat the brain, *per se*.  You're

11   treating the symptoms, so you actually often are using similar

12   medications and modalities.

13        Did that answer your question?

14   Q.   It did.  Thank you.

15        What do you see as your role for these patients as

16   you're helping them navigate through these medical issues?

17   A.   Well, I am -- I'm their support system.  The medical

18   profession is difficult to navigate.  And trying to help people

19   get to see the appropriate specialist -- for example, when you

20   have a patient with PTSD and depression and traumatic brain

21   injury, if I were overseeing that, then each of the doctors for

22   different things could be using medications that were not

23   appropriately added.  And so I kind of oversee what is

24   happening with all the specialists, and I also feel that I like

25   to try and educate the patient on helping them understand what

Lynn Price - Direct

 1   is going on so that we can integrate those different

 2   entities -- the different doctors, things that they're feeling.

 3   Q.   Thank you.  When did you begin treating Ms. Houston?

 4   A.   My first appointment with her was November 8, 2017.

 5   Q.   So that was post-crash, post-injury; right?

 6   A.   Yes.  It was like a year after the crash.

 7   Q.   Why did you begin treating Ms. Houston, and how did she

 8   come to you or end up in your office?

 9   A.   She had been seeing my partner, Dr. Klemmetsen, who moved

10   to Missouri or Minnesota or somewhere cold; and I -- I took

11   over most of her patients.

12   Q.   Did you review at the time you began treating Ms. Houston

13   any of her other physicians' records, or did you review other

14   records much later in your care and treatment?

15   A.   I -- I did not -- it's hard for me to remember.  I mean, I

16   probably briefly looked at her charts before I saw her that

17   day, and that would be my pattern.  I'm sure I didn't read in

18   detail and -- because she would have been scheduled as an

19   established patient with a small appointment time and --

20   although she was new to me.  So I probably didn't do a lot of

21   looking at her chart, but I would have looked at it briefly.

22   Probably no more than five minutes.

23   Q.   Did you look at her other records later on in the course of

24   your treatment with her?

25   A.   Yes, I did.

Lynn Price - Direct

1   Q.  Okay.  Did you -- were you able to work with Ms. Houston

2   with those shorter appointments, or did you extend your

3   appointment?

4   A.  I'm sorry.  I didn't catch what you said.

5   Q.  Sure.  Did you -- were you able to use the shorter

6   appointments, or did you extend her to longer appointments as

7   you became more involved in her treatment?

8   A.  I -- her appointments certainly took longer than they were

9   scheduled for.  And she has -- she has some slow processing

10  speed, and so I don't know if she was actually -- I'd have to

11  actually look back in the charts to know if I scheduled her for

12  30-minute or 40-minute appointments, but generally her

13  appointments took more than 20 minutes.  Not every appointment.

14  That is misleading.  But certainly several of those

15  appointments took substantially longer than the allotted

16  20 minutes.

17  Q.  How long have you been treating Ms. Houston now; and how

18  many times do you think you've seen her, approximately?

19  A.  So I've been treating her since November of 2017, and I

20  think I last saw her in July.  And I've probably had eight

21  visits with her.  I mean, I can give you a number.

22  Q.  That's okay.

23  A.  Yes.

24  Q.  Can you tell, based on your observations and understanding

25  of Ms. Houston, the type of person or patient that she has been

Lynn Price - Direct

1   with you?

2   *A.*   Tracy is a complex patient.  As you've been alluding to,

3   she has several issues that have a lot of overlap.  And so it's

4   not -- you know, it's not as straightforward as somebody with

5   hypertension and you put on medication and they go away and

6   then they come back doing better.  So she's complex in that

7   respect.

8          She's also difficult I think because she -- because

9   she finds it -- I don't know if it's because of her slow

10  processing speed or a general -- I think it's a bit of both,

11  slow processing speed and also a general reluctance to use

12  medications -- that she's -- it takes some time to convince her

13  to try a new medication.  But she's an intelligent woman, and

14  she comes back informed, and we're able to come up with a plan

15  on how we want to proceed.  I don't think it's my job to

16  convince her to do what I want her to do.  It's a partnership.

17  If that answers your question.

18  *Q.*   It does.  Does she come in prepared to your appointments?

19  *A.*   Yes.  I think she does quite a bit of research on her

20  health problems.  She comes up with ideas that I wouldn't

21  necessarily have thought of, and we talk about those things and

22  then come up with a plan.  So, yes, she does come prepared.

23  *Q.*   Does she come in to see you as often as she should, and has

24  that gotten any better over time?

25  *A.*   Well, you asked me this at the deposition, and at that time

Lynn Price - Direct

 1    I told you that I felt that she wasn't seeing more often.  And

 2    that message I think got back to her; and she has been seeing

 3    more frequently, which I'm --

 4    Q.  I'm sorry?  You pixelated.

 5    A.  I said, I'm pleased about the fact that I'm seeing her more

 6    often.

 7    Q.  Okay.  Why is that?  Why are you pleased?

 8    A.  Well, because I feel that I have got to know her better so

 9    that I understand her health concerns better, so I'm better

10    able to advise her.  And the other aspect of that is I think

11    that she knows me better and therefore probably trusts me more.

12    Q.  Did you assist her with a jury service question or issue

13    that she had when she was called for jury duty?

14    A.  Yeah.  I think she asked me to sign a paper to say that she

15    shouldn't have to do jury duty, and I --

16    Q.  How did you feel about that, and why did you sign that?

17    A.  Well, I usually sign those under duress, because I think

18    everybody should do their jury duty.  If I have to do it, then

19    so should they.  But I felt that she -- it would be too

20    stressful for her to stay focused and be able to really be a

21    part of appropriately listening to what was going on in the

22    courtroom.

23    Q.  You mentioned reluctance on pharmaceutical medications.

24    How does she feel about traditional versus nontraditional

25    medicine?

Lynn Price - Direct

1   *A.*  I think, like many people, she's afraid to put many

2   medications in her body; and she has to be convinced that it's

3   the right thing to do.  In terms of -- I don't know about her

4   approach to nontraditional.  It depends on what you put in that

5   category.  Is acupuncture -- acupuncture I suppose could be

6   nontraditional, but it's becoming pretty commonplace these

7   days.  So that's --

8   *Q.*  How do you handle patients?  Do you do traditional and

9   nontraditional, or how is your practice?

10  *A.*  I am open to patients trying nontraditional things.

11  However, I'm up front with them and let them know that that's

12  not my training; so it's difficult for me to advise them.  An

13  example of that is, everybody wants to be on CBD oil and

14  smoking marijuana these days; and that is just really outside

15  my expertise.  So I let them know that I have some

16  reservations; but if that's something they want to try, you

17  know, to go ahead.  I like to think that if somebody is still

18  asking me, can they do something which I know is outright

19  dangerous, that I'm pretty forceful in my opinions that they

20  shouldn't do that.

21  *Q.*  How do you feel about patients like Ms. Houston, who come

22  in educated, prepared, and take up so much of your time?

23  *A.*  If I could see four patients a day, that would be my

24  preference; but in today's economy, that's not realistic.  I --

25  it's much nicer to talk to somebody who is educated than

Lynn Price – Direct

1  somebody who isn't, just, I suppose as a -- in general, as a

2  human being.  But it's certainly easier to persuade people to

3  do things that you want if they just blindly follow what you

4  say.  So as long as every patient isn't super educated and ask

5  me lots of questions, then I actually like it.

