210

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02914-JLK-MEH

TRACY HOUSTON,

    Plaintiff,

vs.

THE UNITED STATES OF AMERICA,

    Defendant.

_____

**REPORTER'S TRANSCRIPT**
TRIAL TO COURT – DAY TWO

_____

    Proceedings before the HONORABLE JOHN L. KANE, JR.,
Senior Judge, United States District Court for the District of
Colorado, continuing at 9:03 a.m., on the 22nd day of
September, 2020, via Video Teleconference.

**A P P E A R A N C E S**

    STEVEN A. SHAPIRO, MICHAEL JON OGBORN, and AMANDA R.
PFEIL HOOD, Attorneys at Law, Ogborn Mihm, LLP, 1700 Lincoln
Street, Suite 2700, Denver, Colorado, 80203, appearing for the
Plaintiff.

    JANE ELIZABETH BOBET and VICTOR WILLIAM SCARPATO, III,
Attorneys at Law, 1801 California Street, Suite 1600, Denver,
Colorado, 80202, appearing for the Defendant.

THERESE LINDBLOM, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

Kenneth Lewis, M.D. – Direct

1                      **P R O C E E D I N G S**

2              (In open court at 9:03 a.m.)

3              *THE COURT:*  Thank you.  Good morning.  Please be

4    seated, everyone.

5              Plaintiff's counsel, can you hear her?

6              *THE WITNESS:*  Are you talking to me --

7              *MR. SHAPIRO:*  Yes, we can, Your Honor.

8              *THE COURT:*  Now, if the witness will please raise his

9    right hand, and the Clerk of the Court will administer an oath.

10   Please go ahead.

11              (**KENNETH LEWIS, M.D., PLAINTIFF'S WITNESS, SWORN**)

12              *THE COURT:*  Thank you, sir.

13              We're going to hear your testimony now, and you'll be

14   examined by plaintiff's counsel first.

15              Go ahead, please.

16              *MR. SHAPIRO:*  Thank you, Your Honor.

17                      **DIRECT EXAMINATION**

18   *BY MR. SHAPIRO:*

19   *Q.*  Doctor, can you please state your name for the record.

20   *A.*  Kenneth Charles Lewis.  L-E-W-I-S.

21   *Q.*  What is your professional address, sir?

22   *A.*  Actually, here at the hospital, I -- 300 West Ottley,

23   Fruita, Colorado.

24   *Q.*  And what is your profession, sir?

25   *A.*  I'm a board-certified anesthesiologist, now currently

Kenneth Lewis, M.D. - Direct

 1   involved in 100 percent interventional pain management.

 2   Q.  Can you describe what it is that an interventional pain

 3   management doctor does.

 4   A.  Yes, we --

 5          THE COURT:  Hold on just a moment.  Somebody is not

 6   muted, and we've got some feedback going on.  If you all could

 7   check, counsel, in your respective rooms.

 8          Go ahead.

 9          THE WITNESS:  Yes.  As an interventional pain

10   management anesthesiologist, we work to both diagnose and treat

11   sources of chronic pain through a variety of techniques,

12   usually needle-based, with advancement under fluoroscopy of

13   needles in and around the spine, primarily, but also structures

14   where there may be neural elements we could diagnose and treat

15   to attempt to reduce the pathology of chronic pain.

16   BY MR. SHAPIRO:

17   Q.  How do you spend your time?  How much time percentage-wise

18   do you spend doing what?

19   A.  I have arranged my practice so that I spend 90 percent of

20   time in the process of actually providing injections.  But also

21   before each injection, there is, of course, a period of time

22   where I'm interviewing the patient that day and counseling them

23   as to what our options may be given either success or failure

24   of that current day's treatment plan.

25   Q.  What is your educational background, Doctor?

Kenneth Lewis, M.D. – Direct

1    *A.*   Medical school training at the University of Arizona, and

2    then an anesthesia residency also at the University of Arizona.

3    And then I practiced as a cardiac anesthesiologist for the

4    first ten years.  And then since that time, I have elected to

5    spend the entirety of my time with interventional pain

6    management.

7    *Q.*   Okay.  And where do you practice, and what do you have set

8    up at that hospital where you are to allow you to practice the

9    way you do?

10   *A.*   Yeah.  I'm the medical director of the Department of

11   Anesthesia at the outpatient procedure center at Colorado

12   Canyons Hospital and Medical Center in Fruita.  And I have a

13   facility that has been designed specifically for my treatment

14   process, with two treatment rooms and five preoperative areas,

15   where patients go both for and following their treatments

16   before they're discharged.  So I have about -- on any given day

17   about eight nurses and radiology techs that help me move

18   through the process of treating the patients.

19   *Q.*   You said you are board certified.  What are you board

20   certified in?

21   *A.*   Anesthesiology.

22   *Q.*   Have you held any positions with the American Society of

23   Interventional Pain Physicians?

24   *A.*   I'm president of the Colorado chapter of Interventional

25   Pain Physicians.

Kenneth Lewis, M.D. - Direct

1  *Q.*  How long have you been the president?

2  *A.*  For eight years, I believe.

3       *MR. SHAPIRO:*  Your Honor, at this time I'd move for

4  the admission of Dr. Lewis as an expert in medicine with a

5  specialty in pain management, anesthesiology, and

6  interventional pain management.

7       *MR. SCARPATO:*  No objection, Your Honor.

8       *THE COURT:*  The tender is accepted.  The motion is

9  granted.  The doctor is recognized by this court as an expert

10  in medicine, with specialty in pain management, anesthesiology,

11  and interventional pain management.

12       *MR. SHAPIRO:*  Thank you, Your Honor.

13  *BY MR. SHAPIRO:*

14  *Q.*  How did you come to see Ms. Houston, Dr. Lewis?

15  *A.*  She was referred to our practice for her post-injury

16  chronic pain with a devastating injury to her foot and ankle

17  that was not progressing despite what appeared to be, you know,

18  aggressive and appropriate orthopedic repair.

19  *Q.*  When did your office first see Ms. Houston?

20       Doctor, if you need to look at your records, please

21  let us know that you're looking at your records to refresh your

22  memory.

23  *A.*  I apologize for not having brought that in myself.

24       *THE COURT:*  No need to apologize.  This is the first

25  time all of us have done this by video.

Kenneth Lewis, M.D. - Direct

1      *THE WITNESS:*  I'm kind of used to having this placed

2  in front of me.  If you need me to, I can have them bring in my

3  chart, but there will be a little delay.

4      *MR. SHAPIRO:*  I would rather do that so we don't end

5  up having to take breaks later.  Is that okay.  Your Honor?

6      *THE COURT:*  Unless you have the records that you can

7  put on the screen now.

8      *MR. SCARPATO:*  It should be Exhibit 64, Mr. Shapiro.

9      *THE WITNESS:*  I'm going to turn right behind, make the

10  request out the door.  It will take me 30 seconds or less,

11  here.

12      I apologize, I have found what I need.

13  *BY MR. SHAPIRO:*

14  *Q.*  My question was, Doctor, when did you first see

15  Ms. Houston?

16  *A.*  And I am looking at my record, and it looks as if that may

17  have been the original consult date of August 27 of -- no,

18  that's -- I'm sorry.  Everything is out of order here.  I

19  thought I was prepared.

20  *Q.*  So did you see -- did your nurse practitioner see

21  Ms. Houston before you?

22  *A.*  Yes.  My nurse practitioner saw the patient before me.

23  *Q.*  Do you have that date, or is that what you're looking for?

24  *A.*  I think they have it backwards in here.  It looks like the

25  one I'm looking at now is dated March 15, 2019.

Kenneth Lewis, M.D. – Direct

1   Q.  And who is your nurse practitioner, and why does your nurse

2   practitioner usually see the patients before you?

3   A.  This is Heather Smith.  She's actually got a doctorate as

4   well as nurse practitioner.  I utilize that because after I've

5   trained them to collect the data that I need, do the physical

6   exams and neurological exams I need, collect all the

7   appropriate X rays, MRIs, and data, that allows them to now

8   follow them and set them up for certain type of initial

9   procedure.  That allows me to focus my time on the actual

10  procedure, because I'd only be able to see a fourth as many

11  people.  I have three nurse practitioners who work with me to

12  accomplish that initial intake information gathering.

13  Q.  Are you quite confident in this nurse practitioner?

14  A.  She does a fantastic note, very thorough; and there is

15  always, of course, communication with me in the process of

16  bringing these patients to my first meeting.  And so, yes, they

17  accomplish what most physicians would be very happy to

18  accomplish.

19  Q.  Why did Ms. Houston come to see you?  I know you mentioned

20  her leg.  What specifically were the issues of why she came to

21  see you and saw your nurse practitioner in March?

22  A.  Yes.  Well, her recovery just did not seem to move the

23  direction she needed.  The pain was bad, worse than before the

24  injury itself, which, of course, is the type of chronic pain I

25  see.  That is what brought her to us, just the fact that there

Kenneth Lewis, M.D. – Direct

 1   was no progressive improvement in her pain condition.

 2   Q.  We know that Ms. Houston also saw Dr. Ellen Price.  What is

 3   your office's relationship with Dr. Ellen Price, and how do

 4   your practices complement each other?

 5   A.  She is a physiatrist.  She is more Eastern medicine, and

 6   mine is more of a Western medicine approach.  Sometimes there

 7   is patients that will respond better to one approach or the

 8   other.  We're fortunate in this program here that we can share,

 9   you know, therapy options with our patients under one roof and

10   be able to actually speak about these patients in person.

11   And -- but, otherwise, she has a completely separate practice

12   from me, but we -- we -- I think it complements the patient's

13   options when all of that is available in one facility.

14   Q.  Did you have an impression after your office first saw

15   Ms. Houston as to the type of care or procedures that she

16   preferred, Ms. Houston, when she was looking into pain

17   management assistance?

18   A.  By the time I had seen her, she had already tried a variety

19   of interventions, specifically medications and, of course, the

20   surgeries, with some mild improvement with the gabapentin that

21   she had been placed on.  But her level of pain was so high that

22   the overall general impression of her condition was -- you

23   know, failed the treatment of her chronic pain syndrome.  And

24   she was going to move forward with a more nonsurgical approach,

25   other than additional orthopedic surgeries.  She did understand

218

Kenneth Lewis, M.D. – Direct

1   in my practice, our treatments would be invasive as far as

2   needles; but she wanted to go forward with some options that

3   might give her relief she was unable to find at that point.

4   Q.  What type of options did you have available to assist

5   Ms. Houston?

6   A.  Well, given my impression of her original presentation,

7   which was a pain syndrome far exceeding the level of current

8   injury and damage, given the fact that her surgery was remote

9   at that point in time, the pain was so severe, I thought she

10  was developing a chronic pain syndrome that was outside the

11  realm of tissue damage.  I have described it as a complex

12  regional pain syndrome, because it was very complex, and

13  regionally, involving just the one extremity.  She didn't have

14  a lot of other back pain or other issues that required

15  evaluation, so this was a -- a non-progressing extremity injury

16  pain that required treatment.  My first choice was to treat the

17  sympathetic system that is involved with remembering and

18  maintaining a pain after injury with sympathetic blocks.

19  Q.  All right.  Let me ask a couple of questions to have you

20  define a few things you just said.  What is chronic pain

21  syndrome?

22  A.  Well, it's relatively self-explanatory.  Pain which is not

23  resolving.  Chronic would be anything longer than three months,

24  and she was well past that.  Also included pain that notably

25  exacerbates during that same period of time, and in her case no

Kenneth Lewis, M.D. – Direct

1   overall improvement.  Syndrome is just the fact that this is

2   occurring in one person and is a known pathology after certain

3   types of severe crush-type injury.

4   Q.  Can you define the sympathetic system and what you do with

5   you sympathetic nerve blocks?

6   A.  I will try to; it is complex.  But there is the central

7   nervous system that most people know, the brain, the spinal

8   cord and roots; but then there is another component of the

9   central nervous system which has more of an autonomic,

10  non-self-driven control of certain functions in your body.  A

11  good example would be controlled blood flow to the kidneys or

12  liver or the movement of your bowels during digestion.  Things

13  that need neuro input, but you don't want to spend time

14  thinking about.  Automatic, autonomic system, one of those

15  systems was involved in.

16          Evolutionarily, we believe there is homeostasis after

17  severe injury to specifically an extremity.  A good example

18  would be, if there is a severe crush injury that also includes

19  bleeding, there is neuro input from the sympathetic system to

20  the small vessels around that injury area that causes the

21  muscles to squeeze down and significantly decrease the amount

22  of blood flow in the extremity with the hopes of salvaging the

23  organism and the extremity.  So there is a lot of internal

24  responses to severe injury that at least initially are very

25  beneficial.  But if those signals of trauma and salvage

Kenneth Lewis, M.D. - Direct

1   continue well beyond what is seen as -- expected to be the

2   healing phase, well, then, that can then turn into a pathology.

3   Q.  Okay.  Thank you.

4        Can you also compare, define, and contrast chronic

5   pain syndrome and complex regional pain syndrome?

6   A.  Could you say that one more time for me?

7   Q.  Yes.  Can you compare, define, and contrast chronic pain

8   syndrome and complex regional pain syndrome?

9   A.  Well, chronic pain syndrome I think would be basically

10  defined as pain that has extended beyond three months.  Complex

11  regional pain syndrome is one that is believed to involve some

12  component of the autonomic nervous system overreacting to the

13  original pain signal that should have dispersed at that point

14  in time.  Once again, that autonomic response is functional

15  initially but can become nonfunctional if it is constantly

16  triggered beyond what should be considered the normal healing

17  phase.

18  Q.  So I want to make sure that I get this foundation, as well.

19  You treat chronic pain; correct?

20  A.  Yes.

21  Q.  Complex regional pain syndrome?

22  A.  Yes.

23  Q.  Traumatic arthritic chronic pain?

24  A.  Yes.

25  Q.  Do you treat post-traumatic stress disorder?

Kenneth Lewis, M.D. – Direct

1   *A.*   I do not.

2   *Q.*   Traumatic brain injury?

3   *A.*   I do not.

4   *Q.*   Depression or anxiety?

5   *A.*   Yes.  Some degree with depression and anxiety in the sense

6   that it's a known component of chronic pain that must be

7   treated in order to have success with the treatment of chronic

8   pain, but I usually refer that out for more professional

9   follow-up.  But it is a component of my practice, where those

10  things must be identified and not allowed to be untreated.

11  *Q.*   So is depression and anxiety common in chronic pain

12  patients?

13  *A.*   Yes.

14  *Q.*   All right.  A few more definitions to get some

15  understanding of.  Can you distinguish between traumatic

16  arthritic chronic pain, chronic pain, and complex regional pain

17  syndrome?

18  *A.*   That would be difficult to do with assurance.

19  *Q.*   Okay.  Why is that?

20  *A.*   Well, all of those include the word pain, which, of course,

21  is the target for my treatment.  One of the sources of the pain

22  is chronic arthritis, in other words, mechanical production of

23  pain, versus a non-mechanical neuropathic -- in other words,

24  nerve injury pain -- where the components were depression and

25  anxiety, plays into the feedback of those symptoms.  It's

222

Kenneth Lewis, M.D. – Direct

1   sometimes difficult to distinguish.  In my practice, of course,

2   the measurement of success is very simply that this -- the

3   decrease in the patient's perceived level of pain.

4   Q.  Does it matter if you can or can't distinguish in what

5   you're doing to try to help these patients?

6   A.  I believe it matters in the sense that if there is a true

7   mechanical component -- and that is the majority of the source

8   of their pain, then the mechanical component needs to at least

9   be stabilized so that that portion of the pain can be removed

10  from the equation, because my therapies are really treating the

11  neuropathic component of that pain.  But that's not always

12  evident, whether it be spine or extremity, whether or not the

13  mechanical component has been optimized.

14  Q.  And if you find a mechanical component, is that something

15  that you refer to, let's say, orthopedic surgeons?

16  A.  There are some mechanical components that I will treat with

17  percutaneous procedures, but those are spines.  If there is a

18  mechanical extremity component, that will always be referred to

19  an orthopedic surgeon.

20  Q.  Okay.  Now, this one I -- want to see if you can explain

21  the distinction between nerve pain and complex regional pain

22  syndrome.

23  A.  They both are part of each other.  You cannot have a

24  complex regional pain syndrome without the nervous system

25  involved, and specifically -- we believe the sympathetic

Kenneth Lewis, M.D. - Direct

1    component of that nervous system being involved in what would

2    be described as overplaying the previous trauma in a way that

3    should have been resolved neurologically.

4    Q.   Now, one other thing.  Can you have a combination of

5    chronic pain syndrome, complex regional pain syndrome,

6    mechanical chronic pain, and nerve pain?

7    A.   Yes.

8    Q.   Does that make it more complex?

9    A.   That makes it more complex.

10   Q.   Is it more difficult to treat that?

11   A.   Yes.

12   Q.   How do you diagnose chronic pain, or how do you dis-- let's

13   do that first.  How do you diagnose chronic pain?

14   A.   Most people would accept the diagnosis of pain at a level

15   to be unbearable for more than three months.

16   Q.   How about, how do you diagnose complex regional pain

17   syndrome?

18   A.   There is a lot of debate there, but I think most people

19   would suggest that that is diagnosed by a -- a presentation of

20   pain that clearly exceeds the known mechanical component or

21   after a known mechanical component has had a time frame to

22   heal, and where there appears to be a pathological,

23   neurological component, which sometimes can include a -- for

24   instance, as the blood vessels are contracting, a blanching of

25   the skin, sensation of severe pain with brushing of the skin,

Kenneth Lewis, M.D. – Direct

1   where there appears to be an overall neurological pathology,

2   where the nerves themselves seem to be nonfunctioning.

3   Q.   How do you diagnose mechanical chronic pain?

4   A.   I think that could be best diagnosed by simply movement of

5   the structure area, and the fact that the structured area is

6   being moved causes pain, which is a mechanical response, versus

7   someone who may have just severe pain when they're lying and no

8   weight and no actual pressure on the involved joint, where that

9   pain is purely a neuro input regardless of any mechanical

10   stress in the problem area.

11   Q.   When you have the combination that we spoke about --

12   chronic pain, complex regional pain, mechanical pain, and nerve

13   pain -- how do you determine or can you determine how much of

14   each is involved?

15   A.   I will say that my approach to that situation would be very

16   focused.  My goal as an interventional pain physician is to

17   find therapies that treat the pain.  And in most presentations,

18   there is a limited number of appropriate safe and reproducible

19   procedures.  And so my practice frequently then weights itself

20   highly on response to therapies that should be something that

21   would reduce pain.  And I will have a list of therapies that

22   may be reasonable, I will discuss those options with the

23   patient, and then my further diagnostic algorithm will very

24   quickly follow the responses to attempts to treatment.  Because

25   in my practice, my goal is not a precise percentage of specific

Kenneth Lewis, M.D. – Direct

225

1    diagnoses versus what is, in my practice, an expected goal of

2    just a simple reduction in pain that's reliable and permanent.

3    Q.  Are you really trying to acquire pain reduction and

4    increased function for your patients?

5    A.  Yes.  That's the entire goal for my office.

6    Q.  What level of pain do patients usually come to treat with

7    you for?

8    A.  That's quite variable.  I mean, even the typical pain scale

9    of zero to ten, of course, is only valid for that individual

10   patient.  And one patient's six may be somebody else's ten, and

11   vice versa.  So I think most people when they find that the

12   degree or pernicity of their pain affects their function or

13   their mood to a degree that it's no longer acceptable, that's

14   when they'll seek out care.

15   Q.  What level of pain did Ms. Houston come to your office

16   complaining of?

17   A.  Give me a second.

18   Q.  Actually, while you're doing that, I'm going to ask you

19   what she told you and how she described her pain.

20   A.  She described her pain as a numbness and tingling in her

21   toes and right foot and some weakness of the right lower

22   extremity, frequent pins and needles sensation in foot/ankle

23   and halfway up shin and calf, accompanied by sensation of

24   stiffness and tightness and overall vice grip on her foot.  She

25   said the pain was aggravated by anything cold or walking or

Kenneth Lewis, M.D. – Direct                        226

1   being in bare feet on tile.

2   Q.  When you hear a description like that, what is your

3   reaction?  What do you automatically think?

4   A.  Those are sensations that would normally not be painful to

5   a patient.  And when you have a sensation that is painful with

6   otherwise non-painful stimulus, with pain involved, that sounds

7   like a complex regional pain syndrome.

8   Q.  What were the results of the evaluation and assessment by

9   your nurse practitioner during the first visit?

10  A.  The differential, neuropathic pain, ankle joint

11  pathologies, sympathetically maintained pain, chronic

12  post-procedural pain, and complex regional pain syndrome.

13  Q.  What does sympathetically maintained pain mean?

14  A.  That's the sympathetic system that we discussed earlier,

15  which sometimes is functional with helping to reduce acute --

16  short-term pathology changes in the organism.  But when that

17  then becomes maintained, regardless evidence of otherwise

18  healing of the original injury, then the maintenance of that

19  response is no longer functional, and, in fact, dysfunctional.

20  Q.  What history did your nurse practicer obtain from

21  Ms. Houston?

22  A.  Would you like me to read the history?  I'm not sure --

23  Q.  If you can give me a summary of it or read it.

24  A.  Sure.  I will read the discussion, which is usually a

25  summary in her note.  One long paragraph.

227

Kenneth Lewis, M.D. – Direct

1          *MR. SCARPATO:*  Your Honor --

2          I'm sorry, sir.

3          I've made a foundation objection to this question.

4          *THE WITNESS:*  Okay.  Sorry.

5          *THE COURT:*  All right.  Sustained.

6          *MR. SHAPIRO:*  Thank you.

7  *BY MR. SHAPIRO:*

8  *Q.*  Doctor, when your nurse practitioner meets with a patient,

9  does she obtain a history?

10  *A.*  Yes, she does.

11  *Q.*  Is that a history that you rely upon in formulating your

12  treatment plan, diagnosis, and how you're going to manage this

13  patient's care?

14  *A.*  Yes.

15  *Q.*  Is that done frequently or all the time with your patients

16  in your practice, and is it routine for you to review those?

17  *A.*  All the time, yes.  Routine for me to review those.

18  *Q.*  Did you review this history in order to formulate what you

19  were going to try to do in order to assist Ms. Houston?

20  *A.*  Yes.

21  *Q.*  What was the history that your nurse obtained?

22  *A.*  As I described above, the description of her pain and the

23  fact that that had occurred after her motor vehicle accident in

24  2016, which also resulted in traumatic brain injury, medial

25  malleolus fracture, with a number of other fractures.

228

Kenneth Lewis, M.D. - Direct

1    *Q.*  Did your nurse practitioner do an evaluation?

2    *A.*  Yes, she did.

3    *Q.*  What were the results of that physical examination?

4    *A.*  Gross motor function to be normal left and right other than

5    there was pain with any attempt to maneuver the affected

6    extremity.  So that was the pain finding.  There did not appear

7    to be any muscular abnormalities.  It was purely a pain

8    syndrome -- I'm sorry.  That also included deep tendon

9    reflexes.  All the neurological and muscular components of the

10   exam were normal, other than the extreme pain with otherwise

11   gentle examination.

12   *Q.*  What does that mean to you when an examination has those

13   findings?

14   *A.*  Well, there are two components to the examination findings,

15   I believe, which is a clear continued mechanical component,

16   versus if she would attempt to stand and walk, of course, there

17   was increased pain.  But there is also severe response to pain

18   with just simple touching of the ankle, and even her perception

19   that we were going to touch her ankle resulted in a significant

20   withdrawal and perception of pain.

21   *Q.*  What was her assessment or diagnosis and treatment options

22   that she would have for Ms. Houston?

23   *A.*  I had read those earlier but I will again.  Original

24   differential diagnosis at the end of her evaluation simply

25   included neuropathic pain, ankle joint pathology,

Kenneth Lewis, M.D. – Direct

1    sympathetically maintained pain, chronic post-procedural pain,

2    and a complex regional pain syndrome.

3    Q.  So after you've had an opportunity to treat Ms. Houston for

4    a while and you've seen her after this assessment, did you

5    agree with the assessment and diagnosis of your nurse

6    practitioner?

7    A.  Yes.

8    Q.  Did you think after that appointment she was going to be

9    treating with your office or Dr. Ellen Price's office?

10   A.  I knew she was going to be eventually treated in my office,

11   and I was not aware -- at that point in time, at least -- of

12   any combined or additional appointments with Dr. Price.

13   Q.  After that initial visit when you began to see Ms. Houston

14   again, did you think that this was just complex regional pain

15   syndrome solely or a combination of different sources of pain?

16   A.  I believe that within a very short period of time I was

17   able to recognize there was a number of other issues involved,

18   including her depression.  That was evident on most of her

19   visits.  And I was clearly impressed by her dismay with the

20   pain.  It seemed to not be resolving; and she felt as if it had

21   really brought her -- her current life condition to a halt,

22   where there was no other -- that was the main and only issue

23   she dealt with each day.  It was an overwhelmingly

24   psychological and painful scenario.

25   Q.  What did you think were the pain generators or the

230

Kenneth Lewis, M.D. - Direct

1    competing combination of pain generators and why?

2    A.   There was the obvious initial very traumatic injury that

3    involved significant orthopedic injury.  But whenever you have

4    that type of injury, there is always associated other tissue

5    injuries with ligaments and nerves and vessels.  And vessels

6    have their own neuro component, as I described before.  So

7    there is a significant overall general extremity tissue injury,

8    and sometimes those tissue injuries far exceed a lingering pain

9    syndrome with more associated than just the bone itself.

10   Q.   What was significant about what she told you and why she

11   wanted your help at that point?

12   A.   She felt that the orthopedists attempting to treat her pain

13   were simply ineffective in giving her the recovery that she was

14   expecting.  I don't think she was expecting to have a normal

15   ankle; she was expecting to have an injured ankle that wasn't

16   chronically severely painful.

17   Q.   Can you tell the judge, if you would, the type of patient

18   that Ms. Houston has been -- before you do that, how many times

19   have you seen her, and how many -- how long have you been

20   treating her?

21   A.   The most recent time -- I'll try -- was a spinal cord

22   stimulator trial.  Of course, the initial time was back in the

23   spring of 2019.  So she was here most recently to see her

24   personally was the placement of the trial stimulator on

25   August 24 of this year.  So from March of 2019 to August of

Kenneth Lewis, M.D. – Direct

1    this year, I could count up all the visits, but numerous.

2    Q.  Okay.  Tell the judge, if you would, the type of patient

3    Ms. Houston is and has been.

4    A.  To summarize that as far as interventional pain physician

5    or her as a person?

6    Q.  As interventional pain specialist.

7    A.  She is just a very complex patient with multiple facets to

8    her pathology, including severe trauma, signs and symptoms of a

9    chronic neuro component that is pathologically involved with

10   that, and then, of course, the difficulty communicating with a

11   patient that also suffers from a brain injury and has

12   situational depression over her chronic pain.  And the

13   combination of those four things make her a very complex

14   patient, both to develop a treatment plan, but also to gauge

15   the success of any of the treatments that you get.  It's very

16   complex and not easy to derive the outcomes that would maybe

17   change your treatment plan in the future.

18   Q.  Is that type of patient unusual in your practice or fairly

19   commonplace?

20   A.  Very commonplace.

21   Q.  When did you finally get an opportunity to do an

22   examination of Ms. Houston, and what were the results of your

23   examination?

24   A.  It looks as if -- if I have things in the correct order,

25   that my initial evaluation of her would have been July 11 of

Kenneth Lewis, M.D. - Direct

1    2019.  At that point in time, I had reviewed her evaluation

2    with Heather Smith, confirming her perception of the beginning

3    of this injury following a motor vehicle accident in 2016 and

4    describing multiple surgeries that she had on her knee, her

5    foot, and her ankle.  And then clearly describing her pain

6    syndrome involving her knee, but specifically the foot and

7    ankle, and with the combined sensations of hypersensitivity,

8    temperature changes, and discoloration.  And the fact that she

9    did have some perceived improvement with gabapentin, which has

10   its therapy on the neuro component that we're describing.  I

11   felt that she had all the signs and symptoms of a progressive

12   poorly treated complex regional pain syndrome.

13   Q.  So you agreed with your nurse practitioner?

14   A.  Yes, I did.

15   Q.  When you see a sympathetic nerve based problem, is it

16   always discolored with temperature change, or does it fluctuate

17   depending on what is going on?

18   A.  If it did fluctuate with the same patient on a day-to-day

19   level, certainly from patient to patient, you may not see all

20   the components that would be classically involved with the

21   description of a complex regional pain syndrome.  And -- so,

22   yeah -- so it was very complex from the beginning.  There was

23   times when she had all those symptoms and other times when she

24   only had certain components.

25   Q.  Okay.  What had she tried, what had not worked, and what

Kenneth Lewis, M.D. – Direct

1   was she asking you to do?

2   *A.*  She had tried with some success using gabapentin, which I

3   will try to simply describe.  It's a medication that decreases

4   the production of a neurotransmitter within the spinal cord.

5   And it is designed to specifically decrease those

6   neurotransmitters in the fibers that transmit pain signals.

7   Sometimes it can be completely focused to just those nerves,

8   and other times there are other mental side effects where

9   obviously non-targeted interventions have a decrease in the

10  neurotransmitters.  But the fact that she had a decrease in her

11  pain -- her perception -- using that type of medication would

12  suggest that there was a clear neuro component with the

13  transmission of her pain.

14  *Q.*  Okay.  Anything else that she tried and had not worked?

15  *A.*  Obviously, she had the multiple surgeries.  And I think

16  that and the gabapentin were the main therapies that she had

17  attempted prior to getting to me.

18  *Q.*  Okay.  What did she want you to do?

19  *A.*  Well, she never had any injections, so no interventional

20  procedures for pain.  She knew, of course, that was what my

21  practice involved; and she wanted to discuss the types of

22  therapies that would be available to her, given the fact that

23  her other more conservative treatments other than the

24  surgery -- the conservative treatments had not resulted in the

25  long-term benefit she hoped for.

234

Kenneth Lewis, M.D. – Direct

1    Q.  Doctor, within a reasonable degree of medical probability,

2    what are your diagnoses for Ms. Houston?

