IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02914-JLK-MEH

TRACY HOUSTON,

    Plaintiff,

vs.

THE UNITED STATES OF AMERICA,

    Defendant.

_____

**REPORTER'S TRANSCRIPT**
TRIAL TO COURT — DAY THREE

_____

    Proceedings before the HONORABLE JOHN L. KANE, JR., Senior Judge, United States District Court for the District of Colorado, continuing at 9:08 a.m., on the 23rd day of September, 2020, via Video Teleconference.

**A P P E A R A N C E S**

    STEVEN A. SHAPIRO, MICHAEL JON OGBORN, and AMANDA R. PFEIL HOOD, Attorneys at Law, Ogborn Mihm, LLP, 1700 Lincoln Street, Suite 2700, Denver, Colorado, 80203, appearing for the Plaintiff.

    JANE ELIZABETH BOBET and VICTOR WILLIAM SCARPATO, III, Attorneys at Law, 1801 California Street, Suite 1600, Denver, Colorado, 80202, appearing for the Defendant.

THERESE LINDBLOM, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

Robert McCarroll - Direct

1          **P R O C E E D I N G S**

2               (In open court at 9:08 a.m.)

3               *THE COURT:*  Good morning.  Please be seated, everyone.

4          Counsel.

5               Can you swear in the witness now, please.

6               (**ROBERT MCCARROLL, PLAINTIFF'S WITNESS, SWORN**)

7               *COURTROOM DEPUTY:*  Please state your name and spell

8     your first and last name for the record.

9               *THE WITNESS:*  Robert, middle name Alan, spelled

10    A-L-A-N, last name McCarroll, M-C-C-A-R-R-O-L-L.

11              *MR. OGBORN:*  Your Honor, for the record, Mr. McCarroll

12    is present in our offices.  We are appropriately socially

13    distanced, more than 6 feet.  But he is in our offices to

14    testify this morning.

15              *THE COURT:*  Go ahead, please.

16                        **DIRECT EXAMINATION**

17    *BY MR. OGBORN:*

18    *Q.*  Good morning, Mr. McCarroll.

19    *A.*  Good morning.

20    *Q.*  I'd like to have you start by telling us a little bit about

21    yourself, beginning, please with your education.

22    *A.*  Certainly.  Formal education, I'm a graduate of high

23    school.  I do not have an advanced degree.

24    *Q.*  Where did you graduate high school?

25    *A.*  George S. Henry High School in Don Mills, Ontario.

Robert McCarroll – Direct

1   *Q.*  Okay.  What caused you to come to the United States?

2   *A.*  I at the time restored historic and artistic works on

3   paper.  And I was working for the Montreal Museum of Fine Arts

4   and had my own little business of RAM Restoration Services.  A

5   phone call in -- oh, my goodness -- 1983, asking if I knew any

6   paper conservators in Canada who might be interested in coming

7   to the University of Denver, where a position needed filling,

8   as an American citizen could not be found for that position.  I

9   was married at the time, and my wife had just graduated with an

10  undergraduate degree and was thinking of an advanced degree.

11  Goodness.  For Canadians to work in the United States,

12  particularly at that time, it was an honor; and so down we

13  came.  And I arrived in August of '84 at the University of

14  Denver; and Debra followed me in November.

15  *Q.*  While working at the University of Denver, give us an idea

16  of some of the work that you would do.

17  *A.*  Certainly.  One of the reasons the University of Denver was

18  interested in me is that while I worked in Canada in some very

19  prestigious institutions, the Royal Ontario Museum and the

20  Montreal Museum of Fine Art, I really enjoyed working with

21  small collections.  And so my experience in helping small

22  museums through my time at the Canadian Center for -- the

23  Canadian Conservation Institute, the appeal of working with a

24  smaller museum was something that I enjoyed.  They needed it,

25  the University of Denver's Rocky Mountain Regional Conservation

412

Robert McCarroll - Direct

1    Center.

2              Worked on pieces of the Denver Art Museum's

3    collection, at the time, the Denver Museum of Natural History

4    Museum.  That name has changed.  Specifically, the first big

5    project I handled when I arrived in '84 were reproductions of

6    Navajo sand paintings.  Golly, huge reproductions, almost

7    life-size.  Sand paintings are made and then destroyed.  These

8    were just incredible historic records of images from the Navajo

9    Nation.  So the types of works of art, historic in nature, but

10   artistic in nature.  I have been -- I'm proud to say and

11   somewhat still in awe that I worked on Picassos, Rembrandts,

12   Modiglianis -- golly, Durr, Martin Schongauer, when you talk

13   about the big names in art history.  And then modern art --

14   modern Canadian and American artist, as well.

15   Q.  I find this extremely fascinating and would continue asking

16   you about this, but I have to move this along.

17   A.  Certainly.

18   Q.  Are you still involved in art restoration today?

19   A.  No, I'm not.

20   Q.  What are you doing today?

21   A.  Sure.  Right now, I am vice president and managing broker

22   of the Evergreen office of Sotheby's International Realty.  I'm

23   a realtor.  I did a career switch when I hit 40.  My eyes

24   changed significantly.  And the time spent under the microscope

25   would led to headaches.  And after so many years, I restored

Robert McCarroll - Direct

1   works of art for 23 years, it was time for a change.  I had an

2   interest in real estate, and hence started out as a weekend

3   receptionist at Coldwell Banker.  Within three years of that

4   position in the Evergreen office of Coldwell Banker, I was

5   managing broker.  No one else wanted to do it.  And in my

6   interest in real estate, I had to harken back to my training in

7   art restoration, where I did an apprenticeship, where I started

8   truly sweeping the floor and making tea for the gentleman that

9   I was apprenticing to.

10          So how do you do real estate as a second occupation?

11  For me, did I want to do?  Weekend reception certainly gave me

12  a broad overview of the working personality.  So from there, I

13  got my real estate license.  Have worked with buyers and

14  sellers over the years.  I enjoy management and seeing people

15  succeed.

16  Q.  How long have you been doing real estate?

17  A.  Licensed in 1991 here in the state of Colorado.

18  Q.  I want to talk this morning about Tracy Houston.

19  A.  Uh-huh.

20  Q.  Do you know Ms. Houston?

21  A.  Yes.

22  Q.  How did you meet Ms. Houston?

23  A.  Sure.  It was probably late 2002 or 2003.  Tracy was the

24  director of the Humphrey Museum in Evergreen.  And I believe we

25  met at an Evergreen Chamber of Commerce mixer at the Humphrey

Robert McCarroll - Direct

1  Museum.

2  *Q.*  Tell me about how that friendship came along.

3  *A.*  Certainly.  I divorced in the year 2000.  Debra went back

4  to Canada; I stayed.  And I thought, gee, I'll probably be

5  married -- remarried in another three or five years.  It took

6  me a couple years to think of dating again, and -- the arts are

7  a major part of my life.  Even though I'm no longer restoring

8  works of art, the arts have always been a big part of my life.

9  And so, quite honestly, people that work in museums are

10  interesting to me because of their inquiring nature and study.

11  *Q.*  At that point in time was Ms. Houston working at the --

12  *A.*  At the Humphrey Museum.  So there was an attraction of

13  someone who had similar interests as -- not that many people in

14  real estate, individuals, male or female, who understand the

15  arts, so it was interesting.  So we started spending time

16  together.  The time together was -- I have always had tickets

17  to the -- or at least membership with Denver Art Museum.  I was

18  at that time really into fly fishing, and so Tracy would often

19  accompany me on fishing trips.  Usually up to Shawnee or in

20  the -- just off of Clear Creek.

21  *Q.*  How often were you -- back in 2003, was there -- how often

22  were you seeing each other -- or 2004 and 2005?

23  *A.*  2003, it was a couple times a month, both being busy.

24  There might be an evening at the Denver Art Museum, the fishing

25  trips would be on the weekend.  At that time Tracy was living

415

Robert McCarroll - Direct

1    off of Alameda in an apartment, so -- not that far from where I

2    was living at the time.

3    Q.  Give us a sense, if you will, going into 2015 -- when she

4    moved to Grand Junction -- there was a time when she moved from

5    Denver to Grand Junction?

6    A.  That's right.  Uh-huh.

7    Q.  Before her move to Grand Junction, did your time together

8    stay about the same, increase, decrease?

9    A.  Significantly decreased.

10   Q.  Before the move?

11   A.  Yes.  Before the move.

12   Q.  Okay.

13   A.  There was a period of time -- Tracy was married between

14   2005 and '10-ish; the exact dates I'm not sure.  But we -- some

15   relationships are better as friendships rather than -- and I

16   personally don't have a huge number of friends, but I have a

17   small number of friends that I keep in touch with.  Now,

18   keeping in touch with -- Facebook is not something for me and

19   what people share on Facebook.  So keeping in touch is maybe

20   not like the majority of folks.  Every three, four months,

21   maybe, keeping in touch.  So as our relationship shifted from

22   something that may have been more in some respects

23   romantically, we kept in touch.

24   Q.  So prior -- just prior to this move to Grand Junction, can

25   you give us a sense of -- still being in contact once every

Robert McCarroll - Direct

1    three or four months?

2    *A.*   There was a period of time that she was married, and so

3    there was no contact during that time.  I think we

4    reestablished contact in maybe 2013 or '14.  I remember her

5    reaching out and saying that she -- she had or a friend had

6    some Chinese paintings, and could I help get an evaluation on

7    that.  And so I referred her to Sotheby's in New York.  We

8    started communicating more after that; but it would be maybe

9    three to four months, maybe six months, there would be an email

10   even before she left.

11         During 2015, we had a bit more correspondence, really.

12   Tracy asked for a referral for a realtor in California; and we

13   had dialogue and emails regarding the sale of her condo in

14   Lakewood in 2015 before her move.

15   *Q.*   During your length of time that you've known Ms. Houston,

16   did you have or gain some understanding of her -- what she

17   loved, what she liked to do, and how she did that?

18   *A.*   Yes.

19   *Q.*   Can you give us a few examples?

20   *A.*   Certainly.  The outdoors.  Tracy, living where she did both

21   on Alameda in the apartments and then her condo in Lakewood

22   along Alameda, very close to Green Mountain.  And hiking and

23   mountain biking or biking on Green Mountain, in the Green

24   Mountain area is certainly something she truly enjoyed.  A big

25   part of her life.

Robert McCarroll - Direct

1   *Q.* Were you able to participate in hiking with her?

2   *A.* No.

3   *Q.* Why is that?

4   *A.* This was up -- a little bit of background. I raced

5   bicycles in Montreal. I joined Colorado Velo and was on the

6   Colorado Velo team when I arrived here in Colorado. A road

7   bike racer. Not a mountain biker. Never been -- hadn't at

8   that time been on a mountain bike. Tracy walked at a fierce

9   pace, hiked at a fierce pace. So did I join her on hikes on

10  Green Mountain? No, I couldn't keep up.

11  *Q.* Okay.

12  *A.* Even -- with the idea of going on bicycle rides, I enjoyed

13  my time of riding, I was older, it wasn't something that we did

14  together. Although I certainly know she -- it's a big part of

15  her life, as I said, and thoroughly enjoyed it.

16  *Q.* Were you familiar at all about how she kept herself busy

17  business-wise prior to 2015?

18  *A.* Uh-huh.

19  *Q.* And in 2015?

20  *A.* Yes.

21  *Q.* Tell us about that, please.

22  *A.* Boards of directors and counseling boards of directors and

23  institutions on hiring members of boards is what she was truly

24  focused on. Small rural electrical associations, if I recall,

25  were part of her clientele.

Robert McCarroll - Direct

 1   *Q.* Did she seem to stay busy at that?

 2   *A.* She wrote seven books.  I didn't read them; I'm sorry.  I

 3   didn't read them.  That's interesting.  You know, board of

 4   directors -- and it really didn't mean much to me, what -- what

 5   being on the board and all of that entailed at the time.  But

 6   certainly there was travel involved, talks, lecturing involved,

 7   and consulting.

 8   *Q.* During that time prior to 2015, did she have any physical

 9   limitations that you were aware of?

10   *A.* None that I was aware of.

11   *Q.* Okay.

12   *A.* When I was living in downtown Denver, we went to a couple

13   of concerts at the -- there is a church at Grant and 16th; and

14   we would walk from my home on East 16th to and from.  I -- now,

15   I have always walked at I think a fairly brisk pace.  Sometimes

16   I was playing catchup on those walks back and forth to the

17   church for those concerts with Tracy.

18   *Q.* How about her intellectual capacity and ability to mentate?

19   Any issues that you observed prior to 2015?

20   *A.* No.  You know, when we went fishing -- Tracy wasn't

21   interested in fishing.  I think her interest in fly fishing was

22   as strong as my interest in trying to go for a hike or a

23   bicycle ride with her.  So when we would go fishing, she would

24   take along books and notebooks; and we'd set up chairs and a

25   picnic basket.  And she would read and make notes while I

Robert McCarroll - Direct

1    fished, and we'd get together for a little bit of food, and

2    then I'd go back to fishing, and she'd go back to writing.

3    Q.   And on December 1, 2016, you know that Ms. Houston was

4    involved in a car collision in the Grand Junction area.

5    A.   Yes.

6    Q.   How did you become familiar -- how did you learn about

7    that?

8    A.   Sure.  I learned of that sometime during the spring of --

9    spring after the accident, so that would be 2017.  Tracy

10   changed her email address a couple times; and one of them was

11   wine country -- I can't remember exactly, but had to do with

12   wine country.  And so I and my office have been sponsors at the

13   Center for the Arts Center for wine series.  So I probably

14   reached out to her, inviting her over to one of these wine

15   events in Evergreen; and got a response that she had been in an

16   accident, had been hospitalized.  And that's when I learned

17   about her accident, in spring of '17.

18   Q.   Did you reach out to her at that point in time?

19   A.   Embarrassed as I was that I didn't know there had been an

20   accident, I'm sure I responded via email.  I don't know that

21   I called by phone.  Embarrassed that I didn't know.

22   Q.   How much -- since that collision and since learning about

23   that in spring of 2017, have you kept in communication or

24   visited with Ms. Houston at all?

25   A.   Invites to visit from Tracy, yes.  Just as when I moved to

Robert McCarroll - Direct

1   Morrison, invited her if she was in the Denver area to visit.

2   I did not make it over to visit -- have not been over to visit

3   her in Grand Junction.

4   Q.  Has she been here to visit you?

5   A.  Yes.  In the fall of '19, she reached out.  There was to be

6   a doctor's appointment, and wondered if she might stay with me

7   for a few days.  And, of course.  Later there was a meeting, I

8   believe, with you or your colleagues a little later that

9   month -- I think that was November -- that she stayed with me

10  at that time, as well.

11  Q.  During the times that she had stayed with you, were you

12  able to personally observe any differences in Ms. Houston's

13  behavior, intellect, or activity?

14  A.  Certainly, the first thing I noticed when she got out of

15  the car was the amount of time it took her to get out of the

16  car, walk to the house, and the trouble she had coming up the

17  front stairs.  I've got about seven stairs from the driveway up

18  to the front porch.  That was October of '19, and it took her

19  some time to get up the stairs and into the house and get

20  settled.  I had set up a room for her with an air mattress.

21  Getting her things out of the car, up the stairs, and into that

22  back room, that was -- it took a lot of time.  She tired

23  easily; so any outings, she would often have a nap.

24  Q.  That was different from pre-collision?

25  A.  Pre-collision, I don't remember her taking naps.  When she

Robert McCarroll - Direct

 1    stayed with me, then and now, she does take short walks; but

 2    they're short walks.  And we've -- she's walked on her own;

 3    I've watched her.  We've been on walks together.  Slow.  Kind

 4    of something of a little bit of a shuffle.

 5    Q.  How about her intellect or her ability to focus on matters?

 6    A.  Sure.  The October and November '19 visits, slower in

 7    conversation, more deliberate in conversation, a time of

 8    gathering thoughts.  Tracy's -- early on in our relationship,

 9    the times we would sit down with -- well, fishing, there would

10    be notebooks, there would be reading books, there would be

11    activities.  I didn't notice any notebooks or leisure reading

12    or reading material in October -- in those -- in '19, in late

13    '19.

14    Q.  And let's take this to present day.  You have spent some

15    time with Ms. Houston over the last few days?

16    A.  Yes.  Uh-huh.

17    Q.  Has she improved, remained the same?  Give us some idea of

18    what --

19    A.  Sure.  We've not spent all that much time together these

20    past few days.  But early -- schedule for the shower -- I live

21    in a very small house.  So a few minutes in the morning,

22    chatting, when she really is waiting for one of your colleagues

23    to pick her up.  At the end of the day -- I work, she's been

24    here in court all this time, so maybe a little bit to eat.

25             And that's interesting.  Not much to eat.  Now, when

Robert McCarroll - Direct

1  we were out and spending time together, I wouldn't say Tracy

2  was a voracious eater, but certainly on her visits from '19 and

3  now, she's really not eating much.  There is a fridge full of

4  food, and I'm certainly -- have offered to prepare some meals;

5  but she's been quite content to nibble, I would say.

6  Q.  One of the specific comparisons I'd like to ask you about,

7  did -- prior to the collision in 2015 -- 2003 to -- going

8  forward until the collision, did you know or have any

9  understanding of Ms. Houston having depression or being subject

10 to anxiety or depression?

11 A.  No, no.

12 Q.  If I were to ask you, Mr. McCarroll -- we've kind of been

13 specific about some of the differences pre- and post-collision,

14 if -- there is something that impacts you the most about

15 Ms. Houston that has changed, what would you tell us?

16 A.  She's slowed down.  The energy that I recall from

17 pre-2000 -- pre-2005 and the energy when she lived in the

18 condo, which would be -- that she sold before she moved to

19 Grand Junction, there was an energy and a vitality and -- there

20 is a term "shining eyes," that when one is engaged, that that

21 spark shows in one's eyes.  I've not -- I've not seen that in

22 her visits in '19 and this year.

23 Q.  Thank you, I appreciate your comments.

24       Ms. Bobet from the defense is going to ask you a few

25 questions.

Robert McCarroll - Cross

1    A.   Certainly.

2                          **CROSS-EXAMINATION**

3    *BY MS. BOBET:*

4    Q.   Good morning, Mr. McCarroll.  How are you?

5    A.   Good.

6    Q.   Can you hear me?

7    A.   Yes.  I'm just a little confused with all of these squares.

8    Q.   Can you hear and see me all right?

9    A.   Yes.

10        *MR. OGBORN:*  We can hear you.

11   *BY MS. BOBET:*

12   Q.   Thanks for being here.  I just have a few questions for

13   you.  So I understand from your testimony, you and Ms. Houston

14   were at some time in the past involved romantically; is that

15   correct?

16   A.   Yes.

17   Q.   But you're not currently?

18   A.   No.

19   Q.   Before you saw Ms. Houston in late 2019, when was the last

20   time before that that you'd seen her in person?

21   A.   Sure.  It would be in 2015, before her move.  The concerts

22   at the church at Grant and 16th that I mentioned for concerts

23   there would be about the last time I saw her in person, when we

24   walked over to the church for those concerts and back.

25   Q.   So fair to say in the last several years, you've only seen

424

1    her in person a few times?

2    *A.*   Truly, yes.

3    *Q.*   Now, you mentioned the work that Ms. Houston was doing in

4    the past before the accident.  You're not aware of how many

5    clients she had as part of that business, are you?

6    *A.*   No.  No.

7    *Q.*   And you're not aware of how much money that business was

8    making; right?

9    *A.*   No.

10   *Q.*   And you have never worked in the medical field; right?

11   *A.*   No.

12   *Q.*   You don't have any medical training?

13   *A.*   No, none.

14          *MS. BOBET:*  Thank you very much.  Those are all of my

15   questions.

16          *THE COURT:*  Redirect.

17          *MR. OGBORN:*  No redirect, Your Honor.  We would ask

18   that this witness be excused.

19          *THE COURT:*  Any objection?

20          *MS. BOBET:*  No objection, Your Honor.

21          *THE COURT:*  Mr. McCarroll, you're excused from your

22   subpoena.  Thank you for your participation in this case.

23          Next witness, please.

24          *MR. OGBORN:*  Next, Your Honor, we will be connecting

25   with Francine Mazone.

1          *MR. SCARPATO:*  Your Honor, this is Bill Scarpato for

2     the United States.  While plaintiff's counsel is getting

3     Ms. Mazone connected, there is one thing I'd like to put on the

4     record, if I may.

5          *THE COURT:*  Yes.

6          *MR. SCARPATO:*  We received email communications from

7     plaintiff's counsel last night between about 5:30 and 9:00 p.m.

8     suggesting there would be substantial revisions to Ms. Mazone's

9     testimony that would bring changes to the future medical

10    expenses in this case by upwards of 75 percent.  And so that's

11    the first we had heard about these changes.  And this is a --

12    we think a disclosure violation under Rule 26 that would

13    ordinarily warrant sanctions under Rule 37.  However, in the

14    interest of efficiency and because it seems like those numbers

15    are going down, we think we can cure any of the prejudice we

16    might suffer as a result of that violation on

17    cross-examination.  However, if we're not, we may be required

18    to recall Ms. Mazone at a future date.

19         *MR. OGBORN:*  If I may respond, Your Honor.

20         *THE COURT:*  Yes.

21         *MR. OGBORN:*  In -- claims do change.  This one did

22    change.  I don't think there is any prejudice, because it did

23    not change up, Your Honor; it changed substantially down.  But

24    to the extent that they want to cure this -- any potential

25    prejudice they think there is there by us changing our numbers

426

 1   down by about 70 percent -- then we have no objection to them

 2   recalling Ms. Mazone if that's what they think they need to do.

 3            THE COURT:  They can recall her if they wish.

 4            MR. SCARPATO:  Thank you, Your Honor.

 5            THE COURT:  Is the witness ready yet?

 6            MR. OGBORN:  She is on.  It's a little difficult to

 7   see her.  It's a little better.

 8            THE COURT:  Can you hear the Court, Ms. Mazone?

 9            Apparently she cannot hear.

10            COURTROOM DEPUTY:  She says she can hear.

11            THE COURT:  I'm not seeing any reaction on the screen.

12            COURTROOM DEPUTY:  Is she unmuted?

13            MR. OGBORN:  Ms. Mazone, can you start by giving me

14   your first name if you can hear me?

15            THE WITNESS:  Yes, I can't hear very well; but I heard

16   that.  Francine Mazone.

17            THE COURT:  All right.  Swear in the witness, please.

18            THE WITNESS:  I can't hear that.

19            MR. OGBORN:  Ms. Mazone, can you turn up the volume on

20   your laptop, please?

21            THE WITNESS:  Well, you know, I'm in a co-working

22   space, I don't know how to do that on this computer, because

23   it's different than what I use.

24            Let's try that.

25            COURTROOM DEPUTY:  Can you hear me?

427

Francine Mazone – Direct

1          THE WITNESS:  I can't hear the judge.  I can hear you,

2     Mr. Ogborn.

3          THE COURT:  Can you hear the courtroom clerk, who is

4     trying to swear you in?

5          THE WITNESS:  No.  Let me get the manager here and ask

6     him to change the volume.  I'm so sorry.

7          Now I can hear you.

8          COURTROOM DEPUTY:  Please raise your right hand.

9          (**FRANCINE MAZONE, PLAINTIFF'S WITNESS, SWORN**)

10         COURTROOM DEPUTY:  Please state your name and spell

11    your first and last name for the record.

12         THE WITNESS:  Francine Mazone.  M-A-Z-O-N-E.

13         THE COURT:  Go ahead, please.

14                         **DIRECT EXAMINATION**

15    BY MR. OGBORN:

16    Q.  Ms. Mazone, I'm going to start, please, by asking you what

17    you do for a living.

18    A.  I'm a registered nurse, and I own a small business where we

19    do medical case management, medical bill reviews, and life care

20    planning.

21    Q.  What kind of education do you have that allows you to do

22    all of those things?

23    A.  First of all, I have a bachelor of science in nursing; and

24    subsequent to that, I am a certified case manager.  And the

25    education required for that, as well as the other

Francine Mazone – Direct

1    certifications, were certification programs.  Specifically for

2    life care planning, I was required to take classes, 120 hours

3    of both in-person and online; submit a life care plan for peer

4    review; and pass an exam.  And to maintain that certification,

5    I have to have 80 continuing education units every five years.

6    *Q.*  Ms. Mazone, when did you first get your license as a

7    registered nurse?

8    *A.*  1974.  A few years ago.

9    *Q.*  How long have you been acting as a case manager?

10   *A.*  Since 1992.

11   *Q.*  And what does that involve?

12   *A.*  As a medical case manager, or a nurse case manager, I'm

13   hired by -- generally now workers compensation carriers.

14   Previously, under the old no-fault law, I worked for auto

15   carriers.  And I'm hired by them for people -- to work with

16   people that have been injured.  And typically now, it's only

17   catastrophic injuries -- brain injuries, spinal cord, et

18   cetera.  What I do is I coordinate the medical care, I work

19   with the providers to develop treatment plans that address the

20   patient's needs, I review medical billing, I provide a lot of

21   education to patients and families, and I communicate with the

22   adjustors on a regular basis.

23   *Q.*  Those skills and putting together those treatment plans, do

24   those come into play at all in your life care planning

25   business?

429

Francine Mazone – Direct

1   A.  Yes, I believe they do, because they -- those skills in all

2   the areas I've done this have -- lend themselves to me knowing

3   a lot about many of the injuries of the people whose life care

4   plans I develop.  I know many of the providers, so it makes it

5   pretty easy to speak with them; and I know the right questions

6   to ask the providers.

7   Q.  As far as being a life care planner, how long have you been

8   doing that?

9   A.  I've been a certified life care planner since 1990 -- no.

10  Excuse me.  Let me correct that.  I did my first life care plan

11  in 1995 and became certified -- I don't know the exact date of

12  my certification.  I don't remember.  It is on my CV.  I think

13  it's 2000.

14  Q.  2000; correct.  Have you testified in the past in court?

15  A.  Yes, I have.

16  Q.  And in those testimonies, say since -- say in the last ten

17  years, can you give us any estimate of how many times you have

18  been qualified as an expert in life care planning?

19  A.  Fifty, forty, something like that.

20       MR. OGBORN:  Your Honor, I'm going to go ahead and

21  move and ask that Ms. Mazone be recognized as an expert in life

22  care planning.

23       MR. SCARPATO:  No objection.

24       THE COURT:  All right.  The tender is accepted.  Go

25  ahead.

430

Francine Mazone - Direct

1    *BY MR. OGBORN:*

2    *Q.*  I want to start with kind of a basic question, Ms. Mazone.

3    What is your goal when starting to establish or determine a

4    life care plan for a plaintiff?

5    *A.*  My goal is to know as much as I can about that person's

6    injury, how it occurred, and also to know and review all the

7    medical treatment that they had to date.  My other goal is to

8    understand and be aware of their past medical history.

9    *Q.*  In Ms. Houston's case, what did you do to satisfy those

10   goals?

11   *A.*  First of all, I reviewed the medical records and reviewed

12   the summary and the chronological summary of those records that

13   actually was completed by a nurse in my office.  And then I had

14   a phone interview with Ms. Houston in August of last year.

15   Subsequent to that -- or not really subsequent -- as I was

16   doing that, also developing questions and identifying the

17   providers to ask those questions to.  And I developed those, we

18   sent those out, and -- I think that answers the question.

19   *Q.*  When you're developing these questions for the providers,

20   is it just a stock group of questions to each provider?

21   *A.*  No, not at all.  Some of the questions are the same, in

22   terms of frequency of office visits.  But it's really very

23   specific to that patient, in this case, to Ms. Houston, in

24   terms of knowing the right questions to ask, based, again, on

25   what you -- we referred to before, my case management work, and

Francine Mazone – Direct

1    then developing those questions specific to this person and

2    specific to their diagnosis.

3    Q.  Ms. Mazone, was there anything in Ms. Houston's case that

4    made it difficult for you to accomplish goals or to get the

5    information you needed to create a life care plan?

6    A.  COVID.  Because I didn't meet with her in person,

7    although -- although I interviewed her by phone in August, my

8    plan was to meet with her in the springtime the following year;

9    and so I wasn't able to do that.  No.  But otherwise, other

10   than that, no.

11   Q.  Do you believe you were able, then, to gather sufficient

12   information to complete your task of doing the life care plan?

13   A.  Yes.  The providers I sent the questions to all responded

14   and answered the questions in a way that could be understood.

15   Q.  Are you, Ms. Mazone, familiar with how other life care

16   planners put together their life care plans through any

17   organizations you belong to or otherwise?

18   A.  Yes.  The standards of practice define the methodology for

19   doing a life care plan; and that's from the International

20   Association of Life Care Planners, of which I'm a member.  And

21   they come under the umbrella of the International Association

22   of Rehabilitation Professionals, also of which I'm a member.

23   Q.  Are those established methodologies, you followed those in

24   Ms. Houston's case?

25   A.  Yes, sir.

432

Francine Mazone – Direct

1        MR. SCARPATO:  I'm very sorry.  That broke up a little

2    bit.  Could the witness please repeat the sources of those

3    standards she relied upon?

4        THE WITNESS:  The International Association of Life

5    Care Planners.  It's not association; it's society.  Sorry.

6    The International Society of Life Care Planners, as well as the

7    International Association of Rehabilitation Professionals.  But

8    the standards are specific for life care planning.

