IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02914-JLK-MEH

TRACY HOUSTON,

    Plaintiff,

vs.

THE UNITED STATES OF AMERICA,

    Defendant.
_____

**REPORTER'S TRANSCRIPT**
TRIAL TO COURT - DAY FOUR
_____

    Proceedings before the HONORABLE JOHN L. KANE, JR., Senior Judge, United States District Court for the District of Colorado, continuing at 9:04 a.m., on the 24th day of September, 2020, via Video Teleconference.

**A P P E A R A N C E S**

    STEVEN A. SHAPIRO, MICHAEL JON OGBORN, and AMANDA R. PFEIL HOOD, Attorneys at Law, Ogborn Mihm, LLP, 1700 Lincoln Street, Suite 2700, Denver, Colorado, 80203, appearing for the Plaintiff.

    JANE ELIZABETH BOBET and VICTOR WILLIAM SCARPATO, III, Attorneys at Law, 1801 California Street, Suite 1600, Denver, Colorado, 80202, appearing for the Defendant.

THERESE LINDBLOM, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

John Gustavson – Cross

1          **P R O C E E D I N G S**

2          (In open court at 9:04 a.m.)

3          *THE COURT:*  Thank you.  Court is in session.

4          Dr. Gustavson.  Doctor, you've already been placed

5    under oath, and that applies throughout the trial.  So it's not

6    necessary to swear you in again.  Can you hear me?

7          *THE WITNESS:*  I can.  Thank you.

8          *THE COURT:*  Please continue with your

9    cross-examination.

10        (**JOHN GUSTAVSON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**)

11                    **CROSS-EXAMINATION CONTINUED**

12   *BY MS. BOBET:*

13   *Q.*  Good morning, Dr. Gustavson.  Thank you very much for

14   coming back to be with us.

15        All right.  Now, you believe Ms. Houston's cognitive

16   or psychological impairments overall are mild; is that correct?

17   *A.*  Based on the information that I got from Dr. Kalat's

18   report, it seemed like they were in the mild to moderate range

19   of impairment.

20   *Q.*  And that would include her memory and attention

21   difficulties; right?

22   *A.*  That's correct.

23   *Q.*  And by mild, you testified that means these impairments may

24   be bothersome, but they're not incapacitating; right?

25   *A.*  That's the conventional thinking.

John Gustavson – Cross

1   *Q.*  And they won't be grossly disruptive to her life?

2   *A.*  That's correct.

3   *Q.*  And they shouldn't prevent her from returning to some sort

4   of gainful activity?

5   *A.*  They would not prevent her from returning to some kind of

6   activity, but they may constitute a disruption.  She may have

7   to do things differently than she would have before.

8   *Q.*  In fact, with the right treatment, you'll expect that

9   Ms. Houston would be able to return to work in the future?

10  *A.*  That was my hope and my expectation.

11  *Q.*  And with the right treatment, it's probable that she'll be

12  able to get back to how she was before the accident?

13  *A.*  Things have changed following post-traumatic stress

14  disorder, so it's not that somebody is restored to their prior

15  condition.  On the other hand, an individual who suffered

16  trauma is able to return to near normal levels of function.

17  *Q.*  Now, you testified a couple of days ago about the therapy

18  that Ms. Houston had received back in her 20s for self-esteem;

19  right?

20  *A.*  Yes.

21  *Q.*  And she told you that therapy was to work on her

22  self-esteem; correct?

23  *A.*  That's how she characterized it to me.

24  *Q.*  And you were skeptical of that?

25  *A.*  I was neither skeptical nor -- nor did I, you know, believe

John Gustavson - Cross

1    it.  It was -- how she characterized it to me, that it was

2    therapy that she had gone through to help her self-esteem.

3    Q.  Well, you believed that -- you believe it was unlikely that

4    one would need several years of therapy just for self-esteem;

5    correct?

6    A.  I would agree with that.  Yes.

7              MS. BOBET:  Just a moment.  We're getting a bit of

8    background noise.  I'm hearing it from plaintiff's counsel.

9    Would you make sure you're muted?  Thank you very much.

10   BY MS. BOBET:

11   Q.  Now, you thought that Ms. Houston probably had PTSD from

12   her -- prior trauma in her life, earlier -- in her early years;

13   correct?

14   A.  I would say correct, insofar that I came to that conclusion

15   after I had completed my treatment with Ms. Houston.

16   Q.  And while she was treating with you, Ms. Houston also

17   didn't tell you about some more recent therapy she had had in

18   the mid 2000s; correct?

19   A.  She did not relate that to me.

20   Q.  She didn't tell you she had been diagnosed with depression

21   in the mid 2000s?

22   A.  No.

23   Q.  She didn't tell you that there was a history of suicidal

24   ideation around that time?

25   A.  She did not.

John Gustavson – Cross

606

1    Q.   Now, you mentioned in your testimony the issue of changes

2    to the brain that PTSD can cause.  Am I characterizing that

3    correctly?

4    A.   Yes.

5    Q.   So with the right treatment for PTSD, those changes in the

6    brain can heal; right?

7    A.   That is the general conclusion, yes.  That as the emotional

8    disorder improves, that the cognitive difficulties should

9    improve correspondingly.

10   Q.   And antidepressants have been shown to block the effect of

11   PTSD in the brain; right?

12   A.   I think "block" is an inappropriate word.  Antidepressants

13   have been shown to reduce the severity of the effects of PTSD.

14   Q.   A term you mentioned in your testimony was brain

15   dysfunction.  Am I correct that this term is generally used

16   synonymously with cognitive impairment?

17   A.   That would be fair.

18   Q.   And you believe Ms. Houston has some degree of brain

19   dysfunction; right?

20   A.   That's right.

21   Q.   You characterized that brain dysfunction as mild?

22   A.   Again, referring back to the neuropsychological testing

23   that was done, she showed impairment -- that is, deficits in

24   several areas of cognitive function.  And those deficits ranged

25   from mild to severe, most of them falling in the mild to

John Gustavson – Cross

1    moderate range.

2    Q.  And brain dysfunction is something that can improve over

3    time; right?

4    A.  Yes.

5    Q.  And if Ms. Houston's emotional problems were to improve,

6    her cognitive problems would also likely get better?

7    A.  Yes.

8    Q.  And in particular, if Ms. Houston gets the appropriate

9    treatment for PTSD, you'd expect improvement in her cognitive

10   problems; right?

11   A.  Yes.

12   Q.  So using the same term, you'd expect an improvement in her

13   brain dysfunction?

14   A.  Yes.

15   Q.  Now, I recall from your testimony that you're familiar with

16   the United States' neuropsychology expert, Dr. Kalat; correct?

17   A.  Yes.

18   Q.  And you've reviewed his reports in this case?

19   A.  I have.

20   Q.  You thought he did an excellent job on those reports;

21   right?

22   A.  They were good reports.

23   Q.  In fact, you agree with virtually all of Dr. Kalat's

24   opinions from those reports; right?

25   A.  For the most part I would agree.  He tended to emphasize

608

John Gustavson - Redirect

1    some things differently than I would have.

2    Q.  All right.

3            One moment, please.

4            Turns out that's all I have.  I was intending to be

5    brief, and I think I succeeded.  Thank you very much.

6    Mr. Shapiro might have redirect for you.

7    A.  Thank you.

8            THE COURT:  Redirect, please.

9                      **REDIRECT EXAMINATION**

10   BY MR. SHAPIRO:

11   Q.  Good morning.  Thank you.  Good morning, Dr. Gustavson.

12   A.  Good morning.

13   Q.  Where do you disagree with Dr. Kalat and his emphasis; can

14   you explain?

15   A.  The impression I got from reading his report is he was

16   characterizing the cognitive difficulties that he diagnosed on

17   her neuropsychological testing as primarily emotional in

18   nature, saying that they were related to PTSD and/or depression

19   or anxiety; and it seemed that he neglected to highlight the

20   idea that these are not just emotional or emotionally based

21   problems, that they're related to known organic changes that

22   can take place in the brain as a result of chronic PTSD or

23   other mood disorders.

24   Q.  Which -- well, you mentioned that Ms. Houston has brain

25   dysfunction which manifests itself in cognitive impairment; and

John Gustavson - Redirect

1   you said that they were from the range of mild to moderate --

2   actually, mild, moderate, and all the way to severe.  How do

3   those impairments impact day-to-day function?

4   *A.*  The -- the effect on day-to-day functioning may range from

5   distressing, troubling, upsetting, or bothersome but not

6   grossly disruptive to one's participation in the usual

7   activities of daily living or work, all the way to for someone

8   who has a severe impairment, they may be incapacitating or

9   disabling with respect to some aspects of mental activity.

10  *Q.*  Do you recall which of the deficits were moderate or

11  severe, and can you explain those?

12  *A.*  Based on Dr. Kalat's testing?

13  *Q.*  Yes.

14  *A.*  He had stated that she had mild impairment on a test called

15  the picture-completion test, which is a test that measures

16  one's attention to visual detail; she had mild impairment on a

17  test called category test, which measures a person's capacity

18  to problem-solve and to shift mental sets and to draw from

19  experience to develop new learning; she developed -- she

20  displayed mild impairment on a test of immediate memory; on a

21  test of delayed memory -- which is memory for information that

22  was presented a short while earlier -- she showed mild to

23  moderate impairment; she showed problems with attention and

24  working memory to be in the below-average range; verbal

25  reasoning and verbal memory were mildly impaired; perceptual

John Gustavson - Redirect

1   reasoning was low average.  I think that's the bulk of his

2   findings.

3   Q.  Okay.  Would those kind of deficits impact a person's

4   ability to function on a day-to-day basis?

5   A.  They will have some impact.  Yes.

6   Q.  Was it a good idea for her to obtain occupational or

7   cognitive speech therapy?

8   A.  I believe that there is potential benefit for doing those

9   therapies.  Yes.

10  Q.  What was the significance of the prior potential PTSD and

11  depression from years earlier and then adding to it what

12  happened here?

13  A.  The potential impact is that if an individual has suffered

14  some kind of psychological or emotional wound because of events

15  or circumstances that happen in the past, it tends to make them

16  more vulnerable to a recurrence of those symptoms with a

17  subsequent event.

18          I'll give you a for instance.  I treated a woman that

19  had PTSD as a result of a hostage situation that took place at

20  her work.  This was several years ago.  And she was in therapy

21  for several months; her symptoms improved; she was able to go

22  back to work; but with the recent advent of the COVID pandemic,

23  even though I had not seen her for several years, she made an

24  appointment to see me.  And she -- when she came in, she said,

25  I'm having a lot of the same symptoms that I had before, I'm

John Gustavson – Redirect

1   not sleeping well, I'm feeling nervous all the time, I'm having

2   flashbacks, I'm depressed, I'm afraid of going outside.  And

3   even though this was a separate event, I think for her, because

4   she had gone through this before, that she was more vulnerable.

5   The conventional thinking is that if a person has suffered some

6   kind of injury in the past, that they may be more susceptible

7   or more vulnerable to a subsequent event.

8   Q.  Doctor, was there any indication in any prior records you

9   saw that indicate that Ms. Houston had any problems from 2006

10   till the time of this crash in 2016?

11   A.  No.

12   Q.  When you say "vulnerable," was this a pre-existing

13   condition, or was this a predisposition?

14         MS. BOBET:  Objection.  Leading.

15         THE COURT:  Overruled.

16         THE WITNESS:  As I understand those terms,

17   pre-existing means that it was there before and ongoing at the

18   time of the more recent event.  And all the data that I had

19   obtained directly from Ms. Houston, as well as subsequent

20   records, suggested to me that it was not ongoing, it was not

21   present.  She was not depressed, she was not seeking therapy,

22   she was not on medication for depression or PTSD or other

23   symptoms at the time of her vehicular accident.  The word

24   "predisposed" suggests that she may have had a condition that

25   would have made her more likely to experience an exacerbation

612

John Gustavson – Redirect

1    of earlier symptoms or a worsening of problems as a result of a

2    subsequent event in this case, the vehicular accident.

3    *BY MR. SHAPIRO:*

4    *Q.*  When it comes back, Doctor, due to other events, is it the

5    same or worse the next time?

6    *A.*  It's variable.  It can be worse.  It is often worse, but

7    not necessarily so.  For example, this woman that I made

8    reference to who came back in in the wake of the COVID-19

9    situation, her symptoms had recurred.  And they were similar;

10   they weren't worse.  But therapy was relatively brief, and she

11   was able to regain her emotional footing and to benefit from

12   the therapy we had done before.  So that can happen, as well.

13   *Q.*  Is post-traumatic stress disorder difficult to treat?

14   *A.*  Yes.

15   *Q.*  Why?

16   *A.*  It's a complicated mental health condition that involves

17   multiple symptoms, symptoms that include an intrusive kind of

18   quality, like memories and flashbacks and nightmares and

19   obsessive thoughts.  It also tends to promote avoidant

20   behavior –– that is, people who have post-traumatic stress

21   often avoid situations that are related to, similar to, or

22   remind them of the event –– and because of that, it can prolong

23   the continuation of the symptoms.  And because it affects

24   mood –– that is, depression, feelings of discouragement,

25   demoralization, frustration, anxiety, tension, worry-filled

613

John Gustavson – Redirect

1    thoughts -- that's one of the components of PTSD.  And taken

2    together, all of those symptoms represent a challenge for a

3    therapist or a medication provider.

4         As I have mentioned in the course of my testimony,

5    there are often changes that take place within the brain -- for

6    example, hyperactivation of an area of the brain that tells us

7    that we're in danger -- a nucleus called the amygdala.  And

8    it's the center for fight or flight.  And when a person is in

9    real danger, that gets activated normally.  It's a part of our

10   survival mechanism.  But a person that has had PTSD will have

11   an activation of that system even when there is no real danger.

12   For example, they may have an exaggerated startle reaction when

13   they're approaching an intersection, not because there is any

14   real danger, but because it reminds them of the event that

15   caused them to get hurt in the first place.

16        And so typically, therapy is long-term; it involves

17   some fairly aggressive interventions.  We've talked about

18   those, exposure therapy, for example, desensitization, eye

19   movement --

20   Q.  Doctor, we lost you.  You pixelated.

21   A.  -- the depression, the anxiety --

22        COURTROOM DEPUTY:  Hold on one moment.

23        MR. SHAPIRO:  We're losing you.

24        THE WITNESS:  I'm sorry.

25        MR. SHAPIRO:  We lost you, and you pixelated.

614

John Gustavson – Redirect

1          *COURTROOM DEPUTY:*  It looks like you signed back in.

2     Can you hear the Court?

3          *THE WITNESS:*  I can hear someone's voice.

4          *THE COURT:*  Mr. Shapiro, do you want to say

5     something --

6          *THE WITNESS:*  You can see me?

7          *MR. SHAPIRO:*  Yeah, we can see you.

8          And, Doctor, the court reporter was going to read back

9     where she lost you, to help you continue to provide the answer,

10    if we can.

11         *THE WITNESS:*  Yes.

12         (Answer read back by the reporter.)

13         *THE WITNESS:*  Those are fairly common therapies.

14    There is no quick fix, no advice that someone can give a

15    patient that talks them out of their PTSD.  For those

16    psychological treatments, patients with PTSD are often treated

17    with medication that is designed to help mitigate the

18    depression or the anxiety or the nightmares or the obsessive

19    thoughts.

20    *BY MR. SHAPIRO:*

21    *Q.*  Doctor, do you have patients that you have treated for very

22    long terms that have post-traumatic stress disorder?

23    *A.*  Yes.

24    *Q.*  Do you have Vietnam War veterans that you are still

25    treating for PTSD?

615

John Gustavson - Redirect

1          We can't hear you.  We lost you.

2          We have been told he is working on it.

3    A.  Can you hear me now?

4    Q.  We can.

5    A.  Your question was, have I treated or am I treating people

6    who are suffering the effects of PTSD from Vietnam, which

7    occurred over 40 years ago?  And the answer is yes.  It can

8    linger for a lifetime.

9    Q.  What are the factors, despite adequate and reasonable

10   care -- why do they -- why does it continue to persist and they

11   need treatment?

12   A.  Some of it has to do with the magnitude of the trauma.

13   Witnessing a death, bodies being maimed, being responsible for

14   the death of other people are terrible things; and they implant

15   indelible memories in the lives of people who are exposed to

16   that.  So that's one factor.

17         Factor number two is, in the aftermath of Vietnam and

18   for many years, we didn't have particularly good treatments for

19   PTSD.  Better treatments have developed in recent years, and we

20   have a better handle on it now than we did before.  Plus, I

21   think the development of the wars in the Middle East have

22   prompted the military, particularly, to develop treatments that

23   are designed in helping soldiers be more emotionally resilient

24   and able to deal with trauma, and we have the kinds of

25   therapies now that we didn't have back then.

John Gustavson - Redirect

 1        Thirdly, it seems like people from that era -- from

 2   the Vietnam era who suffered PTSD -- and it wasn't talked about

 3   so much then.  In fact, I'm not sure that the diagnosis of PTSD

 4   even existed back in the '70s.  I'd have to check on that.  We

 5   called it shell-shock and other things.  And folks would

 6   develop maladaptive habits or patterns of behavior that seemed

 7   to perpetuate the symptoms.  For example, they would become

 8   reclusive, they would isolate, they wouldn't engage in social

 9   activities, they would withdraw.  A lot of these people

10   developed problems with alcohol and drug abuse, which not only

11   did not help, it tended to worsen the problems.  And so a lot

12   of Vietnam veterans, even though it's been years -- decades --

13   since the war, still suffer the lingering effects of that.

14   Q.  Doctor, even with the appropriate treatment or the

15   appropriate medication, are we still looking at a problem that

16   is going to have to be dealt with for the rest of Ms. Houston's

17   life?

18        MS. BOBET:  Objection.  Leading.

19        THE COURT:  Overruled.

20        Go ahead, please.

21        THE WITNESS:  I am not in a great position to answer

22   that because I haven't treated her for so long.  But the

23   typical thinking is that there are emotional and personality

24   changes that result from traumatic experiences that don't ever

25   go away, they don't disappear.  A person isn't restored to

617
John Gustavson – Redirect

1   their pretrauma health and frame of mind.  So to some degree or

2   another, she or anyone who has suffered the effects of PTSD

3   will have to confront those symptoms and address them in some

4   form or fashion.

5   *BY MR. SHAPIRO:*

6   *Q.*  Doctor, is post-traumatic stress disorder more treatable or

7   equally treatable as a mild traumatic brain injury, or are they

8   equally -- well, let me ask that question first.

9   *A.*  They're both disruptive.  If I were given the choice

10  between PTSD and a traumatic brain injury, I'd take PTSD, for

11  the reason being, with a traumatic brain injury, I know that

12  part of the very organ that describes how I think and feel and

13  reason and so forth has been damaged; whereas, PTSD is

14  considered to be more of a psychiatric disorder.  And my own

15  feeling as an individual, I have some capacity to manage that.

16  But as I addressed Ms. Bobet yesterday, I said, the answer to

17  that depends on the severity and the intensity and the

18  magnitude of those symptoms; and they're both bad.

19  *Q.*  Are they both equally as debilitating or disabling?

20  *A.*  Once again, the answer to your question is, it depends.

21  Mild traumatic brain injury tends to improve over time.  And

22  PTSD, given the right treatments, will tend to improve over

23  time, as well.  But as you have pointed out, there are

24  individuals who suffer the life-long, debilitating, even

25  incapacitating effects of PTSD, such as war veterans.

John Gustavson - Redirect

1   *Q.*  What is the effect of Ms. Houston's chronic pain, the

2   continual need for the treatment for the damage to her ankle,

3   causing complex regional pain or sympathetic nerve pain,

4   mechanical pain, et cetera, continuing to be activated and

5   reactivated and trying to reduce it, and every time there is an

6   exacerbation, what is the impact on the PTSD of that chronic

7   pain from this crash?

8          *MS. BOBET:*  Objection.  Leading.  Mischaracterizes the

9   evidence.

10          *THE COURT:*  I'm permitting leading questions because

11   this is a highly technical matter.  The objection is overruled.

12          If you think the question mischaracterizes the

13   evidence, you can bring that out on recross-examination.

14          Go ahead, please.

15          *THE WITNESS:*  Chronic pain in whatever form will tend

16   to compound an existing emotional disorder.  Chronic pain that

17   includes physical restrictions or physical limitations adds

18   another dimension that would amplify or add to emotional or

19   adjustment difficulties, because it interferes with an

20   individual's capacity to engage in the routine activities of

21   work and daily living.

22          I have yet to meet a person that suffers chronic

23   unremitting pain that isn't also depressed at some level,

24   because --

25

John Gustavson - Redirect

1    *BY MR. SHAPIRO:*

2    *Q.*  We lost you.

3    *A.*  -- the sufferer with a feeling of helplessness --

4    *Q.*  Doctor --

5    *A.*  -- and inability to deal with --

6              *COURTROOM DEPUTY:*  Hold on.

7              *THE WITNESS:*  Yes.

8              *MR. SHAPIRO:*  We lost you again for a minute.

9              *COURTROOM DEPUTY:*  Terri, can you let us know at what

10   point you stopped hearing?

11             *THE WITNESS:*  Can you hear me now?

12             *MR. SHAPIRO:*  Wait a second.

13             (Answer read back by the reporter.)

14             *THE WITNESS:*  Because of the changes it introduces

15   into their life and because they're hurting all of the time.

16   It has a demoralizing effect on individuals.

17   *BY MR. SHAPIRO:*

18   *Q.*  Doctor, does the up and down of Ms. Houston's chronic pain

19   continue to retraumatize her regarding this crash and the PTSD?

20   *A.*  Sorry.  That's your office person telling me I should keep

21   trying.

22             Well, there are two effects.  One is pain that waxes

23   and wanes, comes and goes, responds to one treatment and then

24   it returns introduces this sense of helplessness that --

25   creating a feeling that I'm at the mercy over circumstances --

John Gustavson – Recross

1   of circumstances that I have no control over.  And in and of

2   itself, that's got to be very demoralizing.  I mean, there is a

3   whole area of study in the field of psychology called learned

4   helplessness that has to do with that very concept.  So that

5   alone would be significantly discouraging to an individual.

6   And on top of that, if it reminds you every time that she has a

7   recurrence of pain of the accident, then, yes, there would be

8   some kind of retraumatizing effect.

9           MR. SHAPIRO:  Nothing further.  Thank you, Doctor.

10          MS. BOBET:  I just have a brief recross, Your Honor.

11          THE COURT:  Yes.  Go ahead, please.

12                    **RECROSS–EXAMINATION**

13  *BY MS. BOBET:*

14  *Q.*  Dr. Gustavson, I just want to clear up one point about

15  Ms. Houston's impairments, based on the testing you reviewed.

16  Isn't it your assessment that those impairments are mild?

17          MR. SHAPIRO:  Objection.  Asked and answered.

18          THE COURT:  Objection is overruled.

19          Go ahead, please.

20          THE WITNESS:  I would restate the opinion that I

21  rendered earlier, that based on the data in Dr. Kalat's report,

22  that those difficulties are mild to moderate, although the bulk

23  of them fall in the mild range of impairment.

24  *BY MS. BOBET:*

25  *Q.*  Just to be clear, I'm going to pull up an image of your

John Gustavson – Recross

1    deposition testimony here.  I'll read my question and your

2    answer.  You should see it there highlighted, and it's the

3    question about the areas of impairment from Dr. Kalat's

4    testing.

5         Question:  "What's your assessment of how severe

6         those impairments are?"

7         Answer:  "They're mild."

8         Did I ask you that, and was that your answer?

9    A.  You did ask me that, and that's what I said at the time.

10   Q.  Thank you, Doctor.

11        THE COURT:  Just a minute.  Read lines 7, 8, and 9

12   after that.

13        MS. BOBET:  Sure.

14        One moment, let me get it back up here on the screen.

15        Question:  "As far as every impairment you just

16        identified -- memory, attention, visual, spatial --

17        all of those are mild?"

18        Answer:  "Mild in the sense they're not going to

19        be grossly disruptive to her daily life.  They may

20        be bothersome or subjectively distressing; but my

21        impression, based on her testing, is that she can

22        return to some kind of gainful activity or get along

23        in life without having to go live in assisted

24        living."

25        Then it continues.

John Gustavson - Recross

1        THE COURT:  All right.  Read lines 16 through 22,

2    please.