6  *Q.*  Okay.  Did you -- you never saw Ms. Houston as a patient

7  prior to the crash; correct?

8  *A.*  No, I didn't.

9  *Q.*  So all of your observations have been of Ms. Houston after

10 the crash?

11 *A.*  That's correct.

12 *Q.*  What specific items or diagnoses have you been treating or

13 been involved in for Ms. Houston?

14 *A.*  What specific diagnoses, did you say?

15 *Q.*  Yes.  Have you been involved in treating or been involved

16 with?

17         *MS. BOBET:*  Objection, Your Honor.  It's a compound

18 question.  I'm not exactly clear of the form.

19         *THE COURT:*  Rephrase the question, please.

20         *MR. SHAPIRO:*  Thank you, Your Honor.

21 *BY MR. SHAPIRO:*

22 *Q.*  What specific items have you treated Ms. Houston for?

23 *A.*  I have treated her for symptoms associated with PTSD,

24 symptoms associated with her anxiety and depression, I have --

25 I have treated her for, again, symptoms associated with the

Lynn Price - Direct

1    traumatic brain injury, and I have -- I don't know if I can say

2    that I've -- well, yes.  I mean, I've treated her chronic pain

3    and -- can I -- I want to say I've treated her complex regional

4    pain syndrome, because I've given her pain medications.  But I

5    don't -- again, under the guise of the -- under the direction

6    of her other specialists.

7    Q.  Okay.  What are the diagnoses that Ms. Houston carries?

8    A.  Let me see what's in the problem list.  We have her

9    diagnosed with major depression moderate; traumatic brain

10   injury --

11        MS. BOBET:  Your Honor, can we just ask the witness to

12   identify what she's referring to.  I think she's looking off

13   screen and seems to be referring to a document.

14        THE WITNESS:  I'm just looking at her chart.

15        THE COURT:  I think she's answered your question.

16        MR. SHAPIRO:  Thank you.

17   BY MR. SHAPIRO:

18   Q.  Continue, Doctor.

19   A.  Is that okay for me to look at a chart?

20   Q.  Yes, it is.

21   A.  Yeah.  It's just the same as what you've got printed off,

22   but it's in my format, so it's easier for me to look at.

23        THE COURT:  Let me make this clear for you, Doctor.

24   If you need something to refresh your recollection, then the

25   attorneys, both the examining attorney and the opposing

Lynn Price - Direct

1    counsel, need to know what it is that you're looking at to

2    refresh your recollection.  You're perfectly free to do it, but

3    it's necessary to communicate what it is that you're looking

4    at.  That's what the objection was about.

5            So it's not by any means an attempt to question your

6    integrity; it's just so they know what you're looking at so

7    they can look at the same record that they have in their

8    possession.

9            THE WITNESS:  Okay.  I understand.

10           So I am looking at her medical record.  It's on the

11   computer.  It's the format I'm used to looking at; so it's

12   different to the format you have, which is just a printed copy

13   of this.

14   BY MR. SHAPIRO:

15   Q.  Okay.  You were starting to go through the diagnoses that

16   she carries.

17   A.  I'm looking at her problem list.  I have her diagnosed with

18   major depression, moderate; traumatic brain injury, closed;

19   anxiety; complex regional pain syndrome; insomnia;

20   post-concussive syndrome, which is kind of -- well, some of

21   these are redundant, somewhat -- PTSD; and then I've also got

22   the history of the seizure that she had; and just other

23   non-relevant things like knee pain or pap smears.  I'm sure

24   you're not interested in those.

25   Q.  Let me ask you about that prescription for Cymbalta and

Lynn Price – Direct

1   what happened.  Why did you prescribe Cymbalta for Ms. Houston,

2   and what happened?

3   A.  I prescribed Cymbalta because we were trying to -- we were

4   trying to address several things at once:  The depression, her

5   anxiety, poor sleep, the PTSD, all of those constellation of

6   things, but also pain.  Cymbalta is an antidepressant which

7   also has an indication for chronic pain, so I was using it for

8   all of those reasons.

9   Q.  What happened?

10  A.  Well, not long -- I'm not sure exactly how long afterwards,

11  but not long after starting that medication, she had a seizure.

12  And it's difficult to know what provoked the seizure.  It could

13  have been the procedure that she was undergoing, it may be the

14  underlying traumatic brain injury, but it certainly could have

15  been triggered by the Cymbalta.  So we elected to discontinue

16  the medication.

17  Q.  Did Ms. Houston tell you, "I told you so"?

18  A.  Probably.  No.  No.

19  Q.  Did you put her back on a different antidepressant?

20  A.  I don't think I did.  Let --

21       Can I look at my medication list?  I don't think --

22  no.  I think that she was -- I think she was somewhat reluctant

23  to try anything else after that experience, which is

24  reasonable.

25  Q.  Was she benefiting from the Cymbalta?

Lynn Price – Direct

1          MS. BOBET:  I'm sorry.  I didn't catch the last part

2    of that answer.  She was reluctant, and I -- could you ask the

3    witness to repeat that, Your Honor?

4          THE COURT:  Yes.

5    BY MR. SHAPIRO:

6    Q.  Can you repeat that, Doctor, what you said?  She was

7    reluctant --

8    A.  I think she was reluctant, and I think I probably said,

9    which is reasonable.

10   Q.  Okay.  Was she benefiting from the Cymbalta?

11   A.  I don't -- I think it -- I don't recall.  I think it

12   occurred -- I'd have to go in and look at every note.  I'm

13   sorry, I don't recall.  I think she had problems with the

14   seizure so close to me starting it that I'm not sure that we

15   followed on that, but I would have to go back to my note after

16   that to know.

17   Q.  Do you want to try to -- to put her on a different

18   antidepressant?

19   A.  Would I like to?  I think that given she has subsequently

20   had a normal EEG -- which, you know, isn't entirely foolproof,

21   but -- I think -- yeah, yeah, I would.  I mean, I would like to

22   try her on something very low but -- a pretty low dose; but I

23   would be a little nervous, as well, I have to admit.

24   Q.  Why?

25   A.  Because the -- because of the potential that the Cymbalta

Lynn Price – Direct

1   had caused the seizure, and there is that potential with other

2   antidepressants.  It's not a very common side effect; but I do

3   see it happening, especially with people who have had head

4   injuries.

5   Q.  Why does a head injury make you more susceptible to

6   seizures with antidepressant medication?

7   A.  Because the antidepressant -- well, which comes first, the

8   chicken or the egg?  The antidepressant lowers -- has the

9   potential to lower the seizure threshold.  And somebody with a

10  traumatic brain injury, they also have a lower threshold at

11  which they're going to have a seizure; so the two things are

12  additive.

13  Q.  What diagnoses did you make or did you determine for

14  Ms. Houston, as opposed to utilizing other providers'

15  diagnoses?

16  A.  Oh, that's a very difficult question.  I'm -- over time --

17  it's hard for me to remember at what point I didn't know that

18  she had a diagnosis; and, therefore, I gave her a new

19  diagnosis.  Let me think about that.