3    A.  Chronic -- so a serious mechanical injury to the

4    extremities, specifically her ankle, with subsequent trauma

5    from the actual surgeries, because that's additional trauma.

6    Whenever you actually do a surgery, attempting to treat things

7    structurally, and then the combination of both the original

8    severe injury and the subsequent surgeries, resulting in a

9    constant level of neuropathic pain for well longer than what

10   would be considered chronic.

11   Q.  Did you think that this was all sympathetic nerve pain or a

12   combination of the problems that we've already discussed?

13   A.  A combination.  And I forgot to include, on the very first

14   visit, it was obvious she also had a very significant

15   psychological component to her perception of pain with both the

16   anxiety and depression, which is always a significant

17   impediment -- component to her treatment plan.  But, obviously,

18   there was multiple factors involved, mechanical and

19   neuropathic.

20   Q.  Okay.  What did you hope to accomplish, and how were you

21   going to accomplish that with her treatment plan?

22   A.  I described to her that, you know, not being an orthopedic

23   surgeon, I had no goal nor capacity to actually change the

24   mechanical structure of her ankle and that my treatments would

25   be gauged success-wise by one thing -- is her pain reduced?

Kenneth Lewis, M.D. – Direct

1   And hopefully in the process of reducing that pain, maybe see

2   some improvements in other associated issues with her -- in

3   this case, anxiety and depression.  My goal in the practice is

4   reduction of pain with interventional procedures.

5   Q.  You utilized the Budapest criteria for determining whether

6   there was complex regional pain syndrome?

7   A.  There are components of that which I would certainly

8   utilize.  But as I mention to my patients, my goal is not to

9   provide them with some structured diagnosis, but to give them

10  reasonable, well-thought-out treatment plans.  And if somebody

11  doesn't fit into a cookie cutter description of a certain type

12  of diagnosis, that doesn't mean that they're not a candidate

13  for attempts to treat their pain.  In fact, I will not allow

14  any diagnosis to exclude the options for therapy, because in my

15  practice, the goal is simply not -- not a precise diagnosis,

16  but a precise treatment outcome.

17  Q.  Were you aware, Doctor, that a thermography was done and

18  was negative?

19  A.  Yes.

20  Q.  What is a thermography?

21  A.  Thermography is a look into the actual heat pattern of an

22  extremity, typically, given different conditions that were

23  placed upon that extremity and to see if there is an expected

24  pathologic response to that heat image with certain stimuli.

25  But that by itself cannot be considered the description of a

Kenneth Lewis, M.D. - Direct

1    pain syndrome.  It's just one of the tools that is utilized.

2    Q.  What did it mean to you that it was negative for

3    Ms. Houston?

4    A.  It meant that one of the descriptive signs that can be used

5    for a complex regional pain syndrome was not present at the

6    time that she had that test done.

7    Q.  A triple-phase bone scan was not done as suggested by some

8    other doctors.  What did that mean to you, and what would that

9    have done to help you or not with regard to what you were doing

10   to try to assist Ms. Houston?

11   A.  Yeah, that's another lab that will just look at the body's

12   response to injury and kind of a chronic lingering image of

13   that response.  Once again, a tool that is utilized to just add

14   check marks consistent with or not consistent with complex

15   regional pain syndrome.  And it would have been useful; but,

16   once again, positive or negative, the goal in my practice would

17   be attempt to relieve pain with reasonable, safe procedures.

18   Q.  What is the basis for your opinions about the diagnoses you

19   just described for Ms. Houston, why do you believe that those

20   are the diagnoses and how comfortable are you with those?

21   A.  Well, initially, clearly, just the severe mechanical crush

22   multi-tissue injury that was, by everybody's description, a

23   very, very severe injury.  And despite thoughtful, careful,

24   appropriate orthopedic treatment, there was a perception --

25   again, pain is -- can only be described by that patient.  But

Kenneth Lewis, M.D. - Direct

1    the patient's description of severe, chronic, ongoing pain that

2    was outside the realm of what would be expected given the time

3    that she had for healing.  And this includes the

4    hypersensitivity, occasional color changes, and the perception

5    of severe pain, with which would otherwise be described as

6    non-painful stimuli, brushing, touching or stepping on tile.

7    Q.  What impact on your diagnosis and treatment was the fact

8    that the gabapentin was working?

9    A.  Well, as I mentioned before, gabapentin works by decreasing

10   the frequency and intensity of pain signals, specifically pain

11   signals being transmitted within the actual spinal cord.  And

12   the fact that by decreasing the pain fiber component for her

13   pain, regardless of any mechanical input, there was a perceived

14   improvement in her perception of her pain.

15   Q.  What did you do to treat Ms. Houston first?

16   A.  A sympathetic block.

17   Q.  Did it work?

18   A.  It did work.  Briefly, it worked.

19   Q.  Why did the sympathetic nerve blocks work, and how much

20   pain relief did Ms. Houston get?

21   A.  I have to go back to her follow-up evaluation following the

22   treatment.  Give me one second, please.

23   Q.  When did you do those, as well?

24   A.  It looks as if my -- once again, if I have everything in

25   order, it does appear that my first sympathetic block was done

238

Kenneth Lewis, M.D. – Direct

1   on December 9 of 2019, if I have this correct.

2   Q.  And how long did it last?

3   A.  I'd have to go to the next one.

4   Q.  How much pain reduction did it provide?

5   A.  I will tell you the way I typically look at a patient's

6   note is with my computer, which is now being used entirely for

7   this process, where I can go in and see both the nurse's

8   follow-up notes and my notes on one page.  This process is a

9   little alien, so one second -- here we go.

10          So the follow-up, she indicated that she had gone home

11  and slept the first time during the night, but she didn't

12  believe that she had then enjoyed any notable improvement in

13  the days following.  So there would have appeared at least

14  initially to have a response, mostly to the local anesthetic

15  effect, where the entire sympathetic nerve system was turned

16  off.  So a very short but -- a diagnostically short but

17  non-therapeutically lasting treatment for the initial

18  treatment.

19  Q.  It is my understanding that you did another set of blocks

20  after that that impacted her more significantly.  Can you

21  explain that for us?

22  A.  Yeah.  Following the second block, if I'm looking at the

23  correct note -- and I'm doing the best I can -- said that she

24  believes she was 75 percent improved at the time that she was

25  then being evaluated.

239

Kenneth Lewis, M.D. – Direct

1   *Q.*  And when was that second block, and how long did that last?

2   *A.*  If I have it correct, that may have been on December 17.  I

3   will say at that point in time it was my new partner,

4   Dr. Christopherson, who has exactly the same treatment approach

5   I have, as far as how we actually go about placing needles,

6   treating that area.  I believe that was her second injection.

7   *Q.*  Okay.  And how long did that last?  Did that take her up to

8   and into the pandemic?

9   *A.*  I'm seeing a note again where she is seen by Heather Smith

10  on March 15, so I guess that would be -- is that before --

11  *Q.*  Right around.

12  *A.*  Yeah.  At that point in time she states she was having lots

13  of physical therapy done.  And while it was helpful with her

14  mobility, it did not alleviate her pain.  I'm trying to find

15  the right order.  I am so sorry.

16        This does look like -- on February 4 of 2020, that's

17  where she is telling me on the visit -- not my nurse, but me --

18  overall she believes she is 75 percent improved, when compared

19  to her most severe pain presentation.  And she said she credits

20  that improvement to the combination of lumbar sympathetic

21  blocks, gabapentin, and her physical therapy.  She was also

22  using what is called mirror box therapy, that lets her focus on

23  her left foot while using a mirror box, where she believes that

24  she's looking at her right foot.  So there appears to be just

25  that kind of neurological, psychological component to the

Kenneth Lewis, M.D. - Direct

1   perception of her pain.

2   Q.  Was that result that you noted in 2020 a success?

3   A.  I consider that success at the time, yes.

4   Q.  Did you feel that that confirmed your diagnosis, as well?

5   A.  I think it confirmed my decision to use sympathetic blocks.

6   Again, my goal is not to confirm a diagnosis but to confirm a

7   treatment outcome.

8   Q.  Okay.  What was the impact, based on your observations, on

9   her psychologically as a result of the reduction in pain that

10  you created over a period of almost three months?

11  A.  She was notably less anxious and depressed; and, actually,

12  it seemed as if she was beginning to kind of move out of the

13  chronic pain syndrome she was in.  It seemed like on all levels

14  she was recovering.

15  Q.  Was she going to the gym and working out on a regular basis

16  for hours?

17  A.  That was my understanding.  Yes.

18  Q.  Did she enjoy that?

19  A.  She did.

20  Q.  Okay.  Didn't remove all the pain.  Is there any way to

21  remove all the pain?

22  A.  I believe that given the severity of the multi-tissue crush

23  trauma injury she had, that that would be probably an

24  unrealistic expectation.

25  Q.  At your deposition, which took place right in this time

Kenneth Lewis, M.D. - Direct

1  frame, were you hopeful that this would last for a long time?

2  A.  Yes.

3  Q.  Was there any way for you to know how long it was going to

4  last?

5  A.  No.

6  Q.  Did you think she was cured?

7  A.  No.

8  Q.  Were you hopeful at that point that she would not need a

9  spinal stimulator?

10  A.  Yes.

11  Q.  Were you hopeful she wouldn't need further sympathetic

12  blocks?

13  A.  Yes.

14  Q.  Did you think she wouldn't need a stimulator or further

15  sympathetic blocks?

16  A.  At that time, at 75 percent improvement and her increased

17  activity, there was no -- there was no consideration of

18  additional interventional procedures, no.

19  Q.  All right.  During the pandemic, how did things change for

20  Ms. Houston?  What did you learn?  And, first, was your office

21  closed for a period of time?

22  A.  Our office was closed -- I can't give you the exact dates,

23  but I think we saw absolutely no patients for a month; and then

24  we began to see the most severe chronic pain patients a couple

25  of days a week, that was another two to three weeks, before

Kenneth Lewis, M.D. - Direct

1  going back to a more full schedule.

2  Q.  How did it change for Ms. Houston, and when did you learn

3  about the change?

4  A.  I have a note where I am providing her with a new

5  sympathetic nerve block on June 5.  And it's a very, very short

6  description, but she arrived prepared for another sympathetic

7  block, indicating she had 70 percent reduction of her pain for

8  three months, and her pain was beginning to return, and given

9  that success, she wanted to continue the therapy that had given

10  her that relief.

11  Q.  Was she happy about what she just had?

12  A.  The three months of improvement, of course.  Yes.

13  Q.  Okay.  What impact do you usually see on the psychological

14  issues when the pain is significantly reduced?

15  A.  As was expected -- the majority of her anxiety and

16  depression was the fact that her pain was not improving.  As

17  expected, thankfully true, when the pain was notably improved,

18  her mood and anxiety were improved, as well.

19  Q.  Is that something you see quite commonly in your practice?

20  A.  Yes.  That's the most rewarding part of my practice.

21  Q.  When she came back to see you for the additional set of

22  sympathetic nerve blocks -- well, let me ask this first:  Why

23  did the blocks stop working?

24  A.  I don't know.

25  Q.  Is there any way to know?

Kenneth Lewis, M.D. - Direct

1   A.  No.

2   Q.  Okay.  When she came back to see you after the sympathetic

3   nerve blocks wore off or to have another set of blocks, were

4   you able to offer her another set of sympathetic blocks?

5   A.  We had discussed that option.  But given what at that point

6   in time with that injection appeared to be failure of treatment

7   even during the diagnostic phase, I felt that even though it's

8   a safe procedure, it's invasive, that there was other options,

9   given the chronicity of her treatment at that point in time,

10  that needed to be at least on the table at that point in time,

11  which is when we started talking about a spinal trial.

12  Q.  Did the second round of sympathetic blocks work when she

13  came to see you in June of 2020?

14  A.  No.

15  Q.  I ask this question -- I think I know the answer -- but why

16  not, if they worked before?

17  A.  I don't know.  I can't tell you with the same exact

18  process, treatment, image pattern during the treatment, where

19  we use contrast, everything else still appeared to be, you

20  know, the same type of block.  And the fact that there was

21  really no therapeutic event really did not bode well to the

22  idea of just continuing that invasive procedure.

23  Q.  Were you disappointed?

24  A.  I was disappointed.  But as I mentioned to her earlier,

25  there were fortunately still some options to be evaluated, and

244

Kenneth Lewis, M.D. - Direct

 1   that it wasn't the end of her treatment.  It just -- in fact,

 2   we even mentioned, if other things didn't help, we might still

 3   consider -- go back, and just as a final Hail Mary pass,

 4   attempt some sympathetic blocks.  But I felt that given the

 5   amount of time I had seen, the results of her recent

 6   sympathetic block, it was most reasonable to at least look at

 7   other therapies first.

 8   Q.  When she came back in June, how much -- where was her pain

 9   level, and how was she psychologically?

10   A.  Again, I -- here we go.  So she had a visual analogue scale

11   of zero to ten, she was describing four that day, with an

12   Oswestry Disability Index, which basically grades her overall

13   disability from that pain, at 72 percent, which is relatively

14   high.  Those are the ongoing numbers that we will follow to

15   look at people's long-term improvement, both with their

16   functional disability and their perceived level of pain.

17   Q.  What does that mean, the Oswestry scale and it being at

18   72 percent?  How does the scale work?

19   A.  Well, you know, it's a disability index.  So zero would

20   mean that you're not disabled at all, 100 percent would be

21   completely disabled.  So it's a range in there that we like to

22   follow so we're not just looking at pain, but looking at

23   functional improvement from pain.  And it's -- it's a useful

24   tool just for long-term review, to make sure that we're not --

25   that we're not missing other cues that might be useful.

Kenneth Lewis, M.D. – Direct

1   Somebody might say that their pain is improving, but their

2   Oswestry Index Score is actually increasing.  That would

3   suggest there is components of their pain they don't recognize

4   that still affect them as a disability.

5   *Q.*  In Ms. Houston's --

6   *A.*  I'm sorry.  Since I said I would tell the truth, the whole

7   truth, and nothing but the truth, I just want to give you an

8   example of a previous Oswestry Disability Index.  Back in

9   February 4 of 2020, she had described her visual analogue scale

10  pain at level 2 with her Oswestry disability index at only 44.

11  So, you know, there was obviously an increase in her overall

12  disability index score and an increase in her visual analogue

13  scale when she came back in June that we couldn't then bring

14  back down to what we considered successful levels of treatment.

15  Thank you for that.

16  *Q.*  No problem.  That Oswestry scale when she was dealing with

17  the positive impact of the sympathetic nerve blocks indicated

18  that she was doing significantly better?

19  *A.*  She was functionally improving, and her perception of her

20  pain was improving.

21  *Q.*  Okay.  All right.  Was Ms. Houston willing to consider the

22  spinal stimulator trial?

23  *A.*  I think she had the appropriate levels of concern of the

24  idea of both testing and potentially implantation of the device

25  in her central nervous system, but it did give her some hope

Kenneth Lewis, M.D. – Direct

1    that there was a potential therapy that could be considered.

2    And her pain was severe enough that she didn't want to have any

3    options taken off the table at that point.

4    Q.  Okay.  And what is a spinal stimulator and a spinal

5    stimulator trial, how does it work, and what do you do?

6    A.  The whole idea of a spinal cord stimulator is that, of

7    course, pain is perceived in the brain, but there is going to

8    be what is described as a pain generator somewhere in the body.

9    Once the pain is generated -- in her case it was from the

10   trauma in her ankle -- that signal of pain has to be

11   transmitted through the spinal cord, which, of course, is where

12   the gabapentin works by decreasing the signals.

13          A good example would be if someone is paralyzed, they

14   could have a crush injury, as well, but there is no perceived

15   pain.  When we place a spinal stimulator, we place it inside

16   the spinal canal on the back of the spinal cord immediately

17   adjacent to the pain fibers as they track towards the brain,

18   which are in the posterior aspect, dorsal column.  The other

19   name for the procedure is called dorsal column stimulator.  And

20   we can place the initial trial with basically the same

21   invasiveness, nearly identical as a labor epidural.  That trial

22   has small titanium electrodes that sit next to the pain fibers.

23   For three or four days we can stimulate the fibers with high

24   frequency so we interrupt what is a pain signal and

25   preferentially send a signal as what the brain perceives as

Kenneth Lewis, M.D. - Direct

1    pleasant.  It interrupts pain and exchanges it for a pleasant

2    signal.

3    Q.  In order to implant or do the spinal stimulator trial, what

4    requirements do you have?  What has to happen before you do

5    that?

6    A.  We wanted to have exhausted other procedures, first, not in

7    small part due to the fact that they're less expensive, but

8    also may be effective with a commitment to lesser procedure.

9    And it also -- we need to make sure that this is something that

10   she was psychologically prepared to expose herself to, had an

11   optimistic view of that type of therapy.

12   Q.  Did she get psychological clearance for you to do the

13   stimulator trial?

14   A.  I don't have that paperwork in front of me.  I apologize.

15   But by definition, she did, because I put a trial stimulator

16   in.

17   Q.  How did she get through that procedure?

18   A.  Of course, again -- so they will come in on the day of the

19   procedure, which, of course, is the trial.  So the leads extend

20   through the skin to an external generator so that the patient

21   can test the therapy without committing to the implant of the

22   entire device.  And, of course, that's a challenging procedure,

23   just as much as when receiving a labor epidural.  But there was

24   also -- at that point in time, just the leads, re-exacerbation

25   of depression and anxiety.  And I have a very capable

Kenneth Lewis, M.D. - Direct

 1   programmer who will then program the leads and follow the

 2   patient during the trial to make sure that there are

 3   opportunities to optimize the treatment in the brief period of

 4   time we have to evaluate its success.

 5        Throughout that entire process, it was just a very --

 6   a very hard process for Ms. Houston, both from just a

 7   discomfort of the procedure, and just the constant requirement

 8   for data to be collected.  And it was unfortunate that her

 9   psychological component at that point in time I think

10   significantly impacted at least my perception of her results.

11   But she felt that she slept great for a few nights and that

12   there was some notable improvement in her pain, but never a

13   notable improvement when she was actually functionally using

14   her extremity, which was really kind of the -- kind of the most

15   negative component of the test was that it didn't seem to give

16   her the expected relief when actually using her extremity.

17   Q.  So she didn't get the relief that she got from the

18   sympathetic nerve blocks?

19   A.  No.

20   Q.  Was she disappointed?

21   A.  Very.  Because I think it was a surprise to her that we

22   considered her outcome to be a failure, because she felt that

23   it at least was something that was providing her with some

24   benefit, and she was desperate for any therapy that might be

25   provided.  And so it was -- I think she was surprised of our

249

Kenneth Lewis, M.D. - Direct

1    perception that the trial had in its totality -- in fact, I

2    guess -- I think in my note I didn't even call it a failure.  I

3    called it inconclusive, because I didn't want to end the

4    discussion.  I just felt that the data derived at that point in

5    time was inconclusive enough to move forward with a permanent

6    implant.

7    Q.  Why inconclusive?

8    A.  Because I could clearly tell that she perceived treatment

9    function, but I believe for the first time that there was such

10   a large mechanical component to the production of her pain that

11   it overwhelmed the neuropathic treatment.  I felt like she had

12   a very profound neuropathic treatment component to her

13   stimulator which failed because of the overwhelming mechanical

14   component at that point.

15   Q.  So, again, establishing what you've said, that this injury

16   and pain is a combination, multifactorial combination?

17   A.  Yes.

18   Q.  Did you think that the pandemic and the amount of time in

19   the pandemic impacted the psychological issues that were going

20   on?

21           MR. SCARPATO:  Objection.  Foundation.

22           THE COURT:  Overruled.

23           THE WITNESS:  I -- everybody was anxious, across the

24   board.  Any time somebody has pain where the normal timeline

25   for treatment is disrupted, that causes additional anxiety and

Kenneth Lewis, M.D. – Direct

1    depression.  And so, yeah, I think there was certainly a

2    component of the failure of just routine therapy that certainly

3    didn't make it better.

4    *BY MR. SHAPIRO:*

5    *Q.*  Ms. Houston has described those two nights that she got

6    sleep; and she uses the term, "I slept like a dog."  But she

7    mentions that that stimulator creates a buzzing or a humming

8    that helped her sleep.  Does -- have you ever heard something

9    like that before?

10   *A.*  Yeah.  I mean, that is actually the whole therapy.  When we

11   provide the high-frequency but low-current therapy onto the

12   pain fibers, there is -- the patient actually perceives a

13   sensation in their extremity.  But the sensation is hopefully

14   overwhelmed by non-painful stimuli, which people describe as a

15   buzzing or humming.  Now, there are some settings where we can

16   have the frequency so high that it disrupts the pain signal

17   without perception of any signal; but we found that to be less

18   useful during the trial phase, because the patient is not

19   perceiving that the therapy is actually present.  They're just

20   thinking that the pain is gone.  We want them to be able to

21   know the pain is gone and in exchange for what was described

22   frequently as a buzzing and tingling sensation in the

23   treatment.  So she had all the expectations that we were in

24   fact stimulating the appropriate pain fibers.

25   *Q.*  Okay.  Are you still keeping the stimulator on the table as

251

Kenneth Lewis, M.D. – Direct

1   a future treatment option?

2   A.  I would.  And if it hadn't been for what was clearly a

3   failed mechanical production of her pain, I believe it would

4   have been perceived as successful.  But I felt it was going to

5   interfere -- that the overall process would be considered

6   failed by her because of the overwhelming mechanical component

7   that simply was not removed yet.

8   Q.  What does Ms. Houston need to do in order to proceed with

9   another stimulator trial or permanent implantation?

10  A.  I would hope that she would get additional -- maybe even,

11  in fact, a second opinion for orthopedic options.  And while I

12  know that she is concerned about the idea of having her ankle

13  simply fused, I do believe that if the mechanical component

14  could be stabilized so that the actual mechanical component of

15  the pain is removed and all she has is the neuropathic

16  component, I believe we could have an overwhelmingly positive

17  trial, hopefully lead to an implant.

18  Q.  And did you also require psychological counseling with a

19  specific counselor, and can you explain why?

20  A.  Yes.  It was obvious that her -- even during the trial,

21  just that her overwhelming at that point in time actually

22  increased depression and anxiety was interfering just with

23  normal patient-physician and patient-staff communications to

24  the point that I felt it was now becoming a significant

25  component of her pathology and interfering with attempts for

Kenneth Lewis, M.D. - Direct

1   future treatment.  That's not my specialty, but I knew -- I

2   think I had identified a patient that needed that additional

3   support, and sent her to Dr. Gustavson.

4   Q.  Why Dr. Gustavson?

5   A.  Because I trust his input and his therapy plans.

6   Q.  Is that someone that you work with regularly with regard

7   for stimulator trials, psychological assessments, and

8   evaluations?

9   A.  Every patient has to have a pain psychology assessment of

10  one form or another that will show that there is not such a

11  severe psychological component that they can't perceive

12  success.  We don't want failure because of a psychological

13  component.  And because that was done, allowing her to have the

14  trial -- but I think we recognized during the trial that there

15  was actually even more psychological components to her overall

16  pain than we had originally known.  That was one of the main

17  contributions to her failure.  I just felt like she just was

18  not psychologically prepared for this therapy, that in

19  combination with the mechanical pain to overall be perceived as

20  successful.

21  Q.  Are sympathetic nerve blocks still on the table?

22  A.  I believe that given the fact that we are now waiting for

23  further orthopedic stabilization and the fact that she is not

24  currently a candidate for the stimulator because of its

25  outcome, given the success in the past, I think it wouldn't be

253

Kenneth Lewis, M.D. – Direct

1    unreasonable to evaluate that again and, of course, be very

2    critical of the outcomes.

3    Q.   How about injections into the damaged parts, into the joint

4    of the ankle and foot?

5    A.   I leave that entirely up to the experts in that field,

6    which would be clearly the orthopedic surgeons themselves.

7    There are options that might be available with platelet-rich

8    plasma or stem cells; but, again, I'm not going to suggest that

9    would be a treatment process that I'm well versed in.

10   Q.   How about ketamine infusion?

11   A.   That is a very vogue treatment now for treatment of both

12   pain, but specifically also chronic depression, as a

13   dissociative anesthetic.  In anesthesia it's actually used as

14   an induction agent to put off to sleep to begin other

15   anesthetics for surgeries.  But, you know, once again, a

16   therapy that I don't provide, for a number of reasons.  It's

17   not covered by insurance; but, also, it's really more of an

18   IV-like general anesthetic, will require multiple treatments.

19   I'm not saying it wouldn't be beneficial to her, but I don't

20   provide that therapy, and I don't propose to be an expert on

21   it.

22   Q.   Doctor, do you think there will be changes or progress with

23   other options for Ms. Houston's type of issues in the future?

24   A.   I don't believe that I can describe options for the

25   orthopedic procedures that might be available to her.  But I

Kenneth Lewis, M.D. – Direct

1    will say that in the field of dorsal column stimulation, there

2    is a robust and very vigorous research process undergoing,

3    specifically with the company that I used, Boston Scientific.

4    To my knowledge, there is four or five new generators and

5    therapy options coming out just within the next twelve months.

6    So I have seen that therapy change profoundly in just the last

7    five years, and I'm hoping that will continue to show progress

8    and treatment options.

9    Q.  What are your future plans for assisting and helping

10   Ms. Houston with her chronic pain?

11   A.  Well, I would like to see her continue routinely with her

12   psychological evaluation and treatment so that she can learn to

13   deal and perceive her chronic pain more appropriately.  I would

14   like for her to get some second opinions and maybe some

15   additional treatment options to stabilize the mechanical pain

16   that is present in her ankle and then in the meantime, get --

17   if it feels like it's beneficial, maybe consider some

18   sympathetic blocks.  And then once both the psychological

19   component and the mechanical component appear to be stabilized,

20   I think given her perception, she might be an excellent

21   candidate for another trial.

22   Q.  What options will Ms. Houston within a reasonable degree of

23   medical probability likely need over the course of her lifetime

24   with regard to her pain?

25   A.  Once again, I don't know what the terminal treatment might

Kenneth Lewis, M.D. - Direct

1   be orthopedically.  I'm hoping it's stabilized, that the

2   mechanical component is gone.  And hopefully at that point in

3   time -- as an example, after a total ankle fusion, that should

4   be done, what other components they might have may require

5   multiple orthopedic interventions.  In a best-case scenario, I

6   will see her when things are stabilized and she has the

7   component she needs to then control the need for predominantly

8   neuropathic pain syndrome.

9   Q.   Is a spinal stimulator trial and implantation an option for

10  the future, within a reasonable degree of medical probability?

11  A.   Yes.

12  Q.   Sympathetic nerve blocks?

13  A.   Yes.

14  Q.   How many can she do over the course of a year?

15  A.   I've had people have as many as six, as long as the

16  progression of treatment both in percentage of pain relieved

17  and duration of treatment are appropriate.  Sometimes much less

18  than that.  You can tell that it's not going to reach that

19  level of fruition, and the smart thing would be to stop

20  treatments.

21  Q.   Will she continue to need the psychological counseling and

22  the psychological medications dealing with her chronic pain?

23  A.   I would expect that that would be maybe the most permanent

24  component of what she needs to have.

25  Q.   The medication continuation with gabapentin?

Kenneth Lewis, M.D. - Direct

1   A.   That's a -- the risk-benefit is very much in her favor, and

2   I would strongly encourage her to continue that.

3   Q.   What do you think about upping the dosage from

4   1,800 milligrams a day?

5   A.   I would have to review what her response was.  I can't tell

6   you whether or not that has been attempted.  I've had people as

7   high as 2,700 milligrams a day.  And it is a dose-dependent

8   therapy; some doses that seem to be ineffective, but a small

9   increase in dose can be significantly effective.  But it's also

10  a dose profile that has to be observed.  I don't recall where

11  she is in that trial process.

12  Q.   How about stem cells or platelet-rich therapy?

13  A.   Stem cells are not FDA approved for anything.  While they

14  are very encouraging, I don't think there is a valid set of

15  literature that would support that in this setting.  But,

16  again, I would leave that up to her and her orthopedic

17  surgeons.  I know that platelet-rich plasma may provide her

18  with some significant benefits, given what is clearly also some

19  tendinous injuries in her ankle.

20  Q.   How about physical therapy?

21  A.   She has always indicated that was of some benefit, yes.

22  Q.   Is there any reason to stop that over the course of her

23  lifetime?  And how much would you recommend per month, per

24  week?  What are your thoughts over the course of her life?

25  A.   I always would evaluate that level of chronicity for

Kenneth Lewis, M.D. – Direct

1    physical therapy based upon the physical therapist's

2    evaluation, what they're seeing, accomplishing, what needs to

3    be accomplished.  Sometimes you have progress that then is lost

4    and has to be reestablished.  I can't tell you.  I rely on my

5    physical therapist to create a treatment plan.  I will review

6    that and sign off; but I count on them, and should, to evaluate

7    the patient for physical therapy.

8    Q.  What happens when you stop physical therapy when you have

9    problems like Ms. Houston?

10   A.  Well, obviously, we want people moving.  The function that

11   she wants is to be able to move.  Sometimes pain and depression

12   are so severe that you stop doing those things, and then you

13   lose the functional capacity to do it and lose the desire to do

14   it and your perception of the pain is higher, which, then,

15   just -- the whole thing is circles.  So sometimes you just need

16   a physical therapist to keep you on task and to keep the

17   process graded objectively.

18   Q.  Thank you.  If the spinal stimulator is effective, would

19   you still continue her on the 1,800 milligrams of gabapentin?

20   A.  I would use every successful tool available.  If the

21   stimulator works better with gabapentin, then I'm keeping the

22   gabapentin.

23   Q.  Within a reasonable degree of medical probability, what was

24   the cause of the problems that you've been treating Ms. Houston

25   for?

Kenneth Lewis, M.D. – Direct

1    *A.*  Clearly, the motor vehicle accident and the injury to her

2    knee, ankle, and foot.

3    *Q.*  Within a reasonable degree of medical probability, what is

4    your prognosis for Ms. Houston with regard to the injuries and

5    damages she sustained that caused the injuries in question?

6    *A.*  Optimistic and guarded, only because I don't have control

7    over the orthopedic component.

8    *Q.*  Within a reasonable degree of medical probability, are the

9    problems that Ms. Houston is suffering from permanent?