9        MR. SCARPATO:  Thank you.

10   BY MR. OGBORN:

11   Q.  Ms. Mazone, in this case, did you reach an opinion as to

12   whether Ms. Houston would have future medical costs?

13   A.  Yes.

14   Q.  And did you reach opinions with regard to the possible

15   value of those costs going forward?

16   A.  Yes.

17   Q.  Is your opinion contained in Exhibit -- is it contained in

18   some tables that you put together?

19   A.  Yes.  In my life care plan.

20       MR. OGBORN:  And for demonstrative purposes, Your

21   Honor, I'm going to Exhibit 19.

22   BY MR. OGBORN:

23   Q.  Ms. Mazone, Exhibit 19 is your life care plan.  This was

24   initially put together on what date; do you recall?

25   A.  September 27, 2019.

433

Francine Mazone – Direct

1   Q.  And there have been some modifications or amendments to

2   this plan; is that correct?

3   A.  Additions to it.  Yes.

4   Q.  The first -- tell us about those additions, please.

5   A.  The additions are for ankle surgery that Dr. Cota testified

6   to in his deposition in January of this year.  I was asked to

7   supplement the life care plan by costing out those two

8   surgeries.  And then in my study to prep for this testimony, I

9   recognized that one of those surgeries was not defined clearly,

10  and it really wasn't correct, so I corrected that yesterday.

11  Q.  In your life care plan, Ms. Mazone -- I mean, is this a

12  once it's done, it's set in stone, and that's how it's going to

13  be?

14  A.  Not at all.  Inherent in the definition of life care plan

15  is the word dynamic.  A life care plan is a dynamic document.

16  So at this point in time, the 27th, when I did the big life

17  care plan, this is what Ms. Houston's needs were.  Things have

18  changed since then.

19  Q.  I'm sorry.  When you say September 27, you're talking

20  September 27, 2019; right?

21  A.  Yes.

22  Q.  You're --

23  A.  We aren't there yet, are we?  Yes.

24          So the life care plan definition says, a life care

25  plan is a dynamic document.  It changes, based on changes in

Francine Mazone - Direct

1   that patient and treatment that they may receive after the life

2   care plan is completed.

3   Q.  Your life care plan has a number of medical procedures that

4   are going to be needed in the future.  How do you arrive or

5   determine what medical procedures should be put into your life

6   care plan?

7   A.  From the physicians' opinions.  I am not qualified to

8   determine whether a patient will require a surgery or not, so I

9   have to ask the right questions.

10  Q.  I'm going to have you go to Exhibit 19, your tables.  And

11  walk through this with us to help us understand a little bit

12  about this life care plan.

13  A.  Okay.

14  Q.  On the first page of the tables, you have an acupuncture

15  evaluation.  Are you with me?

16  A.  Yes, I am.  I'm not -- am I supposed to be seeing the

17  exhibit?

18  Q.  I'm doing it in hard copy right now so that --

19  A.  All right.  I have the hard copy.  That's what I'm using.

20  I wanted to make sure I wasn't to be seeing an exhibit on the

21  screen.

22  Q.  We can put it up there if you'd like; but I can tell you,

23  it's a little difficult to read, quite frankly.

24  A.  This is fine.  I'm fine.

25  Q.  I think we can all follow along together doing it this way.

Francine Mazone – Direct

1          So let's talk about the acupuncture evaluation, why is

2    that in there?

3    A.  In the questionnaire that I sent to Dr. Price, that was one

4    of the things she indicated Ms. Houston would require.  And in

5    order to -- so the evaluation is just the one time; it's not

6    the actual treatment.  That's what this is, is evaluate -- this

7    and the next page are just the evaluations, not actual

8    treatment.

9    Q.  And as far as acupuncture is concerned, do you know whether

10   Ms. Houston has engaged in that type of treatment at all?

11   A.  I have not received any record indicating that she has.

12   Q.  And because it's on this life care plan, does that mean

13   it's a necessity that she does that -- that she does the

14   acupuncture?

15   A.  More probable than not that she will require acupuncture

16   in -- for her treatment, based on Dr. Price's recommendation.

17   Q.  Okay.  So you indicated already these first two pages are

18   just evaluations.  You're pricing out one-time evaluations or

19   are they multiple-time evaluations?

20   A.  The evaluation is one time.  In the case of physical

21   therapy, for example, it will occur once per year; so it

22   doesn't just occur one time in her lifetime.

23   Q.  As we go to page 3, Ms. Mazone, you have speech, cognitive

24   therapy sessions.  Why was this included in there?

25   A.  Ms. Houston was referred to Lisa Jacobson, who is a speech

Francine Mazone - Direct

 1    therapist.  And this is for her cognitive issues.  And the

 2    first box that says "one per week for three months" has been

 3    completed, or we're at the very end of it -- no.  Has been

 4    completed.  The next one -- pardon me -- is ongoing.  She's

 5    still receiving the treatment.

 6    Q.  For each of these things that you have -- for these medical

 7    activities, you have prices associated with each activity.  How

 8    did you arrive at that price?

 9    A.  I have a person in my office who does the research -- the

10    cost research.  So I want to make clear that I don't do the

11    research myself.  I review it.  But the way that we arrive at

12    it is by using a few different databases.  Those are listed

13    under each box.  Medical fees, in the United States and

14    physician's fee reference we adjust those for -- there is a

15    geographical adjustment factor that we use to come up with the

16    number.  And then in this case, we use actual billings from the

17    provider.

18    Q.  Ms. Mazone, I want to take you to page 5 and talk about the

19    physical therapy sessions that you have in this life care plan.

20    How did you arrive at this number?

21    A.  Dr. Lewis indicated in his questionnaire that she would

22    require this three times a week for lifetime.

23    Q.  Is that -- do you know whether that has proven out to be

24    true?

25    A.  It has not.

437

Francine Mazone - Direct

1   Q.  More --

2   A.  I'm sorry.  She has been receiving physical therapy one to

3   two times a month -- generally, more once a month -- so the

4   cost would be reduced here.

5   Q.  And when we say that the cost should be reduced, it's not

6   necessarily the cost that you have in your life care plan;

7   correct?

8   A.  It's the per year cost that would be different.  The cost

9   per unit is the same, and I can -- if you'd like, I have the

10  numbers -- the current, for one or two times per month.

11  Q.  What is that number?

12  A.  If she goes one time a month, the average cost is $3,480.

13  If she goes twice a month, the average is $6,960.

14  Q.  As we go to the next page, Ms. Mazone, we talk about

15  three-phase bone scan.  Is that something that is still part of

16  the life care plan, the dynamic document that exists before us?

17  A.  My understanding is she has had that completed.

18       Can I go back to my previous answer on the physical

19  therapy?

20  Q.  Yes.  What is that -- what is the issue?

21  A.  The numbers I gave you were annual numbers, not total for

22  her lifetime.  Annual.

23  Q.  Thank you for clarifying that.

24       Are there other things in your life care plan,

25  Ms. Mazone, like the physical therapy that you have

Francine Mazone – Direct

1   reconsidered or reduced as you prepared to come into trial?

2   A.  Yes.  The -- like, on the next page -- for example, page 7,

3   the thoracic MRI has been completed.  It could, however, be

4   repeated based on future care.

5   Q.  So that thoracic MRI, what is that related to?

6   A.  Spinal cord stimulator.

7   Q.  So if a doctor were to testify that he believed that was

8   something that could still happen in the future, then this

9   cost, even though completed once, would stay in your life care

10  plan?

11  A.  My understanding is that they would want to repeat the MRI.

12          To finish my answer, under medications, the life care

13  plan detailed the cost of Ritalin.  From the records I

14  reviewed, it looks like she's taking Adderall now; so that

15  would be a change.  And after reading the records and getting

16  more current, the home healthcare that is included in the life

17  care plan, I think it's appropriate to reduce that.

18  Q.  Let me go back to the answer about Ritalin.  Does that

19  changed -- the fact that she's not taking Ritalin but taking

20  Adderall, does that create a big price difference in your life

21  care plan?

22  A.  Yes.  Over her lifetime, it would.  Annually, the cost of

23  Adderall is $511 to $1,460, as compared to what is listed in

24  the life care plan.

25  Q.  So it causes the amount to go up?

Francine Mazone - Direct

1    *A.*  Yes.

2    *Q.*  You indicated there is some reduction in home health aide.

3    Help us understand, why the reduction from what the doctor

4    recommended?

5    *A.*  Well, Dr. Price said she will likely need a home health

6    aide three to five times a week; so I put it in the life care

7    plan to begin last year.  It hasn't occurred.  She's not

8    getting home healthcare now.  And based on some of the reports

9    and Dr. Johnston's report, functionally, she's able to manage

10   now.  So I think that we could wait ten years, for example,

11   before we implement the home health aide.  And because of her

12   injury, she's more likely than not to require the home

13   healthcare.

14   *Q.*  Is that something as a case manager you typically see on

15   some of your catastrophically injured patients?

16   *A.*  Yes.  Very frequently.

17   *Q.*  Are there any other changes?  I'm going to kind of walk you

18   through some of the things that you think should be altered on

19   this one-year-old document.  Are there other things as we go

20   through this?

21   *A.*  If I were to redo the entire life care plan, I would

22   contact Dr. Lewis again and ask him about the knee treatment,

23   the steroid injection, radio frequency.  I don't feel

24   comfortable pulling it out, because I think it still could

25   occur; but I haven't seen a lot of discussion in the record

Francine Mazone – Direct

1    about that.  And I know that's because of the focus on the

2    CRPS, and so the knee would take a back seat to that.  So I

3    just want to talk with the providers about that.  None of those

4    have occurred.  And the same with the PRP, which I think would

5    still be reasonable.

6           I think she -- you know, she had a spinal cord

7    stimulator trial; but from what I read in the records, it's not

8    totally off the table.  From what I know, medically speaking,

9    it's not.  It wouldn't be something that I would pull out of

10   the life care plan.

11   Q.  As we keep going down, is there anything else that you

12   should comment on to keep us updated on your life care plan?

13   A.  The things that I haven't mentioned that I would keep in

14   the life care plan, from the foot insert to this microcurrent

15   wellness unit.  The medications are the same, based on the

16   medical records.  So the only one I would change there, again,

17   would be the Adderall.

18          Possibly, I could change the antidepressant,

19   although -- if she's not taking Cymbalta, she could be taking

20   something else.  And the costs are usually pretty much the

21   same, unless it's a brand new antidepressant that has come out;

22   and in that case, the cost would be much higher.

23   Q.  Ms. Mazone, I don't want to neglect your supplement; so

24   let's talk about those as well, please.

25   A.  Okay.  And that I do not have in hard copy, but I have my

Francine Mazone - Direct

1    other computer.  So let me pull that up.

2         Okay.

3    Q.  What are the supplements -- I think you've mentioned this

4    already.  The supplements are talking about future possible

5    repairs to the ankle?

6    A.  Yes.  Dr. Cota stated that either a fusion -- an

7    arthrodesis -- or a replacement -- arthroplasty -- were likely;

8    so that's what these spreadsheets show.

9    Q.  And this is the one that you updated just yesterday?

10   A.  Two of the four pages I updated yesterday.  Okay.  So this

11   one that I updated yesterday is for the fusion.  And it's

12   titled 9/22/20 Correction to 3/12/20 Supplement.  And --

13   Q.  For everybody, I think this is Exhibit 21, and 21A is the

14   new supplement.

15   A.  20A.

16   Q.  20A.  I'm sorry.

17   A.  And it details the cost for either an open procedure --

18   where they actually make an incision and open up the ankle,

19   fusion -- and an arthroscopic procedure, because either of

20   those could occur.  The difference between the two is not very

21   much.  So it's about 30,000 to $31,000 for those -- either of

22   those procedures.  And that includes the surgeon, the assistant

23   surgeon, the facility, the lab work, everything.

24   Q.  Now, Ms. Mazone, when you come up with all of these costs,

25   do you ever come up with a total for the life care plan?

Francine Mazone - Direct

1    *A.*  In some cases, when asked to do so, I do; but typically --

2    *Q.*  Were you --

3    *A.*  I --

4    *Q.*  I'm sorry.  Were you asked to do so in this case?

5    *A.*  I was not.

6    *Q.*  What did you do with all of this information?

7    *A.*  I submitted the life care plan when it was completed and

8    answered any questions the economist had after your office sent

9    it to the economist.  My numbers are all today numbers, current

10   numbers.  I don't have the skill to do economist work.

11   *Q.*  Ms. Mazone, one other thing I want to ask you about.  Do

12   you as part of your life care planning come up with a life

13   expectancy formula?

14   *A.*  I reference a life expectancy in my life care plan.

15   *Q.*  How did you arrive at that number?

16   *A.*  The one that's in my life care plan is from the

17   United States Vital Statistics, and that is their publication

18   in June of 2019.  And there is not another more updated one.

19   When I went to get the (unintelligible), I was made aware that

20   the U.S. Census Bureau numbers are used.  That was the first

21   time I ever knew that.  So I didn't change the life care plan,

22   but I'm aware of that.

23   *Q.*  The number you came up with, what was the number that you

24   used?

25   *A.*  In my -- in my plan it was 27 -- 26.5 years.  And I

Francine Mazone - Direct

1   think -- yes.  Yes.  And currently, for this year, it's the

2   same, 26.4, actually.

3   *Q.*  Given the fact that you have focused in your career on

4   these catastrophic injuries, do you believe Ms. Houston's

5   medical situation is complex?

6   *A.*  Yes, I do.

7   *Q.*  What makes it complex?

8   *A.*  Well, a number of things.  First of all, the diagnosis of

9   chronic regional pain syndrome is a very complex and difficult

10  diagnosis for someone to live with.  Secondly --

11       *MR. SCARPATO:*  Objection, Your Honor.  We do not have

12  an expert qualified here on CRPS; we have an expert who

13  qualified in life care planning.  And so if she's going to be

14  testifying about specific diagnoses, I'd at least ask for some

15  *voir dire* on her experience that qualifies her to do so.

16       *MR. OGBORN:*  Your Honor, I didn't ask her about a

17  diagnosis.  I asked what made the case complex in her opinion

18  as a life care planner.

19       *THE COURT:*  Well, the objection is sustained.

20  *BY MR. OGBORN:*

21  *Q.*  Ms. Mazone, with regard to some of these complexities --

22  whatever they may be, diagnoses or anything else -- do they

23  factor into -- do you have an independent judgment you use to

24  alter the life care plan in any way?

25  *A.*  I don't understand your question.

444

Francine Mazone – Cross

1  Q.  When you do your life care plan, are you making your

2  independent decisions about care that is to be received in the

3  future, or is it based on what the doctors say?

4  A.  Both.  I think it's both.  As a nurse case manager, I often

5  suggest, recommend to the provider certain treatments.  That is

6  kind of what happens when I send these questionnaires to the

7  doctors.  But I can't -- I mean, if we were in a clinical

8  setting, I couldn't order those things.

9  Q.  And that's -- and, really, my question goes to this,

10  Ms. Mazone:  If you believed there was a condition, would you

11  just add it into your life care plan without a medical treater

12  indicating that that was appropriate?

13  A.  Absolutely not.  The medical opinions are the foundation

14  for the life care plan.

15  Q.  Do you have -- based on doing this for decades, do you have

16  a level of confidence that Ms. Houston's life care plan is

17  appropriate?

18  A.  Yes.  I'm very confident that this is a very appropriate

19  life care plan for Ms. Houston.

20        MR. OGBORN:  I have no further questions.

21        THE COURT:  Cross-examination, please.

22                    **CROSS-EXAMINATION**

23  BY MR. SCARPATO:

24  Q.  Good morning, Ms. Mazone.  My name is Bill Scarpato.  We

25  haven't met yet, but I'm here on behalf of the government this

Francine Mazone – Cross

1    morning.  Thank you for being here.

2    *A.*  Thank you.

3    *Q.*  I'd like to start off by asking about a couple of the

4    changes in your life care plan that we learned about 15 hours

5    ago.  Your life care plan table of March of this year, which I

6    believe we were just looking at, included acupuncture; true?

7    *A.*  No, I don't believe so.  Not this year.  In March of this

8    year are the spreadsheet tables, they look like Excel tables.

9    This -- this one --

10   *Q.*  I'm referring to Exhibit 19; correct?

11   *A.*  This is September of last year.

12   *Q.*  Okay.  So your September tables of last year, they included

13   acupuncture; true?

14   *A.*  Yes.

15   *Q.*  And when you revised your life care plan in March to add

16   additional costs for orthopedic surgery, you did not remove

17   acupuncture from these September tables; true?

18   *A.*  I did not remove acupuncture from these tables, that's

19   true, because I didn't revise the life care plan.  I just

20   supplemented it with those two specific surgeries.

21   *Q.*  So you supplemented it, but you didn't revise it?

22   *A.*  Correct.

23   *Q.*  And you included the acupuncture in that September table

24   because it was necessary to accommodate Ms. Houston's permanent

25   disabilities; correct?

Francine Mazone - Cross

1    *A.*  It was included in the life care plan as a component of her

2    pain management.

3    *Q.*  And the recommendations noted in your life care plan tables

4    were necessary to accommodate Ms. Houston's permanent

5    disabilities; correct?

6    *A.*  I would call them her functional limitations.  And -- which

7    includes permanent disabilities, but -- yes.

8    *Q.*  And that care would have been -- however you qualified the

9    conditions you are addressing, that care that was listed in

10   your tables was necessary to treat it; right?

11   *A.*  Yes.

12   *Q.*  Two weeks ago, you had a prep session with Mr. Ogborn for

13   this trial; correct?

14   *A.*  About then, yes.

15   *Q.*  And you discussed the acupuncture in that prep session;

16   true?

17   *A.*  Yes.

18   *Q.*  And you discussed that Ms. Houston had never actually done

19   acupuncture; right?

20   *A.*  Yes.

21   *Q.*  And so you removed your provision for acupuncture from your

22   life care plan; right?

23   *A.*  No.  No, I have not removed it.

24   *Q.*  Would it surprise you to hear that the economist who

25   calculated the present value of your life care plan tables has

Francine Mazone – Cross

1   not included acupuncture on that calculation?

2   *A.*  Would it surprise me?  I would ask why.

3   *Q.*  Me too.

4        So you're not aware that acupuncture is no longer a

5   part of the treatments for which Ms. Houston is seeking

6   compensation in this case?

7   *A.*  I don't know that part of this trial.

8   *Q.*  So you're not aware that a deletion of the acupuncture

9   treatment changes the present value of your recommendation by

10  between 17 and about $29,000?

11  *A.*  I'll take your word that that's the amount that it would

12  reduce it by if it were removed.

13  *Q.*  And your life care plan tables also include some provision

14  for physical therapy.  I believe you testified to that earlier

15  this morning; correct?

16  *A.*  Yes.

17  *Q.*  And your original September table included PT of three

18  times a week for the rest of Ms. Houston's life; correct?

19  *A.*  Yes, sir.

20  *Q.*  And you included that because it was a necessary treatment,

21  as well; right?

22  *A.*  Yes.  And recommended by her physician.

23  *Q.*  In fact, it was recommended by Dr. Lewis, the pain

24  specialist; true?

25  *A.*  Yes.

Francine Mazone – Cross

1   Q.   And in your recent trial prep session with Mr. Ogborn, you

2   decided that the PT wasn't a reasonable recommendation either;

3   right?

4   A.   No, that's not what we decided.

5   Q.   Well, you decided in that prep session that the amount of

6   PT in the plan was more than Ms. Houston would actually need;

7   right?

8   A.   Yes.   The original was for three times a week, and the

9   current treatment is for one to two times a month, so it was

10  reduced.

11  Q.   And you also decided that the amount of PT was more than

12  any insurance company would pay for in your prep session;

13  right?

14  A.   We didn't discuss any insurance company in the prep

15  session.

16  Q.   And so I guess I probably know the answer to this question

17  at this point, but I'll ask it anyway.   Are you aware that the

18  reduction of the PT that you've discussed reduces the present

19  value of the treatment in your life care plan by nearly

20  $1.4 million?

21  A.   If that's what Mr. Opp, the economist, has calculated, I

22  will trust that number; but I didn't know what it was.

23  Q.   So you're not aware whether that's nearly an 84 percent

24  reduction on the value of the PT that you had originally

25  included in your plan in September of 2019?

Francine Mazone – Cross

1    A.   No.  As I testified earlier, I didn't total the cost of

2    this total life care plan, and I haven't seen the Opp report,

3    so I don't know other than what I have been told previously

4    what it was.

5    Q.   And there are other deletions in your plan in addition to

6    the PT and in addition -- well, in addition to the PT; right?

7    A.   Whatever it is that I testified to earlier would be the

8    changes in the life care plan.  I don't know about any -- oh,

9    the deletion of the home healthcare, yeah.  Ten years of that.

10   Q.   And for the record, your testimony this morning was the

11   first that the United States had heard about that reduction, so

12   I appreciate that explanation.

13            Are you aware that the total value of the

14   recommendations in your life care plan have been reduced over

15   the course of the last 13 hours by roughly 33 to 73 percent?

16   A.   I was not aware of that until you just said it.

17   Q.   And you included all of those provisions that aren't in

18   there anymore because they were necessary, as far as you knew

19   back in September 2019; right?

20   A.   I originally included them because they were recommended by

21   the providers and were reasonable at that time.

22   Q.   And those are the same doctors who made the other

23   recommendations in your plan; right?

24   A.   Yes.

25   Q.   So I'd like to shift gears from the changes in your plan

450

Francine Mazone - Cross

1   and talk with you a little bit about your retention in this

2   case.  Ms. Houston's law firm hired you; correct?

3   *A.*  Yes.

4   *Q.*  And the life care plan you prepared is meant to set out all

5   of the care that could potentially be needed over the course of

6   the patient's lifetime; true?

7   *A.*  It outlines the care that is more likely than not to occur

8   during her lifetime.

9   *Q.*  And that included the 83 -- 73 percent in costs that are no

10  longer with us today; right?

11  *A.*  In September of 2019, yes, it included that.

12  *Q.*  And your life care plan projects costs over the next 26.4

13  years, I believe you said; right?

14  *A.*  Yeah.  I think 26.5 -- 27 years, yes.  It would be 26 now

15  this year.

16  *Q.*  And so between a third and about three-quarters of those

17  costs haven't survived a year, have they?

18          *MR. OGBORN:*  Objection.  Foundation.

19          *THE COURT:*  Overruled.

20          *THE WITNESS:*  Can you ask that -- what do you mean?  I

21  don't quite understand what you're saying.  That the

22  recommendation -- go ahead.

23  *BY MR. SCARPATO:*

24  *Q.*  Sure.  The recommendations -- the value of the

25  recommendations which you say will be needed over the course of

451

Francine Mazone – Cross

1    the next 26.4 years, between one-third and three-quarters of

2    the value of those recommendations have not survived the year

3    since you prepared your life care plan; true?

4    *A.*   They've changed.  Yes.  And I think we also at the same

5    time have to recognize that there are changes in other things,

6    like the Adderall.  The cost of medication has gone up.

7    *Q.*   I'd like to ask you a couple of questions about your

8    qualifications.  You're a registered nurse; correct?

9    *A.*   Yes.

10   *Q.*   And do I have it right that the last time you did any

11   hands-on nursing in a clinical setting was around 1990?

12   *A.*   Yes.

13   *Q.*   And in addition to being a registered nurse, you also hold

14   a number of licenses dealing with case management or life care

15   planning; true?

16   *A.*   Those are certifications, not licenses.

17   *Q.*   Thank you for that clarification.

18         You don't have a master's degree; true?

19   *A.*   No, I do not.  That is true.

20   *Q.*   You're not an advanced practice nurse; correct?

21   *A.*   I'm not a nurse practitioner.  No.

22   *Q.*   And you don't hold a medical degree?

23   *A.*   No, not at all.

24   *Q.*   So none of your credentials grant you the authority to

25   write prescriptions?

Francine Mazone – Cross

1   A.   I do not have prescriptive authority as an RN.

2   Q.   And does your RN licensure permit you to diagnose

3   conditions?

4   A.   As a nurse, I can do what is called a nursing diagnosis,

5   which is the response to a medical diagnosis.  I cannot provide

6   a medical diagnosis.

7   Q.   And so if a physician has diagnosed a patient, you'd defer

8   to that diagnosis; right?

9   A.   Yes.  But I don't just blindly defer to it.  If a physician

10   diagnosed a patient, and I have met the patient, I've read the

11   medical records, I know about the patient, and their symptoms

12   don't point to that diagnosis, I would ask that physician to

13   please explain how he or she arrived at that.

14   Q.   Are you aware that since you prepared your original life

15   care plan, Ms. Houston went ahead with a series of lumbar

16   sympathetic block injections?

17   A.   Yes.

18   Q.   And so are you aware that those block injections failed to

19   conclusively alleviate Ms. Houston's pain?

20   A.   Yes.  I've read the medical records relative to that.

21   Q.   So you're aware that since you prepared your original life

22   care plan, Ms. Houston also went ahead with a spinal cord

23   stimulator trial; true?

24   A.   Yes.

25   Q.   And if you've reviewed the records, you'd also be aware

Francine Mazone - Cross

1   that the spinal cord stimulator trial only led to a placebo

2   response; true?

3   A.  Yes.  Dr. Lewis' records talk about there being a

4   mechanical component to the pain.

5   Q.  And Dr. Lewis also concluded that moving forward with a

6   permanent implant of the spinal cord stimulator would likely

7   lead to an eventual failure of the treatment; true?

8   A.  Yes.

9   Q.  And Dr. Lewis concluded that therapy is not of use to

10  Ms. Houston now; correct?

11  A.  At this time, yes.

12  Q.  And so you reviewed Dr. Lewis' record.  You didn't have any

13  other type of communication with him; true?

14  A.  That's correct.  Yes.

15  Q.  And your life care plan still has lumbar sympathetic block

16  injections on it; true?

17  A.  Yes.

18  Q.  And it still has a spinal cord stimulator trial on it;

19  correct?

20  A.  Yes.

21  Q.  And I suppose -- well, I'll ask the question.  Are you

22  aware that Mr. Opp, the economist, calculated the present value

23  of those items related to the lumbar sympathetic block

24  injections and spinal cord stimulator trial of being up to

25  $1.2 million?

454

Francine Mazone - Cross

1    A.  I have not seen his report, so I don't know how he

2    calculated those numbers.

3    Q.  So your life care plan includes some potential alternative

4    treatments; correct?

5    A.  Such as -- what do you define as alternative?

6    Q.  So if one set of treatments on the plan is successful, that

7    would mean that another set of treatments on the plan wouldn't

8    be necessary; right?

9    A.  Correct.  Yes.  Correct.

10   Q.  So, for example, in your plan you've noted that ibuprofen

11   may not be needed if the sympathetic blocks or spinal cord

12   stimulator are successful in relieving pain; right?

13   A.  Yes.  That's what it says.

14   Q.  And there are a number of items on your life care plan that

15   have the same note, they may or may not be needed if the

16   sympathetic blocks or spinal cord stimulator are successful;

17   true?

18   A.  Yes.

19   Q.  So you list all of those treatments, and you also list the

20   block injections and the spinal cord stimulator.  And so my

21   question to you is:  Am I understanding from this correctly

22   that you've set out two sets of treatments, one of which will

23   not be necessary if the other is successful?

24   A.  Wherever it says "may not be needed" -- "may or may not be

25   needed if spinal cord stimulation is successful" doesn't mean

Francine Mazone – Cross

1    that all of those that say "may or may not be needed" would be

2    removed if it was a successful placement.  Maybe one would be

3    removed and to augment with the other; so it's impossible to

4    say that they -- which ones would be removed.

5    Q.  And it's impossible to say because it's difficult to

6    predict the type of treatment she'd need in the future?

7    A.  No.  It's not difficult to predict the treatment she needs

8    in the future.

9    Q.  And so for those alternative items that may or may not come

10   off, depending on the success of other treatments, that means

11   that if we just add up the average cost of each of the

12   individual items on your life care plan, that won't necessarily

13   be an accurate estimate of the cost of Ms. Houston's future

14   treatment; right?

15   A.  I think if Mr. Opp does his -- does the work that he's

16   expert in, based on -- and includes what's in the life care

17   plan, that is a reasonable estimate for her future care.

18   Q.  So the reasonable estimate would include both the

19   sympathetic block injections and the spinal cord stimulator

20   trial and the various items that you say may or may not be

21   needed, depending on the success of those injections and the

22   stimulator trial?

23   A.  Having not seen Mr. Opp's record, I can't tell you how he

24   does it.  Did he include those?  Didn't he include those?  That

25   would be a better question I think for him.

456

Francine Mazone – Cross

1   *Q.*  And one thing you did to prepare your report was to send

2   questionnaires to some of Ms. Houston's treating providers;

3   right?

4   *A.*  Yes.

5   *Q.*  You didn't send them to all of the providers that,

6   according to Ms. Houston, treated her because of the accident;

7   true?

8   *A.*  That's correct.  I would not, for example, send one to a

9   doctor she saw three years ago that she is no longer seeing,

10  because I know what they would say.

11  *Q.*  So you decided to send forms to Dr. Ellen Price;

12  Dr. Kenneth Lewis, the pain specialist; Dr. Edith Johnston, her

13  counselor; and Lisa Jacobson, the speech therapist.  Do I have

14  that right?