3        MS. BOBET:  "So there is, you know, obviously a

4    difference between, say, going back to full-time work

5    tomorrow versus going to an assisted living facility

6    tomorrow.  Would you say that Ms. Houston is more

7    capable of -- or that Ms. Houston is capable of going

8    back to full-time work, living a normal life like

9    that?"

10        Would you like me to continue?

11        THE COURT:  Yes, please.

12        MS. BOBET:  Answer:  "At the time I completed my

13    treatment with her, I was impressed she could probably

14    do that, even though she mentioned as a satellite to

15    our therapy that she was having problems with memory

16    and concentration.  But I did not" --

17        Then we'll go on to the next page, Ms. Robinson.

18    "But I did not feel those were incapacitating in any

19    sense and that when she got physically better, she

20    was doing better enough emotionally, she could

21    probably return to the kind of work she had been

22    doing before."

23        Question:  "Is that still your opinion now?"

24        Answer:  "The test results did not dissuade me

25    from that belief."

623

John Gustavson - Recross

1          THE COURT:  Okay.  That's enough.

2          Doctor, does that complete your answer?

3          THE WITNESS:  Yes.

4          MS. BOBET:  May I take the deposition down from the

5     screen?

6          THE COURT:  Yes.  Go ahead.

7          MS. BOBET:  That was the only question I had.  Thank

8     you.

9          THE COURT:  Doctor, thank you for your cooperation and

10    willingness to come back again.  We appreciate that.

11         THE WITNESS:  You're welcome.

12         THE COURT:  Next witness.

13         MR. OGBORN:  Plaintiffs call Jeff Opp, Your Honor.

14    He's on his way into our office -- the courtroom right now.

15         THE COURT:  You need a recess now, is that what you're

16    saying?

17         MR. OGBORN:  No, Your Honor.  He is coming in right

18    now, so we can get started immediately.

19         THE COURT:  All right.

20         We can't see the witness yet.

21         THE WITNESS:  Thank you, Your Honor.

22         THE COURT:  All right.  Can you swear in the witness,

23    please.

24         MR. OGBORN:  Yes, please.

25         COURTROOM DEPUTY:  Please raise your right hand.

Jeffrey Opp – Direct

1          (**JEFFREY OPP, PLAINTIFF'S WITNESS, SWORN**)

2          *COURTROOM DEPUTY:*  Please state your name and spell

3     your first and last name for the record.

4          *THE WITNESS:*  Jeffrey B. Opp.  My last name is spelled

5     O-P-P.

6                      **DIRECT EXAMINATION**

7     *BY MR. OGBORN:*

8     *Q.*  Mr. Opp, I'm going to have you start, please, by telling us

9     what you do for a living.

10    *A.*  I'm a forensic economist.

11    *Q.*  And as a forensic economist, what do you spend most of your

12    time doing?

13    *A.*  Certainly.  So as a forensic economist, I'm one of those

14    economists without a crystal ball.  I can't predict the future;

15    I can't tell you what to invest your money in; what the stock

16    market is going to do; rather, I assist attorneys, insurance

17    agents, and litigates in the various financial aspects of their

18    lawsuits, primarily calculating or refuting damage calculations

19    in wrongful death, employment, personal injury, commercial,

20    governmental entity, and also some statistical work, as well.

21    *Q.*  Please tell us a little bit about your education, what

22    you -- what you did to get to this point in your life.

23    *A.*  You bet.  So I graduated from the University of Denver with

24    a bachelor's degree in economics in 1987.  Almost immediately

25    thereafter, I went on active duty in the Army.  I was in the

Jeffrey Opp - Direct

1  infantry, though, so not a lot of math.  I got off active duty

2  late '88, went to work for a firm by the name of Caulson

3  Karraker and Taylor.  They were a litigation support firm,

4  doing exactly what I do now.  Worked for those folks until

5  January of 1992, when Mr. Caulson and I broke off and formed

6  Caulson Opp Associates.  Mr. Caulson retired in 2015, and it

7  has been Opp & Company ever since then.  Over the 32 odd years

8  I've been doing this work, I think today is the 1,038th time

9  that I have offered sworn testimony.  I have testified in every

10 state in the country, with the exception of Alaska and a couple

11 of New England states.  Helped write a book that was published

12 in 2007 regarding these type of issues and have written

13 thousands of reports regarding personal injury, wrongful death,

14 life care plans, what have you.

15 Q.  Mr. Opp, you have -- you've been qualified -- I think

16 you've just indicated, you've been qualified as an expert in

17 Federal District Courts across the country?

18 A.  Yes, sir.  That is correct.

19 Q.  In fact, qualified as an expert in Federal District Court

20 in Colorado?

21 A.  Yes, sir.

22 Q.  On numerous occasions?

23 A.  Many times, sir.

24      MR. OGBORN:  Your Honor, at this time I would offer

25 Mr. Opp as an expert in forensic economics.

626

Jeffrey Opp – Direct

1          MR. SCARPATO:  No objection.

2          THE COURT:  The tender is accepted.  Go ahead, please.

3   BY MR. OGBORN:

4   Q.  Mr. Opp, what was your scope of forensic economics to be

5   done in this case?

6   A.  Quite frankly, sir, in this matter, my job was basically to

7   be a walking, talking calculator.  That is, to take the amounts

8   provided in Ms. Mazone's life care plans, the description of

9   treatment, the cost for that treatment, duration, and also

10  the -- pardon me -- and to discount those to present values,

11  come up with the amount that Ms. Houston needs today to fund

12  these future treatment plans.

13  Q.  Do you believe that what you received from Ms. Mazone gave

14  you enough information to be able to accomplish your task?

15  A.  Yes, sir, I do.  I mean, to be very clear, I am not a life

16  care planner; so I can't speak to the necessity or the validity

17  of the cost.  Rather, what I'm speaking to is the present value

18  of those costs.  And in order to arrive at the present value, I

19  absolutely did receive enough information to make these

20  calculations.

21  Q.  Mr. Opp, in coming up with present value, you don't have

22  just one number; you have a couple of different numbers you're

23  going to speak about.  Tell me about the philosophy using two

24  different numbers.

25  A.  Absolutely.  So when you're doing a life care plan, pretty

627
Jeffrey Opp - Direct

1    much every life care plan -- I have understandably seen

2    thousands of them -- has a range of values in them.  And that's

3    because different treatments cost different amounts, depending

4    on who you go see, the type of treatment may change.  No one

5    else has a crystal ball besides me.  And, thus, rather than

6    trying to split the middle and say, okay, let's take just the

7    average, I do what is called a high-low.

8         And so on the low side, if you take all the lowest

9    possible values, the lowest treatment options, and the highest

10   replacement time --  i.e., if something is going to be

11   replaced between every five and ten years, a ten-year

12   replacement rate would yield a lower number than a five-year

13   replacement rate -- you could take all of those low amounts,

14   here is the low number.  It means if you believe everything in

15   Ms. Mazone's life care plan, it can't be anything lower than

16   that low number.

17        On the flip side, we do the high number.  It's the

18   absolute inverse of the low.  And that means that you take all

19   the highest possible values in order to arrive at the high

20   number.  And so the answer is, there could literally be with a

21   life care plan this large a hundreds -- or hundreds, quite

22   frankly -- different permutations that could occur.  But the

23   bottom line is, they won't be any lower than the low number;

24   and they won't be any higher than the high number.  And that's

25   the point.

Jeffrey Opp - Direct

 1          And then where I add my expertise, I also do something

 2    different with the discount rates.  Because if we -- again,

 3    without the crystal ball, we're going forward 26.4 years,

 4    rounding down to 25.  If we look back over the last 25 years,

 5    the spread -- which is the difference between rate of growth

 6    and whatever we're measuring, is it something growing at just

 7    regular inflation -- CBI-U; is it something that is growing at

 8    medical inflation -- CBI-M; versus the interest you can earn.

 9    That amount for non-medical costs is about 2 percent discount

10    rate; and for medical costs, is about zero.  Meaning, the rate

11    of inflation for medical costs is about the exact same amount

12    that you could expect to earn on interest.

13          However, over the last five to ten years, there has

14    been what is called an inversion.  Those rates have actually

15    been considerably different.  And the main reason for that is,

16    interest rates over the last five to ten years have been at

17    historic lows.  And so while the rate of growth of inflation

18    and medical costs have gone about -- gone up at about the same

19    rate, interest rates have been at historic lows.

20          And so because I don't have a crystal ball, because I

21    don't know what is going to happen in the future, I then use

22    the lower discount rates and, in fact, on medical costs, a

23    half percent escalation rate on the high number.  I use the

24    25-year amount on the low number.  And so on the low side, we

25    have the most conservative assumption regarding future interest

Jeffrey Opp – Direct

1   rates and costs and the lowest values; and on the high side, we

2   have current day rates for rate of growth and interest costs

3   and the highest value.  So, again, including the interest

4   rates, many different permutations that can come in between the

5   two; but it won't be any lower than the low number; won't be

6   any higher than the high number.

7   Q.  Okay.  So I understand -- we now understand the high

8   number, the low number, we understand you're applying different

9   discount rates to each one of those.  One other question that

10  kind of fits into this category here.  With that high and low

11  and the discount numbers, are you dealing with the possibility

12  that if one modality in the life care plan works, then there

13  may not be a need for another modality of treatment in the life

14  care plan?

15  A.  Absolutely.  So in that example, if, say, one modality when

16  you discount to present value is 50,000, and the other modality

17  is 100,000, well, on the low side, I would only take the

18  $50,000 number and exclude the 100,000.  And I would do the

19  reverse on the high side.

20  Q.  If we can, I'm going to go to 25A, which are the most

21  recent tables you published regarding Ms. Houston's life care

22  plan expenses.  At the very top of the first line --

23       MR. SCARPATO:  Objection, Your Honor.  I'd like to

24  clarify, this exhibit has not been stipulated or moved into

25  evidence.  So if this is going to be used for demonstrative

Jeffrey Opp - Direct

 1   purposes, there is no objection to that; but if it's going to

 2   be moved into evidence, well, then, that --

 3          THE COURT:  Objection sustained.

 4   BY MR. OGBORN:

 5   Q.  Let's move forward.  I'm going to have you go to 25A.

 6          Let's talk about line 1 on Exhibit 25A, which says

 7   "acupuncture evaluation."  What do you have in your current

 8   estimates with regard to the low numbers?

 9   A.  Zero, sir.

10   Q.  There is a line item in there.  Was there a number in there

11   from previous versions of your estimates?

12   A.  There was.  But now based upon conversations that you had

13   with Ms. Mazone over the last couple of weeks that you related

14   to me, I have taken all amounts related to acupuncture out.  So

15   it's not only the acupuncture evaluation, but it's also the

16   acupuncture therapeutic modality later on in the report.

17   Q.  If you go down about seven lines on page 1 of 25A, there is

18   an acronym that says TBD.  What does that mean?

19   A.  To be determined.  And so if there is any amounts in

20   Ms. Mazone's life care plan where the amount and the frequency

21   is not given or it says "to be determined" or "unknown," I have

22   TBD here.  And if you scroll it across, you'll notice the TBD

23   yields zero amounts towards the total.

24   Q.  If we compare -- just below that, in 25A, you have zeros

25   for MRI, thoracic, technical and professional and also for

Jeffrey Opp - Direct

1    lumbar technical and professional.  If we compare that to your

2    high estimates, you have numbers in there.

3    *A.*  Correct.

4    *Q.*  Help us understand, using this as an example, the specific

5    cost estimate, as an example -- help us understand what you're

6    doing there between your low and your high.

7    *A.*  Certainly.  So my understanding based upon your sort of

8    conversations with Ms. Mazone is that the amounts related to

9    the spinal cord stimulator may not be needed in the past -- in

10   the future -- pardon me.  That Ms. Houston had one in the past,

11   it was not successful, although the doctor did not rule out

12   having it in the future.  And so what I've done on the low

13   numbers is I have removed every expense related to -- I can't

14   keep it straight in my head -- spinal cord stimulator from the

15   low amounts.  And my understanding is, from reading

16   Ms. Mazone's report, the MRI costs are related to the spinal

17   cord stimulator; so, of course, those amounts need to be taken

18   out, as well.

19   *Q.*  Mr. Opp, did you reach an opinion within a reasonable

20   probability a forensic economist can reach of the low value of

21   what it would cost to put money away right now to pay for

22   future medical treatment for Ms. Houston?

23   *A.*  Yes, sir.  Based upon Ms. Mazone's report, her two

24   supplements, the conversations that you related to me that you

25   had with her, and also the -- using the methodology that I

Jeffrey Opp - Cross

1   described earlier, the low amounts are $389,443.

2   Q.  That is just for future medical costs?

3   A.  That is correct -- well, future life care plan costs.

4   There are some amounts in there, again, that are not medical in

5   nature.

6   Q.  And based on that same probability, Mr. Opp, did you reach

7   an opinion with regard to what the highest number that you

8   calculated, based on the life care plan, that it might cost

9   Ms. Tracy Houston in the future?

10  A.  Yes, sir.  That amount, again, the same caveats I made on

11  the low side, is $2,863,480.

12          MR. OGBORN:  I have no further questions at this time,

13  Your Honor.

14          THE COURT:  Cross-examination.

15          MR. SCARPATO:  Thank you, Your Honor.

16                      **CROSS-EXAMINATION**

17  BY MR. SCARPATO:

18  Q.  Good morning, Mr. Opp.

19  A.  Good morning, sir.

20  Q.  I'm here on behalf of the government.  Forensic means past,

21  right?  You're looking at economic numbers from before today;

22  right?

23  A.  That's exactly right.

24  Q.  You don't have a crystal ball to look into the future;

25  right?

Jeffrey Opp - Cross

1    *A.*   That's right.  That's why I use multiple different methods

2    in order to address those uncertainties.

3    *Q.*   And if I understand your testimony, you're not opining on

4    whether any of the input that Ms. Mazone supplied to you are

5    reasonable; true?

6    *A.*   That is true, sir.

7    *Q.*   And you have no medical training?

8    *A.*   That is -- no medical training that relates to what I'm

9    talking about here today, sir.

10   *Q.*   And it sounds like you received some instructions from

11   Ms. Mazone's counsel about what input to include or not include

12   in your present-value calculation, separate and apart from your

13   review of Ms. Mazone's various materials; true?

14   *A.*   I don't recall if I would call it instruction, sir.  I

15   would call it a relating by Mr. Ogborn of conversations he had

16   with Ms. Mazone.  But, obviously, as we previously discussed,

17   all of those amounts had the effect of lowering these

18   calculated losses.

19   *Q.*   The acupuncture and things like that; true?

20   *A.*   Correct, sir.

21   *Q.*   So the point of a present-value calculation is to establish

22   the value of a future set of expenditures in today's dollars;

23   am I understanding that correctly?

24   *A.*   You are, sir.

25   *Q.*   And the broader the range of the net-present-value

634

Jeffrey Opp - Cross

1    calculations, the less useful it has -- less use it has as a

2    predictive tool; true?

3    *A.*  No, sir.  We're not talking about any predictive values in

4    statistics, and we're not trying to run a chi-squared test to

5    do goodness of fit or R-squared, sir.  All I'm doing is giving

6    a range of values.  Quite frankly, it's up -- as I understand

7    it from a lay perspective, it's up to the trier of fact to --

8    based upon what they have heard and the testimony they're

9    relying upon to figure out where these would fall in this

10   continuum.  I can't do anything more than give the range.

11   *Q.*  So we're not to rely on your numbers that you've supplied

12   for any sort of predictive value; am I understanding that

13   right?

14   *A.*  From a statistical standpoint, that's absolutely right.

15   From a math standpoint, you absolutely can rely upon my

16   numbers, sir.

17   *Q.*  For the discount rate and the escalation rate; right?

18   *A.*  Exactly right.

19   *Q.*  So do you have any experience in your time as an economist

20   with any type of business projections or any forward-looking

21   work like that?

22   *A.*  All the time, sir.

23   *Q.*  If a 25-year projection turns out to be off by 33 to

24   73 percent only about a year after it's prepared, that's not a

25   very accurate projection; true?

635

Jeffrey Opp – Redirect

1    *A.*  I mean, that's true.  And that's why we use both the

2    25-year projections for the low numbers and the 5- to 10-year

3    projections for the high numbers, because there is a

4    difference.  There is an inversion, and I am acknowledging that

5    inversion.

6         *MR. SCARPATO:*  Those are my questions.  Thank you.

7         *THE WITNESS:*  Thank you, sir.

8         *MR. OGBORN:*  One follow-up, Your Honor.

9                        **REDIRECT EXAMINATION**

10   *BY MR. OGBORN:*

11   *Q.*  Mr. Scarpato asked you about conversations that we had

12   relating to conversations with -- that I had with Ms. Mazone.

13   Were there any other changes that were discussed that you and I

14   have had as a result of my conversations with Ms. Mazone?

15   *A.*  Yes, sir.  So I think we talked about acupuncture.  The

16   other thing I did -- and this was by and large the hugest

17   change in the numbers -- was I have reduced physical therapy on

18   both the low and the high to only two times per month, which

19   had a significant effect on the numbers, because physical

20   therapy, quite frankly, was the largest dollar item in both the

21   high and low life care plans.

22        I've also assumed that the first year of speech and

23   cognitive therapy has occurred in the past, and I'm only

24   using -- so I'm starting, basically, at year two for speech and

25   cognitive therapy.  And we talked about bone scans, and we

Jeffrey Opp - Redirect                                                    636

 1    talked about spinal cord stimulator.

 2            Then you also asked me, sir, what I would term a

 3    what-if.  What if Ms. Houston does not need a home health aide

 4    for ten years -- for the next ten years -- it didn't start

 5    until year eleven -- what change would that have in the

 6    numbers?  And that would -- if we assumed that, the low number

 7    would be reduced to $298,058; and the high number would be

 8    reduced to $2,538,601.  And both of those assume that rather

 9    than home health aide occurring for 26.4 years into the future,

10    it doesn't start until year 11; so we have basically ten years

11    to earn interest before we have to start paying for those

12    costs.

13            MR. OGBORN:  I have no further questions.  Thank you,

14    Mr. Opp.

15            THE WITNESS:  Thank you, sir.

16            THE COURT:  Thank you very much, Mr. Opp.

17            MR. SCARPATO:  Your Honor, I just have just a couple

18    recross questions, if I may.

19            THE COURT:  Well, all right.

20            Hang on, Mr. Opp.  Go ahead.

21            THE WITNESS:  Very good, Your Honor.

22            MR. SCARPATO:  Thank you, Your Honor.  I appreciate

23    it.

24

25

Jeffrey Opp – Recross

1           **RECROSS-EXAMINATION**

2    *BY MR. SCARPATO:*

3    *Q.*  Mr. Opp, it was your testimony that you adjusted your

4    numbers to remove a home health aide for the years 2020 to

5    2030; do I understand that correctly?

6    *A.*  Well, it would actually be through 2029, sir.  Because if

7    you include 2030, that would be eleven years.  But other than

8    that, you're right.

9    *Q.*  Okay.  I'd like to pull up Exhibit 25A and take a look at

10   page --

11          You have it up.  Thank you.

12          -- page 2, and I'll try to show that on the screen.

13          If you could scroll up to show the years at the top of

14   these columns.

15          Mr. Opp, do the years at the top of these columns

16   reflect 2020 through 2029?

17   *A.*  They do, sir.

18   *Q.*  And looking down at the line that we have highlighted, it

19   says "home health aide"; correct?

20   *A.*  That's right.

21   *Q.*  And it reflects a yearly cost of $7,722 for each of 2020

22   through 2029?

23   *A.*  Correct.

24          *MR. SCARPATO:*  Thank you.  No further questions.

25          *THE COURT:*  Thank you.

Jeffrey Opp - Recross

1      Did you have any re-redirect -- surredirect based upon

2   that recross?

3          MR. OGBORN:  No thank you, Your Honor.

4          THE COURT:  All right.  Mr. Opp, thank you, again.

5   You may stand down.

6          THE WITNESS:  Thank you, Your Honor.

7          THE COURT:  It's close to the time for a recess.  Is

8   your next witness going to be the plaintiff again?

9          MR. OGBORN:  Yes, sir.

10          THE COURT:  All right.  Let's take a 15-minute recess.

11          (Recess at 10:11 a.m.)

12          (In open court at 10:32 a.m.)

13          THE COURT:  Let's go ahead, please.

14          MR. OGBORN:  Your Honor, if I may address one thing.

15   Technically -- I know we're all learning this as we go.  For

16   example, not having the right view.

17          One of the things we did to try to minimize the number

18   of machines that were in here running is run everything

19   through -- both cameras through one box.  I'm not sure what

20   that looks like on your screen, Your Honor.  I know that

21   instead of having two people come in separately, it's probably

22   one box that is split in half.  Is that fair?

23          THE COURT:  At the present time, I can see the

24   plaintiff's shoulders, but I can't see her neck or her face or

25   her head.

Tracy Houston – Direct

1      MR. OGBORN:  Your Honor, I appreciate that, and I will

2   fix that.

3      Is -- are the boxes smaller, appreciably smaller?  Are

4   we doing a disservice here?

5      THE COURT:  No, I don't think it's --

6      MR. OGBORN:  Thank you.  I appreciate it, Your Honor.

7   Just working to try to make this as good as it can be.

8      THE COURT:  Just go ahead with your questioning of

9   her, please.

10      I can see her now.

11      MR. SHAPIRO:  Thank you, Your Honor.

12      (**TRACY HOUSTON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**)

13                  **DIRECT EXAMINATION CONTINUED**

14   BY MR. SHAPIRO:

15   Q.  Good morning, Ms. Houston.

16   A.  Good morning.

17      Good morning, Your Honor.

18      THE COURT:  Good morning.

19   BY MR. SHAPIRO:

20   Q.  How are you doing this morning?

21   A.  I'm doing okay.

22   Q.  Good.  Prior to December 1, 2016, how were you functioning;

23   and what was going on in your life?

24   A.  I was functioning quite well.  Running my business,

25   certainly running my household and my property, I was hiking

Tracy Houston - Direct

1   and biking very difficult trails and areas, maintaining my

2   relationships with friends and family.

3   Q.  Did you have any chronic medical problems that were

4   impacting your ability to function?

5   A.  I did not.

6   Q.  Did you have any physical problems that affected your

7   ability to function?

8   A.  I did not.

9   Q.  Any psychological problems that were affecting your ability

10  to function?

11  A.  I did not.

12  Q.  Tell us, if you would, about your property that you

13  purchased about a year prior in Grand Junction, what you were

14  doing with it, and what your goals were with that.

15  A.  Well, I for years wanted to get back to the country, so I

16  spent a number of years trying to find an area that was rural

17  and that I could farm, to some degree.  And so I have five

18  acres, and I'm in hay now, which is -- my hay is a mix of

19  alfalfa and grass.  And so I spent the first year learning

20  about how to -- the maintenance on that piece, the continued

21  work that that would require, and finding people that could cut

22  the hay for me.  I don't have tractors or any type of big

23  equipment.

24          So then I was also doing some things in my house.  I

25  did -- removed some structures on the outside of the house that

Tracy Houston – Direct

1   were old and had vines, oh, that were on the roof, even.  So

2   some updating, both inside and outside.  And then I joined a

3   book club.  I had some time to at least begin to get to know

4   the community.

5   Q.  Were you independent and self-sufficient before the crash

6   in question?

7   A.  Yes.

8   Q.  Was that important to you?

9   A.  Absolutely.

10  Q.  Explain.

11  A.  Well, my background is agricultural, or rural; and that's a

12  core value.  And I had multi-generations of people that I --

13  that helped raise me; so I got a double dose, I'm sure.

14  Q.  When was the last time you had taken a trip in and out of

15  the Grand Canyon prior to the crash of December 1, 2016?

16  A.  I believe it was 2012.

17  Q.  What were your plans for going back to the Grand Canyon at

18  that point?

19  A.  Well, once I got settled in my new home and property, I was

20  thinking that I would begin to reach out to see if there were

21  more people who could do their vacation plans, come together

22  and choose a time, and then I could approach the National Park

23  Service for a permit to go in, which is a competitive process.

24  So that was my --

25  Q.  Did you have a time frame when you were planning on going

Tracy Houston - Direct

642

1    back to the Grand Canyon?