20      I mean, I believe that I had given her the diagnosis

21  of major depression; but I'm pretty sure she already had the

22  diagnosis.  So if I made it adjacent to another physician, or

23  if I made that separately.  I mean, I did make that diagnosis

24  for her.  I diagnosed her with anxiety.  I diagnosed her with

25  attention deficit.  Actually, I did do the adult -- ASRS, which

Lynn Price - Direct

1   is a test for attention deficit; so I made that diagnosis.  I

2   don't know if I made the diagnosis of traumatic brain injury or

3   whether -- whether somebody else made that diagnosis; but

4   certainly I am able to recognize that the symptoms she's

5   describing are typical for that.  I didn't make the diagnosis

6   of complex regional pain syndrome; but at the same time, I

7   think it's an appropriate diagnosis, based on what I'm seeing.

8         So I don't know the answer to your question.

9   Q.  Good answer.  How is the ADD, the attention deficit

10  disorder, how is that -- what is that related to?  Is that

11  something she had for years, or is it due to the traumatic

12  brain injury or her other problems?

13  A.  Well, being as I didn't know her before the accident, it

14  would be hard for me to tell you if she had had it for years.

15  But, certainly, the inattentiveness is something that we see

16  with a traumatic brain injury.  So my suspicion is that she has

17  attention deficit secondary to a traumatic brain injury.

18  Q.  As you have become more involved in Ms. Houston's care,

19  have you gotten to know her better?

20  A.  Yes.

21  Q.  Has she learned to trust you and listen to you over time?

22  A.  I think so.

23  Q.  Has she agreed to take certain medications and treatment

24  options that you recommended but it took some time for her to

25  do so?

Lynn Price - Direct

1    A.  Yes.  I think she has been more willing to try medications

2    as she has learned to trust me.  She's still reluctant -- well,

3    I don't know if reluctant is the right word.  She still wants

4    to make sure that she's educated about it.  So whenever I start

5    her on a medication, she takes the prescription, and I have the

6    understanding that she's probably going to do a little bit more

7    research before she actually takes the pill.  But -- but, yeah,

8    I think -- I think she's -- I think she's more willing to try

9    different things.

10   Q.  What was the history that you received and understanding of

11   her chronic pain, complex regional pain, traumatic brain

12   injury, anxiety, depression, and PTSD?  What was the history

13   that you understood and received?

14   A.  I'm not sure I understand your question.  I mean, I --

15   well, my understanding is that she was involved in an accident,

16   and she didn't -- she had symptoms following that that she

17   didn't have prior to the accident.  And, therefore, those

18   diagnoses have been made subsequent to that.  Is that what

19   you --

20   Q.  Do you know the details of the accident or crash?

21   A.  I to this day, actually, I do not have the record of

22   exactly what happened in the accident.  So, no.

23   Q.  Have you been writing prescriptions for Ms. Houston, and

24   what prescriptions are they that you write on a regular basis?

25   A.  So I've been writing for her the Adderall.  That is the

Lynn Price – Direct

1    medication for the attention deficit.

2    Q.  And I –– why are you writing it, and what does it do?

3    A.  It's a stimulant, and it helps stimulate the attention part

4    of the brain.  And so we use it for –– we use it for little

5    kids who have attention deficit, ADHD; but we also use it for

6    people with inattentiveness secondary to brain injury.

7    Q.  Okay.  Has it been effective for her?

8    A.  She actually had a really good response to it.  I put her

9    on a tiny dose, and she did respond to that.  I think it was at

10   her last visit that she told me she didn't feel like she was

11   getting as much benefit anymore, and we did increase the

12   dosage.  But, yes, I do believe that she's getting benefit from

13   that medication.

14   Q.  What is the dosage that she's taking on a daily basis?

15   A.  Well, we started her at 2.5 milligrams twice a day, and she

16   has subsequently been increased to 5 milligrams twice a day.

17   Q.  Is that still a small dose?

18   A.  Yes.

19   Q.  Okay.  What other medications have you been prescribing for

20   her?

21   A.  I've been prescribing the gabapentin.  That was –– I did

22   not start that medication.  That was –– she was already on that

23   medication when she was seeing Dr. Klemmetsen.  And I think

24   that the only change I made in that medication was to decrease

25   the dose, because we were concerned that that medication might

Lynn Price – Direct

1    be contributing to some of her cognitive difficulties.  We

2    wanted to eliminate that as a possibility.

3    *Q.*  What dosage are you providing to her now?

4    *A.*  And I think I've given her that, as opposed to Dr. Ellen

5    Price.  Let me double-check if I'm prescribing it.  Yes, I am

6    prescribing that.

7           She's getting 600 milligrams three times a day, and

8    that's a pretty good dose.  It's a moderate dose.

9    *Q.*  Okay.  Has it been effective, and what is it for?

10   *A.*  It's for nerve pain, and I believe that it's been

11   effective.

12   *Q.*  Okay.  What other medications?

13   *A.*  I have given her Ambien for sleep, but I -- to the best of

14   my -- to be honest, I'm not sure if she's actually taking that

15   or not.  She's on -- actually, I think she is taking that,

16   which, again, she's on a very tiny dose.  That's normally

17   10 milligrams for men, 5 milligrams for women, and I think she

18   only takes half a dose.  But, again, I'm not absolutely sure

19   whether she's taking it now or not.

20   *Q.*  2.5 milligrams is what she takes?

21   *A.*  Yeah.  I believe so.

22   *Q.*  All right.  Has that been effective for her, do you know?

23   *A.*  I don't recall the last time we talked about the sleep.  I

24   don't recall.  I don't recall if that's effective or not.

25   *Q.*  Okay.  Any other medications you're writing prescriptions

178

Lynn Price – Direct

1   for?

2   A.   I mean, nothing that is related to her case.  I've got her

3   on some PREMARIN.

4   Q.   Okay.  What else have you recommended or participated in in

5   order to help her with her chronic pain or complex regional

6   pain, any other options that you've provided to her?

7   A.   Well, I've given her things that haven't helped.  So I put

8   her on a trial of prazosin for PTSD; and that was not

9   effective, I don't believe, which is why we discontinued it.

10  Just in general, encouraging her to -- I recommended her for

11  physical therapy, I recommended that she join our chronic pain

12  group, and then I -- I don't know -- I was involved with

13  helping her get in to see, like, Dr. Burnbaum, the neurologist,

14  and those kind of things, helping her get in to see

15  specialists.

16  Q.   Dr. Collier, the neurologist, as well?

17  A.   I don't know if I set that up.  I don't recall at what

18  point she saw Dr. Collier, so -- I don't know if I set that up.

19  Sorry.

20  Q.   Prazosin, what is that; and what happened?  Why wasn't it

21  effective for the PTSD?

22       MS. BOBET:  Objection, Your Honor.  Foundation.

23  Compound question.

24       THE COURT:  Overruled.

25       THE WITNESS:  So I can answer?

Lynn Price - Direct

 1 │ *BY MR. SHAPIRO:*

 2 │ *Q.*  Yes, you can.

 3 │ *A.*  So prazosin is a -- it's a -- it's an alpha-adrenergic

 4 │ agent.  It's commonly used for blood pressure, and -- but it

 5 │ seems to be effective in treating PTSD.  It's one of the things

 6 │ that we try.  It can be particularly good at treating the poor

 7 │ sleep and nightmares that we see with PTSD.

 8 │ *Q.*  What happened when she utilized it?

 9 │ *A.*  I don't think -- you know, truthfully, I can't remember

10 │ whether she -- it didn't work or she was reluctant to try it.