10   *A.*  Yes.

11   *Q.*  Does she have a permanent physical impairment?

12   *A.*  Yes.

13   *Q.*  Does she have a disability?

14   *A.*  Yes.

15   *Q.*  Did you review the reports of Dr. Goldman, a physical

16   medicine and rehabilitation doctor retained by the United

17   States?

18   *A.*  Yes, I did.

19   *Q.*  Did you agree or disagree with him, and can you explain?

20   *A.*  I would agree and disagree.  And the reason I say that is

21   that all of the diagnostic criteria that he refers to are

22   completely valid.  Our disagreement would be what to do.  For

23   me, I gauge the success of my patients to an improvement in

24   their pain when provided with therapy.  I am not a fan of

25   diagnostic criteria removing options from my treatment regimen.

259

Kenneth Lewis, M.D. – Direct

1   If we had followed the Budapest criteria completely for the

2   description of a complex regional pain syndrome, then she would

3   never even had the sympathetic nerve blocks, which were clearly

4   successful to her.  She would never have had complex regional

5   pain syndrome which had profound neuropathic pain but not

6   mechanical pain.  So I believe that he is a very good

7   academician and diagnostician, but I don't know what his

8   treatment background is.  And I am a treatment physician; in

9   that sense, we would disagree as to the processes available to

10  a patient.  I am looking for ways to open treatment options,

11  and I think sometimes diagnostic rigidity decreases treatment

12  options.

13  Q.  What impact does complex regional pain syndrome have on

14  Ms. Houston undergoing orthopedic surgery, if that is a choice

15  that she makes?

16  A.  Well, orthopedic surgery is additional trauma, and it is

17  the repetitive trauma to her ankle that has reduced her

18  neuropathic component.  Now, there is a tradeoff.  If it turns

19  out that the surgery is successful and not to notably decrease

20  the mechanical production of her pain, then the overall trauma

21  may be perceived as beneficial.  But, you know, surgery is

22  trauma; and trauma in a patient with an overactive, you know,

23  sympathetic system can sometimes actually increase the

24  perception of the discomfort.  It's a difficult decision to

25  make.

Kenneth Lewis, M.D. – Direct

1    *Q.*  What precautions need to be taken when having surgery when

2    a patient has complex regional pain syndrome?

3    *A.*  And this is one I would revert to my pure anesthesia

4    training.  Which in that situation, probably the best approach

5    would be to place the epidural before the surgery, completely

6    anesthetize the central nervous system from the waist down so

7    that there is no neuro input to the central nervous system,

8    both with the primary central nervous system or sympathetic

9    nervous system, then allow the surgery to be performed.  And

10   then during at least the next three days, minimum, run a very

11   high, continued epidural infusion so there is no immediate

12   post-surgical perception of pain.  And slowly wean that

13   epidural infusion off so that hopefully the patient can get

14   through the new trauma of surgery and not have that

15   instantaneous initial impact to her central nervous system,

16   which may simply flare up her neuropathic pain syndrome.

17   *Q.*  Does that increase the cost of the surgery?

18   *A.*  She's going to have an anesthesiologist anyhow; but, yes,

19   the preoperative epidural and the post-surgical epidural

20   infusion would be increased cost.

21   *Q.*  Doctor, I'd like to pull up Plaintiff's Exhibit 13 and call

22   your attention to your bills, which are listed under No. 23.

23   It's going to pop up in a second.

24        There it is.  If we could scroll up, you could see

25   those.  That takes us to August 24, 2020.  Were those bills

Kenneth Lewis, M.D. - Direct

1    reasonable, necessary, and causally related to the injuries she

2    sustained in the crash in question?

3         MR. SCARPATO:  Objection, Your Honor.  We need a

4    foundation as to the reasonability of these amounts.

5         THE COURT:  Overruled.  He can testify, and you can

6    cross-examine him on that.

7         THE WITNESS:  I do need to point out that some of the

8    fees you're noting are from the hospital, some are from the

9    radiology department, some are nursing, like the conscious

10   sedation.  I have my own billing company, and I'm not sure how

11   many of these actually represent my fees -- which are always

12   the smaller ones, by the way.  But these are reasonable

13   treatment and hospital costs for the procedures that she had,

14   yes.

15   BY MR. SHAPIRO:

16   Q.  Thank you.  Is managing chronic pain over a long period of

17   time complicated, and does it change over time?

18   A.  Yes, it's complicated; and it can change, as we've seen.

19   Q.  Do medications stop working and then need to be changed or

20   altered?

21   A.  Yes.

22   Q.  Do injections not work and other options have to be

23   considered over time?

24   A.  Yes.

25   Q.  And has your field been changing and progressing, and do

Kenneth Lewis, M.D. - Cross

1    you think that will continue over time?

2    A.   Yes.

3    Q.   Thank you, Doctor.  I have no further questions.

4         THE COURT:  We'll take our mid-morning break for

5    15 minutes.  Please be ready to come back.  Thank you.

6         (Recess at 10:40 a.m.)

7         (In open court at 11:01 a.m.)

8         THE COURT:  Thank you.  Begin your cross-examination.

9         MR. SCARPATO:  Thank you, Your Honor.

10                    **CROSS-EXAMINATION**

11   BY MR. SCARPATO:

12   Q.   Good morning, Dr. Lewis.  We haven't met yet.  My name is

13   Bill Scarpato.  I'm here on behalf of the United States.  Thank

14   you for joining us today.

15   A.   Thank you.

16   Q.   It's your opinion that Ms. Houston has complex regional

17   pain syndrome; true?

18   A.   Yes.

19   Q.   And it's also your opinion that there could be another

20   explanation for her pain besides CRPS; true?

21   A.   Yes.

22   Q.   One possible explanation for her pain other than CRPS is

23   some psychological reason; right?

24   A.   I do not believe that's the source of her pain.  I believe

25   that's the source of maybe inappropriate perception of her real

263

Kenneth Lewis, M.D. - Cross

1    pain.

2    Q.   And it was your testimony earlier this morning that we can

3    only know the amount of the patient's pain through their

4    subjective point?

5    A.   Yes.

6    Q.   As an interventional pain doctor, you try to find something

7    you can fix; right?

8    A.   Yes.

9    Q.   Your diagnosis that Ms. Houston has CRPS turns on the fact

10   that you have a treatment for CRPS; right?

11   A.   Yes.

12   Q.   And so it's your belief that diagnosis of CRPS is

13   appropriate and reasonable until proven otherwise; right?

14   A.   Can you say that once again?

15   Q.   Sure.  It's your belief that diagnosis of CRPS -- I'll

16   start that over again.

17        It's your belief that a diagnosis of CRPS is

18   appropriate and reasonable until proven otherwise; true?

19   A.   I'm not sure I understand the question.  I think it was

20   appropriate and reasonable with her presentation.  And "till

21   proven otherwise," I'm not sure what you meant by that.  Sorry.

22   Q.   Did you prepare an expert report in this matter?

23   A.   Report or my notes?

24   Q.   An expert report for the purpose of this litigation.

25   A.   I'm not sure what the definition of that would be, other

Kenneth Lewis, M.D. - Cross

1   than my notes.  Is that maybe my original conversations with

2   the attorney?

3   Q.  Perhaps we can help you out.  I'm going to turn your

4   attention to an exhibit that's been marked for identification

5   in this matter as Exhibit 33.  This is not an admitted exhibit,

6   and we won't be seeking to admit it.

7         Dr. Lewis, I have pulled up what has been marked for

8   identification in this case as Exhibit 33.  Are you able to

9   view that on your screen?

10  A.  Yes, I do now.  Yes.

11  Q.  Are you familiar with this document?

12  A.  Not -- I'm familiar with the process but not the document,

13  I guess.

14        MR. SCARPATO:  Can you scroll down, please.

15  BY MR. SCARPATO:

16  Q.  Is that your signature at the top of this document?

17  A.  I can't see it if it's not scrolled down.  Yes, that's my

18  signature.

19        MR. SCARPATO:  Okay.  And Ms. Robinson, if you could

20  go to the second paragraph in this down.

21  BY MR. SCARPATO:

22  Q.  So this document was not prepared by you; correct?

23  A.  No.

24  Q.  This document was prepared by Ms. Houston's law firm; true?

25  A.  Yes.

265

Kenneth Lewis, M.D. - Cross

1   *Q.*  And you thought that was your signature at the bottom;

2   correct?

3   *A.*  Yes.  I recall seeing this now.  Thank you.

4   *Q.*  Sure.  And that last sentence in the paragraph that we're

5   highlighting says that you'll testify -- "he" -- you -- "will

6   testify that his" -- yours -- "diagnosis of CRPS is appropriate

7   and reasonable until proven otherwise."  Did I read that

8   correctly?

9   *A.*  I can't see it; but if it says that, then, yes, I signed

10  that.

11  *Q.*  Okay.  CRPS is a type of neuropathic pain; right?

12  *A.*  Yes.

13  *Q.*  And that is caused by the nervous system rather than some

14  other mechanical issue; true?

15  *A.*  It is supported by the nervous system, not caused by the

16  nervous system.

17  *Q.*  And it's treated by addressing the nervous system; correct?

18  *A.*  Correct.

19  *Q.*  Lumbar sympathetic block is one of those treatments; true?

20  *A.*  Yes.

21  *Q.*  And the lumbar sympathetic block is specific to complex

22  regional pain syndrome; correct?

23  *A.*  It would be a specific treatment for that.  I don't know if

24  it's the only diagnosis that would be useful -- specific for

25  that treatment.

266

Kenneth Lewis, M.D. - Cross

1   Q.  That injection is aimed at the sympathetic nervous system;

2   true?

3   A.  Yes.

4   Q.  The sympathetic nervous system is part of the response to

5   trauma; correct?

6   A.  Yes.

7   Q.  And so what happens with CRPS is that the nervous system is

8   continuing to provide a perception to the central nervous

9   system of ongoing injury and pain even though the tissues have

10  actually healed; correct?

11  A.  I'd like to just say that the tissues may have partially

12  healed, maybe completely healed; but, yes there is an ongoing

13  perception of pain exacerbated by that system.

14  Q.  You used the sympathetic block injection to interrupt that

15  process in the hopes of having improvement in the patient's

16  perception of pain; correct?

17  A.  Yes.

18  Q.  And this process of turning the system off is very specific

19  to the complex regional pain syndrome; correct?

20  A.  Yes.

21  Q.  And that approach isn't really used for anything but CRPS;

22  true?

23  A.  Yes, fair.  Yes.

24  Q.  So the ideal goal of doing a sympathetic block injection is

25  it cures CRPS, right?

Kenneth Lewis, M.D. - Cross

1   *A.*  To treat its negative results.  Cure is always a hope, but

2   treatment is fine.

3   *Q.*  And just so I'm clear, spinal cord stimulator is another

4   type of CRPS treatment; right?

5   *A.*  It can treat things beyond CRPS; but it treats specifically

6   pain signals within the spinal cord, regardless of the nature

7   of the production.

8   *Q.*  And so turning back to sympathetic block injections.  In

9   Ms. Houston's case, you administered three lumbar sympathetic

10  block injections; correct?

11  *A.*  Yes.

12  *Q.*  Those injections failed to give Ms. Houston lasting relief?

13  *A.*  The second one gave her three months of relief.  If the

14  definition is permanent, no; but lasting as pain relief for

15  three months would be considered lasting.

16  *Q.*  Okay.  So you discussed that a bit on your direct

17  examination.  She reported after that second shot on

18  February 4, 2020, a 75 percent pain improvement; right?

19  *A.*  Yes.

20  *Q.*  And she was going to the gym at that time, I believe you

21  testified; right?

22  *A.*  Yes.

23  *Q.*  And she had been working out for a couple of hours a day?

24  *A.*  I don't recall the duration.

25  *Q.*  Are you aware that she was on an antidepressant in

268
Kenneth Lewis, M.D. – Cross

1    February 2020?

2    A.  No, but that would be expected.

3    Q.  And during that point she attributed her reduction in pain

4    to the combination of sympathetic block injection, gabapentin,

5    and her physical therapy; correct?

6    A.  Yes.

7    Q.  So a couple of months after that, that second shot, the

8    injections wore off; right?

9    A.  Yes.

10   Q.  And you did your third injection in June of this year; do I

11   have that right?

12   A.  Yes.

13   Q.  And that injection provided no relief; right?

14   A.  Yes.  True.

15   Q.  And so twelve days after that, she was in your office to

16   consult for a spinal cord stimulator trial; correct?

17   A.  Yes.

18   Q.  And the spinal cord stimulator is the treatment of last

19   resort for complex regional pain syndrome; true?

20   A.  It is one of the last treatments that is frequently used.

21   I don't know if it's last resort; but, yes, it's a pinnacle

22   treatment.  Yes.

23   Q.  It's also the gold standard for CRPS treatment; right?

24   A.  Yes.

25   Q.  In your view, it works to cure 80 or 90 percent of CRPS

Kenneth Lewis, M.D. - Cross

 1  patients; right?

 2  A.  I don't use the word "cure"; I use the word "treat."

 3  Q.  Okay.  So it's your testimony today that a spinal cord

 4  stimulator does not cure 80 or 90 percent of CRPS patients that

 5  you see?

 6  A.  It treats 80 or 90 percent of the patients.

 7  Q.  Just looking at the -- this isn't the first testimony

 8  you've given in this case; correct?

 9  A.  Today, meaning, with the original attorney?  I'm sorry.

10  Q.  You were -- you sat for a deposition in this case; correct?

11  A.  Oh, yes.  Yes, I did.

12  Q.  And you swore an oath on that day; true?

13  A.  I did.

14  Q.  And you swore an oath to tell the truth; right?

15  A.  Yes.

16  Q.  Just like you did this morning?

17  A.  Yes.

18       MR. SCARPATO:  Can we have page 78, lines 17 through

19  21 of the deposition.

20  BY MR. SCARPATO:

21  Q.  Dr. Lewis, I pulled up the deposition transcript from your

22  deposition in this matter; and I call your attention to

23  page 78, lines 17 through 21.  Are you able to see the text

24  that is being highlighted on the screen?

25  A.  I cannot.  I can see something highlighted but not of a

Kenneth Lewis, M.D. - Cross

1   size that I can read it.

2   Q.  We'll try to zoom that in for you.  Can you see that now?

3   A.  Yes.

4   Q.  So I'm going to read that.  And my question will be whether

5   I've read that correctly.

6        Question:  "So when you say 80 percent, that's a

7        patient that you see with CRPS that got the

8        stimulator, 80 percent of them are essentially

9        cured?"

10       Answer:  "Maybe 90.  Profoundly high, to the

11       point that it's really amazing."

12       Did I read that correctly?

13  A.  Yes.

14  Q.  But the spinal cord stimulator didn't end up working for

15  Ms. Houston in this case; correct?

16  A.  It worked but not enough to consider implant at this time.

17  Q.  So your specific conclusion was that moving forward, there

18  is -- a permanent implant would likely lead to eventual failure

19  of treatment; true?

20  A.  If nothing else were done, yes.  That was my feeling.

21  Q.  And you specifically explained placebo effect which

22  Ms. Houston enjoyed for a short period of time, followed by

23  what was clearly less than 50 percent improvement in her actual

24  pain; true?

25  A.  Yes.

Kenneth Lewis, M.D. - Cross

1   Q.  And you've also come to believe that there is a significant

2   continual mechanical component to her ankle pain; right?

3   A.  Yes.

4   Q.  Because a spinal cord stimulator is designed for

5   neuropathic pain; correct?

6   A.  Yes.

7   Q.  And CRPS is a type of neuropathic pain?

8   A.  Yes.

9   Q.  And so you concluded that the spinal cord stimulator is not

10  of use to her now; right?

11  A.  Not of enough use.

12  Q.  And I would just like to ask you a couple of questions

13  about your treatment notes.  You rely on your notes; right?

14  A.  Yes.

15  Q.  You relied on them to refresh your recollection this

16  morning, in fact; correct?

17  A.  Yes.

18  Q.  And you take care to ensure those notes are accurate;

19  right?

20  A.  As much as I can.  Yes.

21  Q.  And as much as you can, you try to ensure that your

22  treatment notes are complete; correct?

23  A.  Yes.

24  Q.  So if there is a discrepancy between your recollection as

25  you related it today and your treatment notes, we should rely

272

Kenneth Lewis, M.D. - Cross

1   on those treatment notes; right?

2   A.  My notes are my notes.  I can't or won't change them, but I

3   am here speaking and thinking now.

4   Q.  Have you see the life care plan presented in this case?

5   A.  I didn't hear you.

6   Q.  Have you seen the life care plan that was prepared for

7   Ms. Houston in this case?

8   A.  I think I have reviewed it once, and I couldn't recite it

9   for you.

10  Q.  And you provided some recommendations that found their way

11  into that life care plan; correct?

12  A.  I may have.  I don't recall that specific description or

13  process.

14  Q.  Are you familiar with an individual named Francine Mazone?

15  A.  Mazone.  Not offhand, no.

16  Q.  You just can't recall ever having had a telephone

17  conversation or any other type of communication with Francine

18  Mazone?

19  A.  I do not recall, no.

20  Q.  I believe you testified this morning that stem cell

21  treatment is still experimental.  Did I remember your testimony

22  from this morning correctly?

23  A.  I believe that would be fair to describe it that way.  Yes,

24  that's what I said this morning.

25  Q.  And would the same thing be true for platelet-rich plasma

Kenneth Lewis, M.D. - Cross

1    treatment?

2    A.  I do believe that the orthopedic field's use of

3    platelet-rich plasma, especially for tendinous injury is much

4    more sound.

5    Q.  But for platelet-rich plasma, there is less than 10 percent

6    possibility Ms. Houston would ever need that; correct?

7    A.  I do not know how to answer that question either way.

8           MR. SCARPATO:  Pull up the deposition, page 116,

9    lines 9 to --

10           MR. SHAPIRO:  What page?

11           MR. SCARPATO:  116, lines 9 through 16.

12   BY MR. SCARPATO:

13   Q.  Dr. Lewis, are you able to see the lines that we're

14   highlighting here?

15   A.  I do not see any highlighted lines yet.  I do now, yes.

16           MR. SCARPATO:  Okay.  And so if we scroll up on so

17   that we have lines 9 through 16 showing.  Thank you.

18   BY MR. SCARPATO:

19   Q.  The question was:

20           Question:  "So would it be more accurate to say

21       that stem cell therapy and PRP" -- platelet-rich

22       plasma -- "treatment would be a possibility?"

23           Answer:  "Would be a possibility, that would be

24       fair."

25           Question:  "What would you put the likelihood

Kenneth Lewis, M.D. - Cross                                              274

1          percentage-wise that she'll need either stem cell or

2          PRP treatment?"

3                Answer:  "Less than 10 percent."

4                Did I read that correctly?

5   A.  You did.

6   Q.  And there was some discussion this morning about physical

7   therapy.  And was it your testimony that you rely on a physical

8   therapist to evaluate a patient and tell you what physical

9   therapy Ms. Houston needs?

10  A.  Yes.

11  Q.  The physical therapist is the one with the expertise to

12  decide how much PT is actually needed; right?

13  A.  Yes.

14  Q.  You wouldn't micromanage the PT process; true?

15  A.  I might be involved if there was something I thought would

16  be useful; but, I guess, micromanage, I would not do.

17  Q.  So I'll turn to a couple of additional potential treatments

18  or therapies for Ms. Houston now.

19                You would agree that pool therapy can be helpful for

20  chronic pain; right?

21  A.  In the sense that any activity is useful for an extremity

22  that would otherwise maybe not be used.  So I'm not sure what

23  the context of that answer was.

24  Q.  So any physical activity can help with chronic pain in the

25  lower extremity?

275

Kenneth Lewis, M.D. – Cross

1  *A.*  In her case, activity that doesn't require actually placing

2  weight on the fractured ankle might be very useful.

3  *Q.*  You would agree with recommendations for treatment that are

4  designed to help Ms. Houston become more physically active in

5  that manner you've described?

6  *A.*  Yes.

7  *Q.*  And you also think it's reasonable for Ms. Houston to have

8  ongoing psychological evaluations and treatment to deal with

9  her chronic pain; true?

10  *A.*  Yes.

11  *Q.*  And you've continued her on her pain medication,

12  gabapentin; right?

13  *A.*  Yes.

14  *Q.*  So I'd like to talk a little bit about the interaction

15  between psychological illness and pain, if we could, for a

16  couple of minutes.

17        Many of the same chemical imbalances that occur with

18  chronic depression are similar to those that occur with chronic

19  pain; true?

20  *A.*  True.

21  *Q.*  And so chronic pain can make depression worse; right?

22  *A.*  Yes.

23  *Q.*  And depression can make chronic pain worse?

24  *A.*  Yes.

25  *Q.*  So treating both chronic pain and depression at the same

Kenneth Lewis, M.D. – Cross

1  time is usually beneficial; correct?

2  A.  Yes.

3  Q.  And so you'd agree it's possible that Ms. Houston might

4  have some psychological disorder where she's describing pain

5  that doesn't exist as a physical matter; right?

6  A.  No.  I believe that her depression may make her perceive

7  her true pain as something more than might be otherwise.

8  Q.  And so from your perspective, there is no reason why

9  Ms. Houston shouldn't be on an antidepressant; true?

10 A.  No.

11 Q.  And I'd like to just ask a couple of questions about

12 Ms. Houston's first visit to your office, or how she came to

13 your door.  When a new patient comes into your office, they're

14 typically seen by a nurse practitioner; right?

15 A.  Yes.

16 Q.  And in Ms. Houston's case, that was Heather Smith; true?

17 A.  Yes.

18 Q.  And the nurse practitioner applies some suspected diagnoses

19 based on their visit with the patient; right?

20 A.  Yes.

21 Q.  And the treatment -- the patient's history that the nurse

22 practitioner gets, that comes from the patient's report; right?

23 A.  Yes.

24 Q.  So what the patient says?

25 A.  Yes.

Kenneth Lewis, M.D. – Cross

1   Q.   And you don't treat traumatic brain injury; correct?

2   A.   No.

3   Q.   And you wouldn't have an opinion on the diagnosis

4   Ms. Houston might carry that is not directly relevant to your

5   treatment; true?

6   A.   True.

7   Q.   And you said this morning, you're 100 percent in the pain

8   management field; correct?

9   A.   Yes.

10  Q.   And about 98 percent of your practice is doing injections;

11  true?

12  A.   Yes.

13  Q.   And so it's fair to say that when patients come to your

14  office, they know what kind of practice it is that you have;

15  right?

16  A.   Usually they are aware.  Yes.

17  Q.   And the procedures that you do are expensive; true?

18  A.   Yes.

19  Q.   And you see about 100 patients a week; right?

20  A.   I would -- probably be pretty close.  Yes.

21  Q.   And when Ms. Houston came to you, you diagnosed her with

22  CRPS because you have a treatment for CRPS; right?

23  A.   Yes.

24  Q.   And so Ms. Houston did in fact become one of your patients;

25  right?  We've established that.

Kenneth Lewis, M.D. - Cross

1    A.   Yes.

2    Q.   And are you aware that she referred herself to your

3    practice?

4    A.   It's not surprising.  That happens a lot.  If that's true,

5    then, yes.  But I wasn't aware of the referral source, but

6    that's not surprising.

7    Q.   And so I'd like to talk with you now a little bit about

8    your billing.  You have no say in the billing for the

9    outpatient procedure center where you do your work; right?

10   Those are the bigger numbers that were shown to you earlier

11   this morning; right?

12   A.   True.

13   Q.   And you have a billing company that does your billing

14   specifically; correct?

15   A.   Yes.

16   Q.   And you try to have as little knowledge in the billing

17   process as possible; right?

18   A.   I try not to let the insurance brand affect my

19   decision-making.  I try to make a real point of that, yes.

20   Q.   And you don't review your bills before they get sent out;

21   correct?

22   A.   No.  I have a compliance officer within the billing company

23   who is very good at making sure my bills are appropriate.

24   Q.   And you don't know how much patients are charged for your

25   specific services; correct?

Kenneth Lewis, M.D. - Cross

1   A.  I have some ideas; but, once again, I do not want the value

2   or disvalue of a procedure to affect my decision-making.  I

3   want that to be medically based.

4   Q.  You mentioned a couple of surgeries this morning.  I just

5   want to be clear, those were orthopedic surgeries; right?

6   A.  Other than the possibility of a stimulator implant, yes,

7   all of her surgeries I believe were orthopedic, that were at

8   least appropriate to this discussion.

9   Q.  Yes, I should have made that clear.  The surgeries that

10  Ms. Houston has already received, those are all orthopedic

11  surgeries; right?

12  A.  To my knowledge, yes.

13  Q.  And those surgeries aren't designed specifically to treat

14  pain; true?

15  A.  Well, part of their process is to treat pain.  Stabilizing

16  an injured tissue would certainly have as one of its very real

17  goals to reduce the pain that's due to the injury.

18  Q.  The primary purpose of those surgeries is to repair the

19  mechanical structures in the joint; correct?

20  A.  That's a component of the surgery that can be controlled by

21  the surgeon.  Yes.

22  Q.  Are you aware that Ms. Houston has already gotten a second

23  opinion from an orthopedist in this case?

24  A.  I don't recall.  I may have been told that; but I'm not

25  aware of that, no.

Kenneth Lewis, M.D. - Cross

1    *Q.*  And so you're not aware that that other -- second

2    orthopedist recommended no surgery in Ms. Houston's case?

3    *A.*  I guess, no, I was not aware of that.

4    *Q.*  I'd like to talk a little bit more about chronic regional

5    pain syndrome, that diagnosis.  You diagnosed Ms. Houston with

6    CRPS in her right ankle and right knee; correct?

7    *A.*  Yes.

8    *Q.*  And your treatment, lumbar sympathetic block and spinal

9    cord stimulator, were designed specifically for CRPS in the

10   ankle; true?

11   *A.*  Yes.

12   *Q.*  And your definition of CRPS is a presentation by the

13   patient, where the perception and presentation of pain far

14   outweigh any physical source or ongoing source of pain

15   generation; right?

16   *A.*  Yes.

17   *Q.*  A good example of that would be where a person gets a paper

18   cut and after that, it results in a complete loss in the use of

19   an extremity; true?

20   *A.*  That would be one example.  Yes.

21   *Q.*  And only about 5 percent of your patients present with

22   CRPS; true?

23   *A.*  I believe that would be a fair number.

24   *Q.*  And in the general population, CRPS is much less than that;

25   correct?

Kenneth Lewis, M.D. - Cross

1    *A.*   Yes.

2    *Q.*   So I guess you've heard of the Budapest criteria, because

3    you were asked a couple of questions about that this morning.

4    So are you familiar with the Budapest criteria?

5    *A.*   I am.

6    *Q.*   And so that's a set of diagnostic tools or questions that

7    physicians use to diagnose CRPS; correct?

8    *A.*   Yes.

9    *Q.*   So let me ask you a couple of questions about those

10   Budapest criteria.   One of those is that a patient won't be

11   able to tolerate light touch on the affected area; correct?

12   *A.*   That can happen.   Yes.

13   *Q.*   And so fair to say that a patient who has constant

14   light-touch sensitivity, that person is more likely to have

15   CRPS than one with only intermittent light-touch sensitivity;

16   true?

17   *A.*   More likely, yes.

18   *Q.*   Another of those Budapest criteria is discoloration of the

19   affected extremity; correct?

20   *A.*   Correct.

21   *Q.*   If a person doesn't have discoloration in the affected

22   area, that would mean that there are fewer things in the

23   positive column for a CRPS diagnosis; correct?

24   *A.*   Yes.   But I would have to add that that symptom can change

25   on the same person during the same day, during the same visit.

282

Kenneth Lewis, M.D. - Cross

1   Q.  And if a person doesn't have temperature asymmetry in the

2   affected area versus the unaffected area, there means there

3   would be fewer things in the positive column for a CRPS

4   diagnosis as well; true?

5   A.  Are you speaking about specifically thermography, is that

6   the temperature changes?  Are you talking about just by touch?

7   Q.  We can do the thermography first.  If the thermography exam

8   presents as negative for CRPS, that's one thing less in the

9   positive column for a CRPS diagnosis; true?

10  A.  It is.  But do you mind if I just read one brief statement

11  written by your expert, Mr. Goldman, specifically regarding

12  that?  Because I think it's important.

13  Q.  Sure.

14  A.  Okay.  "Thermal imaging is not a stand-alone screening

15  examination and cannot diagnose or rule out the presentation of

16  injury, infection, or disease.  It's a tool, and a very gross

17  and frequently inaccurate tool."

18  Q.  Okay.  How about feeling it just with your hand,

19  temperature asymmetry between the affected area and the

20  unaffected area?  If you feel no temperature asymmetry, is that

21  another thing less in the positive column for a CRPS diagnosis?

22  A.  Yes.  But the value of that exam is it can be done

23  repetitively and specifically when the patient is actually

24  suffering those changes.

25  Q.  And another of the Budapest criteria for diagnosing CRPS is

283

Kenneth Lewis, M.D. - Cross

1    swelling in the affected area; correct?

2    A.   Yes.

3    Q.   And if you don't observe swelling in the affected area,

4    that's another thing that wouldn't be in the positive column

5    for CRPS; right?

6    A.   Yes.

7    Q.   And you spoke a little bit about a three-phase bone scan

8    this morning.  A three-phase bone scan is another diagnostic

9    tool that could be used to help diagnose CRPS; right?

10   A.   Yes.

11   Q.   And so if Ms. Houston were to have gotten a three-phase

12   bone scan and if it was negative, that would decrease the

13   likelihood of CRPS; right?

14   A.   It would decrease the likelihood.

15   Q.   Are you aware that Ms. Houston was recommended to get a

16   three-phase bone scan?

17   A.   Yes.

18   Q.   And are you aware that she never had that recommended bone

19   scan?

20   A.   Yes.

21   Q.   And so for you, the gold standard for diagnosis of CRPS is

22   to treat things that would treat CRPS and hope for improvement;

23   right?

24   A.   I would phrase it in my practice is that the gold standard

25   for treating symptoms consistent with CRPS is to gauge the

Kenneth Lewis, M.D. - Cross

1   outcome of treatments of things for CRPS.  I'm not in the

2   businesses of diagnosis; I'm in the business of positive

3   outcomes of treatment of pain.