15  *A.*  Dr. Ellen Price, Dr. Lewis, Dr. Johnston, and the speech

16  therapist, yes.  Her current treating providers.

17          *MR. SCARPATO:*  And, your Honor, I do note the time.

18  I'm happy to take the mid-morning break.  I'd defer to your

19  preference.

20          *THE COURT:*  We'll be in recess.

21          (Recess at 10:48 a.m.)

22          (In open court at 10:52 a.m.)

23          *THE COURT:*  Thank you.  Continue.

24          *MR. SCARPATO:*  Thank you, Your Honor.

25

457

Francine Mazone – Cross

1   *BY MR. SCARPATO:*

2   *Q.* Welcome back, Ms. Mazone.  Before the break we were talking

3   about which physicians you had sent questionnaires to as part

4   of your preparation of your life care plan; and I believe it

5   was your testimony that you sent forms to her treating

6   providers -- her current treating providers.  True?

7   *A.* Yes.

8   *Q.* You didn't question at any point why Ms. Houston is seeing

9   her current treating providers, as opposed to others who have

10  seen her in the past for the same conditions; correct?

11  *A.* Not -- no, I don't think so.  I think when she and I spoke

12  on the phone, I have some recollection of she made a change;

13  but I don't recall why.

14  *Q.* And you said this morning that you had intended to have an

15  in-person visit with Ms. Houston, but the pandemic got in the

16  way.  Am I summarizing that appropriately?

17  *A.* Yeah.  So I testified that I planned on meeting her in

18  person in the spring, and along came COVID.

19  *Q.* And you disclosed your life care plan on September 30,

20  2019.  That's last year; right?

21  *A.* Yes.

22  *Q.* Did you make any attempts to have a socially distanced

23  visit of the sort that we're doing in our individual rooms

24  today?

25  *A.* No, because I'm an at-risk person.  I wasn't going to take

Francine Mazone – Cross

1    a trip to Grand Junction.

2    Q.  Understood.  Did you attempt to conduct a videoconference

3    of the sort we're doing today?

4    A.  No.

5    Q.  Now, I'm sorry I can't get off this subject; but I'd like

6    to ask you a couple more questions about Dr. Lewis' PT

7    recommendation.  You said this morning that about the first ten

8    years of that physical therapy shouldn't be on your plan

9    anymore because Ms. Houston hasn't -- excuse me.  I'm sorry.  I

10   have that confused with the home health aide.  We'll get there

11   in a moment.

12          On the PT, at no point in your life care plan did you

13   make an allowance for Ms. Houston needing less frequent

14   physical therapy if it leads to increased functioning; right?

15   A.  The life care plan reflects Dr. Lewis' recommendation for

16   three times a week for her lifetime, and I -- I put under that

17   in the table, Dr. Lewis' comment, "may or may not be needed."

18   Q.  So that wasn't quite my question.  My question was --

19   A.  I'm sorry.

20   Q.  -- you didn't make any allowance for Ms. Houston needing

21   less frequent physical therapy if it leads to increased

22   functioning; right?

23   A.  Only just by the comment that is in the life care plan.

24   Q.  And you didn't specifically allow for any changes in the

25   frequency of the visits as Ms. Houston ages; correct?

Francine Mazone – Cross

1    A.   No.   Because he recommended lifetime.

2    Q.   And when you make a life care plan, you're supposed to use

3    knowledge of human growth and development, including the impact

4    of aging on disability and function; right?

5    A.   Absolutely.   Particularly the effects of aging on the

6    person's disability.

7    Q.   In your opinion, the basis of a life care plan is the

8    presumption everything in it is more likely than not necessary;

9    correct?

10   A.   Correct.

11   Q.   The treatment should be included if there is a 51 percent

12   likelihood of it being needed; right?

13   A.   Yes.

14   Q.   I'd like to take a quick look at the letter you wrote to

15   the providers when you sent them those questionnaires.   And the

16   first paragraph of that document, I'm going to try to pull --

17   A.   Pardon me --

18   Q.   We're going to pull it up on the screen for you.   Are you

19   able to see it on the screen?

20   A.   The letters are pretty much the same, although there is

21   some minor differences in each letter.

22   Q.   Okay.

23   A.   But it's -- yes, I can see it.   And I have -- I have one in

24   front of me.

25   Q.   Okay.

Francine Mazone – Cross

460

1    A.   Which one is that?  Who is that to?  Dr. Lewis.

2    Q.   That's to Dr. Lewis.  And the first paragraph says that

3    Ms. Houston's attorney has asked you to analyze her future

4    medical and rehabilitation needs secondary to her disability

5    and injuries which occurred on 12/1/2016.  Did I read that

6    correctly?

7    A.   Yes.

8    Q.   And you provided them a questionnaire along with this

9    letter; right?

10   A.   Yes.

11   Q.   If we could go down to the fourth paragraph.  It should

12   begin, "I am enclosing."

13        And this paragraph says in its second sentence, "It's

14   not necessary to provide" –– "to prepare a narrative response

15   or send medical records.  Rather, for your convenience and ease

16   of response, a questionnaire, which you can complete by hand,

17   has been attached in order to outline the information."

18        Did I read that correctly?

19   A.   Yes.

20   Q.   Okay.  So you didn't have the doctors prepare a narrative;

21   true?

22   A.   I did not request that they do so; that's true.

23   Q.   And you didn't ask them to explain themselves any further

24   other than filling out that questionnaire; right?

25   A.   Only in that in the questionnaire, I give them space for

Francine Mazone - Cross

1    comments.

2    Q.  And those questionnaires are between one and three pages;

3    correct?

4    A.  In this case, yes.

5    Q.  And they -- you had them fill them out by hand?

6    A.  Yes.  Sometimes they type them.

7    Q.  And so nowhere in that letter that we were just looking at

8    do you explain that the provider should employ the 51 percent

9    standard in listing out the treatments in their questionnaire;

10   true?

11   A.  I don't use the word 51 percent.  What I do say is -- in

12   the third paragraph, which you didn't talk about -- "I realize

13   it can be difficult to pinpoint exactly what a person's future

14   medical care regime may include.  However, for purposes of

15   estimating future treatment and costs at this point in time, I

16   would appreciate your opinion within reasonable medical

17   probability."

18   Q.  And you don't define for the providers "reasonable medical

19   probability"; correct?

20   A.  No, I didn't.

21   Q.  I'd like to shift gears and talk with you a little bit

22   about diagnoses.  In order to have -- in order to do a life

23   care plan, you have to have an understanding of the patient's

24   diagnoses; correct?

25   A.  Yes.

Francine Mazone - Cross

1    *Q.*  And you need to get the right diagnosis when you're

2    planning a patient's care; true?

3    *A.*  I rely on the medical records and the treating providers

4    for the correct diagnosis.

5    *Q.*  As a general matter, as a medical professional, you need to

6    get the right diagnosis when you're planning a patient's care;

7    right?

8    *A.*  Yes.

9    *Q.*  You need to get the diagnosis right so that you can

10   properly treat the illness; true?

11   *A.*  Well, I don't need the diagnosis, so I don't get it right.

12   I rely on the medical records of the treating providers as to

13   what the patient's diagnosis is.

14   *Q.*  You're not here to render an opinion on any of the

15   diagnoses that led to the suggested treatment in your life care

16   plan; true?

17   *A.*  No.  I can't make a medical diagnosis.

18   *Q.*  And so if any of the diagnoses set out in your life care

19   plan is incorrect -- are incorrect, the impact of that on your

20   plan of care would be a question for the providers, not for

21   you; true?

22   *A.*  Yes.  I believe I testified to that in my deposition.

23   *Q.*  And so I have one housekeeping item that I'd like to take

24   care of with you, Ms. Mazone.  One of the things that you

25   relied on in formulating your life care plan was a preinterview

Francine Mazone – Cross

1   form from Ms. Houston; correct?

2   *A.*   Yes.

3   *Q.*   We're going to put up that questionnaire for you here, once

4   we can get it up on the screen.  Page 5 of the PDF.

5         Great, that's perfect.

6         So we're showing on the screen, Ms. Mazone, a document

7   that has been marked and admitted as Exhibit 68; and we're

8   showing you page 5, at the top right-hand corner.  Can you see

9   where it says "person completing the form"?

10  *A.*   Yes -- well, I have my hard copy here, yes.  I'm looking at

11  that.

12  *Q.*   And that person's name is Cindy Waller; correct?

13  *A.*   Yes.

14  *Q.*   And Cindy Waller is the paralegal for Ms. Houston's law

15  firm; true?

16  *A.*   Yes.

17  *Q.*   So it's your understanding that this form was at least

18  completed with the assistance of Ms. Waller?

19  *A.*   My understanding is that Ms. Waller completed the form with

20  input from Tracy Houston.

21  *Q.*   And so now we'll talk about the home health aide.  You

22  testified this morning that the first ten years of the home

23  health aide provision in your life care plan should come off

24  because Ms. Houston hasn't seemed to need a home health aide.

25  Am I summarizing that correctly?

464
Francine Mazone – Cross

1   *A.*  I think that's what I said.  Yes.

2   *Q.*  Are you aware that Mr. Opp, the economist, has included

3   home health aide expenses from 2020 through 2030 and, indeed,

4   through the rest of Ms. Houston's life span -- expected life

5   span?

6   *A.*  Again, I haven't seen his reports, so I don't know -- go

7   ahead.

8   *Q.*  So if his report has expenses for a home health aide from

9   2020 through 2030, those should come off now; true?

10  *A.*  2019, yeah.  The beginning of the life care plan.  Yes.

11  *Q.*  Okay.  And you included that home health aide originally

12  for three to five times a week starting last year, 2019, for

13  the rest of Ms. Houston's life because that was on Dr. Ellen

14  Price's questionnaire; true?

15  *A.*  That's what she recommended, yes, in her questionnaire.

16  *Q.*  And you testified to it this morning, Ms. Houston doesn't

17  have a home health aide now; right?

18  *A.*  As far as I know, she does not.

19  *Q.*  In fact, she hasn't had one since January 2017, the month

20  after the accident; true?

21  *A.*  That's my understanding.  Yes.

22  *Q.*  And you're aware that Ms. Houston is currently able to

23  drive?

24  *A.*  Is currently able to drive?

25  *Q.*  Correct.

465

Francine Mazone – Cross

1   A.  Is that what you said?  Yes.

2   Q.  And you're aware that she's able to do her personal hygiene

3   independently?

4   A.  Yes.

5   Q.  And she can dress herself by sitting down?

6   A.  Yes.

7   Q.  I'm sorry.  Was that a yes?

8   A.  Yes.  I'm sorry.

9   Q.  That's okay.  I just misheard you over the phone.

10         And she does her own laundry; true?

11  A.  Yes.

12  Q.  She has no difficulty eating; correct?

13  A.  Right.  She can feed herself without any problems.

14  Q.  And she shops independently?

15  A.  She sometimes I think has groceries delivered, or her

16  neighbors helped her with that.  That was based on my interview

17  with her.

18  Q.  Okay.  So it's your testimony today that Ms. Houston

19  doesn't shop independently?

20  A.  I said she sometimes has groceries delivered because the

21  grocery store is so overwhelming for her.  I note that in my

22  report, and I just can't find it right this minute.

23  Q.  She does housework and maintenance independently; true?

24  A.  As far as I know, yes.

25  Q.  And you included that home health aide originally because

Francine Mazone - Cross

1   that's what Dr. Price said; right?

2   A.   Yes.   In Dr. Price's questionnaire, I said, is there

3   anything else that you would add or she needs; and she said,

4   home health aide.   And that's --

5   Q.   You didn't -- sorry.   I didn't mean to interrupt you.

6   A.   I just said, that's why I included it in the life care

7   plan.   That is one of the cases where the physician is able to

8   expand on their recommendation.

9   Q.   And you didn't have any type of follow-up communications

10  with Dr. Price to confirm or clarify that recommendation; true?

11  A.   I didn't feel the need to.   Yes, that's true.

12  Q.   But two weeks ago, you had a conversation with

13  Ms. Houston's attorney; and you took the home health aide off.

14  Right?

15  A.   Yes.

16  Q.   Are you aware that Mr. Opp, the economist, calculated the

17  present value of the home health aide as between 160 and

18  $655,000?

19  A.   I haven't -- excuse me.   Again, I haven't -- again, I

20  haven't seen his report.

21  Q.   One moment, Ms. Mazone.

22        So, Ms. Mazone, are you aware of what the current

23  calculation is of the present value of your life care plan

24  recommendation?

25  A.   The current one?   No.   I am not aware of that.   When you

Francine Mazone - Redirect

1    say "current," I'm figuring that you're meaning based on the

2    corrections done yesterday and the changes that we've talked

3    about.

4    Q.  And apparently this morning as well.  Yes.  So -- well,

5    I'll save that question for Mr. Opp.

6         Those are my questions.  Thank you, Ms. Mazone.

7    A.  Thank you.

8         THE COURT:  Redirect.

9                      **REDIRECT EXAMINATION**

10   BY MR. OGBORN:

11   Q.  Ms. Mazone, just a few things.  Why make changes to a life

12   care plan before you're coming in to testify?

13   A.  To reflect the patient's current status.

14   Q.  Accuracy is important?

15   A.  I'm sorry?  I didn't hear you.

16   Q.  Is accuracy important to you?

17   A.  Accuracy is very important to me.  Yes.  Which is --

18   Q.  The life care plan -- I'm sorry, go ahead.

19   A.  No, I'm sorry.  Go ahead.

20   Q.  The life care plan -- in cross-examination, you indicated

21   that the life care plan still includes both lumbar sympathetic

22   blocks as well as a spinal stimulator.  Why include both in the

23   life care plan?

24   A.  Because based on what Dr. Lewis wrote in his report, that

25   there is a mechanical component of her pain, once that is

Francine Mazone – Redirect

 1   addressed, she may still have the neuropathic pain.  And

 2   that -- the sympathetic blocks and the trial and the spinal

 3   cord stim would address that.

 4   Q.  Even though she's been through one trial of the spinal

 5   stimulator, that's still included in your life care plan; why

 6   is that?

 7   A.  Because if they -- if she continues to have the neuropathic

 8   pain that it doesn't resolve, then she would -- that would be a

 9   modality, again, to address that pain.  Because she's got these

10   two components of pain.

11   Q.  Let me move on to physical therapy.  You have it in there

12   twice a month, and it was in there three times a week.  Is

13   there more than one type of physical therapy that can be

14   utilized by a chronic pain patient?

15   A.  Oh, yes.  Many.  And I -- I think Ms. Houston has actually

16   done some of those.  Like, she's done mirror therapy and, like,

17   strengthening, range of motion type of physical therapy.

18   Physical therapists have become quite specialized.

19   Q.  If one had physical therapy three times a week or multiple

20   times in a month, does it mean you're doing the same thing over

21   and over again?

22   A.  No.  Not at all.  You can be doing totally different

23   things.  Like, you could be working on range of motion in your

24   ankle; and then you could also be working on desensitization,

25   for example.

Francine Mazone - Redirect

1    *Q.*  Mr. Scarpato asked you about diagnosis and how important

2    that is.  Your life care plan, if it turns out that there was

3    no traumatic brain injury or CRPS, would that impact the

4    treatment you have in there for the symptoms she's

5    experiencing?

6         *MR. SCARPATO:*  Objection, Your Honor.  Foundation.

7         *THE COURT:*  Sustained.

8    *BY MR. OGBORN:*

9    *Q.*  Let me -- is your life care plan depending on a diagnosis,

10   or is it depending on what the doctors are telling you they

11   think the treatment is needed?

12   *A.*  The tables in the life care plan reflect the physicians'

13   opinions, which, again is the medical foundation for the life

14   care plan.

15        *MR. OGBORN:*  No further questions, Your Honor.

16        *THE COURT:*  Thank you.

17        May she be excused from her subpoena?

18        *MR. OGBORN:*  Plaintiffs would ask that she be excused,

19   Your Honor.

20        *THE COURT:*  Mr. Scarpato, you thought you might call

21   her again.  What's your position?

22        *MR. SCARPATO:*  We do not anticipate recalling

23   Ms. Mazone, no, Your Honor.

24        *THE COURT:*  All right.  You're excused from your

25   subpoena.  Thank you, Ms. Mazone.

Edith Johnston - Direct

1          *THE WITNESS:*  Thank you, Your Honor.

2          *THE COURT:*  Next witness, please.

3          *MR. SHAPIRO:*  Your Honor, at this time we would call

4    Dr. Edith Johnston.

5          *THE COURT:*  Doctor Johnston, can you hear me?

6          *THE WITNESS:*  Try again.  Yes, sir.

7          *THE COURT:*  Can you swear in the witness.

8          *COURTROOM DEPUTY:*  Could you please raise your right

9    hand.

10              (**EDITH JOHNSTON, PLAINTIFF'S WITNESS, SWORN**)

11         *COURTROOM DEPUTY:*  Please state your name and spell

12   your first and last name for the record.

13         *THE WITNESS:*  Edith D. Johnston.  J-O-H-N-S-T-O-N.

14                      **DIRECT EXAMINATION**

15   *BY MR. SHAPIRO:*

16   *Q.*  Good morning, Ms. Johnston.  Can you hear me?

17   *A.*  Yes, sir.

18   *Q.*  Okay.  Can you tell us your professional address, please.

19   *A.*  800 A Street, Delta, Colorado.  And it's Post Office 301,

20   Delta, Colorado.

21   *Q.*  What is your profession, Ms. Johnston -- Dr. Johnston?

22   Pardon me.

23   *A.*  I'm a licensed professional counselor and a certified rehab

24   counselor.

25   *Q.*  Can you explain what it is you do with your patients on a

Edith Johnston - Direct

1    day-to-day basis in your practice?

2    *A.*  When I work with patients -- my clients -- I assess and

3    collaborate with where they are at this particular moment and

4    what they see as not working for them in their lives, around

5    mental health issues, around disability adjustment, whatever

6    they feel is not working for them and figure out how to be able

7    to get to where they would like to be and what would work for

8    them in their day-to-day life to have the greatest functioning

9    and quality of life as possible.

10   *Q.*  What range of specific types of patients and specific types

11   of problems do you work with?

12   *A.*  Currently, I'm primarily working with adults.  Over the

13   years, I've worked with adolescents as well as adults.  And --

14   so the ages of 16 to 101.  As far as what kinds of things do I

15   work with?  I work with ADHD, anxiety, depression, PTSD,

16   cognitive impairments, learning disabilities, chronic pain,

17   mood disturbances.

18   *Q.*  Okay.  Do you also do acupressure?

19   *A.*  Yes, sir.  I'm certified both as an instructor and a

20   practitioner in Jin Shin Jyutsu.

21   *Q.*  Can you explain what that is and why you utilize it?

22   *A.*  Jin Shin Jyutsu is from Japan, and it is a very gentle

23   touch acupressure, which also allows them -- because it's done

24   with the fingers, it allows me to be able to teach clients how

25   to use it themselves.  And it will help mitigate both emotional

Edith Johnston – Direct

1  and physical pain, because it is a whole-body energetic

2  meridian system.

3  Q.  Did you -- have you done that with Ms. Houston?

4  A.  Yes.

5  Q.  Over the course of your career, how long have you been

6  practicing?

7  A.  My license as a professional counselor is from 1994, I

8  believe it is; and I've been practicing under that professional

9  counseling license since then.  But as a certified

10  rehabilitation counselor, I have over 30 years' experience.

11  Q.  How many patients have you treated with cognitive issues

12  from a brain injury or other types of issues?

13  A.  Several hundred.  I -- not extensive, but several hundred.

14  That's one of my specialties.

15  Q.  How about post-traumatic stress disorder?

16  A.  Yes.  One of my areas that I work in and contract with the

17  is the military, so PTSD is one of the areas I work with.

18  Q.  Can you explain what it is you do for military -- and you

19  say "contract with," what do you do for military personnel with

20  PTSD?

21  A.  Well, my contracts with military personnel is for active

22  duty, as well as veterans.  And I do counseling and pain

23  management, which involves both CBT and other modalities for

24  talk therapy, as well as using the acupressure as a means for

25  them to learn and also to facilitate them in managing the

Edith Johnston - Direct

1    symptoms.

2    Q.   How long have you worked with military personnel with PTSD

3    issues?

4    A.   Over 15 years.

5    Q.   What experience or background do you have in diagnosing

6    traumatic brain injuries?

7    A.   I do not diagnose directly brain injury; I don't do the

8    testing; I don't do the full-blown assessments; I work with

9    those with brain injuries to be able to learn how to function

10   better and look at the cognitive behavioral concepts to be able

11   to have functional quality of life.

12   Q.   What certifications do you have or have you had in

13   traumatic brain injury or brain injury?

14   A.   I've had -- in the past I've been certified as a brain

15   injury specialist -- CBIS -- which is shown that you have

16   knowledge and the skill set and reference points and experience

17   within working with those with brain injury.

18   Q.   What experience or background do you have in diagnosing

19   post-traumatic stress disorder?

20   A.   As a licensed professional counselor, I'm licensed to be

21   able to use the DSM in order to identify the mental health --

22   mental health diagnoses; and I have continuing education to

23   continue to keep my skill set up to date and be able to

24   diagnose and treat.

25   Q.   Do you teach classes on brain injury, and what are those

474

Edith Johnston - Direct

1  classes about?

2  *A.*  I've taught classes on brain injury over the years with --

3  in conjunction with BIAC grants, to be able to assist

4  individuals in understanding how to manage their symptoms; how

5  to be able to look at and reenter a workforce situation; how to

6  increase their functioning with skill sets, strategies,

7  modifications, again, to be able to gain greatest function.

8  *Q.*  You said BIAC.  What is BIAC?

9  *A.*  Brain Injury Alliance of Colorado.  And previous to that it

10  was actually with the association -- National Association of

11  Brain Injury.

12  *Q.*  Can you explain your philosophy of treatment?  Does the

13  specific diagnosis matter, or is it more what you're seeing or

14  trying to do?

15  *A.*  The diagnosis is a way to communicate a body of knowledge

16  and a body of symptomology.  My focus is on function.  What is

17  their ability -- abilities now; how are they functioning in

18  their day-to-day life; and how would they better be able to

19  function, to accomplish and engage in life the way they want

20  to.  So I focus on where they're at, where they want to go, and

21  how can they, and what they need to be able to get from where

22  they're at and where they would like to be.

23  *Q.*  How do you deal with the losses that people with these

24  disabilities or problems have?  How do you deal with that?

25  What is your role?

Edith Johnston - Direct

1    A.  Well, when people have a loss, there is a grief process.

2    And that grief process is not time limited.  They will

3    reexperience that brief process throughout their life with

4    finding out what they can and can't do again, what they had

5    done before.  So being able to integrate the limitations of

6    function that they have and set accommodations and/or

7    strategies to be able to improve or work within those

8    limitations is the main focus of adjusting to that grief, that

9    loss, and to be able to regain and integrate the person they

10   are and the person they want to be.

11   Q.  Do you diagnose post-traumatic stress disorder?

12   A.  As a mental health counselor, yes.  That's one of my

13   functions.

14   Q.  Anxiety?

15   A.  Yeah.

16   Q.  Depression?  We lost you there for a minute.

17   A.  Yes.

18   Q.  Yes, depression?

19   A.  Yes.  Are we okay now?  I said yes.

20   Q.  Okay.  I just wanted to --

21           Terri, are you getting her it?  Because I saw her

22   pixelate.

23           COURT REPORTER:  Yes, I am.

24           MR. SHAPIRO:  Thank you.

25

476

Edith Johnston - Direct

1   *BY MR. SHAPIRO:*

2   *Q.*  Other psychological conditions, do you diagnose those, as

3   well?

4   *A.*  Yes, as a licensed professional counselor and according to

5   the DSM.

6   *Q.*  Could you provide the Court with your educational

7   background, please.

8   *A.*  I have a bachelor's in sociology, a master's in

9   rehabilitation counseling, a master's in business

10  administration, and a doctorate in rehabilitation counseling.

11  *Q.*  Have you taken and continue to take continuing education

12  courses in post-traumatic stress disorder, traumatic brain

13  injury, or brain injury, anxiety, depression, chronic pain?

14  *A.*  Yes.

15  *Q.*  What licensures do you hold?

16  *A.*  I hold the Colorado state license for professional

17  counselor.

18  *Q.*  And what certifications do you hold?

19  *A.*  I'm a certified rehabilitation counselor, and I maintain

20  that one.  I have had other certifications over the years.  And

21  I'm a certified --

22  *Q.*  What --

23  *A.*  -- acupuncturist.

24  *Q.*  What other certifications have you had over the years that

25  you have -- have you just not continued those certifications?

477

Edith Johnston - Direct

1   A.  Yes.  I've chosen not to maintain certifications, and so

2   did not file the paperwork and the money.  I've been a

3   certified disability management specialist, certified brain

4   injury specialist --

5   Q.  Are you a psychologist?

6   A.  No.

7   Q.  Are you a vocational rehabilitation specialist?

8   A.  Yes.  I'm a certified rehabilitation counselor --

9   Q.  Are you --

10  A.  -- and that's part of that certification.

11  Q.  Are you a professional counselor?

12  A.  Yes.

13  Q.  Can you explain what that is and what you are qualified to

14  do?

15  A.  A professional counselor allows you to assess and provide

16  treatment for individuals with mental illness or mental health

17  issues.

18  Q.  Can you explain -- I'm sorry.  Go ahead.

19  A.  No.  I was going to say, I may not have answered the second

20  half of your question; but I think so.

21  Q.  So the second part of the question was, what is it that you

22  are qualified to do as a licensed professional counselor?

23  A.  Assess, evaluate, and treat individuals with mental illness

24  or mental health problems.

25  Q.  How would you -- well, can you explain your employment

Edith Johnston - Direct

1   history, what you've done and where over the years, please.

2   A.   I have been self-employed at least part time since 1990 as

3   a counselor and performed both duties as a rehabilitation

4   counselor and a licensed professional counselor in the mental

5   health field; I have worked for the Colorado state vocational

6   rehabilitation department; I have worked for IntraCorp, which

7   is a private company, subcompany -- subsection of CIGNA; I have

8   worked for a school district as a counselor in conjunction --

9   as a collaborative position with the local mental health

10  center; I've worked as a clinical director for Alternative

11  Youth Adventures.   That summarizes it.

12  Q.   Okay.   You indicated you were not a psychologist.   Are

13  you -- in what you do as a licensed professional counselor do

14  you do things traditionally; or how would you describe what you

15  do, in comparison to what a traditional psychologist does.

16  A.   I am not a psychologist.   And a psychologist's training

17  provides them to a skill set that is beyond what my training

18  is.   As a professional counselor and rehabilitation counselor,

19  my focus is on function for individuals; and, therefore, my

20  tools are more diverse than many mental health counselors are.

21  Which looks at mind, body and spirit, otherwise, physical as

22  well as mental aspects of how they're functioning in society

23  and functioning in their daily lives.   And I use, then,

24  strategies and approaches that will -- cognitive behavioral

25  traditional type of mental health, as well as being expanded

Edith Johnston - Direct

1   with pacing functional abilities, assessing the integration of

2   the physical dynamics with the mental dynamics.  And then I'm

3   also trained, as we said previously, in acupressure; so I use a

4   lot of the Oriental or energetic process to be able to have

5   individuals, again, have choices so they can choose what will

6   work best for them to be able to have the greatest function

7   they desire and are capable of.

8   Q.  You used the term -- you said "more diverse."  Was that

9   what you just described, or would you describe it differently?

10  A.  It's what I described and also in the sense of practical

11  application, looking at learning disabilities, how people

12  learn, what their cognitive processes are, as well as in what

13  is their mental health cognitive processes, emotional

14  processes, and physical functional abilities collaborated

15  together as a whole person.

16  Q.  How many times have you been involved in the legal process

17  as an expert or as a treater?

18  A.  A few times.  At one point in my history, I was a

19  board-certified vocational expert and worked in assessing

20  vocational aspects of individuals.  It's been over the last few

21  years, only three or four, maybe a half a dozen times.  Prior

22  to that, probably 100.

23          MR. SHAPIRO:  At this time, Your Honor, I would move

24  for the admission of Dr. Johnston as an expert in professional

25  counseling, rehabilitation counseling, disability management,

Edith Johnston - Direct                                        480

1    and a brain injury specialist.

2              *MS. BOBET:*  No objection.

3              *THE COURT:*  Counsel?  Pardon me?  I didn't hear you.

4              *MS. BOBET:*  No objection, Your Honor.

5              *THE COURT:*  The tender is accepted.

6              Go ahead, please.

7              *MR. SHAPIRO:*  Thank you, Your Honor.

8    *BY MR. SHAPIRO:*

9    *Q.*  What records have you reviewed, Doctor, besides your own

10   during your treatment of Ms. Houston?

11   *A.*  I have reviewed the psychological evaluations that were

12   presented here through this process and through her regular

13   medical records, as well as the medical background records

14   that -- from Kaiser and --

15   *Q.*  From where?  Sorry.

16   *A.*  From Kaiser, were her pre-existing medical records, as well

17   as the evaluations that had been involved in this process.

18   *Q.*  So let me just check that off.  You reviewed her prior

19   Kaiser records that had emotional or psychological records;

20   correct?