2    *A.*  Well, I thought there was a chance for 2016; but most

3    likely it would have been 2017, due to the complications in

4    that type of adventure planning.

5    *Q.*  Was it about making money, taking people into the Grand

6    Canyon and out, or what was it for you?

7    *A.*  It wasn't about making money.  It was -- it was about

8    personal development and being in nature and helping others --

9    when you're away from cell phones and TVs and spend three days

10   out in nature, particularly in one of the -- as I mentioned,

11   it's one of the seven natural wonders of the world, and there

12   are not words to describe it.  And it has an effect.  People

13   begin to let down, and some people like to talk, and your

14   physical hiking next to each other allows for that.  So . . .

15   *Q.*  Prior to this crash, what would you say your strengths

16   were?

17   *A.*  Well, intelligent, problem solving, insightful, caring.

18   *Q.*  You used the term with me on other times as visionary.

19   *A.*  Yes.

20   *Q.*  What -- why?  What do you mean by that?

21   *A.*  Well, I -- the example of the alternative school that I

22   worked to open, I am a visionary, in that I see a need that

23   oftentimes solves problems and helps other people and be able

24   to see the future of that.  I put a stake in the ground, in

25   both my person and my energy, and then move from there.

Tracy Houston - Direct

643

1    *Q.* What would you say your weaknesses were before this crash

2    and your injuries?

3    *A.* I overthink things; I underestimate how much work things

4    will be; I underestimate how much time things will take;

5    sometimes people see me as stubborn.

6    *Q.* Now, besides growing hay out of your new place at that time

7    in Grand Junction, were you also -- did you have another

8    income-producing part of that property?

9    *A.* I did. I had a mother-in-law apartment.

10   *Q.* And so how were you utilizing that apartment?

11   *A.* Through Airbnb.

12   *Q.* Okay. Before the crash, you talked about how things were

13   going in the Grand Junction area, developing relationships, et

14   cetera. Were you hiking in the Grand Junction area at that

15   point?

16   *A.* Yes.

17   *Q.* Where were you hiking? What kind of hikes?

18   *A.* Well, it's deserty there. But the Colorado National

19   Monument and the Grand Mesa both offer hikes. So they're not

20   necessarily multi-day hikes, just day hikes.

21   *Q.* What level of physical exertion were they in the hikes that

22   you were doing before the crash?

23   *A.* Medium. For me, they were medium.

24   *Q.* What does that mean?

25   *A.* Well, I was a member of the Colorado Mountain Club for

Tracy Houston – Direct

1   years.  And they on their publications about hikes would rate

2   them so that you didn't overdo.  One would be low and shorter

3   and not so much elevation; and then it would go up to, like

4   five, which is long, no water, and a lot of up.

5   Q.  Okay.  What's the Grand Canyon?

6   A.  It's a five.  People die there all the time.

7   Q.  Okay.  All right.  What's Pikes Peak?

8   A.  That would be a five.

9   Q.  Okay.  And so what were you doing, what numbers?

10  A.  Two, maybe three.

11  Q.  Were you in any active medical treatment for issues that

12  were chronic or limiting your ability to do anything prior to

13  the crash?

14  A.  I was not.

15  Q.  All right.  I want to go through your prior health history,

16  if we can.  Did you have psychological issues that required any

17  treatment when you were a child and when you became a young

18  adult?

19  A.  I didn't have psychological help as a child.  As a young

20  adult, I did.

21  Q.  Okay.  Tell us about that and tell us why and what you did.

22  A.  Well, my mother was both physically and emotionally

23  abusive.  And then my parents were divorced, and she left and

24  moved back to her place where she was raised in New Jersey, so

25  I basically just took over the care of the house and moved

645

Tracy Houston – Direct

1  forward from there.  It was very, very difficult; but in some

2  respects, it was a relief, because there was so much tension

3  and difficulty with her there.

4  Q.  What kind of help did you get, and did you need help, and

5  what did you do for that?

6  A.  Well, I originally went in for a divorce.  I was married at

7  18 and then divorced not -- just a few years after that.  So I

8  went in for the divorce, but then it kind of -- it grew to deal

9  with the issues from the abuse and -- you know, so it was a

10  period of five years and weekly and then at times, I would just

11  check in on occasion afterwards.

12  Q.  Where did you get that counseling?

13  A.  I was raised in the First Presbyterian Church of Brighton,

14  and they have a program where they started care and counseling

15  for people in the community.

16  Q.  So you did that counseling through your church?

17  A.  That's correct.

18  Q.  Okay.  When else did you get psychological counseling after

19  that, before the crash?

20  A.  I believe it was in -- around 2005.  I was divorced, I had

21  a second marriage, it was a few years in the marriage, and I

22  wanted to have some help as that decision came about and the

23  marriage ended.

24  Q.  How long did you get counseling then?

25  A.  I know it was a period of months.  It could have been up to

Tracy Houston – Direct

1    a year.

2    *Q.*   Was it helpful?

3    *A.*   Yes.

4    *Q.*   Did you feel the need to continue counseling after 2005,

5    2006?

6    *A.*   I did not.

7    *Q.*   After you did the counseling after your first divorce, did

8    you find that helpful?

9    *A.*   Oh, very helpful.

10   *Q.*   Did you need any more counseling after that and before you

11   went through the counseling in 2005 and 2006?

12   *A.*   Just to check in with them was all I needed.

13   *Q.*   Between 2006 and 2016, the time of the crash, did you

14   obtain any additional mental health counseling?

15   *A.*   No, I did not.

16   *Q.*   Did you need any?

17   *A.*   No.

18   *Q.*   How were you functioning?

19   *A.*   Fully and completely.

20   *Q.*   Did you ever have before the crash any problems with your

21   cognitive abilities?

22   *A.*   No.

23   *Q.*   Your ability to think?

24   *A.*   No.

25   *Q.*   Remember?

Tracy Houston - Direct

1    A.   No.

2    Q.   Process?

3    A.   No.

4    Q.   You mentioned no physical issues, as well.  How often would

5    you be in a gym, and what did going to the gym mean or help you

6    with?

7    A.   Well, I described myself as a gym rat.  The gym, for

8    example, in Grand Junction where I attend has -- or at that

9    time when I first moved there has a number of programs, so very

10   similar to where I was in Lakewood.  So I utilized the classes

11   in spinning, some step classes, and then used the weights and

12   the stair climber and sometimes the pool.

13   Q.   How many days a week would you be in the gym or would you

14   be working out prior?

15   A.   At -- what time frame are we in?

16   Q.   Before the crash.

17   A.   Well, I started a physical fitness regime in my early 20s

18   after I had my daughter.  I was -- I gained weight that I

19   couldn't seem to get rid of, and so that is when the gym

20   memberships and some of the other more focused swimming and

21   cycling began.  And it didn't stop.  If I was ill, sometimes I

22   got a sinus infection, that was the only time I didn't go.

23   Q.   So how many days a week would you be working out?

24   A.   Three to four days a week.

25   Q.   Okay.  How prior to the crash did you learn or know how to

Tracy Houston - Direct

1  consume healthcare?

2  *A.*  Well, I did my yearly exams -- female exams.  I did

3  occasionally have sinus infections, and so I had allergy and

4  some -- at some point as I got a little older, I had to have my

5  eyes examined.  So on occasion, so maybe once or twice a year.

6  *Q.*  Okay.  How did you -- what kind of healthcare did you

7  prefer, or were you traditional, non-traditional, Eastern,

8  Western?

9  *A.*  I would move along a continuum of both, both natural -- I

10  was very conscious about the way I ate, what gave me energy,

11  how much I ate during the day, and so that, as well as maybe

12  supplements or herbal-type remedies.  And some of that came

13  from my grandmother.  She was, as I mentioned, raised in

14  Arkansas and in a time where medical care maybe wasn't accessed

15  in the same way, particularly for rural people.  But I then

16  also used the traditional medicine.

17  *Q.*  Okay.  Did your consumption of healthcare and how you

18  consumed it or how you looked at consuming it change after the

19  crash?

20  *A.*  Tremendously.  I was thrown into an unknown world, and I've

21  had hundreds of doctors' appointments.

22  *Q.*  Before the crash, did you research and look into your

23  healthcare options and needs; or did that only occur after the

24  crash?

25  *A.*  No, I did research.  I -- in addition, I wrote my master's

649

Tracy Houston - Direct

1  thesis on cultural issues that -- and communication and

2  thinking styles that would allow going back and forth from both

3  traditional and nontraditional medicine.

4  Q.  What got you involved in nontraditional, or Eastern

5  medicine, as opposed to traditional?

6  A.  Well, from my grandmother, early on.  I was down there --

7  as I mentioned, with my mother leaving, I spent more time

8  there; so she would treat me with different remedies that she

9  grew up with.  And so that was the start of it.  And then, of

10  course, as a culture, I think -- I don't know when we became

11  more aware that there was other options outside of the

12  traditional medicine; but I think I probably grew up in a time

13  when, you know, over-the-counter or different mindfulness and

14  health products came to our -- available.  So . . .

15  Q.  Before we start talking about the crash, is there anything

16  you'd, like, the Court to know about you prior to the crash

17  that you don't think we've discussed?

18  A.  That I was happy.

19  Q.  The move to Grand Junction was agreeing with you?

20  A.  I waited a lot of years to be back in the country.

21  Q.  Let's talk about the day of the crash.  What date did the

22  crash happen?

23  A.  December 1, 2016.

24  Q.  About what time?

25  A.  I think it was 10:00 in the morning or so.

Tracy Houston – Direct

650

1   Q.   What kind of a vehicle were you driving?

2   A.   I had a Jeep Grand Cherokee.

3   Q.   How long had you had that car?

4   A.   2002.

5   Q.   Was your car operating properly that day?

6   A.   Yes.

7   Q.   Where were you going?

8   A.   I was going to the paint store.

9   Q.   Did you have any particular time you had to be there?

10  A.   No.

11  Q.   What did you need paint for?

12  A.   I was doing some work inside and outside, kind of updating

13  the property; so I was painting one of the rooms in the house.

14  Q.   Were you going to be painting the room?

15  A.   Yes.

16  Q.   Okay.  You didn't have any specific time you needed to be

17  there?

18  A.   No.

19  Q.   Okay.  Were you wearing a seatbelt?

20  A.   Yes.

21  Q.   Do you always wear a seatbelt?

22  A.   Yes.

23  Q.   How do you know you were wearing a seatbelt that day?

24  A.   When my car hit the building, I -- I was really concerned

25  because there was all this smoke.  And I put the car in park

Tracy Houston - Direct

1   and turned the car off, and I took my seatbelt off, and I was

2   trying to get out of the car.  I was scared.  I thought the car

3   was on fire.

4   Q.  So how do you know you were wearing a seatbelt?

5   A.  I took the seatbelt off.

6   Q.  Okay.  Tell us what happened.

7   A.  At what point?

8   Q.  Before the accident and take us through the accident.

9   A.  Well, I had put some paint in the car to return that was

10  older -- they recycle where I bought the paint -- and I was

11  driving to the paint store.

12  Q.  What road were you traveling on?

13  A.  24 Road.

14  Q.  All right.  Tell us what happened one second --

15      You guys see that, too?

16      MS. BOBET:  We don't see that.

17      THE COURT:  What are you referring to?

18      MR. SHAPIRO:  Sorry, Your Honor.  We have a Zoom Cloud

19  meeting thing popped up telling us we were signed out.  I

20  was -- we were wondering if you -- if we lost anybody or what

21  was going on.

22      MS. BOBET:  I'm not seeing that.

23      MR. SHAPIRO:  Okay.  All right.  Sorry.

24  BY MR. SHAPIRO:

25  Q.  Can you tell us what happened.

Tracy Houston - Direct                                                652

1    *A.* I was coming up to the intersection there on H Road and 24,

2    and I saw a car flying by. And I tried to brake, and -- I

3    don't remember crossing traffic, but I hit the car. There was

4    a really loud boom. And the next thing I knew, I saw this

5    building coming up, and I knew I was going to hit that

6    building.

7    *Q.* Do you remember what happened between the boom and when you

8    saw the building coming up?

9    *A.* That's the only part that I -- of that particular part I

10   don't remember.

11   *Q.* Okay. Do you remember the impact with the building?

12   *A.* I did.

13   *Q.* Okay. Did you feel -- were you in pain when you stopped?

14   *A.* No, not that I remember.

15   *Q.* What do you remember once you came to a stop?

16   *A.* I put the car in park, I turned the car off, and there was

17   a tremendous amount of smoke in the car. I took my seatbelt

18   off, I opened the door; but for some reason, I couldn't get

19   out.

20   *Q.* Why?

21   *A.* I don't know.

22   *Q.* Did you ever get out of the car, or were you taken out of

23   the car?

24   *A.* I was taken out of the car.

25   *Q.* Did the airbags go off?

Tracy Houston – Direct

1   A.   Yes.

2   Q.   Do you remember the airbags going off?

3   A.   No.

4   Q.   Was it front and side airbags, or just front, or do you

5   know?

6   A.   I only noticed the front.  I don't know if it was more.

7   Q.   Was the car on fire?

8   A.   I don't think so.

9   Q.   Okay.  Do you know if it was the airbag smoke, or do you

10  have any idea?

11  A.   I was told later that that was fairly common, that airbags

12  have smoke.

13  Q.   Did you know if you got your foot on the brake prior to the

14  impact?

15  A.   I got my foot on the brake.

16  Q.   Okay.  Did you feel your leg snap?

17  A.   No.

18  Q.   After the crash, you're sitting there in the car, you're

19  trying to get out, what do you recall next?

20  A.   A lady came up to the car and said some things -- I don't

21  remember exactly what she said -- but she gave me a scarf or

22  something to comfort me.

23  Q.   What else do you remember?

24  A.   That some people came, the firemen, I believe, took me out.

25  Q.   Do you ever remember speaking with Ms. Terrell?

Tracy Houston - Direct

1    A.   No.

2    Q.   Who else do you remember talking to, if anyone, at the

3    scene?

4    A.   No one.

5    Q.   Did you hit the steering wheel?

6    A.   No.

7    Q.   Did you hit the windshield?

8    A.   No.

9    Q.   Did you feel the seatbelt grab you?

10   A.   I -- no.

11   Q.   Were you scared?

12   A.   At what point?

13   Q.   Right after this happened.

14   A.   I was only scared when the car -- the -- what I perceived

15   as fire.

16   Q.   What do you remember were -- did you know if you were hurt?

17   A.   I -- I didn't -- when I was in the car?

18   Q.   Yes.

19   A.   All I remember seeing was my foot like that, but I don't

20   remember like a consciousness that I was hurt.

21   Q.   What did you see when you looked at your foot?

22   A.   That -- well, the -- the foot was like an L, completely in.

23   Q.   Did you have any reaction to that?

24   A.   Not that I remember.

25   Q.   Do you remember hitting the house?

Tracy Houston - Direct

1    A.   Yes.

2    Q.   Did your knee -- right knee bother you at all at that

3    point?

4    A.   No.

5    Q.   Do you remember how long it took for the emergency

6    responders to get there?

7    A.   Just a few minutes.

8    Q.   Do you recall any of what you were thinking at that point,

9    as you were sitting in the car after this happened?

10   A.   I told the lady that came up to the car that I hit someone.

11        What was the question, again?

12   Q.   What were you thinking as you were sitting there before

13   they took you out of the car?

14   A.   I don't remember what I was thinking.

15   Q.   Do you remember them taking you out of the car?

16   A.   Yes.

17   Q.   Do you remember being placed in the ambulance?

18   A.   No.

19   Q.   Do you remember the ambulance ride to the hospital?

20   A.   Some.

21   Q.   What do you remember?

22   A.   Just what it looked like and that they were talking to me.

23   Q.   Do you remember what was being said?

24   A.   No.  No.

25   Q.   Do you remember what happened -- do you remember arriving

656

Tracy Houston – Direct

1    at the hospital?

2    A.   My first recollection at the hospital was in the emergency

3    room.

4    Q.   So you don't remember arriving and being taken out of the

5    ambulance?

6    A.   No.

7    Q.   Okay.  What's your first recollection at the hospital?

8    A.   I was on a table.  There were quite a few people in the

9    room, and there was -- they were cutting my clothes off.

10   Q.   Anything else?

11   A.   They took X rays.  That's when I saw the bone of my foot.

12   Q.   What do you mean?

13   A.   When they cut the clothes off, I looked down and saw the

14   bone.

15   Q.   Sticking out of the skin?

16   A.   Yes.

17   Q.   I want to look at some of the photographs from the scene

18   that we've stipulated into evidence.

19         If we could bring up No. 2.

20         So there is -- yes -- nobody -- can you -- can you all

21   see Exhibit No. 2?

22         THE COURT:  I can.

23         MS. BOBET:  I can see that, yes.

24         MR. SHAPIRO:  Okay.  Thank you.  So can we.

25

Tracy Houston – Direct

1  *BY MR. SHAPIRO:*

2  *Q.*  All right.  Do you know what that first page is,

3  Ms. Houston?

4  *A.*  I think that that's the building that was hit.

5      *MR. SHAPIRO:*  Okay.  Let's go to the second page,

6  Ms. Waller.

7  *BY MR. SHAPIRO:*

8  *Q.*  Do you know what that is?

9  *A.*  It looks like the building that was hit.

10      *MR. SHAPIRO:*  Okay.  Can we go to the next page.

11  *BY MR. SHAPIRO:*

12  *Q.*  What is that?

13  *A.*  That's the front of my car.

14  *Q.*  Right where you hit the building?

15  *A.*  Yes.

16      *MR. SHAPIRO:*  Okay.  Can we go to No. -- page 4 --

17  excuse me.  That is 4.  Can we go to -- sorry.  You're right.

18  That is page -- that is T-106.  Let's go to page 5, or T-107.

19  *BY MR. SHAPIRO:*

20  *Q.*  That's the front of your vehicle?

21  *A.*  Correct.

22      *MR. SHAPIRO:*  Let's go to 006 or T-113.

23  *BY MR. SHAPIRO:*

24  *Q.*  Do you know what that is?

25  *A.*  I believe that's Ms. Terrell's car.

Tracy Houston – Direct

1          MR. SHAPIRO:  Okay.  Next page.

2     BY MR. SHAPIRO:

3     Q.  Do you know how fast you were going prior to this crash?

4     A.  Well, there is a hill kind of as it comes down right before

5     the intersection, so I normally let my foot off the gas there

6     and slowed some.  You come into some trees and some buildings

7     there, but I don't know how fast I was going.

8          MR. SHAPIRO:  Okay.  Let's go to 008, or T-115.  Let's

9     go to 009, T-122.  These are all Ms. Terrell's.

10         MS. BOBET:  Your Honor, I believe we've gone through

11    all of the pictures before.  I'm cognizant of the time.  We're

12    running significantly behind.  We won't necessarily make a

13    cumulative objection, but we may in the future.

14         THE COURT:  All right.  No objection there.  Go ahead.

15         MR. SHAPIRO:  Okay.  Let's go if we can to stipulated

16    Exhibit 3.

17    BY MR. SHAPIRO:

18    Q.  Is this just a photograph of your car in the tow lot?

19    A.  Yes.

20    Q.  Let's go to Exhibit 4.  What are these -- this first photo,

21    4-001?

22    A.  That's a photo of my foot --

23    Q.  Is that after the second surgery, when the external fixator

24    was taken off, and Dr. Cota did additional surgery?

25    A.  Yes, after -- because I had a cast for quite some time, so

Tracy Houston - Direct

 1   it's sometime after that.

 2   Q.  Okay.  Let's go to 002.  Is that just a view of the other

 3   side of your ankle?

 4   A.  Yes.

 5   Q.  Let's go to 003.  What is this one of?

 6   A.  That's me in the hospital.

 7   Q.  That's after the first surgery with the external fixator?

 8   A.  Yes.

 9   Q.  Who took these photos for you?

10   A.  Well, I think some of the ladies from the book club came to

11   visit.

12   Q.  Okay.  Let's go to 004.  This looks like your left elbow.

13   Do you know how that got hurt?

14   A.  No.

15   Q.  Let's go to 005.  This is your right knee.  Do you know how

16   that got hurt?

17   A.  No.

18   Q.  And let's go to 006.  What is that?

19   A.  I don't know.

20   Q.  Okay.  Does that look like your right knee after the

21   surgery?

22   A.  I guess so.

23   Q.  Okay.  Do you recall the doctors involved in your care at

24   St. Mary's Hospital?

25   A.  Yes.

Tracy Houston - Direct                                          660

1    Q.  What do you recall about the doctors -- let's start with

2    Dr. Deering, anything she may have said to you that you

3    remember?

4    A.  I remember her coming up to me in the emergency room, and

5    she introduced herself.  I don't remember anything.

6    Q.  Okay.  Do you remember meeting Dr. Cota for the first time?

7    A.  Yes.

8    Q.  What do you remember about that?

9    A.  He came -- Dr. Cota came to my hospital room when I had the

10   fixator on to talk to me about both the ankle and the knee

11   injuries.

12   Q.  Anything else?

13   A.  I don't think so.

14   Q.  Do you know why two surgeries were necessary?

15   A.  Oh, yes.  He explained to me that the inflammation -- that

16   after an injury, there was so much inflammation that the --

17   they drilled -- they drilled into my bone on the front of my

18   leg to put the -- and my foot to put metal in to hold the piece

19   that comes up so it stays stable.

20   Q.  How were your pain levels while you were at St. Mary's?

21   A.  I was in a lot of pain.

22   Q.  What was being done, or were you -- how were you?

23   A.  Well, at one point in time I had so much pain that -- they

24   wouldn't give me any more medicine, and they -- I was told I

25   had to wait until a doctor came in.  And it was like 4:00 or

Tracy Houston - Direct                                  661

1    5:00 or something in the morning, and the person who could

2    approve more medicine wasn't available, and it didn't matter

3    what my pain levels were.  I was in the most pain I'd ever felt

4    in my life; and, basically, I just got to lay there.

5    Q.  Between the first and second surgery, did they get you up;

6    or did you just have to lay there with your leg up in the air?

7    A.  I laid there with my leg up in the air.

8    Q.  How long were you are at St. Mary's Hospital?

9    A.  I think almost two weeks.

10   Q.  Okay.  Were you living -- was anyone else living with you

11   at the time of this crash?

12   A.  No.

13   Q.  Did any of the doctors explain to you the significance of

14   the injury, what they had to do, and how serious it was?

15          MS. BOBET:  Objection, Your Honor.  Calls for hearsay.

16   And I believe much of this evidence has already been in

17   testimony.

18          THE COURT:  It's not a question for hearsay.  It's

19   what her response was.

20          Go ahead, please.

21          MR. SHAPIRO:  Thank you, Your Honor.

22          THE WITNESS:  What was it, again?

23          MR. SHAPIRO:  Terri, could you read back that

24   question, please.

25          (Question read back by the reporter.)

Tracy Houston - Direct

1          MR. SHAPIRO:  Thank you.

2          THE WITNESS:  I believe Dr. Cota when he came did

3   explain what he had to do.  I did not understand the

4   seriousness of it.

5   BY MR. SHAPIRO:

6   Q.  How were you doing emotionally during this hospitalization?

7   A.  I was undone.  I -- I was totally overwhelmed and lost.

8   Q.  What do you mean?

9   A.  I had no sense of myself.  I had a hard time processing

10  what was going on.

11  Q.  Did you have any support network, family, there or close

12  friends helping you; or who was there to come and support you?

13  A.  Well, Penny was able to come, some of my neighbors came,

14  and some of the ladies that I had met in the book club came.

15  And the chaplain -- I asked to see the chaplains, and they

16  came.

17  Q.  Were you able to care for yourself at all while you were at

18  the hospital?

19  A.  No.

20  Q.  Do you remember discussions about discharge and where they

21  were going to send you and why?

22  A.  I do.  They were going to transport me to Larchwood.

23  Q.  Why?

24  A.  I was unable to take care of myself.

25  Q.  Before you left the hospital and you went to Larchwood,

Tracy Houston - Direct

1   were you getting out of bed, and were they trying to get you

2   out of bed?

3   A.   Yes.

4   Q.   How was it?

5   A.   Very difficult.  I could barely make it into the hall.

6   Q.   Did you get more productive as time went on before you

7   left?

8   A.   Yes.  I think at times I made it down the hall some.

9   Q.   On crutches, or how?

10  A.   I think I was on crutches.

11  Q.   Okay.  Were you doing any physical therapy while you were

12  in the hospital?