11 │ I think she did try it, but I think it didn't work.

12 │ *Q.*  Okay.

13 │ *A.*  I would have to search through my notes to find the answer

14 │ to that question.

15 │ *Q.*  And have you referred her to a physical therapist that

16 │ specializes in chronic pain?

17 │ *A.*  Yes.

18 │ *Q.*  Who is that?

19 │ *A.*  She's seeing -- oh, gosh, I can't remember the name.

20 │ Downstairs, she's seeing Tara and Laurel.  I can't -- one of

21 │ them is a general physical therapist, and the other one

22 │ specializes in chronic pain and is part of our chronic pain

23 │ group that meets --

24 │ *Q.*  How did physical therapy go?

25 │ *A.*  I believe she's getting benefit from it.

Lynn Price - Direct

1    Q.   Okay.  How often does she see the physical therapist?

2    A.   It looks like she's seeing them on a weekly basis.

3    Q.   And how long has that been going on?

4    A.   Her initial evaluation was the 2nd of July, and she last

5    saw them 15th of September.

6    Q.   So was this prescribed before the pandemic hit and then had

7    to wait?

8    A.   That's entirely possible, but I'm not sure of the answer to

9    your question.

10   Q.   Okay.  Have you been following her treatment with Dr. Lewis

11   for the sympathetic nerve blocks and the trial spinal

12   stimulator?

13   A.   Yeah.  So she -- I know she had the sympathetic nerve

14   block; and she did respond to that, I believe.  And then she

15   had -- the spinal cord stimulator trial was done late in

16   August, and Tracy has yet to report back to me as to whether

17   that is helping.  And I haven't had a report, other than from

18   you, which I don't think counts.

19   Q.   No, it doesn't.  Okay.

20        Does Ms. Houston consult with you on the choices that

21   she's making with providers?

22   A.   When I see her, we -- she updates me with the things that

23   she's doing and what she's trying and what seems to be working,

24   I just haven't -- I've not seen her since I think it was July,

25   so I'm not -- I'm not really sure what she's had since that

Lynn Price - Direct

1    time.  And I don't always get -- unfortunately, I don't always

2    get consult notes from her specialists.

3    Q.  How long do you want her to continue with physical therapy

4    for chronic pain?

5    A.  For as long as it works.

6    Q.  Have you recommended that Ms. Houston continue with her

7    psychological counseling?

8    A.  Yes.

9    Q.  For how long?

10   A.  For -- I mean, for -- again, for as long as she feels like

11   she's getting benefit from it.

12   Q.  Okay.  Are you aware -- have you been provided with her

13   prior medical history records to look over to see if there was

14   anything significant in her background?

15   A.  I don't have any -- I don't have her past medical record.

16   Q.  Okay.  Do you know how she's done with Dr. Johnston and the

17   psychological counseling?

18   A.  I believe that she's had benefit from that, and that --

19   but, again, I don't think I get the consult note from

20   Dr. Johnston.

21   Q.  Okay.  Do you see any of the notes from her speech

22   therapist or her cognitive therapy?

23   A.  No.  Her speech therapist doesn't send me anything either.

24   Q.  Have you observed her cognitive issues, and what

25   specifically have you observed?

Lynn Price - Direct

1   *A.*  Again, I didn't have the benefit of knowing her before the

2   accident; but I -- I -- I see an intelligent woman who has slow

3   processing -- slow processing speed is the main thing that I

4   see from her.  And she's often -- she is often very tearful,

5   she's got a depressed mood, she's very anxious.  And then, you

6   know, things that she describes -- you asked me specifically

7   what I've witnessed, which is different than what she

8   describes, I suppose.

9   *Q.*  Right.  What have you observed about her psychological

10  issues?

11  *A.*  She is -- she has depression; she has anxiety, which -- and

12  she has the attention -- the inattentiveness.  Those are the

13  things that I'm -- I believe I'm observing in the office

14  visits.

15  *Q.*  Okay.  What have you observed about her chronic pain

16  issues?

17  *A.*  I have not focused as much on her pain, because she's been

18  seeing the chronic pain specialist; so I haven't -- I don't

19  think I can tell you observations that I've had from that.

20  *Q.*  Okay.

21  *A.*  Describing --

22  *Q.*  What specifically led you to the conclusion that

23  Ms. Houston is suffering from a traumatic brain injury?

24       *MS. BOBET:*  Objection.  Mischaracterizes the evidence.

25  She testified that she didn't know if she diagnosed TBI.

Lynn Price – Direct

1          *THE COURT:*  Sustained.

2     *BY MR. SHAPIRO:*

3     *Q.*  Doctor, within a reasonable degree of medical probability,

4     does Ms. Houston have a traumatic brain injury?

5     *A.*  I believe that the symptoms that she is having would be

6     consistent with that diagnosis.  And based on my conversations

7     with her and my understanding of the functional level prior to

8     the accident, it would be the most -- it would be a reasonable

9     diagnosis to have.

10    *Q.*  Would those symptoms be caused by other diagnoses that

11    Ms. Houston carries?

12    *A.*  Well, again, there is a lot of crossover with these

13    diagnoses; and I'm -- I'm focusing on the practicality of

14    treating the patient in front of me.  So in -- is she depressed

15    because her life has been turned upside down by a major

16    traumatic event?  Did she have PTSD because she's -- was

17    involved in a major event?  Or does she have a brain injury

18    caused by that event?  It's in many ways -- it doesn't -- it

19    doesn't dictate how I treat the patient.  And because the

20    symptoms of all of those things are very similar, it's very

21    difficult for me to say which of those -- I can't remember what

22    the question was.

23    *Q.*  You answered it.  Thank you.

24    *A.*  Okay.  Good.

25    *Q.*  How has Ms. Houston been?  Describe her as a patient.

Lynn Price - Direct

1    *A.* How has she what?  Sorry.

2    *Q.* How is she as a patient?

3          *MS. BOBET:* Objection.  I think this is asked and

4    answered.

5          *THE COURT:* Overruled.

6          *THE WITNESS:* How is she as a patient?  She's -- she's

7    a pleasant woman.  I enjoy taking care of her.  I think she is

8    distressed by her -- she's distressed by her -- what has

9    happened to her, and she is keen and really motivated to try

10   and find a solution to the symptoms and the problems that she's

11   having.  And I'm -- I enjoy taking care of her.  She's a very

12   pleasant woman, intelligent woman, but she's a challenge.  I

13   think she -- she's a challenge to find solutions for, solutions

14   that she's actually willing to try.  There may not be solutions

15   in the long run, anyway.

16   *BY MR. SHAPIRO:*

17   *Q.* Have you discussed with her the use of CBD products?

18   *A.* She specifically asked me about them, and I gave the answer

19   that I give to most patients, which is, I don't know a lot

20   about it, but CBD seems to fix everything these days, and I

21   don't see any reason why she shouldn't give it a go.  And last

22   time I spoke to her she told me that the CBD was helping her

23   with her sleep.  So I have -- I feel that's okay for her to

24   continue with that.  She doesn't seem to be having any negative

25   effect from it.

Lynn Price - Direct

1    Q.  Has she discussed acupuncture with you?

2    A.  I believe that -- I'm not sure if she's actually had

3    acupuncture.  I know that -- I think she has had acupuncture;

4    but your question is, has she talked to me about it?  And I

5    don't think -- I don't know.  I know that she's been talking

6    with the physical therapist about trying dry needling, which is

7    a similar procedure.