4   Q.  Okay.  Your goal is the treatment of pain; right?

5   A.  Yes.

6   Q.  And your goal wasn't to diagnose the source of the pain;

7   right?

8   A.  Sometimes the diagnosis of a source of the pain occurs with

9   treatment; sometimes you get treatment without a diagnosis of

10  the reason why.  Both are successful.

11  Q.  So you're familiar with Dr. Ellen Price; right?

12  A.  Yes.

13  Q.  You spoke of her this morning.  And you said Dr. Price is a

14  physiatrist.  Is that the same thing as a physical medicine and

15  rehabilitation doctor?

16  A.  Yes.

17       MR. SCARPATO:  Can we have Exhibit 63, please.

18  BY MR. SCARPATO:

19  Q.  I'd like to pull up for you some of Dr. Price's treatment

20  notes, which are Exhibit 63 for identification and have been

21  admitted into evidence.  The top paragraph on page 1.

22       And my first question, Dr. Lewis, is, are you able to

23  see the paragraph that we've called up on the screen?

24  A.  I can see it and make out some of the words.

25  Q.  Okay.  So the third line from the bottom of that first

Kenneth Lewis, M.D. - Cross

1    paragraph, I read, "I do not see any evidence of CRPS.  She has

2    no swelling, no edema, no light-touch pain, and no color

3    changes."  Did I read that correctly?

4    *A.*  I see that.  Yes.

5    *Q.*  So you and Dr. Price -- Dr. Ellen Price have made this

6    different diagnosis here; right?

7    *A.*  Yes.

8    *Q.*  And that's because you relied on a patient's self-report

9    more than these objective -- objective criteria; right?

10   *A.*  I try to incorporate every piece of evidence that I can

11   find.

12          *MR. SCARPATO:*  Okay.  Can we pull up the deposition at

13   page 101, please.  Lines 1 through 8.

14   *BY MR. SCARPATO:*

15   *Q.*  Thank you, Dr. Lewis, for your patience with the

16   technology.  We're all kind of figuring it out as we go.

17   *A.*  I understand.

18   *Q.*  So, Dr. Lewis, are you able to see the text that we pulled

19   up on to the screen?

20   *A.*  Not yet.  Something is coming up now.  Yes, I can see; and

21   I can read most of it.

22   *Q.*  Okay.  So I'll read; and my question will be, did I read

23   that correctly?

24          Question:  "So Dr. Price in her notes wrote that

25       she did not see any evidence of CRPS.  Do you have a

Kenneth Lewis, M.D. - Cross

1      sense of where the difference in your diagnosis is

2      coming in?"

3          Answer:  "I'm listening to the patient more than

4      I'm looking at the signs.  Yeah.  For me, a patient

5      that has horrible pain well past the healing phase

6      for the type of trauma they have, that's the

7      overwhelming piece of evidence for me.  That

8      overwhelms everything else."

9          Did I read that correctly?

10  *A.*  Yes.

11  *Q.*  And so in your view, if you decide to treat a person for

12  CRPS, you consider them to have CRPS until proved otherwise;

13  right?

14  *A.*  I think that would be a fair intention of your thought.

15  Yes.

16  *Q.*  And CRPS is harder to treat than ordinary, run-of-the-mill

17  chronic pain; right?

18  *A.*  Yes.

19  *Q.*  CRPS is usually more expensive to treat than other more

20  run-of-the-mill chronic pain; right?

21  *A.*  Yes.

22  *Q.*  You didn't treat Ms. Houston for chronic regional pain

23  syndrome in her -- I apologize if I asked that question

24  already.

25  *A.*  Say it one more time.  I'm sorry.

287

Kenneth Lewis, M.D. - Redirect

1    Q.  Sure.  You didn't treat Ms. Houston for chronic regional

2    pain -- excuse me -- complex regional pain syndrome in her

3    knee; correct?

4    A.  No.  I don't believe the knee was ever the focus.

5    Q.  And you referred to the Oswestry scores earlier in your

6    testimony; do I have that right?

7    A.  Yes.

8    Q.  Can the results of that sort of testing be influenced by

9    depression or anxiety?

10   A.  Absolutely.

11   Q.  Stand by, Dr. Lewis, for just a moment.

12   A.  Uh-huh.

13   Q.  Thank you, Dr. Lewis.  Those are my questions.

14          THE COURT:  Redirect.

15                    **REDIRECT EXAMINATION**

16   BY MR. SHAPIRO:

17   Q.  Doctor, I was looking at Exhibit 63, the defendant's

18   Exhibit 63.  And in note of a Dr. Price's -- and it is

19   page Price 006 -- and she uses an interesting assessment or

20   plan or diagnosis.  She says, "Chronic pain and probable

21   sympathetically maintained but unlikely complex regional pain

22   syndrome."  What does that mean?

23   A.  I do not know what her point is, at least on a therapeutic

24   level.  For me, as I say, I'm looking at data -- at least the

25   potential therapies.

Kenneth Lewis, M.D. - Redirect

1    *Q.* But if you have sympathetically maintained pain, do you

2    have complex regional pain syndrome?

3    *A.* I would argue that, yes, it doesn't -- that statement

4    doesn't make sense to me.

5    *Q.* Okay. So Dr. Price believes that Ms. Houston had -- has

6    chronic pain and probably sympathetically maintained pain --

7        *MR. SCARPATO:* Objection. Foundation.

8        *THE COURT:* Overruled.

9    *BY MR. SHAPIRO:*

10   *Q.* -- but not complex regional pain syndrome. How would you

11   treat sympathetically maintained pain any different than

12   complex regional pain syndrome?

13   *A.* No difference at all.

14   *Q.* So I want to talk about cure, the word "cure." Can you

15   cure complex regional pain syndrome?

16   *A.* I would not use the word "cure." Treat.

17   *Q.* Why, sir?

18   *A.* The trauma in this case -- in this specific situation, the

19   trauma is there and permanent. It doesn't mean that the

20   perception and the disability from that trauma needs to be

21   untreated, even if you can't cure the reason for it.

22   *Q.* Is there any way for anyone to cure complex regional pain

23   syndrome?

24   *A.* I've had patients after a stimulator has been placed and on

25   gabapentin and psychological therapy and physical therapy that,

Kenneth Lewis, M.D. - Redirect

1    essentially, have no pain; so I think it would be reasonable in

2    some subsets of patients to actually describe that as an actual

3    cure.

4           MR. SHAPIRO:  Thank you, Doctor.  Appreciate your

5    time.

6           THE COURT:  Thank you, Doctor.

7           May this witness be excused?

8           MR. SHAPIRO:  Yes, sir.

9           THE COURT:  Any objection?

10          MR. SCARPATO:  No.

11          THE COURT:  Doctor, you're excused.  Thank you.

12          THE WITNESS:  Thank you, gentlemen.

13          THE COURT:  Who is your next witness, please?

14          MR. OGBORN:  We are calling Dave Lester.

15          We are bringing up another camera, Your Honor, so it's

16   taking us one second here.  Have it plugged in and ready to go,

17   but we lost the connection, unfortunately.

18          COURTROOM DEPUTY:  I show you connected twice, so you

19   only need to be in there one time.

20          MR. OGBORN:  Our paralegal doing double her job.

21          THE COURT:  Just go ahead.  I can hear him.

22          Swear him in, please.

23   There, you've got one witness.

24

25

David Lester – Direct

1            (**DAVID LESTER, PLAINTIFF'S WITNESS, SWORN**)

2            *COURTROOM DEPUTY:*  Please state your name and spell

3    your first and last name for the record.

4            *THE WITNESS:*  My name is David Lester.  L-E S T E-R.

5            *MR. OGBORN:*  I want to make sure, is the volume okay

6    for everybody?

7            *COURTROOM DEPUTY:*  Yes.

8                        **DIRECT EXAMINATION**

9    *BY MR. OGBORN:*

10   *Q.*  Mr. Lester, I'm going to have you start off and tell us a

11   little bit about yourself.  What do you do for a living?

12   *A.*  I'm a professional independent director for a number of

13   corporations.  I have started running a number of companies,

14   taking a couple public and on NASDAQ.  I'm involved in both

15   profit and nonprofit organizations and serve on boards, and I'm

16   a trustee of some foundations.

17   *Q.*  You have been a friend of Tracy Houston for some time?

18   *A.*  Yes.

19   *Q.*  How did you originally meet Tracy Houston?

20   *A.*  Tracy and I both attended the University of Denver.  I have

21   an MBA from the University of Denver, and we have common

22   interests in terms of corporate directorships.  And my main

23   first connection with Tracy was learning about her interest and

24   her involvement and her support for helping corporate directors

25   be more aware of rules and more aware of the best way to serve

David Lester – Direct

1  the boards that they were members of.

2  *Q.* And when you talk about Tracy Houston's job being to help

3  these board members understand the rules, were you familiar

4  with how she went about doing that?

5  *A.* Yes, I was.  Indeed.

6  *Q.* Help us understand a little bit, please.  What would she do

7  in order to accomplish that task -- those tasks?

8  *A.* She had several ways to do that.  The most important way

9  was she communicated with potential directors and people who

10 were on boards.  She provided information on things that were

11 happening, current rules and regulations that were changing,

12 corporate governing issues, and she communicated these things

13 in multiple ways.  She communicated with them in in-person

14 kinds of meetings with different groups.  But very importantly,

15 she communicated these both in publications she prepared; and

16 she communicated these in what you might call blog or

17 informational, circulated on a regular basis when new

18 information came out.

19 *Q.* Did you personally have access to some of the materials

20 that were being used by Ms. Houston?

21 *A.* I did, indeed.  Yes, I got regular input.

22 *Q.* Was that something you appreciated and relied upon in doing

23 your job?

24 *A.* I found that she was always very much aware of the changes

25 and new rules and also aware of ways to improve performance of

David Lester - Direct

 1   boards, and it was very helpful.

 2   Q.   Mr. Lester, prior to 2016, how much contact would you

 3   typically have with Ms. Houston?

 4   A.   When she was living in the Denver area, a few times, I

 5   would have information coming to me by email, roughly weekly;

 6   and Tracy and I would talk from time to time.  And as we became

 7   more aware of our personal interest, as well, we would do

 8   hiking sometimes and just go out and have a business discussion

 9   on the trail, as opposed to doing it on a -- in an office.

10   Q.   When you say "share personal interest," hiking was one of

11   those interests?

12   A.   Very much, yes.  It was for me.

13   Q.   How often would you engage in hiking or outdoor-type

14   activities with Ms. Houston?

15   A.   Oh, I don't know, eight or ten times a year.  Maybe more

16   often, just depending upon the given year and our activities,

17   how much we were in town.

18   Q.   Would you say she was an avid hiker or kind of part time?

19   A.   I would say she was a very avid, very active hiker.

20   Q.   When you say "active," why do you add active?

21   A.   Well, I always enjoyed my hikes with Tracy in that time

22   period, because she would get out, and we would hike along.

23   There wouldn't be delay or stopping to take a breather or

24   anything.  We would move right along on the trails, and that's

25   the way I prefer to do it.

David Lester - Direct

1    Q.  At some point in the end of 2016 or early 2017, did you

2    come to learn that Ms. Houston had been involved in a car

3    collision?

4    A.  I certainly did.  Yes.

5    Q.  How did you find out, sir?

6    A.  Tracy and I would keep in touch fairly regularly.  We have

7    mutual friends.  And I probably learned directly from Tracy,

8    but could have been mutual friends.

9    Q.  How -- after that collision, did you continue to stay in

10   touch with Ms. Houston, as before?

11   A.  My most recent contact with Ms. Houston was when she was

12   living in the Denver area.  And when she moved to Grand

13   Junction, our contact became more on the phone, as opposed --

14   or by email, as opposed to the personal connections.  But,

15   yes, I continued very much to stay in contact with her.

16   Q.  Did you ever see her physically after the 2016 collision?

17   A.  I did.  Yes.

18   Q.  Help us understand, were there any differences in her

19   behavior and her activity level?

20   A.  Significant differences.  She remains, you know, friendly

21   and personable and knowledgeable; but in several ways, I

22   noticed changes.  For example, we would have discussions on the

23   phone; and there would be certain times or sometimes during the

24   day -- certain times when her cognitive ability seemed

25   diminished.  She would not be able to follow the line of

David Lester – Direct

1    thought as easily as she always had before.  And physically, we

2    had occasion to do a couple of walks -- and this was not a

3    hike.  These were walks in the Denver area -- and I noticed

4    that she was way diminished in terms of her ability to move

5    along in a brisk fashion that she had in the past.

6    Q.  You mentioned the fact that her cognitive abilities seemed

7    better in parts of the day, maybe not so good in other parts of

8    the day.  Were you able to discern a pattern?

9    A.  Not a regular pattern; perhaps a little more in the

10   mornings things were better.  But I became aware there were

11   times when she would or wouldn't be particularly cognizant, so

12   I kind of let her initiate the contacts, because I knew she

13   could pick a time when she was comfortable with discussions.

14   Whereas, when I would call without any kind of advance notice,

15   sometimes she might be less -- maybe seemed more tired or less

16   organized.

17   Q.  In 2018 and 2019, did you perceive any difference in the

18   materials she was putting out or the type of business contact

19   she was maintaining?

20   A.  Oh, yes, definitely.  In the prior times before her

21   accident, she was actively involved; and there would be regular

22   communications with directors that were part of her following.

23   And after that, it dropped off dramatically.  I would often

24   share something that I would find or become aware of that might

25   be of interest to her.  One of the areas she specialized very

David Lester - Direct

1    much was in women directors.  And during that period of time,

2    the state of California was going through a process of making

3    it easier for women to be involved with and actually be a part

4    of the major boards.  And when I find something on that topic,

5    I would certainly share that.  But the sharing from her

6    direction was much less intense.

7    Q.  You talked about helping put women on boards, especially in

8    California.  In fact, California passed a law that said, in

9    certain boards, board of directors, you had to have --

10   A.  Yes.

11   Q.  -- representation by a woman?

12   A.  Uh-huh.

13   Q.  Is that something you thought that Ms. Houston was ready or

14   able to take advantage of prior to 2016?

15   A.  Oh, most certainly.  She was very much aware of what was

16   going on, very actively involved.  And when I say "actively

17   involved," I mean, a participant and a driving force in some of

18   the women getting involved with boards, kind of activities.

19   She would often make connections that she and I might discuss

20   with a woman who was well qualified for a particular board

21   position she became aware of opening up.

22   Q.  And prior to 2016 -- let me be specific, Mr. Lester -- did

23   she actually help any members of your boards?

24   A.  She helped members of my boards, mostly by pass-ons that I

25   would provide to them with information she became aware of.  So

David Lester - Direct

1    if it were something that would be crucial to a particular

2    board that I was on, I would often share that information with

3    the other members of the board so they would become aware of it

4    as soon as that became a policy or law.

5    Q.  Now I want to go post-2016.  Has she -- have you been able

6    to use any materials she's provided you to assist with your

7    boards?

8    A.  That has changed dramatically.  Before that date and time,

9    she was actively regularly disseminating information.  And

10   after that point in time, that became only occasional and when

11   we would discuss something, but not in the routine basis.

12   Q.  Mr. Lester, as it relates to her project of getting women

13   on boards, is that something that could be monetized?

14   A.  Oh, yes.  Most certainly.  There are a lot of very capable

15   women that need to be matched with companies who have openings

16   or who could potentially benefit from the skills those women

17   had.  So being a matching service, that sort of thing,

18   certainly is a way to monetize it.  There are other ways, just

19   providing general information.

20   Q.  Post-collision, after 2016 -- so into 2018, 2019 -- have

21   you seen Ms. Houston or -- do you have any knowledge of

22   Ms. Houston being involved in any of those activities of

23   helping match qualified women with boards that need them?

24   A.  None specifically, no.

25   Q.  As you compare Ms. Houston, pre-2016, post-2016, as a

David Lester - Direct

1    friend and as a business colleague, what do you see as the

2    biggest differences that you attribute to this collision?

3    *A.*  Well, certainly -- obvious differences in terms of her

4    ability to be as physically active in the outdoors and manage

5    her property, things like that.  Clearly, a change in

6    spontaneity and going out, limitation in terms of the amount of

7    time or energy she can put into a walk.  You might -- sort of

8    changes we're talking about here are a hike of miles versus a

9    walk of a couple of blocks.  And that's dramatic change and

10   very noticeable change.

11        In terms of the cognitive things and all, she has

12   always been very impressive in terms of her knowledge and her

13   communication skills and things like that.  And now you find

14   that if she's in a window of time when she is energized, that

15   remains, by and large; but if she is in a situation where she's

16   either extended in terms of the length of time she has to be

17   involved or engaged in discussions, it's hard for her.  There

18   are some times when she might be moving along pretty much in an

19   open conversation and just feel like she forgot where she was

20   going on something like that.  That was not the case at all

21   before.

22        *MR. OGBORN:*  Mr. Lester, thank you very much for your

23   time.  I know Ms. Bobet may have a couple of questions for you.

24   She's on the screen in front of you.  I'll let her take over.

25        *THE WITNESS:*  Yes, ma'am.

David Lester – Cross

1            **CROSS-EXAMINATION**

2    *BY MS. BOBET:*

3    *Q.*  Good afternoon -- good afternoon, Mr. Lester.  How are you?

4    *A.*  I'm fine.  Thank you.

5    *Q.*  Now, you talked to Ms. Houston about the accident; right?

6    *A.*  Yes, I did.

7    *Q.*  You talked to her about this litigation; correct?

8    *A.*  Yes, I have.

9    *Q.*  After the accident, you encouraged her to file a lawsuit?

10   *A.*  I didn't personally encourage her to.  I felt like those

11   decisions were hers, and I would support whatever she thought

12   was of value and important after the accident.

13   *Q.*  You helped her find a referral to a lawyer to represent her

14   in a suit; right?

15   *A.*  I was passively involved.  My brother-in-law is an

16   attorney, and I know a number of attorneys in the Denver area

17   on a personal basis.  So we shared names, but I didn't

18   specifically bring her to the firm that she is working with now

19   or anything like that.  More giving her a sense of the

20   community.

21   *Q.*  You talked with her about how much money she should demand

22   from the United States in this lawsuit; right?

23   *A.*  We talked in general about that.  Not anything specific.  I

24   learned there was a cap on the amount that the Postal Service

25   was allowed to go forward with without entering a litigation.

David Lester - Cross

1   We also talked in general about the kinds of expenses that she

2   has now from a standpoint of trying to return to normal and

3   trying to avoid the kind of constant background pain

4   situations.  But I wasn't -- I wasn't specifically focused on

5   those things, but more trying to provide some general oversight

6   and guidance and support.

7   Q.  I just want to clarify one thing you just said about a cap

8   on the amount the Postal Service can pay.  Could you say that

9   part again?

10          MR. OGBORN:  Objection.  Relevance.

11          THE COURT:  Overruled.

12          MS. BOBET:  Well --

13          THE WITNESS:  My understanding was that the Postal

14  Service as a pseudo-government agency was able to make an open

15  offer for settlements up to a million dollars.  Anything beyond

16  that would not be within their realm of providing support for

17  ongoing use.

18  BY MS. BOBET:

19  Q.  Your understanding wasn't from any communication with a

20  Postal Service representative, though; right?

21  A.  That's correct.  It was not.

22  Q.  And, obviously, it sounds like that understanding

23  influenced or came up in your conversations with Ms. Houston

24  about potentially filing a lawsuit; right?

25  A.  Generally, yes.  I guess I'd say so.  I left those kinds of

David Lester – Cross

1   things very much to her to make the decisions and what she

2   felt, because I didn't have specific visibility of the kinds of

3   expenses that she was incurring or expected to incur in the

4   future.  But I certainly knew other people who had ongoing pain

5   from injuries and things like that, and I knew that could be

6   quite expensive.

7   Q.  How many times have you seen Ms. Houston in person since

8   the accident?

9   A.  In person, only a handful of times.  I travel to the

10  Western Slope occasionally, but I haven't visited her in her

11  home during the -- since the accident.  And she's been in

12  Denver a couple of times, and we have tried to spend a little

13  time together at those times.

14  Q.  So Ms. Houston traveled to Denver a couple of times since

15  the accident?

16  A.  Two that I'm consciously aware of, and that was related to

17  the case.

18  Q.  You don't have any medical training, do you?

19  A.  I do not have specific medical training.  I have a degree

20  in psychology, and I have technical degrees and business

21  degrees.  I also have been the president of a publicly traded

22  medical corporation, and I've been on the board of directors of

23  other medical companies.  I have no medical degree.

24  Q.  And those positions on the boards or with the medical

25  companies, that was on the corporate side, not the actual

David Lester – Redirect

1    practice of medicine; correct?

2    A.   That's correct.

3    Q.   And you never worked as a medical professional at any time?

4    A.   That is correct.

5    Q.   You're not a psychologist?

6    A.   I am not a psychologist in any practicing sense.

7    Q.   Not a psychologist in a practicing sense.  Are you in a

8    non-practicing sense?

9    A.   I tried to use my degree in psychology to give me a better

10   understanding of human interactions.

11   Q.   You've never had a job in the field of psychology?

12   A.   That's correct.  I never have.

13           MS. BOBET:  That's all for me, thank you.

14           THE WITNESS:  Thank you very much.

15           MR. OGBORN:  One follow-up topic.

16                    **REDIRECT EXAMINATION**

17   BY MR. OGBORN:

18   Q.   Mr. Lester, there was a discussion about a million dollar

19   cap, so to speak.  Were you having that discussion in

20   conjunction with filing a lawsuit; or was that discussion in

21   conjunction with, what are your expenses and needs going to be

22   going into the future and helping Ms. Houston with some

23   financial planning?

24   A.   My sense was only just a knowledge of it.  I had no

25   discussions about filing a lawsuit related to that at all.

David Lester – Redirect

1  *Q.*  Very good.

2       *MR. OGBORN:*  No further questions, Your Honor.

3       *THE COURT:*  All right.  Thank you.

4       May this witness be excused?

5       *THE WITNESS:*  Thank you, sir.

6       *MR. OGBORN:*  Yes, please, Your Honor.

7       *MS. BOBET:*  Yes, Your Honor.

8       *THE COURT:*  All right.  Witness is excused.

9       And we will stand in recess until five minutes after

10 1:00.  Now, when Dr. Price is -- she's given up or rearranged

11 her schedule, so I want to stop promptly with whatever witness

12 we have at 3:30 so Dr. Price can be cross-examined and have the

13 redirect before today's proceedings are over.  Can you schedule

14 accordingly?

15      *MR. OGBORN:*  Yes, sir.

16      *THE COURT:*  All right.  We'll be in recess.  Thank

17 you.

18      (Recess at 12:06 p.m.)

19      (In open court at 1:10 p.m.)

20      *THE COURT:*  Thank you.  Please be seated.

21      We have a witness to be sworn.  Would you please swear

22 in the witness.

23

24

25

John Gustavson – Direct

1        (**JOHN GUSTAVSON, PLAINTIFF'S WITNESS, SWORN**)

2        *COURTROOM DEPUTY:* Please state your name and spell

3    your first and last name for the record.

4        *THE WITNESS:* My name is John Gustavson. My last name

5    is spelled G-U-S-T-A-V-S-O-N.

6        *MR. SHAPIRO:* May I proceed, Your Honor?

7        *THE COURT:* Yes. There seems to be some delay in the

8    speech on the screen from this witness.

9        *COURTROOM DEPUTY:* That's on his end, Your Honor.

10       *THE COURT:* All right. Let's go ahead.

11       *MR. SHAPIRO:* Thank you.

12                    **DIRECT EXAMINATION**

13   *BY MR. SHAPIRO:*

14   *Q.* Dr. Gustavson, can you please provide us with your

15   professional address.

16   *A.* My work address is 2530 North Eighth Street, Suite 204,

17   Grand Junction, Colorado.

18   *Q.* Can you tell us your profession, please?

19   *A.* I am a licensed clinical psychologist.

20   *Q.* Are you also a neuropsychologist?

21   *A.* Yes.

22   *Q.* How long have you been a psychologist and

23   neuropsychologist?

24   *A.* Since -- a clinical psychologist since 1981; I was a school

25   psychologist for a few years before that.

John Gustavson - Direct

1    *Q.*  How about a neuropsychologist?

2    *A.*  I completed a post-doctoral fellowship in neuropsychology

3    in 1981 and have practiced neuropsychology in various forms

4    since that time.

5    *Q.*  How long have you practiced as a psychologist and

6    neuropsychologist in the Grand Junction area?

7    *A.*  Since 1984.

8    *Q.*  Can you tell the judge about your practice as a

9    psychologist and neuropsychologist and explain what it is that

10   you do and the types of patients that you treat or assist?

11   *A.*  I came to Grand Junction in 1984 to take a position with

12   what was then Hilltop Rehabilitation Hospital, which is a

13   hospital that was designed to treat people that have had

14   traumatic head or spinal cord injuries or other serious

15   illnesses; and I worked there as an employee for two years.

16   Later, my partner, Dr. Dale Bowen, and I developed a private

17   practice.  We continued to provide services for Hilltop

18   hospital for a few years, and then we moved out of the facility

19   and into our own office in about 1988.  And I've been in

20   private practice since then.

21           I see a general variety of mental health patients,

22   people suffering from depression, anxiety, post-traumatic

23   stress disorder, obsessive-compulsive disorder.  And included

24   in my practice, I do evaluations on people that have had brain

25   injuries, brain trauma, brain insults of one sort or another; I

John Gustavson - Direct

1    undertake testing to evaluate the nature, extent, magnitude of

2    those types of problems; and I provide treatment or

3    consultation for treatment for those individuals.  As an

4    extension of my practice, my private practice, I consult one

5    half day a week at the Hilltop Life Adjustment program, which

6    is a residential facility, akin to an assisted living facility,

7    for survivors of trauma brain injury; I also have worked in the

8    area of chronic pain management; and I currently have a

9    contract to provide mental health services at Family Health

10   West Hospital the equivalent of one day a month.  In addition

11   to that I do presurgical psychological evaluations on patients

12   that are applying for procedures like weight loss surgery or

13   spinal cord stimulator surgery.

14   Q.  Do you work with patients in addition with post-traumatic

15   stress disorder?

16   A.  I do.

17   Q.  Complex regional pain syndrome?

18   A.  Yes.

19   Q.  Chronic pain?

20   A.  Yes.

21   Q.  Do you treat, diagnose, and determine causal connections

22   regarding brain injuries, post-traumatic stress disorder, and

23   chronic pain with your patients on a routine basis?

24   A.  Yes, I do.

25   Q.  Have you worked with any of the doctors that are involved

John Gustavson - Direct

1  with Ms. Houston's care and treatment before this case?

2  A.  I have worked with Dr. Kenneth Lewis, who is a pain

3  specialist and I know had some interest in trying different

4  pain management strategies with Ms. Houston.  I have a close

5  working relationship with Ellen Price, who has been involved in

6  this case; I know of Lynn Price, who is a family physician in

7  the Grand Junction area; I have worked with and shared patients

8  with Dr. Ann Marie Collier, who is a neurologist; and I've also

9  had some dealings with Dr. Kalat, the other neuropsychologist

10  involved in this case.  And I think there are others.  I am

11  aware that Ms. Houston has been participating in cognitive

12  retraining therapy with a speech therapist at Family Health

13  West, and I know that.  There may be others.

14  Q.  How about Dr. Cota?

15  A.  I only know him by name.  I received records from his care

16  of Ms. Houston prior to my initial consultation, but I don't

17  know him personally.

18  Q.  How about Dr. Burnbaum, the neurologist?

19  A.  I do know and have worked with -- in fact, my office is

20  right next door to Dr. Burnbaum's neurology clinic, except that

21  he moved away recently and opened an office in Fruita.

22  Q.  Do you have a specialty?

23  A.  Well, I advertise my specialty -- because I have an

24  additional year of post-doctoral training in neuropsychology --

25  as a specialist in the field of neuropsychology, which deals

John Gustavson - Direct

1    with a variety of aspects of injury and trauma and problems

2    with the brain and central nervous system.

3    Q.  What is the difference between a psychologist and a

4    neuropsychology?

5    A.  A clinical psychologist is more of an all-encompassing

6    term.  It is designed -- the individual is designed -- trained

7    and educated to treat patients who have all varieties of mood,

8    emotional, behavioral, and mental health problems.  A

9    neuropsychologist is typically a clinical psychologist who

10   specializes in the treatment of brain trauma, brain injury, and

11   evaluating and providing therapy for individuals, and that's in

12   that particular subset of mental health problems.

13   Q.  How much of your practice is psychology versus

14   neuropsychology?

15   A.  I would say probably 60 to 70 percent is general

16   psychology, I see a variety of patients for variable kinds of

17   problems; and then maybe 30 or 40 percent is focused on

18   different aspects of neuropsychology.

19   Q.  Can you tell us your educational background to become a

20   psychologist and a neuropsychologist?

21   A.  I have a bachelor's degree in psychology -- general

22   psychology from Brigham Young University; I followed that

23   with -- by earning a master's degree in school psychology from

24   the same institution; and then I transitioned into the clinical

25   psychology program also at Brigham Young University.  That's a

308

John Gustavson - Direct

1   three-year academic program and one-year internship.  I

2   completed my internship at the University of Nebraska Medical

3   Center.  And then following my internship, I completed a

4   post-doctoral fellowship, which was an additional year of

5   study, focused solely on neuropsychology, also at the

6   University of Nebraska Medical Center.

7   Q.  Do you need to be fellowship trained in order to be a

8   neuropsychologist, or is that the preferred path?

9   A.  That is the preferred path.

10  Q.  Okay.  Is there a board certification for neuropsychology?

11  A.  Yes, there is.

12  Q.  Are there many board-certified neuropsychologists, or most

13  have chosen not to go through that route?

14  A.  There are a few of whom I'm aware in the state of Colorado.

15  But it's a special designation that requires extra work, and I

16  think it's to the credit of the individual who has done that,

17  but it's not necessary to practice as a neuropsychologist.

18  Q.  What is your role in treating brain injury, post-traumatic

19  stress disorder, chronic pain patients?