21   *A.*  Yes.  Yes.

22   *Q.*  Dr. Jones, an abbreviated neuropsychological assessment

23   that was done?

24   *A.*  Okay.  One of us froze.

25   *Q.*  You just did.  I hear you, though.

481

Edith Johnston – Direct

1              Are you there?

2    A.  I'm not getting anything at that point in time.  You froze.

3              Ask me again.

4    Q.  Okay.  You're back?

5    A.  I have it.

6    Q.  Dr. Jones, an abbreviated neuropsychological assessment

7    that was done?

8    A.  Yes.

9    Q.  The neuropsychological evaluation by Dr. Kalat?

10   A.  Yes.

11   Q.  The examination and evaluation by Dr. Goldman?

12   A.  Yes.

13   Q.  Were the prior issues from the Kaiser records important for

14   you for what you were doing with Ms. Houston?

15   A.  Information always helps.  Was that required or definitely

16   important with the way I work?  No.  I take the person from

17   where they are now and where they want to go.  And many times,

18   past things will come up; but it's not my focus.  Where are

19   they now, and where do they want to go?

20   Q.  What -- when did you start your treatment of Ms. Houston?

21   A.  April 2018.

22   Q.  How did Ms. Houston find you?  How did she get to you?

23   A.  She was a self-referral on her own research.

24   Q.  What history did you obtain from Ms. Houston when you

25   started your care and treatment?

Edith Johnston - Direct

1    *A.*  We discussed her purpose and her reason for coming.  I have

2    two screening tools that she completed for both what her

3    current medical and historical medical issues were, as well as

4    what her current mental health focus and presentation was.  And

5    she had described to me that part of her concern was the fact

6    that she was -- she did not feel the same as she had prior to

7    the accident.  So she identified the accident as a key changing

8    point for her.

9    *Q.*  Did you determine what was significant in her prior life,

10   as well as her daily life since the accident?

11   *A.*  Not in the initial.  The prior daily life was more of

12   what -- when we did a strength assessment, and what was the

13   differences between pre and post.  What she saw as her

14   differences, what she experienced as differences between her

15   pre and post condition, because she was very much focused on

16   the change that had taken place within her, that she was

17   experiencing.

18   *Q.*  What did you learn about the differences between her pre

19   and post situation?

20   *A.*  She was very aware and frustrated with the decrease in her

21   cognitive ability, the increase in emotions and the intensity

22   of the emotions, the lack of being able to manage her emotions,

23   the intensity of her fear and not being able to do any of the

24   things she had done previously because it triggered pain, it

25   triggered fear, it triggered anxiety, relative to the trauma

Edith Johnston - Direct

1   she had described she experienced.  I think that basically

2   summarizes it.

3   Q.  How many times have you treated Ms. Houston?

4   A.  I've seen her 31 times.

5   Q.  Are you continuing to see Ms. Houston at this point?

6   A.  Yes.

7   Q.  Doctor, within a reasonable degree of medical probability,

8   what diagnoses did you determine Ms. Houston has?

9   A.  We looked at an adjustment disorder and post-traumatic

10  stress syndrome and anxiety.

11  Q.  Can you provide the basis for those diagnoses for

12  Ms. Houston?  In other words -- are you there?

13          That's surprising.  That's the first time.

14          Your Honor, we're trying to reconnect.

15          THE COURT:  Yeah.  I understand.

16          THE WITNESS:  Okay.  I'm back.

17  BY MR. SHAPIRO:

18  Q.  Doctor, are you there?

19  A.  I'm here.  Can you hear or see me?

20  Q.  We can.

21  A.  Okay.  I just -- I had a beautiful white screen.

22  Q.  Let me go back to that question again.

23          Can you provide the basis for the diagnoses that you

24  have for Ms. Houston?

25          MS. BOBET:  I'm sorry.  Can we go back?  It was

Edith Johnston - Direct

1    cutting out a little bit.  The question before that, what were

2    the diagnoses?

3         MR. SHAPIRO:  No, we had the diagnoses.  Did you hear

4    that, Ms. Bobet?

5         MS. BOBET:  I'd ask the witness to answer again so

6    we've got it.

7         MR. SHAPIRO:  Thank you very much.

8    BY MR. SHAPIRO:

9    Q.  Can you provide the diagnoses that you determined existed

10   within a reasonable degree of medical probability for

11   Ms. Houston?

12   A.  The diagnoses that I identified were anxiety and

13   post-traumatic stress syndrome.

14   Q.  Any others?

15   A.  I was looking at disability adjustment, otherwise

16   adjustment to, which included both anxiety and depression at

17   that particular time.

18   Q.  Okay.  Have those diagnoses changed over the course of your

19   treatment?

20   A.  No.  Those diagnoses have remained the same through the

21   course of the treatment.  The intensity and the status relative

22   to those diagnoses have varied.

23   Q.  Okay.  Can you provide the bases for those diagnoses that

24   you determined for Ms. Houston?

25   A.  According to the characteristics for those diagnoses,

Edith Johnston - Direct

1    Ms. Houston provided evidence of -- according to the DSM --

2    Q.  What is the DSM?

3    A.  *Diagnostic and Statistical Manual* for mental health

4    diagnoses.

5    Q.  And is that a standard in your field for making diagnosis

6    and determining diagnoses?

7    A.  Yes.

8    Q.  Okay.  Thank you.  Please go ahead.

9    A.  The -- well, what she evidenced was sleep disturbances,

10   increased feelings of unsureness and uncertainty, confusion,

11   overwhelm, fear, fear for incidents -- items related to her

12   incident at the time of her injury.  She felt she could not

13   think straight, she could not process information.  That's

14   basically a summary of it.

15   Q.  Okay.  Did you determine or assume that there was a brain

16   injury, or did you not get to that, or did it not matter?

17   A.  Ms. Houston related that she felt she had a brain injury.

18   We went through different kinds of symptom descriptions

19   relative to it, and we looked at the cognitive issues, and we

20   addressed those cognitive issues with her understanding and

21   feeling that she had had a brain injury.

22   Q.  What specific cognitive difficulties have you observed with

23   Ms. Houston over the time that you have treated her?

24   A.  Slower processing time for being able to make decisions;

25   needing to both read and hear much of the information to be

Edith Johnston - Direct

1    able to process it; increased emotional responses, which

2    interrupt her cognitive processing of data and information; the

3    emotional being less managed -- the emotional being less

4    managed in choice and timing of expression.

5    Q.  Anything else?

6    A.  I think that basically covers it.

7    Q.  Which of the diagnoses that you provided caused cognitive

8    difficulties?

9    A.  Post-traumatic stress syndrome includes affecting the

10   cognitive ability and being able to process information.

11   Q.  Anything else?

12   A.  Those are -- that's the main one.  Anxiety -- high anxiety

13   just means -- is the fact that you're so focused on the

14   emotional dynamics that you're experiencing that we don't --

15   the emotions don't slow down enough for you to be able to

16   process a lot of data sometimes.

17   Q.  Can you provide us with a history that you obtained for

18   Ms. Houston that you utilized to assist with your treatment?

19   A.  She had described her accident; she provided me with an --

20   and indicated even on her report that she had been in a car

21   accident.  And then she identified the different areas of

22   emotional concerns that she had, as well as completing the

23   survey for the different types of physical concerns she had,

24   including sleep disturbances and pain in her left ankle, as

25   well as headaches and fatigue, and things like that.

Edith Johnston - Direct

1    *Q.* Did you obtain a history of how the accident happened, how

2    significant it was, or did that not matter?  What did you get

3    from the accident that was important for you to utilize?

4    *A.* She gave me a brief overview of what the accident was.  And

5    as far as all the details of the accident, it was not what we

6    focused at all or unnecessary for my process.  We looked at

7    what she felt was the residual impact and limitations and what

8    she wanted to be able to move forward with, and that's what we

9    focused on.

10   *Q.* So what was important in the facts and circumstances of

11   this crash that were important for your assessment, evaluation,

12   and treatment?

13   *A.* The -- will you repeat that question, please?

14   *Q.* Sure.  What were the facts and circumstances of the crash

15   that were important for your assessment, evaluation, and

16   treatment of her?

17   *A.* The crash, what -- the factors involved with the crash was

18   what she experienced -- physical pain and the physical damage

19   within her ankle and the fact that she had extreme fear from

20   situations that she reflected upon as being related or similar

21   to that one, and the increased cognitive overwhelm and

22   confusion that she was experiencing from trying to sort her

23   experience out.

24   *Q.* What situations were impacting her post-crash that you

25   needed to work on and have worked on with her?

Edith Johnston - Direct

1    *A.*   One basic one was -- because she actually resides in the

2    Grand Junction area, my office is in the Delta area, so one of

3    the first ones that came about that we were looking at was

4    driving.   There was an extreme fear and response to being able

5    to drive, so we worked with that.   Being able to take in

6    information, process information, being able to be able to set

7    up a consistent pattern to engage in daily activities or other

8    productive activities she wanted to, that was another aspect we

9    were looking at.   To be able to manage her thought processes,

10   her emotional processes, and the experience that was limiting

11   her on a day-to-day basis were things that we looked at and

12   addressed for helping her move forward with being able to be

13   greater functioning in a similar manner to what she had prior

14   to the accident.

15   *Q.*   What I'd like to do is go through a little more history,

16   and then I want to delve into what you just said.

17         Did Ms. Houston have history of any psychological

18   issues?

19   *A.*   In my review of the records and also her indication of

20   having some anxiety or concerns about being overwhelmed at

21   different times, she had given me that.   And in the review of

22   the Kaiser records that came up, there was also a past of

23   having depression and anxiety.

24   *Q.*   What were those situations in the past, and were they

25   significant for what you were going to do?

Edith Johnston - Direct

1    *A.* They were significant in the sense that she had experienced

2    a divorce and life experiences that created depression and

3    anxiety for her. I think in her records, there is a reflection

4    on some sort of childhood trauma also. And as that came to

5    surface, it just reiterated the fact that they were a component

6    in her current trauma, because those are experiences that are

7    with us all the time. My treatment didn't change, because it

8    was still taking her in as a whole person at this moment in

9    time and how and where does she want to move forward?

10   *Q.* The records that you saw the last time she had gotten any

11   psychological counseling, do you remember when that was prior

12   to the --

13   *A.* No.

14   *Q.* Okay. Do you recall from those records or do you have

15   those records in front of you regarding the date of 2005?

16   *A.* Oh, I recall, yeah -- I can recall the records indicated

17   about that time period. I couldn't give you an exact date or

18   anything.

19   *Q.* Did she have any depression, anxiety, or functional issues

20   for a significant period of time prior to this crash; or how

21   was she doing prior to this crash?

22   *A.* Immediately prior to this crash, she was functioning

23   independently, fully self-responsible, making decisions,

24   engaged in vocational activities work, as well as volunteer

25   work, and she was satisfied and felt comfortable in what she

Edith Johnston - Direct

 1   was doing.

 2   Q.   Were there any disabilities or limitations in her function

 3   prior to this crash?

 4   A.   Disabilities or lack of functioning?

 5   Q.   Yes.

 6   A.   She was able to engage in life in a manner that she was

 7   comfortable with and successful at, so there were no evident

 8   ones from her description of limitations or disabilities.

 9   Q.   How does the prior issues that you saw from 2005 and as a

10   child impact how this crash and how her injuries would affect

11   her or did affect her?

12   A.   The studies and the knowledge we know now from the work

13   that's been done is that cumulative trauma adds to and

14   increases the impact of trauma on each individual.  So they're

15   a component of it; but they're not the decisive part, because

16   she was able to function prior to the accident effectively at a

17   level that she desired to.

18   Q.   Prior to this crash, did she have a diagnosis of any

19   psychological issues that you're aware of?

20   A.   Immediately prior to the crash?  Not that I'm aware of.

21   Q.   Did she carry a diagnosis prior to this crash of

22   post-traumatic stress disorder?

23   A.   Not that I'm aware of.

24   Q.   Traumatic brain injury?

25   A.   Not that I'm aware of.

Edith Johnston - Direct

491

1   *Q.*  Any cognitive difficulties?

2   *A.*  Not that I'm -- not that I know of.

3   *Q.*  Chronic pain?

4   *A.*  No, not that -- that's indicated in anything that she gave

5   to me or that I read.

6   *Q.*  How would you describe Ms. Houston's intellect prior to the

7   crash, based on what you're aware of?

8   *A.*  The description and the exchange that Ms. Houston and I

9   have indicated that she had above-average intellect with the

10  way she was able to solve problems, her creativity, her ability

11  to process information, and to apply that information.

12  *Q.*  How much of that intellect or cognition or mentation was

13  affected by this crash?  What percentage can you provide to us?

14  *A.*  I don't have pre and post testing; so, therefore, I don't

15  have specifics to be able to run an actual formula.  But it's

16  not uncommon and the way she expressed her abilities and her

17  lack of being able to perform the same cognitions post as

18  prior, I would say easily 15 percent.

19  *Q.*  Can you describe who Ms. Houston was -- and still is --

20  prior to this crash?  How would you describe her?

21  *A.*  She presented -- because it's self-report -- is that she

22  was an independent, self-directed, determined, practical

23  individual that could set goals, achieve goals, and would be

24  willing to commit to and engage in whatever was necessary to

25  achieve the results that were desired.

Edith Johnston - Direct

1    *Q.* Can you explain to this court who Ms. Houston is, how her

2    mind works, and what she needs to assist her with recovering

3    from this?

4    *A.* Ms. Houston has slow processing.  And this is evident in

5    when she pauses, when she thinks through, when she will ask for

6    clarification of information you're giving her, wanting time to

7    process it, not making decisions immediately, but taking longer

8    time to think it through and look at all of the dynamics that

9    would affect her and impact her to be able to make choices.

10   She's determined.  She desires to continue to be

11   self-sufficient.  She is an individual that acknowledges her

12   independent upbringing, rural upbringing, and sees that as

13   strong -- as one of her strengths and one of her values to be

14   able to move forward.  She knows that overall pacing is now

15   required.  Otherwise, if she becomes exhausted, overdoes it,

16   has overstimulus, overinput, that her clarity of thinking and

17   her processing speed isn't as -- the same as it was prior; and

18   so she knows that she will need breaks and be able then after

19   the time to reflect and reorganize the materials so that she

20   can make choices and decisions.

21         *MR. SHAPIRO:*  Your Honor, I was going to go into

22   another topic, but I see the time.  I don't know if that works.

23         *THE COURT:*  We'll be in recess one hour.  Come back at

24   1 o'clock.

25         (Recess at 11:59 a.m.)

Edith Johnston – Direct

1          (In open court at 1:03 p.m.)

2              THE COURT:  Please continue.

3              MR. SHAPIRO:  Thank you, Your Honor.

4     BY MR. SHAPIRO:

5     Q.  Dr. Johnston, what has been the importance of physical

6     activity to -- for Ms. Houston, both pre- and post-crash?  What

7     does that mean to her?

8     A.  For Ms. Houston, she has been a very active individual; and

9     outdoors is very much part of her daily living and has been

10    also part of a lot of her leisure time and engagement.

11    Pre-crash, she discussed -- you know, describes doing Grand

12    Canyon boat trips, as well as hiking and all that.  So post,

13    we -- because of the ankle injury and the chronic pain,

14    together we collaborated in her taking small steps and

15    beginning to reintegrate that into her life, because it's one

16    of the ways she deals with stress and one of the ways that's

17    just part of enjoyment of life for her.

18    Q.  So can you explain why Ms. Houston came to see you and why

19    she continues to see you?

20    A.  Ms. Houston came to see me to be able to regain her

21    functioning and her abilities to engage in life socially,

22    intellectually, daily activities.  And she continues to see me

23    because of the fact that it's a chronic pain process, she's

24    still ongoing on treatment, she's still integrating who she was

25    before and who she is now, and continues to expand her

494

Edith Johnston - Direct

1   enjoyment from what she could not -- what she saw and didn't do

2   anything after the time of the crash to what her previous

3   activities were.  And she engages in those and continues to see

4   me so she can have strategies, ideas, accommodations, and a way

5   to process information that she gets.

6   Q.  So we talked about how much of her intellect or mentation

7   you believe she has lost or is not able to utilize; you said

8   about 15 percent.  How much of her prior functioning has she

9   lost and why?

10  A.  Well, she -- when I first initially saw her, she had lost

11  her -- the level of engagement, independently and in activities

12  in life probably as much as 60, 70 percent.  Currently, we're

13  still seeing a reduction of engagement in all activities,

14  probably around 45, 50 percent.

15  Q.  What impact has that loss of function had on who

16  Ms. Houston is or was?

17  A.  Well, it's a major impact, because, again, the things that

18  she was doing on a daily basis have been disrupted and limited;

19  and so for her to integrate and regain her engagement in

20  society, engagement in her daily activities, engagement in her

21  productivity, both avocationally and vocationally, it is taking

22  time, and she has not regained so that she is fully active or

23  engaged again.

24  Q.  Has Ms. Houston improved as a result of your assistance,

25  and can you illustrate areas of improvement that you observed

Edith Johnston - Direct

1   or know about?

2   *A.*   A couple of areas.  One is her driving.  When she first

3   started with me, she had someone drive her here, and she

4   wouldn't go out on her own for driving.  And she has taken

5   trips up to the mountain now, short ones; she's been able to

6   drive over to Denver and back in various conditions; she drives

7   to all of her own appointments now, most of the time; and we

8   looked at different ways to accommodate that, both for chronic

9   pain and also for the PTSD triggers.

10         We've looked at her social engagement; and because of

11  her confusion, her loss of being able to process words, she did

12  not feel comfortable in many social engagements.  And so she is

13  in two different types of social groups now, where she had

14  abstained from almost any kind of connection other than for a

15  few neighbors or a few people that she was comfortable with.

16  And she is willing to go out and try different social

17  activities now, both relative to professional and just pure

18  engagement as far as arts or crafts or just enjoyment, hiking

19  or whatever.  Those are two examples that are there.

20         A third one is the fact that she was unable to be

21  consistent in performance of any activities for any period of

22  time.  And she's increased her time period, knowing what she

23  can consistently perform at in order to take a break so she can

24  come back and be able to perform again and be productive.  So

25  she's identified a routine or a process that will allow her

Edith Johnston - Direct

1   more consistency in performance without being exhausted,

2   increased dynamics of pain or mental confusion.

3   *Q.*   What specific techniques have you used to assist

4   Ms. Houston with her recovery?

5   *A.*   We had CBT -- cognitive behavioral -- looking at her

6   thought processes, looking at her fears, looking her belief

7   systems, and looking at her activities.  We have looked at

8   desensitization.  That would be the driving, because the

9   accident was directly related to being in a vehicle, so how

10  could she start doing things?  We have looked at strategies to

11  accommodate limitations.

12          So as a specific example with driving, because of the

13  pain in her foot, we looked at making sure she was using a lot

14  of cruise control and using it prior to increasing the pain so

15  that those pains wouldn't be increased.  We've looked at trying

16  different activities, simply walking around her property to

17  begin getting outdoors and beginning to exercise to the point

18  of taking some actual hikes.  So it is a strategy -- a

19  desensitization and a strategy of relearning and taking steps

20  and having successes and being able to stretch, but stretch

21  within the whole concept of pacing so it's not overdone.

22  Because when we overdo it, overexhaust, then we interrupt

23  functioning abilities, and it becomes that we have to have a

24  recovery period.  So decreased recovery periods, increased

25  function periods, and set it up so that she is aware of what

Edith Johnston - Direct

1   kind of routine works best for her.

2   Q.   How did you begin to integrate physical activity into her

3   therapy and why?

4   A.   Physical -- physical activity is part of who she is.  It

5   was a way she engaged.  And it was important to her to be able

6   to get out and do significant hiking, significant being out in

7   the outdoors, whether it was on her land in managing her

8   property or whether it was actually outside in recreational

9   areas and engaging in those, and sometimes it overlapped with

10  some of her professional stuff.

11       How did we do that?  Again, setting up activities that

12  she would do.  Some of them she tested on, coming to see me.

13  She's in Grand Junction, I'm in Delta, so then she would plan a

14  trip up to Paonia, another 40 miles down the road, and be able

15  to then do some walking by a lake or river or just in the hills

16  and then come back.  If she felt that it was more than she

17  could handle, she stops and rests on the way to and from

18  different places.

19       So physical activity is part of who she is, and so

20  engaging in that also helped her realize she could do things,

21  rebuilding self-esteem, rebuilding self-confidence, and

22  integrating what she had lost as part of her now that she could

23  accomplish again with strategies and principles and tools to be

24  able to be successful at it.

25  Q.   You indicated that you utilized cognitive behavioral

Edith Johnston - Direct

1    therapy with her.  What examples can you give of utilizing

2    cognitive behavioral therapy with her?

3    A.  A lot of the -- the fact that I cannot now, I feel -- I

4    feel fear, so we had the feelings and the emotions of fear and

5    incapacitation, anxiety about doing anything, and going through

6    the process and what skill set did you have?  What were your

7    thoughts in?  How could you do it?  How can you then do it now?

8    So we looked at what behavior she had, what emotions they were

9    bringing up, how her thoughts impacted both the behaviors and

10   the emotions so that she could move forward with actually

11   engaging in those activities without triggering overwhelm,

12   confusion, panic, anxiety when engaging in different types of

13   behaviors or activities, with the thoughts that "I can't do

14   this any longer."

15   Q.  Is there a difference between exposure therapy and

16   cognitive behavioral therapy?

17   A.  Yeah.  My understanding and what I've read and what I've

18   seen as far as exposure therapy is, repeat exposure to the

19   actual trauma incident so that it no longer -- it decreases the

20   trigger effect of absolute panic or fear, anxiety.

21   Q.  Did you utilize that with Ms. Houston?

22   A.  In exposure therapy, in the sense that we would walk

23   through activities that were similar to the accident and how to

24   be able, then, to continue to do them without totally repeating

25   the actual trauma experience.

Edith Johnston - Direct

1    Q.   Did you use reframing?

2    A.   Yes.

3    Q.   Explain that, please.

4    A.   Reframing is where we're looking at "I'm incapable" or

5    "this is something I can't do."  We looked at, it's a matter of

6    not whether you can or can't do it, it's how to do it.  So

7    reframing in the perspective of "how can I look at, that I can

8    actually perform this?"  "I can't do it the same way I used to

9    do it, so how can I do it now?"  And so you look at being able

10   to use walking sticks when you're hiking versus just going out

11   and swinging your arms; using your cruise control more often

12   when you're driving versus just driving.  So that's reframing,

13   but also taking it to the point of implementation, because

14   you're reframing from "I cannot" to "how can I?"

15   Q.   How about integrating new information modalities or new --

16   for pain management?  How did you utilize that, and what did

17   you do?

18   A.   Well, one thing you do is you discuss what is working for

19   her and then how to implement that on a routine basis so that

20   you're preventive versus acting in aftermath with the increased

21   pain or anxiety or the overwhelm.  So how can we prevent it?

22   So looking at what works.  We added in the acupressure, we

23   added in the use of a specific magnus acupuncture points --

24   again, a tool for managing symptoms.  We looked at integrating

25   her reading, taking breaks, so, again, that she could

Edith Johnston - Direct

1   facilitate a consistent engagement.

2   Q.  Did you also deal with -- we've heard Ms. Houston talk

3   about pacing versus pushing through her disability.  What have

4   you -- what have you worked on with her, and how has that been

5   effective?

6   A.  Pushing through, strong determination, toughing it out was

7   part of our reframing also.  And part of that was beginning

8   to -- where she could demonstrate to herself that by pacing, by

9   taking in up to a point and not beyond the point of where

10  things would increase as far as aggravation of symptoms.  So

11  knowing what her best performance stamina was and being able to

12  adjust to that and take breaks and be able to move forward,

13  have more consistent performance for a longer period of time

14  without pushing through, pushing beyond, which is a normal

15  tendency because of her value system and what her upbringing

16  was, is that I can do this, I will just need to push through

17  and be determined.  How to use that strength in a way that

18  would facilitate her and not create exacerbation of symptoms.

19  Q.  How did you deal with her fear response to the PTSD with

20  regard to her flight/fight response?  How did you work through

21  those issues?

22  A.  The fight/flight/freeze type of response is part of the

23  autonomic system, it's part of a protection mechanism.  So

24  there we want to look at acknowledging it, learning about it,

25  understanding it, and then being able to have the body, mind

501

Edith Johnston - Direct

1   come out of hypervigilance and be able to decrease that

2   heightened automatic response so her system is more relaxed, so

3   that she can better choose her responses and be better able to

4   access all of her abilities to be able to engage at that time.

5   *Q.*  Did you utilize EMDR --

6   *A.*  No.

7   *Q.*  -- eye movement desensitization reflex.  Why not?

8   *A.*  I'm not trained in it.

9   *Q.*  Okay.  Do you like that technique?  Do you know of that

10  technique?

11  *A.*  I know of that technique, I know that there is validity in

12  that technique, and I know that there are other professionals

13  that provide it and that there have been good results for it.

14  *Q.*  And the techniques that you just described that you used,

15  are those techniques supported by the research and literature

16  in the field of psychology?

17  *A.*  Yes, they're supported.  And even if we look at what is

18  recommended by the veterans PTSD specialized resource and

19  information, they still -- they emphasize that there is more

20  than one choice, choose what is best for you.  They look at

21  cognitive processing therapy, they look at again at the

22  prolonged exposures, as well as EDMR [sic] as evidence based

23  with results and good engagement for PTSD.  Bodywork, the

24  engagement within that, van -- let's see.  How do you spell and

25  say that name?  Van der Kolk -- V-A-N D-E-R K-O-L-K -- is one

Edith Johnston - Direct

1   them that studied about the body-mind integration, which is

2   where my Jin Shin Jyutsu becomes involved.  As far as CBT goes,

3   that's informed trauma; and I've taken classes and been

4   certified in informed trauma, CBT classes.

5   Q.  How has -- how has the -- first, was your work -- did your

6   work also get her to speech and cognitive therapy?

7   A.  Yes.

8   Q.  How?  Define that.

9   A.  She was talking about having difficulties with recalling

10  words, pulling words out, being able to express herself

11  verbally.  And she had been to see Dr. Price and -- Dr. Ellen

12  Price and I had worked together previously before.  But also

13  because I'm not a primary care referral source, then I

14  suggested that she do some research on a speech therapist so

15  that she could independently decide whether that this would be

16  beneficial, discuss it with Dr. Price, because she had some

17  appointments scheduled.  And at that point in time she got a

18  referral and has been involved in therapy.

19  Q.  Has that been helpful?

20  A.  I have not seen the test results.  What I understand from

21  what she says and the information I've gotten from her, that

22  she has made significant improvement on being able to more word

23  find, more rapidly being able to use her speech and verbal

24  cognition in a more effective manner.

25  Q.  These -- these deficits cognitively that she has, does it

503

Edith Johnston - Direct

1    matter if a diagnosis is PTSD, chronic pain, drug medication,

2    TBI for somebody to benefit from speech therapy -- or cognitive

3    speech therapy?

4    *A.*   No.   Some of the information may determine some little

5    different strategies, but as far as being able to benefit from

6    speech therapy?   The function has been lost, and to be able to

7    increase that function is the purpose of it.

8    *Q.*   You also -- I know you used Jin Shin acupressure, and I

9    knew you were doing something called Jin Shin fingerholds.

10   What is that, and what did that do to assist Ms. Houston?

11   *A.*   Jin Shin fingerhold is basically accessing the meridians

12   through holding your fingers.   And all twelve meridians can be

13   accessed through the fingerholds.   And by holding them to the

14   20 minutes for best practice so that you can get a pulsation,

15   which that pulsation can be like a blood pulse, but it also can

16   be more like static electricity, it can be more like warmth, it

17   can be different kinds of sensations.   It gives you an

18   all-clear signal, which opens up blockages.   That facilitates

19   individuals in calming, facilitates managing various

20   symptomology, whether it be chronic pain, or whether it be

21   triggers from PTSD, or whether it just be overload, confusion,

22   and anxiety.   So fingerholds empowers an individual that they

23   have something they can concretely do in a moment -- their

24   fingers are always with them -- and at the same time,

25   physiologically, through the meridian system, it is improving

Edith Johnston - Direct

1   function within the body.

2   Q.   Did it help her?

3   A.   Yes.

4   Q.   How?

5   A.   She reports that it was able to calm her, gave her -- so

6   that she could think with more clarity, and it also helped

7   manage some of her pain symptoms.

8   Q.   Okay.  Did you also suggest that Ms. Houston sign up for a

9   traumatic brain injury advocacy study that was being done by

10  Craig Hospital in the Grand Junction area?

11  A.   Yes, I did.

12  Q.   And has she done that?

13  A.   Yes.  She did complete the study and the course.

14  Q.   Was it helpful for her?

15  A.   She was able to relate to different information that was

16  obtained and strategies in that course that benefited her so

17  that she could feel more comfortable in interacting and

18  increase her function.

19  Q.   Did you also suggest that she join a traumatic brain injury

20  support group?

21  A.   Yes, I did.

22  Q.   Pain support group?

23  A.   Yes, I recommended that also.

24  Q.   Did she do those?

25  A.   She met with people that were part of the support group.

Edith Johnston - Direct

1   The timing that they met wasn't as conducive for her, because

2   it was in the evening, and it also wasn't comfortable in the

3   particular area that they were meeting for her.  So she met

4   them, and she also met them at some brain injury workshops that

5   were held in Grand Junction.  So, yes, she had connected with

6   the brain injury peer support group.