13  A.   I think so, but I can't say for sure.

14  Q.   Okay.  How were your pain levels as you got ready to

15  transfer to Larchwood?

16  A.   It was hard.  I --

17  Q.   Do you remember the pain medications that you were being

18  provided with?

19  A.   I was on -- I can't quite remember them, but I think I was

20  on some kind of Oxycontin and Valium for the -- I can't

21  remember anymore.

22  Q.   All right.  How was it that -- how long did you stay at

23  Larchwood, the rehabilitation?

24  A.   I think I was there almost two weeks.

25  Q.   What do you remember about Larchwood?

Tracy Houston - Direct

1    *A.*  It was extremely difficult.  I was in pain; and I was in,

2    like, a nursing home.  I did have physical therapy there, and

3    that was like a highlight of the day.  And I -- the night

4    nurses there were like angels.  They'd show me pictures of

5    their dogs and come talk to me.

6    *Q.*  How were the pain medications working when you were at

7    Larchwood?

8    *A.*  Well, I quickly learned that they were overwhelmed there,

9    and you could wheel your wheelchair down to where the

10   dispensary was instead of waiting until a nurse came to your

11   room.  And I was highly motivated and in pain to wheel my

12   wheelchair down there and get my pain meds.

13   *Q.*  Were you able to do --

14            We have a blue screen for the Court.

15            *COURTROOM DEPUTY:*  One moment.

16            *MR. SHAPIRO:*  Okay.

17            *THE COURT:*  Okay.  We've got the screen back again.

18   *BY MR. SHAPIRO:*

19   *Q.*  When you were at Larchwood, were you able to do your

20   ADLs -- toileting, showering, washing -- or was everything

21   being done for you?

22   *A.*  I had help with everything.

23   *Q.*  Were you able to go to the bathroom?

24   *A.*  Not without help.

25   *Q.*  Do you remember the discussions about leaving Larchwood and

Tracy Houston – Direct

1    going home?

2    *A.*   Yes.

3    *Q.*   What do you remember?

4    *A.*   Well, I couldn't wait to get home.  But they had done a

5    home assessment, and things had been prepared so that I could

6    be in my wheelchair.

7    *Q.*   What kind of help did you have when you got home?

8    *A.*   I had a nurse, an occupational therapist, my neighbors,

9    and, again, some of the ladies from the book club came and

10   helped, and Penny when she could came.

11   *Q.*   How did it go when you got home?

12   *A.*   It was hard.  I didn't feel as lost, but I -- I was

13   disoriented.  I was in pain.

14   *Q.*   Were you still taking pain medication?

15   *A.*   Yes.

16   *Q.*   Do you remember first getting the gabapentin?

17   *A.*   Oh, I believe that was in the hospital.

18   *Q.*   Okay.  Do you remember why?

19   *A.*   My foot was burning.

20   *Q.*   What do you mean?

21   *A.*   It feels like your foot is on fire.

22   *Q.*   When you got home, were they getting you up and putting any

23   weight on your legs, or how were you getting around or doing

24   therapy?

25   *A.*   Well, I had the wheelchair.  And then the physical

Tracy Houston – Direct

1  therapist came at some point in time and helped me start to

2  walk.

3  *Q.*  How was that going?

4  *A.*  Very difficult.

5  *Q.*  When did you notice that your head wasn't quite working?

6  *A.*  Well, when I -- once I got home, I had to probably use it

7  more than -- I live alone, so -- January or February.

8  *Q.*  What did you notice?

9  *A.*  Slow thinking, just -- like the whole -- just -- I couldn't

10  process.

11  *Q.*  We heard testimony about the record where you called -- the

12  home healthcare nurses called the Primary Care Partners,

13  Dr. Price's office, in February.  Is that the earliest date

14  that you remember, or was it before that?

15  *A.*  I think that's probably the earliest -- I certainly was

16  foggy and lost in the hospital, but I didn't make a lot of

17  decisions there.

18  *Q.*  Okay.  You were still in January and February on opioids?

19  *A.*  I think so, but I'm not sure.

20  *Q.*  Do you remember coming off of the opioids?

21  *A.*  Yes, uh-huh.

22  *Q.*  When?

23  *A.*  I don't remember when.

24  *Q.*  Okay.  So how long were you in a wheelchair?

25  *A.*  I think I was in a wheelchair for, like, three months.

Tracy Houston - Direct

 1    Q.   Okay.  How long did you have a walker?

 2    A.   Maybe a month or two.

 3    Q.   How about crutches?

 4    A.   Probably a couple months, two, three months, something of

 5    that nature.

 6    Q.   And how about a cane?

 7    A.   Maybe -- well, I was going back and forth between the

 8    crutches and the cane for several months.

 9    Q.   Okay.  Did it take you about ten months before you could

10    walk without any assistance?

11    A.   Yes.

12    Q.   How was that process for you of getting back to walking?

13    A.   Extremely difficult.

14    Q.   Why?  What was hard?

15    A.   Well, the whole mechanics of walking, I didn't -- I

16    couldn't believe I had to be told by a physical therapist how

17    to walk.

18    Q.   How many days a week were you getting physical therapy at

19    home and then at their offices; do you know?

20    A.   I -- I was a couple of days a week.  I don't know the

21    number.

22    Q.   Okay.  How long were you unable to drive yourself?

23         Let me ask it a different way.  When do you think you

24    first drove by yourself?

25    A.   Well, I remember I started driving in my neighborhood.  And

Tracy Houston - Direct

 1   I asked some of my friends to come sit with me, and I believe

 2   that I progressed to enough that I could drive to

 3   Dr. Gustavson's appointments.

 4   Q.  Was that pretty nice?

 5   A.  Absolutely.

 6   Q.  You don't know when that was, September, October, July,

 7   August?

 8   A.  I feel it was sometime in the summer, there.

 9   Q.  So when you were still on crutches?

10   A.  Uh-huh.

11   Q.  Were you driving with your right foot or with your left

12   foot?

13   A.  So I was driving with my right foot.  So I can't

14   remember -- because I had the cast, but I can't remember.  Then

15   I had this boot, and I can't remember.

16   Q.  So you had a cast for how long?  How big was the cast?

17   A.  Oh, it was huge.

18   Q.  From where to where?

19   A.  It was my whole foot, up my leg.  I had to sleep -- I

20   couldn't -- I had to sleep on my back.  I couldn't move the

21   thing.  I can't remember how long I had it.

22   Q.  And then you had a boot that was just your whole lower leg?

23   A.  Well, they had a brace on my -- yeah, the brace had to go

24   on first; and then the boot went on top of it.

25   Q.  How was it for you emotionally, getting back in the car to

669

Tracy Houston – Direct

1    drive?

2    A.   Very difficult.

3    Q.   What do you remember?

4    A.   I was scared, but I really -- I was determined.  I wanted

5    to do it.

6    Q.   Okay.

7    A.   So I just took it step by step and drove in my

8    neighborhood.  And then they tried to have somebody with me

9    through the process, because then I started driving out on the

10   roads.

11   Q.   Why did you want to see Dr. Gustavson?

12   A.   Help with understanding the trauma and the PTSD and what he

13   thought was PTSD, help process this.

14   Q.   Did he help you?

15   A.   Yes.

16   Q.   What did he help you with?

17   A.   He was helpful with understanding PTSD, very informative

18   about that, and somewhat reassuring that people who have, you

19   know, violent kind of situations and the trauma after that --

20   how the body responds to that.  And he gave me a book that some

21   of my people that when they would come visit would read to me

22   parts that --

23   Q.   What did you get from that book?  Were you able to read it

24   yourself, or did you have people reading it to you, or how did

25   you -- how much did you get through?

Tracy Houston – Direct                                    670

1    *A.*  I flipped through some of it, but the reading was done by

2    people who helped me.  And it was informative as far as –– the

3    body, I guess, has like a –– a response that holds the trauma,

4    something like that, and then you can work through it.

5    *Q.*  Did Dr. Gustavson use that book as he was treating you?

6    *A.*  Yes.

7    *Q.*  Did you find that helpful?

8    *A.*  Yes.

9    *Q.*  Was he helpful in getting you back to driving?

10   *A.*  Yes.

11   *Q.*  How?

12   *A.*  Just the understanding that it was part of –– those panicky

13   feelings of being afraid were part of the process.

14   *Q.*  What else did he help you with besides getting back to

15   driving?

16   *A.*  A general understanding of my condition and that it was

17   all, while unfortunate, a natural part of violent car crashes.

18   *Q.*  How were you sleeping after the crash?

19   *A.*  Sleep since the crash has been extremely difficult.

20   *Q.*  What do you remember early on when trying to sleep or

21   sleeping after the crash?

22   *A.*  Nights were very long.  I had reoccurring nightmares of the

23   accident for months.

24   *Q.*  What do you mean?

25   *A.*  I would be asleep, and I had –– it was like I was in the

671

Tracy Houston – Direct

1   car accident repeatedly, all over again.

2   Q.  Was that every night?

3   A.  At first, it was quite often.  I don't remember if it was

4   every night.

5   Q.  How long did that go on for?

6   A.  Well, the sleep disruptions began to diminish as far as a

7   full-blown reliving the accident, but I can't remember when

8   that happened.  And then I just began to wake up with like a

9   start, like -- like if you see a snake and your whole body is

10  like -- so that as it began to diminish, I didn't relive the

11  details of the accident, just had that feeling.  And I still

12  have that.

13  Q.  Still to this day?

14  A.  Yes.

15  Q.  How often?

16  A.  Maybe -- it depends on the pain cycle, so it does vary, but

17  several times a week.

18  Q.  What do you mean it varies depending on the pain cycle?

19  A.  Well, the -- when the barometer changes, my -- when I first

20  came home from the hospital and the barometer changed, I was so

21  undone, I had to call the nurse.  I did not know what was

22  happening, I thought something -- my whole body was just all of

23  a sudden hurting, and so she helped me understand that.  And as

24  time went on, when the barometer changes, that severe response

25  diminished.  But even today, when the barometer goes up, if

Tracy Houston - Direct

1    there is going to be some kind of change in the pressure, then

2    my pain -- that's part of my pain cycle, and so my pain goes

3    up.  And so if that's happening, on nights like that, then it

4    seems like I have more sleep disruptions then.  And then there

5    is the pain cycle of the treatment.  So when I get relief from

6    some of the treatment, I can sleep better, and so I don't have

7    so many of those disruptions.

8    Q.  When you have the disruptions, is it still a startle, or is

9    it just the pain wakes you up?

10   A.  Well, I have the startle; but the pain -- I mean, the pain

11   is there.

12   Q.  Did Dr. Gustavson help you with those issues of the

13   intrusions into your sleep about the crash?

14   A.  He helped me to understand it.  I mean, there was an

15   intellectual kind of, you know, understanding of it.  It

16   doesn't take it away, but at least you have some idea of what

17   on earth is going on.

18   Q.  Did he tell you how to deal with it?

19   A.  I can't remember if he gave me any techniques to deal with

20   it or not.

21   Q.  When did you first start to try and read again?

22         Let me ask it differently.  Before the crash, what

23   were your reading habits or tendencies?

24   A.  Well, I enjoyed reading.  I read a lot.

25   Q.  What kind of reading did you enjoy?

673

Tracy Houston – Direct

1    A.   I read for my work; and then personally, I read

2    autobiographies and stories about people's lives.

3    Q.   Would you categorize yourself as a voracious reader?  Is it

4    something that you enjoyed to relax every day?

5    A.   Absolutely.

6    Q.   Are you somebody that's house is just full of books?

7    A.   Yes.

8    Q.   Okay.  After the crash, when did you attempt to try to read

9    again; and what did you notice?

10   A.   I tried to read emails in the hospital, and I would just

11   read -- reread and reread to get it.  It just caused headaches.

12   And then when I went home, I still tried to read emails and

13   then tried to start reading -- I can't remember if -- I

14   couldn't read the contracts with the -- I tried to get an

15   attorney, and there were contracts, and I couldn't read them,

16   so I had a friend help me with that.

17   Q.   What contracts?

18   A.   Something that you sign for hiring attorneys.

19   Q.   Okay.

20   A.   And then the book Dr. Gustavson gave me, those are the

21   earlier probably --

22   Q.   What did you notice when you were trying to read?

23   A.   My comprehension wasn't there, and it -- it was a strain.

24   If I kept trying to take in the data, I was overwhelmed and --

25   Q.   How were you doing with being able to make decisions?

Tracy Houston – Direct

1    *A.* Well, from the time I came home from the hospital, it was

2    very difficult.

3    *Q.* What kind of issues did you have, and then how did you try

4    to work around them?

5    *A.* Well, I was fortunate at first to not have to make

6    decisions like with cooking and trying to do groceries, because

7    people helped me.  I have people I call angels that were kind

8    enough to continually come to my home and bring me food, help

9    with my housecleaning, help bathe me.

10   *Q.* How were you dealing with trying to make decisions and

11   utilize your brain?

12   *A.* Well, as I got better, it was kind of like being a widow.

13   You know, after the first initial loss, then people didn't come

14   as much.  And so I ended up -- and the occupational therapists

15   had trained me how to use the stove from my wheelchair and how

16   to, you know, kind of downsize your activities and remember --

17   I had such pain going from room to room that they help you

18   remember what you do in each room so you don't have to keep

19   going to each room.  It was literally -- the energy that this

20   took just to move from room to room had to be planned.  And so

21   that was the first part.  And then once I -- people didn't come

22   as much, I -- that's when I had to do more as far as, like,

23   writing a list for what somebody might -- some people still got

24   groceries for me; but, you know, what did I need?  It was very

25   difficult.  I found in the mornings I could do more, so I would

Tracy Houston - Direct

675

 1  begin to prioritize that way.

 2  *Q.*  Are you still better in the morning than you are later in

 3  the day?

 4  *A.*  Yes.

 5  *Q.*  Are you an early riser?

 6  *A.*  Yes.

 7  *Q.*  Were you always an early riser?

 8  *A.*  Yes.

 9  *Q.*  What time do you get up to try to accomplish things all the

10  way up till today?

11  *A.*  Well, sometimes I -- it's usually 3:00 or 4:00 in the

12  morning.  Either I have the sleep disruptions, or there is the

13  pain, but I can't lay down any longer.

14  *Q.*  Why not?

15  *A.*  That's -- that's just --

16  *Q.*  How many hours of sleep did you get before this crash a

17  night?

18  *A.*  Oh, usually eight -- eight or nine hours.

19  *Q.*  After the crash, what do you get?

20  *A.*  Well, it varies, again.  It varies with the pain and the

21  pain cycles.  I really don't know why there is war, because if

22  you could just deprive people of their sleep, that would handle

23  any problem.  So I get -- it varies from -- good is four, maybe

24  five hours.

25  *Q.*  Do you try to take a nap during the day, or can you?

Tracy Houston - Direct

 1   A.  Well, I do lay down, but I -- sometimes I sleep, but not

 2   very often.

 3   Q.  Okay.  As you were starting to do more and you were home

 4   and people were coming less, how were you doing emotionally?

 5   A.  Can you repeat that?  I'm sorry.  I lose you.

 6   Q.  Sure.  After you were home and people stopped coming as

 7   much as they did, how were you dealing with it emotionally?  Or

 8   how were you doing emotionally?

 9   A.  It was very difficult.  I have never felt so alone in my

10   life, and I have been solo or living single most of my life.

11   Q.  How did you deal with it?

12   A.  I forced myself out of bed every morning, I had my little

13   cry, and we got on with it.

14   Q.  So how long was it before you first went to the grocery

15   store by yourself?

16   A.  I don't know.  It was a long time.  It was months.  I don't

17   know.

18   Q.  When did you first notice problems with sensitivity to

19   light and sound?

20   A.  Laying in the hospital and in the nursing home, the rehab.

21   Q.  What did you notice?

22   A.  Just uncomfortable and startled and agitated.

23   Q.  When did you first notice the tinnitus, the ringing in your

24   ears?

25   A.  Oh, after the seizure, syncope thing -- episode.

Tracy Houston – Direct

1   *Q.* So you didn't have that before that event with the

2   Cymbalta?

3   *A.* No.

4   *Q.* Okay. How long was it before you were able to manage your

5   own affairs?

6   *A.* Well, that came gradually. I would say maybe for the first

7   year or so.

8   *Q.* How were you managing your affairs, then, for the first

9   year, if you were struggling?

10  *A.* I had people help me.

11  *Q.* Who?

12  *A.* Well, I had neighbors help me, I had friends help me, both

13  in Denver and the ladies from the book club there in Grand

14  Junction.

15          *MR. SHAPIRO:* Your Honor, we're close to the noon

16  hour. I was just going to shift into another topic.

17          *THE COURT:* Let's take the recess until 1 o'clock,

18  please.

19          *MR. SHAPIRO:* Thank you, Your Honor.

20          (Recess at 11:57 a.m.)

21          (In open court at 1:02 p.m.)

22          *THE COURT:* Thank you. We're going to interrupt the

23  testimony of the plaintiff and have another witness called by

24  the defense; is that correct?

25          *MS. BOBET:* Yes, Your Honor.

Ann Marie Collier, M.D. - Direct

1          *THE COURT:*  All right.  Is the witness ready?

2          *MS. BOBET:*  Yes.  The defense called Dr. Ann Marie

3    Collier.

4          Dr. Collier, can you hear us?

5        (**ANN MARIE COLLIER, M.D., DEFENDANT'S WITNESS, SWORN**)

6          *COURTROOM DEPUTY:*  Please state your name and spell

7    your first and last name for the record.

8          *THE WITNESS:*  Dr. Ann Marie Collier.  C-O-L-L-I-E-R.

9          *THE COURT:*  Be seated.  Let's get on with the

10   examination.

**DIRECT EXAMINATION**

12   *BY MS. BOBET:*

13   *Q.*  Good afternoon, Dr. Collier.  Nice to see you in person.

14   My name is Jane Bobet, and I represent the United States in

15   this case.

16          You're a medical doctor; correct?

17   *A.*  Yes.

18   *Q.*  What is your area of specialty?

19   *A.*  I'm a board-certified neurologist and a board-certified

20   epileptologist.

21   *Q.*  What degrees do you hold?

22   *A.*  I hold an M.D., as well as a bachelor of science.

23   *Q.*  And where do you currently practice?

24   *A.*  St. Mary's Hospital Medical Group in Grand Junction,

25   Colorado.

679

Ann Marie Collier, M.D. - Direct

1    Q.  How long have you worked there?

2    A.  I've been here for approximately four years.

3    Q.  What does your current practice entail?

4    A.  My current practice entails treating patients with --

5    diagnosing and treating patients with neurologic disorders.

6    Q.  Did you hold any positions before your current position

7    there?

8    A.  I did.  I was an epileptologist in Montana for almost two

9    years, about 18 months.

10   Q.  Any other positions?

11   A.  Before that, I was a resident and a fellow at the

12   University of Utah.

13        MS. BOBET:  Your Honor, at this time we'd offer

14   Dr. Collier as an expert in neurology.

15        THE COURT:  Plaintiff's counsel?

16        MR. SHAPIRO:  No objection, Your Honor.

17        THE COURT:  Tender is accepted.  You may proceed.

18   BY MS. BOBET:

19   Q.  Now, Dr. Collier, you saw Ms. Houston once in July of 2018;

20   right?

21   A.  That is correct.

22   Q.  Let's talk about that visit.  Who was Ms. Houston referred

23   to you by?

24   A.  I believe Dr. Lynn Price.

25        MS. BOBET:  And, Ms. Robinson, if we could pull up

Ann Marie Collier, M.D. - Direct

1  Exhibit 57.  We'll be looking at the first page of that

2  document.

3       *THE WITNESS:*  Do you mind if I pull up the exhibit as

4  well?

5  *BY MS. BOBET:*

6  *Q.*  So it should be showing on your screen shortly.  Can you

7  see that?

8  *A.*  I can.  Yes.

9  *Q.*  Okay.  Is this a record of your visit with Ms. Houston in

10  2018?

11  *A.*  It certainly is.

12       *MS. BOBET:*  All right.  Let's scroll down to under

13  HPI.

14       Ms. Robinson, can you scroll down and enlarge that so

15  we can read that paragraph a little better.

16  *BY MS. BOBET:*

17  *Q.*  So as an initial matter, what does HPI stand for in this

18  record, Dr. Collier?

19  *A.*  History of present illness.

20  *Q.*  If we look at the end of that very first line, the sentence

21  reading, "The purpose of the patient's visit is somewhat

22  elusive."  Did I read that right?

23  *A.*  Yes.

24  *Q.*  All right.  So what was your understanding of the purpose

25  of Ms. Houston's visit to you in July of 2018?

Ann Marie Collier, M.D. - Direct

1    *A.*  She had been referred to me for concussion with

2    post-concussive syndrome.

3    *Q.*  What does that mean that the purpose is somewhat elusive,

4    that phrase?

5    *A.*  Well, I don't have any evidence that she ever had a

6    concussion.  And on direct questioning, the patient didn't

7    endorse that she had ever had a concussion.  And so when I went

8    back to review the reports from the emergency department visit,

9    I did not see any evidence to suggest on presentation that she

10   had any symptoms suggestive of a concussion with the accident.

11   No CT was performed.  And when I reviewed that -- so,

12   basically, the patient did not provide me with much history.

13   So when a patient doesn't provide me with much history, I have

14   to go back in and do medical record review.  And a lot of times

15   I'm doing that during the appointment and after the

16   appointment, in retrospect.

17          So I went back to look at the hospital notes, I went

18   back to look at the emergency department report.  And the first

19   thing I look for as a neurologist was, was there any

20   neuroimaging performed to suggest that this patient had

21   sustained an injury to her head during -- you know, during her

22   admission or presentation.  And I did not see any evidence of

23   that, I did not see any suggestion of that during the

24   hospitalization, nor was neurology consulted.

25          So the purpose of the visit was somewhat elusive,

Ann Marie Collier, M.D. - Direct

1    because I couldn't find that there was any evidence of a

2    concussion to suggest post-concussive syndrome.

3    Q.  Just so I'm clear, when you're talking about the emergency

4    room records, those would have been the records from just after

5    the accident?

6    A.  When she was brought in.  Yes.

7           MS. BOBET:  Let's take the document down so we can see

8    you more easily.

9    BY MS. BOBET:

10   Q.  Okay.  What impression did you form of Ms. Houston during

11   that time that you saw her in July of 2018?

12   A.  You know, I mean, you have to forgive me.  I have to go off

13   of my -- I'm sorry.  My computer just did something --

14          I have to go off my recollection of the visit a lot of

15   time from my notes.  But based upon my notes, when I -- what I

16   infer into what I had said in my notes, my impression would be

17   that it was someone who would benefit from seeing a mental

18   health professional; and that's what I put in my notes.

19   Q.  And just to go back to one point to clarify earlier.  When

20   you referred to a concussion, is that term the same as a mild

21   traumatic brain injury, or does it mean something different?

22   A.  I believe it -- to me it means the same -- you know, very

23   similar things.  Concussion is the sequelae of a traumatic

24   brain injury.  And, you know, you do have to -- may I just

25   volunteer that you do have to understand that typically in

683

Ann Marie Collier, M.D. - Direct

1    order to diagnose a traumatic brain injury, it's done through

2    a -- it's kind of a systematic process, especially a mild

3    traumatic brain injury.  You know, of course, for me, as a

4    neurologist, when I see a severe traumatic brain injury, there

5    is a lot -- it's not so.  Right?  You're going to see

6    neuroimaging changes, potentially neurodiagnostic changes.  So

7    when I see someone who has had a severe traumatic brain injury,

8    it's pretty obvious just from imaging, and so it's not

9    something that is subtle.

10         When I'm seeing someone for a mild traumatic brain

11   injury, a lot of times that's actually diagnosed through a

12   battery of tests that are performed by speech-language

13   pathology or neuropsychology.  It's not typically something

14   that I am going to diagnose just based upon a one-time visit.

15   There is going to be -- there are a battery of tests and kind

16   of a systematic approach to diagnosing it.  It tends to be a

17   multidisciplinary type of approach to diagnosing a traumatic

18   brain injury -- excuse me -- a mild traumatic brain injury.

19         And I did not have the privilege of having any records

20   to suggest that that had been done in this patient, and she

21   wasn't volunteering that to me.  She wasn't actually very

22   forthcoming at all, and that's why I put in my notes that the

23   purpose of this visit was somewhat elusive.