8    Q.  And what do you think about that?

9    A.  I -- I see a lot of patients getting benefit from it, so I

10   think it's a reasonable thing to try at this point.

11   Q.  Doctor, within a reasonable degree of medical probability,

12   what is your prognosis for Ms. Houston?  And if you'd like, you

13   could talk about each one of the problems or generally.

14   A.  I -- I'm pessimistic about her possibility of getting back

15   to where she was prior to the accident.

16   Q.  Why?

17   A.  Because of the traumatic brain injury, I think that she's

18   unlikely to get back to 100 percent.  I think there are

19   things -- I think there are things that can still improve.  I

20   still think that we can -- I think she's coming to some

21   rationalization that she's not going to get 100 percent better,

22   and sometimes that's a better place to start from.  I think

23   that we'll do a better job of getting her depression and

24   anxiety and sleep and probably PTSD under control as she comes

25   to the realization that, you know, this -- she's got what she's

Lynn Price - Direct

1    got, and she's -- trying to help her with the functionality.

2    We can make things better, but I don't see her being

3    100 percent.

4    Q.  You used the term "under control."  I didn't hear you say

5    cured.  Why?

6    A.  Because I don't think there is a cure.

7    Q.  How long do you see her taking the medications that you're

8    prescribing?  Do you see her stopping the medications?

9    A.  Well, that's difficult to tell with Tracy.  I think that I

10   would urge her to continue to take them while she's still

11   having benefit.  And -- the medications that I have her on

12   right now, I believe she is getting benefit; so certainly I'm

13   going to encourage her to continue to do so.  I think I will

14   also encourage her to potentially try slightly higher doses

15   that might be more effective.

16        So, I mean, I think she'll be on -- I mean, she's

17   somebody that is probably going to be on medications for the

18   rest of her life.  Hopefully, she'll see some benefit from

19   them.

20   Q.  Doctor, I'd like you to look at -- Ms. Waller is going to

21   put up --

22        Is that Exhibit 12, Ms. Waller, the medical summary?

23        *MS. WALLER:*  No, it's Exhibit 13.

24        *MR. SHAPIRO:*  Pardon me.  Can you put up Exhibit 13

25   and scroll it to Primary Care Partners.

Lynn Price - Direct

1    *BY MR. SHAPIRO:*

2    *Q.*  Primary is your group, right, Doctor?

3    *A.*  Yes.

4    *Q.*  Okay.  So we have those charges, and then we also have --

5    if you can go to the next page -- that's the physical therapy.

6    Are those charges -- are those visits reasonable, necessary,

7    and causally related to the crash in question, specifically

8    related to the care of her pain, cognitive issues, and

9    psychological problems?

10   *A.*  Yes.

11   *Q.*  Do you believe that Ms. Houston has physical and mental

12   limitations?

13           You can take that down.  I'm sorry.

14   *A.*  Yes.

15   *Q.*  Are those the limitations that physically and mentally that

16   we have spoken about?

17   *A.*  Yes.

18   *Q.*  Have you limited Ms. Houston from doing anything?

19   *A.*  I have -- I think the only thing that I limited her from

20   doing is the jury duty.  I actually encourage her to do as much

21   as she feels she is able to do.

22   *Q.*  Within a reasonable degree of medical probability, Doctor,

23   does Ms. Houston have a permanent disability?

24   *A.*  Yes.

25   *Q.*  What is that permanent disability?

Lynn Price - Cross

1    A.  Well, it's a combination of the traumatic brain injury, the

2    PTSD, and the chronic regional pain syndrome.

3    Q.  Do you think Ms. Houston's been as attentive to her

4    problems as you think she should be?  Has she been proactive?

5    A.  Yes.

6              MR. SHAPIRO:  Thank you for your time, Doctor.

7              THE COURT:  Cross-examination.

8              MS. BOBET:  Thank you, Your Honor.

9                        **CROSS-EXAMINATION**

10   BY MS. BOBET:

11   Q.  Good afternoon, Dr. Price.  Nice to see you again.

12   A.  Likewise.

13   Q.  Now, you testified that --

14   A.  Can I just pause you a minute for a technical issue?

15   Q.  Yes.

16   A.  I just realized that the battery is running down on my

17   computer.  I thought it was plugged in, but it's not.

18   Q.  All right.  Standing by.

19   A.  Okay.  Looks like we are good.  Sorry about that.

20   Q.  Quite all right.  Now, you mentioned in your testimony

21   today that your approach is to treat the symptoms that are in

22   front of you rather than rely on a particular diagnosis; is

23   that right?

24   A.  I mean, I am -- yes -- yes and no.  I mean, I think that if

25   you've got a solid diagnosis that is going to help you treat

Lynn Price - Cross

1    somebody; but with the problems that somebody like Tracy has,

2    it's hard sometimes to absolutely have a definitive diagnosis;

3    so you're often left treating symptoms.  So when I see --

4    fortunately, a lot of the problems that she has, there is a lot

5    of overlap with what the diagnosis can be, but often the

6    treatment -- often, the treatment is the same.  And I see that

7    often in medicine, not just with Tracy, but, you know, with

8    other diagnoses as well.  So I just come from it from a

9    practical standpoint.  But the diagnosis starts the process

10   off, I think.

11   Q.  And in general, as a general matter, having the right

12   diagnosis is important to picking the right treatment; right?

13   A.  It certainly helps.

14   Q.  And, for example, having the right diagnosis leads doctors

15   to choose the medications that are most effective; right?

16   A.  Again, you know, it's -- so does the patient have

17   inattentiveness because of traumatic brain injury or does she

18   have attention deficit disorder?  Distinguishing between those

19   two is not as critical as recognizing that she has the symptom

20   of inattentiveness.  So my choice of stimulant medication,

21   Adderall, for her did not rely on me having an accurate

22   diagnosis of traumatic brain injury or attention deficit

23   disorder.  I am treating the symptom of inattentiveness.  So

24   recognizing that she's inattentive is important for treating

25   that medication.  Am I making sense?

Lynn Price - Cross

1   *Q.* I just want to be clear -- I'm speaking generally -- is it

2   your testimony that having a good diagnosis doesn't matter for

3   choosing the right medication?

4   *A.* No, I'm not saying that. Always striving to get the

5   correct diagnosis as a good starting point for how to treat a

6   patient. Absolutely.

7   *Q.* And, obviously, it's detrimental if a patient has a

8   condition that they're not being properly treated for; right?

9   *A.* Yes.

10  *Q.* All right. In your practice, it sounds like you've seen a

11  lot of patients suffering with depression; right?

12  *A.* Yes.

13  *Q.* Have you seen patients who have depression and who have

14  been misdiagnosed with something else?

15  *A.* Yes. So, for example, if somebody has -- if somebody has

16  dementia, they can have inattentiveness and poor memory and

17  poor concentration, which can look like depression. And

18  conversely, somebody can have depression that can look like

19  dementia.

20  *Q.* And we may have covered this, but I just want to make sure

21  I'm clear. Something like depression or anxiety could cause

22  difficulty concentrating; right?

23  *A.* Yes.

24  *Q.* It could cause memory difficulties?

25  *A.* Yes.