20  A.  My initial role typically is an evaluative role.  That is,

21  I get referrals from providers -- healthcare providers in the

22  community, family physicians, neurologists, physiatrists --

23  that would be doctors in the area of physical medicine and

24  rehabilitation -- and other specialists who are interested in

25  having me conduct an initial evaluation, sometimes called a

John Gustavson - Direct

1    neuropsychological consultation.  That consists typically of a

2    diagnostic interview; what we refer to as a mental status

3    examination; and a gathering of data regarding an individual's

4    background, their developmental history, academic and work

5    history, relationship history, and that sort of thing.

6           And then on the strength of that information, I

7    prepare a -- I typically prepare a written report for my own

8    benefit, as well as for reference to the referring physician.

9    And ordinarily, I will describe a treatment plan, if one is

10   necessary, which may involve psychological treatment, which

11   takes on a variety of forms.  And if necessary, I may propose

12   treatment in other areas of specialty, such as speech,

13   occupational, or physical therapy.  And then I will typically

14   follow up if needed in providing mental health counseling and

15   psychological treatment for those individuals.  And whether

16   it's a brain injury or post-traumatic stress disorder or

17   chronic pain, the format is always the same.

18   Q.  Do brain injuries, post-traumatic stress disorder, and

19   chronic pain provide similar presentations of signs and

20   symptoms?

21   A.  Each is its own distinct entity, but there is an overlap.

22   Q.  Can you describe that?  Can you explain?

23   A.  Well, post-traumatic stress disorder has a constellation of

24   symptoms that define the disorder.  And that would be things

25   like exposure to a particular kind of trauma; intrusive

John Gustavson – Direct

1    symptoms like nightmares, flashbacks, things of that nature;

2    then there is a tendency for the individual to avoid stimuli

3    that remind them of the event or the situation that caused the

4    trauma; and then there are typically changes in mood or

5    personality as a result of that.

6          Someone that has chronic pain, their presentation

7    symptoms may overlap, in the sense that they can be depressed

8    or have anxiety or change in life circumstances.  But typically

9    the focus is on a localized injury, for example, low back,

10   shoulder, knee, or foot.  With someone who has a brain injury,

11   there has been an event or situation that has brought that

12   individual to the attention of healthcare providers, often

13   neurologists or neurosurgeons or physiatrists; and they want

14   information that helps them to understand the nature and the

15   extent of problems related to the brain injury.  And then

16   they're looking for supporting treatment.  So there may also be

17   mood, emotional, and personality changes that go along with a

18   brain injury.  So there are some overlaps between those three

19   clinical entities; but there are distinguishing

20   characteristics, as well.

21   Q.  Do all three present with cognitive issues?

22   A.  No.

23   Q.  Which ones would present with cognitive issues?

24   A.  I should say, not necessarily; they may.  Individuals in

25   each one of those categories may present with cognitive

John Gustavson - Direct

1  problems.  We don't necessarily see cognitive issues with

2  chronic pain unless there are also significant mood and

3  emotional overlay, depression, anxiety, and that sort of thing,

4  which may interfere with the clarity or the efficiency of

5  cognitive processes.

6        There is an overlap, certainly, between post-traumatic

7  stress disorder and brain injuries on the order of concussive

8  head injuries, mild and moderate traumatic brain injuries, and

9  so forth, in that it's not uncommon for people with either/or

10 both of those syndromes to complain of forgetfulness,

11 distractibility, inattention, difficulty concentrating,

12 difficulty focusing, problems with loss of mental sharpness,

13 mental efficiency.

14 Q.  Are the treatments similar for all three when there is

15 cognitive issues?

16 A.  I would say there are appreciable differences.  With

17 someone who has post-traumatic stress disorder, the focus of

18 attention is on the stress, the residuals of the intrusive

19 thoughts and memories and flashbacks and the exaggerated

20 startle reaction and that sort of thing.  That becomes the

21 greater focus in a therapeutic context.  Whereas, with somebody

22 who has a brain injury, the emphasis may be on understanding

23 the nature and the implications of the brain injury, depending

24 on what kind of brain injury it was, what are the symptoms that

25 go along with it?  I think the focus, at least from my

John Gustavson – Direct

1   perspective, with someone who has sustained brain injury has

2   always been on helping them to understand, almost in a didactic

3   way, because I want people that I treat to be as expert as they

4   can be in understanding those kinds of problems, which gives

5   them a greater tool to be able to learn coping strategies and

6   ways of adjusting to that.

7   Q.  How do you know what the diagnosis really is, and does it

8   really matter what the actual name that you put on the

9   diagnosis is?

10  A.  That's an interesting question.  Because it seems to me

11  that there are those who get caught up in the idea of "we need

12  to make the most accurate diagnosis."  And whether somebody is

13  suffering from acute stress disorder, post-traumatic stress

14  disorder, prolonged grief disorder, all of which present in

15  similar ways, and there are some physicians who think, we need

16  to get the exact diagnosis.  From my perspective, it's more

17  important to describe what the symptoms are.  And if we have a

18  clear sense of what the difficulties -- the mood or the

19  behavioral or the emotional difficulties are, we can direct our

20  treatment at ameliorating those symptoms.

21       But there are distinguishing features, for example,

22  between post-traumatic stress disorder and traumatic brain

23  injury.  Where the person has traumatic brain injury,

24  typically, there was an event or a condition that resulted in

25  the injuries, an individual striking their head or being struck

John Gustavson – Direct

1   on the head or sustaining a penetrating injury to the head, as

2   if from, for example, a stabbing or a bullet wound or something

3   of that nature.  Whereas, with post-traumatic stress disorder,

4   there was an event or situation or prolonged exposure to some

5   situation that was terrifying, upsetting, potentially

6   dangerous, life threatening, or where other individuals may

7   have been maimed or even lost their lives.  So the

8   precipitating event, if you will, the situation that caused the

9   trauma, becomes kind of the distinguishing feature.

10  Q.  You also do psychotherapy and also test your patients;

11  right?

12  A.  I do both of those.

13  Q.  Were you involved in the treatment of Ms. Houston?

14  A.  I was.

15  Q.  Are you still involved in treating Ms. Houston?

16  A.  I am not.

17  Q.  Are you aware that Dr. Lewis is sending her or wants you to

18  treat her with regard to future implantation of the spinal

19  stimulator?

20  A.  I have been apprised that that is something that he is

21  thinking of doing.  Yes.

22  Q.  Okay.  How was Ms. Houston referred to you?

23  A.  I was trying to figure that out, and I looked back at the

24  intake materials when a call was initiated to my office.  And

25  the very first time that happened, the call came from your

John Gustavson - Direct

1  office, Mr. Shapiro.  And I don't know if she got my name from

2  your office and called and said, Mr. Shapiro has asked me to

3  see you, or if someone from your office called and scheduled an

4  appointment.  That's not clear.

5         When Ms. Houston filled out the initial paperwork in

6  my office, she said that the referral had come from her then

7  orthopedic surgeon, Dr. Cota, and that he was the referring

8  source.  And in conjunction with her enlisting in therapy in my

9  office, I received copies of his notes.  So one or other or

10 both of you.

11 Q.  Okay.  Have we had other cases together?

12 A.  Yes.

13 Q.  How many, do you know?

14 A.  One or two.

15 Q.  In this case, what did you review in order to treat and

16 formulate your opinions regarding Ms. Houston?

17 A.  At the time that she came to my office, I had only received

18 the office notes of Dr. Cota regarding her leg injury.  And I

19 typically have -- when patients present in my office for the

20 first time, I have a questionnaire that asks a lot of nosy

21 questions about their history, upbringing, family life, prior

22 history of mental health problems or treatment, history of

23 alcohol or substance abuse, and a lot of other things; and I

24 had Ms. Houston fill that out.  So I had that paperwork

25 available to me, and reviewed those materials prior to meeting

315

John Gustavson – Direct

1   her face to face.  And then met with her in my office on the

2   6th of June of 2017 for an hour-long what is sometimes called a

3   diagnostic interview or just a clinical interview, where I go

4   over the history of the problem -- that is, what happened --

5   what is it that led up to her seeking psychological treatment;

6   and I cover the areas that I mentioned about her prior history.

7   And then I do what is called a mental status examination, where

8   I consider such things as the clarity of her thinking, her

9   speech, her orientation, whether or not she shows any evidence

10  of disorganized thinking or psychotic symptoms and get a

11  history of the symptoms that she is displaying, such symptoms

12  as feelings of discouragement, helplessness, hopelessness,

13  obsessive worry, and things of that nature.

14  *Q.*  Since you've seen Dr. Cota's records, have you reviewed

15  other records later on after your care of Ms. Houston?

16  *A.*  I don't believe that I had any other records during the

17  course of time that I was treating her; but subsequent to that,

18  I have reviewed a stack full of records.

19  *Q.*  Did you also review the raw data from Dr. Kalat, the

20  defense neuropsychologist?

21  *A.*  Yes.

22  *Q.*  His reports, as well as Dr. Goldman's reports?

23  *A.*  Yes.

24       *MR. SHAPIRO:*  At this time, Your Honor, I'd move for

25  the admission of Dr. Gustavson as an expert in the field of

John Gustavson - Direct

1    psychology and neuropsychology.

2            *MS. BOBET:*  No objection.

3            *THE COURT:*  The tender is accepted.  The doctor is

4    qualified in this court in this case as an expert in psychology

5    and neuropsychology.

6            Go ahead, please.

7            *MR. SHAPIRO:*  Thank you, Your Honor.

8    *BY MR. SHAPIRO:*

9    *Q.*  When did you first see Ms. Houston after the crash of

10   December 1, 2016?

11   *A.*  June 6, 2017, was the first time I had face-to-face contact

12   with her.

13   *Q.*  How many times did you see Ms. Houston for treatment?

14   *A.*  In addition to my initial visit, I saw her for five

15   sessions.

16   *Q.*  When you first saw Ms. Houston, how did she present

17   herself, and how was she physically?

18   *A.*  She was hobbled by a leg injury, and she was using a crutch

19   for support as she walked in.  My impression was that she was

20   pleasant, cooperative, appropriately engaged in our discussion.

21   I ascertained that she had a number of symptoms that suggested

22   to me that she was suffering from an emotional disorder.  I

23   chose to -- based on that set of symptoms, diagnose

24   post-traumatic stress disorder.  Those symptoms included such

25   things as having intrusive memories and flashbacks of the

John Gustavson – Direct

1    accident.  She was unable to drive at the time partly because

2    of her leg injury and partly because she had a phobia that

3    was -- she was afraid to try to operate a vehicle.  She

4    described to me anxiety, a sense of worry and foreboding, as

5    well as a tendency to have an exaggerated startle reaction to

6    things that reminded her of her accident.

7    Q.  Was she using crutches or a cane all the way through your

8    care and treatment?

9    A.  No.  She gradually weaned away from -- seemed like she used

10   a crutch for a while; then she transitioned to a cane; and on

11   or about the last session, she was walking independently,

12   although she was wearing some kind of support garment on her

13   foot.

14   Q.  You gave part of the history.  Can you give us the history

15   and the reason Ms. Houston was there to see you?

16   A.  I'm referring to my neuropsychological consultation of

17   June 6, 2017.  She had told me about the automobile accident of

18   12/1/2016, where it had happened, some of the circumstances of

19   the accident.  She said that she was wearing restraints; that

20   the airbag of the vehicle had deployed; she described some

21   things that happened immediately after the accident on the

22   scene; and her acute care hospitalization, surgery that she

23   underwent on her leg; and how she was then transitioned to a

24   post-acute recovery center.  So she gave me the history of

25   that, told me that she was still seeing a physical therapist in

John Gustavson – Direct

1    the office of her orthopedic surgeon.  She told me that she

2    felt like she was making reasonable progress, and she gave me a

3    list of what I would consider to be the primary symptoms that

4    she was experiencing, they included such things as reliving the

5    accident, feeling depressed, having a lot of pain, being unable

6    to drive.

7            And then after those present –– what I would call

8    presenting symptoms, she gave me a history of what it was like

9    growing up, her academic work, what kind of employment she had

10   done, relationship history, other mental health, medical and

11   mental –– and medical history.  Then as I had mentioned

12   earlier, I did a mental status examination.  And then I sort of

13   cobbled together all of my thoughts and came up with what I

14   thought was a reasonable diagnosis and proposed treatment

15   plan.

16   Q.  What was significant in her past medical history, if

17   anything?

18   A.  She said she was in good health, aside from seasonal

19   allergies.  She told me that she had history of surgery for

20   tonsils and a tubal ligation and then the surgeries related to

21   her automobile accident and that she was on medication for pain

22   management.  Otherwise, it was what I would consider fairly

23   unremarkable.  She was in pretty good health.

24   Q.  Did you subsequently learn about any history of

25   psychological counseling sometime in her past?

John Gustavson - Direct

1    *A.*  I would sort of classify that at a mental health history.

2    *Q.*  All right.

3    *A.*  Which I would distinguish from medical history.  And

4    Ms. Houston told me that she had had cognitive behavioral

5    counseling for low self-esteem in her 20s, which she related to

6    the way she had been treated by her mother.  And she told me

7    that she had taken Paxil, which is an antidepressant, at that

8    time.

9    *Q.*  Anything else in her past psychological or mental health

10   history?

11   *A.*  She had no history of alcohol or substance abuse, did not

12   use nicotine, and had no history of recreational drug use.

13   *Q.*  Did you have any information about a divorce in 2005 and

14   some psychological treatment for a period of time with Kaiser?

15   *A.*  She told me she had been married twice.  The first time for

16   four years, but her husband filed for divorce for unspecified

17   reasons; and a second marriage ended after two years because of

18   incompatibility.  And she told me that she had been on her own

19   since her early 40s.  She was 55 at the time she came to see

20   me, so that would have been 15 -- 13, 14, 15 years earlier.

21   She did not tell me about counseling that she had regarding

22   that divorce.

23   *Q.*  Okay.  Did you subsequently see those prior Kaiser

24   counseling notes, and what was significant for you in

25   helping -- excuse me -- in formulating your opinions?

John Gustavson - Direct

1   *A.*  I had been provided copies of notes from that counseling,

2   and it was clear that she had been going through some

3   adjustment and emotional issues at that time, and that she

4   underwent treatment.

5   *Q.*  Okay.  Did you also have a chance to review a

6   neuropsychological evaluation after the crash by Dr. Jacob

7   Jones?

8   *A.*  Yes.

9   *Q.*  Was there anything significant about that assessment?

10  *A.*  It was unimpressive.

11  *Q.*  Okay.  What is the significance -- why do you say that, it

12  was unimpressive?

13  *A.*  Well, it was not particularly thorough.  It seems like it

14  was an evaluation that was done for purposes of application for

15  disability benefits.  And I -- I could not tell that Dr. Jones

16  had reviewed any medical records and that he had accepted

17  everything that Ms. Houston had told him at face value -- and

18  some of which may not have been supported by the evidence --

19  and that his test findings seemed a little spurious.  So that

20  is to say, I just did not put a lot of confidence in that

21  evaluation.

22  *Q.*  That was going to be my next question.  What was

23  significant in her prior health and mental health history when

24  you were assessing and determining how to treat her after the

25  crash and formulating your opinion?

John Gustavson – Direct

1    A.  With respect to health history, she seemed to be in

2    relatively good health prior to the December 1, 2016, accident.

3    She had conveyed to me that she was a professional in the area

4    of executive coaching and that she had had some success doing

5    that.  She impressed me as being relatively bright and

6    insightful.  So with respect to overall health and functional

7    status, I got the impression that she was fairly high

8    functioning, all things told.

9            With her mental health history –– and we didn't get

10   into the counseling too much, that counseling that she had

11   prior –– except that she had had a difficult time with her

12   mother.  And when her parents divorced, she told me that she

13   had gone to live with her father, which was a little bit

14   unusual, but suggested to me that there was some kind of

15   friction or caustic relationship between her and her mother

16   that would have caused her to make that decision or maybe the

17   court to make that decision.  She told me she characterized her

18   counseling in her early 20s as to work on self–esteem issues

19   that were a product of this dysfunctional relationship she had

20   with her mother.  It seemed like later data, after I completed

21   my treatment with Ms. Houston, suggested that she may have had

22   symptoms of –– similar to post–traumatic stress disorder

23   related to those early events in her life.

24   Q.  Was there any indication in the records of prior

25   depression?

John Gustavson – Direct

1  *A.*  Yes.  The records indicated that she was depressed.

2  *Q.*  Where?  What time frame?

3  *A.*  I don't recall.

4  *Q.*  Okay.  Was there any prior abuse?

5  *A.*  I'm sorry?  Prior abuse?

6  *Q.*  Yes.

7  *A.*  It seemed like it made reference to an abusive relationship

8  with her mother.

9  *Q.*  Does her prior medical as well as psychological history

10  create a predisposition of vulnerability with subsequent

11  trauma, like the crash in question?

12  *A.*  There is a general rule of thumb in the field of

13  psychological treatment that it's important to understand the

14  nature and the implications of mental health events or

15  circumstances that occurred earlier in a person's life.  So if

16  the person is -- a child was abused -- let's say an adult woman

17  who may have been abused as a child by a parent -- that that is

18  something that we need to understand and include in our

19  assessment and treatment of the patient, because events like

20  that can shape a person's view of themselves or view of the

21  world or their capacity for trust or developing warm,

22  companionable relationships with people.  So it's important to

23  know that.

24         My impression at the time that I saw Ms. Houston was

25  that in the years predating her automobile accident, that she

323

John Gustavson - Direct

1    had functioned fairly well.  And if she had had problems in the

2    past, that they had been in remission -- that is, that she had

3    dealt with them, and they were not ongoing.

4           So in reference to your question in particular, she

5    had problems that I think predated her -- the problems she

6    developed after her automobile accident, but she was not

7    experiencing depression or adjustment or emotional difficulties

8    at the time she got hurt.

9    Q.  Was there any indication of prior cognitive deficits before

10   the crash?

11   A.  Not that I recall.

12   Q.  Any prior disabilities before the crash?

13   A.  No.

14   Q.  What specific facts did you have regarding the crash, and

15   how did that assist you in formulating opinions and treating

16   Ms. Houston?

17   A.  I had the report of the orthopedist, as I mentioned

18   earlier; and then I had Ms. Houston's description, which seemed

19   to correlate with the information in the record.  And those

20   were the main sources of material that I used in formulating my

21   treatment plans.

22   Q.  What were those facts, and how did they assist you?

23   A.  That she had had a serious and debilitating injury to her

24   leg, and she had had a couple surgeries.  Something called an

25   open reduction and internal fixation on her ankle that was

John Gustavson - Direct

1    fairly complex, and that she had had a surgery on her knee.

2    And that the expectation was that she would require a year to

3    rehabilitate, and that she may have lingering pain from that

4    injury.

5    Q.  Why was that important in helping you treat and formulate

6    opinions for her?

7    A.  Two issues.  One is that persistent pain can take its toll

8    on one's outlook, their sense of hope, their mood.  Rarely have

9    I met someone who suffers chronic unremitting pain who is not

10   also discouraged, frustrated, or depressed; so that was an

11   issue.  The other is, if this injury left her with, you know,

12   life-altering changes -- for example, a permanent limp or

13   difficulty walking or exercising -- that that would have an

14   effect in terms of reshaping -- forcing her to reshape her view

15   of herself as a person and causing her to make adjustments in

16   her living circumstances, daily routine, and activity patterns,

17   and that that would bear on her mood and her emotional state.

18   Q.  Why is that?

19   A.  I think it's fair to say that anyone who experiences a

20   major life-altering event has to deal with that in some form or

21   fashion.

22   Q.  What is the impact of chronic pain on a person's cognition,

23   as well as their psychological reaction?

24   A.  Well, I'll start with the psychological reaction first.

25   And chronic pain, as I mentioned a few moments ago, has a

John Gustavson - Direct

1    corrosive effect on one's mood.  People that suffer persistent

2    pain that does not abate, it gets discouraging, it's

3    disheartening, it's frustrating, it causes them to have to

4    remold their sense of who they are and how they deal with life.

5    And it's very common for those individuals to suffer depression

6    or anxiety, to have to take medication, or seek psychological

7    therapy for those problems.

8            The problem with pain and cognition is that -- well,

9    there are two issues.  One is that depression -- chronic

10   depression, in particular -- can have a disruptive effect on

11   such things as memory, concentration, attention to detail, and

12   that sort of thing.  And then in addition to that, the effect

13   of pain -- if you could imagine, let's say hypothetically,

14   someone poking you in the back with a cattle prod.  You know,

15   that happens all the time.  It not only hurts, but it's

16   distracting, and you have trouble concentrating.  If you're not

17   concentrating, you're not remembering and consolidating

18   information; and so it can -- it can compromise the sharpness

19   of one's thinking and the efficiency of one's cognitive

20   function.

21   Q.  After the initial few visits, did you form an impression or

22   diagnosis with regard to Ms. Houston?

23   A.  I diagnosed her with post-traumatic stress disorder.

24   Q.  Why?

25   A.  She had the array of symptoms that correlates with that.

John Gustavson – Direct

1  Q.  Is that opinion to a reasonable degree of

2  neuropsychological or psychological probability?

3  A.  Yes.

4  Q.  What were you able to do in your visits with her to assist

5  her, and were you helpful?

6  A.  One really needs to understand, with an injury of the kind

7  that she sustained, where there is severe orthopedic injury,

8  that the primary focus in the aftermath of that kind of

9  accident, the -- the focus tends to be on physical recovery.

10  And so attention is paid to the mending of the bone and the

11  physical rehabilitation, the ability to walk without

12  assistance, to get around.  And so part of my role as her

13  therapist was to provide support during that recovery time and

14  to engage in therapy that was encouraging her to retain a sense

15  of hope, a sense of promise about the future, a sense that

16  we're going to get through this, at some point that she would

17  be back on her feet, be able to return to driving and normal

18  activities.

19          And so part of therapy was designed to help

20  desensitize her to the anxiety that she had about driving.  And

21  over the course of time, she gradually improved in her ability

22  to drive, to be in a car, and to not be waylaid by anxiety or

23  startle reaction, that sort of thing.  So that was one piece of

24  therapy.

25          The second part was to deal with the psychological

John Gustavson - Direct

1    trauma.  That would be such things as the intrusive thoughts

2    and the flashbacks and the avoidant behavior that she developed

3    and the depression and those kind of things.  And my general

4    thinking in therapy tends to be on the conservative side.  In

5    other words, while there is a concept in mental health

6    treatment that is sometimes referred to as the

7    least-restrictive or the least-aggressive alternatives, and

8    that is, you know, you don't crack a nut with a sledgehammer.

9    You -- if there is something that can be handled through talk

10   therapy rather than putting somebody on medication, then you do

11   talk therapy.  If that doesn't work, then you may want to add

12   medication.  For example, in the case of severe depression, if

13   that doesn't work and the person is in crisis, maybe you would

14   look at psychiatric hospitalization.

15        My approach was to be relatively conservative and

16   gentle and supportive.  I wanted her to understand -- I wanted

17   Ms. Houston to understand the nature and the effects of

18   post-traumatic stress disorder.  I recommended some reading

19   material to her.  And, you know, based on my understanding of

20   her professional background as a personal or an executive coach

21   and her training in college and so forth, I felt like she had

22   the academic or intellectual ability to understand and benefit

23   from that.  So she participated in reading that material,

24   because my understanding, it gives us greater ability to master

25   whatever problems we may be facing.

John Gustavson - Direct

1    We worked on what we call systematic desensitization,

2    which is exposing the person to the kinds of things that are --

3    that would be upsetting or anxiety provoking and getting them

4    used to that.  You know, there is a sort of a -- what I call

5    grandma's wisdom about, if you get bucked off the horse, get

6    back in the saddle kind of thing.  Because if you stay away

7    from it, you're going to be afraid of horses the rest of your

8    life.  And I think that's a sort of crude way of saying it; but

9    the idea is get a person back to the normal activities that

10   they were doing before, including driving, and by doing that,

11   by making headway, by gaining ground, by improving those areas,

12   then you anticipate that the other problems will subside with

13   time.

14        And so as I look back through my notes about the

15   sessions we had together, it felt like Ms. Houston was very

16   motivated, she was engaged in the therapy process, she

17   gradually increased her ability to do things, and by the last

18   session had made what I would consider a fairly substantial

19   drive on the interstate highway from one end of the Valley to

20   another to attend some function.  And she felt pretty pleased

21   with her accomplishment.  So we considered progress that she

22   had made, and she felt like she was in a good place.  And she

23   was interested in exploring some other avenues of self-growth,

24   and by mutual agreement we decided not to schedule any further

25   sessions at that point.

John Gustavson - Direct

1   Q.   What was the book that you got her or gave her to read?

2   A.   It was a best-selling book by Bessel van der Kolk called

3   *The Body Keeps the Score*.   And he is a well-known expert in the

4   field of post-traumatic stress disorder and wrote this book

5   several years ago.   It became a best seller and one of the

6   top-rated books.   And it gives a clear and detailed description

7   of the nature and effects of PTSD, gave some -- the book gives

8   some fairly detailed examples of individuals who have

9   experienced that and methods of treating that disorder.

10  Q.   Did that book help Ms. Houston, and did you discuss that

11  with her so -- so you understood she had read it and sort of

12  got it?

13  A.   She told me that she had read parts of it and that it was

14  instructive to her and helped her to understand what she was

15  going through at the time.

16  Q.   What is the impact, Doctor, of continual issues with pain

17  on your psychological makeup or your psychological reaction as

18  well as your cognitive reaction?   What I mean by that is, what

19  happens when pain goes up, and what happens when pain goes

20  down, and how does that impact psychological as well as

21  cognitive issues?

22       *MS. BOBET:*   Objection, Your Honor.   Form and

23  foundation.

24       *THE COURT:*   Overruled.

25       *THE WITNESS:*   There are three aspects of pain which

John Gustavson - Direct

1    are important as I treat someone with persistent, severe pain.

2    One aspect is the intensity of the pain; how bad is it?  On a

3    scale one to ten, where would you rate your pain?  The second

4    dimension of pain is, how frequently does it happen?  Does it

5    happen three times a day; does it happen once a week; how often

6    do you have occurrence of the pain symptoms, whether it's low

7    back pain or migraine headaches or something like that?  And

8    the third dimension is the duration; how long does it last?

9    Let's say you have a spasm in your back that is debilitating to

10   you, this will last for five minutes or five hours or five

11   days.

12           The question that you asked referred to the variable

13   nature of pain, that sometimes it's better, sometimes it's

14   worse.  If an individual can gain some understanding of what

15   are the events that make the pain worse, then they have some

16   capacity to manage that.  You know, if they understand that

17   bending, squatting, lifting, twisting, turning, reaching, or

18   whatever it is makes the pain worse, then they can make some

19   adjustments.  Perhaps I shouldn't -- because I have low back

20   pain, shouldn't lift more than 20 pounds at a time.  And that

21   allows a person some control.  If, on the other hand, the pain

22   comes and goes without any identifiable precipitant -- that is,

23   sometimes it comes on out of the blue, and sometimes it goes

24   away for no particular reason -- that leaves a person with a

25   sense of helplessness.  I don't have any control, I'm at the

331

John Gustavson - Direct

1  mercy of this pain, and it creates a condition that we in

2  psychology refer to as learned helplessness.  It's the feeling

3  that, I'm at the mercy of my pain, or I'm at the mercy of my

4  circumstances, or nothing I do makes a difference.  And that is

5  one of the core features of depression, a sense of

6  helplessness, a sense of powerlessness.

7       If a person has a grasp on things that help -- heat

8  helps, sitting in a hot tub helps, wearing a pressure garment

9  helps, using a -- what is called a TENS unit -- transcutaneous

10  electrical nerve stimulating unit -- if that helps, then

11  they've regained a sense of control.  I can do something that

12  will promote a positive change with one or more of those three

13  dimensions that I mentioned, the intensity or the frequency or

14  the duration.

15       So, you know, it's a complicated question.  But I

16  think the short answer is that it is variable, and it affects

17  different people in different ways.

18  *BY MR. SHAPIRO:*

19  *Q.*  Did you determine what her motives or goals were in working

20  with you?

21  *A.*  She wanted to return to normal life.

22  *Q.*  Did you feel she met her goals -- the goals in working with

23  you during the time she treated with you?

24  *A.*  No.

25  *Q.*  Why not?

John Gustavson - Direct

 1 │ *A.*  She was making progress, but she wasn't there yet.

 2 │ *Q.*  Was she cured?

 3 │ *A.*  No.

 4 │ *Q.*  Did you feel Ms. Houston has or had a traumatic brain

 5 │ injury?

 6 │ *A.*  That was not a conclusion that I came to.

 7 │ *Q.*  Why not?

 8 │ *A.*  There was no evidence to support, in my opinion, that she

 9 │ had suffered physical or mechanical forces that would have

10 │ caused damage to her brain.

11 │ *Q.*  Were you aware -- I want to ask you what these items mean

12 │ to you.  If the EMT at the scene said that she was slow to

13 │ respond to questions to the point that it had to be repeated?

14 │ *A.*  My reaction to that is that's fairly typical following an

15 │ accident that creates trauma.  People are confused, distracted;

16 │ and to say that somebody is slow to respond would not

17 │ necessarily mean anything in particular, unless it was

18 │ something that persisted over time.

19 │ *Q.*  How about light-headed and lethargic?

20 │ *A.*  My answer would be the same.  Again, light-headedness can

21 │ be a psychological reaction; it can be a sense that what just

22 │ happened is kind of bewildering, and I'm having a hard time

23 │ getting my bearings; it can mean several different things.

24 │ Lethargic simply means that she seemed tired or worn out.

25 │ *Q.*  Okay.  Did she present with similar symptoms to a traumatic

John Gustavson – Direct

1   brain injury?

2   *A.*  Are you talking about on the scene or in the course of my

3   work with her?

4   *Q.*  The course of your work with her.

5   *A.*  She had -- I will say that she had cognitive complaints,

6   symptoms of decreased mental efficiency.

7   *Q.*  And is the reason that you are not diagnosing or felt that

8   there was a traumatic brain injury because she didn't have the

9   beginning?

10  *A.*  Well, there are two things.  One, in order to diagnose TBI,

11  there has to be a specific event -- a person struck her head on

12  the steering wheel or she was thrown from the vehicle and hit

13  her head on a rock or she had an indication of severe whiplash

14  or -- so there had to be some kind of physical or mechanical

15  force applied to the head in order for someone to suffer a

16  concussion.