7         Pain support group, the one that we discussed, she

8   checked out and made some more connections online with

9   different things and followed up with some more online.  But an

10  active group I think had disbanded, where it had been active in

11  the Grand Junction greater area several years ago.  But she did

12  follow up with it, and she did engage in workshops and

13  information for pain support with peer groups online.

14  Q.  Did you communicate what you believe Ms. Houston's future

15  treatment needs to Ms. Mazone, our life care planner?

16  A.  Yes.

17  Q.  Okay.  Within a reasonable degree of medical probability,

18  Doctor, what is the cause of Ms. Houston's diagnosis --

19  diagnoses for which you were treating her for?

20  A.  The car accident that was --

21  Q.  Why?

22  A.  Because her pre-abilities were much greater and much more

23  engaging than her post-abilities, and the accident was the

24  trigger point for her, and she wanted more assistance to be

25  able to reengage.

506

Edith Johnston - Direct

1   *Q.* Did you apportion any of her impact of function on her

2   previous psychological issues?

3   *A.* No.

4   *Q.* Within a reasonable degree of medical probability, are the

5   problems that you are treating Ms. Houston for permanent; are

6   the effects permanent; and if so, which ones?

7   *A.* Her diagnoses, because the experience will not be negated

8   or erased, are permanent.  The extent and the degree of the

9   symptomology will vary over time.  She has had a decrease in

10  symptomology, but she has also had times where it increased due

11  to external and internal environment contributions.  So they

12  will be permanent; the degree and the limitation will vary over

13  time.

14  *Q.* What would you measure as success in treating Ms. Houston?

15  What is success for you in treating her?

16  *A.* Increasing (unintelligible) and increased management of

17  symptoms.

18  *Q.* Say that again.  You pixelated.

19  *A.* Increased engagement and increase in management of

20  symptoms.

21  *Q.* How much of Ms. Houston's cognitive issues are due to

22  gabapentin that she takes every day, versus PTSD, versus

23  chronic pain, versus TBI?

24  *A.* It's --

25          *MS. BOBET:* Your Honor, objection.  This goes beyond

Edith Johnston – Direct

1   the scope of what Dr. Johnston has been qualified to testify

2   about.

3          *THE COURT:*  Overred.

4   *BY MR. SHAPIRO:*

5   *Q.*  You can answer, Dr. Johnston.

6   *A.*  Okay.  So gabapentin is a contributing factor.  What

7   percentage?  That's an individual thing; and as far as I know,

8   there isn't any specific objective testing that can tell us the

9   particular contribution.

10  *Q.*  And the other factors that I mentioned, can you tell what

11  is causing what?

12  *A.*  It's a whole person.  We can't divide it up.  They all are

13  impacting contributions to cognitive abilities and cognitive

14  impairment.

15  *Q.*  Within a reasonable degree of medical probability, what

16  limitations or restrictions does Ms. Houston have with what she

17  can and cannot do?

18  *A.*  Physical limitations –– physical limitations can be

19  measured by a functional capacity evaluation.  I'm not

20  qualified to do that.  I do provide and implement or

21  acknowledge, review functional capacity evaluations.

22  Cognitively, we're looking at mental health; and we're looking

23  at cognitive function.  And that's where I utilize

24  psychological testing to present some information on the

25  limitations.

Edith Johnston - Direct

1      Cognitive limitations, mental health impairments, she

2 has residual impact.  It has decreased her function and

3 decreased her ability to do what she was accustomed to doing

4 prior.  I estimated earlier in our discussion here that about

5 15 percent of her intellect was impacted.  Emotionally, we're

6 looking at -- that is considered in that also because the

7 emotions and the control of the emotions and the intensity of

8 the emotions also impact functional level.

9 *Q.* Are there other techniques that can be used to assist

10 Ms. Houston with her PTSD and trauma issues?

11 *A.* Well, Ms. Houston has explored different things, like with

12 her physical therapist.  And they're looking at laser

13 treatments, they're looking at heat and cold, looking at

14 physiology.  The speech therapy being able to work with the

15 cognitive impairments.  If we look at adaptations to being able

16 to be more functional in a work or in a particular social

17 setting, then we look at occupational therapy that can be

18 facilitated.  I use acupressure.  That has benefited.  She has

19 responded to that.  She can then, therefore, use acupuncture

20 also.  She's looking at different actual interventions

21 medically.  Those would be possibilities.  The EDMR that has

22 been recommended -- the EMDR that has been recommended, if that

23 was something she wanted to pursue, could have benefits.

24 Ongoing psychoeducation, ongoing self-integration, and having

25 cognitive processes of CBT, reframing as feedback for her

Edith Johnston - Direct

1    because of the decreased processing speed and heightened

2    intensity of emotions would be beneficial.  I think that covers

3    it.

4    Q.  When you say CBT, are you saying cognitive behavioral

5    therapy?

6    A.  Yes, sir.

7    Q.  Okay.  Sorry.

8    A.  That's okay.

9    Q.  How has the psychostimulant of Adderall been for

10   Ms. Houston from your perspective?

11   A.  Her use of Adderall, I haven't monitored, and the

12   beginning-ending of it or the amounts, I haven't.  I heard her

13   indicate that it just had an impact on her to be able to focus

14   and assist with that concentration.

15   Q.  You're aware, aren't you, that she tried an antidepressant

16   called Cymbalta; correct?

17   A.  I'm aware of it, yes.

18   Q.  How was she doing on it before the reaction that she had?

19   What was your perception?

20   A.  I didn't cognitively relate that particular medication.

21   Each time we met, I've seen improvement; and I've seen

22   different times when stressors arise, that I've seen decreased

23   function.  So per se for Cymbalta, I can't tell you.

24   Q.  What do you think about her taking an antidepressant, and

25   how have -- have you had discussions with her, and what do you

510

Edith Johnston - Direct

 1   think about her trying that?

 2   A.   When Ms. Houston and I discuss things, we look at the pros

 3   and cons and what she understands about it.   And I encourage

 4   her to further research it, because part of her strength is

 5   being able to understand and research with time -- giving her

 6   the time to process it -- a variety of information.   And it

 7   also, then, helps her to be able to decide the validity of any

 8   treatment form for herself.

 9          As far as antidepressants goes, they have been

10   effective with different individuals.   Her particular reaction,

11   because she's off of the antidepressants and her preference is

12   not to be on lots of medications, indicates that we look at

13   other methodologies instead.

14   Q.   Okay.   And you have worked with her on her depression with

15   other modalities?

16   A.   Yes.   That's -- we look at the cognitive behavioral; we

17   look at reframing; we look at the Jin Shin acupressure; we look

18   at engaging activity, because movement in the body facilitates

19   different chemistry in the body, which is more motivating and

20   more -- helps an individual to have a more positive outlook on

21   life, just by the fact that's the way the body works.

22   Q.   Would you like to see her on an antidepressant, or is that

23   her choice?

24   A.   That's her choice.

25   Q.   Can you describe Ms. Houston as a patient?   How would you

Edith Johnston – Direct

1   describe her and the process that you've worked through with

2   her?

3   A.  So how would I describe her as a patient and how we've

4   worked through her process --

5   Q.  Yes.

6   A.  Okay.  Ms. Houston is and capable of being an independent

7   decision maker.  That is her preferred style.  So providing her

8   with information, examples, helping her go through and try

9   different things for -- and actual experience at times so that

10  she can make her own choices is really, really important.  It

11  also is important in the sense -- because if you choose as an

12  individual, then you are more committed to being able to apply

13  those particular techniques or strategies.

14  Q.  Has Ms. Houston grieved the losses that she has sustained,

15  or is that process still ongoing?

16  A.  That's an ongoing process, and it will be an ongoing

17  process across her lifetime, because things have changed, and

18  those changes are permanent.

19  Q.  Does she look at grieving the losses as quitting or

20  failing?

21  A.  Part of processing the grief, part of processing those

22  losses was going through the "I can'ts."  And she is a

23  determined person to want to get back involved; and she's

24  self-reliant in many ways; but it was opening up and going

25  through the initial processes of grief to be able to be angry,

Edith Johnston - Direct

1   being able to deny it, and to be able to look at different

2   options to reengage and integrate who she was now and that

3   there were choices and ways for her to go ahead and be the

4   person she would want to be.

5   *Q.*   How much improvement do you believe Ms. Houston has

6   obtained with the work that she's done with you?

7   *A.*   Well, from some of the activities -- if we look at just

8   functional activities, we're almost at zero when we first met;

9   and now she can engage in them on a regular daily basis.  That

10  would be an improvement.  The amount and still the fact that

11  certain things will trigger her, she will go from being

12  functional in areas and then decrease in function and then

13  reengage again.  So she's improved significantly.  It's made a

14  difference in her life.

15  *Q.*   Within a reasonable degree of medical probability, what is

16  your prognosis for Ms. Houston, and how long do you believe she

17  will need care and treatment from a psychologist or licensed

18  professional counselor like yourself?

19  *A.*   She would benefit from it over her lifetime.  How much she

20  needs to utilize it will be an independent decision.  And she

21  does look at benefits and other priorities and makes a choice

22  to be able to use it.  She falls back on and comes back to

23  therapies, whether it be speech, whether it be other pain

24  management modalities, or the psychological ones, she comes

25  back to them to reuse them to be able to continue to improve.

Edith Johnston - Direct

1    One of her characteristics that's consistent is being an

2    individual that grows in her own self.

3    Q.   Doctor, did you have an opportunity to review the reports

4    of the government's doctors, Dr. Kalat, and Dr. Goldman?

5    A.   Yes.

6    Q.   Do you choose to comment on those, or say if you disagree

7    or not?

8    A.   No, I don't -- those are valid opinions.  I don't have any

9    comments.

10   Q.   It appears that those doctors are critical of your

11   methodology that you've used in caring for Ms. Houston, and

12   that if you used methodology that they agreed with, she would

13   be cured or much better.  What is your reaction to that?

14          MS. BOBET:  Objection.  That's characterizing opinions

15   not yet in evidence and mischaracterizing opinions that will be

16   in evidence.

17          THE COURT:  Sustained.

18   BY MR. SHAPIRO:

19   Q.   Doctor, is there a magic pill or a magic treatment that

20   would solve all of the problems that you are treating

21   Ms. Houston for?

22   A.   No.

23   Q.   What is the impact on Ms. Houston of an increase in her

24   pain and a decrease in her pain?  How does that impact how she

25   does functionally across the board?

514
Edith Johnston – Direct

1   *A.*  With pain -- when pain increases, it requires physiological

2   and mental energy response; and so it does impact directly your

3   ability to function.  When your pain decreases, you engage more

4   frequently and do more things.  Knowing the whole concept of

5   pacing is to knowing where your activities impact your

6   experience of pain.  That's not the only thing that impacts the

7   experience of pain.

8   *Q.*  What is driving the psychological and functional

9   disabilities that she has?  Is it the pain; is it the PTSD; is

10  it the TBI; is it the anxiety and the depression?

11  *A.*  All of the above.

12  *Q.*  Did you notice a difference in Ms. Houston when the

13  sympathetic nerve blocks worked for a period of about three or

14  so months?

15  *A.*  Yes.

16  *Q.*  What did you notice?

17  *A.*  She felt relief; she engaged in various activities more;

18  she was able to refocus her attention on other matters within

19  her life and to be able to engage and do.

20  *Q.*  What differences did you notice when the sympathetic nerve

21  block's effect wore off?

22  *A.*  She reported increased pain and decreased engagement.

23  *Q.*  What differences did you note in Ms. Houston during the

24  pandemic?

25  *A.*  Increased anxiety; increased social isolation, which was a

Edith Johnston – Direct

 1   matter of the pandemic, which she had been progressively

 2   increasingly increasing her social engagements prior to the

 3   pandemic; the extreme concerns about access to treatment,

 4   because many things were limited or shut down as the pandemic

 5   came up and then opened up again.  She had an awareness of it,

 6   but had increased symptomatology.

 7   *Q.*  Are you surprised that Ms. Houston agreed to try the

 8   sympathetic nerve blocks, spinal stimulator trial,

 9   antidepressant medication, and the psychostimulants?

10   *A.*  I'm not going to say surprised.  It was a matter of the

11   fact that Ms. Houston initially wants to be able to do it

12   independently, and then she wants to be able to have less pain,

13   because it takes over so much of her life, so she was willing

14   to consider, look at, research, and weigh the options to try

15   recommendations that would have been provided to her by her

16   providers to be able to have more control of her pain and

17   increase her activities in life.

18   *Q.*  Dr. Lewis has indicated that if she works with

19   Dr. Gustavson on the psychological issues related to the pain,

20   that he would consider implanting the stimulator or doing the

21   trial again.  How do you feel about that?  Did you encourage

22   her or not?

23          *MS. BOBET:*  Objection, Your Honor.  Again, this is

24   beyond the scope of the witness's expertise as a rehabilitation

25   counselor and licensed therapist.

1          THE COURT:  Overruled.

2          THE WITNESS:  I would encourage her to consider things

3   with the information she has.  I encouraged her if it was an

4   option she wanted to pursue, because she had experience and

5   benefits from it, that at least exploring it and engaging in

6   the follow-up that was recommended, then she can make her next

7   decision.

8   BY MR. SHAPIRO:

9   Q.  Within a reasonable degree of medical probability, Doctor,

10  is Ms. Houston disabled?

11  A.  Yes.

12  Q.  Are her disabilities permanent?

13  A.  Yes.

14          MR. SHAPIRO:  Ms. Waller, can you put up Exhibit 13.

15  And if you would go to No. 17.  There it is.

16  BY MR. SHAPIRO:

17  Q.  Dr. Johnston, we're scrolling through your billing from

18  April 11, 2018, through July 30, 2020.  Are your bills

19  reasonable, necessary, and causally related to the crash and

20  injuries sustained by Ms. Houston?

21  A.  Yes.

22  Q.  Of all the care that Ms. Houston has had or attempted since

23  this crash, what do you think has been most effective for her?

24  A.  What do I think was most effective for her?

25  Q.  Yes.

Edith Johnston – Cross

1   *A.*   The fact that she's received treatment and increased

2   management of her symptoms and increased engagement in life.

3   Which ones?  It's a whole picture, and she's a whole person.

4           *MR. SHAPIRO:*  Thank you.  No further questions.

5           *THE COURT:*  Cross-examination, please.

6                      **CROSS-EXAMINATION**

7   *BY MS. BOBET:*

8   *Q.*   Good afternoon, Dr. Johnston.

9   *A.*   Good afternoon.

10  *Q.*   Nice to see you again.

11          Now, you received a Ph.D. from Columbia Pacific

12  University; right?

13  *A.*   Correct.

14  *Q.*   And you also have an MBA from that same institution?

15  *A.*   Correct.

16  *Q.*   That's a correspondence school located in California;

17  right?

18  *A.*   Correct.  Yes.

19  *Q.*   And when you attended that school for your degrees, the

20  school was approved but not accredited in California; right?

21  *A.*   Well, I'm not going to go through the technicalities.  I

22  believe it was both approved and accredited within California.

23  *Q.*   And since you attended that school, a court in California

24  ordered the school to be closed; is that right?

25  *A.*   Yes.

518

Edith Johnston – Cross

1  Q.  Now, just to be clear, you're a rehabilitation counselor,

2  not a licensed psychologist; correct?

3  A.  Correct.

4  Q.  It's through your work as a rehabilitation counselor that

5  you have experience with things like brain injury; right?

6  A.  And as a licensed professional counselor.

7  Q.  Through those two capacities, that's how you have

8  experience with brain injuries; correct?

9  A.  Correct.

10  Q.  You're not a neuropsychologist?

11  A.  That's factual.

12  Q.  You're not a neurologist?

13  A.  No.

14  Q.  You're not a psychiatrist?

15  A.  No.

16  Q.  You don't hold a medical degree?

17  A.  No.

18  Q.  You're not able to prescribe medications?

19  A.  That's correct.

20  Q.  You're not qualified to interpret a brain scan?

21  A.  Correct.

22  Q.  And you don't diagnose people with TBIs yourself; right?

23  A.  Correct.

24  Q.  Now, in your practice, you focus on helping multi-talented

25  individuals; is that right?

Edith Johnston - Cross

1   A.   Yes.

2   Q.   I'm going to pull up an image here to share, which you

3   should see on your screen shortly.  Can you see that?

4   A.   Yes.

5   Q.   And this is your website; correct?

6   A.   Correct.

7   Q.   As we scroll down, these are obviously you, the pictures;

8   is that right?

9   A.   Yes.

10  Q.   All right.  So your business is called How To In Life?

11  A.   Correct.  The legal name is How To Life Consultants, LLC.

12  Q.   Is it fair to say the primary focus of your practice is

13  working with multi-talented individuals?

14  A.   That is the focus I have put online on my website, yes.

15  Q.   Is that the focus of your practice?

16  A.   Not the entire focus.

17  Q.   And you consider yourself to be a multi-talented

18  individual; is that right?

19  A.   Correct.

20  Q.   Now, on the same page --

21       Let's scroll about halfway down, Ms. Robinson.  Keep

22  scrolling, please.

23       In the middle of what you see in the screen there is a

24  sentence that begins "my."  It reads, "My passion is to assist

25  those of high abilities and potential to" -- we're going to try

Edith Johnston - Cross

 1  to zoom this in for you.  The first thing it lists here is, "My

 2  passion is to assist those of high abilities and potential to

 3  understand their own idiosyncrasies and that what is wrong with

 4  them is actually what is very right."  Is that correct?

 5  *A.*  That's what it states, yes.  That's one of the things I

 6  work with, yes.

 7  *Q.*  So that is something you do in your practice?

 8  *A.*  Yes.

 9  *Q.*  In that same document, that bullet-pointed list, middle

10  bullet point, you're still talking about assisting those with

11  high ability and potential.  That bullet point reads, "To

12  express their unique qualities for the personal experience of

13  the magic, the mystery, the flow of being gifted."  Did I read

14  that right?

15  *A.*  Yes, ma'am.

16  *Q.*  So that's another part of your practice?

17  *A.*  Yes.

18  *Q.*  And one of the goals in your practice is to eventually

19  transition patients out of having sessions with you; is that

20  right?

21  *A.*  Correct.

22  *Q.*  So someone who you are treating now, your hope is that at

23  some point in the future, they'll stop seeing you; right?

24  *A.*  It's their choice.  But my intention is -- my intention is

25  to have them be self-sufficient and independent.  Yes.

Edith Johnston – Cross

1   Q.  Ms. Houston's been seeing you now for around two and a half

2   years; is that right?

3   A.  Correct.

4   Q.  Do you think she can stop seeing you soon?

5   A.  Yes.  She can stop seeing me soon, and she could also

6   continue to see me.

7   Q.  You went over this a bit with Mr. Shapiro, but I just want

8   to ask a couple more questions.  Do you treat patients who have

9   PTSD using exposure therapy?

10  A.  The intensive exposure therapy, where it's reenacting the

11  actual incident?  No.  Where it has exposure to their

12  experiences and what triggers them that are similar to the

13  incident?  Yes.

14  Q.  Do you treat patients with PTSD using flower essences?

15  A.  Yes.

16  Q.  And what is that, flower essences?

17  A.  Flower essences is a homeopathic-like remedy that is taking

18  flowers at their peak bloom and taking the essence of them,

19  which, then, we look at energetics versus chemical.  And flower

20  essences focus on and were originally started with Bach in the

21  United Kingdom.  And Flower Essence Society, where I work

22  through most of the time, is here in the United States.  There

23  are different ones throughout the country.  But flower essences

24  focus on emotions, identifying emotions, and being able to

25  facilitate integrating or healing those emotions.

Edith Johnston - Cross

 1  *Q.*  And flower essences, is that different from forest washing?

 2  *A.*  Yes.

 3  *Q.*  What is forest washing?

 4  *A.*  Forest washing, which has been defined in those terms from

 5  the Japanese and the Japanese medical field and their studies,

 6  and it involves being in nature and being able to be with --

 7  just out in the open and be with nature.  It's been documented

 8  that it's a healing process.

 9  *Q.*  And is that a treatment that you recommend for your

10  patients?

11  *A.*  Yes.

12  *Q.*  Including patients with PTSD?

13  *A.*  Yes.

14  *Q.*  I just want to be clear.  I've been using the phrase PTSD.

15  I believe I heard you say before in your testimony

16  "post-traumatic stress syndrome," is that the same thing as

17  PTSD?

18  *A.*  Yes.  Disorder or syndrome.  PTSD is the actual diagnostics

19  within the DSM.

20  *Q.*  And you diagnosed Ms. Houston with PTSD and anxiety; right?

21  *A.*  Correct.

22  *Q.*  You didn't diagnose her with anything else?

23  *A.*  No.

24  *Q.*  So you didn't diagnose her with a TBI?

25  *A.*  No, I did not diagnose her with a TBI.  Under --

Edith Johnston - Cross

1    Q.  I'm sorry.  Go ahead.

2    A.  Under Axis II on my progress notes, which is information of

3    diagnoses that also have come to my attention, I did list TBI,

4    because she reported having a TBI.

5    Q.  You have anticipated my next question, which was going to

6    be, she brought -- Ms. Houston brought her TBI diagnosis to

7    you; correct?

8    A.  Correct.

9            MS. BOBET:  Can we go to Exhibit 31, please.

10           We'll turn your attention shortly to Exhibit 31, which

11   is not stipulated, and has not been admitted.

12   BY MS. BOBET:

13   Q.  Do you recognize this as a report in this case that

14   Ms. Houston's counsel prepared and you signed?

15   A.  Yes.

16           MS. BOBET:  If you'd scroll back up, please, to the --

17   the second page, fourth sentence.

18   BY MS. BOBET:

19   Q.  So the sentence beginning, "They have worked" -- "they have

20   worked on looking at the grief process, reintegration of self,

21   accepting the lack of function, and how to move forward with

22   life."  Did I read that right?

23   A.  Yes.

24   Q.  Is that an accurate description of the kind of work that

25   you've done with Ms. Houston over the course of your treatment?

Edith Johnston - Cross

1   *A.*   Yes.

2   *Q.*   So the work you've done with her includes looking at the

3   grief process?

4   *A.*   Correct.

5   *Q.*   And encouraging her to accept her lack of function?

6   *A.*   Yes.

7   *Q.*   Now, you have treated Ms. Houston for PTSD; correct?

8   *A.*   Correct.

9   *Q.*   And you say that some of the treatment you've given her for

10  PTSD falls into the category of exposure therapy?

11  *A.*   Yes.  In exposing oneself to similar situations, yes.

12  *Q.*   You also recommended that Ms. Houston participate in

13  Toastmasters as a means of exposure therapy; is that correct?

14  *A.*   Yes.

15  *Q.*   And Toastmasters, that's an organization that focuses on

16  personal development and largely public speaking; is that

17  correct?

18  *A.*   Yes.

19  *Q.*   And another aspect of your treatment for Ms. Houston's PTSD

20  is looking with her at the emotional roller coaster; correct?

21  *A.*   Correct.

22  *Q.*   Is that the same as what you referred to earlier as pacing?

23  *A.*   It's part of it.  But emotional roller coaster is the

24  change of the intensity and the experience of the emotions

25  relative to her pain level, what is going on in her life, et

Edith Johnston - Cross

1    cetera.

2    Q.  So your treatment as far as the emotional roller coaster

3    goes involves acknowledging that is the case?

4    A.  Acknowledging it and then being able to use strategies to

5    manage.

6    Q.  And just so I'm clear, all of the relevant information

7    about your treatment of Ms. Houston would be reflected in your

8    clinical notes; right?

9    A.  Correct.

10   Q.  And that's the only place that information would be

11   reflected?

12   A.  Yes.

13          MS. BOBET:  Pull up Exhibit 71, please.

14   BY MS. BOBET:

15   Q.  Now, you testified before, you responded to some questions

16   from Francine Mazone, who is a life care planner hired by

17   Ms. Houston in this litigation; correct?

18   A.  Correct.

19   Q.  And I'll pull up that document, and I'll ask you if this is

20   the questionnaire that you filled out in response to

21   Ms. Mazone.

22   A.  Yes.

23   Q.  Can you see that on your screen?

24   A.  Yes.

25   Q.  All right.  Besides responding to Ms. Mazone with this

Edith Johnston - Cross

1   questionnaire, did you have any other communications with her?

2   A.   Not that I recall.   None.

3   Q.   I'd like to turn your attention to your response to that

4   first question.   Now, you testified earlier that in your

5   response to Ms. Mazone you did not apportion any of

6   Ms. Houston's current presentation to prior psychological

7   issues; correct?

8   A.   Correct.

9   Q.   And I see here the first question that Ms. Mazone has asked

10   is, "What percentage of her" -- referring to Ms. Houston --

11   "current presentation is related to the December 1, 2016,

12   injury, and what to pre-existing conditions of anxiety and

13   depression?"   Did I read that correctly?

14   A.   You read it correctly.   Yes.

15   Q.   In your response you've written, "75 percent disability

16   adjustment, PTSD, TBI, chronic pain."   Did I read that

17   correctly?

18   A.   Yes.

19   Q.   And below that, "25 percent, general anxiety."   Did I read

20   that correctly?

21   A.   Yes.

22   Q.   So in your view, 75 percent of Ms. Houston's current

23   presentation is related to the accident; right?

24   A.   Yes.

25   Q.   And 25 percent is from her pre-existing condition of

Edith Johnston - Cross

1   anxiety; right?

2   *A.*  No.  I was not clear in my answer what was before and what

3   was after.

4   *Q.*  Do you remember taking a deposition in this case?

5   *A.*  Yes, ma'am.

6           *MS. BOBET:*  All right.  We're going to pull up the

7   transcript there.  If we can go to page, Ms. Robinson, 133,

8   line 8 -- excuse me -- line 12.

9   *BY MS. BOBET:*

10  *Q.*  Can you see that on your screen, Dr. Johnston?

11  *A.*  No.

12  *Q.*  My apologies.  It would be helpful if I shared it.

13          All right.  So can you see that now?

14  *A.*  Yeah.  I can see it.

15  *Q.*  All right.  This is a transcript of the deposition.  I'll

16  just read here on -- we're discussing that same questionnaire.

17  On line 12:

18          Question:  "And 25 percent is related to a

19      pre-existing condition of anxiety?"

20          Answer:  "Yes."

21          Did I read that correctly?

22  *A.*  Yeah, you did.

23  *Q.*  All right.  One moment, please.

24          One more question, just so we're clear.  Your

25  responses to the life care planner, Ms. Mazone, after you

Edith Johnston – Redirect

 1    submitted that questionnaire response, you didn't have any sort

 2    of follow-up questions or communications with her, did you?

 3            Are you able to hear me?

 4    A.  Yes.  My response was no.

 5    Q.  All right.  Those are all of my questions.  Mr. Shapiro

 6    might have a few additional ones.  Thank you, Dr. Johnston.

 7            THE COURT:  Redirect.

 8                      **REDIRECT EXAMINATION**

 9    BY MR. SHAPIRO:

10    Q.  Dr. Johnston, could you please explain what you understood

11    you meant by the 75-25 apportionment between the crash and

12    general anxiety, please?

13    A.  My response at that particular moment on this form is the

14    fact that that was the level of impact relative to the

15    accident.  I neglected, from what I'm looking at now -- and

16    that doesn't mean my recall is 100 percent -- that I didn't

17    answer the conditions and anxiety and depression pre.  I'm not

18    sure.

19    Q.  Okay.  Why did you suggest as part of Ms. Houston's

20    treatment that she utilize Toastmasters?

21    A.  Her -- she indicated, socially, that she was not feeling

22    able to speak in front of groups; and it was one of the things

23    that she had done before -- lead workshops, lead group

24    discussions, engage in groups of people to accomplish different

25    goals in both nonprofit and profit settings.  And so to

Edith Johnston - Redirect

1    reintroduce her in a safe environment, one that is encouraging

2    and supporting, it was recommended and encouraged for her to go

3    to Toastmasters.

4    Q.  Did she do it?

5    A.  She checked it out and talked to a few people.  And as far

6    as follow-through goes, she did some other social things.  She

7    didn't actively become, as far as I know, involved in a

8    Toastmasters group; but she did talk to some of the

9    Toastmasters in the Grand Junction area.

10   Q.  Do you counsel people of all abilities?

11   A.  Yes.

12   Q.  Do you counsel multi-talented individuals differently than

13   others?

14   A.  I counsel each individual according to their individual

15   needs and individual abilities.

16   Q.  Can you explain mind, body, and spiritual counseling.

17   A.  It's the approach that we are a whole person and factors

18   both from the mind and the emotions, as well as physical body,

19   and then our need for spirituality or however we perceive that

20   is part of all who we are.  And those are all factors in

21   determining how we can integrate, achieve, engage in life.  And

22   so all of those factors need to be processed and developed,

23   utilized to be able to be the whole person we are.

24   Q.  Is that a holistic or a traditional approach to counseling?

25   A.  It's holistic (unintelligible) some traditional --

530

Edith Johnston – Redirect

1   Q.  You pixelated, and we lost you when you started your

2   answer.