24   Q.  When you say she wasn't forthcoming, could you elaborate on

25   that?

Ann Marie Collier, M.D. – Direct

1    A.  Sure.  So I am trained as a physician to ask open-ended

2    questions.  So when I walk into an exam room, the first thing I

3    do is say, How can I help you today?  And I -- I'm being honest

4    here.  I can't -- this visit occurred in 2018.  It was, you

5    know, part of a regular clinic day.  In my mind, I -- you know,

6    I didn't get that the patient was volunteering information to

7    me as to, like, why she was here.  Sometimes patients will say,

8    Well, my doctor sent me here; and I don't have a lot to work

9    with, with that.  So, you know, the patient said that she had

10   been followed by a mental health professional for traumatic

11   brain injury and that she was going to classes at CMU and that

12   she was seeing Dr. Johnston, a mental health professional, for

13   mild TBI.  And those results were not available to me, and the

14   results of those classes were not disclosed to me on the part

15   of the patient.

16        So if you scroll down to that --

17   Q.  I'm sorry to interrupt.  Could you speak a little bit

18   slower.  We're sort of having trouble following, with the

19   video, especially.  Sorry to interrupt.

20   A.  Sorry.  We're physicians.  We are trained to talk fast, and

21   so I apologize.

22        So what I put in my note here, "She is followed by

23   Dr. Johnston, a mental health professional, for mild TBI."

24        And, again -- sorry.  We have had so much smoke this

25   summer that I've been hoarse for a good part of it.

Ann Marie Collier, M.D. - Direct

1        "She states that she was in the study for TBI.  She

2   attended four classes at CMU.  However, the results of these

3   classes were not disclosed to me on the part of the patient,"

4   meaning -- what that means to me is, I probably asked her,

5   well, what did they say about those results?  And she did not

6   have the results of those classes or the results from her visit

7   with Dr. Johnston.  So, again, when I -- I'm kind of putting

8   these notes in for myself, saying that she's just not giving me

9   a lot of information.

10  Q.  Understood.

11       And let's pull up the records again.  We'll scroll to

12  page 4, for the benefit of everyone there.

13       I don't know if you have your paper records, Doctor.

14  Are you able to see that on your screen?

15  A.  Yeah.

16  Q.  Okay.  So the phrase that Ms. Robinson has just highlighted

17  reads, "However, the index of suspicion on my part is high that

18  this is primarily psychiatric, noting underlying comorbidities

19  prior to the accident."  Did I read that right?

20  A.  Yeah.  That was an extrapolation on my part.  Again, I had

21  to go into medical records.  So we have something called a

22  quality health network, as well as QHN.  And so I went back --

23  I mean, when a patient is not volunteering information to me, I

24  have to basically go back into records to try and find out what

25  is going on here.  And, again, as a neurologist, I'm kind of

Ann Marie Collier, M.D. - Direct

686

1    used to that, because I am seeing brain-injured patients, I'm

2    seeing patients with dementia, I'm seeing patients who have had

3    seizures, who may not remember the event.  So it's not

4    something that is beyond the scope of expectation in my

5    practice, but I sometimes have to go back and do fairly

6    extensive medical record review.  So I went back I believe as

7    far as 2005 to try and find out, like, you know, was there

8    something else going on with this patient prior to this?

9            I truly -- I'll tell you the truth -- which I'm, of

10   course, supposed to do, of course -- but the honest truth is, I

11   don't really understand how the diagnosis of traumatic brain

12   injury was -- has come about for this patient; and so I was

13   trying to understand if there was something else that was

14   underlying for this patient prior to this accident.  Because,

15   again, she wasn't forthcoming to me; and so I had to try to

16   figure out, like, what was going on.  I had to try to piece it

17   together myself.  So I was piecing together a history with very

18   little information provided to me.  And so based upon my

19   medical record review, I was able to go back and see that she

20   had been followed by mental health in the past for underlying

21   psychiatric comorbidities.  And that's why I put in there that

22   she would possibly benefit from something like EMDR, which is

23   eye movement desensitization and reprocessing, which is what is

24   used --

25           COURT REPORTER:  I'm sorry.  Could you please repeat

Ann Marie Collier, M.D. - Direct

 1   that and slow down.  The last sentence I have is, "And that's

 2   why I put in there that she would possibly benefit from

 3   something like EMDR, which is eye movement desensitization and

 4   reprocessing, which is what is used" --

 5          THE WITNESS:  I'm so sorry.  My apologies.

 6          So EMDR, eye movement desensitization and

 7   reprocessing.  And, basically, it is considered the standard of

 8   care for veterans with post-traumatic stress; and it is

 9   something that I do recommend to my patients with PTSD.

10          So, actually, interestingly, when I go back and look

11   at the medical records from Dr. Gustavson, who is a

12   neuropsychologist, it was primary psychiatric, and it was PTSD.

13   At least back initially, when you review the previous exhibits,

14   I found it -- it was actually really fun and fascinating to

15   read the books that you had sent me when I was looking back at

16   the diagnosis.  So I think that -- I felt kind of vindicated

17   that even though I didn't have access to those records or the

18   privilege of reviewing those at the time, that I -- I didn't

19   actually even know that she had gone to see a

20   neuropsychologist, because those records weren't provided to

21   me.

22          So even though I was functioning on very, very limited

23   data, and the patient wasn't forthcoming to me -- she didn't

24   even volunteer that she had seen a neuropsychologist -- I had

25   said that I do have a clinical index of suspicion that this is

Ann Marie Collier, M.D. - Direct

1    a primary psychiatric diagnosis.  And in reviewing

2    Dr. Gustavson's note, he corroborated that by -- never in his

3    notes on his battery of psychiatric tests did he put "traumatic

4    brain injury."  When you read Dr. Gustavson's notes, what he

5    says is PTSD.  And that's not to say that that's not a

6    debilitating condition; but I don't ever see -- a

7    neuropsychologist who does formal psychiatric testing on this

8    patient, never in his notes did he document traumatic brain

9    injury.  So even though I didn't have that information at the

10   time, I was somehow able to, based on my limited assessment of

11   the patient, say that I do feel that this is primary

12   psychiatric; and I stand by that.

13   *BY MS. BOBET:*

14   *Q.*  In that same part of the note, I noted the phrase, "primary

15   psychiatric, noting underlying comorbidities prior to the

16   accident."

17   *A.*  Yes.

18   *Q.*  What were those underlying comorbidities?  And, remember,

19   speak slowly, please.

20   *A.*  Thank you for that reminder.

21          So when you go back and look at the notes from

22   Kaiser-Permanente -- I believe it was -- you see that she had

23   been seeing someone for PTSD in the past.  And to me, it

24   suggests that -- you know, someone who has a history of trauma

25   is susceptible to having -- if they have another traumatic

Ann Marie Collier, M.D. - Direct

1    experience, it could potentially reignite past trauma.  So I --

2    you know, for someone who at baseline has a history of trauma,

3    if they have another traumatic experience, it could potentially

4    compound it.  So that's kind of all I was suggesting there.

5    Q.  And did you make any recommendations for Ms. Houston after

6    you saw her in July of 2018?

7    A.  At that appointment, what I had recommended was that the

8    patient see a neuropsychologist and have formal

9    neuropsychiatric testing.  And, again, because I was not

10   provided -- you know, you have to understand that

11   Dr. Gustavson's notes are not available through the health

12   network nor through Care Everywhere.  And if a patient doesn't

13   bring them to the appointment and doesn't volunteer that that's

14   who they saw, I'm not going to -- you know, M.D. doesn't mean

15   medical deity.  I cannot, like, know that that had happened.

16          So I actually recommended that she see a

17   neuropsychologist, I had recommended EMDR, I had also

18   recommended an MRI, because she hadn't had -- had not had

19   neurodiagnostic imaging.  And so I find it interesting that she

20   was carrying around this diagnosis of traumatic brain injury

21   without having ever had even neuroimaging.  Which, again, you

22   know, if it's a mild traumatic brain injury, the MRI would

23   likely be negative.  But at the same time, what I said in my

24   note was -- you know, I didn't say that it -- what my

25   assessment was was definitive.  But I said it was a clinical

690
Ann Marie Collier, M.D. - Direct

1    index of suspicion, but it is a diagnosis of exclusion, and

2    further recommendations pending results of MRI brain, which she

3    did attempt to undergo.  But it was a failed exam secondary to

4    claustrophobia, and she did not ever follow up to repeat that

5    MRI with either anesthesia or oral agents.

6            And so she was essentially -- I put "return to clinic

7    if symptoms worsen or fail to improve."  And that's kind of

8    open-ended.  If she had -- if she had done the MRI, and the MRI

9    was abnormal or showed some concerning findings, then my office

10   would have contacted her and had her come back in to review

11   those results, which was not done because she didn't complete

12   the MRI.

13   Q.  I'd like to show you just one more page from your records

14   of your visit with Ms. Houston.  We should be getting it pulled

15   up here.  And it's defective how it's scanned, and it's a

16   little hard to read.

17           But I believe this is a section called progress notes.

18   And we've got a sentence highlighted here, "Note, the patient

19   currently is not on an antidepressant medication such as" --

20   excuse me -- "is not on an antidepressant, medication such as

21   duloxetine could potentially confer benefits for addressing

22   pain as well as underlying psychiatric comorbidities."  Do you

23   see that?

24   A.  I do.

25   Q.  So was that another recommendation that you made?

Ann Marie Collier, M.D. - Direct

1   *A.*   It was.  But I --

2   *Q.*   One moment --

3   *A.*   Go ahead.

4   *Q.*   No.  Please continue.

5   *A.*   If you see the next line, though, "it is to be discussed

6   with a mental health professional."

7   *Q.*   Thank you.  One moment.

8           And since July of 2018, you haven't seen Ms. Houston

9   again; right?

10  *A.*   No.

11  *Q.*   So you're not necessarily aware of how she's doing

12  currently?

13  *A.*   Well, I am now because of the fact that she's been brought

14  to my attention.  So I do know kind of what is going on, that

15  she has seen another neurologist, that she had had some sort of

16  event during PT.

17  *Q.*   Understood.  What is your understanding of that event

18  during PT?

19  *A.*   They're calling it a reaction to the duloxetine.

20  *Q.*   Okay.  Were there other options of what that could be, or

21  was it conclusively determined what it was?

22  *A.*   It's not conclusive, because she didn't actually have an

23  EEG.  They are saying that she possibly had a seizure due to

24  the duloxetine, which is actually exceedingly rare.  Other

25  options are syncope, pre-syncope, a stress response, also

692

Ann Marie Collier, M.D. - Direct

1    psychogenic non-epileptic seizure is in the differential.

2            But interestingly and ironically, she was sent to me

3    for post-concussive syndrome.  And I am an epileptologist.  In

4    fact, I am the only board-certified epileptologist on the

5    Western Slope, within a 250-mile radius.  And even though the

6    clinical index of suspicion was that this was possibly a

7    seizure secondary to duloxetine, she was not sent to the

8    seizure expert for this.  I find that kind of interesting.

9    Q.  And just so we're clear.  When you used the phrase

10   "syncope," as opposed to "seizure," what does that mean?

11   A.  So syncope is basically -- it can be a number of things.

12   There is vasovagal syncope, there is neurocardiogenic syncope,

13   it could be a lack of blood flow to the brain that causes you

14   to faint, it could -- syncope is -- think of fainting spell.

15   So the layman's term is fainting, fainting spell -- not even

16   layman's.  It's kind of passing out.  So syncope is like a

17   passing-out episode.

18           The difference between syncope and seizure is that a

19   seizure is actually an electrical discharge in the brain.  So

20   it's an abnormal firing of neurons in the brain, triggering an

21   event that results in clinical manifestations that we call

22   seizure.

23           Now there are some people who can have what is called

24   syncope with post-syncopal convulsions.  And those are not

25   necessarily electrographically generated either.  It's,

Ann Marie Collier, M.D. – Direct

 1   essentially, basically, some muscle jerks that appear to be

 2   convulsions; but they're not cortically generated.  So an

 3   epileptic seizure is an event that occurs from electrical

 4   discharges in the brain, so we say that that's cortically

 5   generated.  Whereas, a syncopal episode is not thought to be

 6   electrical activity that is cortically generated.  That's the

 7   difference.

 8          I hope I was clear on that, and I hope I spoke slow

 9   enough.

10   Q.  It's a little fast still, but, you know, probably because

11   we're unfamiliar with the terms -- or at least I certainly am.

12          Just one last point on this.  As far as a syncopal

13   episode, is dehydration something that could cause that?

14   A.  Absolutely.  You know, there are actually a number of

15   causes of syncope.  There is one cause of syncope called

16   post-micturition syncope, which is a type of syncope that

17   occurs after people go to the bathroom.  That's actually very

18   common.  There is dehydration syncope; there is syncope that

19   occurs when people see the sight of blood; some people pass out

20   when they're in pain; some people pass out from a stress

21   response.

22          Brace yourself, stenographer.  There is actually

23   something called psychogenic pseudosyncope -- which is my

24   favorite word to say ever, because it just rolls off the

25   tongue.  But there is psychogenic syncope, as well.

Ann Marie Collier, M.D. - Direct

1   Q.   In your review of the records -- more recent records for

2   Ms. Houston, did you come to any conclusion of the potential

3   effect of dehydration on this episode that she suffered?

4   A.   It's conjecture at this point --

5        MR. SHAPIRO:  Your Honor, I'm going to object --

6   excuse me.

7        I'm going to object, Your Honor.  This witness has

8   never been endorsed to render opinions regarding anything other

9   than her one visit or regarding any review of any other

10  records.  In fact, I was not even aware of the review of the

11  records until this examination just occurred, that she was even

12  provided them by Ms. Bobet.  So I would say, this is not

13  disclosed, it is outside of the disclosures that we have

14  received.

15       MS. BOBET:  Your Honor, she's endorsed as a

16  neurologist; and she has a specialty in epilepsy and seizures.

17  And Mr. Shapiro was on the conversation with Dr. Collier when

18  we discussed these records, and plaintiff is the one who has

19  attempted to put these records into evidence.  So there is not

20  a disclosure issue here, in my view.

21       THE COURT:  The objection is sustained.

22       Go on.

23       MS. BOBET:  Just one moment.

24  BY MS. BOBET:

25  Q.   Just to be clear -- and I apologize if I'm asking you to

Ann Marie Collier, M.D. – Cross

1   repeat yourself.  To your knowledge, has Ms. Houston gotten an

2   MRI since your visit with her in July 2018?

3   *A.*  I am not aware of her having had an MRI since the failed

4   study.

5          *MS. BOBET:*  Thank you.  Those are all the questions I

6   have.  Mr. Shapiro might have some questions for you, or

7   Mr. Ogborn.  Thank you.

8          *THE WITNESS:*  Okay.  Thank you.

9          *THE COURT:*  Cross-examination.

10          *MR. SHAPIRO:*  Yes, thank you, Your Honor.

11                          **CROSS-EXAMINATION**

12   *BY MR. SHAPIRO:*

13   *Q.*  Good afternoon, Dr. Collier.  How are you today?

14   *A.*  Well enough.  How are you?

15   *Q.*  Good.  Thank you.

16          I had a question.  From our conversation the other

17   day, I understand you are an epileptologist -- which doesn't

18   roll off of my tongue.  That is a doctor -- a neurologist that

19   specializes in seizures; right?

20   *A.*  Yes.

21   *Q.*  And it's my understanding that you said you don't diagnose

22   mild traumatic brain injuries or post-traumatic stress

23   disorder, that that is not your specialty; is that accurate?

24   *A.*  It is certainly not.

25   *Q.*  Okay.  And you don't treat or diagnose post-concussive

696

Ann Marie Collier, M.D. - Cross

1   syndrome or mild traumatic brain injury -- I said that

2   already -- because that's not your specialty?

3   *A.*  That is not true.  I do treat post-concussive syndrome.

4   *Q.*  Okay.  I had some questions about cognitive difficulties.

5   Cognitive issues after a traumatic event can stem from a number

6   of things; is that accurate, Doctor?

7   *A.*  Yes.

8   *Q.*  Post-traumatic stress disorder would cause cognitive

9   issues; correct?

10  *A.*  Yes.

11  *Q.*  Chronic pain would cause cognitive issues; correct?

12  *A.*  It could, but I -- I guess I'm wondering why you're asking

13  a neurologist psychiatric questions.

14  *Q.*  Well, as I understand it, you're board certified in

15  neurology, which also includes a board certification in

16  psychiatry; isn't that accurate?

17  *A.*  It's the American Board of Psychiatry and Neurology, ABPN.

18  *Q.*  That's why I was asking that question, I thought that was

19  part of your training; is it not?

20  *A.*  I can tell you that it is part of my training, but I'm just

21  kind of perplexed as to -- I don't treat PTSD.

22  *Q.*  Okay.  But does PTSD cause cognitive difficulties?

23  *A.*  It certainly can.  Yes.

24  *Q.*  Does depression and anxiety cause cognitive difficulties?

25  *A.*  Yes.  In fact, there is something called pseudodementia,

Ann Marie Collier, M.D. - Cross

1    which is where people are mistakenly diagnosed with dementia

2    when they actually have depression.

3    Q.  And medications such as gabapentin also cause brain

4    fogginess or cognitive issues, isn't that right?

5         MS. BOBET:  Objection, Your Honor.  This is outside

6    the scope of her expertise.  She's qualified --

7         THE COURT:  Sustained.  The objection is sustained.

8    BY MR. SHAPIRO:

9    Q.  As I understand it, Doctor, you diagnosed -- or your

10   impressions, and I want to make sure -- were cognitive change;

11   correct?

12   A.  Correct.

13   Q.  And was that related to the car crash in December of 2016?

14   A.  I don't know.

15   Q.  And chronic pain of the right ankle.  Was that related to

16   the car crash in 2016?

17        MS. BOBET:  Objection.  This is outside of the scope

18   of her expertise.

19        THE COURT:  Sustained.

20   BY MR. SHAPIRO:

21   Q.  Doctor, you mentioned her prior psychological history

22   creating a susceptibility to additional traumas that occur

23   later; is that accurate?

24   A.  It certainly doesn't help.

25   Q.  And once you have post-traumatic stress disorder, do you

Ann Marie Collier, M.D. - Cross

1   always have post-traumatic stress disorder?

2   A.   It depends on how well it is treated and managed.

3   Q.   You talked about Cymbalta, or did you say duloxetine;

4   right?

5   A.   Yes, sir.

6   Q.   And Dr. Price has testified that she was concerned about

7   keeping her -- putting her back on Cymbalta after the episode.

8   Would you agree with that cautious nature and consider another

9   antidepressant?

10  A.   I can't answer that question, because I don't know what

11  you're talking about.  It wasn't part of something I was

12  supposed to address during this.  I was supposed to only

13  address my appointment, as far as I understand.  I mean, I

14  don't know.  All I can say is, I don't know really what -- I

15  don't know what happened at this physical therapist appointment

16  to cause her to have that episode.  I was not the neurologist

17  to see her after that appointment, so I cannot comment on

18  Dr. Price's trepidations.

19  Q.   Okay.  Are you aware of how the crash happened?

20  A.   I did read in the report that there was a failure to yield

21  on the part of the Subaru, and she was hit, and her Jeep hit a

22  barn.

23  Q.   Okay.  Are you aware of the significance of her injuries

24  that day?

25  A.   I am aware that she sustained an injury to her ankle and

Ann Marie Collier, M.D. – Cross

1   was admitted -- was transported to the St. Mary's emergency

2   department, where she was taken for debridement and repair of

3   that ankle, and she did require hospitalization.

4   Q.  Do you know how significant the injury was or how long she

5   was hospitalized?

6         MS. BOBET:  Objection.  This is certainly beyond the

7   scope of the direct, as well as beyond --

8         THE COURT:  Sustained.  The objection is sustained.

9   BY MR. SHAPIRO:

10  Q.  Do you work with Dr. Lynn Price frequently or get referrals

11  from her?

12  A.  I've gotten referrals from her.  We don't work directly

13  together.

14  Q.  Do you work with Dr. Gustavson, or get referrals from

15  Dr. Gustavson, or does he -- do you refer to him?

16  A.  I work more frequently with Dr. Gustavson than I do with

17  Dr. Price, yes.  But, again, we're not in the same area.  But

18  let me just say that I've actually spoken personally with

19  Dr. Gustavson on a number of occasions about patients that we

20  share.

21  Q.  Okay.  Do you respect the work of Dr. Gustavson?

22  A.  Beyond a shadow of a doubt.

23  Q.  Okay.  Do you work with or -- do you work with

24  Dr. Burnbaum?

25  A.  Not directly, but -- I mean, he was part of our call pool

700

Ann Marie Collier, M.D. – Cross

1   back when he took call at our hospital.  And he now is with

2   Family Health West, so he's not in my group, and he no longer

3   takes calls.  So we're kind of peripherally involved.  I'm

4   aware that he is still practicing.  He's practiced in the Grand

5   Valley for a long period of time.

6   *Q.*  Do you --

7   *A.*  So I am very familiar with Dr. Burnbaum.

8   *Q.*  Do you respect the work of Dr. Burnbaum?

9   *A.*  Dr. Burnbaum is a very qualified neurologist.

10          *MR. SHAPIRO:*  Thank you.  Thank you for your time,

11  Doctor.  Sorry to take up your time today.

12          *THE WITNESS:*  Not a problem.

13          *THE COURT:*  Any redirect?

14          *MS. BOBET:*  No, Your Honor.

15          Thank you, Dr. Collier.

16          *THE WITNESS:*  Are we done?

17          *THE COURT:*  Thank you.  May she be excused from her

18  subpoena?

19          *MS. BOBET:*  Yes.

20          *MR. SHAPIRO:*  Yes.

21          *THE COURT:*  You are excused, Doctor.

22          *THE WITNESS:*  Thank you, Your Honor.

23          *THE COURT:*  Next witness, please.

24          *MR. SHAPIRO:*  Your Honor, we would recall Ms. Houston.

25          *THE COURT:*  Okay.

Tracy Houston – Direct

1           *MR. SHAPIRO:*  Everybody ready?

2           *THE COURT:*  Please go ahead.

3        (**TRACY HOUSTON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**)

4                **DIRECT EXAMINATION CONTINUED**

5    *BY MR. SHAPIRO:*

6    *Q.*  We were chatting before lunch about you being able to

7    manage your affairs.  How long was it before you were able to

8    manage your affairs again?

9    *A.*  Well, it progressed.  I can't remember exactly when, like,

10   for example, I could go to the grocery store; but it was

11   sometime after I began to drive.  And I've gotten help with a

12   number of things, particularly on the outside of my property,

13   and still do that today.  I have gotten quite a bit of help

14   from the speech therapist.  So my guess is, over time, while I

15   still have difficulty maybe reading longer documents and some

16   issues along with that, I am able to have strategies to have

17   help with either using other people for that, so -- I don't

18   know if that answers the question.

19   *Q.*  So I'm going to ask you about the speech therapy or

20   cognitive therapy later, but what help do you get on your

21   property that you still get help with?

22   *A.*  The outside of my property, I have people help me with yard

23   work and such like that.

24   *Q.*  Are you able to do the yard work, or are you limited in

25   your yard work?

Tracy Houston – Direct

1    A.  I'm limited.  Yeah.

2    Q.  Do you try to do your yard work?

3    A.  Yes.

4    Q.  Okay.  Why did you go to see Dr. Gustavson?

5    A.  I felt like I needed to begin to look at the traumatic

6    repercussions of the car accident and have some insight into

7    that.

8    Q.  Did you -- how did you get to see Dr. Gustavson?  How did

9    you find him?

10   A.  You referred me.

11   Q.  Okay.  Did you like working with Dr. Gustavson?

12   A.  Yes, I did.

13   Q.  Was he helping you?

14   A.  Yes.

15   Q.  Why did you stop working with Dr. Gustavson?  What was

16   going on at that time?

17   A.  Well, we had originally set -- he wanted to set six

18   appointments, so we did that.  And we had conversation at the

19   end of the appointments about what we've reviewed and where I

20   was at.  And there was other treatments that I wanted to look

21   at at that time, so . . .