Lynn Price - Cross

1    Q.  Or sleep disruption?

2    A.  Yes.

3    Q.  And you believe Ms. Houston suffers from depression?

4    A.  I do.

5    Q.  And you diagnosed her with depression?

6    A.  Yes.

7    Q.  Now, a patient presents to you with psychological

8    complaints.  As a general matter, is their prior psychological

9    or psychiatric history relevant to evaluating that patient?

10   A.  Yes.

11   Q.  Let's talk about PTSD.  PTSD can present with cognitive

12   symptoms; right?

13   A.  Yes.

14   Q.  For example, PTSD can present with poor concentration?

15   A.  Yes.

16   Q.  And it can present with deficit attention?

17   A.  Yes.

18   Q.  And it can present with deficits in learning or memory?

19   A.  Yes.

20   Q.  And it can present with deficits in processing?

21   A.  Yes.

22   Q.  PTSD can present with deficits in mental executive

23   functioning in general; right?

24   A.  Yes.

25   Q.  Now, there is treatments available for PTSD; true?

Lynn Price - Cross

1   *A.*   Yes.

2   *Q.*   That would include behavioral therapy?

3   *A.*   Yes.

4   *Q.*   And in Ms. Houston's case, you believed she should be

5   seeing a cognitive behavioral therapist on a regular basis;

6   right?

7   *A.*   Yes.

8   *Q.*   Specifically, she should see a psychologist?

9   *A.*   Yeah, or a licensed social worker or -- yes.  But, yes,

10   somebody in that domain.

11   *Q.*   And I believe you mentioned another treatment for PTSD is

12   prazosin; right?

13   *A.*   Yes.

14   *Q.*   Is that generally a safe medication?

15   *A.*   It can cause low blood pressure.  I mean, like any

16   medication, it can have side effects; but generally it's safe.

17   *Q.*   And there is no danger of addiction with prazosin?

18   *A.*   No.

19   *Q.*   And you testified before that Ms. Houston had tried

20   prazosin before for a brief period of time; right?

21   *A.*   Yes, I believe so.

22   *Q.*   If you'll refer to --

23          Ms. Robinson, can you pull up what has been marked as

24   Exhibit 55, which is stipulated and admitted.  We'll pull that

25   to Primary Partners, page 15.

Lynn Price - Cross

1           Dr. Price, we sent you a hard copy of the exhibit that

2    we'd be using with you; so we'd like to refer to the hard copy

3    just so we're all literally on the same page here.  Do you have

4    that in front of you?

5    A.   What did you say, Exhibit 55?

6    Q.   Exhibit 55 which is excerpts of Primary Care Partners'

7    records.

8    A.   Yes.

9    Q.   Do you have that exhibit?

10   A.   Yes, I do.

11   Q.   We're going to go to -- the pages all have what are called

12   Bates numbers in the bottom right.  We're going to go to the

13   page that is numbered, Primary Care Partners 016.

14   A.   Yes, I've got that.

15           MR. SHAPIRO:  Jane, are you going to put it up so we

16   can see it?

17           MS. BOBET:  Yes.  Just one moment.

18           Did that work?

19           Are you able to see that?  Okay.  Great.

20           MR. SHAPIRO:  Can you make it larger, please?

21           MS. BOBET:  Yes.  We're going to refer to a particular

22   part in just a minute.

23   BY MS. BOBET:

24   Q.   On this page, about halfway down, it says, "She has never

25   been tried on prazosin, and we have discussed it today."  Is

Lynn Price - Cross

1   that right?

2   *A.*   Yes.

3   *Q.*   Okay.  So what's the date of this record, if you can see

4   it?

5   *A.*   November 8, 2017.

6   *Q.*   Okay.  So in the first visit you had with her, you

7   recommended she try the prazosin?

8   *A.*   Was this my first visit with her?  Yes.

9   *Q.*   Okay.  Now, within that same exhibit, we'll move to a few

10  pages -- a couple of pages before.  It's labeled on the bottom

11  right, Primary Care Part 012.  Primary Care Partners 12.  Just

12  below that black redaction, do you see that all right?

13  *A.*   Yes.

14  *Q.*   I see it's written here, "She has discontinued the process

15  in her bedtime.  This was for PTSD."  Is that right?

16  *A.*   Yes.

17  *Q.*   That "process in," does that refer to her prazosin?

18  *A.*   Well, that's how I'm reading it; but this is not my note.

19  *Q.*   Fair to say, that's probably what it referred to?

20  *A.*   Yeah.

21  *Q.*   Okay.  What's the date of this record?

22  *A.*   This is February of 2018.  Oh, it is my note.  I can't

23  see --

24  *Q.*   Well --

25  *A.*   Because it was before -- I was thinking it was before my

Lynn Price - Cross

 1    first visit; but you're right.  I can't see that I signed it.

 2    Have I signed it, if it was my note?

 3    Q.  That's just a function of how your office produced the

 4    document to us.  The pages are out of order, so we're referring

 5    to our Bates numbers.

 6    A.  I have to guess that this is my note.  I probably know

 7    better if I look on my computer and see.

 8    Q.  Let's -- so that we're all on the same page, let's keep

 9    referring to this.  But -- so where we were discussing before,

10    where it refers to, "She has discontinued the process in," do

11    you believe that refers to her discontinuing the prazosin?

12    A.  Yes.

13    Q.  Okay.  And continuing on in that same place, the record

14    reads, "She feels like it may have helped, but she read about

15    it, and she does not feel like it helped with the underlying

16    problems, so she has subsequently discontinued."  Did I read

17    that correctly?

18    A.  Yes.

19    Q.  This would have been something that Ms. Houston told you,

20    that's reflected here; right?

21    A.  Yes.

22    Q.  She told you that they thought the prazosin may have been

23    helping her; right?

24    A.  Yeah.  Looks that way.

25    Q.  But she discontinued it because she didn't feel like it was

Lynn Price - Cross

1   addressing what her underlying problem was?

2   A.  Yes.

3   Q.  As a general matter, if a patient has PTSD but doesn't

4   receive that right treatment for PTSD, is that detrimental to

5   them?

6   A.  Yes.

7   Q.  You believe that Ms. Houston has PTSD; right?

8   A.  I do.  Yes.

9   Q.  You believe there are treatments that could help PTSD for

10  her?

11  A.  Yes.

12  Q.  And, again, that's cognitive behavioral therapy?

13  A.  Yes.

14  Q.  And would that include something like exposure therapy?

15  A.  Yes.

16  Q.  And medications to help with her mood could also help with

17  PTSD; right?

18  A.  Yes.

19  Q.  And those medications would include antidepressants;

20  right?

21  A.  Yes.

22  Q.  I want to talk about antidepressants.  You often prescribe

23  them to patients, it sounds like; is that correct?

24  A.  Yes.

25  Q.  And antidepressants can be used for lots of different

Lynn Price - Cross

1    reasons, is that right?  They obviously treat depression.

2    Correct?

3    A.   Sorry.  I didn't realize that was a question.  Yes.

4    Q.   And if the patient has symptoms like difficulty

5    concentrating that results from their depression, an

6    antidepressant could treat those symptoms; right?

7    A.   Yes.

8    Q.   And antidepressants can also treat pain; is that right?

9    A.   Yes.  Certainly some better than others; but, yes.

10   Q.   Antidepressants can treat sleep disruption?

11   A.   Yes.

12   Q.   Another -- now, are there different types of

13   antidepressants; is that correct?