17        Secondly, one looks at evidence from radiologic

18  studies or early workups in the emergency room, maybe a CAT

19  scan or an MRI scan or something like that that would signify a

20  person has had brain trauma; and I saw no evidence of that.

21        And the third was, you know, ongoing symptoms.  You

22  know, a person that has PTSD will often complain that, I'm not

23  remembering things, I can't focus, I don't feel as sharp as I

24  used to, but to recognize that may or may not be related to

25  brain trauma, *per se.*

John Gustavson - Direct

1    *Q.*  What about when orthopedic injuries distract a person or

2    prevent them from using their head for a while, and then they

3    use their head, let's say, weeks or months later and notice the

4    cognitive issues, is that uncommon, common, and what does that

5    mean to you?

6    *A.*  First of all, it's not uncommon.  A person has some kind of

7    major injury, and a person in the aftermath of that injury

8    focuses on the physical recovery.  You know, I'm waiting for my

9    leg to heal, or my pelvis was broken, and I'm going to be in a

10   wheelchair, and I want that to get better; I want to feel

11   healthier; I want to improve my ability to walk around.  And so

12   early in the course of an injury, that tends to be the primary

13   focus, and it's -- after we see an improvement in those

14   symptoms, then a person may be more aware of lingering

15   cognitive difficulties, changes in their mental faculties and

16   so forth.

17         So let's say, for example, a certified public

18   accountant, who is used to doing a lot of detailed work and

19   organizing information, crunching numbers and all of that, has

20   a head injury, and they are in the hospital, and they've also

21   broken their leg.  And their initial recovery course focuses on

22   physical therapy and rehabilitation, and their thinking or

23   their cognitive functions start to clear up.  Then they go back

24   to work, and they find that, I'm not concentrating like I used

25   to, and I'm not putting things together, and I'm not

John Gustavson - Direct

1    remembering the details of conversations on the telephone, and

2    it -- it is only then that -- it's not that their cognitive

3    functions have gotten worse -- because we don't expect that,

4    after a concussive head injury -- but it's that they become

5    more apparent as a person has engaged in the kinds of tasks

6    that require a greater sense of mental sharpness and mental

7    activity.

8    Q.   Do you need -- do you have to have loss of consciousness or

9    a head strike to diagnose a TBI?

10   A.   You don't have to have a head strike, *per se*, and you don't

11   have to have loss of consciousness, but the accepted wisdom is

12   you have to have some alterations in consciousness that result

13   from some kind of physical activity -- physical force.

14         For example, shaken baby syndrome.  You know, a baby

15   may experience brain damage as a result of being shaken

16   violently.  There is no -- the head didn't strike anything,

17   it's just that the activity of the shaking caused the brain to

18   impact parts of the skull and caused the damage.

19   Q.   What does alteration of consciousness mean?

20   A.   That means a period of time when they lost their sense of

21   awareness and their orientation, and they may seem spacy or

22   delirious, and they may have trouble remembering details of the

23   event or the accident.

24   Q.   Doctor, when a patient has post-traumatic stress disorder,

25   does that create organically based changes with the physiology

336

John Gustavson - Direct

1   to the brain?

2   *A.*   Yes.

3   *Q.*   Are those changes similar to a traumatic brain injury?

4   *A.*   The changes in terms of the symptoms that a person would

5   show are very similar.

6   *Q.*   Are those changes permanent?

7   *A.*   Not necessarily.

8   *Q.*   Is post-traumatic stress disorder permanent?

9   *A.*   Well, the more complex answer to that question is that if a

10   person has post-traumatic stress disorder, it has a shaping

11   influence on the rest of your life.  And a person never -- that

12   has had that kind of experience never returns to what I would

13   call their pretrauma state, that there are always going to be

14   some effects.  On the other hand, people that have PTSD get

15   better.  And, you know, with the right kind of therapy and

16   right circumstances, they can return to what I would call near

17   normal functioning and live fulfilling, productive lives.

18   *Q.*   Is there a magic pill that would take care of or cure

19   post-traumatic stress disorder?

20   *A.*   There is not only no magic pill, there is no actual pill to

21   fix post-traumatic stress disorder.  There are medications that

22   will help with the mood or the emotional or the personality

23   changes that enable a person to recover more completely, but

24   there is no -- there is no pill or potion or procedure that

25   makes it all better.

John Gustavson – Direct

1    *Q.*  What kind of treatment can assist a patient that has

2    deficits from post-traumatic stress disorder and the

3    physiological changes to their brain?

4    *A.*  I'm going to clarify your question by saying that the

5    research is real clear in showing that people who have PTSD as

6    well as chronic depression or chronic anxiety disorders will

7    often show changes in brain biology or brain physiology.  And

8    that's not based on some obscure article in some Scandinavian

9    neurology journal.  That is replete throughout the literature,

10   that there are changes that take place in the brain, for

11   example, in an area called the amygdala, which is the seat of

12   your flight or fight response, will become overactive with

13   PTSD, leaving a person hypervigilant and worry filled and

14   always expecting something bad to happen.

15          We know that an area of the brain called the

16   hippocampus, which is responsible for short-term memory, there

17   are changes that have been documented in the hippocampus of

18   people that have chronic PTSD or depression; and, therefore, it

19   seems to correlate with the capacity to retain new information,

20   to remember things in the short term.  We know that there are

21   changes that take place to the -- what is called the prefrontal

22   cortex.  It's at the very front of the brain.  It's the part of

23   the brain that allows us to plan ahead and think and regulate

24   our emotions and control our behavior and so forth.  So we know

25   based on radiologic studies -- these would be things like MRI

338

John Gustavson - Direct

1    and PET scans and SPECT scans of the brain -- that these

2    changes take place.

3           So the conventional thinking is that if you treat the

4    PTSD where a person is also complaining of these cognitive

5    difficulties, that as the PTSD improves, that there should be

6    some improvement in those mental faculties, that attention

7    should improve.  And the capacity to stay focused and to be

8    free of distraction and to remember things, those should

9    improve as, well.  And I think the medical research supports

10   that, as well.

11   Q.  Is it a good idea to consider psychostimulants or cognitive

12   therapy with PTSD where there is cognitive difficulties.

13   A.  There are medications that are designed -- they have had

14   their greatest impact on people who have a condition called

15   attention deficit disorder; and that stimulants, medications

16   like Ritalin or Adderall or Dexedrine, will improve the

17   cognitive function of those individuals.  They have also been

18   used in a clinical setting with patients that have traumatic

19   brain injury with some benefit.  And for people who are

20   distracted and unfocused and they feel like their brain is not

21   firing on all cylinders, taking a stimulant can have beneficial

22   effects.  I would say that it's typically a trial-and-error

23   kind of thing, let's see if this works, and some people report

24   an improvement.

25           And I would say as an addendum to that, that research

John Gustavson - Direct

1    has shown that any kind of stimulant, even something like

2    caffeine, can help improve the sharpness of somebody's mental

3    abilities.  Those of you who are coffee drinkers know that

4    first thing in the morning you're not up to par until you've

5    had your first cup of coffee.  And research shows that college

6    students, if they have a cup of coffee before they go in for a

7    test will tend to do better than if they don't.

8           So stimulants, they stimulate the brain; they help the

9    brain do more efficiently what it may not be doing either as a

10   result of fatigue or brain injury or emotional issues.

11   Q.  Now, you've seen Ms. Houston's neuropsychological testing

12   that was done by Dr. Kalat.  Do you believe that the deficits

13   that appeared on that testing would benefit from a

14   psychostimulant and/or cognitive therapy?

15   A.  I would say that's an empirical question.  I think it would

16   be a worth a try.

17   Q.  Okay.

18   A.  But whether or not it truly makes a difference would have

19   to be evaluated.

20   Q.  Thank you.  Did you also consider the amount of gabapentin

21   that she was taking as a factor in the problems that you were

22   seeing?

23   A.  I did not.

24   Q.  Okay.  Did --

25   A.  Gabapentin was prescribed for pain management.

340

John Gustavson - Direct

1   Q.   Okay.   Does gabapentin indicate -- cause cognitive issues?

2   A.   It can, because it works on the central nervous system.

3   But one must evaluate the costs versus the benefits.   If

4   gabapentin is helping peripheral nerve pain, then that should

5   have an enhancing effect on cognitive functioning.   So less

6   pain, better mental clarity.   On the other hand, some people

7   say, you know, it sort of makes me feel cloudy or tired or

8   something when they take it.   Certainly, if that is a side

9   effect, it would correlate with the administration of the

10   medication, then one must consider, are the benefits of this

11   more important than the side effects?

12   Q.   When you completed your treatment with Ms. Houston, within

13   a reasonable degree of neuropsychological probability, what was

14   your prognosis?

15   A.   I not only was hopeful, I expected she would continue to

16   make improvement, for a couple of reasons.   One is, this is a

17   woman who was very health conscious, very concerned with doing

18   the sorts of things that would promote her health and

19   well-being.   You know, optimal nutrition, optimal activity.

20   And she had discussed some other avenues of treatment, a

21   retreat somewhere, and some kind of healing groups and things

22   of that nature.   And I thought, this is a woman who is choosing

23   to take charge of her own wellness; and, you know, more power

24   to you.

25            The other thing is that this is a woman who is a

John Gustavson - Direct

1  fairly accomplished professional and in my opinion had a good

2  grasp of coping tools and strategies for helping people improve

3  and enhance their lives and that she would certainly be in a

4  position to apply those to her own life.

5          And so based on my impression that, as of our last

6  session, she said, you know, I feel like I'm on a good path,

7  I'm getting better, and I'm not -- you know, I'm all in favor

8  of supporting that.  Coupled with the other things that I just

9  mentioned, I was hopeful that her situation would continue to

10  improve over time.

11  *Q.*  What was the impact or what did you think the impact was

12  going to be on her continued chronic pain and the levels of

13  pain that she may or may not continue to have on her cognitive

14  recovery and her PTSD recovery?

15  *A.*  She had explained to me when she first came in that they

16  expected that it would take a year for her leg to heal.  And by

17  the time I completed my therapy with her, that year had not

18  concluded.  I'm not an orthopedist, I'm not a pain management

19  doctor, so I was not in a position to make a prediction about

20  the continuing nature of her pain.  But if, indeed, the pain

21  were to continue to improve over time, I would have expected

22  her cognitive abilities to improve correspondingly.  If on the

23  other hand -- although I did not anticipate this -- but if on

24  the other hand her pain had persisted or failed to improve or

25  for some reason had gotten worse, I would have expected that to

John Gustavson - Direct

1   have an adverse effect on her mental faculties.

2   *Q.* Doctor, you're aware that after your care and treatment,

3   Ms. Houston continued care and treatment with Dr. Edith

4   Johnston?

5   *A.* I am.

6   *Q.* Did you think that was a good idea, for her to continue to

7   get care with Dr. Johnston?

8   *A.* As I had mentioned earlier, this is a woman who is

9   concerned with her health and quality of life.  And if she has

10  continuing problems, then seeking additional mental health

11  therapy would have been a good idea.

12  *Q.* I want to ask you this about Ms. Houston:  Would you say

13  she was a skeptic, an optimist, a minimizer, a maximizer in

14  your experience with her?

15  *A.* My general impression -- and I'm limiting this comment to

16  the time that I worked with her -- was that she was optimistic.

17  She seemed to be pretty directed in recovering her health and

18  was hopeful about the outcome and looked at the future in a

19  positive way.

20  *Q.* In the testing that you reviewed by Dr. Kalat, was there

21  any indication of her overpresenting or -- what's the better

22  word -- maximizing or overshowing her psychological or pain

23  issues?

24  *A.* He -- Dr. Kalat did some personality testing, which showed

25  that she tended to focus disproportionately -- that is,

John Gustavson - Direct

1   compared to other people -- on physical symptoms and that

2   because of her personality makeup or her mood, that her

3   attention to pain and body and health functions was exaggerated

4   from the norm.

5   Q.  Do you agree with that?

6   A.  I don't disagree with the results of the testing.  The test

7   measures that Dr. Kalat gave pick up on those kind of qualities

8   of an individual's personality and thinking.  It was not

9   consistent with the version of Ms. Houston that I saw when I

10  was working with her, because she didn't spend a lot of time

11  complaining and ruminating and bemoaning her physical injury.

12  Her interest was on getting better.

13  Q.  What would you expect if years later these problems still

14  existed in how she would present?

15  A.  If the problems continued unabated or if they worsen, that

16  would have a demoralizing effect on an individual's mental

17  state.  And one may in that situation tend to become more

18  focused, more preoccupied on physical symptoms -- I'm hurting

19  all the time; my pain doesn't go away; I don't get any relief;

20  it's not getting any better -- and that would tend to leave a

21  person feeling discouraged and frustrated.

22  Q.  When you do that testing, and a person really is having

23  those physical issues, and they're continuing at a fairly high

24  level, isn't that what you would expect from the test results?

25          MS. BOBET:  Objection, Your Honor.  Leading.

John Gustavson – Direct

1          THE COURT:  It is.  He's been doing that, and I'll

2    overrule it, but no more leading after this.

3          You can answer the question.

4          THE WITNESS:  The personality testing that Dr. Kalat

5    administered measures one's personality makeup and will often

6    give a conclusion or a likelihood, statistically speaking, that

7    this person may more than the average individual tend to be

8    attentive to or focused on or worried about or depressed by

9    physical symptoms.  The testing does not rule out an organic

10   cause -- that is, a tissue injury or an orthopedic injury -- so

11   it becomes a little murky.

12          I'll give you a for instance.  People that have

13   multiple sclerosis, which is, you know, a bona fide medical

14   condition that is very debilitating and can be determined by

15   medical tests, will often produce a similar profile on those

16   personality tests of overattention to or maybe what we call

17   somatization, a tendency to exaggerate the symptoms.  But in

18   that case, there is clear and compelling evidence of an

19   underlying organic problem.  So one cannot say on the basis of

20   personality testing that this person, they're -- they're

21   exaggerating problems or they're symptom magnifying.  It just

22   says they are more focused on that than -- statistically so

23   than age and gender peers.

24   BY MR. SHAPIRO:

25   Q.  Within a reasonable degree of medical probability, Doctor,

John Gustavson – Direct

1   what was the cause of Ms. Houston's PTSD, cognitive issues, her

2   need for treatment, and her psychological difficulties that you

3   were involved in her care and treatment for?

4   A.   The accident of December 1, 2016.

5   Q.   Within a reasonable degree of medical probability, are

6   those issues that you diagnosed and the problems she was

7   complaining of permanent?

8   A.   To some degree she will have permanent difficulties or

9   conditions as a result of that injury.  Yes.

10  Q.   What impact, within a reasonable degree of

11  neuropsychological probability, would these problems and

12  diagnoses have on her ability to function and live life?

13  A.   Well, to a degree, we're speculating; so I'm not sure I can

14  say within a reasonable degree of psychological probability.

15  We don't know at this point.  She, as I understand, is still in

16  therapy and getting some rehabilitation.  And my hope on her

17  behalf is that she will continue to show improvement.  But if

18  she does not, if things were to remain as they have been, from

19  my recent reading of medical reports, then it would be

20  moderately to significantly disruptive to her life, her work,

21  her capacity to enjoy a satisfying, rewarding life.

22  Q.   I want to talk about the reports of Dr. Kalat and

23  Dr. Goldman that you reviewed.  What was your impression,

24  what -- did you -- did you agree or disagree?  Let's talk about

25  Dr. Kalat first, evaluation, testing, and assessment?

John Gustavson – Direct

1   *A.*  Dr. Kalat did a very thorough examination.  And his –– the

2   administration of the tests that he did meets usual standards

3   of practice in assessing neuropsychological issues.  His report

4   was detailed and thorough; and he spent time doing things that

5   a clinician, somebody who is providing treatment doesn't

6   ordinarily do, which is to annotate his conclusions and cite

7   research and so forth.  Typically, when we see a patient, we do

8   a diagnostic workup; and we derive our conclusions.  But he

9   seemed to be very invested in sort of proving his conclusions,

10  which is fine.  I know him to be a respected neuropsychologist.

11          So that said, there were I think three things that

12  stood out to me when I read his report.  One is that this is a

13  woman who did show neuropsychological problems on the testing.

14  She had problems with memory, concentration, visual –– I'm

15  sorry –– visual-spatial relationships, and that sort of thing.

16  So they're documented in his report.

17          Secondarily, he included information in his report

18  that indicated he made an assessment of her test-taking

19  effort –– that is, was she giving her best effort, or was she

20  sandbagging it a little bit, was she underperforming, was she

21  malingering?  And the information contained in his report said

22  that he had no evidence that she was engaging in any deliberate

23  symptom magnification or suboptimal effort.  So that suggests

24  to me that the findings from his report were valid.

25          On the personality testing, as I mentioned earlier, he

John Gustavson – Direct

 1    said that she tends to be more of a somaticizer; she tends to

 2    focus excessively on physical symptoms; and that in her mind,

 3    that they may take on greater importance than they would for

 4    somebody else.

 5         I think the final issue that stood out at me when I

 6    read his report was that he went to great lengths in several

 7    instances to say, she did not have a brain injury and that

 8    anybody who made the conclusion that she did was probably

 9    creating more problems than being helpful.  He didn't have any

10    evidence that she had a traumatic brain injury, while at the

11    same time she did show evidence of what I would consider

12    cognitive dysfunction.  And I make a distinction between brain

13    injury and brain dysfunction.  Brain injury is where there has

14    been tissue damage that can be observed by some method or

15    means.  Damage to the tissue, bruising, an area of necrosis to

16    the brain tissue, that's what I would call brain injury or

17    brain injury damage.  Brain dysfunction simply means that it's

18    not working properly; it's not firing on all cylinders for

19    whatever reason.  And those reasons can be the by-product of

20    mood disorders like depression, anxiety, or post-traumatic

21    stress disorder.

22         So I thought it was a reasonable report.  He tended to

23    emphasize the psychological aspects of her diminished

24    performance and to emphasize her tendency to focus on somatic

25    problems.  But it was clear that she gave reasonable effort,

348

John Gustavson - Direct

1   that she was appropriately motivated, and that the results were

2   believable.

3   Q.  It's my understanding that the parts of the brain impacted

4   by these deficits was the hippocampus and the prefrontal

5   cortex.  Are those consistent with the post-traumatic stress

6   disorder that you've diagnosed?

7   A.  Yes.  The literature says that the areas of the brain that

8   are most affected with post-traumatic stress disorder are the

9   two areas you mentioned, plus the amygdala, which is the

10  arousal, fight or flight center of the brain.

11  Q.  The other question I have has to do with brain dysfunction

12  versus brain damage.  You indicated there are brain changes due

13  to PTSD.  Is there brain damage or brain changes, and what's

14  the difference?

15  A.  The research says that there are anatomical changes -- both

16  anatomical and activation changes that go with these mood

17  disorders.  I think an analogy may be helpful here.

18          Let's say you drive your automobile into a brick wall,

19  causing massive damage to the engine.  In other words there

20  are -- there is damage to the metal components of your engine,

21  the wires are broken, and there has been physical damage --

22  physical injury, if you will -- to the engine of your car.

23  Obviously, it's not going to work as well as it did before it

24  got damaged.  On the other hand, let's say you drive a car, you

25  just don't take care of it -- you don't change your oil, you

John Gustavson - Direct

 1  don't take it in for a checkup, you don't change your spark

 2  plugs -- and you find that your car is not operating

 3  efficiently.  Maybe it's missing as you're driving down the

 4  road; maybe its power has diminished; it doesn't have the

 5  pickup that it normally has.  In that case, you've got an

 6  engine that is not functioning properly, but there has not been

 7  any damage to the engine in the way that there would have been

 8  damage if you drove your car into a wall.

 9          So that's the distinction in my mind, that the brain

10  is not firing on all cylinders as an effect of depression or

11  PTSD.  But if -- if we went in and checked somehow, say, in a

12  postmortem study, would we find areas of tissue or structures

13  that had been damaged?  The answer is probably not.

14  Q.  So are you saying -- that sounds like a distinction of

15  degree, since it appears to me that there is both damage.  Am I

16  hearing you wrong?

17  A.  Yeah --

18          MS. BOBET:  Objection, Your Honor.  Leading.

19          MR. SHAPIRO:  I'll move on.

20          THE COURT:  Sustained.

21          THE WITNESS:  I'm sorry?

22          MR. SHAPIRO:  I'll move on.

23          THE WITNESS:  Okay.

24  BY MR. SHAPIRO:

25  Q.  Can you explain from a psychological or neuropsychological

350

John Gustavson - Direct

 1   reason why Ms. Houston didn't get better or is left with those

 2   residual cognitive problems?

 3   A.  From my reading of the medical information subsequent to my

 4   treatment of her, it sounds as if the symptoms of her

 5   post-traumatic stress disorder have continued and possibly even

 6   worsened; and that as a consequence of that, that she has also

 7   experienced a persistence of these mental difficulties, the

 8   memory and the concentration and capacity to stay focused.

 9   Q.  Doctor, I'm going to ask Ms. Waller to put up Plaintiff's

10   Exhibit 13 and take us to No. 7, which was your care and

11   treatment.

12         It should pop up there any second.

13   A.  This is the section that includes Tracy Houston medical

14   expense summary?

15   Q.  Yes.

16   A.  Yeah.  I've got it in front of me.

17   Q.  Okay.  No. 7 is your care for the five visits.  Was that

18   care reasonable and necessary and causally related to the crash

19   in question?

20   A.  Yes.

21   Q.  Have you also been paid for your time on the medical/legal

22   portion of this case, as well as for the treatment or the care

23   that you rendered to Ms. Houston?

24   A.  Yes.

25         MR. SHAPIRO:  Thank you.  I have no further questions.

John Gustavson – Cross

1       THE COURT:  Cross-examination, please.

2       MS. BOBET:  Thank you.

3                          **CROSS-EXAMINATION**

4  BY MS. BOBET:

5  Q.  Good afternoon, Dr. Gustavson.  Nice to see you again.

6  A.  Good afternoon, Ms. Bobet.

7  Q.  So I assume you're quite familiar with brain injury; right?

8  A.  Yes.

9  Q.  In fact, you specialize in brain injury cases?

10  A.  Yes.

11  Q.  And you obviously treated Ms. Houston, and you also signed

12  or prepared two expert reports.  Is that right?

13  A.  Yes.

14  Q.  And in forming your opinions for those reports, you

15  obviously considered more records than just your own treatment

16  records; correct?

17  A.  Obviously.

18  Q.  Obviously.  And in this case you're only opining on issues

19  relating to psychology, neuropsychology, your areas of

20  specialty; correct?

21  A.  Yes.

22  Q.  Now, I think you might have covered this, but I just want

23  to make sure I'm clear.  PTSD can present with cognitive

24  complaints; right?

25  A.  Yes.

352

John Gustavson – Cross

1   *Q.*   And those could include poor concentration?

2   *A.*   Yes.

3   *Q.*   Deficits in sustained attention?

4   *A.*   Yes.

5   *Q.*   Deficits in learning and memory?

6   *A.*   Yes.

7   *Q.*   Deficits in processing speeds?

8   *A.*   Yes.

9   *Q.*   Deficits in executive function generally?

10  *A.*   Yes.

11  *Q.*   And depression could present with similar cognitive

12  complaints; right?

13  *A.*   Yes.

14  *Q.*   And so could TBIs?

15  *A.*   Yes.

16  *Q.*   As a general matter, would you agree that it's important

17  for a patient to be correctly diagnosed?

18  *A.*   Yes, it is important.

19  *Q.*   And a misdiagnosis is never good?

20  *A.*   It's not always bad, but it certainly carries a number of

21  risks.

22  *Q.*   And in particular, someone who has PTSD, if they're

23  misdiagnosed with something else, that could be detrimental to

24  them; right?

25  *A.*   I'm sorry.  You broke up just a little bit on that

John Gustavson – Cross

1    question.

2    Q.   Sure.  I'll repeat it.

3          In particular, someone who has PTSD, if they're

4    misdiagnosed as having something else, that can be detrimental

5    to them; right?

6    A.   It can be; correct.

7    Q.   And getting the correct diagnosis, that's important for

8    determining the right treatment; yes?

9    A.   Yes.

10   Q.   And so as we've heard a bit, when a person is referred to

11   you, you typically go through some specific steps to make a

12   diagnosis; is that right?

13   A.   Yes.

14   Q.   You have them fill out a questionnaire?

15   A.   Yes.

16   Q.   And do an initial consultation that includes a diagnostic

17   interview and mental status exam?

18   A.   Yes.

19   Q.   And you sometimes administer psychological testing; is that

20   right?

21   A.   Yes.

22   Q.   And that includes the MMPI [sic], which is, if I'm

23   remembering correctly, Millon Behavioral Medicine Diagnostic?

24   A.   Yes.

25   Q.   Is that test widely used in the field of psychology?

John Gustavson – Cross

1   A.  Both of them are, yes.

2   Q.  I want to talk about PTSD, which, obviously, you covered in

3   your direct testimony.  And just so we're clear, PTSD is

4   treatable; right?

5   A.  Right.

6   Q.  In fact, it's more treatable than TBI; right?

7   A.  I'm not sure I would say that.

8   Q.  Do you remember taking your deposition in this case?

9   A.  It sort of depends on the nature and severity of the TBI

10  versus the PTSD.  You can have very severe and debilitating

11  PTSD.  You can have a TBI -- let's say, a concussive head

12  injury from a sports injury or something like that -- that

13  doesn't require therapy at all.  Kind of recovers

14  spontaneously.

15  Q.  As a general matter, it's your testimony that PTSD is not

16  more treatable than TBI?

17  A.  My answer is that it depends on the nature and the severity

18  of the condition.  Both of them can present with very severe,

19  debilitating symptoms or may be treatable, one or the other or

20  both.

21  Q.  I'll ask again, do you remember taking a deposition in this

22  case?

23  A.  I have painful and vivid recollections of that.

24  Q.  I try not to take that personally.  Do you remember being

25  under oath for that deposition?

John Gustavson – Cross

1    A.   Yes.

2    Q.   Same as you are here today for your testimony?

3    A.   Yes.

4         MS. BOBET:   Ms. Robertson, can you please pull up

5    Dr. Gustavson's deposition, page 54, line 22 and then on to

6    page 55, line 1.

7         Just bear with us a second.   We're going to get it

8    pulled up electronically.

9    BY MS. BOBET:

10   Q.   Can you see that deposition transcript on your screen,

11   Dr. Gustavson?

12   A.   It's a little blurry, but I can read it.

13   Q.   I believe we also sent you a hard copy in a sealed

14   envelope.   If you've got that, you're welcome to refer to that

15   as well.   It's all the same.

16        It's page 54, line 22, then on to page 55, line 1.

17   A.   So what page are we on?

18   Q.   We're on page 54, starting on line 22.   Are you there?

19   A.   54, line 22.   Yes.

20   Q.   All right.   Okay.   I'm going to read, and I'll ask you if I

21   read it correctly.

22        "Whereas, PTSD is thought to be more amenable to

23     treatment."

24        Question:   "So just to sort of sum up, fair to

25     say that PTSD is more treatable than TBI?"

 1              Answer:  "After -- yeah, after a period.  Yes."

 2              Did I read that right?

 3    A.  You read that correctly.

 4              THE COURT:  Counsel, it's not an impeachment of what

 5    he just testified to.  He testified to something entirely

 6    different than that question.

 7              MS. BOBET:  My understanding of his testimony, Your

 8    Honor, was that he was saying that PTSD is not necessarily more

 9    treatable than TBI.  I think it's somewhat different.

10              THE COURT:  Sometimes there are TBI cases which are

11    not as serious as PTSD cases, and sometimes there are PTSD

12    cases which are far more serious than TBI cases, and it depends

13    upon the individual cases to which one is more treatable.

14    That's not inconsistent with his testimony in the deposition.

15              MS. BOBET:  I'll move on.

16    BY MS. BOBET:

17    Q.  With the right treatment for PTSD, would you accept that

18    the associated cognitive difficulties would improve?

19    A.  Yes.

20    Q.  And people with PTSD need to be treated for PTSD; is that

21    right?

22    A.  Yes.

23    Q.  And so some treatment for PTSD can include medications, I

24    believe you mentioned; is that right?

25    A.  That's correct.

357

John Gustavson – Cross

1    Q.   And those could include antidepressants?

2    A.   Yes.

3    Q.   And that would be SSRI or SNRI antidepressants; right?

4    A.   Yes.

5    Q.   And that could include mood stabilizers, too; right?

6    A.   Yes.

7    Q.   Or something like prazosin?

8    A.   Prazosin is not a mood stabilizer, if that's your question.

9    Q.   No.  My question was, treatment for PTSD, could that

10   include prazosin?

11   A.   Prazosin is actually a heart medicine, but it's found -- it

12   has been found to have a beneficial effect on the nightmares

13   that patients experience after PTSD, so that would be included

14   in the list of possible treatment options.

15   Q.   And you have seen success in patients with PTSD using all

16   of these medications; is that right?

17   A.   Yes.

18   Q.   While we're on the subject of medications, I want to make

19   sure I understand your testimony before.  Is it correct that a

20   stimulant could be helpful for virtually anyone with their

21   focus?

22   A.   Yes.

23   Q.   So it wouldn't just be helpful for someone with a TBI?

24   A.   When I say "helpful," what I mean is that taking a

25   stimulant helps, you know, perk us up and be more alert and

John Gustavson – Cross

1  attentive.  And so at moderate doses, in isolated cases, a

2  stimulant can help anybody, even people who don't have a TBI or

3  a mood disorder.  But I have seen cases with people that have

4  moderate or severe brain injury benefit from taking a

5  stimulant, not only in helping their mental abilities, but

6  helping their behavior control.  It's like it awakens the brain

7  and helps them to be more cognizant and more aware of the

8  effects of their behavior and people around them.  So it

9  certainly can be beneficial.

10 Q.  And then continuing on with the treatments available for

11 PTSD -- sorry to switch around on you -- but those treatments

12 for PTSD also include psychological treatment; is that right?

13 A.  Yes.

14 Q.  They would include something like cognitive behavioral

15 therapy?