3   A.  Okay.  It's holistic.  Some, quote-unquote, traditional

4   mental health therapies do integrate a more holistic approach.

5   You have counselors that are trained with specific --

6   traditional counselors that are trained also in specific areas

7   of mind-body.  Mine is based on the fact that I'm also a

8   rehabilitation counselor and a Jin Shin acupressurist.

9           MR. SHAPIRO:  Thank you, Doctor.  No further

10  questions.

11          THE COURT:  Thank you.  Can this witness be excused?

12          MS. BOBET:  No objection.

13          MR. SHAPIRO:  Yes, Your Honor.

14          THE COURT:  All right.  Thank you, Dr. Johnston.

15  You're excused from your subpoena.  I appreciate your

16  testimony.

17          THE WITNESS:  Thank you, sir.

18          THE COURT:  Next witness.

19          MR. SHAPIRO:  Your Honor, we would call Lisa Jacobson.

20  And she is signing in, Your Honor.

21          Your Honor, the reason this is taking longer is

22  because we were a little ahead of where I thought we would be.

23          THE COURT:  I didn't notice her endorsed as a witness,

24  by the way.

25          MR. SHAPIRO:  Yeah, she's always been.

Lisa Jacobson – Direct

1          *MS. BOBET:*  We were aware.

2          *THE COURT:*  All right.

3          Can you hear us?  Please, ma'am --

4          *THE WITNESS:*  I can't hear you, Your Honor.

5          I'm turning my volume up.  That should help.

6          *COURTROOM DEPUTY:*  Can you hear me?

7          *THE WITNESS:*  Yes.

8          *THE COURT:*  Swear in the witness, please.

9          *COURTROOM DEPUTY:*  Would you please raise your right

10    hand.

11              (**LISA JACOBSON, PLAINTIFF'S WITNESS, SWORN**)

12          *COURTROOM DEPUTY:*  Please state your name and spell

13    your first and last name for the record.

14          *THE WITNESS:*  My name is Lisa Jacobson.

15    J-A-C-O-B-S-O-N.

16          *MR. SHAPIRO:*  May I proceed, Your Honor?

17          *THE COURT:*  Please do.

18                          **DIRECT EXAMINATION**

19    *BY MR. SHAPIRO:*

20    *Q.*  Thank you.  Can you give us your professional address,

21    Ms. Jacobson?

22    *A.*  Yes.  It's 300 West Ottley, at Colorado Canyons Hospital,

23    Fruita, Colorado, 81521.

24    *Q.*  What is your profession, ma'am?

25    *A.*  I'm a speech-language pathologist.

532

Lisa Jacobson – Direct

1   Q.  Can you explain what it is that a speech-language

2   pathologist does?

3   A.  I work with people that have cognitive issues, language

4   issues, swallowing, voice, speech pronunciation.

5   Q.  What specific types of diagnoses do you work with that have

6   those issues?

7   A.  People that have had a stroke, perhaps a brain injury,

8   maybe a neurodegenerative disease like ALS, Parkinson's,

9   sometimes people that have just a voice disorder that's not --

10  so that would be called dysphonia -- swallowing disorders are

11  called dysphasia.

12  Q.  Can you tell the judge what your educational background was

13  to become a certified speech-language pathologist?

14  A.  Yeah.  I have a master's degree in speech-language

15  pathology.

16  Q.  And it appeared when I looked at your background that a lot

17  of your background had to do with music education.  How did you

18  get into speech and language pathology with that background?

19  A.  So this is a second career for me.  I did -- I have a

20  master's degree in voice performance also and a bachelor's in

21  music education.  I was looking for the opportunity to work

22  more directly with people and started looking into music

23  therapy.  That exposed me to a wide population range.  And then

24  I decided to pursue speech-language therapy.  It's easier to

25  get patients and get reimbursed for that, as opposed to music

Lisa Jacobson - Direct

1    therapy.

2    Q.  Do you use music therapy as part of your speech-language

3    pathology practice?

4    A.  I haven't yet.  Not very much, a little bit.  Sometimes

5    I'll try to see if I can slow somebody's speaking rate down if

6    we sing something or maybe make up a limerick to try to

7    remember things; but not too much yet.

8    Q.  How long have you been a speech-language pathologist?

9    A.  Well, as part of the degree program, there is a lot of

10   practicum hours.  If I'm remembering right, it's -- I can't

11   remember if it's 200 or 300 direct hours.  But then I've had my

12   degree for three years, and I've been certified for two years.

13   Q.  And where do your patients -- how do you get your patients?

14   A.  So the patients here at Colorado Canyons are referred by

15   their physicians.  Sometimes it's an ear, nose, throat

16   physician, or it might be gastroenterology or an oncologist,

17   but typically it's their primary care physician that refers

18   them to our office.

19   Q.  Who referred Tracy Houston to you?

20   A.  I believe that was Dr. Price.  I get the Prices mixed up.

21   Ellen, I believe.

22   Q.  Thank you.  So it wasn't Lynn Price, it was Ellen Price?

23   A.  Yeah.  Ellen that works with a lot of pain issues and has a

24   practice here in this building.

25   Q.  I do it, Ellen Price, pain; Lynn Price, family?

Lisa Jacobson - Direct

1  *A.*  All right.  Now you know how my work is.

2  *Q.*  Thank you.  Why did Dr. Price refer Tracy Houston to you?

3  *A.*  She referred her for -- let me see how she worded it --

4  TBI.  Patient needs cognitive retraining.  Motor vehicle

5  accident.

6  *Q.*  Did you have a working diagnosis, or what specifically were

7  you told besides motor vehicle accident, I guess by Dr. Price,

8  first?

9  *A.*  Yeah.  Let's see.  So her documentation, TBI, that would

10  indicate traumatic brain injury.  I'm looking to see what

11  the -- the listed diagnoses on the intake form are -- not the

12  intake form, but in our billing form -- it was more related to

13  the pain issues, chronic pain, and the fracture issue.  But in

14  the handwritten prescription, that was where she said TBI,

15  motor vehicle accident.  And then typically I look through the

16  medical records if I have the time to dig a little deeper.  So

17  I -- I read her most recent note in there.

18  *Q.*  And what did you learn from that note from Dr. Price --

19  what kind of a medical doctor is Dr. Price?

20      *MS. BOBET:*  I'm sorry.  The witness is referring to

21  some documents.  Can you just let us know what you're looking

22  at as you're testifying, please.

23      *THE WITNESS:*  Absolutely.  So I'm looking at

24  May 9, '19, office visit with Ellen Price.  And you asked me

25  what -- what kind of physician she is.  My understanding, I

535

Lisa Jacobson – Direct

1    think she's a physiatrist, which is a new word for me.

2    *BY MR. SHAPIRO:*

3    *Q.*  So physical medicine and rehabilitation?

4    *A.*  Sounds good.

5    *Q.*  Okay.  What was your work background -- has it been since

6    you became a speech-language pathologist?

7    *A.*  My work background since I've become?  Okay.  So let's see.

8    I've worked here at -- in outpatient therapy for a little over

9    a year -- a year February, it was.  And then I've done some

10   inpatient here.  Prior to that I was in the high school for two

11   years, working with high school students with disabilities

12   mostly.  And I'm -- also have, as part of my degree program,

13   been placed in several locations.  Grand Junction Regional

14   Center that deals with adults with intellectual disability,

15   mental illness; St. Mary's Hospital, both outpatient and

16   inpatient; let's see, Colorado Canyons pediatric rehab; more

17   time in the school district; and then some time working at

18   Idaho State University, at their clinic, both working with

19   people with aphasia, which is a language disorder after a

20   stroke or brain injury, and then also just pediatric, I think

21   was my other case that I did there.

22   *Q.*  Okay.  Do you diagnose medical conditions to lead to your

23   treatment, or do patients come to you with a diagnosis?

24   *A.*  They typically come to me with a diagnosis, but then I --

25   in my records and after my testing, I will provide the

536

Lisa Jacobson - Direct

1   diagnosis that is within my scope of practice.  So it would be

2   cognition, language, voice, swallowing, those kind of things.

3   *Q.*  So --

4   *A.*  Uh-huh.

5   *Q.*  Sorry.  Go ahead.

6   *A.*  Generally, it becomes more specific when I add my

7   diagnosis.

8   *Q.*  Did you come to a diagnosis on Ms. Houston?

9   *A.*  Yeah.  Let me see what I -- how I worded it.  I'm just

10  looking at the initial examination, and that is 6/25/19.  And

11  my diagnosis was cognitive communication deficit and attention

12  and concentration deficit.

13  *Q.*  What does that mean in your world and to us lay people?

14  *A.*  So cognitive communication deficit, it's areas of

15  attention, memory, perception, organization, language,

16  processing speed, problem solving, verbal reasoning, executive

17  functioning -- so planning, evaluating, making adjustments.  So

18  those are the kinds of things that come under cognitive

19  communication disorder.

20  *Q.*  All right.  I want to go further before I ask you how you

21  came to that diagnosis.  Do you test your patients?

22  *A.*  Yes.

23  *Q.*  How do you test your patients?

24  *A.*  So I -- it's generally a combination of things.  So we'll

25  have conversation, which I term as verbal discourse.  So I'll

Lisa Jacobson - Direct

1    look at how organized their thinking is; are they responding

2    appropriately; are they having trouble finding their words;

3    how -- how is their processing time; are they taking extra

4    time; are they getting distracted?  So a lot of that is the

5    informal part as I'm interviewing with them.  And then I would

6    do either a standardized assessment, like the cognitive

7    linguistic communication test, or the RBANS, is another one

8    I've done with Tracy.  That's the Repeatable Battery Assessment

9    of Neurological Status.  And then some informal things, problem

10   solving, math, describing differences between items.

11   Q.  Besides testing, what else do you do to determine how to

12   help your patients within your skill set?

13   A.  Well, particularly with -- if the patient is presenting

14   with things that have to do with cognition, with their

15   thinking, I really want to find out what their daily experience

16   is; how are they managing their activities of daily living; if

17   they have a career, are they planning to return to that; what's

18   involved in -- what kinds of thinking skills are involved in

19   that career; and what are their goals, so that what we're doing

20   in therapy is relevant to them and things they need to

21   function.

22   Q.  What is your goal with your patients?

23   A.  My goal with my patients?  I guess to be able to help them,

24   if possible, return to their prior level of functioning.  And

25   if that's not possible, to maximize their current functioning,

Lisa Jacobson - Direct

1  to give them strategies to be able to manage what they need

2  most appropriately.  And also I want to make sure, too, that

3  they're not socially isolating themselves as a result of their

4  medical issue.

5  Q.  Why in these situations are you worried about socialized

6  isolation?  Is that part of these symptoms or problems?

7  A.  A lot of times, it can be.  There can be a lack of

8  motivation after any kind of brain injury.  There can be

9  changes in social skills, people's comfort level, interpreting

10 social information.  Or if they're having trouble with their

11 thought process being slow, they may tend to withdraw because

12 they feel self-conscious.  Or having trouble with memory,

13 they're concerned about repeating themselves.  A lot of reasons

14 people can hold back.

15 Q.  Are you still -- you started treating Ms. Houston on

16 June 25, 2019.  Are you still treating Ms. Houston?

17 A.  Yes.  We've decreased the frequency, but I'm still meeting

18 with her a few more times.  Uh-huh.

19 Q.  How often do you see her, and how long was the prescription

20 from Dr. Price?

21 A.  Let's see.  So you asked me earlier about what documents I

22 was looking at.  I'm looking at the prescription -- the

23 handwritten prescription from Dr. Price.  So it says times

24 twelve; and that's where she also said, "patient, motor vehicle

25 accident, TBI, needs cognitive retraining."  So times twelve

Lisa Jacobson – Direct

1  means twelve sessions.  If it was weekly, that would be twelve

2  weeks.  And then typically at the end of that period, if the

3  patient still is making progress, and I see the potential for

4  more progress, then I'll submit a request for more sessions.

5       MR. SHAPIRO:  At this time, Your Honor, I'd move for

6  the admission of Ms. Jacobson as an expert in the field of

7  speech and language pathology.

8       MS. BOBET:  No objection.

9       THE COURT:  The tender is accepted.  Go ahead, please.

10      MR. SHAPIRO:  Thank you, Your Honor.

11  BY MR. SHAPIRO:

12  Q.  What was the history that you received from Ms. Houston,

13  what complaints did she have, and what did she want to gain

14  from working with you?

15  A.  So her complaints were slow processing -- that was her

16  primary written complaint on the initial assessment -- intake

17  form.  I'm sorry.  I'm forgetting your other questions.

18  Q.  What was the history that you received about what happened,

19  and what did she gain?

20  A.  Yeah.  So I believe she told me that she had been in an

21  accident and that she was finding that her thinking speed was

22  slower, she was in a lot of pain, and she just essentially

23  wanted to know what we could do to help her thinking get

24  better.  She talked about some -- probably talked about --

25  let's see.  I'm looking at my notes again from the initial

Lisa Jacobson - Direct

1   assessment.  She said she was overwhelmed with auditory

2   stimulants.  It was hard for her to be out in public.

3   Decreased motivation to engage with people.  She described

4   herself as generally more irritable than she had been and just

5   trying to lead a quiet lifestyle.  Sensitivity to light, kind

6   of a startle response to noises -- just common noises.  Those

7   are the things that I had jotted down.

8   Q.  How many sessions have you had with Ms. Houston up till

9   now?

10  A.  I think it's 33, if I remember it correctly.  Twenty-three.

11  Twenty-three.

12  Q.  And I assume that you went back to Dr. Price and asked for

13  additional visits?

14  A.  Yeah.  Yeah.

15  Q.  Why?

16  A.  Why?  As I said, you know, I'll request more visits when

17  somebody is making progress and when I can see that they're

18  motivated to continue therapy, to set new goals, or continue

19  old goals, as appropriate.  And so, yeah, I feel like if the

20  therapy is of value to them and to their progress, then I'll

21  request more.

22  Q.  Can you tell us the type of patient that Ms. Houston has

23  been over the course of time you have worked with her and what

24  her motivation has been?

25  A.  Yeah.  I would say she's highly motivated.  She's a good

Lisa Jacobson – Direct

1    advocate for herself.  It's not uncommon for her to email and

2    say, hey, I was thinking about what goals we might have ahead

3    and what the latest test results are and whether we can see,

4    you know, what would be a good way to address them.  She's good

5    at -- she's willing to be vulnerable.  I think it takes, you

6    know, a lot of -- it takes some risk to tell somebody that

7    you're not doing as well as you used to be able to do.  And

8    very conscientious.

9    Q.  What did she specifically ask for help from you?  What --

10   as you went along, what did she want more help with?

11   A.  So let's see.  I think initially -- and sometimes those

12   things come about from questions I'll ask, and sometimes it's

13   from what the person has reported to me.  But she wanted to be

14   able to return to work if possible, to be able to assess her

15   readiness to do that.  Later on -- well, let's see, I guess as

16   we talked about that, we talked about what kind of skills she

17   would need for that environment; and she would report to me

18   about how different things she was doing, that I had suggested

19   she might try.

20          It was important to her -- you know, I pointed out to

21   her that a lot of her work sounded like it required some really

22   great listening skills and memory as part of that.  And so that

23   is an example of other things we worked on.  She was having

24   trouble just maintaining attention to read to herself; so you

25   can imagine, you know, she was forgetting conversations, as

542

Lisa Jacobson – Direct

1   well.

2          And then later as we progressed in therapy, we were

3   looking at -- let's see -- I think -- more -- some of the more

4   recent things, she wanted to fill out an application for some

5   funding for Vacation Rental By Owner, that they were offering

6   possible funding during the COVID time.  So we brainstormed

7   about what she could write about, what could be some compelling

8   points.  So I was helping her with organization of that, just

9   asking her questions to help her think through that.  Another

10  recent one, looking at a document that she got from an

11  insurance company.  And she was really concerned that she make

12  the right decision about her coverage and was frustrated that

13  she, you know, couldn't make -- couldn't organize her thoughts

14  about that document; so we talked about ways to troubleshoot

15  that.

16  Q.  Did you end up besides being a speech and language

17  pathologist actually counseling and advising her about how to

18  do things?

19  A.  You know, from time to time I think she would ask about --

20  or comment on trying to remain -- trying to have clear

21  thinking.  I think I asked her questions more probably along

22  the lines of, have you, you know -- have you tried meditation,

23  or what is your therapist telling you about this?  But I think

24  she asked me, what did I think about using medications at one

25  point.  Typically, I just respond to those kinds of things by

Lisa Jacobson - Direct

1   asking questions to help them -- you know, help people think

2   through things.  I don't tend to advise them on choices very

3   much.

4   Q.  Did you give her homework on the case?

5   A.  Yes.

6   Q.  Did she do the homework?

7   A.  She did.  I was looking back through the record kind of

8   preparing for this, and it was interesting -- and I found this

9   to be the case with other people I've worked with -- that I

10  might make an assignment, and then it might be a few weeks

11  before that patient is able to kind of pull it together and

12  follow through on it.  But she -- she does.  She has.  So, for

13  example, pain might interfere or, oh, you know, kind of

14  forgetting to do things, it can be especially early on part of

15  the processing issues.  And so, you know, we've revisited it;

16  and then she would report back to me later.  So, yeah.

17  Q.  Do you think she has enjoyed and been engaged with your

18  assistance?

19  A.  Yes.  Yes.  She's really expressed that she's been really

20  grateful for it and continues to, you know, want to work --

21  what should we work on next?  How can we move forward?  Yeah.

22  Q.  What observations have you had of Ms. Houston and her

23  deficits or problems?

24  A.  She's made a lot of progress, for sure.  When I first met

25  her, her affect was very flat.  She was pretty discouraged.

544

Lisa Jacobson - Direct

 1    She is a pretty private person, so she would be trying not to

 2    be tearful, but at times she would, you know, be tearful about

 3    just being so frustrated with the lack of ability to be who she

 4    was before.  I'm sorry.  I lose track of your question when I

 5    get nervous, so tell me again.

 6    Q.   Have you ever done this before?

 7    A.   No.

 8    Q.   You're doing great.

 9    A.   Thank you.

10    Q.   What observations did you have of her issues and deficits?

11    A.   Okay.  So, yeah.  So deficits, definitely slow processing,

12    slow speech, slow to respond to questions, memory issues.

13    Let's see -- her ability to infer information based on what

14    she's been given was difficult.  She would get headaches after

15    we would do things that were challenging, cognitively.  And

16    then as time passed, the headaches generally have gone away.

17    She's been able to -- she's regained some of her smile and some

18    of those things, unless she's having a pain issue again.  Her

19    thinking is much more organized.  Her memory skills really

20    increased.  She's great at using strategies, great at thinking

21    about her own thinking ability, which is difficult at first

22    after an injury.

23    Q.   What do you mean by -- say that one more time.  She was

24    having difficulty thinking about her own thinking ability?

25    A.   Yeah.  So a term called metacognition; that's where you're

545

Lisa Jacobson – Direct

1   aware of how your thinking process is going.  So at first, she

2   just knew it was muddled and foggy; but further on, she began

3   to see a little more specifically what things were challenging

4   for her and what strategies she could put in place.

5   Q.  Is that gaining insight --

6   A.  Yes.

7   Q.  -- into her -- did she lack insight at the beginning?

8   A.  Some, yeah.  I think so.

9   Q.  You've also been involved in her care during her trying the

10  psychostimulant Adderall.  What impact did you see of the

11  Adderall on Ms. Houston?

12  A.  That is very --

13          MS. BOBET:  I object.  It's outside the witness's

14  scope to talk about the effects of medication.  If she's just

15  talking about her observations, that is obviously a different

16  matter.

17          THE WITNESS:  I was planning to --

18          THE COURT:  Just a second, please.  I have to rule.

19          The objection is overruled.  She can testify as to

20  what she observed without giving an opinion as to the effects

21  of the medication.

22          Go ahead, please.

23          THE WITNESS:  Yeah.  So what I observed -- so as I was

24  describing earlier, in the first few sessions, especially, her

25  affect was very flat, her speech was slow, her processing was

Lisa Jacobson – Direct

1    slow, her ability to remember things was slow.  When she began

2    taking the Adderall, she had a lot more energy -- she reported

3    having a lot more energy; she had -- her facial appearance was

4    much more -- she was much more likely to smile; her speech rate

5    was faster; so it appeared that at that time she was making

6    some significant change of some kind.

7    *BY MR. SHAPIRO:*

8    Q.  Were you aware that there was a period of time where she

9    was taking the medication Cymbalta, an antidepressant?

10   A.  I don't recall her mentioning that.  I'm -- she may have.

11   I don't know.

12   Q.  What did you observe when her pain level was increased?

13   A.  That has been really interesting, because she had a really

14   nice period of time where her pain was -- appeared to be

15   resolved.  She wasn't complaining about it; her walking

16   appeared better, coming in and out of the appointment; she had

17   better concentration.  But then a little bit more recent -- in

18   more recent months, she was having less success getting her

19   pain resolved, and so her -- her affect, her facial expressions

20   became a little bit more flat again; her thought process

21   appeared to be slowing down; it was hard for her to follow

22   through on homework, because she was -- as she described, she

23   was just trying to get through the day.  She talked about --

24   Q.  Have you --

25   A.  Yeah --

547
Lisa Jacobson – Direct

1  *Q.*  Do you know if that was the period of time after she had

2  the sympathetic nerve block and it was effective?

3  *A.*  I recall her saying she had had some kind of injection that

4  had worked, but this more recent one hadn't.  I don't know if

5  that would be the sympathetic nerve block.

6  *Q.*  Can you explain in lay terms, if you would, what impact the

7  deficits that you've observed would have on someone's everyday

8  activities?

9  *A.*  Yeah.  So I think a good example is, in a conversation --

10  you're having a conversation, whether it's with a peer or in a

11  work situation, and if you're having a hard time processing

12  quickly, it's going to be hard for you to ask appropriate

13  questions, to respond appropriately, and to then think about

14  where to go next in a conversation.  That's one example.

15       People can have, you know, really extreme difficulty

16  with organization, not be able to follow a recipe or remember

17  to put the coffee in the coffee filter.  I don't think that

18  Tracy was experiencing that level of deficit; but what she was

19  even reporting difficulty with, as I said earlier, just being

20  able to make sense of what she was reading, to be able to make

21  decisions upon it.  Planning a trip would be a much more taxing

22  process, overwhelming, even just thinking about getting from

23  Grand Junction to Denver.  You'd have to think about what your

24  energy level was going to be like, whether you have the

25  attention to drive, whatever the task was there, whether you

Lisa Jacobson - Direct

1   needed time to rest before and after that.  So A lot of -- you

2   have to think a lot about managing your energy level when

3   stimulus is overwhelming to you or when you're having trouble

4   just processing at a normal rate.

5   Q.  Has she worked hard with you to overcome these issues?

6   A.  Yeah, she has.  She's really great about putting strategies

7   in place.

8   Q.  I want to ask in a little while the specifics, but has she

9   gotten improvement from what you've worked with her on?

10  A.  Yes, she has.  Definitely.

11  Q.  What is it that you do that magically makes her better?

12  A.  Nothing.  But we work together -- I will try to replicate

13  some activities -- try to find activities that replicate things

14  that she may need in her daily living.  And then as we're doing

15  them together, I'll usually make observations, or I'll ask the

16  patient for their observations.  How is that going for you?

17  What are you having difficulty with?  Or I might say, it looks

18  like you're stuck as you're thinking of -- you're reading what

19  is on this page, and you're looking over here getting ready to

20  write, it looks like you're getting bogged down in that

21  process.  So just making observations and giving suggestions.

22  Here is something you can try to increase your memory, or here

23  is something you can try to make something overwhelming a

24  little bit more attainable.

25  Q.  Are you giving her tools or compensatory strategies to work

549
Lisa Jacobson – Direct

1   with or around her issues?

2   A.   Yeah.  That's a large part of what we're doing.

3   Absolutely.

4   Q.   How have you helped her get motivated to engage socially,

5   because she gets overwhelmed in those situations?  In other

6   words, what strategies have you given her for that?

7   A.   A couple of things.  We -- we spent some time talking about

8   the need to balance what activities she finds overstimulating

9   or were challenging, whether that's just cognitively or with

10  the sensory of -- for example, you go out and run an errand,

11  you probably are going to need to take some kind of break

12  before meeting with a friend to have coffee, because you're

13  going to be exhausted.  So some of it is that kind of planning.

14  And some of it might be, for example, could you keep a journal

15  and write down -- after you meet with a friend, write down some

16  main ideas, some things that they shared that you don't forget,

17  so that next time you meet with them, before you go see them,

18  you can review it, look at it.  And that helped her confidence

19  quite a bit.

20  Q.   You used the term when we met called she had a deer in the

21  headlights look.

22  A.   Yes.

23  Q.   What do you mean by that?

24  A.   That was -- that's that flat affect that I was talking

25  about, where -- it's -- there is not a lot of facial expression

Lisa Jacobson – Direct

1    going on.  The mouth is more slack or closed, the eyes are more

2    vacant looking.  I guess deer in the headlights would imply

3    that their eyes are wide open.  Yeah, I guess that's actually

4    more accurate for her.  Eyes wide open and probably kind of

5    reflecting about how she's feeling about taking everything in.

6    That's my assumption.  But, yeah, it's just that appearance.

7    Q.  Did she ask you to assist her trying to prepare an article?

8    A.  An article?

9    Q.  Yeah.  Something that she could publish or something she

10   could write --

11   A.  Oh, okay.  Yeah.  We -- let's see.  She -- we had talked

12   about, okay, what is the next step towards job readiness for

13   you?  And so she had some ideas, well, I was thinking about --

14   I used to post articles on the internet, and that is how

15   different clients would come to me, and so -- but that felt

16   overwhelming to her, so we broke that process down a little bit

17   to, okay, what kind of things would you need to be able to plan

18   this article?  What do you need to do?  Search the internet.

19   What kinds of terms would you search for?  Can you set a timer

20   for yourself to limit this -- the feeling of overwhelm?  So

21   you're spending ten minutes searching and set a time where you

22   take a break and come back to it.  So in that sense, yeah.

23   Q.  Was she able to accomplish that, or were you able to assist

24   her accomplishing doing something complex like that?

25   A.  I would say I think we did work that was complex like that.

Lisa Jacobson – Direct

1   I don't recall whether she published anything before we moved

2   on or got interrupted with -- yeah, I don't remember at what

3   point in the treatment, whether that was COVID interruption or

4   pain interruption; but she did start that process.

5   Q.  Did you do testing on her early on in her care?

6   A.  Yes.  We did testing at the initial visit and then two

7   other times.

8   Q.  Can you tell us what you learned from the initial testing?

9   A.  Uh-huh.  Let me see here.  So I'm --

10          MS. BOBET:  Objection.  My apologies.  If the witness

11  could just identify what the witness is referring to as she's

12  testifying.

13          THE WITNESS:  I'm with you.  So the initial

14  examination, 6/25 -- and I'm actually looking at the assessment

15  section.  So we're -- and then prior to that assessment

16  section, you can see under "objective," is "outcome measurement

17  tool."  Outcome measurement tools are the more specific pieces

18  of information.  And then the assessment is my -- essentially,

19  I guess you would say, diagnosis or kind of summary of what I

20  discovered there.

21          So -- which would you like to hear about, the summary

22  or the more specific?

23  BY MR. SHAPIRO:

24  Q.  I'd like to hear the summary and then see if we have more

25  specific.

Lisa Jacobson – Direct

1   A.   Okay.  So I'll just read it to you.  "Patient presents with

2   a mild cognitive linguistic deficit characterized by a mild to

3   moderate deficit in sustained attention and memory, given

4   auditory language of moderate length, mild to moderate deficit

5   in convergent and divergent language reasoning, and mildly

6   increased processing time for multi-paragraph reading

7   comprehension."

8   Q.   Can you translate into English for us.

9   A.   Yeah.  So it might help a little bit if you go down a

10  little bit further under "patient problems."  It's a little

11  more succinct.  "Decreased sustained attention and memory for

12  auditory language."  So I'll rephrase that.  So her ability to

13  sustain or maintain attention when listening to something is

14  below normal.  Her ability to process written information

15  that's multiple paragraphs in length is -- it's slow.  And her

16  ability to use her reasoning skills for language are lower than

17  average.

18         So, for example, convergent reasoning means, if I give

19  you cues to describe something, are you going to be able to say

20  what it is?  So it's round, I throw it, it bounces, are you

21  going to know what it is?  If I read you a short paragraph

22  about a baseball game, are you going to recognize what that is?

23  That's convergent language.  Divergent is, can you think of ten

24  animals that are in a zoo?  So you're naming items within a

25  category, being able to categorize your thinking.  So decrease

553

Lisa Jacobson – Direct

1   in those areas.

2   Q.  Anything else?

3   A.  Let's see.  She had difficulty maintaining attention when

4   I -- she would ask me a question, and I would describe

5   something, she had difficulty understanding the -- anything at

6   length.  I remember her commenting about that, could you repeat

7   that again?  It was too long for me to hold my attention.

8   Q.  Any other deficits?

9   A.  She had a -- difficulty with the memory.  So I give her a

10  list of items that -- let's see -- she had trouble with it, but

11  when she would use the strategy of writing things down, she did

12  better with it.  That's an example of one of the memory issues

13  we might have worked on.  She developed a headache on that

14  first assessment, for sure.  I read her a story.  She recalled

15  eight of the seventeen details of the story, so pretty

16  significant deficit there.