22   Q.  What other treatments were you wanting to look at?

23   A.  Somatic experiencing, some grief workshops -- or workshop.

24   I can't remember what else.  There may have been others.

25   Q.  Why did you need to do that other than through

703
Tracy Houston – Direct

1    Dr. Gustavson?

2    A.   A different tool chest.  Basically, he wasn't trained in

3    some of the things that I was looking at.

4    Q.   What were the problems that you were still struggling with

5    that you felt you needed help with?

6    A.   Oh, certainly, the anxiety and the PTSD, the mind slowness

7    and all of the cognitive issues, the pain, the grief was

8    starting to settle in at that point with the loss, so --

9    some --

10   Q.   When did you decide that you wanted to see another

11   psychologist or another therapist?

12   A.   Well, I went to that grief workshop and began to do some

13   research and watching YouTube videos about different

14   modalities, I guess they're called, for healing.  And I came

15   across Dr. Johnston, then.

16   Q.   How did you find Dr. Johnston?

17   A.   On the internet.

18   Q.   What did you like about Dr. Johnston that led you to

19   schedule time to meet with her?

20   A.   She had -- again, back to that continuum of East and West

21   offerings.  But I really liked the fact that the rehab, the

22   how-to -- because I'm a doer, and I needed someone with that

23   focus and liked the fact that she has some counseling in her

24   background, too.

25   Q.   What do you mean, you're a doer; and why did she fit that?

Tracy Houston - Direct

 1   What did you think was there that was going to assist you?

 2   A.  Well, to get moving, both, you know, physically, mentally,

 3   all of the above was my goal.  And rehab would be, to me -- the

 4   way I understood it and the way I experience it is how to

 5   function, how to adapt, and try to get back to what you want

 6   and -- to some degree and maintain some of your identity.

 7   Q.  How long have you now been working with Dr. Johnston?

 8   A.  I believe that it's a little over two years.

 9   Q.  Has it been effective for you?

10   A.  Absolutely.

11   Q.  How has she been effective for you?

12   A.  Well, she's able to draw from -- she's not so isolated in

13   one way of healing.  So she has a different tool kit, I guess,

14   if you will; and she can bring that out, according to where I'm

15   at.  But the -- she has a foundation from years of working with

16   people like this.  We have a big hospital in Grand Junction,

17   and they experience very similar injuries in the sense of

18   physical to me, and then the PTSD.  So -- and they're doers,

19   like me.  So I felt like she could help with that.  And then

20   the grief, I was beginning to grieve quite heavily; so she

21   helped with that, as well.  And I think the practical side of

22   it was, it became apparent that as I progressed physically, as

23   well as emotionally, she was able to address maybe next steps.

24           So, for example, if I wanted to go on what I call a

25   nature walk and was frustrated because I couldn't get very far,

Tracy Houston - Direct

1    she would say, well, here is what you can do.  You can buy some

2    kind of assist that will help you.  She helped me -- she had to

3    help me repeatedly on this pacing idea and not trying to get

4    everything done at once.  And it's really the definition of

5    insanity, if you ask me; but it's the way you have to do it.

6    But if your pain is going up or your fatigue is going up, you

7    have to stop.  The hard part about that is you start thinking

8    about your pain as soon as you stop.  So -- but the --

9    ultimately, in the end you can do more if you do take breaks

10   and stop.  So that was extremely helpful.  And -- let's see.

11   Let me see what else.

12          It did help also, then, with the desensitization, I

13   guess it's called.  And then the -- because I would go from her

14   office, and she would help me -- she knew the area, so she

15   would help me -- say I was driving whatever it was to her

16   house -- I mean, to her office, and then I would take drives

17   from there.  And she would know how far, if there was any cliff

18   dropoffs, you know, what challenges I would have as far as

19   driving and if I could -- there was a chance to verbalize what

20   that was going to take for me to stretch it out -- to stretch

21   the drive out, so that was very helpful.

22   Q.  How did she discuss or work with you about driving to

23   Denver, which I know was a significant event?

24   A.  Yeah.  Extremely stressful.  First, you know, resting the

25   day before, so -- but then, of course, then that would require

Tracy Houston – Direct

 1   many days of planning so that everything was packed or done to

 2   just go on the trip.  And then different places that I could

 3   stop.  So -- and basically, just the -- how it -- how it would

 4   roll out in a longer-term drive.

 5   Q.  How did you feel, managing to be able to drive to Denver

 6   and then back to Grand Junction?

 7   A.  It was hard, but it was good.

 8   Q.  If I remember correctly, did you drive back with weather?

 9   A.  Some, yeah.

10   Q.  And how did you do?

11   A.  Well, it's a little scary on Vail Pass, but it was good.  I

12   mean, it's a -- it's good.

13   Q.  Okay.  How did she help you with grieving your losses?

14   A.  Well, first of all, somebody that will sit and listen,

15   it's -- it's very heavy, and it's -- it's not a problem to be

16   solved, it's a process.  And she was able to meet me where I

17   was at with that, as well as help me find my song.  So it just

18   reminded me of a saying, a bird doesn't sing to solve a

19   problem, a bird sings because she has a song.  And she was able

20   to help me deal with the loss and keep some of my identity.

21   Q.  What was the song that you found?

22   A.  Well, some slice of who I was, I could still tap into, to

23   gain slowly some sense of myself, whether it be a short nature

24   walk or -- whatever we would talk about.

25   Q.  How did she help you with your ability to do your

707

Tracy Houston - Direct

1   day-to-day functions?

2   A.   Well, the pacing.  She was quite patient with me and

3   reiterated that I had to do that, I had to accept it.

4   Q.   Have you finished grieving what you've lost?

5   A.   No.

6   Q.   Where are you?

7   A.   I think I've begun some grieving.  I have some acceptance.

8   Q.   Does finishing grieving mean failure to you?

9   A.   I don't know that grief finishes.  It's a process.  When my

10  dad died, I still sometimes grieve over that; and that was

11  quite some time ago.  But the failure part is not being able to

12  do the things that I used to do, not being able to do -- get

13  ahold of the pain.

14  Q.   Do you still believe that you're going to get better?

15  A.   Yes.

16  Q.   Why?

17  A.   Well, I'm going to keep at it.

18  Q.   How effective have you found the pacing that she taught

19  you?

20  A.   Again, it's hard; but it's -- it's the way it has to be.

21  It helps.  I actually can do more, I am less fatigued if I

22  pace.  And it's a -- it's a highly structured life.  From the

23  time I get out of bed, I am on a schedule.  I feel like I'm in

24  a prison, but it helps.

25  Q.   What is that schedule?

708

Tracy Houston – Direct

1   *A.*  I get out of bed, and I -- I used to stretch first or have

2   my breakfast, depending on the pain level.  And the stretching

3   kind of regime, I have multiple physical therapist direction as

4   far as how to stretch and loosen up my lower body and up into

5   my hips.  And I do some pain relief with a ball now for my

6   latest physical therapist; and I also am doing trigger

7   points -- pressing trigger points to relieve pain.  And my

8   physical therapist before this current one had me also doing

9   what is called mirror box therapy.  So three times a day I have

10  that routine.

11  *Q.*  What is that?

12  *A.*  That's just how I have to to keep the pain down.

13  *Q.*  No.  What is the mirror box therapy?

14  *A.*  Oh.  The mirror box therapy, it's to trick the brain and

15  get the messages of the pain to stop.  So the PT therapist said

16  that it was started at Walter Reed Hospital with vets that have

17  phantom limb pain.  And you sit with a mirror so it --

18  throughout my house, I have stations set up for everything that

19  I do.  And I have a mirror, and you sit -- like, I sit on the

20  couch; and you put the opposite limb -- so my left is the

21  opposite limb.  And you look in the mirror, and you move the

22  opposite limb in its -- the brain somehow sees it that the

23  right one is moving, and it says to the brain and the nervous

24  system, everything is fine.

25  *Q.*  Do you think it works?

Tracy Houston - Direct

1   *A.*  Yeah.  It takes time.  I've been doing it -- I can't

2   remember -- February or March of this -- yeah, this year.  And

3   there is some improvement from it.  And if I miss -- sometimes

4   I'll miss an evening, it -- I can tell.  So it's -- it's kind

5   of a new thing, I guess, but . . .

6   *Q.*  What else is part of your routine to get going in the day?

7   *A.*  So, then, I have that, and I have my breakfast, then I go

8   swimming.  I'm sort of alternating swim days with some

9   weightlifting that my physical therapist wants me to do and my

10  doctor -- several doctors have said swimming is good.  So now

11  that our gym is open, I can do those things.  And then I come

12  home, and I have my lunch.  And I have increased the Adderall I

13  think since the last time we met, so I have more energy in the

14  afternoon.  So I rest, but now I get up and I try to do

15  different things before I go back to the rest, where before I

16  was just on the couch, basically, into evening.  So I'm very

17  proud of that.  It's a small step, but . . .

18  *Q.*  How many hours a day do you spend trying to minimize your

19  problems?

20  *A.*  Oh, let's see.  With the exercise and all the routine my

21  three times a day, my doctors' appointments -- well, it varies.

22  So some -- if there is days I don't have a doctor's

23  appointment, it would be five to six.  If there is a doctor's

24  appointment, it would be a little more.

25  *Q.*  If you don't do the routine that's been given to you by

Tracy Houston – Direct

1   your physical therapists, what do you notice?

2   A.  My pain goes up.

3   Q.  How long does it take for you to get out of the house on an

4   average day?

5   A.  Easy two hours.

6   Q.  Is that because of the routine?

7   A.  Partly, yeah.

8   Q.  How do you feel when you get up in the morning?  Are the

9   pain levels better, worse, or are you restricted?

10  A.  Well, when I first get out of bed, the first steps or few

11  minutes are pretty difficult, because it's been -- it's stiff.

12  Then if I do -- I'm experimenting now to do the stretching

13  routine before breakfast, so fewer steps even before breakfast.

14  I'm seeing if I do that, then, before, if my pain doesn't

15  increase as fast.  So -- but generally speaking, as the day

16  goes on, the pain increases.

17  Q.  Every day?

18  A.  Every day.

19  Q.  So do you feel pain when you put your feet down on the

20  floor first thing in the morning, when you're getting out of

21  bed?

22  A.  It is the first thing I feel.

23  Q.  What is that feeling?  What is the pain feeling of putting

24  your foot on the ground?

25  A.  Yeah.  It's just stiff, and so as I -- as my ankle steps --

Tracy Houston - Direct

1   sorry.  I don't have the language.  There is extreme stiffness

2   and tightness.

3   Q.  How would you describe, and if you would describe, the pain

4   that you have on a daily basis?  Can you explain the kinds that

5   you have?

6   A.  Yeah.  If there is -- the worst is this what I call a vice

7   grip feeling, just around the ankle.  And it's a tightening.

8   It literally feels like there is a mechanism that is squeezing

9   down.  Then I have the stiffness, and then I have the

10  tingling -- like a burning, tingling in my foot.

11  Q.  Did you want to utilize medications early on in your

12  recovery?

13  A.  Yes.

14  Q.  Did you want to try antidepressants or stimulants early on

15  in the process?

16  A.  No.

17  Q.  You agreed to use the pain killers at the beginning?

18  A.  Yes.

19  Q.  Why?

20  A.  You mean, when I was in the hospital at the beginning?

21  Q.  And when you got out.

22  A.  It was pretty severe.  I don't -- I -- yeah.

23  Q.  Okay.  Why did you want to avoid antidepressants and

24  psychostimulants?

25  A.  Well, they change the way the brain works.  And I have

712

Tracy Houston - Direct

 1    found myself in a new world with a new way that I have to live.

 2    And the way I explain it is if -- my granddad used to always

 3    say, if you're in the dark, you're going to want to see how to

 4    turn the light on.  And so I have struggled with what Dr. Lynn

 5    Price has helped me with -- if you're going to have a certain

 6    level of performance, you're going to have to balance that out

 7    with certain effects of medication.  So there it is.

 8    Q.  When you finally agreed to utilize the psychostimulant, the

 9    Adderall, what did you think when you first started?

10    A.  Well, I think I was on the Ritalin, and that was like I

11    drank ten cups of coffee.  But, then, Adderall, that -- we you

12    started -- I can't remember the sequence, but it was dosage --

13    different levels of dosage, and it helped.

14    Q.  Did you like it?

15    A.  I liked the fact that I was performing better, that I could

16    think better, and that I had more energy.

17    Q.  What did you notice?

18    A.  Well, my head was clearer.  I had more of a sense of

19    myself.

20    Q.  Did you increase the dosage?

21    A.  Yes.

22    Q.  What dosage are you taking now?

23    A.  Two times a day, 5 milligrams.

24    Q.  Okay.  And was that even better for you?

25    A.  Yes.  Uh-huh.

Tracy Houston – Direct

1   Q.  Okay.  Why did you not want to take the antidepressant?

2   A.  Well, I have really struggled.  I already have gabapentin

3   that's messing with my brain, and then I'd have another one.

4   And I have some questions that they're addictive.  Some of the

5   research that I've done is now showing that people that get off

6   antidepressants have a -- like withdrawal symptoms.  And to

7   me -- even though they don't say they're addictive, to me,

8   that's a lot to take on.

9   Q.  Why did you finally agree with Dr. Price to try the

10  Cymbalta?

11  A.  Well, pain wears you out.  And back to that, what she keeps

12  saying to me about balancing it out.  Plus it had supposedly

13  some pain relief factor to it.

14  Q.  You started taking the Cymbalta I think at the beginning of

15  2020, is that when it was?  Sometime in that time frame?

16  A.  I think so.

17  Q.  What did you think when you started taking it -- let me ask

18  this question first:  Did you take the Cymbalta after you had

19  took the sympathetic nerve blocks, or in that time frame?

20  A.  Yes.

21  Q.  And so how was your pain level when you started the

22  antidepressant?

23  A.  I can't remember where it was at in the cycle with the

24  shots.

25  Q.  Okay.  Did you like Cymbalta?

Tracy Houston – Direct                                  714

1    *A.*   Yeah.

2    *Q.*   What did you notice about the Cymbalta?

3    *A.*   I felt more like myself.  Yeah, just lighter.

4    *Q.*   What do you think about taking antidepressants in the

5    future?  And I know you've heard an awful lot this week.

6    *A.*   Uh-huh.

7    *Q.*   But what are you thinking?

8    *A.*   I think that I would consider it, but it's going to have to

9    have -- Dr. Price is going to have to talk with somebody

10   else -- and I don't know who -- but there is going to -- there

11   is going have to be some time spent on that, because I -- I

12   don't want it -- my brain is already -- it's the only one I

13   got.

14   *Q.*   Did you use Dr. Johnston because you didn't want to do

15   formal psychotherapy, or were you trying to avoid formal

16   psychotherapy, or why the how-to or the doing person like

17   Dr. Johnston?

18   *A.*   Well, I wanted to tap into kind of the roots of who I was,

19   and I -- I felt like action or doing is what I needed.  I mean,

20   I had been laid out completely for months; and I needed to do

21   whatever I could, get going.  And so -- and I had experienced

22   cognitive behavioral therapy before in my 20s, when I did that.

23   So it's not that I rule it out -- and I know she says she's

24   used part of it with our work -- but I need -- I need to have a

25   variety of tools.  But the rehab put me in action.  It put me

715

Tracy Houston - Direct

1    back in some situations that then would feed my soul and help

2    with my identity.

3    Q.  As you started to get more active, when you started -- you

4    were off the crutches, you're off the cane, what did you notice

5    physically about your right leg and right knee, how was it

6    functioning, and what were you trying to do?

7    A.  Well, in physical therapy, I couldn't -- when I first

8    started, they put me on a bike, and I couldn't even go all the

9    way around.  So one of the first things we did was work on

10   trying to get that so I could do a full pedal all the way

11   around.  And then the other part of physical therapy was

12   getting -- you know, once all of the mechanisms were off of me,

13   getting the foot as much range of motion as possible.

14   Q.  How much range of motion do you have now?

15   A.  I don't know.  They measure it, but it's -- it's

16   diminished, but I don't know.

17   Q.  Okay.  As you started doing more and more activities, what

18   did you notice about what would happen or how you would be able

19   to do it?

20   A.  The more I walk, the more I hurt.

21   Q.  What if you don't walk?

22   A.  Well, then there is a window of time, if I sit too long,

23   it's the same.  It starts squeezing, the pain comes -- yeah.

24   Q.  Has the activities such as walking, easy hikes, going to

25   the gym been good or bad?

Tracy Houston - Direct

1   A.   Oh, it's good.

2   Q.   Why is it good?

3   A.   Because you have to keep moving.

4   Q.   Okay.  As you get more active -- let me ask this:  What is

5   your pain level like every day when you get up -- roughly, when

6   you get up in the morning?

7   A.   Well, the initial is -- it's higher, then it goes down

8   because I do the stretching.  And then as the day goes on, it

9   gets higher; so by evening, it's pretty tough.

10  Q.   Okay.  Of the care that you have received for your physical

11  injuries, what -- which care or which types of care have been

12  most effective for you?

13  A.   Hmmm.  Well, I guess the pain relief is number one.

14  Q.   Which was that?

15  A.   The shots.

16  Q.   The sympathetic nerve blocks?

17  A.   Yes.

18  Q.   That you didn't want to have.

19  A.   Right.

20  Q.   Okay.  How much did that reduce your pain?

21  A.   It was 50 percent.  Yeah.

22  Q.   What else besides the sympathetic nerve blocks has been

23  effective and that you felt you got a lot of help with the

24  physical injuries?

25  A.   Well, there is smaller reduction if I keep doing the

717

Tracy Houston - Direct

1    stretching.  And the new therapy that I'm in with the physical

2    therapist, it's called trigger therapy, that helps.

3    Q.  What does that do, and how much pain reduction have you

4    gotten with that?

5    A.  The trigger therapy is where they press on certain parts of

6    the muscle structure all the way up into my back, and it

7    relieves -- it loosens and relieves the -- excuse me -- some of

8    the tightness.  So -- and then on the spinal cord stimulator, I

9    gained range of motion from that, that she even noticed.  So

10   that was good.  It helps.  In other words, the more -- the more

11   range of motion I have, the more natural my gait is, so there

12   is less stress on the whole torso.  It's just -- and that's

13   less pain.

14   Q.  And you didn't want to try the spinal stimulator either.

15   A.  Well, you've got to be ready for that.  Yes.

16   Q.  So why -- what else has been effective physically?

17   A.  Well, those are probably the ones that are a little more.

18   Then I try different topicals, and I'm currently trying a

19   topical that has THC and CBD.  And topical, meaning it's a

20   salve; and I put it on my ankle at nighttime.

21   Q.  Has that helped?

22   A.  Yes.  It's hard -- I'm getting tired.  There is other ones,

23   and you just have to give me a minute.

24   Q.  Okay.  Let me ask you:  How much effectiveness do you get

25   from the gabapentin?

718

Tracy Houston – Direct

1    A.   Some.

2    Q.   Have you ever tried to reduce the gabapentin?

3    A.   Yes.

4    Q.   What happens?

5    A.   The pain goes up.

6    Q.   Okay.  Has there been a day that you have not had pain

7    since this crash?

8    A.   No.

9    Q.   How is your right knee?

10   A.   My knee is good.  I -- I function completely, you know, can

11   ride the bike.  The only time it hurts is when the barometer

12   change happens.

13   Q.   Does it limit you in any way?

14   A.   No.

15   Q.   And the only time you get pain, you say, is when the

16   barometer changes?

17   A.   Uh-huh.

18   Q.   Have you had any treatment for it lately, and do you need

19   any treatment for it?

20   A.   I have not had any treatment lately, and I don't feel like

21   I need any treatment for it.

22   Q.   Okay.  And are you pleased with the recovery on your right

23   knee?

24   A.   Yes.

25   Q.   Do you wish you had had that kind of recovery with your

Tracy Houston – Direct

 1  right ankle and foot?

 2  A.  Very much so.

 3  Q.  What else decreases the pain on a daily basis with your

 4  ankle and foot?  You mentioned more activity.

 5  A.  Can you repeat?

 6  Q.  What increases the pain besides physical activity?

 7  A.  Well, if I sit for a longer amount of time, if I walk too

 8  much, if I don't do my stretching, if the weather changes, if I

 9  drive.

10  Q.  Okay.  When did you first learn that you had nerve pain?

11  A.  I think that was in the hospital.

12  Q.  Okay.  How about complex regional pain, when did you, I

13  guess, believe that you had complex regional pain?

14  A.  When my left leg started hurting.

15  Q.  What do you mean, your left leg; and why would that tell

16  you that?

17  A.  Well, the arch in my left foot is -- has that same kind of

18  tightening feeling.  It was over the pandemic time, spring, I

19  guess -- no -- yeah, May or June.

20  Q.  Of this year?

21  A.  Yes.

22  Q.  What eventually led to your decision to allow Dr. Lewis to

23  do the sympathetic nerve blocks and then the trial spinal

24  stimulator?

25  A.  I was getting worn down with the pain.

720

Tracy Houston – Direct

1    *Q.* Are you glad that you tried it?

2    *A.* Yes.

3    *Q.* And what finally led you to try the antidepressant

4    medication?

5    *A.* Getting worn down.

6    *Q.* You also use a microstimulation unit?

7    *A.* Yes.

8    *Q.* How long have you been using that, and where did you get

9    that information from, and what does it do?

10   *A.* I can't remember when I started that, but I went to a

11   physical therapist who had that as part of their toolbox.  And

12   it's -- let's see -- it's an electrical signal, I think, that

13   comes -- there is a little box, and there is wires, and there

14   is little pads, and you can put it on your area that hurts.

15   And then there is different programs that -- it's a loaner that

16   I have.  They reprogram it and -- that's actually how I got

17   through the pandemic, because I was locked out of pain care.

18   *Q.* How often do you use that, and what does it do?

19   *A.* I used it several times a day for a period of months, when

20   I got the home machine.  And so that was after I stopped going

21   to those appointments, and I don't remember when it was.  Now I

22   use it when it's more extreme, like when the barometer changes

23   or like in the pandemic, when I -- I was just left.

24   *Q.* How much does it help you?

25   *A.* It will help for an hour or so.  I mean, it's temporary;

721

Tracy Houston - Direct

1   but it does help.

2   Q.  Okay.  How many sympathetic nerve blocks have you had so

3   far?

4   A.  I think -- three or four -- I thought it was four.  Maybe

5   three or four.

6   Q.  How many have worked?

7   A.  Well, the first time I -- I thought I had to have two

8   pretty close together, and then I got relief.  And then in June

9   I had one of this year, and I didn't get relief.

10  Q.  Okay.  When you did get relief, you said the pain was

11  reduced by 50 percent?

12  A.  Uh-huh.

13  Q.  How did that -- how did you do because of that?  What did

14  you then try to accomplish in your life?

15  A.  I immediately went to the gym and worked out as much as I

16  could.  I overdid it, and I had to go back to the physical

17  therapist, because -- my left leg was just -- yeah --

18  Q.  Did you finally get help about how to work out as you were

19  having reduced pain?

20  A.  Yeah.

21  Q.  Okay.  And how long did that last?

22  A.  What -- how long --

23  Q.  The sympathetic nerve block injection that worked.

24  A.  Couple months.

25  Q.  Okay.  Did you then agree to try the spinal stimulator

Tracy Houston - Direct

1   trial?

2   *A.*   Yes.

3   *Q.*   Explain what they did.

4   *A.*   So it's the same principle as tricking the brain, but it's

5   inside your body.  And there are two places in your back where

6   they go in and put -- once they took it out, I didn't realize

7   how many wires there were -- probably maybe half a dozen wires

8   that are all together, and probably this long, and they sit

9   right on the spine.  And then there is these two -- they come

10  out of your back, and there is these two patches.  And then,

11  yeah, the hand-held machine.  And it sends a signal that --

12  they say tingling or buzzing, that every time a pain signal

13  goes up your spine, it's blocked.  So it tricks the brain into

14  thinking, no pain.

15  *Q.*   Okay.  What did you think of how it worked?

16  *A.*   Well, it was -- the first couple of nights, I slept with

17  it, so I was -- I was really -- it was helpful.

18  *Q.*   Why?  What did it do, or what did you notice?

19  *A.*   Well, there is less pain with it, but the -- can you tell

20  me again that question?

21  *Q.*   Sure.  What did it feel like?  What did it do for you?

22  What did you think?

23  *A.*   Well, it feels like there is a little buzzing or vibrating

24  in your body; and you're -- they put it on the set of nerves

25  that connect to where the pain is, so you -- that tingling is

Tracy Houston - Direct

 1   in both your legs, and -- I don't know what else you need.