14   A.   Yes.

15   Q.   Those include SSRIs or SNRIs?

16   A.   Yes, and tricyclics.

17   Q.   What does that acronym stand for, SSRI?

18   A.   Selective serotonin reuptake inhibitor.

19   Q.   And what does SNRI stand for?

20   A.   Seratonin norepinephrine -- so I feel like I'm in med

21   school -- reuptake inhibitor.

22   Q.   So those are the sort of three types of antidepressants.

23   Generally, what are the differences between those types?

24   A.   So -- I mean, you would -- you often use SSRIs -- you might

25   use them in different circumstances.  Certain physicians are

Lynn Price - Cross

1   more comfortable with some over others.  You might pick out

2   different symptoms that you're trying to hit.

3   Q.  Within each of those categories, SSRI, SNRI, and

4   tricyclics, within each of those categories, are there -- there

5   are a number of different specific medications that are

6   available; right?

7   A.  Yes.

8   Q.  And you prescribe a variety of different antidepressants;

9   right?

10  A.  Right.

11  Q.  You prescribe Cymbalta; is that correct?

12  A.  Yes.

13  Q.  And that's an SNRI?

14  A.  Yes.  It's almost in a category of its own, but -- because

15  it's also pain medication.

16  Q.  Do you prescribe Lexapro in your practice?

17  A.  Yes.

18  Q.  And that's another kind of antidepressant; right?

19  A.  Yes.

20  Q.  That's an SSRI?

21  A.  Uh-huh.  Yes.

22  Q.  Antidepressants are generally effective; right?

23  A.  Depends on the patient.  Yes.

24  Q.  As a general matter, antidepressants are effective; is that

25  correct?

Lynn Price – Cross

1    A.   Yes.

2    Q.   And for the antidepressants that you prescribe, you

3    prescribe those because they're generally safe; right?

4    A.   Yes.

5    Q.   And they're not addictive; is that right?

6    A.   No, they're not addictive.

7    Q.   But a stimulant medication, that is addictive; right?

8    A.   Yes.

9    Q.   And stimulants would include something like Adderall?

10   A.   Yes.

11   Q.   Would include some things like Ritalin?

12   A.   Yes.

13   Q.   And stimulants like Adderall can also cause increased

14   anxiety?

15   A.   They can.  Yes.

16   Q.   Can cause mood changes?

17   A.   Yes.

18   Q.   They can cause insomnia?

19   A.   Yes.

20   Q.   And Adderall is a variety of amphetamine; is that true?

21   A.   Yes.

22   Q.   Now, I have a few more questions on antidepressants in

23   general.  Is it common for a patient who is prescribed an

24   antidepressant, they need to take that medication for some

25   period of time before seeing its full effects?

Lynn Price - Cross

1   *A.*  So usually -- so usually you would expect to have to take

2   an antidepressant for a few weeks.  In the initial studies on

3   these medications, they were used on severely depressed

4   patients who were hospitalized; and it was suggested that they

5   needed to be on the medication four to six weeks to see

6   effectiveness.  Usually, I like to give it that amount of time

7   to see if they're effective.  But with less severely depressed

8   patients, you can see responses in two weeks, but usually not

9   sooner than that.  If you're seeing a response sooner than

10  that, then it's probably placebo effect.  Unless you're -- if

11  you're talking about treating the depression.  You can see

12  sometimes that they're treating the side effects sooner.  So if

13  you've got -- if you're taking advantage of the sedating

14  effects of the medication, you're likely -- because you want to

15  help them with sleep, you may see that improvement the very

16  first night.

17  *Q.*  Now, if a patient is on antidepressants and experiences

18  some side effects, those generally go away after a few weeks on

19  medication; is that right?

20  *A.*  Well, usually I explain to patients that if they're having

21  a very mild side effect, they probably should put up with it,

22  because it will likely go away; but if they're having a

23  horrendous side effect, they should probably discontinue it and

24  let me know.

25  *Q.*  Is it common for patients who are prescribed an

Lynn Price - Cross

1   antidepressant to need to try different medications to find the

2   one that works best for them?

3   A.   Not really.  We try to avoid that.  I once did specialist

4   training on treating depression.  And the psychiatrist said

5   that the biggest mistake family practice doctors do is

6   switching and changing antidepressants.  And you should choose

7   one that you think is a good one, and if it's not working, you

8   should crank up the dose, but not switch and change around.  So

9   in general, I don't -- I try not to change some of these

10   antidepressants if it's not working.  I like to try and

11   escalate the dose or augment with another medication.

12          Obviously, if it's a side effect issue, then I'm

13   likely to discontinue it and try another in the hope that it's

14   not a class effect, and they're not going to have the same side

15   effect.  If that's something I feel comfortable doing, if it's

16   a relatively trivial side effect such as diarrhea.  But when it

17   is a more serious side effect, of course, it makes you a little

18   bit gun shy.

19   Q.   All right.  Do you believe Ms. Houston could benefit from

20   being on an antidepressant; right?

21   A.   Yes.

22   Q.   In fact, you would still really like to see her on an

23   antidepressant; true?

24   A.   I would like to try her on one; but, obviously, with the

25   response that she had to the Cymbalta, with potentially that

Lynn Price - Cross

1    causing a seizure, I would like to, you know -- I want to be a

2    little bit careful.

3    Q.  Let's talk about that episode.  So is there a difference as

4    a general matter between a seizure and a syncopal episode?

5    A.  Yes.

6    Q.  What is a syncopal episode?

7    A.  A syncopal episode is basically just passing out.  Whereas,

8    a seizure, of course, is with all the neurons firing in the

9    brain and actually having a seizure.  I don't know how else

10   to -- it's a different entity.

11   Q.  If you'll refer to -- in that Exhibit 55, we're going to

12   page Primary Care Part 399.  It will be towards the end of that

13   tab there.

14         I'll ask Ms. Robinson to pull it up and zoom in on the

15   large paragraph, mid page, the first line of that paragraph.

16   Share contents shortly.

17         All right.  I'd like to refer you, Dr. Price, to the

18   first line in this sort of big paragraph of text.  "Patient

19   wish to talk about her visit" --

20         MR. SHAPIRO:  Can you tell me what number you're on?

21   Sorry.

22         MS. BOBET:  We're on Exhibit 55, page Primary Care

23   Partners 399.

24         MR. SHAPIRO:  Thank you.

25         MS. BOBET:  And we're on the first line of that big

Lynn Price - Cross

1   paragraph of text.

2   *BY MS. BOBET:*

3   *Q.*  And that reads, "Patient wish to talk about her visit with

4   Dr. Burnbaum on April 3.  She did have a normal EEG.  He felt

5   that this was likely a syncopal convulsion."  Did I read that

6   correctly?

7   *A.*  Yes.

8   *Q.*  And this is a record of yours; right?

9   *A.*  Yes.

10  *Q.*  And it's repeating what you understand the neurologist

11  opined about the episode Ms. Houston suffered?

12  *A.*  Yes.

13  *Q.*  So the neurologist thought that it was a syncopal

14  convulsion; right?

15  *A.*  Yes.

16  *Q.*  Which is different than a seizure?

17  *A.*  Yes.