16 A.  Yes.

17 Q.  And desensitization?

18 A.  Yes.

19 Q.  What is desensitization therapy?

20 A.  It is a procedure that enables a patient to approach a

21 situation or a stimulus that is upsetting or threatening or

22 bothersome to them in some way on a gradual basis, that they

23 become more accustomed to it so it no longer affects them.  The

24 parallel in medicine would be giving an individual low doses of

25 something that they may be allergic to in order to build up the

359

John Gustavson – Cross

1   immune system so that they're no longer allergic to it -- or

2   they have less of a response.  That's called -- that's also

3   called desensitization.

4   Q.  And for desensitization, there are specific steps that a

5   treatment provider would go through as part of that therapy;

6   right?

7   A.  Yes.

8   Q.  And those would include relaxation procedures and then

9   introducing anxiety provoking --

10  A.  Yes.

11  Q.  I'm sorry.  Relaxation procedure; is that right?

12  A.  Yes.

13  Q.  And then introducing anxiety-provoking stimuli?

14  A.  Yes.

15  Q.  Another type of therapy for PTSD is reprocessing; is that

16  right?

17  A.  Yes.

18  Q.  What does that entail?

19  A.  Typically, we use the word "reprocessing" in combination

20  with some other words.  There is a therapy called eye movement

21  desensitization and reprocessing; and it is a procedure that

22  exposes a patient to the event or situation which was most

23  closely associated with the trauma while engaging in some

24  activities like alternating eye movements or tapping or

25  something that allows the brain -- and this is somewhat

John Gustavson - Cross

1    theoretical -- but it allows the brain to digest, if you will,

2    the event that happened, and so that it ceases to have the

3    traumatizing effect that it did before -- let's say a combat

4    veteran who had some terrible wartime experience, where they

5    have to think about and remember and relive the event while

6    engaging in these other activities -- and it allows the brain

7    to kind of make peace with all of it so it doesn't affect them

8    in the adverse ways it did previously.

9    Q.   And that's -- the EMDR process that you mentioned as a type

10   of reprocessing, that's guided by a therapist or a

11   psychologist; right?

12   A.   Yes.

13   Q.   Another type of therapeutic treatment for PTSD would be

14   exposure therapy?

15   A.   Yes.

16   Q.   What does that involve?

17   A.   Exposure therapy -- there is some crossover between all of

18   these -- but exposure -- what is sometimes referred to as

19   prolonged exposure therapy, it's a therapeutic technique that

20   involves requiring the patient to remember and visualize and

21   reexperience the event or the situation that caused the trauma

22   and to feel the emotions that went along with it and to

23   consider the way that's affected their thinking.  And by the

24   intensive exposure, gradually they experience a remission -- a

25   reduction, that is -- of the traumatizing effects.

John Gustavson – Cross

1    *Q.*  And that exposure therapy involves the treatment provider

2    facilitating the patient encountering the traumatic thing;

3    right?

4    *A.*  Yes.  And it can be done on an individual basis, one on

5    one; or it can be done in a group setting.

6    *Q.*  So these psychological treatments for PTSD that we've

7    discussed -- desensitization, cognitive behavioral therapy,

8    reprocessing, and exposure therapy -- those are often done in

9    conjunction with one another; right?

10   *A.*  Yes.

11   *Q.*  And that is specifically done with the help of a

12   psychologist?

13   *A.*  Yes.

14   *Q.*  And the treater or the psychologist would repeat those

15   techniques with the patient over a number of sessions; right?

16   *A.*  Yes.

17   *Q.*  And you have seen success in patients with PTSD using all

18   of those therapeutic methods; is that correct?

19   *A.*  That's correct.

20   *Q.*  As far as psychological treatments for PTSD, the

21   therapeutic treatments you've mentioned -- cognitive therapy,

22   exposure, desensitization, and reprocessing -- those things

23   together are the gold standard for treating PTSD; are they not?

24   *A.*  Yes.

25   *Q.*  That is the first-line treatment for people with PTSD?

John Gustavson - Cross

1    *A.*  Yes.

2    *Q.*  So in general, fair to say they're effective for treating

3    PTSD?

4    *A.*  Yes.

5    *Q.*  I believe you mentioned before that another thing that can

6    be helpful in treating PTSD is antidepressants.  Would that be

7    as a supplement to those first-line therapeutic treatments?

8    *A.*  Yes.

9    *Q.*  How about something like flower essences, would that be a

10   valid treatment for PTSD?

11   *A.*  I am not familiar with that type of care.

12   *Q.*  You say it's detrimental to the patient if their PTSD is

13   not treated properly; right?

14   *A.*  It can be.  Yes.

15   *Q.*  Because the PTSD could persist?

16   *A.*  Yes.

17   *Q.*  The idea being that PTSD doesn't go away on its own; it

18   requires specific treatment of the type that you laid out.

19   Right?

20   *A.*  It would not be fair to say that it never goes away on its

21   own.  I mean, there are lots of people that have had traumatic

22   events who never seek therapy, and they somehow find a way of

23   getting better.  So time, you know, is -- the tincture of time

24   is a great therapeutic device.  But for someone who has PTSD

25   that has become disruptive or debilitating to their life, it's

John Gustavson – Cross

1   not getting better on its own, then some kind of intervention

2   is warranted, to be sure.

3  Q.  Now, we talked a bit about TBI; and I'll do my best not to

4   retread ground where we don't need to.

5        Are you aware of the Veterans Administration,

6   Department of Defense guidelines for a concussion?

7  A.  Yes.

8  Q.  And those are a valid tool for diagnosing a concussion?

9  A.  Yes.

10 Q.  And just want to be clear, the term "concussion" is used

11  sort of interchangeably with mild TBI; is that right?

12 A.  Those terms are used synonymously.

13 Q.  How about the World Health Organization's TBI diagnostic

14  criteria, are you familiar with those?

15 A.  Yes.

16 Q.  And are those valid criteria for diagnosing TBI?

17 A.  Yes.

18 Q.  And you yourself typically take certain specific steps to

19  diagnose a TBI; right?

20 A.  I do.

21 Q.  That would include getting a complete history of the event

22  that is suspected to have caused the TBI?

23 A.  Yes.

24 Q.  And getting an understanding of the patient's symptoms?

25 A.  Yes.

John Gustavson - Cross

1   *Q.*  And if necessary, you'll administer psychological tests?

2   *A.*  Yes.

3   *Q.*  You've never relied solely on a patient's self-reporting to

4   diagnose a TBI; would you?

5   *A.*  I would try not to.

6   *Q.*  And if another provider has diagnosed a TBI solely on what

7   a patient told them, you would say they're on professionally

8   shaky ground; right?

9   *A.*  I would say that it is professionally unwise to make a

10   diagnosis only on the basis of a patient's self-report.

11   *Q.*  But I understood your earlier testimony that diagnosing a

12   patient with a TBI requires that their change in mental status

13   must immediately relate to some trauma to the head.  Am I

14   characterizing that accurately?

15   *A.*  Yes.

16   *Q.*  So a patient who first develops TBI-like symptoms several

17   months after the claimed incident is likely not suffering from

18   a TBI?

19   *A.*  That is correct.

20   *Q.*  So, for example, a patient who first complains of symptoms

21   of a TBI a few months after an accident, it's fair to assume

22   that person did not suffer a TBI in the accident?

23   *A.*  That is correct.

24   *Q.*  So some of the -- we discussed some of the overlapping

25   symptoms between PTSD and TBI; but, specifically, those would

John Gustavson – Cross

1   include symptoms of mood and personality changes.  Is that

2   right?

3   *A.*   Yes.

4   *Q.*   And then certain symptoms present more commonly in PTSD

5   than TBI; right?

6   *A.*   Right.

7   *Q.*   Including something like disrupted sleep?

8   *A.*   Yes.  That could be an example.

9   *Q.*   And TBI is treated differently than PTSD; right?

10  *A.*   Yes.

11  *Q.*   For example, you might recommend rehabilitational or speech

12  therapy for a patient with a TBI; but you wouldn't recommend

13  that to a patient with just PTSD?

14  *A.*   Probably not.

15  *Q.*   Now, obviously, the focus of the therapy that a patient

16  gets would be different depending on the diagnosis, TBI versus

17  PTSD; is that right?

18  *A.*   Yes.

19  *Q.*   If a person who has not suffered from a TBI believes for

20  whatever reason that, in fact, she has suffered from a TBI,

21  could that belief itself potentially be detrimental?

22  *A.*   Yes.

23  *Q.*   And detrimental in that it could cause the patient to

24  conclude there is nothing she can do to fix what is wrong with

25  her?

366

John Gustavson - Cross

 1  *A.*  That would be a possibility.  Yes.

 2  *Q.*  Or believe that she's permanently disabled?

 3  *A.*  Yes.

 4       *MS. BOBET:*  I'm cognizant of our time, and we have

 5  another witness, and we need to take a break.  Your Honor,

 6  would you prefer that I continue questioning Dr. Gustavson?  I

 7  have a bit more.  I'll try to keep it short, but we do --

 8       *THE COURT:*  It's 10 after 3:00.  She's supposed to

 9  testify at 3:30.  How much more time do you want to spend on

10  this witness?

11       *MS. BOBET:*  I'll try to get it done -- I know Your

12  Honor had mentioned taking a break, I believe, before

13  Dr. Price.  I want to make sure we have time for everything,

14  but I'm happy to keep going.

15       *THE COURT:*  Well, let's go for another ten minutes,

16  and then we'll take a recess.

17       *MS. BOBET:*  All right.

18  *BY MS. BOBET:*

19  *Q.*  Dr. Gustavson, just so I'm clear -- and I apologize if I am

20  going over it again -- you didn't diagnose Ms. Houston with a

21  TBI; right?

22  *A.*  That is correct.

23  *Q.*  That was because there wasn't sufficient evidence to

24  diagnose her with a TBI?

25  *A.*  Right.

John Gustavson – Cross

1   Q.   And, of course, in your treatment of her, you didn't see

2   any indication that she sustained a TBI in the accident; right?

3   A.   There was no information that would have led me to change

4   my impression that she did not have a TBI.

5   Q.   And I've heard from Ms. Houston that her impression was

6   that you might have dismissed some cognitive complaints that

7   she brought to you.  Would you have dismissed those cognitive

8   complaints in your treatment of her?

9   A.   Looking through the record, I was aware that she was

10  complaining of some cognitive problems.  I did not dismiss them

11  as if they didn't matter; but my focus was, let's rehabilitate

12  the PTSD.  And as she improves, I would expect her cognitive

13  difficulties to improve over time.  So I didn't pay them as

14  much attention as she may have preferred.

15  Q.   Now, you discussed earlier about -- that Ms. Houston may

16  have been referred to you by her attorney.  Is it correct that

17  Ms. Houston's attorney was copied on the records of your

18  treatment of Ms. Houston?

19  A.   Yes.  Yes.

20  Q.   After your last session with Ms. Houston in September of

21  2017, you understood that she would not be continuing with

22  PTSD-specific treatment; is that right?

23  A.   No.  She just said that she wanted to try out some

24  different forms of healing.

25  Q.   And those would be options for self-healing?

368

John Gustavson - Cross

1   *A.*  Self-initiated measures.

2   *Q.*  And she was interested in trying something called a --

3   excuse me -- something called somatic experiencing technique?

4   *A.*  Is that in my report?

5        MS. BOBET:  Sure.  We can pull it up.  Ms. Robinson,

6   it's Exhibit 60, page Gustavson 10.

7   *BY MS. BOBET:*

8   *Q.*  Can you see that, Dr. Gustavson?

9   *A.*  Yes.  Somatic experiencing techniques.

10  *Q.*  So that was something that Ms. Houston was looking into

11  doing after she finished treating with you; right?

12  *A.*  Yes.

13  *Q.*  Are you familiar with that treatment?

14  *A.*  Not *per se*, although I would surmise that somatic

15  experiencing refers to the fact that stress affects the soma --

16  that is, the body -- mind-body connection, and that I imagine

17  it would involve some kind of therapy that was focused on that.

18  *Q.*  I see here in that same discussion paragraph, second to the

19  last line, that the treatments Ms. Houston was looking for

20  after she finished her treatment with you also included

21  attending a healing retreat at a monastery?

22  *A.*  Yes.

23  *Q.*  In your view, were those treatment options likely to be

24  effective specifically in treating her PTSD?

25  *A.*  My impression was that she was taking charge of her own

John Gustavson – Cross

1   wellness; and when a person does that, they get benefits out of

2   those kind of procedures or those kinds of treatments.  I was

3   not of the opinion that those things were specifically designed

4   to treat PTSD.  On the other hand, I felt that we made some

5   headway in therapy so that she was on the road to recovery from

6   the early effects of her PTSD.

7   Q.  I want to talk a little bit about the treatment that

8   Ms. Houston had gotten from Dr. Johnston.  And she started

9   treating with Dr. Johnston after she commenced treating with

10  you; right?

11  A.  That's right.

12  Q.  And you're not able to determine whether Dr. Johnston had

13  done any of the kind of psychological treatments for PTSD that

14  we discussed earlier, are you?

15  A.  I have not reviewed Dr. Johnston's records in detail, no;

16  so I don't know what exactly she was doing.

17  Q.  So you reviewed a more recent record since you last saw

18  Ms. Houston; right?

19  A.  Yes.

20  Q.  As well as the report and testing data from the

21  United States' expert, Dr. Kalat?

22  A.  Yes.

23  Q.  And having reviewed this updated information and having

24  treated Ms. Houston for a time, is it your view that

25  Ms. Houston needs ongoing treatment for her PTSD?

John Gustavson – Cross

1    *A.*  The bulk of the information that I have available to me

2    suggests that she is having some ongoing issues that warrant

3    some kind of treatment.  Having been out of touch with her for

4    as long as I have, I am not prepared to say anything about the

5    seriousness or magnitude of those problems or the extent that

6    she requires ongoing treatment; but it appears to me that she

7    is not well.  She is continuing to have problems.

8    *Q.*  And to the extent that she would benefit from further

9    treatment for her PTSD, those would be the types of front-line

10   treatments we discussed earlier, like exposure therapy,

11   desensitization; is that right?

12   *A.*  Yes.

13   *Q.*  Could Ms. Houston also benefit from being on an

14   antidepressant?

15   *A.*  Possibly.  Again, that would hinge on the severity of her

16   depression, whether or not she's tried any.  My impression of

17   Ms. Houston from when I worked with her, that she was of the

18   mindset that, I want to do this on my own.  You know, I don't

19   want to have to rely on medicine.  But if therapy is not

20   helpful or if a person's emotional problems get worse in spite

21   of therapy, then you start looking at more aggressive

22   interventions like medication.

23   *Q.*  I'm at another break in my outline.  I want to check in on

24   the timing to make sure we're not running into our next

25   witness.

Lynn Price – Cross

1          THE COURT:  Doctor, the difficulty we have is that

2    another doctor was testifying yesterday and did not complete,

3    and she has to come back, and she had to rearrange her

4    schedule.  And, unfortunately, I'm going to have to do the same

5    with you to complete your examination.  Counsel will get in

6    touch with you as to when is a time that we can schedule the

7    completion of your examination.  I apologize for that, but the

8    scheduling is beyond my control.

9          We'll be in recess for ten minutes.  Please make

10   contact with Dr. Gustavson and arrange a convenient time.

11         (Recess at 3:19 p.m.)

12         (In open court at 3:35 p.m.)

13         THE COURT:  Please be seated.

14         Dr. Price, you're already under oath in this case.

15   It's not necessary to readminister the oath.  We're simply

16   going to continue with the examination of your testimony.

17         MS. BOBET:  Thank you, Your Honor.

18         (**LYNN PRICE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**)

19                  **CROSS–EXAMINATION CONTINUED**

20   BY MS. BOBET:

21   Q.  Thank you, Dr. Price, for coming back to us to finish your

22   testimony.  We appreciate it.

23   A.  Not a problem.

24   Q.  You discussed yesterday that in January 2020 you prescribed

25   Ms. Houston Cymbalta; is that right?

372

Lynn Price - Cross

1    A.   Yes.

2    Q.   And after that January 2020 visit, she began taking the

3    Cymbalta?

4    A.   Yes.

5    Q.   And she had improvement while she was taking that medicine;

6    yes?

7    A.   I believe she did.  Yes.

8    Q.   So I'd like to refer to a page from your medical records,

9    which --

10           Can you pull that up?

11   A.   What was the date on that?  April --

12   Q.   It's a record dated February 20, 2020 -- it should be up on

13   your screen shortly, so --

14           MR. SHAPIRO:  Jane, what exhibit and page number?

15           MS. BOBET:  Yeah.  That's Exhibit 55, Primary Care

16   Partners page 214.

17           MR. SHAPIRO:  Thank you.

18           MS. BOBET:  Sure.  It should be up on everyone's

19   screens now or shortly.

20   BY MS. BOBET:

21   Q.   Can you see that, Dr. Price?

22   A.   Yes, I can.

23   Q.   Okay.  So in that paragraph on that page that says, "chief

24   complaint," towards the beginning of that paragraph, I just

25   want to walk through some of those notes.

Lynn Price - Cross

1          It says, "Patient is here for a four-week follow-up.

2    At her last visit we started her on Cymbalta, 20 milligrams at

3    bedtime."  Are you following me okay?

4    A.  Yes.

5    Q.  And then after that it says, "The patient tells me that she

6    is doing really well.  She feels more like herself.  She is a

7    published write, and she has not done any writing for the last

8    several years, but she has started writing again."  Am I

9    reading that right?

10   A.  Yeah.  I think that should say she's a published writer.

11   Q.  I suspected as much.  Are those some of the improvements

12   that Ms. Houston saw while she was taking the Cymbalta?

13   A.  Yes.

14   Q.  And then further down, sort of halfway through that same

15   paragraph, "She feels that she is getting a better sense of

16   herself.  She tells me that she has not slept well in the last

17   three years, but now she is sleeping really well.  She is not

18   having any night terrors."  Did I read that right?

19   A.  Yes.

20   Q.  So would those have been some more of the improvements that

21   Ms. Houston saw while she was on the Cymbalta?

22   A.  Yes.

23   Q.  Okay.  We touched on this in your testimony yesterday, but

24   I want to fill in some details on the topic of TBI.  You don't

25   ordinarily diagnose traumatic brain injury yourself, do you?

Lynn Price - Cross

1    A.   No, not generally.  People usually come to me with the

2    diagnosis already.

3    Q.   And you're not an expert on traumatic brain injury; right?

4    A.   No.

5    Q.   You rely on a neuropsychologist or a neurologist to

6    identify a TBI in general; right?

7    A.   Yes.  I usually have specialists involved.  It depends on

8    the degree of severity and how specific you are.  So I

9    frequently diagnose people as having concussion, which is a

10   mild traumatic brain injury; and I don't usually get

11   specialists involved in that situation unless somebody is

12   having prolonged symptoms or difficulty returning to normal.

13   Q.   Okay.  So if a neuropsychologist said that someone had a

14   traumatic brain injury, you would rely on their opinion for

15   that diagnosis?

16   A.   Yeah.  I mean, it would inform my feelings on that, as

17   well.  Yes.

18   Q.   So --

19   A.   So --

20   Q.   I'm sorry.  Go ahead.

21   A.   No.  I was -- so when you send somebody to a specialist,

22   they are -- you can -- I might have them help me confirm what I

23   already believe; or they might help me find different diagnoses

24   if -- if there was some suspect that that wasn't the right

25   diagnosis.

375

Lynn Price - Cross

1   Q.  Symptoms of traumatic brain injury overlap with depression;

2   right?

3   A.  Yes.

4   Q.  And they can overlap with symptoms of PTSD?

5   A.  Yes.

6   Q.  In fact, the symptoms of PTSD can be very similar to the

7   symptoms of TBI; is that right?

8   A.  Yes.

9   Q.  And a patient could be misdiagnosed with a TBI because of

10  those overlapping symptoms?

11  A.  I suppose so.  Yeah.

12  Q.  Now, referring you again to that same exhibit, 65, let's go

13  towards the beginning of the exhibit, the page marked Primary

14  Care Partners 16.

15          This is a record of your visit with Ms. Houston of

16  November 8, 2017.

17          MR. SHAPIRO:  Jane, can you repeat that, where you

18  are?  Sorry.

19          MS. BOBET:  Exhibit 55, page Primary Care Partners 16.

20  It should be on your screen, as well.

21          MR. SHAPIRO:  Thank you.

22          MS. BOBET:  Sure.

23  BY MS. BOBET:

24  Q.  Dr. Price, this is a record from your visit with

25  Ms. Houston on November 8, 2017; right?

Lynn Price - Cross

1   *A.*   Yeah.  I think this was my first visit with her.

2   *Q.*   And in the paragraph beginning on that same page, the first

3   sort of full paragraph, beginning "The patient tells me."  The

4   second line of that paragraph it reads, "She also sustained a

5   closed-head injury."  Did I read that correctly?

6   *A.*   Yes.

7   *Q.*   And so this record reflects that Ms. Houston told you that

8   she sustained a closed-head injury in the accident in 2016;

9   right?

10  *A.*   Yes.

11  *Q.*   So you didn't independently diagnose her with that head

12  injury; is that correct?

13  *A.*   No.  That was -- that would have been before I met her.

14  *Q.*   And correspondingly, you didn't independently diagnose her

15  with a TBI; right?

16  *A.*   I don't know if I independently diagnosed her with a TBI.

17  I -- as far as I understood, she has that diagnosis, based on

18  what I have seen and her symptomatology.  I've also seen it on

19  the diagnosis on -- from the -- that have come from other

20  providers, so that is my presumptive diagnosis.  Whether I was

21  originally the one that used that term or whether it was used

22  by other providers before me, I can't tell you 100 percent.

23  *Q.*   You haven't definitively diagnosed Ms. Houston with a TBI

24  yourself, have you?

25  *A.*   That's my working diagnosis, along with her other diagnoses

Lynn Price - Cross

 1   that I'm trying to treat.

 2   *Q.*   Is it your testimony that you have definitively diagnosed

 3   Ms. Houston with a TBI?

 4   *A.*   Well, your question is difficult, because, again, I am --

 5   I'm not trying to be evasive here, but it's just difficult for

 6   me to answer that question as a yes or no.  She has multiple

 7   symptoms which I am trying to treat.  There are several

 8   possible diagnoses with overlapping symptomatology that I am

 9   trying to treat from a practical standpoint.  And in many ways,

10   to me -- you're trying to tie me down to this diagnosis, and I

11   understand that, but that's not really what informs my

12   treatment.  So I would say a working diagnosis for her is TBI;

13   a working diagnosis for her is PTSD; a working diagnosis is

14   depression and anxiety.  And I'm trying to treat the symptoms

15   that she is presenting with, with those possible diagnoses in

16   mind.  Whether it's definitively TBI, whether it's definitively

17   PTSD, whether it's definitively depression and anxiety is -- is

18   difficult to say and in many respects, from my standpoint,

19   somewhat irrelevant.

20        But I don't mean -- again, I don't want that to sound

21   evasive, but that's where I'm coming from is trying to treat

22   the symptoms that she's presenting with.  So I don't spend a

23   lot of time worrying about whether she definitively has the TBI

24   or whether she definitively has PTSD.  What I am trying to do

25   is making sure that she gets the care that she requires for the

Lynn Price - Cross

1   symptoms that she's presenting with.  If that makes sense.

2   *Q.*  And to do that, to give her the care for the symptoms she's

3   presenting with, you look at what you call a working diagnosis,

4   which is a possible diagnosis?

5   *A.*  Yes.

6   *Q.*  Okay.  So, then -- just so I understand, is a patient's

7   diagnosis irrelevant to the kind of treatment that you provide

8   to them?

9   *A.*  No.  I mean, it gives you -- it gives you a place to start.

10  Right?  So if I didn't -- if it didn't occur to me that she

11  might have PTSD, then it would never have occurred to me to try

12  her on prazosin, for example.  But her being on prazosin and it

13  working for her doesn't necessarily prove that she has PTSD; it

14  just helps me decide what kind of things that we might try for

15  her.  So it's not irrelevant in that sense; it just gives you a

16  place to start.

17          And, you know, you keep -- there is value in

18  reassessing whether you have the right diagnosis, because,

19  again, it presents you with different treatment options that

20  you might not otherwise think of.  So if while I'm assessing

21  her I come up with, oh, well, maybe it's this, and I come up

22  with another potential diagnosis, it gives me another treatment

23  avenue to go down to try.  But, again, if I came up with some

24  medical diagnosis, then it gives me a starting point to try

25  some different things that we might not otherwise have tried;

Lynn Price - Cross

1    but it would still be a working diagnosis.  Because, you know,

2    there is not really definitive testing that is completely

3    foolproof for any of these diagnoses.

4           In medicine, you will always -- I can't say always --

5    you are often treating what you think somebody has.  I mean,

6    for example, Alzheimer's.  The only definitive test for

7    Alzheimer's is a brain biopsy, but we don't -- that's something

8    you're going to do at autopsy.  You still try and work on the

9    symptoms and make a presumed diagnosis and choose your

10   medications based on what is most likely, given those symptoms.

11   Q.  Understood.  Let's refer back to that record from November

12   of 2017, which is your first visit with Ms. Houston.  To your

13   knowledge, was that the first time that she had reported

14   sustaining a head injury?

15   A.  I actually -- I don't know.  I don't know the answer to

16   that.  These are things that she told me at her first visit, so

17   I -- I don't know if that had been reported elsewhere.

18          MS. BOBET:  So, Ms. Robinson, can you skip a few pages

19   later to -- in that same exhibit, Primary Care Partners

20   page 022.  That one.

21   BY MS. BOBET:

22   Q.  So this is another record from your practice dated

23   August 22, 2017; is that right?

24   A.  Yes.

25   Q.  So that would have been Ms. Houston seeing another provider

Lynn Price - Cross

1   in your practice shortly before she started treating with you?

2   A.  Yes.

3   Q.  Now, if we go -- scroll down to chief complaint, that

4   section, about halfway down the page.  I see that paragraph

5   discusses an MVA -- motor vehicle accident -- as well as leg

6   and ankle surgeries; is that correct?

7   A.  Yes.

8   Q.  There is no mention here of a head injury in the accident;

9   right?

10  A.  No.

11  Q.  Would you expect that if Ms. Houston had reported a head

12  injury to your colleague at the time, that that would be

13  reflected here in these notes?

14  A.  I don't know, because I don't know whether she was there

15  just to address the pain or whether to -- she was there to

16  address other symptoms that she was having.

17  Q.  But if Ms. Houston had reported a head injury on that date,

18  you would expect it to be reflected in the record; right?

19  A.  I mean, it's hard for me to discuss somebody else's record.

20  If she had told me at this visit that she had had a head

21  injury, I would have recorded it.  It's hard for me to comment

22  on what Dr. Klemmetsen would have done.  My guess would be, if

23  she would have been told that, she would have recorded it; but

24  it's only a guess.

25  Q.  So going back to the November 2017 visit, your first visit

Lynn Price - Cross

1   with Ms. Houston.  She told you that she sustained a head

2   injury in the accident; right?

3   A.  Yes.

4   Q.  And that's why you wrote it in your record; right?

5   A.  Yes.  I wrote it because my -- my HPI is -- a lot of that

6   is what the patient is telling me.  And I think I indicated

7   that "patient tells me."

8          MS. BOBET:  If we can pull that back up.

9   BY MS. BOBET:

10  Q.  While we're doing that, you said HPI.  What does that for?

11  A.  Oh, history of present illness.  So that's -- everything

12  between the chief complaint and the allergy list is the history

13  of present illness -- actually on this one, it's everything

14  from chief complaint down to past medical history would be what

15  we call the HPI, the history of present illness.

16  Q.  And that all comes from the patient themselves?

17  A.  Well, usually I put in my notes "patient tells me,"

18  "patient says this," if I'm trying to indicate that I am

19  getting that information from the patient.  Otherwise, I might

20  put stuff in there that I've read elsewhere, but usually I

21  would indicate that I got it from a particular record or

22  perhaps there is something that I already knew.

23  Q.  And I see here you did say, "the patient tells me" at the

24  beginning of that paragraph; right?

25  A.  Yes.

382

Lynn Price - Cross

1  *Q.* So the information in that paragraph was information that

2  Ms. Houston told you?

3  *A.* Yes.

4  *Q.* And you prescribed -- at some point you prescribed

5  Ms. Houston Adderall; is that right?

6  *A.* Yes. I think that's -- I'm not sure exactly when I started

7  that, but that's been this year.

8  *Q.* And Adderall is a similar medication to Ritalin?

9  *A.* Yes. It's a stimulant medication that we use for

10  inattentiveness or concentration. I started that -- actually,

11  it was November of 2019 that we started her on that medication.

12  *Q.* And just for the record, is what you're referring to your

13  notes of your treatment of Ms. Houston on the computer?

14  *A.* Yes. I'm looking -- I've got the chart open on this

15  computer to the side here.

16  *Q.* Thank you. So am I correct that one would not prescribe a

17  patient both Ritalin and Adderall; it would be one or the

18  other?

19  *A.* Yeah. They're too similar to be used concurrently.

20  *Q.* And you prescribed Ms. Houston the Adderall to treat a

21  suspected TBI; right?

22  *A.* I used the Adderall to treat her inattentiveness. The

23  cause of the inattentiveness, again, is -- could be TBI, could

24  be some underlying inattentiveness because of her depression,

25  anxiety, PTSD. Again, it's not -- it's not all that important

383

Lynn Price - Cross

1   to me why she has the inattentiveness.  I mean, it is.  I

2   don't -- it's so hard to -- I mean, I think that the

3   possibility of TBI causing inattentiveness was why I chose this

4   particular medication; but I may have tried it for other causes

5   of inattentiveness equally.

6   Q.  In this particular case, why you chose to prescribe that

7   medication was because of a concern of a TBI; am I right?

8   A.  I'm sorry.  I didn't catch what you said exactly.

9   Q.  I want just to make sure I'm understanding.  In this case,

10  why you chose to prescribe this medication was because of

11  concerns of a TBI?

12  A.  Potentially.  I used the medication to treat -- yes, I

13  think it's reasonable to say that I used it for -- because of

14  my belief that she has a TBI which is causing her

15  inattentiveness.  But, again, if somebody is complaining about

16  inattentiveness, regardless of having the TBI, even if she

17  hadn't had a TBI, if this was a major symptom that she was

18  having, I would have opted to try this medication anyway.