17  Q.  Has she improved steadily, and what impact did COVID and

18  pain have on her work with you?

19  A.  So as I mentioned earlier, the pain was definitely an

20  interruption in her ability to work on her goals outside of

21  therapy.  It was hard for her to have the attention and the

22  motivation to do that.  She was just exhausted.

23          On the COVID, we were able to have some teletherapy

24  during that time.  I think maybe some of her physical relief

25  was interrupted during that time because, you know, she

Lisa Jacobson – Direct

1    couldn't come in I don't think for those appointments to

2    relieve the pain; but we were able to do a little bit of work

3    through teletherapy during that time.

4            MR. SHAPIRO:  Your Honor, I don't know what time the

5    Court wants to take the afternoon recess.

6            THE COURT:  Is this a good time for you?

7            MR. SHAPIRO:  Yeah.  That's why I was asking.

8            THE COURT:  Okay.  Take a recess for 15 minutes.

9            MR. SHAPIRO:  Thank you.

10           (Recess at 2:58 p.m.)

11           (In open court at 3:17 p.m.)

12           THE COURT:  Okay.  Get back to work.

13           MR. SHAPIRO:  Thank you, Your Honor.

14   BY MR. SHAPIRO:

15   Q.  What goals, Ms. Jacobson, did you set for Ms. Houston after

16   you did the testing that the two of you set; and how much of

17   the goals have you gotten met or close to meeting?

18   A.  Okay.  So initial goals were that she could answer basic

19   questions after having a paragraph -- a one-paragraph passage

20   read.  And let's see, how is that worded?  One-paragraph length

21   of complex or abstract verbal information with 85 percent

22   accuracy.  So, yeah, she nearly met that goal.  80 percent

23   accuracy, when I did progress note in August.  Another one was

24   after reading a longer section, like four to six paragraphs,

25   could she answer questions, returning to that written material

Lisa Jacobson – Direct

1    just half the time or less?  And that was one we continued for

2    a while, and gradually she was able to meet that goal.  And,

3    then, let's see.  Verbal reasoning activities, so using working

4    memory, being able to retain information that she heard, could

5    she work with that and be able to come back with that

6    information accurately.  And she did well with that, as well.

7           Later on some of the goals were, could she do things

8    that required shifting attention from one activity to another

9    or sustaining attention for longer; and that is something that

10   she made good progress with.  Let's see.  Other goals later

11   on -- let me see, here.  Other goals later on were, would she

12   be able to use some strategies during the time that we were

13   apart and report back on the strategies she used.  That was

14   definitely something that she has done well with.

15          Let's see.  Another goal -- oh, at one point more

16   recently when she was having pain issues again, her -- we had a

17   goal that she would go to the grocery store, come back with

18   items she went for.

19   Q.  Why is that a problem?

20   A.  Well, that's -- that's attention and memory and -- yeah,

21   being overwhelmed with the stimulus.

22          Other goals were more employment related.  I can't

23   remember if I spelled those out in writing or not, but

24   definitely practicing organizational planning strategies for

25   things.  We worked on those things, and she put some good tools

556

Lisa Jacobson - Direct

1    in place, and has made good progress with those.

2    Q.  Is she able to read a book yet, or is she still limited in

3    what she can read and comprehend?

4    A.  That's a good question, because I -- you know, for a while,

5    one of the things that we were planning to do, she was going to

6    read a book -- we were going to both read it and then discuss

7    it.  I thought that that would replicate some of her

8    professional tasks a little bit better, that she would be using

9    her thinking skills to do that.  And that did not occur.  I

10   think that her pain issues began to interfere with her ability

11   to get motivated, to concentrate that long.  So we adapted that

12   to be shorter -- shorter passages.  She's certainly able to

13   read and comprehend, but it's the attention part of that that

14   is hard to do on longer pieces.

15   Q.  Are you -- when you push Ms. Houston to do more with her

16   attention, concentration, and her verbal and visual reasoning,

17   what happens?  What have you observed?

18   A.  Well, certainly in the -- you know, in 2019, headaches and

19   just that kind of fogginess.  Now, more -- more this year, I

20   guess, she's made improvements in being able to retain

21   information over longer passages and information.  We can have

22   a conversation; I can ask her about the different things that I

23   might have mentioned, that I'll be really intentional about

24   being detailed with things.  She's gotten really good at

25   keeping track of those things.  So it varies.  It depends on

Lisa Jacobson - Direct

1   the task and depends of her pain level that day.

2   Q.  Is she frustrated with her I'll say limitation?  What have

3   you observed about her level of frustration with her problems?

4   A.  Yeah.  That's where I would -- you know, I feel like she --

5   she will become tearful and reflecting how hard something might

6   have been, like a trip out of town or -- or just recognizing

7   that it's -- it's harder than it used to be.  And so she would

8   express that verbally and then sometimes be tearful about that.

9   Yeah.

10  Q.  You have tested Ms. Houston, as I understand it, three

11  times now?

12  A.  I believe that's correct.

13  Q.  And has she steadily improved, and is she still improving?

14  A.  Yeah.  She's making great progress.  So one of the

15  assessments that I ordered for us to have here in our practice

16  is the repeatable boundary assessment of neurological status --

17  the RBANS.  And the reason I wanted that is because there are

18  multiple versions of that, so then we were able to compare her

19  results.  Yeah.  Significant improvement.

20  Q.  When you say "significant," can you quantify?

21  A.  Sure.  Yep.  I can be more specific, for sure.

22  Q.  Let me ask this question first --

23  A.  Uh-huh.

24  Q.  Is it an objective quantification of her improvement?

25  A.  Yes, absolutely.  It's based on standardized data, even for

Lisa Jacobson – Direct

1    her age group and education level.

2    Q.  Thank you.  Please.

3    A.  Yeah.  So, for example, there is a memory index score, and

4    it was -- let's see.  So I am going to be reporting on the

5    assessment dated 8/20 of 2020, and then the other one -- you'll

6    find those in the notes for those particular dates.  Oh, the

7    other one was September 10 of 2019, so almost a year later.  So

8    her memory index score went from a low average to a high

9    average, particularly her ability to remember a story went from

10   extremely low to average.  Her visuospatial constructional

11   index score went from low average -- I guess it maintained

12   average -- it maintained low average; but her -- some of the

13   visual perception elements increased from borderline to

14   average.

15        The language index score -- let's see -- I think that

16   that remained essentially the same.  The attention went from

17   average to high average.  A particular section of that went

18   from low average to an average.  And then her delayed memory --

19   so her ability to remember things that we did earlier in the

20   assessment -- went from low average to average.  So overall,

21   her overall score went from low average to average, for her age

22   and educational level.

23   Q.  Are you pleased with that progress?

24   A.  Yes, I'm excited about that.  Yeah.

25   Q.  Is there more room for continued progression?

Lisa Jacobson - Direct

1  *A.*  Yes.  I -- I would say so.  Her -- I'm looking at

2  comparisons here to see where I would like to see more work.

3  Yeah.  I would say in the area of attention.  It's improved a

4  lot, but I would like to see continued improvement in that

5  area.  And primarily the visuospatial constructional -- that's

6  more -- yeah.  That's a really defined measurement, but I would

7  like to see more progress in the area of her executive

8  functioning, her ability to take complex information, break it

9  down, analyze it, and come up with logical conclusions in a

10  more timely manner.

11  *Q.*  So is it fair to say that these tests are helping you

12  determine what to work on to continue to have her progress?

13  *A.*  Yeah.  They're certainly a factor.

14  *Q.*  Okay.  Have you seen her outside of the tests utilize the

15  skills that you've given her?

16  *A.*  Uh-huh.  Yes.  Absolutely.

17  *Q.*  Can you tell me -- tell us, please, what are her

18  weaknesses?

19  *A.*  Yeah.  I think, you know, processing time, response time in

20  conversation is still slow.  I would say that her confidence in

21  being able to make sense of complex information, I would like

22  to see her grow in that area and in her ability to plan,

23  analyze, and make decisions moving forward.  I think she's

24  making progress; but, yeah, I'd like to see more progress

25  there.

Lisa Jacobson – Direct

1    *Q.*  How about her strengths?

2    *A.*  Yeah.  So as I was saying earlier, some of the things --

3    she's very intelligent, conscientious, very much advocating for

4    herself, planning ahead.  I think her habits of organization

5    and notetaking are really beneficial.  Being willing to risk

6    looking not good enough so that she can continue to work,

7    that's a huge benefit.

8    *Q.*  Has she expressed to you what she would like to do if she

9    could get better?

10   *A.*  I know for a time she was interested in returning to work.

11   And so, yeah, some of her goals were, what would that look

12   like?  How could you enter into that in a way that is going to

13   increase your reputation rather than damage if some of your

14   deficits are still present?  How can you put your strategies in

15   place to maximize your ability to listen to people, make sense,

16   and give them advice or help them reflect on their decisions?

17          Travel is another thing that we've talked about a

18   little bit, that she wants to feel comfortable doing that and

19   misses being able to do some of those things.

20   *Q.*  You gave her some tools to assist with her decision-making.

21   *A.*  Yes.

22   *Q.*  I call these balloons or mapping; she called it silos.  Can

23   you explain what that is and the purpose behind that and how

24   she's done?

25   *A.*  Yeah.  So it's -- I know it as mind mapping; and you can

Lisa Jacobson – Direct

1   even get apps, I guess, for your smart devices to do the mind

2   mapping.  Tracy is not a smart device fan; she's paper and

3   pencil.

4           So you take your main concept that you're trying to

5   work out; and, really, what you're doing is using a visual

6   space to brainstorm.  So you might put your main concept in a

7   circle, and then you might have a line going to another circle

8   that has an idea that's related to it.  And then from there,

9   you might have lines coming off of that second circle with more

10  circles that are related to that.  So, for example, if you're

11  planning a trip, what are all the things you need to think

12  about?  Your designation, your cost, safety, your route, and

13  all of those different things.  So we might plan that out; and

14  as she thinks of things, it's a visual organization strategy.

15  Q.  So how does it help her with decisions?  She just has

16  everything in front of her at that point?

17  A.  Yeah.  And as you begin thinking about one aspect of

18  planning, that usually leads to another thought; and so then

19  you can sort of write that branch of that thought out.  But

20  it's nice to be able to get it offloaded, I call it -- offload

21  it from your brain onto the paper so can break it down into

22  pieces.  And then you can decide what piece you want to tackle

23  first; and that was something we did with her article planning,

24  too.

25  Q.  So you've actually worked through decisions with her

Lisa Jacobson – Direct

1    utilizing that?

2    *A.*  Uh-huh.  Yes.

3    *Q.*  You mentioned wanting -- her wanting to get back to

4    traveling.  What is the issues that she has when she tries to

5    travel?

6    *A.*  I feel like she shared it in confidence with me.  For

7    example, traveling to Denver -- a place that she's very

8    familiar with -- she was excited to have accomplished that; but

9    it was very frightening to realize that she could walk out of

10   the building and not know how to get somewhere, somewhere that

11   she -- you know, like to a certain restaurant that she might

12   have been familiar with.  Just the amount of stimulus that you

13   take in -- we talked about what factors might have interfered

14   with her ability to be oriented to where she was.

15          Then other aspects of travel, you know, if you're

16   going to travel alone, how are you going to maintain your

17   safety?  Are you aware of your surroundings in the same way

18   that you used to be, or have things changed?  So she described,

19   you know, for example, a time in a parking lot at a store where

20   somebody approached her car -- and I can't remember if they

21   knocked on the window, but it was frightening.  And she

22   thought, am I -- you know, am I interacting with people in a

23   different way?  Why did I appear vulnerable to them?  That was

24   something she wasn't accustomed to.  And that's not uncommon to

25   experience these kind of brain issues.  Sometimes we misread

Lisa Jacobson – Direct

1   our social information.

2   Q.  Does Ms. Houston –– should Ms. Houston continue with your

3   services as long as she is improving?

4   A.  I think as long as –– you know, we all can pursue things to

5   improve.  But if –– if –– I feel like if what we're doing

6   together is within my scope of practice and is clearly

7   something that –– where there still is a deficit and we can

8   look forward and I can give her strategies, then I think it's

9   appropriate.

10  Q.  If she stops working with you, will she fall back, or can

11  she maintain her progress?

12  A.  That's a great question.  I think it depends a lot on the

13  person.  It depends on other factors, too.  If –– if there is

14  pain interfering with motivation to continue to do –– to

15  challenge yourself, then I think it would be hard to continue

16  to make progress.  If there –– if depression becomes a factor,

17  that can, you know obviously make a difference in whether you

18  continue to challenge yourself and make progress.  So –– remind

19  me of your question again.

20  Q.  If she stops working with you, will she fall back, or will

21  she be able to maintain what she's got?

22  A.  I think that she could maintain what she's learned in

23  terms –– you know, I think she knows the strategies that we put

24  in place and can certainly maintain it if she is, you know,

25  physically in a good state to do so.

564

Lisa Jacobson – Direct

 1   *Q.*  Were you surprised at how much she has gotten out of your

 2   care and treatment?

 3   *A.*  Yeah.  It was nice to do the assessment and see that it was

 4   measurable progress.  And it was also nice to look through the

 5   notes and see that, oh, my gosh, she used to get headaches

 6   within, you know, 30 minutes, and now we're able to go through

 7   challenging activities, and she's able to feel encouraged and

 8   like she can take those on.  So, yeah, it's really nice to see

 9   the progress and seeing how the goals have changed through our

10   therapy, too.

11   *Q.*  Do you think that she has appreciated or understands how

12   much progress she has gotten working with you?

13   *A.*  Ah --

14   *Q.*  You haven't given her the test results.  She's listening

15   now for the first time.

16   *A.*  Yeah.  She emailed me maybe a week ago, can we go over

17   the test results?  And she scheduled an appointment so we could

18   go over those and set some goals and look at those and see what

19   would be appropriate goals.

20   *Q.*  Okay.  I have one more question.

21        Ms. Waller, can you put up Exhibit 13, and take us to

22   No. 25, please.

23        And that should come up on your screen, Ms. Jacobson.

24        Do you see all of those visits listed?

25   *A.*  Uh-huh.

Lisa Jacobson - Cross

1   *Q.* From June 15 to July 14 is what we have that up to.  Has

2 your care been reasonable, necessary, and causally related to

3 the cognitive injuries that Ms. Houston has?

4   *A.* Yes.

5         *MR. SHAPIRO:* Thank you for your time.

6         *THE WITNESS:* You're welcome.

7         *THE COURT:* Cross-examination, please.

8                   **CROSS-EXAMINATION**

9 *BY MS. BOBET:*

10   *Q.* Good afternoon.  Can you hear me all right?

11   *A.* Yes.

12   *Q.* We've spoken on the phone before.  This is my first time

13 seeing you in person, so hello.

14   *A.* Hello.

15   *Q.* Now, you had somewhere around two dozen sessions with

16 Ms. Houston; right?

17   *A.* Uh-huh.

18   *Q.* And you only expect to have a few more sessions with her?

19   *A.* My thinking is -- well, it depends.  It depends on what her

20 goals are.  If she is, you know, looking to return to work,

21 taking on more difficult tasks, then I'm happy to work with her

22 for a few sessions to think through what -- what strategies she

23 can put in place to ensure that those are working for her,

24 whether we need to make some changes.  If she's planning to

25 maintain things as they are, then I would say, you know, maybe

566

Lisa Jacobson - Cross

 1   we're having two to four more sessions, depending on what goals

 2   she wants to work on.  It depends on the complexity of her

 3   life, I guess.

 4   Q.  So with a few more sessions focused on the goal of

 5   returning to work, do you think it's possible she will be able

 6   to return to work?

 7   A.  I think we need to look at it in stages and see how the

 8   smaller pieces go.  If she's able to piece together articles

 9   that are to the standard that she wants to recruit more -- more

10   clients, then I think we would start there.  If she, you know,

11   is wanting to expand that to -- past the articles, but to

12   having one-on-one sessions, then I guess I would want her to

13   use me as a guinea pig, maybe, or include me on how those are

14   going, to whether that's going to continue to be successful or

15   not.  I have to see more of what that looks like to know.

16   Q.  It sounds like there is some strategies that you can use to

17   make it possible that she'll be able to go back to work; right?

18   A.  I think it depends on the -- the complexity of the people

19   that she's working with, whether she's able to offer

20   suggestions that are appropriate to them or not.

21   Q.  I want to talk just briefly about the tests you use.  Those

22   are the RBANS assessments; is that correct?

23   A.  Yes.

24   Q.  So you mentioned some areas in which Ms. Houston has

25   improved in the time between the two different tests; right?

Lisa Jacobson - Cross

1   *A.*   Yes.

2   *Q.*   And one thing struck me, that I think you mentioned she had

3   high average scores in some areas; is that correct?

4   *A.*   I believe so.

5   *Q.*   And those included immediate memory and attention; right?

6   *A.*   Let me look here.   Immediate memory, yes.   Attention, yes.

7   *Q.*   So she has a high average score in immediate memory score

8   and attention; correct?

9   *A.*   Uh-huh.   Yes.

10   *Q.*   And I just want to be clear.   You didn't diagnose

11   Ms. Houston with a TBI yourself; correct?

12   *A.*   No.   That wouldn't be my scope of practice.

13   *Q.*   You didn't diagnose her with any kind of brain injury?

14   *A.*   No.

15          *MS. BOBET:*   Ms. Robinson, can you pull up Exhibit 70.

16   BY *MS. BOBET:*

17   *Q.*   I believe you -- you mentioned earlier, you responded to

18   questions from Francine Mazone, who is the life care planner

19   hired by Ms. Houston in this litigation; is that right?

20   *A.*   Yes.

21   *Q.*   I'm going to pull up on your screen, you should see it

22   shortly --

23   *A.*   Okay.

24   *Q.*   -- Exhibit 70.   For the record, it's been stipulated and

25   admitted.

568

Lisa Jacobson – Cross

1              Can you see that, Ms. Jacobson?

2   A.   Not yet.  Yes.

3   Q.   Okay.  Great.  So is that your response to the questions

4   you received from Ms. Mazone?

5   A.   Yes.  That looks to be mine.

6   Q.   All right.  We'll just scroll down and see the signature

7   there.  Is that your signature?

8   A.   It's -- yes.  That's my signature.

9   Q.   Okay.  So just this one page is your response; right?

10  A.   Yes.

11  Q.   Ms. Mazone didn't follow up with you at all after you

12  submitted these responses?

13  A.   Not that I recall.

14  Q.   And you didn't have any other communications with

15  Ms. Mazone besides answering the questions on this form; is

16  that correct?

17  A.   Right.  She I believe sent me a letter -- I can't remember

18  if she called me ahead of time -- and then I indicated to her

19  when I submitted it.

20          MS. BOBET:  If you can scroll back down to the end.

21  BY MS. BOBET:

22  Q.   So the date of this is September 12, 2019; is that right?

23  A.   Yes.

24  Q.   So more than a year ago?

25  A.   Yes.

Lisa Jacobson - Cross

1  *Q.*  And as I understand your testimony, Ms. Houston has

2  improved since then; correct?

3  *A.*  Yes.

4  *Q.*  You're not specifically involved with your office's

5  billing, are you?

6  *A.*  No, not unless there is some kind of a refusal of payment,

7  you know --

8  *Q.*  I'm sorry.  I stepped on your words there.  What was the

9  last part?

10  *A.*  That's okay.  If I've made some kind of an error that makes

11  it difficult to bill, that's the only time that I would be

12  involved.

13  *Q.*  You're not ordinarily involved with processing bills for

14  your office; correct?

15  *A.*  Correct.

16  *Q.*  And you're not aware of the rate that specific services are

17  charged at?

18  *A.*  Not generally.  I mean, I usually have a ballpark figure;

19  but, no.

20  *Q.*  So you wouldn't be aware of the specific cost for one

21  session with you, for example?

22  *A.*  You know, generally, I -- you know, it depends on the kind

23  of session it is.  But I have, you know, certain sessions that

24  might be between 2 and 500.  You know, it's pretty rough in my

25  head.  Yeah.

1          MS. BOBET:  One moment.

2          THE WITNESS:  Uh-huh.

3          MS. BOBET:  Those are all the questions that I have

4   for you.  I appreciate your time.  Mr. Shapiro might have more.

5          THE WITNESS:  Okay.

6          THE COURT:  Go ahead, please.

7          You're muted.

8                        **REDIRECT EXAMINATION**

9   BY MR. SHAPIRO:

10  Q.  I just have a couple of questions, Ms. Jacobson.  Would you

11  agree that Ms. Houston's pain level is a key to her return to

12  work and her function?

13  A.  I would absolutely say it's key to her functioning; and,

14  therefore, return to work could be part of that.

15  Q.  You determined with your three sets of tests -- let me ask

16  you this:  Did you determine with your three sets of tests that

17  she objectively has cognitive deficits that impact her everyday

18  activities?

19  A.  Yeah.  I think that's clearly shown.  Uh-huh.

20         MR. SHAPIRO:  Thank you.

21         THE COURT:  Thank you very much, Ms. Jacobson.

22         THE WITNESS:  You're welcome.

23         THE COURT:  May this witness be excused?

24         MR. SHAPIRO:  Yes, sir.

25         MS. BOBET:  No objection, Your Honor.

1          *THE COURT:*  All right.  You're excused from further

2     testimony in this case.  Thank you very much.

3               *THE WITNESS:*  Thank you.

4               *THE COURT:*  Next witness, please.

5          *MR. OGBORN:*  Your Honor, I think we should explain

6     something about the schedule.  I know that Mr. Opp was

7     scheduled to testify before Ms. Jacobson.  And I saw you

8     looking at your schedule, and I think we ought to explain what

9     happened.

10         Because we got a little delayed in witnesses today, we

11    kept pushing Mr. Opp back.  He ended up having a root canal

12    yesterday afternoon, had some swelling and some pain, and so we

13    moved him to tomorrow morning so that maybe he would be able to

14    enunciate better when he comes in.  So we have -- I think -- we

15    have Dr. Gustavson finishing up tomorrow morning at

16    9:00 o'clock; we have Mr. Opp coming in immediately following

17    Dr. Gustavson; and then we will continue with the testimony of

18    the plaintiff, Tracy Houston.  In order to fill up this

19    afternoon, I think what we'd like to do is start the testimony

20    of Tracy Houston to use our time best as possible.

21              *THE COURT:*  That's fine.

22         *MS. BOBET:*  If I could just add while we're discussing

23    timing.  We had anticipated starting the defendant's case by

24    tomorrow afternoon, and so we have Dr. Collier will be ready

25    after the lunch break at 1:00.  And I'm not sure if she has a

572

 1    lot of flexibility in her schedule; so if it's possible to call

 2    her then, we'd ask to do that.

 3            THE COURT:  Yes.  Call her out of turn.  Any

 4    medical --

 5            MR. SHAPIRO:  What is the rest of the expert schedule,

 6    Ms. Bobet?

 7            MS. BOBET:  We're anticipating after Dr. Collier,

 8    we'll call Dr. Kalat and then Dr. Goldman.  We're not going to

 9    be calling Ellen Price.  But between Dr. Kalat and Dr. Goldman

10    that will probably be half a day each.  So by my calculation, I

11    think that probably takes us into next week; although I suppose

12    things could go differently.

13            THE COURT:  All right.

14            Let's go ahead with your next witness, please.

15            MR. OGBORN:  Thank you.

16            MR. SHAPIRO:  We would call Ms. Houston.

17            Your Honor, we are just setting up the camera for her

18    to be able to see everyone.

19            Your Honor, we're just having a minor technical

20    difficulty.

21            THE COURT:  Ms. Houston, this is the judge.  Can you

22    hear me?

23            THE WITNESS:  Yes, Your Honor.

24            THE COURT:  All right.  I want you to understand, it's

25    about seven minutes before 4:00, and we're going to have your

Tracy Houston – Direct

1    examination.  It will be up to your attorney, sometime between

2    4:30 and 5:00, we'll recess and then you will come back and

3    testify further.  If you're having any difficulty at all,

4    please let us know, and we'll recess earlier.

5              Please swear in the witness.

6              (**TRACY HOUSTON, PLAINTIFF'S WITNESS, SWORN**)

7              *MR. SHAPIRO:*  Your Honor, I gather you and Ms. Bobet

8    can see Ms. Houston, Ms. Houston can't see both of you yet.

9    It's coming.

10             *THE COURT:*  She doesn't need to see me.

11             *COURTROOM DEPUTY:*  Please state your name for the

12   record and spell your last name.

13             *THE WITNESS:*  My name is Tracy Houston, and my last

14   name is spelled H-O-U-S-T-O-N.

15                         **DIRECT EXAMINATION**

16   *BY MR. SHAPIRO:*

17   *Q.*  Ms. Houston, where do you live, and what's your address?

18   *A.*  My address is 1231 Signal Rock Road, Grand Junction,

19   Colorado.

20   *Q.*  How long have you lived in Grand Junction?

21   *A.*  Since December of 2015.

22   *Q.*  Why did you move to Grand Junction?

23   *A.*  I wanted to live back in the country, where -- in an area

24   that was similar to where I was raised.

25             *MR. SHAPIRO:*  Okay.  She can see all of us at this

Tracy Houston – Direct

574

1    point, Your Honor.

2    *BY MR. SHAPIRO:*

3    *Q.*  Where did you live before that?

4    *A.*  Lakewood, Colorado.

5    *Q.*  And where did you grow up?

6    *A.*  I grew up in Adams County, just outside of a small

7    community in Brighton, Colorado.

8    *Q.*  You told me it was near where the new courthouse is?

9    *A.*  Yes.  My grandparents were dryland wheat farmers, and they

10   had a half section right across the street from where the new

11   courthouse is.  And as a kid I went with my grandmother with

12   her cart up that hill.  And at the top of that hill, there was

13   an area where there was a lot of rocks; and so we collected

14   rocks for her flower garden.

15   *Q.*  How many siblings do you have?

16   *A.*  I have a sister.

17   *Q.*  Older or younger?

18   *A.*  Older.

19   *Q.*  Tell us about your childhood and what happened with your

20   mom and dad.

21   *A.*  Well, I was raised -- it's a very rural area where I was

22   raised, and maybe about a mile down the road from my

23   grandparents.  And so I had horses and was involved in

24   O-Mok-Sees and gymkhanas and gardening and a lot of -- well,

25   physical outdoor activities.

Tracy Houston – Direct

1        And then my grandparents had a very special role.  My

2   dad was the youngest of seven boys, and me being a girl, my

3   grandmother was thrilled, of course.  And so when my parents

4   were divorced -- which I was 11 -- they -- our relationship

5   that was already in place grew; and they really did step in for

6   my mother.  She had come to college and went to college in

7   Greeley; and then she moved back to New Jersey, where she was

8   from, once my parents were divorced.  So -- yeah, it was -- I

9   feel like I was very fortunate to be raised in a rural area,

10  with rural experiences and a sense of myself very deeply rooted

11  in that.

12  Q.  How did you deal with your mom leaving when she did, and

13  what was the relationship like with your mom before that?

14  A.  Well, I dealt with my mother leaving.  It was very

15  difficult, but I basically took over the house.  Even though I

16  was the younger of the two of us, I was in my person, maybe

17  more like the older.  So about the time I turned nine or so and

18  became, you know, closer to a teenager, became stronger, my

19  mother -- yeah, she was deeply disturbed by me and was both

20  physically and emotionally abusive.

21  Q.  There is some notes in your Kaiser records that talk about

22  sexual abuse.  All it says is those words; there is nothing

23  else.  Was there ever any sexual abuse?

24  A.  No, there was not.

25  Q.  Okay.  But your mom was physically and emotionally abusive

576

Tracy Houston – Direct

1    to you?

2    A.   Correct.

3    Q.   We'll talk about that in a little bit.  How old are you

4    now?

5    A.   58.

6    Q.   How old were you at the time of this crash?

7    A.   55.

8    Q.   Have you been married?

9    A.   Yes.

10   Q.   On how many occasions?

11   A.   Twice.

12   Q.   When did you first get married?

13   A.   I was 18.

14   Q.   And when did you get divorced the first time?

15   A.   I think I was early 20s.  I don't remember exactly.

16   Q.   Any children from that first marriage?

17   A.   Yes.  I have a daughter.

18   Q.   Do you have any other children?

19   A.   I do not.

20   Q.   How old is your daughter?

21   A.   She's 38.

22   Q.   Okay.  And when did you get married again?

23   A.   I was in my 40s.

24   Q.   And how long were you married the second time?

25   A.   Only a few years.

577

Tracy Houston - Direct

1   Q.   Okay.  What family members were around you as you were

2   growing up?  How big was your family?

3   A.   Well, with the seven boys, they were all married, and my

4   father was the only one to stay close to his parents.  Some of

5   my uncles were in Denver, and some -- I think the farthest away

6   was California, one of my uncles.  But my grandmother often --

7   she was from Arkansas, and she loved to cook.  And oftentimes

8   whoever could come with their children, so we had Sunday meals

9   and lots of camaraderie and fun on the farm.

10  Q.   So I know you've told me a lot of times that you were dry

11  wheat land farmers.