 2   Q.  Why do you think you slept better?

 3   A.  Well, less pain; and that tingling, that buzzing was so

 4   comforting.  I -- I -- it was wonderful.

 5   Q.  Was that the best two nights of sleep you had since this

 6   crash?

 7   A.  Absolutely.

 8   Q.  Dr. Lewis would not implant it because you didn't have

 9   enough pain relief?

10   A.  Right.

11   Q.  How did you feel about that?

12   A.  I cried.

13   Q.  When you went in to see him for this, it was at the -- when

14   things finally started opening again, right, from COVID?

15   A.  Right.

16   Q.  How were you emotionally during that time frame?

17   A.  It was one of the cruelest things I think I've ever lived

18   through, to be locked out of pain care.  So -- it was a

19   struggle day to day, and I was anxious and --

20   Q.  When did your sympathetic nerve block effectiveness wear

21   off, since we all locked down the middle of March?

22   A.  Yeah.  It was -- it started to wear off -- it wore -- it

23   wears off slowly.  March, April, that time frame.

24   Q.  And what levels did your pain go back up to?

25   A.  During what time?

724

Tracy Houston – Direct

1   *Q.*  After the sympathetic nerve blocks wore off.

2   *A.*  Probably 4.

3   *Q.*  What other types of modalities or treatments are you

4   considering for your leg and foot as you go forward?

5   *A.*  Well, I'm certainly open to more shots and possibly the

6   spinal cord stimulator, ketamine.  I'm so sorry.  I'm so tired,

7   I can't remember them all.

8   *Q.*  What do you think about continuing physical therapy with

9   the person you're working with?

10  *A.*  Absolutely.

11  *Q.*  That's helping?

12  *A.*  Absolutely.

13  *Q.*  How about stem cells and platelet therapy?

14  *A.*  Yes.

15  *Q.*  You have mentioned horse therapy.

16  *A.*  Yes.

17  *Q.*  And I don't understand that.  Maybe you can explain it.

18  *A.*  Well, my -- one of my neighbors, Jim Dollerschell, he ran a

19  wild horse rescue program on the Book Cliffs for years.  And on

20  some of my walks, I go over there and feed the horses, little

21  carrots.  And I had mentioned this to Dr. Johnston, and she

22  said that there is a place by me that is called Harmony Acres,

23  and they have licensed counselors that help you visit with the

24  horses.  And then it helps you deal with the grief and the

25  emotional component of the pain.  This is all I know now.

Tracy Houston - Direct                725

 1   We've just recently been talking about it.

 2   Q.  Okay.

 3          Your Honor, I'm debating going into another topic or

 4   taking a break because she's tired, and we're going to have to

 5   take a break in the afternoon.  So I wanted to get your

 6   thoughts.

 7          THE COURT:  All right.  I think -- let's take a break

 8   now, and the plaintiff can get some rest.  We'll come back when

 9   you're ready.  Let me know.

10          MR. SHAPIRO:  Okay.  Thank you.

11          (Recess at 2:32 p.m.)

12          (In open court at 2:54 p.m.)

13          THE COURT:  Please be seated.

14          Please proceed.

15          MR. SHAPIRO:  Thank you, Your Honor.

16   BY MR. SHAPIRO:

17   Q.  Ms. Houston, I want to talk about the cognitive issues and

18   the impact that they have on you on a daily basis.  Can you

19   explain even with the Adderall, with the occupational therapy,

20   speech therapy, sort of what impact it has on you on a daily

21   basis?  How do you deal with it?

22   A.  Well, it gives you a small sense of mastery, that you can

23   accomplish, at least to some degree, tasks that you need or

24   would like to do.  And so it's a tool that has been very

25   helpful for me to move forward -- or the tools within that, and

726
Tracy Houston - Direct

1   then the meds with it.

2   *Q.*   Even with the assistance from speech and cognitive therapy

3   and the use of the Adderall, what percentage of your cognitive

4   ability have you lost or has been impacted?

5   *A.*   Well, it depends on the pain level and the time of day, but

6   I would -- I would say 50 percent.

7   *Q.*   Does the pain impact the cognitive ability significantly?

8   *A.*   Yes.

9   *Q.*   So we talked about Dr. Ellen Price referring you to Lisa

10  Jacobson.  Do you want to continue that?

11  *A.*   Yes.

12  *Q.*   Why?  What are you getting out of it?

13  *A.*   Well, confidence, tools, the time to reevaluate where I've

14  been, where I can go.

15  *Q.*   Are you still improving?

16  *A.*   Yes.

17  *Q.*   Do you use the tools that she has given you every day?

18  *A.*   Every day.

19  *Q.*   She started talking yesterday about balloons; you call them

20  silos.

21  *A.*   Uh-huh.

22  *Q.*   How do you use them, and why do you use them?

23  *A.*   Well, I use them to organize my thoughts.  So if I have a

24  task that will take a lot of energy or is longer than -- you

25  know, like certain amount of time, maybe over an hour, like I'm

Tracy Houston – Direct

 1    driving somewhere farther, it's a way that I can sit down, look

 2    at what that requires -- like some of the work that I did with

 3    her on the driving was working towards maybe drives that I

 4    could be away from home longer and so how to think about my

 5    safety and what would I do if a certain situation would happen.

 6    It helps me with kind of just an organizational way to approach

 7    more complicated but yet -- expand my life some.

 8    Q.  Do you feel like you've gotten more of your life back

 9    because of the speech cognitive therapy?

10    A.  Absolutely.

11    Q.  The Adderall?

12    A.  Yes.

13    Q.  The psychological counseling from Dr. Johnston?

14    A.  Yes.

15    Q.  What other plans are you thinking about to assist with your

16    cognitive issues?  What do you want to continue to do, and what

17    other things would you like to do?

18    A.  Well, I think the Adderall, I would continue; I would

19    continue the speech therapy.  I forget the second part of your

20    question.  I'm so sorry.

21    Q.  What would you like to do --

22    A.  Well --

23    Q.  -- besides those things?

24    A.  Okay.  For increased function, in general?

25    Q.  Yes.  Cognitive.

Tracy Houston – Direct

1   A.   Cognitive.  I'd like to read more.

2   Q.   I mean, your plans to get to be able to do that?

3   A.   Sorry.  Like, certain therapies or --

4   Q.   Yeah.  Anything in mind?

5   A.   I think -- I know I have things, but I'm having a hard time

6   recalling.

7   Q.   That's okay.  Would you like to continue with Dr. Johnston?

8   A.   Yes.

9   Q.   Do you have plans for how to deal with your psychological

10   issues, things you would like to do with regard to the

11   psychological or emotional issues?

12   A.   I have some ideas about that.  I think that -- I think that

13   the medicine with the -- the Cymbalta, maybe possibly some

14   antidepressant medicine that I could feel comfortable with,

15   that would be like a temporary.  I think that and maybe

16   finding -- either going back to Dr. Gustavson, because I think

17   he could prescribe or find -- or Dr. Price, somebody that she

18   could -- like a neurologist or somebody that could look at what

19   is available that would have the least possibility for going

20   back to the hospital and having something happen to my brain.

21   Q.   Okay.  You've heard a lot about being diagnosed with

22   post-traumatic stress disorder.  What has it meant to you, and

23   how does it impact you on a daily basis?

24   A.   Well, it's debilitating, for sure.  I lose a sense of

25   myself.  I have to be really careful about where I go, and my

729

Tracy Houston - Direct

1   social situation has to be -- like, capacity to socialize is

2   limited; so I just have to be careful that I don't -- I rest

3   before I go, and I don't go somewhere where there is noise and

4   all kind of distraction or I can't focus.

5   Q.   Are you depressed?

6   A.   I would say I have that situational depression.

7   Q.   What does that mean to you?

8   A.   That I can't beat this pain.

9   Q.   So you think the situational depression is related to your

10  pain?

11  A.   It's related to that and this -- my life is -- my life was

12  gutted, and now I am faced with multiple health issues 24/7,

13  and I'm aging.

14  Q.   Are you struggling with anxiety?

15  A.   Yes.

16  Q.   What creates increased anxiety for you?

17  A.   Well, pain leaves you on edge a lot.  I have a lot of

18  questions about -- if you feel like you get a little traction,

19  you get a little pain relief, and then you're just --

20  (indicating).  So I have what I call pain despair cycle.

21  Q.   What is that?

22  A.   That's my reality.

23  Q.   I don't understand.  Explain.

24  A.   Well, there is not a cure for what I'm dealing with,

25  chronic pain; and so I'm in the cycle where it doesn't end.

Tracy Houston - Direct

1   Q.   How do you deal with that, day in and day out?

2   A.   Well, it's really important to me to bring -- in any

3   challenge, to bring the full sense of who Tracy Houston is to

4   any challenge.  So I go back and think about my time growing

5   up, and I think about the challenges my grandparents had and

6   overcame, or just lived with.  That's inspirational to me.  I

7   think about my father.  I think about projects that I could do

8   to help other people maybe in the future.

9   Q.   Does that make you feel good or help you get through it?

10   A.   Yes.

11   Q.   How have your social interactions been since you've been

12   injured?

13   A.   Very limited.

14   Q.   Okay.  How has that impacted your emotions, your

15   psychological issues?

16   A.   Just like with the pandemic, how people are somewhat in my

17   situation, isolated and anxious and --

18   Q.   Are you lonely?

19   A.   Yes.

20   Q.   Were you lonely before?

21   A.   On occasion.

22   Q.   How have your social interactions been impacted by your

23   pain?

24   A.   Well, some of the most opportune times to socialize, I

25   can't do.  I'm either doing pain management treatment at home,

Tracy Houston – Direct

1   or by evening I'm worn out.

2   Q.  Why did you believe you had a traumatic brain injury, and

3   did any doctor tell you that?

4   A.  Well, I was struggling with memory issues and cognitive

5   kind of like functioning issues, had trouble making decisions,

6   tremendous amount of fatigue.  And I think the only doctor that

7   said for sure that I had it was Dr. Ellen Price.

8   Q.  Okay.  If you had to rank the providers that gave you care

9   across the board, who have you gained the most from?

10  A.  Dr. Lewis, Dr. Johnston, Dr. Price and Lisa Jacobson.

11  Q.  You didn't mention Dr. Cota.  I'm surprised.

12  A.  Yeah.  Well, it was a while ago; but absolutely his help --

13  and my physical therapists that I had throughout the time and

14  currently have are also important.

15  Q.  What percentage reduction have you had in your ability to

16  physically function because of the injuries you sustained in

17  this crash?

18  A.  Do you mean, like, move?

19  Q.  Physically be able to function and be active.

20  A.  Well, 60 or 70 percent with the physical.

21  Q.  How about mental or cognitive functional abilities because

22  of the injuries in the crash?

23  A.  Well, that is getting a little better, so 50.

24  Q.  How has it been, trying to navigate the medical system

25  since you got hurt?

Tracy Houston – Direct

732

1    *A.* Oh, my God.  I'm totally overwhelmed.  I am the caretaker,

2    I'm my advocate, and I'm the patient.  There is no buffer.

3    *Q.* Has it been hard?

4    *A.* Extremely.

5    *Q.* Have you gotten better at it?

6    *A.* Yes.

7    *Q.* How have you noticed that you're getting better at it, and

8    why?  What is it that you've gotten better at?

9    *A.* I am better at communicating with the doctors; I'm better

10   at asking questions and doing the research and trusting what

11   they advise.

12   *Q.* Are you hiking, and how often are you hiking?

13   *A.* Well, I am walking.  I'm doing nature walks and -- right

14   now, I'm doing more swimming, because my new physical

15   therapists were trying to -- especially after the pandemic --

16   just back off a bit on the pressure on the ankle.  So . . .

17   *Q.* How long do you do nature walks, and how often do you do

18   them?

19   *A.* Well, before the pandemic, I was going usually 60- to

20   90-minute walks probably -- if we weren't having storms or

21   something, every other day.

22   *Q.* How does that impact your pain levels?

23   *A.* Well, it -- I can walk and take breaks, but then I can't --

24   I can't go anymore, so --

25   *Q.* Does it feel good to do the walks?

Tracy Houston - Direct

1   *A.*   Absolutely.

2   *Q.*   Is it worth the increase in pain?

3   *A.*   Absolutely.

4   *Q.*   Okay.  Swimming, what are you doing to swim?

5   *A.*   I do a variety of things.  Sometimes I swim laps; sometimes

6   I tread water; sometimes I just float.  And then they have --

7   where I'm going to now, they have what is called a lazy river;

8   and my physical therapist has me walking to some degree on a

9   limited basis in that area of the pool.

10   *Q.*   What have you noticed about the swimming?  Is it helpful?

11   What are you getting out of it?

12   *A.*   Well, I love the exercise; and, yes, it does -- it's

13   helpful.

14   *Q.*   How many days a week are you doing that?

15   *A.*   I go four or five days a week.

16   *Q.*   So when you're swimming four or five days a week, are you

17   not going on the nature walks?

18   *A.*   Correct.

19   *Q.*   Okay.  How are you dealing with your adventure needs?  What

20   do you do about your adventure needs?

21   *A.*   Well, I try to do -- like, when I go to see Dr. Johnston, I

22   may drive up a little farther to Paonia or other areas.

23   Sometimes I go to the Grand Mesa or the Colorado National

24   Monument.

25   *Q.*   Have you attempted to try to work at the things you did

734
Tracy Houston – Direct

1    before this crash?

2    A.   You mean, my professional work?

3    Q.   Yes.

4    A.   Yes.

5    Q.   How has that gone, and what has occurred?

6    A.   Well, I tried to start doing some marketing.  I don't have

7    any clients, so -- I put together like an email, but I was not

8    confident to send it out and I wasn't sure if I would be able

9    to do the work, so . . .

10   Q.   How many times have you tried?

11   A.   Just the once.

12   Q.   How long ago?

13   A.   It was my first -- when I first started working with Lisa

14   Jacobson.

15   Q.   Will you continue to try?

16   A.   If I -- if I feel there is some stabilizing.  I'm not quite

17   sure.  If I got -- if I get in another cycle, where I'm either

18   blocked out of pain care again or the treatments I'm getting

19   stop working, I don't know how to handle that.  I won't be able

20   to function at that level, to work with the people that I

21   worked with before.  It's not going to happen.

22   Q.   Have you considered -- we've talked about future care that

23   you've considered.  You heard Dr. Cota talk about joint

24   replacement or fusion; you've heard Dr. Lewis about -- talking

25   about looking at the mechanical ankle pain; what are your

Tracy Houston – Direct                                            735

1    thoughts about those procedures or consultations?

2    *A.* Well, I have a friend in Arizona who got an ankle

3    replacement; and she was in a similar car accident to me.  And

4    she is doing quite well.  So I -- I want to be able to -- I

5    think I would like -- at least my initial thoughts are, I would

6    like to have the ankle replacement over the fusion, because you

7    have more range of motion.  And so, like, she can do nature

8    walks.  She can do that and be mostly pain free.  So -- but I'm

9    not sure, because I don't know how to sequence the -- I think I

10   have -- like Dr. Cota was saying, I have scar tissue and most

11   likely pain and stiffness from that scar tissue, and I don't

12   know -- you know, do they do surgery to take that out; and then

13   do you see how that is, then, before you do the big, you know,

14   replacement?  I don't know what to do.

15   *Q.* Do you want to consult with some other specialists to think

16   of what other options there are orthopedically for you?

17   *A.* Oh, absolutely.

18   *Q.* Okay.  Have you considered narcotic pain medication?

19   *A.* I'm only beginning to think about that.  I really don't

20   want to go that route.

21   *Q.* Why are you thinking about it?

22   *A.* I'm worn out.

23   *Q.* Are you optimistic about your future and your ability to

24   function physically and mentally?

25   *A.* For the most part, yes.

736

Tracy Houston - Direct

1   *Q.*  How do you keep yourself up?

2   *A.*  Well, it's what I said about my identity and my sense of

3   myself and drawing on my family and thinking about them.  I

4   take a lot of inspiration from where I live.  A tremendous

5   amount of birds come there, and there is a lot of beauty there.

6   And, like, going to visit with the horses, I love -- it's

7   little things, and -- it's the little things that takes you a

8   long way.

9   *Q.*  What are your fears and concerns in living with these

10  problems as you go forward in your aging?

11  *A.*  Well, it's hard to think about -- I worry about falling; I

12  worry about my body giving out.  My left leg is already -- from

13  overcompensation or -- and probably the CRPS, it's -- I forgot

14  the question.

15  *Q.*  Concerns about getting older.

16  *A.*  Yeah.  I want to be as independent as long as I can.

17  *Q.*  Are you willing to utilize the home healthcare assistance

18  that has been discussed in your life care plan?

19  *A.*  Absolutely.

20  *Q.*  Explain to this court what these injuries have taken from

21  you or cost you.

22  *A.*  Well, there isn't one part of my life that hasn't been

23  either disrupted or wiped out, except for the little bit of

24  sense of myself that I have.  My life was gutted, and I -- I am

25  left with a future that will be filled with uncertainty,

Tracy Houston - Direct

1   medical visits, psychological visits, pain, probably not

2   staying in my home as long as I would like.  I don't know

3   whether I have enough words to say what -- that would encompass

4   all that I've lost.  It's devastating.

5   Q.  Have you been able to find a new way to define Tracy

6   Houston the way she is now?

7   A.  Well, that's -- at one point I said to Dr. Johnston, I

8   really appreciate all your help with this pacing, but it's not

9   me.  And she said back to me, you are just going to have to

10  figure out another way to tough it out.  And since then, I have

11  been thinking about that.  And so I hope to help people in a

12  variety of ways, whether they be other pain people or other

13  people that have suffered in car crashes.  There is a program

14  for vets up in Aspen, Colorado, where they go for forest

15  washing and be in the woods, that I'd like to be a part of.  So

16  I think things like that, in addition to helping other people,

17  will be -- give my life meaning and give me a distraction.

18  Q.  Are you still thinking about the Grand Canyon?

19  A.  Absolutely.

20  Q.  How do you see yourself doing that?

21  A.  Well, I'm making efforts to build a relationship with a

22  gentleman who crawls mountains all over the world; and so if I

23  have to partly walk and partly crawl, I will do that.

24  Q.  Are you permanently disabled?

25  A.  Yes.

Tracy Houston - Direct
738

1   *Q.*   How would you define your disability, physically and

2   emotionally and cognitively?

3   *A.*   I have chronic pain, my brain isn't the same, and I have

4   emotional cycles involved with the whole situation.

5   *Q.*   Do you believe your problems are permanent?

6   *A.*   Some.

7   *Q.*   Do you hope for new developments in medicine to help you?

8   *A.*   Very much so.  I'm hoping with the opioid crisis and --

9   when we get away from that quick fix, that there will be new

10  things and some alternative things.

11          *MR. SHAPIRO:*  I'd like to have Ms. Waller pull up

12  Exhibit 13.

13  *BY MR. SHAPIRO:*

14  *Q.*   You've had a chance to go over that.

15  *A.*   You want me --

16  *Q.*   Yeah.  Do you see it?

17  *A.*   Yes.

18  *Q.*   Okay.  Is this Exhibit 13 a medical expense summary for the

19  care that you received as a result of the injuries you

20  sustained in the crash of December 1, 2016?

21  *A.*   Yes.

22  *Q.*   Are these the bills that have been paid by insurance

23  company for your care and treatment related to this crash?

24  *A.*   Yes.

25  *Q.*   Is the total of this medical expense summary --

Tracy Houston - Cross

1              Can you scroll up?

2              Is the total of those expenses up to this date

3    $257,111.34?

4    A.  Yes.

5              MR. SHAPIRO:  At this time, Your Honor, I'd move for

6    the admission of Exhibit 13.

7              MS. BOBET:  Your Honor, I believe Exhibit 13 has

8    already been admitted.  It's a stipulated exhibit, so no

9    objection.

10             THE COURT:  It's admitted.  It's in already.

11             MR. SHAPIRO:  Thank you.  I have one last question.

12   BY MR. SHAPIRO:

13   Q.  What would you like this court to know about you and this

14   situation that we have not discussed?

15   A.  That I'm a doer, that I will always be a doer, and I always

16   have been a doer.

17             MR. SHAPIRO:  Thank you.

18             THE COURT:  Cross-examination, please.

19                        **CROSS-EXAMINATION**

20   BY MS. BOBET:

21   Q.  Good afternoon, Ms. Houston.  It's nice to see you again.

22   A.  Good afternoon, Ms. Bobet.

23   Q.  You yourself are not a doctor; correct?

24   A.  I'm sorry.  I was adjusting my chair.  Could you repeat?

25   Q.  I'll try to project.  Let me know if you can't hear me at

740

Tracy Houston – Cross

1  all.  You yourself, you're not a doctor; right?

2  A.  I am not.

3  Q.  Would you agree that you would defer to the best medical

4  advice that you can get?

5  A.  Yes.

6        MS. BOBET:  I'm sorry.  I'm hearing some whispering or

7  interference on that end.  I don't know if there is a way to

8  mute it or not.  Thank you.

9  BY MS. BOBET:

10  Q.  And, Ms. Houston, would you defer to the best advice that

11  you can get that would help you become more active?

12  A.  Yes.

13  Q.  Now, we've heard a lot of evidence or talked a lot about a

14  potential TBI, and I just want to ask a few questions about

15  that now.  You don't believe that you hit your head in the

16  accident; do I have that right?

17  A.  Yes.

18  Q.  But you do believe that you have a mild traumatic brain

19  injury, or TBI?

20  A.  Yes.

21  Q.  And that the TBI was from the accident?

22  A.  Yes.

23  Q.  And I believe you testified that the only doctor you're

24  aware of who has diagnosed you with a TBI is Dr. Ellen Price?

25  A.  Yes.

Tracy Houston - Cross

1   *Q.* Are you aware that Dr. Ellen Price testified in her

2   deposition in this trial, that she said she's not qualified to

3   diagnose a TBI?

4   *A.* I was not part of any testimony with Dr. Ellen Price.

5   *Q.* So you're not aware that she testified to that?

6   *A.* No.

7   *Q.* Are you aware that she said she would defer to a

8   neuropsychologist like Dr. Gustavson for a TBI diagnosis?

9   *A.* No, I didn't.

10        *MS. BOBET:* Ms. Robinson, can you pull up -- it's

11   document Houston Cross 1.

12        *MR. SHAPIRO:* Excuse me. What is that?

13        *MS. BOBET:* It's not in the exhibit book. I'm going

14   to pull it up on the screen shortly.

15        *MR. SHAPIRO:* What are you pulling up? Sorry.

16        *MS. BOBET:* It's going to be discovery responses dated

17   November 19, 2019.

18   *BY MS. BOBET:*

19   *Q.* Are you seeing this document, Ms. Houston?

20   *A.* Not yet -- oh, yes. Here it is.

21   *Q.* Okay. Do you recognize this document as a set of

22   interrogatories, discovery responses?

23   *A.* Yes.

24   *Q.* I think this is one I asked you about during your

25   deposition.

Tracy Houston - Cross

1          Could you scroll down to the second to the last page,

2   Ms. Robinson?  Page 22.

3          I'm sorry.  Bear with us one second, here.

4          Is this your signature at the bottom of this document?

5   *A.*  Yes.

6   *Q.*  Thank you.

7          And then Ms. Robinson, if you could go to page 8 of

8   this document.  Scroll down, please, to the injury, TBI.

9          All right.  Item No. E here, that -- this is an

10  interrogatory response to a question about what you've been

11  diagnosed with.  Do you recognize this response?

12  *A.*  So is that the one you've highlighted or --

13  *Q.*  Yeah.  So what I have highlighted here -- and I'll ask you

14  if I read it correctly -- that -- it's an interrogatory about

15  conditions you've been diagnosed with and the medical providers

16  who diagnosed them.  Item E reads, traumatic brain injury, and

17  in parentheses, Dr. Johnston, Dr. Lynn -- Dr. L. Price and NP

18  Smith.  Did I read that right?

19  *A.*  Yes.

20  *Q.*  So this response would reflect that a TBI was diagnosed, in

21  your view, by Dr. Johnston --

22          I'm sorry?

23          *MR. SHAPIRO:*  Cindy just coughed.

24          *MS. BOBET:*  I'm hearing things.  My apologies.  It's

25  towards the end of the day.