18  *Q.*  And then on here also, to your knowledge she had an EEG

19  after that episode; right?

20  *A.*  Yes.

21  *Q.*  And that EEG was normal?

22  *A.*  Yes.

23  *Q.*  So that's a further indication that what she had was not a

24  seizure; is that right?

25  *A.*  It's possible that it wasn't a seizure.

Lynn Price - Cross

1   *Q.*  And I'd like to refer to the next line in this same

2   paragraph, "Likely related to dehydration, missed sleep, and

3   possibly the Cymbalta."  Did I read that correctly?

4   *A.*  Yes.

5   *Q.*  So the event, the syncopal convulsion that Ms. Houston

6   suffered, was likely related to dehydration; is that right?

7   *A.*  Well, I'm reporting what Dr. Burnbaum has said.  That was

8   his thought.

9   *Q.*  And Dr. Burnbaum is the neurologist that saw Ms. Houston;

10  right?

11  *A.*  Yes.

12  *Q.*  Do you have any reason to disagree with the neurologist's

13  conclusion?

14  *A.*  Not really.  No.

15  *Q.*  And in general, when you're talking about a seizure or a

16  possible seizure, a neurologist is the right expert to ask

17  about that; right?

18  *A.*  Yes.

19  *Q.*  So I'll ask again, is it true that Ms. Houston's episode

20  was likely related to dehydration?

21  *A.*  It's possible that the episode that occurred was not a

22  seizure, but a syncopal episode caused by dehydration.  That's

23  one interpretation.  That's the interpretation Dr. Burnbaum

24  gave.  I have no reason to believe that that is not correct.

25  *Q.*  So no reason to believe that the syncopal episode could

1    have been caused by dehydration?

2    *A.*   Could have been.  Yes.

3    *Q.*   No reason to believe it wasn't caused by missed sleep?

4    *A.*   No.

5    *Q.*   And there is a possibility that it was caused by the

6    Cymbalta?

7    *A.*   Yes.

8    *Q.*   Is there future risk associated with stimulants?

9    *A.*   Potentially, yes.

10   *Q.*   And, again, Adderall is a type of stimulant; right?

11   *A.*   Yes.

12   *Q.*   Ms. Houston is still on the Adderall, to your knowledge;

13   correct?

14   *A.*   Yes.  She was last time I spoke with her.

15         *MS. BOBET:*  So I see -- what time is it?  Looks like

16   we're at 5:04.  I still do have a fair amount of material for

17   this witness.  I'm happy to continue questioning if Your Honor

18   would prefer; or we can recess until tomorrow, as you prefer.

19         *THE COURT:*  How is your schedule, Doctor, for tomorrow

20   morning?

21         *THE WITNESS:*  Well, I believe I've got a full schedule

22   of patients.  Let me have a look.

23         *THE COURT:*  Can you make it?

24         *THE WITNESS:*  Let me see.  I've got a full schedule of

25   patients from 8:30 until 4:00 p.m.

1          MS. BOBET:  If Your Honor would prefer -- I'm sorry --

2    I'm so sorry.  Go ahead.

3          THE COURT:  I was going to say, can we ask the doctor

4    to be back here at 4:15 tomorrow afternoon?  Can we take other

5    witnesses in the meantime?

6          THE WITNESS:  Yeah, I can do that.

7          THE COURT:  Let's do that.

8          And I want to explain something to you, Doctor, as

9    well, for the benefit of the other people involved in this.

10   And that's that we -- because of the coronavirus, we have

11   certain regulations here at the court that are very strict.

12   And we've already gone over the time, but we're supposed to be

13   clearing the entire courthouse by 5:15.  So that's the reason I

14   have to inconvenience you to have you come back tomorrow.  It's

15   not that we couldn't go on tonight, except that I just can't do

16   that.

17         THE WITNESS:  If we meet at 4:15, are we going to be

18   able to get this completed?  Or do I need to reschedule my last

19   patient and make it a little earlier?

20         THE COURT:  Yes, if you can -- if you can reschedule

21   your last patient, make it a little earlier, that would be

22   wonderful.

23         THE WITNESS:  We can do that.  How -- how much longer

24   do you think?  What time would be -- if we want to finish by

25   5:00 o'clock tomorrow again, did you want to meet at 3:30?

1  Would that --

2          THE COURT:  We have as much trouble trying to project

3  the length of examination as each diagnosis.

4          But how much more do you think you have, Ms. Bobet?

5          MS. BOBET:  I'll endeavor to keep the rest of my

6  questions to an hour, and I think that's a reasonable estimate.

7          THE WITNESS:  So if I reschedule my patient, and we

8  meet at 3:30, does that work for everybody?

9          THE COURT:  3:30 would be absolutely splendid.

10         MS. BOBET:  I appreciate it.

11         THE WITNESS:  I'll say 3:30, if you say you'll keep it

12  to an hour.

13         MS. BOBET:  Now you've got me pinned to that.

14         THE COURT:  Let's say -- we'll recess on this witness

15  until 3:30 tomorrow afternoon.  And we will recess court until

16  9:00 a.m. tomorrow and proceed with the rest of the plaintiff's

17  case by having her next witness ready.  All right?

18         Mr. Ogborn, are you there?

19         MR. OGBORN:  I am, Your Honor.

20         MR. SHAPIRO:  We are here.

21         THE COURT:  Is that agreeable?

22         MR. OGBORN:  Yes, Your Honor.  Thank you.

23         MR. SHAPIRO:  We'll juggle witnesses.

24         THE COURT:  We'll be hearing the other witnesses

25  starting at 9:00.  We'll be in recess.

1        And thank you for your cooperation, Dr. Price.  I

2   appreciate it.

3        *THE WITNESS:*  Not a problem.

4        (Recess at 5:08 p.m.)

5                          **I N D E X**

6   **Item**                                                    **Page**

7

Opening Statement By Mr. Shapiro                              4
8   Opening Statement By Mr. Scarpato                           22

9      MYLES SHIFLET
           Direct Examination By Mr. Ogborn                    36
10          Cross-examination By Mr. Scarpato                  49
       KENYON HENRICKS
11          Direct Examination By Mr. Ogborn                   52
           Cross-examination By Ms. Bobet                      59
12     ADAM COTA
           Direct Examination By Mr. Shapiro                   65
13          Cross-examination By Mr. Scarpato                 126
           Redirect Examination By Mr. Shapiro               134
14          Recross-examination By Mr. Scarpato              138
       PENNY HAGEL
15          Direct Examination By Ms. Bobet                  140
           Cross-examination By Ms. Bobet                    148
16          Examination By The Court                         152
           Cross-Examination Continued By Ms. Bobet          154
17          Redirect Examination By Mr. Ogborn               154
       LYNN PRICE
18          Direct Examination By Mr. Shapiro                156
           Cross-examination By Ms. Bobet                    189

19

20                      PLAINTIFF'S EXHIBITS

21   Exhibit        Offered   Received   Refused   Reserved   Withdrawn

22   2, page 3                    44
    2, page 4                    45
23   2, page 5                    45
    2, pages 6,7,8,9             46
24   2, pages 1 and 10           48
    15                           78

25

1                    REPORTER'S CERTIFICATE

2            I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.
3
             Dated at Denver, Colorado, this 27th day of September,
4    2020.

5

6

7

8                    _____

9                    Therese Lindblom,CSR,RMR,CRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25