19  Q.  And while we're discussing Ms. Houston's cognitive issues,

20  inability to concentrate is one of her cognitive issues; is

21  that right?

22  A.  Yes.

23  Q.  And those issues could have been caused by a TBI, or they

24  could have been caused by something else; right?

25  A.  Yes.

Lynn Price – Cross

1    Q.   In fact, they might have been attributable to her PTSD?

2    A.   Yes.

3    Q.   Let's talk about chronic pain.  You see a lot of cases with

4    chronic pain; right?

5    A.   Yes.

6    Q.   And just so we're clear on the terminology, when you say

7    "chronic pain," that just refers to pain that is ongoing?

8    A.   Yes.

9    Q.   So is it fair to say that chronic pain is fairly common?

10   A.   Yes.

11   Q.   And contrasting that with something like complex regional

12   pain syndrome, or CRPS -- CRPS is quite rare; is that right?

13   A.   Yes.  I think in my career, I've seen two maybe three

14   patients with CRPS; whereas, I see people with chronic pain if

15   not on a daily basis, certainly on a weekly basis.

16   Q.   And for chronic pain, there are a variety of options to

17   treat that; right?

18   A.   Yes.

19   Q.   One option for treating chronic pain is physical therapy?

20   A.   Yes.

21   Q.   Another option is something like pool therapy?

22   A.   Did you say cool therapy?

23   Q.   Pool, P-O-O-L.

24   A.   Yes.  That would be an option.

25   Q.   Another option is acupuncture?

Lynn Price – Cross

1    *A.*   Yes.

2    *Q.*   Generally, if someone has benefited from, let's say,

3    physical therapy –– if someone has benefited from physical

4    therapy in the past, it's probably worth them trying again;

5    right?

6    *A.*   Yes.  I mean, I think it's worth trying it more than one

7    time.  Although, sometimes you see that somebody gets to a

8    point where they've got to maximum benefit in some situations;

9    but I think it's always worth trying it more than one time.

10   *Q.*   And that would be generally particular courses of physical

11   therapy for a specified amount of time; right?

12   *A.*   So usually if I refer somebody to physical therapy, I leave

13   it open as to how long they are going to have that course of

14   physical therapy, based on what is happening on a week–to–week

15   basis with the physical therapist.  Often we have a prescribed

16   amount of time just to satisfy insurance requirements.

17   *Q.*   But whatever the end date is, whether it's something you

18   recommend or the physical therapist, with a course of physical

19   therapy, there is an end date to it; correct?

20   *A.*   Yeah, I believe so.

21   *Q.*   A person could continue with these exercises or strategies

22   they get from the physical therapist on their own

23   independently; is that right?

24   *A.*   Well, so physical therapy is more than just a course of

25   exercises.  There is more that goes on in a physical therapy

386

Lynn Price - Cross

1   visit than just teaching somebody exercises.  But, yes, I do

2   encourage people to -- I think that's the benefit of a physical

3   therapist over a chiropractor, is that they are taught to do

4   exercises that they can continue at home.

5   Q.  You mentioned the max benefit of physical therapy.  When

6   someone reaches that maximum potential of the benefit they're

7   going to get from physical therapy, is the idea, then, they

8   would not continue to go to physical therapy?

9   A.  Yes.  There comes a point where the physical therapist may

10  say that -- I mean, usually, the initial physical with physical

11  therapy, they set goals of what they want the patient to

12  achieve.  And they may discontinue physical therapy to the

13  point they have achieved those goals.  Or it may just be that

14  they have been sent there for six weeks of physical therapy,

15  and the six weeks has come to an end.

16  Q.  When you recommend that a patient go to physical therapy,

17  about how many times per week or per month do they go?

18  A.  Sometimes -- sometimes I see people going twice a week;

19  other times it's once a week; sometimes it can be a couple

20  times a month.  That's something I think is negotiated between

21  the patient and the physical therapist and, again, somewhat

22  dictated by insurance coverage.

23  Q.  You wouldn't expect that when you recommend physical

24  therapy for a person, that they'll necessarily have that

25  physical therapy for the rest of their life; right?

387

Lynn Price - Cross

1   A.   No.   I mean, in most instances you would not expect that.

2   Q.   Let's talk about post-traumatic arthritis.   You see a lot

3   of patients with general arthritis; is that right?

4   A.   Yeah, osteoarthritis.

5   Q.   And so post-traumatic arthritis is sort of a subset of

6   arthritis that just has a specific cause; right?

7   A.   Yeah.   It's a subset of arthritis caused by trauma --

8   trauma to the bone.   It's very commonly seen.

9   Q.   There are various treatments available for arthritis,

10  including post-traumatic arthritis; is that right?

11  A.   Yeah, there are some treatments available.

12  Q.   And it would also include physical therapy?

13  A.   Yeah.   It's one of the first things that I recommend to

14  people with either osteoarthritis or post-traumatic arthritis.

15  Q.   And you see some effectiveness in your patients in general

16  with physical therapy for arthritis?

17  A.   I mean, not every patient, by no means; but, yes, I do see

18  benefit.   Although I wouldn't continue to prescribe that as a

19  course of treatment.

20  Q.   Let's talk about treatment for Ms. Houston in particular.

21  You recently recommended that she undergo some additional

22  physical therapy; is that right?

23  A.   I probably did.   I don't recollect -- I'm sorry.   I'm

24  distracted by the fact that you've all seized up for the last

25  several minutes.

Lynn Price - Cross

1   *Q.*  You're not able to see us?

2   *A.*  Well, I can hear you perfectly well; but you've all just

3   frozen.  But I don't know that that really matters.  I just

4   can't see your mouth moving.

5   *Q.*  I see you quite well.

6   *A.*  Okay.  Well, that's okay, then.

7   *Q.*  Please let me know if you can't hear me or understand what

8   I'm asking.

9   *A.*  Yeah.  Can you just repeat your last question?  I think you

10  asked me if I prescribed physical therapy at her last visit; is

11  that right?

12  *Q.*  Yeah.  I asked if you recently referred Ms. Houston for

13  physical therapy?

14  *A.*  I think I -- well, she is getting physical therapy right

15  now with Laurel and Tara; and I think that I recommended that

16  at her last visit.  Actually, I didn't recommend it at her last

17  visit, I commented at her last visit that she was -- seemed to

18  be getting benefit from that.  And so it was probably the

19  previous visit that I had recommended it.

20  *Q.*  All right.  You've anticipated my next question, which was,

21  you saw some improvement from that physical therapy; is that

22  right?

23  *A.*  Yes, she did.  I put in my note that she's finding it

24  really helpful.

25  *Q.*  So could Ms. Houston benefit from continued physical

Lynn Price - Cross

 1   therapy in the future?

 2   A.   Again, there may come a point where she's got to -- as much

 3   benefit as she's going to get; or she may get continued benefit

 4   by continuing to go.  It's difficult to predict.  But -- I

 5   mean, she might -- I mean, there is three possible scenarios:

 6   That she gets benefit from one course of treatment and doesn't

 7   get any further benefit; she could potentially get benefit from

 8   continuing to do that lifelong; or she might be somebody who

 9   would benefit from it and doing it intermittently, six weeks

10   here, six weeks next year, you know, six weeks down the road.

11   It's difficult to predict that.  But certainly when somebody

12   has found benefit from physical therapy, and then that is

13   interrupted because they feel at that time that they've got

14   maximum benefit, doesn't preclude me from trying it again.

15   Q.   Do you think Ms. Houston could benefit from something like

16   pool therapy?

17   A.   Potentially, yes.

18   Q.   How about orthotic inserts for her shoes, could that

19   benefit her?

20   A.   I think she tried that.  I think she saw Dr. Terri Schmitt,

21   the podiatrist, for this.  And I actually -- I don't know the

22   outcome of that.  I don't know that she got benefit from that

23   or not, whether -- whether she pursued it.

24   Q.   Do you think she could benefit from trying it again?

25   A.   Possibly.

390

Lynn Price - Cross

1   Q.  When we're talking about the benefits of these various

2   things, would those be benefits for both her functioning and

3   her pain?

4   A.  Yes.  Because I -- she has had a foot drop, and an orthotic

5   can help with function when there is a foot drop, as well as

6   for the pain.

7   Q.  I want to ask you in general, what, if any, value do you

8   see in sort of continuity in medical care?

9   A.  What benefit do I see in continuity of medical care?

10  Continuing to come and see her regular doctors rather than

11  going to see somebody completely different?

12  Q.  Yeah.  What benefit is there to that?

13  A.  So -- I mean, statistically, we know that there are

14  benefits from the patient seeing -- following up with the same

15  family practice doctor, likely because you are not trying to

16  reinvent the wheel.  I mean, when you meet a new patient,

17  you're not really sure exactly what is going on; and so

18  probably at the first visit, they don't get necessarily the

19  best care.  But as you get to know somebody, you understand

20  what problems they have and what needs to be addressed.  And so

21  I think continuity of care is very important.  I see that from

22  a family practice standpoint.

23          Having said that, sometimes there is benefit from

24  having a fresh pair of eyes taking a look to make sure that

25  you're not missing anything, because it's easy to -- to think

391

Lynn Price - Cross

1  that you have the diagnosis and you're -- once you're sure of

2  your diagnoses, you're less likely to entertain new ones.  So I

3  think there is benefit in both respects; but I think

4  statistically you'll find that there is -- it has been shown

5  that there is better care with continuity.

6  Q.  Now, as a general matter in your treatment of Ms. Houston,

7  have you found her able to ask informed questions about her

8  medical care?

9  A.  Yes.

10  Q.  And she's able to keep track of her own medications?

11  A.  Yes.

12  Q.  And she's able to keep track of her own medical

13  appointments?

14  A.  Yes.

15        MS. BOBET:  I'd like to refer to Exhibit 55,

16  page Primary Care Partners 123.

17        It will come up shortly.

18  BY MS. BOBET:

19  Q.  What is this?

20  A.  That's a good question.  This looks like -- so I think this

21  is a portal message.  It's basically a secure email that the

22  patient has sent me.  I don't see -- I don't see my response to

23  it.

24  Q.  So it's a message from Ms. Houston to your office that is

25  sent electronically?

Lynn Price - Cross

1    A.   Yes.

2    Q.   And she sent quite a few of these over the course of her

3    treatment with you; right?

4    A.   Yes.  I'm just looking in my chart, because I can see them

5    more easily on the electronic record, I think.  March --

6    3/19/19.

7            Just indulge me for a moment.

8    Q.   Sure.

9    A.   I don't -- that's not actually helping me.  Sorry.

10   Q.   We can just stick with this page that's up.

11   A.   Yeah.  Okay.  Because I can't see a corresponding message

12   in the chart.

13   Q.   I'll just ask you about this document that is up right now.

14   I'll direct your attention to that?

15   A.   Yeah.

16   Q.   The types of questions that she's asking here -- looks like

17   in that first paragraph, she says, "I need to have a telephonic

18   consult on pain management.  I called with this request last

19   week but did not hear from you."  Did I read that right?

20   A.   Yes.

21   Q.   Those types of questions about her ongoing care and

22   following up with your office, is that pretty typical of her

23   interactions with you?

24   A.   Yes.  I get -- we get quite a bit of portal messaging from

25   Tracy.

Lynn Price - Cross

1        *MS. BOBET:*  Let's go to page 189 in that same exhibit.

2        Bear with us one moment.  All right.  This one here.

3   *BY MS. BOBET:*

4   *Q.*  Is this another portal message from Ms. Houston to your

5   office?

6   *A.*  Yeah, I believe so.

7   *Q.*  I think you discussed this with Mr. Shapiro yesterday, but

8   this -- a request from her for a note excusing her from jury

9   service; is that right?

10  *A.*  Yes.

11  *Q.*  If you look down at the sent message on August 16, 2019,

12  5:29:17, that paragraph reads, "I need a written note from you

13  that I am unfit for jury service."  Is that right?

14  *A.*  Yes.

15  *Q.*  And that's an excuse from federal jury service.  I don't

16  know if you know that, but is that -- do you have an

17  understanding on that?

18  *A.*  Not really.  It was just jury service, whatever that might

19  be.

20  *Q.*  Do you see towards the last paragraph, before where it

21  says, "Thank you, Tracy," there is an email address listed

22  there that you can email the excusal to.  Do you see that?

23  *A.*  Yes.

24  *Q.*  That address is @cod.uscourts.gov?

25  *A.*  Yes.

Lynn Price - Redirect

```
 1    Q.  After you received this message, your office did provide
 2    the note excusing her from jury duty?
 3    A.  Yes.
 4         MS. BOBET:  Just give me one moment.  I want to check
 5    that I asked you everything I need to, here.  One second
 6    please.
 7         All right.  Those are the questions I had for you,
 8    Mr. Shapiro may have some additional questions.  Thank you very
 9    much for your time, Dr. Price.
10         THE WITNESS:  You're welcome.
11         THE COURT:  You're not on.
12         THE WITNESS:  I don't have any pictures or anything
13    right now.  I can hear everybody, but I can't see anybody.
14                     REDIRECT EXAMINATION
15    BY MR. SHAPIRO:
16    Q.  Can you hear me?
17    A.  Yes, I can.
18    Q.  Okay.  I want to talk about prazosin.  Is that how you say
19    that?
20    A.  Yes.
21    Q.  Doctor, are you familiar with the research articles about
22    that PTSD drug causing more harm than good?
23         MS. BOBET:  Objection.  Foundation.
24         THE COURT:  Overruled.
25         THE WITNESS:  No.
```

Lynn Price - Redirect

1   *BY MR. SHAPIRO:*

2   *Q.*  Are you familiar with the research that points out that it

3   doesn't help the nightmares and insomnia and in fact increases

4   that -- the insomnia and nightmares?

5          *MS. BOBET:*  Objection.  Foundation.  It's talking

6   about evidence -- something not in evidence.

7          *THE COURT:*  He's just asking if she's familiar with

8   it.  That's -- I need a foundation; that's what he's doing.

9   The objection is overruled.

10         Go ahead, please.

11         *THE WITNESS:*  I've -- the research I did on prazosin

12  is a few years old, and at that time it was recommending that

13  this be used.  If there is anything newer, then I'm not aware

14  of it.

15  *BY MR. SHAPIRO:*

16  *Q.*  Do you respect a patient like Ms. Houston who does her

17  research before accepting a prescription?

18  *A.*  Absolutely.  I think it's very important for patients to be

19  informed about their diseases and medications and how they

20  might affect them.  I applaud it.

21  *Q.*  And if there is research that supports that, and she

22  decided against using this because of that, do you fault her

23  for that?

24  *A.*  Absolutely not.  And because I can't do research -- because

25  I take care of so many patients, there is -- you know, you're

Lynn Price - Redirect

1  mentioning some recent research that shows that these

2  medications might not work.  I might not be privy to the most

3  recent research because I'm not a specialist in this issue.

4  And patients are, you know -- they're doing research, they're

5  looking at things that are perhaps more up to date than me.  So

6  it wouldn't be the first time that somebody has come to me with

7  suggestions of how to take care of their problem.

8          I think you asked me -- what did you ask me again?

9  Q.  I've forgotten by now, Doc.  Sorry.

10  A.  I think you asked me whether I think it's unreasonable for

11  her to discontinue the medication if her research found that

12  there was problems with the medication.  And in that case,

13  certainly no, I wouldn't.

14  Q.  Okay.  I understand that there are numerous choices for

15  depression or PTSD, such as -- I want to ask you a question --

16  is Zoloft a reasonable choice?

17  A.  Yes.  It's a good SSRI.  I use it quite frequently.

18  Q.  How about Paxil?

19  A.  It's another reasonable choice.  I rarely use it because

20  it's difficult for patients to get off it.  It's not something

21  I generally prescribe, unless somebody comes to me already on

22  that medication and it's already working.

23  Q.  How about Prozac?

24  A.  I use Prozac a lot.

25  Q.  How about Effexor?

Lynn Price - Redirect

1   *A.*  Again, Effexor is one of the ones that I try to avoid using

2   because it's difficult to discontinue.  But I have prescribed

3   it in multiple occasions with patients.  It's just not my first

4   line.

5   *Q.*  I notice in your record from November 8, 2017, that you

6   also were trying Lexapro with Ms. Houston, or giving her an

7   opportunity to try that.  What is Lexapro, and what were you

8   thinking?

9   *A.*  Lexapro is another SSRI.  It's one -- I don't use Lexapro

10  as commonly as citalopram, but they are very similar

11  medications.  Citalopram is one I use very commonly.  It's

12  almost my first-line antidepressant.  It is an SSRI.  Lexapro

13  is a very close cousin.

14  *Q.*  Okay.  But you chose Cymbalta for her, that she try.  Why?

15  What was the reasoning with that one, as opposed to all of the

16  others?

17  *A.*  Cymbalta was my choice because it -- in addition to being a

18  good medication for depression, it's also a good medication for

19  pain management; and I was trying to kill two birds with one

20  stone.

21  *Q.*  If you were going to choose another antidepressant to

22  assist her with her PTSD or depression and anxiety, what would

23  be your next line of attack?

24  *A.*  Well, I would consider some of the ones you've suggested.

25  Sertraline, Lexapro, citalopram would all be good options.

Lynn Price - Redirect

1    There is also some evidence for use of the mood stabilizers,

2    which are the atypical antipsychotics, things like Seroquel,

3    Zyprexa.

4    Q.   Which of those would have the least impact on potential

5    seizure activity?

6    A.   I'm sorry.  I didn't catch what you said.

7    Q.   Which of those would be least likely to trigger any seizure

8    activity in a patient like Ms. Houston?

9    A.   I mean, I think that they all have that potential, or the

10   potential is relatively small.  The fact that she has had a

11   seizure or seizure-like activity after starting the Cymbalta

12   makes me a little gun shy.  So I would be careful, but -- it's

13   difficult to pick out any one that would be less likely.

14   Q.   Okay.  Can you pull up your record from February 1, 2017,

15   from your office?

16          And Ms. Bobet, it is Primary Care Partners 002.

17   A.   February 1 of what year?

18   Q.   2017.

19          MS. BOBET:  I don't see that page in the exhibit.

20          MR. SHAPIRO:  It's not in your exhibit, but it's

21   Primary Care Partners 002.  And her appointment -- not her

22   appointment, but Dr. Klemmetsen from that date.

23          MS. BOBET:  Are you able to share that on the screen

24   so that we can see what the witness is looking at, please?

25          MR. SHAPIRO:  Yes.  Sure can.

Lynn Price – Redirect

1        THE WITNESS:  I don't see -- February 1, 2017?

2        MR. SHAPIRO:  Yes, ma'am.

3        We'll pop it up, but then can you see it?  You won't

4    be able to see it.

5        THE WITNESS:  Yeah, this is not -- I don't think there

6    is an office visit.  There is a notation of test results.

7    BY MR. SHAPIRO:

8    Q.  That is correct.  That is it.  And I'm going to ask you

9    about that task created.  Do you see that?

10       We have it on the screen.

11   A.  Okay.

12   Q.  Can you see --

13   A.  I've got the same thing.  It's -- there is a task has been

14   created.

15   Q.  Okay.

16   A.  Yeah.

17   Q.  This appointment date or task note occurred less than two

18   months post-crash; fair?

19   A.  Yes.  Because the crash was December 2016; right?

20   Q.  Correct.  December 1.

21   A.  Yeah.

22   Q.  Okay.  And Ms. Waller just highlighted a section.  Can you

23   read that?

24   A.  Yes.  "Shelly from Home Care of the Grand Valley called

25   stating patient is having a hard time mentally since the

Lynn Price - Redirect

1    accident."

2    Q.  And what is -- sorry.  What is HCGV?

3    A.  That's Home Care of the Grand Valley.  It would have been

4    her home care agency that was taking care of her home health

5    when she came home from the hospital.

6    Q.  So it appears that Ms. Houston was complaining of mental

7    issues within a couple of months of the crash?

8    A.  Yes.

9         MR. SHAPIRO:  Okay.  We can take that down,

10   Ms. Waller.

11   BY MR. SHAPIRO:

12   Q.  So one of the notes that I wanted to go over with you that

13   Ms. Bobet raised was the visit from November 8, 2017, Primary

14   Care Part 016.

15   A.  That's my first visit with her, November 8, 2017?

16   Q.  Correct -- no, that actually is not the one.  I wanted to

17   go to -- pardon me -- page 214, which is your visit of

18   February 20.

19   A.  Yes.  I've got that up here.

20   Q.  Got that?

21   A.  Yes.

22   Q.  So at that point in time, were there a number of things

23   going on?  And what I mean -- let me ask it more specifically.

24   Was she feeling the positive effects of the sympathetic nerve

25   blocks at that time?

Lynn Price – Redirect

1          MS. BOBET:  Objection.  Foundation.  Mischaracterizing

2    the evidence.

3          THE COURT:  Why -- why does it misinterpret the

4    evidence?

5          MS. BOBET:  Well, it assumes the fact that she was

6    feeling the effect of the sympathetic block, and I don't know

7    that there is a foundation for Dr. Price to speak to that.

8          THE COURT:  Overruled.

9          THE WITNESS:  I'm not sure -- did I refer to the

10   sympathetic -- I don't know at what point she had -- what was

11   the date of the sympathetic nerve block, and I don't think --

12   let me read this.

13         She had shots by Dr. Lewis at this point.  She is

14   getting benefit, so it's difficult to know whether it's the

15   shots, whether it's the physical therapy, whether it's the

16   Cymbalta, several things that have -- that she's gone through

17   at that point that could have contributed to her improved sense

18   of self.

19   BY MR. SHAPIRO:

20   Q.  It was a really good visit, wasn't it?  This was the most

21   optimistic I think I've seen one of your notes in all your

22   treatment.

23   A.  Yes.  I -- it was.  It's the point at which I really felt

24   that we could -- had the potential to make some improvements in

25   her life with treatment options.  So, yeah, this was the first

Lynn Price - Redirect

1   visit where -- it was the first time I have seen her really

2   smile and seemed quite positive and energized.

3   Q.  Then we know -- and I want to go through the emergency room

4   visit with the Cymbalta.  We have marked that as Exhibit 82.

5           And Ms. Waller, I would ask that you bring up SMMC

6   20004.

7           MS. BOBET:  I don't see an Exhibit 82.

8           MR. SHAPIRO:  What was that, Ms. Bobet?

9           MS. BOBET:  I don't see an Exhibit 82.  I think ours

10  ended --

11          MR. SHAPIRO:  We added it to utilize the records from

12  the St. Mary's Hospital emergency department.  So it is the

13  St. Mary's Hospital emergency department record of 2/24/20.

14          MS. BOBET:  This is the first we're hearing of a new

15  exhibit.

16          MR. SHAPIRO:  Yes, but you certainly have had the

17  records for some time.  And in your direct examination, you

18  were raising the issue about dehydration as being a cause of

19  this syncope or seizure episode.

20          Here we go.

21          THE WITNESS:  I can't see it on the screen, but I

22  actually do have it in my -- I've got it pulled up from my

23  office -- my office --

24          MR. SHAPIRO:  We'll try one more time, and other than

25  that, we'll just utilize your record for my one question.

Lynn Price - Redirect                                                403

1              *MS. BOBET:*  Your Honor, we don't have a copy of this

2    in front of us.  I take Mr. Shapiro at his word that it has

3    been disclosed to us.  So without being able to see it, you

4    know, we would have an objection.

5              *MR. SHAPIRO:*  There it is.

6              Can you go to SMMC 20004, please.

7              Is that it, Ms. Waller?  Scroll down to the bottom.

8    Right there.  Thank you.

9              Can you highlight that "patient presents" paragraph,

10   please.

11   *BY MR. SHAPIRO:*

12   *Q.*  The point I wanted -- the question I wanted to ask, did it

13   appear that the emergency room physicians indicated, "she does

14   not appear dehydrated"?

15   *A.*  I see that.  You asked me a question?

16   *Q.*  Yes.  Is that what their impression was?

17   *A.*  Yes.  Yes.

18   *Q.*  Thank you.

19   *A.*  So when she presented at the emergency room, she did not

20   appear dehydrated, per this report.

21   *Q.*  Now let's go to Dr. Burnbaum's note --

22             Which we've marked that as Exhibit 81, Ms. Bobet; so I

23   think you have that.

24             *MS. BOBET:*  We do not have it.  Can we wait until it's

25   up so --

Lynn Price – Redirect

1        MR. SHAPIRO:  Yes, we're going to pull it up.

2   WCN 002.

3        THE WITNESS:  That's the 3rd of April, right?  Yes.

4        MR. SHAPIRO:  That is 3rd of April.  Correct.

5        If you could scroll down to the assessment and plan on

6   WCN 002.

7        MS. BOBET:  Your Honor, before Mr. Shapiro questions

8   the witness further on this, could we have a bit of voir dire

9   about her –– to lay foundation of her knowledge of these

10  records.

11       MR. SHAPIRO:  Certainly.  I'm happy to, Your Honor.

12       THE COURT:  Go ahead.

13  BY MR. SHAPIRO:

14  Q.  Doctor, did you receive copies of these from the hospital

15  and from Dr. Burnbaum, and are they in your file and have been

16  in your file?

17  A.  Yes.  Both of the things that you just referred to, this

18  neurology consult and the ER report, are things that I have at

19  some point reviewed and are in the electronic medical record.

20  Q.  And that would be done in the ordinary course of your

21  practice, that if one of your patients goes to the emergency

22  room or sees a specialist, that you would receive copies of

23  those records?

24  A.  We endeavor to always get them in.  They don't always get

25  in; but, yes.

Lynn Price - Redirect

1  Q.  Thank you.  In this situation, you did get them; right?

2  A.  Yeah.  Both of them, yes.

3      MR. SHAPIRO:  All right.  Ms. Waller, can you just

4  highlight that first sentence under plan.

5  BY MR. SHAPIRO:

6  Q.  Doctor, when you received this assessment plan from

7  Dr. Burnbaum about the syncope or seizure episode and you saw

8  what he said in this paragraph, particularly the first

9  sentence, what was your understanding or belief as to what

10 likely occurred?

11 A.  Well, my impression was that -- I mean, he's put here that

12 it's very possibly due to the Cymbalta.  So, certainly, that

13 was my concern.  He also refers to missed sleep; and we know

14 that poor sleep, again, is a factor in having seizures.  In

15 fact, if you send somebody for a seizure study, an EEG, you

16 usually deliberately sleep deprive them ahead of time so that

17 you can try and get a positive result.

18 Q.  Did you have that concern about the Cymbalta after seeing

19 the emergency room records and seeing Dr. Burnbaum's assessment

20 evaluation?

21 A.  Yes.

22 Q.  Do you still have concerns about an antidepressant because

23 of that?

24 A.  Yes, I do.  I mean, it doesn't mean that I would not think

25 it worth trying something else; but that would be my concern,

Lynn Price - Recross

1  is that she have another seizure.  And if she declined to try

2  another antidepressant, I could not fault her for that.

3  *Q.*  Doctor, I have one last question.  Is Ms. Houston's case

4  complex?

5  *A.*  Absolutely.

6          *MR. SHAPIRO:*  Thank you very much, Doctor.  Have a

7  good day.

8          *THE WITNESS:*  Thank you.

9          *MS. BOBET:*  Your Honor, could I -- my apologies.  I

10 was going to ask one question of recross, if Your Honor will

11 permit me.

12         *THE COURT:*  All right.  Go ahead.

13         *MS. BOBET:*  Ms. Waller, can you leave that document

14 up, actually?  We don't have it in our exhibit binder.

15                    **RECROSS-EXAMINATION**

16 BY MS. BOBET:

17 *Q.*  I just want to make clear, we heard the word "seizure":

18 But in the first line in this record, Dr. Price, Dr. Burnbaum

19 refers to what happened as a syncopal episode; is that correct?

20 *A.*  It's -- is that the word -- "very likely had a syncopal

21 convulsion."

22 *Q.*  The part that Ms. Waller has highlighted up on the screen

23 right now.

24 *A.*  I can't see anything on the screen.  I have to look on my

25 record.

1  *Q.*  Okay.

2  *A.*  The chief complaint it says, "Tracy Houston is in to see me

3  today for a syncopal episode and concussion."

4        *MS. BOBET:*  Thank you very much.  That was my only

5  question.

6        *THE COURT:*  Dr. Price, this is the judge talking to

7  you.  I want to thank you very much.  I think you've gone above

8  and beyond the call of duty to reschedule your day in order to

9  complete this examination, and we are all grateful for your

10  contribution and know it was a sacrifice.  Thank you for that.

11        We will be in recess until 9:00 a.m. tomorrow morning.

12        *MR. SHAPIRO:*  Judge --

13        *THE COURT:*  Yes.

14        *MR. SHAPIRO:*  -- we have the ability to put

15  Dr. Gustavson back on if the Court would like that.

16        *THE COURT:*  How long -- for what period of time?

17        *MR. SHAPIRO:*  I don't know.

18        Ms. Bobet, what do you think?

19        *MS. BOBET:*  I think we probably have another 20 to

20  30 minutes with Dr. Gustavson.

21        *THE COURT:*  We don't have that time.  We'll be in

22  recess.

23        *MR. SHAPIRO:*  Thank you.

24        (Recess at 4:40 p.m.)

25

1                          **I N D E X**

2     **Item**                                                        **Page**

3        KENNETH LEWIS
            Direct Examination By Mr. Shapiro                         212
4           Cross-examination By Mr. Scarpato                         263
            Redirect Examination By Mr. Shapiro                       288
5        DAVID LESTER
            Cross-examination By Ms. Bobet                            298
6           Redirect Examination By Mr. Ogborn                        302
         JOHN GUSTAVSON
7           Direct Examination By Mr. Shapiro                         304
            Cross-examination By Ms. Bobet                            351
8        LYNN PRICE
            Cross-Examination Continued By Ms. Bobet                  372
9           Redirect Examination By Mr. Shapiro
            Recross-examination By Ms. Bobet                          407
10

11

12                     REPORTER'S CERTIFICATE

13        I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
14
          Dated at Denver, Colorado, this 29th day of September,
15   2020.

16

17

18                     *Therese Lindblom*

19
     _____
20                     Therese Lindblom,CSR,RMR,CRR

21

22

23

24

25