12  A.   Uh-huh.

13  Q.   What does that mean?  And what else did you do on the farm

14  between -- besides, as I understand it, grow wheat without

15  water.

16  A.   Uh-huh.  Well, that's what dryland wheat farming is, it's

17  totally relying on mother nature to rain.  And so we didn't

18  have what they call crawlers, which are really big equipment --

19  sometimes maybe you drive by and see water coming out from very

20  large -- there is no irrigation and no water, so -- but my

21  grandparents' farm had many outbuildings and then older

22  equipment.  And so there was -- I was very curious and got a

23  chance to explore and just -- you know, I can remember looking

24  at the different kinds of trees and the moss that would grow,

25  and I could get up on the old equipment, and it was very

578

Tracy Houston – Direct

1    intriguing for me.

2    Q.  Did you have animals?

3    A.  Oh, yes.  We had, you know, the typical kind of dog, cat;

4    but my focus maybe more was on the horses.

5    Q.  Any other animals besides horses, dogs, and cats?

6    A.  No.

7    Q.  Did you have to take care of the animals?

8    A.  Yes.

9    Q.  What were your responsibilities?

10   A.  Well, the feeding, some cleaning of stalls, some keeping up

11   of equipment, you know, maybe oil saddles and stuff like that.

12   Q.  Did you participate in the farming activities?

13   A.  Yes.

14   Q.  What did you do?

15   A.  Well, I -- there was a piece of equipment that -- at that

16   time you pulled and you put the seed in, whatever you were

17   growing, and it would drop through cylinders, and there was --

18   and this was behind the tractor.  So it hooked up to the

19   tractor, and then there was like a little seat that you could

20   sit on and look to see how the grain was falling through.  And

21   it was my job to make sure that there was still grain in there

22   and to kind of monitor that and speak up when it needed to be

23   refilled.  So just things that made a kid feel like they were,

24   you know, a part of something.

25   Q.  Tell us what you gained or what you got of yourself from

Tracy Houston - Direct

 1   growing up in that kind of a lifestyle.

 2   *A.*  Well, I was very fortunate to gain a sense of myself that

 3   was expansive, that could be put to different tasks and have

 4   some level of accomplishment, understand a work ethic and what

 5   that meant, that there really -- when there was challenges, it

 6   really wasn't a challenge so much, you just work through it.

 7   And there was some level of faith -- Christianity, faith.

 8   So . . .

 9   *Q.*  What was your relationship like between you, your father,

10   your grandparents, aunts, uncles, and cousins?

11   *A.*  Well, good.  I was a lot younger, because my dad being the

12   youngest of seven boys, there was a pretty good gap between him

13   and the older -- the next one up, so -- and my cousins, I was

14   younger.  And so it was a little bit of -- and I was my dad's

15   girl, so -- somewhat kind of special, in that sense, you know.

16   *Q.*  How long did you stay on the farm, and when did you leave?

17   *A.*  Well, let's see.  I raised my daughter there.  When she

18   went to college, then I left.

19   *Q.*  So let's talk about your education.  You had -- how old

20   were you when you had your daughter?

21   *A.*  Oh, I was 20.

22   *Q.*  And where were you in the education process at that point?

23   What happened with high school?

24   *A.*  I had dropped out of high school.  My poor father

25   probably -- I approached him several times to leave school, and

Tracy Houston - Direct

1   he wanted me to just at least try one year of high school,

2   which I started, and then I -- I didn't finish from there.  So

3   I just went to work more than I was already working.  And then

4   once I was divorced, I found myself being the sole provider for

5   my daughter, so I went back and got my GED and -- I can't

6   remember when that was.  And then I started at Aims Community

7   College, and I went there for two years at night, and then I

8   transferred those credits to Metro State.  So I started

9   commuting at night into Denver.  And I got scholarships for

10  most of that education.  And then I decided that I wanted to

11  have a master's degree so --

12  Q.  Let's stop one second.  When did you graduate from Metro

13  State, and with what type of a degree?

14  A.  I think it was 1989.

15  Q.  Okay.

16  A.  And I got a bachelor's in business.

17  Q.  Okay.  Did you like school?

18  A.  Very much.

19  Q.  Were you good at school?

20  A.  Yes.

21  Q.  Were you good at high school before you dropped out?

22  A.  Pretty good, except for math.  I couldn't do that.

23  Q.  Okay.  And you got a bachelor's degree.  Were you working

24  during that time frame?

25  A.  Yes.

581
Tracy Houston – Direct

1   *Q.*  When you were going to school?

2   *A.*  Yes.

3   *Q.*  And so what were you doing -- let's start when you dropped

4   out of high school.  What kind of jobs did you try to do?

5   *A.*  Well, Penny and I, as she testified, we were working at the

6   sub shop, and then I started waiting tables.  And then when I

7   was divorced, I didn't have any skills besides that, and it

8   didn't make that much money, so I started cleaning homes.  So I

9   don't know how much farther you want me to go.

10  *Q.*  What was your first business that you set up yourself?

11  *A.*  That was a cleaning business.

12  *Q.*  And so where were you cleaning homes, and was it just you?

13  *A.*  I was cleaning homes in Brighton, and I -- a little bit of

14  business I had with people.

15  *Q.*  How old was your daughter during this time frame?

16  *A.*  Well, she was a toddler then.

17  *Q.*  How did you take care of her while you were working?

18  *A.*  Partly day care, and my dad helped.  We lived right next to

19  my dad.  I had a mobile home there on the property.

20  *Q.*  Okay.  So you -- you go to Metro.  Were you working through

21  Metro?

22  *A.*  Yes.

23  *Q.*  What were you doing as you were going to Metro State

24  University?

25  *A.*  I think that's when I was cleaning homes.

582

Tracy Houston – Direct

1    *Q.*   Okay.  What type of a job did you have after that?

2    *A.*   I got a job at Aims Community College.  I was teaching part

3    time, and then I became director of their recruitment.

4    *Q.*   At Aims Community College.  How did you get that position?

5    *A.*   Well, it was at the Fort Lupton campus.  That was a

6    satellite campus.

7    *Q.*   How did you get that type of position?

8    *A.*   I believe I interviewed for that.

9    *Q.*   Okay.  And so any other jobs while you were going through

10   Metro State University?

11   *A.*   Not that I can remember.

12   *Q.*   All right.  Do you remember when you graduated from Metro

13   State?

14   *A.*   I think it was 1989.

15   *Q.*   And then what kind of job did you get after graduating from

16   Metro State University?

17   *A.*   I think that's when I was at Aims.

18   *Q.*   Okay.  Any other jobs after that before going on to get

19   your master's?

20   *A.*   Well, somewhere in there, I began to do public

21   participation, and I worked at a really small firm, and we

22   worked under CH2M Hill.

23   *Q.*   Under what?

24   *A.*   CH2M Hill.

25   *Q.*   Okay.

Tracy Houston – Direct

1  A.  It's an engineering firm.  And we would do stakeholder or

2  outreach -- like, for example, if they were going to expand

3  I-70, we would go mile by mile and interview the neighborhood

4  people, the politicians, and see if there was going to be

5  issues like maybe a historic building that people would maybe

6  object to, like should a construction of a road take over that

7  area.

8  Q.  Was that a full-time job?

9  A.  Yes.

10 Q.  Did you like that?

11 A.  Yes.

12 Q.  I want to ask you, what type of activities did you

13 participate in -- and did you go to Brighton High School?

14 A.  I did.

15 Q.  And you didn't graduate from Brighton High School?

16 A.  I did not.

17 Q.  Okay.  What activities did you participate in high school?

18 A.  I was in gymnastics, and then I still -- I -- yeah, I think

19 it was just those gymnastics.

20 Q.  Okay.  Were physical activities important to you, and why?

21 Where did that develop?

22 A.  Well, it started where I was raised, you know, as far as

23 the -- working around what was happening around the rural area,

24 whether that be the gardening or the farming or walking with my

25 grandmother up the hill to get rocks.  That's -- that was

Tracy Houston - Direct

1   pretty everyday, you know, deeply ingrained part of my life.

2   Q.   Okay.   What did education mean to you, and why after you

3   got your bachelor's did you want to go obtain a master's

4   degree?

5   A.   Well, education meant to me that I could support as the

6   head of my household.   And I felt like I needed to broaden out

7   in the -- I needed to broaden out, outside of business to

8   understand culture and communication more -- communication.

9   Q.   How did you obtain a master's, and where did you obtain a

10   master's?

11   A.   I graduated from the University of Denver.

12   Q.   When did you do that?

13   A.   I believe it was '96.

14   Q.   And what was your master's degree in?

15   A.   Liberal arts.

16   Q.   Okay.   And what were you hoping to do with your master's

17   degree?

18   A.   Well, I felt that it would position me to not only have a

19   broader base of skills, but help me build to advance myself.

20   Q.   Did you enjoy your college education as -- your bachelor's

21   as well as your master's?   What did it do for you?

22   A.   Well, I was commuting into Denver; so it taught me to

23   understand a whole different lifestyle.   You know, the rural

24   versus the urban.   And it opened up my world.   Metro State,

25   particularly, is a campus with a tremendous amount of

Tracy Houston - Direct

1   diversity.  And I would stand in the hallway and just -- and,

2   you know, people would come by, and it was just like -- it

3   was -- it was extremely stimulating and intriguing to me.

4          And then -- for example, at DU, they allowed me to

5   choose a large amount of my credits as far as elective; and so

6   I was able to -- at that time they were teaching one of the few

7   courses on Native American Indians and their culture and

8   communication styles and just -- you know, it was just

9   tremendous eye opening for me.

10  *Q.*  How did you manage to pay for your education and also work

11  to pay to raise your daughter while going through both of those

12  educational programs?

13  *A.*  I got a lot of scholarships.  I had a really high GPA so --

14  I did have some financial aid.  My father helped me.  I did get

15  a small amount -- when we could find my ex-husband, I got a

16  small amount of child support, and then my wages.

17  *Q.*  Were there times during your going through the educational

18  system and trying to work to support your daughter that you

19  needed government assistance?

20  *A.*  Uh-huh.

21  *Q.*  How was that, and what impression did that leave on you?

22  *A.*  Well, I was thankful for it; but it's hard.  It's -- it

23  was --

24  *Q.*  How are you feeling today?

25  *A.*  Fine.

Tracy Houston – Direct

1   *Q.*  How does your leg feel?

2   *A.*  It hurts.

3   *Q.*  After you got done with your master's degree, what did you

4   do?

5   *A.*  Well, I continued working and raising my daughter.  I was

6   doing also volunteer work all throughout -- on and off

7   throughout that, so . . .

8   *Q.*  I know you wanted to show some background documents to the

9   Court.  What I'd like to do is put up --

10          And, Judge, it's in our exhibit book, starting with

11   No. 5.

12          *THE COURT:*  All right.

13          *MR. SHAPIRO:*  Can we put that up for Ms. Houston?

14          *MS. BOBET:*  Just for the record, this is not a

15   stipulated exhibit.  We had some objections to it, so we can

16   argue those if they're moved into evidence.

17          *MR. SHAPIRO:*  We don't intend on moving them into

18   evidence.

19   *BY MR. SHAPIRO:*

20   *Q.*  So is this your -- an older curriculum vitae of yours?

21   *A.*  No.  This is my volunteer history.  Yes, uh-huh.

22   *Q.*  So we've talked about the MBA.

23          Can we scroll up a little bit more.  Stay down for a

24   second, Ms. Waller.

25          What is ICAST?

Tracy Houston - Direct

 1   *A.*  ICAST is a nonprofit that works in the renewable energy

 2   space.  It focuses for maybe underserved or lower income areas.

 3   *Q.*  And what were you doing for that nonprofit?

 4   *A.*  I was on their board and helped -- because I had previously

 5   been on a board of an electric co-op, so my contributions were

 6   understanding how that -- the world of energy worked, which is

 7   highly regulated and complicated, and then how a kind of

 8   upstart energy could expand.  And through the years I was

 9   there -- the last year or two, I can't remember which, but I

10   ended up chairing that board.

11   *Q.*  Okay.  And then while you were going through your master's

12   program, or after your master's program, did you volunteer to

13   assist students?

14   *A.*  I did.

15   *Q.*  What did you do, and did you enjoy it?

16   *A.*  I loved it.  Well, at the Daniels School of Business, I

17   spent many years with them, doing a variety of different kind

18   of interfacing or engagement with the students.  So certainly

19   serving as a mentor.  And at times, the professors there would

20   call me to either speak one-on-one with a class or on a panel.

21   And at point, Chancellor Coombe, who was the chancellor -- I

22   forget the years he was there -- he wanted to start having

23   dinners with all of the incoming sophomores and to have an

24   alumni at each table, and I was very honored to be chosen to do

25   that.  He was hoping to help with retention.

Tracy Houston – Direct

1          *MR. SHAPIRO:*  Okay.  Let's scroll up, Ms. Waller,

2     please.

3     *BY MR. SHAPIRO:*

4     *Q.*  What is the Women's Vision Foundation that you participated

5     in?

6     *A.*  Yeah.  It's a nonprofit that helps women advance in their

7     career.

8     *Q.*  Is that something you enjoyed, as well?

9     *A.*  Uh-huh.  Yes.

10    *Q.*  All right.  Next we see the Brighton School District.  What

11    did you volunteer to do there?

12    *A.*  Well, after I dropped out of high school and began that

13    journey to GED and on, it became obvious to me that at that

14    time there wasn't a choice outside of the traditional high

15    school for people who either wanted to work or who just didn't

16    fit or whatever the situation was.  So I had this vision of

17    having a school that would address needs of students that would

18    fit that kind of situation.  And I began to share with people

19    about that and build a group that was excited about that.  And

20    as a volunteer, I did this.  And it got traction; and it got

21    the support of the school superintendent of the school

22    district, as well as the board.  And seven years later, we

23    opened -- in the building where I went to junior high, we

24    opened that school.  And today, it graduates about 200 students

25    a year, still today.

589

Tracy Houston – Direct

1          MR. SHAPIRO:  Okay.  Let's scroll up more.

2     BY MR. SHAPIRO:

3     Q.  I gather that's something you are very proud of?

4     A.  Yes.

5          MR. SHAPIRO:  Next, if you could go down a little bit,

6     Ms. Waller.

7     BY MR. SHAPIRO:

8     Q.  I see the Chamber of Commerce?

9     A.  Yes.

10    Q.  What was that?

11    A.  I helped with different educational events they had.

12    Q.  Okay.  And then I see United Power.

13    A.  Yes.  I was -- I was elected to that board.  It's a small

14    rural cooperative.

15    Q.  Okay.  And Aims Community College, what was that?

16    A.  I served on their advisory committee.

17         MR. SHAPIRO:  Okay.  Is there any more on that,

18    Ms. Waller?  That's it.

19         Okay.  Can we go to Exhibit 6.

20    BY MR. SHAPIRO:

21    Q.  I just want to put that up to refresh your recollection.

22    What is that -- an article I gather that was written about you.

23    What is that about?

24    A.  That's volunteer work for Holding the Vision, that

25    alternative school.

590

Tracy Houston – Direct

1   *Q.* Why is that so emotional for you to look at and talk about?

2   *A.* Well, the strength that my people -- my grandparents and my

3   father passed down to me.  My father especially was one to help

4   in the community, as well as his work professionally.  And I

5   was very fortunate to be around people like that and was able

6   to help other people.

7   *Q.* Okay.  Let's go to No. 7.  Is this a curriculum vitae

8   regarding your boards?

9           I want to see that come up first.  What is this one?

10  *A.* Yeah, my work.

11  *Q.* What is that -- what is in that Exhibit No. 7 to

12  illustrate?

13  *A.* It's -- like the resumé of my work.

14  *Q.* And after you got your master's, what was the work that you

15  put yourself into?

16  *A.* I joined a group called the Lennick Aberman Group.  And

17  they were executives who had left American Express and started

18  a consulting group to help performance in companies --

19  *Q.* Okay.

20  *A.* -- basically.

21  *Q.* What other companies did you start -- become involved in?

22  *A.* Can you scroll down?  I sure can't.  A little farther.

23          So then from after I worked with Lennick Aberman, I

24  started my own business, which continued some of -- I had a

25  contract with a company that was serving boards and doing a

Tracy Houston – Direct

1   little work on my own.  And so I just transitioned out of that

2   company once a year was up and went full time on my own.

3   Q.  Doing what?

4   A.  I was consulting with boards on performance or

5   effectiveness, as well as helping candidates who wanted to sit

6   on boards.

7   Q.  And that was when, in 1998?

8   A.  No.  I started in 2007.

9   Q.  That's the Board Resources Service, and that's -- can you

10  explain to the Court what it was that you did and how you

11  developed business for that company.

12  A.  Well, I worked to understand how a board functioned and

13  what they thought might be an area for improvement.

14  Q.  Okay.

15  A.  And then helped them with plans to do that.  And then the

16  individual one-on-one coaching, I worked with individuals to

17  decide what their next step was and make a plan to get there.

18  Q.  And you started doing that in 2007, and when did you stop

19  doing that?

20  A.  After the accident.

21  Q.  And have you been able to go back to that?

22  A.  No.

23  Q.  Why not?

24  A.  I -- I'm not able to focus and perform at that level.

25  Q.  Are you still trying?

Tracy Houston - Direct                                    592

 1  *A.*  Not as much.  I -- I tried to put together, as Ms. Jacobson

 2  was talking about, some advertising; but I was not able to go

 3  through with that.

 4  *Q.*  Have you given up on doing that?

 5  *A.*  I don't know.  Not -- not completely.

 6  *Q.*  Describe for us, if you would, your intellect or cognitive

 7  abilities as you understood them prior to this crash.

 8  *A.*  I felt like I was an intelligent, high-performing,

 9  insightful, caring --

10  *Q.*  Did you enjoy reading?

11  *A.*  Yes.

12  *Q.*  What kind of reading?

13  *A.*  Both professional reading, personal reading.

14  *Q.*  Okay.  What did you like to read, personally?

15  *A.*  I read either biographies or nonfiction.

16  *Q.*  Okay.  Did you enjoy writing?

17  *A.*  Yes.

18  *Q.*  What kind of writing?

19  *A.*  I wrote articles for -- about performance and goal

20  reaching; I wrote books about that; gave webinars and other

21  talks about that.

22  *Q.*  Okay.  Any other businesses that you started before you

23  started your corporate business?

24  *A.*  Well, I -- I started that cleaning business.

25  *Q.*  We talked about that.  Any others?

Tracy Houston – Direct

1    *A.*  Not that I started.

2    *Q.*  Okay.  When you started your own business dealing with

3    boards, as you've indicated, what did you like about it?

4    *A.*  My most favorite thing was one-on-one, the helping people.

5    *Q.*  What kind of skill set did you need to do that kind of

6    business?

7    *A.*  Deep listening, the ability to coach and motivate people.

8    *Q.*  How did you attract clients?  How did you utilize the

9    internet?

10   *A.*  I attracted clients with marketing pieces that I developed

11   and/or wrote.  And I did use the internet, and I also went to

12   associations here in Denver, and I also did some networking at

13   the University of Denver.  Doing that volunteer work, there was

14   quite a group of people there that I would interface with.  And

15   then as time went on, I would get referrals.

16   *Q.*  Did you publish books on the internet about subjects?

17   *A.*  I did.

18   *Q.*  What kind of books did you publish on the internet about

19   what kind of subjects?

20   *A.*  Well, three of them were how to become a board member; one

21   was on constructive inquiry; I can't remember the others.

22   *Q.*  Okay.  How did you get into hiking, and what kind of hiking

23   did you get into that you enjoy?

24   *A.*  Well, my church as a youth, we had a youth group.  And so

25   we had a van, and we would go on trips.  And then I went to

Tracy Houston - Direct

1   summer camp in the mountains, and that was a start -- start of

2   the -- kind of a hiking portion of my outdoor.

3   Q.   What did you get from hiking?

4   A.   Oh, well, again, the sense of myself in a physical

5   situation that was -- it refreshed me; it kept me in shape; it

6   put me in some of the most unusual places on earth.

7   Q.   Where have you hiked that would be unusual?

8   A.   Well, I have been very fortunate to hike nine of the fifty

9   some 14ers here in Colorado.  And I have been extremely

10  fortunate to spend time in the Grand Canyon, both with groups

11  and leading groups in the Grand Canyon.

12  Q.   How many times have you hiked down into Grand Canyon and

13  out of the Grand Canyon?

14  A.   Three.

15  Q.   And when did you do that?

16  A.   It started in 2000 maybe '8 or '9.  I can't recall for

17  sure, but somewhere along that line.

18  Q.   And what was it about the Grand Canyon and those hikes that

19  resonated with you?

20  A.   Wow.  The Grand Canyon is -- I -- it's fearfully beautiful,

21  and there are not words.  It's one of the seven natural wonders

22  of this world.  And when you go in there, it is a world on its

23  own.  And you hike down through millions of years of history,

24  and -- it has such a presence that it works on you.  And

25  people -- not everyone, but some people come out of there

Tracy Houston – Direct

1   different.

2   *Q.*  Did you -- before this crash, did you start developing -- I

3   don't know if I want to call it a business to do it, but what

4   were your plans with the Grand Canyon?

5   *A.*  Well, I trained with a gentleman who was already taking

6   people in, that I was a copilot with him.  And so I did one

7   trip with him, and then I also learned from him how to apply --

8   you have to apply like a year ahead to get in, and it's

9   competitive, and everybody has to make their schedules for

10  their vacations.  So it's a pretty lengthy process there,

11  and -- I forgot the question.

12  *Q.*  What were you trying to do with the Grand Canyon trips

13  before this crash occurred?

14  *A.*  Okay.  So then from the copilot, I twice had a group of

15  people that I led on three-day backpacking trips.  And so I was

16  working towards a business model that would combine physical

17  activity with personal and professional growth.

18  *Q.*  So were you using it almost for team building for a

19  professional?

20  *A.*  It definitely could be that.  Yeah.

21  *Q.*  Was it something you were doing to make a living, or was it

22  something you were doing to share something that you loved?

23  *A.*  Well, at that point I wasn't making much money off of it.

24  I did charge to get reimbursed for some of the expenses; and

25  then people if they felt like giving a tip like to your guide,

Tracy Houston – Direct

1   they would.  But it was the sharing of that place with people.

2   Q.  I want to show some photographs of some past experiences

3   and have you look at these and describe them.  This is

4   Exhibit 9.

5            Can we put those up?

6            What is the first photograph?

7   A.  That's --

8   Q.  What's that?

9   A.  Mount Falcon, outside of where I lived in Lakewood.

10  Q.  When was that?

11  A.  I think it was a couple years before I moved.

12  Q.  To Grand Junction?

13  A.  Yes.

14  Q.  Was that when you crested the top?

15  A.  Yes.

16  Q.  And below, we know that is Denver.  Rockies game?

17  A.  Yes.

18  Q.  What are the next ones?

19  A.  That was Trail Ridge Road.  I rode my bike up to -- yeah.

20  I rode from Estes Park up to Trail Ridge.

21  Q.  Okay.  Keep going.  That's Trail Ridge and a moose?

22  A.  Oh, yeah.  We were on a hike in -- what's the park in Estes

23  Park?

24  Q.  Rocky Mountain?

25  A.  Rocky Mountain National Park, and we came on a moose.

597

Tracy Houston – Direct

1 Q. Okay.  Let's keep going.  What's this?

2 A. That's a big elk in Estes Park.

3 Q. Okay.  That?

4 A. Oh, did a week's rafting trip on the Green River.

5 Q. Okay.  Let's keep going.  What's that?

6 A. Yeah, that's the trip.

7 Q. To -- on the river?

8 A. Yeah.

9 Q. What's that?

10 A. That's a trip -- a group of us -- that's when you first --

11 when you first begin your descent, that's the trail.

12 Q. Into the Grand Canyon?

13 A. Yeah.

14 Q. Okay.

15 A. Yeah.  So when you get to the bottom, that's the river you

16 cross there.

17 Q. Okay.  How long is it to the bottom and, obviously, to the

18 top?

19 A. Well, depending on how you go in, it's 6 or 7 miles.

20 Q. Okay.  Let's keep going.

21 A. I can't remember where that was.

22 Q. All right.  The next ones.  Who is your friend?

23 A. That's Carlos.  We called him the Latin lover because

24 everybody who walked by on the trail, he kissed.

25 Q. Where was that?

Tracy Houston – Direct

 1  *A.*  That's by Red Rocks.

 2  *Q.*  Okay.  Do you remember what these are?

 3  *A.*  I was in a step class.

 4  *Q.*  Okay.  These?

 5  *A.*  That's downtown Golden on a bike.

 6  *Q.*  Okay.

 7        *MS. BOBET:*  I want to break in.  I see like it looks

 8  like there is a lot more pictures.  I don't know if this is a

 9  point where it starts to get cumulative.  But if this is

10  something that is going to be moved into evidence or move much

11  further, we'll have a 403 objection on those grounds.

12        *THE COURT:*  Overruled.

13  *BY MR. SHAPIRO:*

14  *Q.*  So, now, was this cross-country skiing?

15  *A.*  Yes.

16  *Q.*  Where was this?  You look like you're --

17  *A.*  We're crossing a frozen lake there, but I can't remember

18  where we were.  Somewhere in Colorado.

19  *Q.*  Okay.  Keep going.

20  *A.*  Oh, this is -- this was a glacier, and these people -- we

21  went -- hiked up here to the top, and these people were sliding

22  down this glacier.  And the two gals that I was with, I turned

23  and I said, "I'm going to do that."  And so that's exactly what

24  I did.

25  *Q.*  Slid down the glacier?

Tracy Houston - Direct

1    A.  I got on the little tube.  And that water -- oh, my gosh.

2    Q.  All right.  Let's keep going.  Keep going.

3            Where are we there, do you remember?

4    A.  Colorado, but I can't remember.

5    Q.  All right.  Keep going.

6            Where is that, and what were you doing?

7    A.  That was a conference that I was speaking at in -- I

8    believe that was in Florida.

9    Q.  Okay.  And that was to assist with building your business?

10   A.  Yes.

11   Q.  Let's scroll down a little faster.

12           I know you were at some conference with some of these

13   weathermen and newscasters?

14   A.  Yeah.

15   Q.  What is that?  Is that your master's?

16   A.  No.  Chancellor Coombe invited me to speak at one of their

17   graduation ceremonies on behalf of the alumni.  And so that was

18   extremely meaningful for me as a high school dropout, because I

19   got to put robes on with all the trustees at DU.

20   Q.  Are you pretty proud of that?

21   A.  Absolutely.

22   Q.  Okay.  Let's keep going.  Keep going.

23           What are you doing there?

24   A.  New Years, start out the year jumping into a lake in

25   Boulder.

Tracy Houston – Direct

1  *Q.*  Okay.  Let's go to the next -- where is that?  Grand

2  Canyon?

3  *A.*  No, that's Moab.  Hiking in Moab, Utah, in Arches National

4  Park.

5  *Q.*  Okay.  Keep going.  What are these pictures?  Go a little

6  further.

7  *A.*  Yeah, this is Fairplay, Colorado, at a race, where you race

8  the llamas.  And you dress up, and you can win prizes.

9  *Q.*  Okay.  Let's scroll down a little more.  I want to see if

10  we can get to some of the Grand Canyon.

11        Where is this?

12  *A.*  This is -- this is at the Grand Canyon.  And this

13  particular picture, you can begin to see the descent and what

14  that -- and even maybe feel in your body how steep that is.

15        *MR. SHAPIRO:*  Okay.  If we could take that down,

16  Ms. Waller.

17  *BY MR. SHAPIRO:*

18  *Q.*  Ms. Houston, is it difficult for you to see those photos?

19  *A.*  Yes.

20  *Q.*  Why?

21  *A.*  Well, it's pretty -- reminder of about the loss.

22  *Q.*  Do you look at those photographs and think you look

23  different?

24  *A.*  Yeah.

25  *Q.*  What do you see?

Tracy Houston – Direct

1   *A.*   I was smiling.

2   *Q.*   What's that?

3   *A.*   I was smiling.

4         *MR. SHAPIRO:*  Your Honor, I think it would be a good

5   time to break for the day.

6         *THE COURT:*  We'll recess until 9:00 a.m. tomorrow

7   morning.  Court will be in recess.

8         (Recess at 4:48 p.m.)

9                        **I N D E X**

10  **Item**                                                    **Page**

11

12   ROBERT MCCARROLL
         Direct Examination By Mr. Ogborn          411
         Cross-examination By Ms. Bobet            424
13   FRANCINE MAZONE
         Direct Examination By Mr. Ogborn          428
14       Cross-examination By Mr. Scarpato         445
         Redirect Examination By Mr. Ogborn        468
15   EDITH JOHNSTON
         Direct Examination By Mr. Shapiro         471
16       Cross-examination By Ms. Bobet            518
         Redirect Examination By Mr. Shapiro       529
17   LISA JACOBSON
         Direct Examination By Mr. Shapiro         532
18       Cross-examination By Ms. Bobet            566
         Redirect Examination By Mr. Shapiro       571
19   TRACY HOUSTON
         Direct Examination By Mr. Shapiro         574
20                   REPORTER'S CERTIFICATE

21        I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.
22
          Dated at Denver, Colorado, this 30th day of September,
23  2020.

24

25
                                _____
                                Therese Lindblom,CSR,RMR,CRR