743
Tracy Houston – Cross

1  *BY MS. BOBET:*

2  Q.  This would reflect in your view, traumatic brain injury was

3  diagnosed by Dr. Johnston, Dr. L. Price, and Nurse Practitioner

4  Smith; is that correct?

5  A.  That's what it says.  I don't know who NP Smith is, but --

6  yes, that's what it says.

7  Q.  This doesn't list Dr. Ellen Price; right?

8  A.  No, it does not.

9  Q.  I just want to go over, and make sure I have some sort of

10  dates on the treatment correct.  So we heard today -- and I

11  just want to make sure this is correct -- you saw the

12  neurologist Dr. Collier once in July of 2018; is that your

13  recollection?

14  A.  Yes.

15  Q.  And then after the episode you had at physical therapy this

16  past February, it was recommended in the emergency room that

17  you see Dr. Collier again; is that right?

18  A.  I don't recall.

19  Q.  In any event, you didn't see Dr. Collier again; do I have

20  that correct?

21  A.  I did not.

22  Q.  You've got a different neurologist, who is Dr. Burnbaum?

23  A.  Correct.

24  Q.  And, obviously, you're currently treating with Dr. Lewis

25  for pain; right?

Tracy Houston – Cross

1   *A.*  Correct.

2   *Q.*  And you've been seeing him or others in his practice since

3   around mid 2019; do I have that timeline correct?

4   *A.*  I think so.

5   *Q.*  And before that, you saw a different pain specialist,

6   Dr. William James; is that right?

7   *A.*  Correct.

8   *Q.*  And then you saw Dr. Gustavson for your cognitive or

9   emotional symptoms for a few months in 2017; right?

10  *A.*  Yes.

11  *Q.*  And you saw him in September of 2017?

12  *A.*  I think so.

13  *Q.*  You didn't reach out to him to continue treatment further

14  after that; right?

15  *A.*  I did not.

16  *Q.*  Instead, you started treating with Dr. Johnston in

17  April 2018, around that time frame?

18  *A.*  I think so.

19       *MS. BOBET:*  One moment.

20  *BY MS. BOBET:*

21  *Q.*  I'd like to talk a little bit about your sort of current

22  functioning, current daily activities.  You have not had care

23  from a skilled nurse since early 2017; do I have that right?

24  *A.*  I believe so.  Whenever it ended, I've not had them back.

25  *Q.*  So no professional coming to your home to assist with

745

Tracy Houston - Cross

1   things like dressing or bathing since that early 2017 time

2   frame?

3   A.  Correct.

4   Q.  And now you're able to dress yourself just by sitting on

5   the bed; right?

6   A.  Correct.  Or a chair.

7   Q.  And you're able to bathe yourself?

8   A.  I use a bath bench; but, yes.  Uh-huh.

9   Q.  And you prepare your own meals?

10  A.  I do.

11  Q.  And you do your own grocery shopping -- or at least until

12  everything went crazy with COVID, you did?

13  A.  Yes.

14  Q.  And you handle your own finances?

15  A.  I do.

16  Q.  You don't have any difficulties with that; right?

17  A.  I do not.

18  Q.  No difficulty paying your own bills?

19  A.  No.

20  Q.  Do you still rent the mother-in-law apartment at your house

21  on Airbnb?

22  A.  On occasion.  There was an interruption with COVID.

23  Q.  Understandable.  But absent COVID, that's still something

24  you do?

25  A.  Yes.

746

Tracy Houston - Cross

1   *Q.*  As far as household chores, you do housekeeping like

2   sweeping and dusting; right?

3   *A.*  I do.

4   *Q.*  Cleaning the bathroom?

5   *A.*  Yes.

6   *Q.*  And doing the laundry?

7   *A.*  (Nodded head.)

8   *Q.*  I'm sorry, I didn't hear.

9   *A.*  Yes.

10  *Q.*  Thank you.  And no friends or neighbors regularly come in

11  to help you with those kind of household chores; right?

12  *A.*  Not inside, no.

13  *Q.*  To help you get -- the help you get from neighbors around

14  the house now is occasional handyman-type tasks?

15  *A.*  Correct.

16  *Q.*  Something like fixing a faucet on your sink?

17  *A.*  Correct.

18  *Q.*  Are you proud of the progress that you've made as far as

19  those day-to-day, everyday activities?

20  *A.*  Yes.

21  *Q.*  Before COVID, part of your daily routine was to go to the

22  gym; right?

23  *A.*  Yes.

24  *Q.*  And it sounds like, perhaps, since things have been opening

25  back up since COVID, you've started going to the gym again?

Tracy Houston - Cross

1    *A.*   Yes.

2    *Q.*   So I think I'm understanding you right that maybe your gym

3    routine has changed, so I want to try to take it

4    chronologically.  Before COVID, when you were on kind of a

5    regular daily basis going to the gym, would you walk on the

6    treadmill?

7    *A.*   Yes.

8    *Q.*   And you'd do cycling on a recumbent bike?

9    *A.*   Sometimes.  Yes.

10   *Q.*   You do the StairMaster machine?

11   *A.*   Only after the -- when I had the couple of shots with the

12   pain relief was I able to do that.  During that time though, I

13   did.  Yes.

14   *Q.*   And you do situps at the gym; right?

15   *A.*   Yes.

16   *Q.*   And you lift weights?

17   *A.*   Yes.

18   *Q.*   I think I have here from your deposition testimony -- I

19   just want to make sure it was right -- that weightlifting for

20   your upper body you do 10 to 20 pounds; right?

21   *A.*   Correct.

22   *Q.*   And when you do weightlifting with your legs at 50 pounds?

23   *A.*   Well, it's a -- yes, it's 50.  But it's -- you sit, and you

24   put -- you put your legs in, so it isn't so much lifting as

25   it's pushing.  And the -- the gym I'm at now doesn't have that

748

Tracy Houston - Cross

 1  machine.

 2  Q.  But before -- the gym you were going to before COVID, it

 3  would be around 50 pounds on that leg exercise machine?

 4  A.  Yes.

 5  Q.  Okay.  And when you were going, again, before COVID, each

 6  section of the gym would be around an hour; right?

 7  A.  My -- yes.  My time at the gym?  Yes.  Uh-huh.

 8  Q.  And you would drive yourself to the gym when you would go;

 9  right?

10  A.  Yes.

11  Q.  And you drive yourself to all of your appointments?

12  A.  Well, I'm not allowed to drive to some of the pain

13  appointments.  And then I had to take a Valium to do the MRI,

14  and I wasn't allowed to drive to that.

15  Q.  And as part of your sort of regular routine, at least

16  before COVID, you were going on hour-long walks around the

17  neighborhood?

18  A.  I -- can you repeat that?  I'm having a hard time hearing.

19  Q.  Sure.  I'll try to enunciate.  As part of sort of your

20  regular routine, at least before COVID, you were going on

21  hour-long walks around your neighborhood; is that right?

22  A.  Yes.

23  Q.  And I know you discussed the nature walks that you've been

24  able to do.  Did you start doing those in around 2018?

25  A.  Yes.

Tracy Houston - Cross

1   *Q.*  So you've been able to do that for a couple years?

2   *A.*  Yes.

3   *Q.*  Since you started doing those nature walks, have -- your

4   ability to do it or go longer, has that increased?

5   *A.*  I can at times do up to 90 minutes.  And I take -- from the

6   time I started, I had to take more frequent rests; and now I

7   take less -- fewer rests.

8   *Q.*  Okay.  And you do those walks -- is that still around once

9   a week that you'll do a nature walk like that?

10  *A.*  Well, during COVID, because the gym was closed, I walked

11  more.

12  *Q.*  So let me break that down a little bit.  Before COVID, how

13  often were you doing a nature walk?

14  *A.*  Probably about once a week.  Yes.

15  *Q.*  And then during COVID, about how often?

16  *A.*  I tried to get out every day, just in my neighborhood

17  there.

18  *Q.*  And how about now?  I hesitate to say post-COVID, but --

19  how about now?

20  *A.*  Now I'm swimming, so -- my neighbors have a -- her mom is

21  94, and so in the evening, they -- she gets her stroller out,

22  and we -- you know, we go three or four blocks, so I do that

23  with them.

24  *Q.*  On the nature walks, do you sometimes use like hiking poles

25  to assist you?

Tracy Houston - Cross

1    A.   Yes.  Uh-huh.

2    Q.   But other than that, you don't use any kind of device to

3    assist you in moving around; right?

4    A.   Correct.

5    Q.   So not a cane or a walker or anything like that?

6    A.   Do you mean on the hikes or when I'm walking?

7    Q.   Other than the hikes, just day-to-day moving around, you're

8    not using anything like a cane or a walker to get around;

9    right?

10   A.   Well, I take it on our little evening walk, but not any

11   other time.

12   Q.   And do you sometimes ride your bike around your

13   neighborhood?

14   A.   Well, this year, I haven't; but previously I did.  Yes.

15   Q.   When you say "previously," I believe when I first met you

16   in November 2019, that was something you were doing.  Is that

17   around the time frame that you would have been riding your

18   bike?

19   A.   When it was warmer in the summer, yes.  Uh-huh.

20   Q.   And you spend time with friends?

21   A.   Yes.

22   Q.   As far as the nature walk -- I'm sorry to skip around a

23   little bit -- but where do you do those?  Is there a particular

24   park or area that you go to for them usually?

25   A.   Yes.  I go to McInnes Canyon area, and then there is a park

Tracy Houston - Cross

 1   in town.  It's called -- I think it's Lincoln Park.

 2   Q.  And you generally drive yourself to get to both of those

 3   areas; right?

 4   A.  Yes.

 5   Q.  So, then, tell me a little bit more about what your sort of

 6   physical activity has been like since COVID.  You mentioned

 7   earlier, speaking with Mr. Shapiro, that you started swimming;

 8   is that right?

 9   A.  Yes.

10   Q.  Around when did you start doing that?

11   A.  I believe the gym opened back up in June.

12   Q.  About how often do you go swimming?

13   A.  I was doing it, like, five days a week.  And then they

14   closed the indoor pool for a -- for fixing, and so I had to go

15   to the outdoor pool, and it's cold -- the water is cold, so I

16   was doing three days a week.  And then we had rain, and so -- a

17   little less then.

18   Q.  When you're swimming, how long do you do that for?

19   A.  We're limited.  You have to sign up, and you get

20   45 minutes.

21   Q.  Okay.  What kind of swim strokes do you do?

22   A.  I do the breaststroke and the backstroke.

23   Q.  I have to remember my swimming days.  You'll do

24   breaststroke one lap and then backstroke the other?

25   A.  I generally warm up with the breaststroke, and then I'll do

Tracy Houston - Cross

1    some backstroke.

2    *Q.*   Okay.  And so with -- with both of those strokes, you're

3    using both sort of an arm movement to propel through the water,

4    as well as kicking with your legs?

5    *A.*   Correct.

6    *Q.*   Do you wear orthotics in your shoes?

7    *A.*   I do not.

8    *Q.*   When was the last time approximately that you wore one?

9    *A.*   Maybe sometime in 2018.

10   *Q.*   On your right foot, to understand the injured place we've

11   all been talking about, you don't have regular swelling; do I

12   have that right?

13   *A.*   Correct.

14   *Q.*   No color changes anywhere on your lower right leg?

15   *A.*   Correct.

16   *Q.*   And you can wear clothes that go over the right leg, like

17   where the fabric brushes it?

18   *A.*   Correct.

19   *Q.*   And you can tolerate having a sheet or a blanket over it

20   when you sleep?

21   *A.*   Correct.

22       *MS. BOBET:*  One moment.

23   *BY MS. BOBET:*

24   *Q.*   So we've heard testimony that early this year, you took an

25   antidepressant, Cymbalta.  That was around -- you started late

Tracy Houston - Cross

1   January of this year; is that correct?

2   A.  I think so.

3   Q.  And you took it for around four weeks?

4   A.  Yes.

5   Q.  And that was the first time since the accident that you've

6   taken antidepressants; do I have that right?

7   A.  Correct.

8   Q.  But before you were prescribed the Cymbalta, you'd been

9   prescribed one before that; right?

10  A.  Yes.  I believe so.  Right after the accident.

11  Q.  But you never filled that prescription; correct?

12  A.  No.

13  Q.  And one reason -- I don't want to mischaracterize what

14  you're saying, but do I have it correct that you were reluctant

15  to take an antidepressant because you worried about putting

16  chemicals in your body?

17  A.  Well, partly, yes.  Uh-huh.

18  Q.  And the other part is you were worried it might be

19  addictive?

20  A.  Correct.

21  Q.  And you're still currently taking Adderall; correct?

22  A.  Correct.

23  Q.  Okay.  And before that, you had taken Ritalin?

24  A.  Yes.

25  Q.  And you started taking the Adderall around December 2019;

Tracy Houston - Cross

1    does that time frame sound correct?

2    A.   I'm sorry.  I can't recall.

3    Q.   Are you aware that Adderall can be addictive?

4    A.   Yes.

5    Q.   Now, when you were on the Cymbalta for that brief time in

6    early 2020, you felt better; right?

7    A.   Yes.

8    Q.   Your mood improved?

9    A.   Yes.

10   Q.   And you were sleeping well?

11   A.   Better.  Uh-huh.

12   Q.   And you were feeling more yourself?

13   A.   Yes.

14   Q.   And you were able to get back to writing some?

15   A.   Did you say writing?

16   Q.   Writing, like with a pen.

17   A.   Some.  Yes.

18   Q.   Uh-huh.  What were you writing?

19   A.   I write, like, postcards.  There is a program in the Grand

20   Junction area for vets that sends care packages, so I -- you

21   can contribute to those care packages in a variety of ways, so

22   I do some of that.

23   Q.   And you also had a reduction of pain around that time;

24   right?

25   A.   Remind me again what time frame.

Tracy Houston - Cross

1   Q.  Yeah.  The time frame in early 2020, when you were taking

2   the Cymbalta, you had a reduction in pain around that time too;

3   right?

4   A.  Correct.

5   Q.  And it was also around the time you had done one of the

6   shots from Dr. Lewis?

7   A.  I forget.  I can't remember -- tell me what time frame

8   we're in, again.

9   Q.  We're talking early 2020.  Sort of late January to late

10  February of this year.

11  A.  I thought I had the shots in December, but I'm not sure.

12  Q.  Okay.  And that was also around the time that -- same time

13  frame -- late January to late February this year -- when you

14  started doing a new physical therapy exercise, that mirror box

15  exercise; is that right?

16  A.  Correct.

17  Q.  Sorry.  Just bear with me for a moment if you would.

18  Thanks.

19          So you stopped taking the Cymbalta in late February of

20  this year; correct?

21  A.  I can't remember how long after the -- I had to get an

22  appointment with Dr. Price after the emergency room.  I thought

23  it was in March, but I'm not sure.

24  Q.  Okay.  So just so I understand, you -- your recollection is

25  that you stopped taking the Cymbalta in March?

Tracy Houston - Cross

1   A.   I think so.

2   Q.   And you haven't been back on any antidepressant since then?

3   A.   No.

4   Q.   Now, when you saw her in 2018, Dr. Collier recommended that

5   you get an MRI; right?

6   A.   Yes.

7   Q.   And you didn't -- well, let me rephrase.  You made an

8   attempt to get that, but it failed.  Is that correct?

9   A.   Correct.

10  Q.   That was because of claustrophobia?

11  A.   Correct.

12  Q.   Did you try again to reschedule the MRI with medication?

13  A.   I did not.

14  Q.   So since the accident, you have not had an MRI?

15  A.   Since what accident?

16  Q.   Since the accident we're talking about in December of 2016.

17  A.   No.  I had an MRI for the spinal stimulator.

18  Q.   My apologies.  I should have been more specific.  You have

19  not had a brain MRI since the accident?

20  A.   Correct.

21  Q.   When you went to the emergency room in February of this

22  year, after the episode at PT, the ER doctor you saw also

23  recommended an MRI, right?

24  A.   I don't recall.

25  Q.   Now, I want to talk briefly about the company that you

Tracy Houston - Cross

1   started.  That company was started -- was called Board Resource

2   Services?

3   *A.*  Yes.

4   *Q.*  When did you start that?

5   *A.*  I believe it was in 2007.

6   *Q.*  Okay.  So approximately 13 years ago?

7   *A.*  Yes.

8   *Q.*  And you ran that company from your home?

9   *A.*  Yes.

10  *Q.*  In the few years before the accident, from 2012 to 2015, am

11  I correct that on average that business made around $23,000 a

12  year in gross receipts?

13       *MR. SHAPIRO:*  Your Honor, I'm going to object to

14  relevancy.  There is no wage loss claim.  There never has been.

15  What she made or didn't make is completely irrelevant to the

16  issues for this court.

17       *MS. BOBET:*  Your Honor, Ms. Houston put her work

18  history and business and success at issue; and the income of

19  that business is directly relevant to the success of the

20  business and evaluating that claim.

21       *THE COURT:*  I'll admit it for that limited purpose.

22  The objection is overruled to that.

23       *MR. SHAPIRO:*  Thank you.

24  *BY MS. BOBET:*

25  *Q.*  So I'll ask the question again, Ms. Houston.  In the few

Tracy Houston - Cross

1   years before the accident, from 2012 to 2015, on average, your

2   business made roughly $23,000 per year in gross receipts; is

3   that right?

4   A.  Yes.

5   Q.  And so, then, after expenses -- taking that out of that

6   number -- on average, in the few years -- 2012 to 2015 --

7   before the accident, your business made a little under $6,000

8   per year in net profit?

9   A.  I don't know.  I don't know.

10  Q.  Does that number approximately sound correct for the net

11  profit that your business averaged in the few years before the

12  accident?

13  A.  It seems low, but I don't know.

14  Q.  In 2016 -- which, obviously, towards the end of the year

15  was when the accident was -- the business made in gross

16  proceeds $28,000; is that right?

17  A.  I'm not sure; but probably.  Yes.

18  Q.  Okay.

19  A.  I think that's close enough.

20  Q.  And that year, 2016, you also had some income from book

21  sales?

22  A.  I'm sure I did.

23  Q.  And that -- those book sales for 2016 totaled around $660?

24  A.  I'm not sure.

25  Q.  Does that approximate number sound right?

759

Tracy Houston – Redirect

 1  *A.*  I have no way to recall.

 2  *Q.*  How long after the accident did you retain counsel?

 3  *A.*  I can't remember.  It was not while I was in the hospital

 4  or rehab, but shortly after I went home.

 5  *Q.*  And your attorneys submitted an administrative claim on

 6  your behalf with the Postal Service before this claim was

 7  filed; right?

 8  *A.*  I don't know what that is.

 9  *Q.*  Fair enough.  Just one moment, please.

10        Those are all of my questions at this time,

11  Ms. Houston.  Thank you.

12  *A.*  Thank you.

13        *THE COURT:*  Redirect.

14                   **REDIRECT EXAMINATION**

15  *BY MR. SHAPIRO:*

16  *Q.*  I just have a couple questions, Ms. Houston.

17        Did you try orthotics that were prescribed by a

18  podiatrist after you got hurt?

19  *A.*  I did.

20  *Q.*  Did they help?

21  *A.*  It was difficult.  My ankle, the degree of stiffness, as I

22  said earlier, and the degree of pain, it all changes throughout

23  the day.  So they would be comfortable for a little bit, and

24  then I would go off balance and start worrying about falling

25  and -- it was just difficult.

1   *Q.*  Did you think they were worth keeping and using?

2   *A.*  No.  I -- no.

3   *Q.*  Did you also get prescribed a pair of running shoes or

4   sneakers called Hokas or Hokas?

5   *A.*  Yes.

6   *Q.*  Did you like those?

7   *A.*  Yeah.  It was helpful.

8   *Q.*  Do you still use those?

9   *A.*  At times.  I'm -- again, my foot is changing; and it's a

10   constant problem to get shoes that are -- help that -- that

11   don't -- well, it's just hard.

12        *MR. SHAPIRO:*  I have nothing else.  Thank you.

13        *THE COURT:*  Thank you very much Ms. Houston.

14        Next witness, please.

15        *MR. SHAPIRO:*  Your Honor, the plaintiffs would rest

16   their case.

17        *THE COURT:*  All right.  Is the defendant ready with

18   its first witness?

19        *MS. BOBET:*  I believe we could get our witness on the

20   phone.  We anticipate just -- as far as timing purposes, we'll

21   do our best; and we imagine we can get everything done for our

22   two remaining witnesses in a day.  I think given, sort of, the

23   time it is now, it might make sense to start with Dr. Kalat

24   tomorrow.

25        *THE COURT:*  All right.  Okay.  Do you think you can

1    finish up tomorrow?

2         MS. BOBET:  I think we can.  I don't want to speak for

3    plaintiff's cross-examination; but that's what we've estimated

4    for our experts, is to get both Dr. Kalat and Dr. Goldman done

5    within a day.

6         THE COURT:  I always ask that question knowing I'm

7    asking, how long is a piece of string, and you don't know it

8    until you see it.  But your best estimate is that we can finish

9    up with those two tomorrow?

10        MS. BOBET:  That's the best I can estimate.  And I

11   would ask, Your Honor, for everyone's planning purposes -- I

12   know the Court has reserved some time next week.  Could we plan

13   on doing closing arguments on Monday, assuming we're able to

14   get through our witnesses tomorrow?

15        THE COURT:  Well, that's all right.  My understanding

16   was that counsel had asked for time to look at the transcript

17   and to come up with proposed findings after the close of

18   testimony.  So I'm not sure that we need to have the arguments

19   right now, until you have the transcript; and it would make

20   more meaningful argument if that were the case.

21            But I think that -- that the plaintiff, it seems to

22   me, is pretty much exhausted right now and that it makes sense

23   for us to recess until 9:00 a.m. tomorrow.  And we'll try to

24   complete the testimony tomorrow, and then we can talk about

25   whether we want to go ahead with closing arguments or wait

 1    until you get the transcripts and so forth.

 2           My preference generally in a bench trial is to wait

 3    until counsel's reviewed the transcripts, because we're not

 4    engaged so much in closing argument with rhetoric, as you would

 5    be with a jury, but more with a factual determination.  And

 6    I've listened carefully to the testimony.  So I think I'm

 7    better off, but we'll talk about that after the close of the

 8    evidence.

 9           Why don't we stand in recess now until 9:00 a.m.

10    tomorrow morning.  And you'll be ready with your first doctor.

11           MS. BOBET:  Yes, Your Honor.

12           THE COURT:  Okay.

13           MR. SHAPIRO:  Thank you, Your Honor.

14           THE COURT:  Does plaintiff's counsel intend any

15    rebuttal testimony?

16           MR. SHAPIRO:  Not at this time, Your Honor.

17           THE COURT:  Okay.  All right.  That's your best

18    estimate, you're not going to, unless something happens

19    tomorrow.

20           MR. SHAPIRO:  Yes, sir.

21           THE COURT:  All right.  I know you want to keep your

22    hole card covered.  Okay.  We'll be in recess.  Thank you,

23    counsel.

24           (Recess at 4:08 p.m.)

25

1                          **I N D E X**

2     **Item**                                                    **Page**

3

      JOHN GUSTAVSON
4         Cross-Examination Continued By Ms. Bobet          604
          Redirect Examination By Mr. Shapiro               609
5         Recross-examination By Ms. Bobet                  621
      JEFFREY OPP
6         Direct Examination By Mr. Ogborn                  625
          Cross-examination By Mr. Scarpato                 633
7         Redirect Examination By Mr. Ogborn                636
          Recross-examination By Mr. Scarpato               638
8     TRACY HOUSTON
          Direct Examination Continued By Mr. Shapiro       640
9     ANN MARIE COLLIER
          Direct Examination By Ms. Bobet                   679
10        Cross-examination By Mr. Shapiro                  696
      TRACY HOUSTON
11        Direct Examination Continued By Mr. Shapiro       702
          Cross-examination By Ms. Bobet                    740
12        Redirect Examination By Mr. Shapiro               760

13

14                    REPORTER'S CERTIFICATE

15        I certify that the foregoing is a correct transcript
      from the record of proceedings in the above-entitled matter.
16
          Dated at Denver, Colorado, this 1st day of October,
17    2020.

18

19

20                    _Therese Lindblom_

21                    _____

22                    Therese Lindblom,CSR,RMR,CRR

23

24

25