1     IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF COLORADO

2

3 Civil Action No. 18-cv-02914-JLK-MEH

TRACY HOUSTON,

4

5   Plaintiff,

vs.

6

7 THE UNITED STATES OF AMERICA,

8   Defendant.
 _____

9

       **REPORTER'S TRANSCRIPT**

10     TRIAL TO COURT - DAY FIVE

11 _____

12   Proceedings before the HONORABLE JOHN L. KANE, JR.,

13 Senior Judge, United States District Court for the District of

14 Colorado, continuing at 9:10 a.m., on the 25th day of

15 September, 2020, via Video Teleconference.

16      **A P P E A R A N C E S**

17   STEVEN A. SHAPIRO, MICHAEL JON OGBORN, and AMANDA R.

18 PFEIL HOOD, Attorneys at Law, Ogborn Mihm, LLP, 1700 Lincoln

19 Street, Suite 2700, Denver, Colorado, 80203, appearing for the

20 Plaintiff.

21   JANE ELIZABETH BOBET and VICTOR WILLIAM SCARPATO, III,

22 Attorneys at Law, 1801 California Street, Suite 1600, Denver,

23 Colorado, 80202, appearing for the Defendant.

24     THERESE LINDBLOM, Official Reporter
     901 19th Street, Denver, Colorado 80294

25    Proceedings Reported by Mechanical Stenography
     Transcription Produced via Computer

Stephen Kalat - Direct

1              **P R O C E E D I N G S**

2              (In open court at 9:10 a.m.)

3              *THE COURT:*  Thank you.  Good morning, and please be

4    seated.

5              Swear in the witness, please.

6              (**STEPHEN KALAT, DEFENDANT'S WITNESS, SWORN**)

7              *COURTROOM DEPUTY:*  Please state your name and spell

8    your first and last name for the record.

9              *THE WITNESS:*  My name is Stephen S. Kalat.  Kalat is

10   spelled K-A-L, as in Lima, A-T.

11             **DIRECT EXAMINATION**

12   *BY MS. BOBET:*

13   *Q.*  Good morning, Dr. Kalat.  What is your area of practice?

14   *A.*  I'm a licensed psychologist, and I specialize in

15   neuropsychology.

16   *Q.*  How long have you been practicing in the field of

17   psychology?

18   *A.*  I have been licensed in Colorado since 1980.

19   *Q.*  And within that broader field of psychology, how long have

20   you been specializing in neuropsychology, specifically?

21   *A.*  I have been doing neuropsychology as my primary practice

22   since around 1993.  And since that time, I have had increasing

23   focus in clinical neuropsychology; and in the last 15 years,

24   it's been 98 percent or 99 percent in neuropsychology.

25   *Q.*  Can you briefly describe your current practice.

Stephen Kalat - Direct

1   *A.*  Well, my practice has changed a little bit since the

2   pandemic.  But primarily, I do evaluations --

3   neuropsychological evaluations, and I'm doing less

4   psychotherapy or neuropsychological counseling.

5   *Q.*  And what were you asked to do in this case?

6   *A.*  I was asked to review the medical records, interview, and

7   evaluate Ms. Tracy Houston.

8   *Q.*  And you're being compensated for your time on the case;

9   right?

10  *A.*  I am.

11  *Q.*  Is that compensation contingent on what opinions you

12  render?

13  *A.*  No.

14  *Q.*  Is the compensation contingent on the outcome of the case?

15  *A.*  Not at all.

16  *Q.*  I'd like to refer to what is stipulated Exhibit No. 74 --

17  this has been admitted.  It should show up on your screen

18  shortly, Doctor.

19        Are you able to see this document on your computer?

20  *A.*  I am.

21  *Q.*  Do you recognize it?

22  *A.*  Yes.  That's my resumé.

23  *Q.*  Okay.  I'd like to just take you through some highlights

24  and information on the resumé.  What degrees do you hold?

25  *A.*  I have a Ph.D. in counseling and student development.  That

Stephen Kalat – Direct

1    was comprehensive examinations in counseling, psychology, and

2    clinical psychology, and student development.

3    Q.   And what institution is that from?

4    A.   University, did you say?

5    Q.   Yes.

6    A.   From the American University in Washington, D.C., and I

7    completed my Ph.D. in August 1977.

8    Q.   Could you briefly describe your post-graduate education.

9    A.   I moved to -- took a position at -- with Denver Health and

10   Hospitals and completed a year of an American Psychological

11   Association approved internship in clinical psychology at

12   Denver Medical Center, then known as Denver General Hospital,

13   and the related community mental health centers.

14   Q.   What --

15   A.   Subsequent to that -- I'm sorry.

16   Q.   No.  Continue, please.

17   A.   Right.  Subsequent to that, I took post-graduate education

18   in neuropsychology, including starting in 1986, with training

19   in the Luria-Nebraska Neuropsychology Battery.  But more

20   intently, around 1992, 1993 took continuing education through

21   multiple agencies, including the American College of

22   Professional Neuropsychology, the National Academy of

23   Neuropsychology, the Reitan Neuropsychological Laboratory, the

24   American Psychological Association; and, as well, I took two

25   years of post-doctoral supervision in clinical neuropsychology

Stephen Kalat - Direct

 1  from a board-certified neuropsychologist.

 2  Q.  Thank you.

 3       Ms. Robinson, if you could go down to page 2 of this

 4  document.

 5       Now, Dr. Kalat, I won't ask you to summarize

 6  everything here, since your resumé has been admitted; but does

 7  this look to accurately reflect your professional activities on

 8  this case?

 9  A.  Well, the top of the page is professional activities.  Yes.

10  And those are accurate.

11  Q.  If you could go to the next page, please.  And does this

12  look to accurately reflect your work activities?

13  A.  Yes.

14  Q.  Could you briefly summarize your work since your

15  post-graduate education.

16  A.  Since my post-graduate education, around those years, I was

17  director of psychology in two -- for two psychiatric hospitals.

18  I trained in biofeedback and was -- and started to do chronic

19  pain evaluations.  And then I completed -- initiated more

20  intensive training and supervision in clinical neuropsychology;

21  and I began to practice neuropsychology from especially 1993,

22  1994, in private practice.

23  Q.  Are there any particular conditions that you have

24  specialized in?

25  A.  Well, I do adult neuropsychology; so I will evaluate

Stephen Kalat – Direct

1   patients who have Parkinson's disease, multiple sclerosis, and

2   other neurologic diseases.  But the most common neurologic

3   injuries are mild traumatic brain injuries and moderate

4   traumatic brain injuries; so I've done more in mild traumatic

5   brain injury assessment and treatment, probably, than anything

6   else.

7   Q.   Okay.  I'm just going to take this document down so we can

8   see you more clearly as you're testifying.  But for everyone's

9   reference, this is Exhibit 74.

10          So approximately how many patients have you evaluated

11  in your career?

12  A.   Hundreds, if not over a thousand.

13  Q.   And I know you've mentioned seeing patients with TBI.  Have

14  you treated or evaluated patients with PTSD?

15  A.   Yeah, those -- in personal injury cases, of course -- in

16  personal injury cases in which individuals have suffered an

17  injury, PTSD is very common; and I've taken training and

18  treated PTSD.  I've also spent a couple years consulting to a

19  medical evaluation service, evaluating veterans with PTSD and

20  mild traumatic brain injury.  So over the years, I would say

21  there has been a parallel process of evaluating mild traumatic

22  brain injury, as well as evaluating PTSD.

23  Q.   How about patients with depression or anxiety?

24  A.   I've been treating patients with depression and anxiety

25  since before I was licensed, when I was in graduate school; but

Stephen Kalat - Direct

770

1    throughout my career I've treated patients with anxiety and

2    depression.

3    Q.   How about patients with chronic pain?

4    A.   Well, I began to transition to health psychology and

5    chronic pain treatment back in 1990, so I've seen many patients

6    with chronic pain syndromes.  But in terms of neuropsychology

7    assessments, it's also a common comorbid condition --

8    concurrent condition.

9              MS. BOBET:  Your Honor, at this time we'd offer

10   Dr. Kalat as an expert with specialized training and knowledge

11   in the fields of psychology and neuropsychology.

12             THE COURT:  Any objection?

13             MR. SHAPIRO:  None, Your Honor.  Thank you.

14             THE COURT:  All right.  Tender is accepted.

15             Go ahead, please.

16   BY MS. BOBET:

17   Q.   Dr. Kalat, we'll discuss this in more detail shortly; but

18   at the outset, based on your review of materials and your

19   evaluation of Ms. Houston, what were some of the high-level

20   conclusions you came to?

21   A.   My conclusions regarding Ms. Houston are that she did not

22   sustain a mild traumatic brain injury at the time of the

23   collision, that she did sustain somatic physical injuries --

24   she had an open right ankle fracture -- and, in addition,

25   Ms. Houston sustained an exacerbation of depression --

Stephen Kalat - Direct

1    developed a major depression.  It improved for some time when

2    she was working with Dr. Gustavson, but then it worsened, as

3    she had severe depression in -- identified in 2018, 2019.  And

4    she has also suffered from PTSD.

5    Q.  Did you form any conclusions about the types of treatment

6    that she's had for those conditions since the accident?

7    A.  The types of treatments that she's had?

8    Q.  Yeah.

9    A.  Was that your question?

10   Q.  What --

11   A.  Yes.

12   Q.  -- if any, conclusions did you form about those?

13   A.  Well, my conclusions are that she has had inadequate

14   treatment for her depression -- her major depression; she's had

15   no consistent or persistent course of antidepressant

16   medications, which would be the most likely indicated

17   medications, based on the field to date -- as it stands; and

18   that she's had treatment for PTSD, but I don't believe it's

19   been systematic.  And the primary identified beneficial

20   procedures for treating PTSD are exposure therapies, and I

21   don't believe she's ever had a course of exposure therapies for

22   helping resolve her PTSD.

23   Q.  So at a high level, what type of information did you rely

24   on in forming these opinions?

25   A.  I based that on my review of the records, the personality

Stephen Kalat – Direct

1   testing -- which included an MMPI-2-RF and a Millon Multiaxial

2   Clinical Inventory -- so it was the records, the personality

3   testing, my interview with Ms. Houston, and my review of the

4   most recent records available to me.

5   Q.  Let take you through those one at a time.  As far as the

6   records, I believe you mentioned you reviewed Ms. Houston's

7   medical records; do I have that right?

8   A.  I did.

9   Q.  Did you also review any expert reports or depositions?

10  A.  Yes.  I reviewed Dr. Gustavson's deposition, Dr. Johnston's

11  deposition, and Ms. Houston's deposition.

12  Q.  Going back for a moment to the medical records, are those

13  the type of records that you would typically review in

14  conducting a neuropsychology evaluation?

15  A.  Yes.  Particularly if it's in a medical/legal context,

16  where there is an abundance of records.

17  Q.  And you also mentioned you did an in-person evaluation of

18  Ms. Houston.  What did that entail?

19  A.  I interviewed Ms. Houston; I conducted a neuropsychological

20  battery -- the Meyers Neuropsychological Battery -- and I

21  conducted personality testing.

22  Q.  About how long did you spend with Ms. Houston in person?

23  A.  I believe it was five hours over two days.

24  Q.  And what, if any, instructions did you give to Ms. Houston

25  in connection with that evaluation?

773

Stephen Kalat - Direct

1    *A.*   I gave my usual instructions, which are to -- which

2    indicate that medical/legal evaluations are somewhat different

3    in their confidentiality because the results go to lawyers and

4    may be presented in court; that there was no treating

5    doctor-patient relationship involved; no recommendations or

6    treatment recommendations would be made during the evaluation;

7    I would not be treating her or providing treatment during the

8    evaluation; and also that I encouraged her -- I informed her

9    that it was important to give honest and accurate answers, as

10   well as give her best effort during testing.  I also asked her

11   to tell me during the day about her fatigue and pain status and

12   how that changed.

13   *Q.*   In your interview with Ms. Houston, did you form any

14   impression as to whether any information from her was lacking?

15   *A.*   I would say that one thing that was lacking was, I asked

16   her about her pre-accident income -- which is a relevant issue

17   when someone has assumed a disability role, because job

18   satisfaction and how one is performing at work in their

19   occupation or profession affects an individual's ability to

20   recover -- and she didn't -- she refused to disclose that to

21   me.  That was one thing.  And then I would say that was the

22   primary thing that was lacking.

23   *Q.*   In your evaluation of Ms. Houston, did you consider any

24   prior psychological issues?

25   *A.*   I did.  I reviewed her records, and I noted that in 2005,

Stephen Kalat - Direct

1    2006, she had a history of depression and had been in

2    treatment.  She had an episode where she was reported to be

3    denying depression but reporting suicidal ideation, which I

4    think is a key indicator that she tends to suppress -- may lack

5    awareness of her degree of depression.  And I noted that she

6    also reported at that time that she had had a lot of therapy

7    over the years.

8    Q.  And what, if anything, do those -- does that history of

9    psychological issues indicate to you?

10   A.  Well, I think that she has a history of depression, which

11   makes one more vulnerable to developing PTSD, but also makes

12   one more vulnerable to second and third episodes of major

13   depression.  And that's just the fact of how that works.  And I

14   think -- although she reported no depression between 2006 and

15   the motor vehicle accident, I think it was likely that there

16   was prior depression, based on her performance on the Millon

17   Multiaxial Clinical Inventory, which indicated that she had

18   long-standing traits associated with depression.

19   Q.  I think you mentioned that in your view, Ms. Houston seemed

20   to, perhaps, lack awareness of prior psychological issues.  Is

21   there any effects of that kind of lack of awareness?

22   A.  Well, it's -- I think it's a very relevant issue.  It shows

23   up on her MMPI-2, which indicated that she tends to minimize

24   psychological factors.  And I think what she does do is channel

25   her distress and her awareness of her difficulties; and she

Stephen Kalat – Direct

1    ascribed that to a mild traumatic brain injury, which most

2    likely did not occur.  And then she also informed -- I believe

3    she also informed providers that she had had a closed-head

4    injury; and so that began to enter into the record and had some

5    momentum of its own, where, then subsequently people identified

6    her as having a history of mild traumatic brain injury.  But in

7    my opinion, that didn't occur.

8    Q.  Well, let's talk about the tests that you conducted of

9    Ms. Houston.  I believe you mentioned both neuropsychological

10   and personality testing; do I have that right?

11   A.  Yes, that's correct.

12   Q.  Okay.  Let's start with the neuropsychological tests.  What

13   are those designed to evaluate, in a general matter?

14   A.  We -- we develop an assessment -- an estimate of where an

15   individual should be performing, what their expected

16   performance would be; and that's called expected premorbid

17   functioning; and we use various methods to do that.  And then

18   we conduct testing which has been shown to be able to

19   discriminate effects of brain dysfunction, and we compare those

20   patterns and strengths and weaknesses to the patient's expected

21   level of performance.

22   Q.  And I believe you mentioned a couple of them, but just --

23   what are the names of the neuropsychological tests that you

24   conducted of Ms. Houston?

25   A.  The psychological tests -- the personality tests were the

Stephen Kalat - Direct

1    MMPI-2-RF, and the Millon Multiaxial Clinical-IV.

2    Q.   Those are the personality tests or other types of tests?

3    A.   Those are the personality tests.  Did you want me to

4    describe the cognitive tests?

5    Q.   Yes.  I'm sorry.  I used the wrong term.  What is the

6    cognitive tests -- the names of those tests?

7    A.   So I administered a Meyers Neuropsychological Battery; and

8    that has tests that assess attention, verbal and visual memory,

9    visual and verbal abilities, novel reasoning ability, and

10   sensory motor functions.  We also test for motivation.

11   Q.   And as a general matter, how often are all of those tests

12   that you administered used in the field of neuropsychology?

13   A.   They're used by many providers, probably in the hundreds.

14   I don't have the exact details, but they're used widely.  And

15   the tests themselves have a history in neuropsychology, where

16   they've been used for decades.

17   Q.   And let's start with the cognitive tests.  At a high level,

18   what were the results of those cognitive tests that you

19   administered to Ms. Houston?

20   A.   Well, Ms. Houston did show a discrepancy between her actual

21   and expected performance; so her actual performance was below

22   expectation.  And the specific cognitive domains where she had

23   weaknesses included attention, verbal memory, visual abilities,

24   and there was some weaknesses in novel reasoning or executive

25   functions.

Stephen Kalat – Direct

777

1  Q.  Were there any areas in those cognitive tests in which she

2  had expected or above expected results?

3  A.  Yes, she did.

4  Q.  And just for the record, I see you're referring to a

5  document.  Would that be your expert report that you're looking

6  at, or can you just let us know?

7  A.  No.  I'm going to go to a -- I would prefer to go to the

8  list of the tests -- the test summary, because that outlines

9  those tests more directly.

10       And she had average to above-average performances in

11  her auditory processing, her verbal attention, her ability to

12  name objects, her motor speed, her processing speed, her visual

13  memory was intact; so she had numerous average to above-average

14  performances.

15  Q.  And as far as the below-average results on those cognitive

16  tests, did you form any opinion about what those below-average

17  results were likely attributable to?

18  A.  I did.  And that is the pattern that she had is very much

19  what happens with depressed patients.  I did a statistical

20  analysis comparing whether it was more likely due to mild

21  traumatic brain injury or PTSD, and the answer was PTSD.  And I

22  did a statistical analysis of whether it was more likely due to

23  mild traumatic brain injury or depression, and the discriminant

24  function analysis -- the statistical analysis showed it was

25  more similar to depression.  And then there is a neuronet

Stephen Kalat - Direct

1    analysis that is available in the Meyers Neuropsychological

2    Battery which compares multiple conditions -- anxiety,

3    depression, chronic pain, and other conditions.  And the most

4    likely condition that caused this pattern was -- that was

5    associated with this pattern was depression.  So in my opinion,

6    that fits with the personality data which shows major

7    depression is a prominent -- the prominent problem that she

8    has.

9    Q.  And in your experience with patients, is PTSD or

10   depression -- can that cause the sort of below-average results

11   that you saw?

12   A.  Yes.  There is an entire database -- research database that

13   shows that depression can affect cognitive functioning in

14   attention, verbal memory, visual-spatial abilities and

15   executive function, just as those areas that Ms. Houston had

16   relative weaknesses in.

17   Q.  And something that we had at one point discussed -- I

18   believe it's in your report -- is the -- is there any effect of

19   a person's belief that they have a brain injury on their

20   performance on these tests?

21   A.  Yes.  So there is a -- in my last report, I had noted that

22   Polich and colleagues have produced a recent paper and

23   identified that negative expectations, negative beliefs about

24   one's abilities can result in increased poor performance.

25   Julie Suhr and John Gunstad of Ohio University conducted a

Stephen Kalat - Direct

1    study in which they showed that individuals who have a

2    traumatic brain injury or who had a history of traumatic brain

3    injury, if attention is called to that condition, they perform

4    worse than if attention is not called to that history.  So when

5    patients focus on their belief that they have -- have negative

6    expectations about their abilities, they perform worse on

7    neuropsychological testing.

8    Q.  And as far as the results of those cognitive tests for

9    Ms. Houston, are those themselves sufficient to show a TBI?

10   A.  No.  So the National Academy of Neuropsychology paper by

11   Ron Ruff and colleagues in 2009 specifically pointed out that

12   you can't diagnose mild traumatic brain injury based on

13   cognitive testing -- later cognitive testing, because there is

14   so many other factors that can affect that neurocognitive

15   performance, including anxiety, depression, pain, and PTSD.  So

16   there are many factors that can affect cognitive performance,

17   and it's a good thing to be reminded of that.

18        The way that mild traumatic brain injury is diagnosed

19   is based on the condition of the patient at the time of the

20   accident and whether they exhibited the symptoms of concussion

21   or mild traumatic brain injury at that time.

22   Q.  So that's the cognitive testing.  You also mentioned doing

23   personality testing.  Just broadly, what's the sort of

24   difference between those two?  I think I may have confused

25   things with using the wrong term, so I want to make sure that's

Stephen Kalat – Direct

1    clear.

2    *A.*   Between cognitive and personality testing?

3    *Q.*   Yes.  Are they designed to evaluate differently?

4    *A.*   They are designed to do different things.  The cognitive

5    testing is to look at the individual's strengths and weaknesses

6    cognitively; the personality testing looks at their self-report

7    of symptoms and their personality factors that are affecting

8    them and whether they have a symptom -- whether -- whether

9    they're overreporting symptoms.

10   *Q.*   And in general, or at a high level, what are the results of

11   the personality tests that you administered to Ms. Houston?

12   *A.*   I did find that Ms. Houston was reporting a great deal of

13   depression on the Millon -- she was reporting a great deal of

14   depression.  That was on the MMPI-2-RF.  On the Millon, the

15   clinical syndromes that were indicated included major

16   depression, PTSD, and anxiety.

17   *Q.*   Did those personality tests show a TBI for Ms. Houston?

18   *A.*   The personality tests really don't assess TBI.  So no, they

19   didn't; but that is because that's not their purpose.

20   *Q.*   So after your review of records, your interview of

21   Ms. Houston, and then the testing which you've described, what

22   conclusions did you reach about the psychological conditions

23   she likely had?

24   *A.*   I believe she has major depression as her primary problem.

25   And, secondarily, she also has significant reporting of PTSD

Stephen Kalat - Direct

1    symptoms; and she meets the criteria -- she met the criteria

2    for PTSD.

3    *Q.*  And I understand you've concluded that she did not suffer a

4    TBI; do I have that right?

5    *A.*  That's correct.  That's my conclusion.

6    *Q.*  Why -- why did you conclude she didn't suffer a TBI?

7    *A.*  She was in a collision; there was an airbag deployment; she

8    recalled approaching the wall; she reported no loss of

9    consciousness to the emergency medical service personnel; she

10   reported no loss of consciousness in the emergency room; she

11   reported no loss of consciousness in the hospital; she reported

12   no loss of consciousness to Dr. John Gustavson, who treated her

13   for PTSD; and there is no indication that she had symptoms of

14   concussion and traumatic brain injury at the time of the motor

15   vehicle accident or after the collision.  And those

16   diagnoses -- she developed cognitive complaints perhaps seven

17   months later.  That was reported by Dr. Gustavson, that she

18   reported some cognitive complaints; but he was treating her for

19   PTSD.  And Dr. Gustavson is a very knowledgeable and bright

20   neuropsychologist with a great deal of experience, and he never

21   saw her as having sustained a traumatic brain injury.

22   *Q.*  Now, you mentioned, among other things, loss of

23   consciousness as a sign of a TBI -- or that that would be

24   relevant.  Are there specific criteria for assessing or

25   diagnosing a mild TBI?

Stephen Kalat – Direct                                          782

1    *A.* Yes.  In my opinion, the best ones are the World Health

2    Organization task force criteria, which are also used by the --

3    they're also consistent with the Department of Defense Veterans

4    Administration guidelines for assessing and treating PTSD --

5    I'm sorry -- for assessing and treating traumatic brain injury.

6    Sorry.  Those criteria are similar but improved from earlier

7    criteria by the American Academy of Rehabilitation Medicine in

8    1993.  So the basic elements are did the patient sustain a loss

9    of consciousness; did they suffer amnesia; did they have an

10   alteration of consciousness, within the World Health

11   Organization criteria; did they show organic confusion; and --

12   or did they have neurologic signs?  Neurologic signs could

13   include seizures or other signs of concussion.

14   *Q.* And in your view, did Ms. Houston meet any of those

15   diagnostic criteria for TBI as a result of the accident?

16   *A.* I don't believe so.  Not at all.

17   *Q.* Now, Ms. Houston recalls that -- I think I'm characterizing

18   this right -- that she is missing a few seconds around the time

19   of the accident shortly after the impact of the cars.  What

20   effect, if any, does that have on your opinion about this TBI

21   criteria?

22   *A.* My understanding of what happened -- I think what most

23   likely happened was Ms. Houston was involved in a collision,

24   there was an airbag deployment -- airbag deployments occur in a

25   split second.  The speed of an airbag deployment by government

783
Stephen Kalat – Direct

1    requirements is one-twentieth of a second, so that's faster

2    than the blink of an eye.  That airbag deployment then rapidly

3    inflates.  Often the patient experiences there being smoke in

4    the vehicle, and they often get panicky.  As Ms. Houston

5    reported, she got panicky because she thought there was a fire

6    because of the smoke.  But that is typically the dust of the

7    airbag deployment, and that happens very frequently.  And the

8    airbag deployment interrupts one's ongoing experience.  So

9    later when Ms. Houston described some -- a second or two of

10   blackout or not seeing anything, I believe that was secondary

11   to the airbag deployment and not a true mild traumatic brain

12   injury indicator because there were no concussive symptoms

13   after the accident, there was no organic confusion, and there

14   was no report of concussive symptoms in the hospital.  So there

15   is no indication that she sustained a mild traumatic brain

16   injury.

17   Q.  And so we saw in the records from the EMT immediately after

18   the accident that just immediately after, Ms. Houston was

19   feeling lethargic and she was a bit slow to respond.  How, if

20   at all, do those facts impact your opinion as far as the TBI

21   criteria for Ms. Houston?

22   A.  Well, those aren't part of the criteria for indicating

23   traumatic brain injury; but as behavioral indicators, they

24   could be associated with shock.  Slowness in responding could

25   be related to a concussion, but it would not be diagnostic of a

Stephen Kalat – Direct

1    concussion --

2    Q.   And --

3    A.   -- because other things can cause it.

4    Q.   Sorry.  And Ms. Houston did eventually at some point report

5    some cognitive symptoms like foggy thinking.  How, if at all,

6    does that play into your view of whether she suffered a TBI?

7    A.   So the Veterans Administration/Department of Defense

8    guidelines, for example, say that if there are new symptoms

9    after 30 days, they need to get an independent workup, because

10   they're not likely to be due to a prior concussion 30 days

11   ago -- or 30 days or more ago.  So these symptoms of cognitive

12   complaints developed about, I think, six, seven months after

13   the accident.  My first note of it is really in Dr. Gustavson's

14   records, and he did not -- that did not trigger a TBI diagnosis

15   for him.  And it doesn't for me either.  It indicates a late

16   report of cognitive symptoms; and those kinds of

17   post-concussive-like symptoms can occur due to PTSD,

18   depression, pain, and in a variety of other factors.  In my

19   opinion, those are late symptoms that can be due to her

20   difficulties but were not due to a traumatic brain injury.

21   Q.   As far as late symptoms, would reporting, say, a few months

22   after -- four or five months -- would that change your opinion

23   at all; or how does that factor into what is late or not?

24   A.   Well, to me, what is late is something that doesn't appear

25   for 30 days or more.  And there were no reports of cognitive

785
Stephen Kalat - Direct

1    symptoms early on, there were reports later.  And that was

2    after developing depression, PTSD, sleep disturbance, having

3    chronic pain.  So those difficulties can cause those kinds of

4    functional complaints.

5    *Q.*  If a person has suffered a mild TBI, how long would you

6    expect any symptoms with that to persist?

7    *A.*  Typically, the research shows that cognitive symptoms

8    abate, improve, and tend to remit in days, weeks, or a few

9    months.  And that's well documented by Iverson in his review of

10   mild traumatic brain injury in 2005 and multiple meta-analyses

11   or studies.  Cognitive problems remit, but what may persist is

12   cognitive complaints due to depression and PTSD or chronic

13   pain.

14          And in the best comprehensive analysis by Michael

15   McCrea and colleagues, a broad range of experts from medical

16   schools in Canada and the United States, both

17   neuropsychologists and neurologists, indicated that a very

18   small percentage of people have persisting symptoms at one

19   year.  And if they do, one should evaluate those factors that

20   are likely causing them, including depression, PTSD, and

21   chronic pain and not -- and that those should be the targeted

22   treatment, because it's expected that mild TBIs remit.

23   *Q.*  Under what circumstances, if any, would later developing

24   kind of cognitive symptoms alone ever indicate a mild TBI?

25   *A.*  Could you repeat that question?

Stephen Kalat - Direct

1   *Q.*  Sure.  Are there any circumstances under which later

2   developing cognitive symptoms by themselves could indicate a

3   mild TBI?

4   *A.*  No.  And the reason I say that is, mild traumatic brain

5   injury is really not a progressive disorder.  It's not like a

6   neurodegenerative disease like Alzheimer's disease or

7   Parkinson's, where there is a progressive element of increased

8   symptoms -- increased cognitive decline.  That isn't what

9   happens in mild TBI.  Mild TBI remits -- improves and remits.

10  And where there are persisting symptoms, one has to look to

11  concurrent factors like PTSD and major depression and chronic

12  pain and treat those.

13  *Q.*  I think I know the answer from your testimony, but I just

14  want to make sure it's clear.  What overlap is there with the

15  symptoms of TBI and other conditions like PTSD or depression or

16  chronic pain?

17  *A.*  What is the overlap?

18  *Q.*  Yeah.  The overlap in those symptoms.

19  *A.*  Oh.  So it's important to note that that's a problem in the

20  field, that when people see cognitive symptoms, even late

21  cognitive symptoms, they assume it's due to an earlier TBI,

22  when we know that post-concussive-like symptoms are caused by

23  PTSD, major depression, chronic pain.  And they occur somewhat

24  in the natural, normal population.  College students report a

25  lot of post-concussive-like symptoms just from being college

787

Stephen Kalat - Direct

1   students.  So it's -- it's a point of confusion in the field,

2   where people mistakenly attribute late post-concussive-like

3   symptoms to mild TBI, when the mild TBI sometimes never even

4   occurred, as in this case.

5   Q.  Now, switching gears a little bit.  We've heard the term

6   "brain dysfunction" in connection with Ms. Houston's cognitive

7   symptoms.  What does that term mean to you, brain dysfunction?

8   A.  It means that someone has probably -- it's probable they're

9   describing cognitive dysfunction, and they're attributing that

10  to changes in brain processes.

11  Q.  And in your view, does Ms. Houston have brain dysfunction

12  to any degree?

13  A.  Well, to the extent that I think it's due to depression and

14  PTSD, yes, she has some brain dysfunction; but I would describe

15  it as cognitive dysfunction.  The problem with --

16  Q.  Do you --

17  A.  I'm sorry.

18  Q.  No.  Go ahead.

19  A.  I was going to say, the problem with describing it as brain

20  dysfunction is it tends to encourage her to see it as something

21  that is untreatable or unresolvable, when PTSD and depression

22  are highly treatable disorders.

23  Q.  Now, we've heard some testimony that PTSD, perhaps, can

24  have an effect on the brain itself.  Do you have an opinion on

25  that?

Stephen Kalat - Direct

1    *A.* Yes. I think that PTSD can/does cause problems with

2    attention, encoding of information, the anxiety interferes with

3    learning; and as a result, when someone is not learning, they

4    have bad memory for something. There are other areas where

5    PTSD can affect cognitive functioning.

6    *Q.* How about effects of PTSD on sort of the structure or

7    functioning of the brain itself, do you have an opinion on

8    that?

9    *A.* Yeah. I think that's a somewhat controversial area. When

10   I was president of the Colorado Neuropsychological Society, I

11   was very interested in that issue and invited J. Douglas

12   Bremner from Emory University, a physician -- a psychiatrist

13   who does a lot of PET scans and published numerous papers on

14   PTSD and brain dysfunction. And he noted that when he had

15   findings of actual brain changes, that that was with the most

16   severe PTSD patients. And later on, when there was a study --

17   when he published a study with Vasterling on Iraqi war

18   veterans, he found no consistent pattern of either cognitive

19   dysfunction or brain dysfunction.

20           So there is a controversy as to whether or not some of

21   those changes in the brain, particularly shrunken hippocampus,

22   whether that is due -- which is the electronic switchboard that

23   helps us encode information and affects learning and memory --

24   whether that is due to pre-existing problems with having a

25   smaller hippocampus or whether it's actually caused by PTSD.

Stephen Kalat - Direct

1    So it's a little bit of a controversial area.  But I don't

2    doubt that both depression and PTSD affect the hippocampus and

3    can affect the brain; and once it's treated and can be

4    improvement, the brain has plasticity and can change back.

5    *Q.*  As a general matter, what in your view is the importance of

6    getting the right diagnosis for a patient?

7    *A.*  Well, I think that if you don't have the right diagnosis,

8    and you're working on incorrect beliefs about a patient's

9    condition, you can distract -- you can distract yourself and

10   the patient, you can reinforce the patient's belief in the

11   permanency of their condition.  There is a number of papers by

12   Mittenburg which show -- expresses concern that providers --

13   healthcare providers who misdiagnose patients and attribute

14   everything to persisting TBI discourage the patient and cause

15   emotional distress; and the patient has -- develops a very

16   pessimistic attitude about change, because TBI is seen as

17   something that is less likely to remit over time.  And so there

18   is that problem.

19          And, in addition, if you don't diagnose properly, you

20   don't choose the most effective treatments; and you can

21   squander treatment resources and patient time by referring them

22   to cognitive rehabilitation therapy when they never had a TBI.

23   And that's not an effective way to treat PTSD or depression.

24   So the focus needs to be on the condition the patient has

25   rather than whether they're imaged to have, what they

Stephen Kalat - Direct

1   self-define themselves as having.

2   Q.   Now, you touched on this earlier.   There is many mentions

3   of a TBI in Ms. Houston's medical record.   What, if any,

4   explanation do you think there is for that?

5   A.   I think probably Ms. Houston started to experience some

6   cognitive complaints; and about seven months after the

7   accident, she reported some to Dr. Gustavson.   And then I think

8   there is an indication in her deposition -- or Dr. Goldman's --

9   what she told Dr. Goldman -- Bart Goldman, whose deposition I

10   did not review -- but in her deposition it indicated that she

11   probably told him that she diagnosed -- self-diagnosed

12   traumatic brain injury.   Because I can't find any record of a

13   provider independently determining that she sustained a mild

14   traumatic brain injury.   They appear to have taken

15   Ms. Houston's word that she had a closed-head injury, and that

16   developed a diagnostic momentum of its own.

17   Q.   What do you think the effect was on Ms. Houston from the

18   attribution or misattribution of symptoms to TBI?

19   A.   Well, I think there have been numbers of effects.   One

20   probably is, it's worsened her depression, because she sees it

21   as a more permanent condition -- most likely.   Patients do

22   that.   Secondly, it distracted her providers to treat

23   depression -- to treat her as if she had a TBI.   For example,

24   she had severe depression in 2019 -- and in December of 2019,

25   she had severe depression; and shortly thereafter, she was

Stephen Kalat – Direct

1   asking for Adderall, or psychostimulant, which is used for

2   treatment of traumatic brain injury.  And she got on that,

3   found that to be somewhat helpful, but it's not a direct

4   treatment -- it's not the most direct treatment for major

5   depression.

6   Q.  While we're on this topic, what kind of drug is Adderall?

7   I think you mentioned psychostimulant?  Is that --

8   A.  Adderall is an amphetamine.  And amphetamines historically,

9   back in the '40s, were used for treatment of depression.  But

10  it's very criticized as a treatment for depression now, because

11  the antidepressants -- particularly the newer ones -- are much

12  more effective in treating the symptoms of depression and

13  helping to reduce depression.

14  Q.  So I just want to make sure I'm characterizing this right.

15  Is it your opinion that Ms. Houston is not getting the right

16  treatment?

17  A.  She's not getting the typical recommended treatment for

18  depression.

19  Q.  And not getting the -- that recommended treatment, what, if

20  any, effect in your view does that have on other things she

21  might have, like chronic pain?

22  A.  Well, I think depression can increase chronic pain, and

23  chronic pain can increase depression.  It has an effect

24  probably on helping improve her PTSD, because the same

25  antidepressants that are used for treating major depression are

Stephen Kalat – Direct

1   also used for treating PTSD and reducing the symptoms of PTSD.

2   They improve sleep -- they tend to improve sleep, they tend to

3   improve anxiety, and improve depression.

4   Q.  So moving into sort of the recommendations that you've made

5   for treatment for Ms. Houston, it sounds like one of those is

6   medication.  Can you elaborate on that?

7   A.  Yes.  It's -- ultimately, it's the neuropsychologist's role

8   to recommend appropriate avenues for treatment.  And what I

9   recommended was that she be seen by a psychiatric reviewer

10  and -- who could decide whether or not she would benefit or

11  whether or not she should receive antidepressant medication.

12  Q.  Did you make any other recommendations for treatment for

13  Ms. Houston's condition?

14  A.  I did.  I also recommended exposure therapies for the

15  treatment -- systematic treatment of PTSD.  Those are

16  evidence-based treatments which have been shown to be

17  effective.  They're the ones recommended by the American

18  Psychological Association guidelines.  There is repeated

19  research which shows that exposure therapies are the most

20  effective in treating PTSD and -- along with going behavioral

21  therapy.  And those are the things I recommended.

22  Q.  So I want to break that down a little bit.  Let's start

23  with exposure therapies.  Am I characterizing accurately that

24  those are sort of targeted at treating PTSD specifically?

25  A.  Yes.

Stephen Kalat – Direct

1   *Q.* And what does that entail, the various exposure therapies,

2   at a high level?

3   *A.* Well, an example of an exposure therapy would be repeating

4   the experience in a first-person imaginal exposure to the

5   accident and the fears associated with the accident, what she

6   experienced in detail. And often when that's done either in

7   writing or in reviewing the writing, a repeated imaginal review

8   of the experience is -- more is recollected. And through

9   repeated exposure to that material, the patient's anxiety

10  typically breaks and is reduced.

11  *Q.* And is that kind of exposure therapy done in connection

12  with a psychologist, some  kind of mental health professional?

13  *A.* Right. So if someone is trained in treating PTSD -- it

14  might be a licensed psychologist or a licensed social worker,

15  someone who can treat PTSD systematically and help resolve it.

16  *Q.* And about how long have those exposure therapies been used

17  in the field to treat PTSD?

18  *A.* Oh, gosh. I'm guessing 20 years, but -- yeah, I would say

19  probably 20 years. But the most recent American Psychological

20  Association guidelines which indicated the use of exposure

21  therapies, that came out last year.

22  *Q.* You also mentioned a recommendation for Ms. Houston of

23  cognitive behavioral therapy. What does that entail?

24  *A.* Again, that would be systematic treatment of her depression

25  and anxiety, systematic treatment of her PTSD, in restructuring

Stephen Kalat – Direct

1    her thinking.  And I -- to her credit, Dr. Johnston did some

2    cognitive processing therapy, as indicated in her records.  But

3    I don't believe it was as systematic as it could have been,

4    because I think repeated systematic treatment would have

5    improved the patient's PTSD more.

6    *Q.*  So -- just to move on -- I'm sorry -- go back to exposure

7    therapy.  Is it your view that Ms. Houston has gotten

8    systematic exposure therapy since the accident?

9    *A.*  No, she has not.

10   *Q.*  Now, as mentioned, Ms. Houston has been seeing

11   Dr. Johnston; and based on the records, it looks like she's

12   been seeing her about two and a half years.  What's your

13   impression of the effectiveness of the treatment that

14   Dr. Johnston is providing to Ms. Houston?

15   *A.*  I don't think it's been -- I think she's helped the patient

16   do more driving.  She has been supportive of the patient, who

17   is going through a lot of difficulties with her physical

18   treatments and pain complaints and her complaints of PTSD and

19   depression.  So she's supportive of the patient, but I don't

20   believe that the treatment modalities have been systematic

21   enough to have an impact on Ms. Houston.  And I think

22   Ms. Johnston joined with Ms. Houston in the belief that TBI --

23   traumatic brain injury -- and PTSD were the prominent problems.

24   And as a result, I think that's encouraged more distress for

25   Ms. Houston, who needs to focus on her depression and PTSD, not

Stephen Kalat – Direct

1    on a TBI that didn't happen.

2    *Q.*   I want to ask you about a few recommendations that

3    Dr. Johnston has made for Ms. Houston and your view of their

4    likely effectiveness for what Ms. Houston has.   How about a

5    treatment with flower essences?

6    *A.*   No.   Flower essences, forest washing, acupressure, and

7    other things mentioned by Ms. Houston -- I'm sorry --

8    Ms. Johnston in treating Ms. Houston, in discussing those

9    treatments, none of those are evidence-based treatments for

10   PTSD.

11   *Q.*   How about a recommendation that Ms. Houston participate in

12   Toastmasters, a public speaking group?

13   *A.*   Well, I don't have a problem with that.   I think that if

14   she did that, maybe that would help social anxiety and decrease

15   her anxiety, because that's what Toastmasters does.   When one

16   gets out there and is assertive and speaks, I think it helps

17   reduce anxiety.   So I think that's not a treatment for PTSD,

18   but I think it's a helpful treatment for anxiety.

19   *Q.*   How about something like grief therapy, is that a treatment

20   for PTSD or depression?

21   *A.*   So I would have to know more about what she meant by that.

22   I don't believe it's a treatment for PTSD -- it's not a correct

23   treatment for PTSD.   Grief therapy, in my mind, is usually when

24   one suffered a loss and is unable to resolve a major loss in

25   one's life.   Typically, in -- when counselors talk about that,

Stephen Kalat - Direct

1    they talk about people reviewing their losses as the result of

2    an accident or as a result of having depression or PTSD.  And I

3    think that probably keeps the focus on the negative and

4    probably doesn't help treating depression.  I've never seen a

5    study which says grief therapy over accident losses helps

6    depression.

7    Q.  What recommendation, if any, would you make about

8    Ms. Houston's continuing to treat with Dr. Johnston?

9    A.  Well, it's a little -- I would say the more important issue

10   is, can she find someone or can she be recommended to someone

11   who can treat persistently -- who can treat systematically her

12   depression and PTSD; and I would recommend a cognitive

13   behavioral psychologist, would be the most appropriate treater.

14   Q.  Now, with the right treatment for the condition that she

15   has, how would you expect Ms. Houston to progress in the

16   future?

17   A.  Well, it's become more complicated because there has been

18   years of unsystematic treatment and a lack of resolution of

19   symptoms.  In the first year, had she had an educated -- a

20   talented psychologist to work with, she probably could have

21   resolved this -- or significantly improved her depression and

22   PTSD.  At this point I think that a year of treatment would

23   be -- would make sense -- another year of treatment with

24   someone who is an expert at treating depression and PTSD with

25   either exposure therapies or cognitive behavioral therapies.

797
Stephen Kalat - Direct

1    *Q.*  And you testified earlier about the connection between

2    Ms. Houston's pain and her -- excuse me -- her emotional or

3    psychological symptoms.  What effect, if any, would you expect

4    the kind of treatment that you've outlined to have on her pain?

5    *A.*  I think there is some potential for improving her pain

6    experience or management of pain if she's properly treated for

7    depression and PTSD.  I think that antidepressant medications

8    can also have benefits for pain experience, because pain

9    experience is the actual pain stimulus, but it's also how one

10   processes it cognitively.  And there is often a cycle of

11   depression and pain and sleep disturbance, and breaking into

12   that cycle and improving depression and sleep could benefit her

13   management of depression -- management of pain.

14   *Q.*  And is that your belief within a reasonable probability as

15   a neuropsychologist?

16   *A.*  I think it's a -- I think my statement is reasonable and

17   within a reasonable degree of certainty, yes.

18   *Q.*  And within that same reasonable degree of medical

19   certainty, with the right treatment, what do you think the

20   likely effects on Ms. Houston sort of day-to-day functioning

21   would be?

22   *A.*  I would expect it to improve.  She's already done some more

23   involvement in life, based on my record review; but I think

24   that proper treatment of depression and PTSD would help that.

25          *MS. BOBET:*  One moment here.

Stephen Kalat - Cross

 1          Those are all the questions I have on direct.  I note

 2    we're near our time for mid-morning break.  Your Honor, does it

 3    make sense to take the break now?

 4          THE COURT:  Yes.  We'll take the break and come back

 5    for cross-examination.  Court will be in recess.

 6          (Recess at 10:16 a.m.)

 7          (In open court at 10:32 a.m.)

 8          THE COURT:  Thank you.  Please continue with

 9    cross-examination.  We'll start with that.  Go ahead.

10          MR. SHAPIRO:  Thank you, Your Honor.

11                        **CROSS-EXAMINATION**

12    BY MR. SHAPIRO:

13    Q.  Dr. Kalat, good morning.  How are you?

14    A.  Good morning.  Fine.  Thank you, Mr. Shapiro.

15    Q.  It's been a little while, but you and have had the

16    opportunity to go through this a few times, haven't we?

17    A.  Yes.  I think we have, and we were also involved in the

18    Brain Injury Association of Colorado many years ago.

19    Q.  Yes, we were.  The last time we went through this was

20    another Grand Junction case; do you remember that one?

21    A.  Yes.

22    Q.  And if I remember correctly, during that time the majority

23    of your work -- probably about 85 percent of your work was

24    being retained by defendants in civil litigation, personal

25    injury matters; is that still about right, 85 percent?

Stephen Kalat - Cross

1    *A.*  Well, I don't think that's correct in terms of the numbers.

2    It is now, because I haven't seen a clinical patient since

3    March, and I'm limiting my practice.  But last year, 2019,

4    about half of my cases were clinical, half were legal/medical.

5    And of the legal/medical cases, 40 percent were plaintiff --

6         *COURTROOM DEPUTY:*  Hold on just a moment.

7         *THE WITNESS:*  -- and 60 percent were defense.

8         *THE COURT:*  Just a moment.  We're getting a lot of

9    strange feedback from your end, and I notice you're pixelating

10   a lot also.  Are your connections correct?

11        *MR. SHAPIRO:*  I'm not noticing the pixelation.  Is

12   anybody else?

13        *MS. BOBET:*  We're getting a little bit of feedback.

14   It's not too bad.

15        *THE WITNESS:*  Was that from my speaker?

16        *THE COURT:*  It is.  We're getting a lot of feedback

17   from your end.  So we'll keep an eye on it.

18        Terri, can you let us know where we need to pick back

19   up?

20        *THE WITNESS:*  I can change to headphones if there is

21   too much feedback.

22        *COURTROOM DEPUTY:*  Hold on just a second.

23        (Answer read back by the court reporter.)

24        *THE WITNESS:*  May I add to that?  Is that --

25

Stephen Kalat - Cross

1    *BY MR. SHAPIRO:*

2    *Q.*  Go ahead.

3    *A.*  Just let me know, and I'll change to headphones if I need

4    to.

5    *Q.*  You disappeared.

6    *A.*  Really?

7             *MS. BOBET:*  We're hearing you okay on the

8    United States' end, but I don't see the picture anymore.  Can

9    you undo whatever you just did?

10            *THE WITNESS:*  Well, can you see me now?

11            *MR. SHAPIRO:*  No.

12            *MS. BOBET:*  Want to try logging off and logging back

13   in real quick.

14            *THE WITNESS:*  How about now.

15            *THE COURT:*  I can see you.

16            *THE WITNESS:*  Thank you, sir.

17            *MR. SHAPIRO:*  We can see you now.

18            *MS. BOBET:*  I can see you.

19            *MR. SHAPIRO:*  How is the sound now for everybody?

20            *THE COURT:*  The Court is okay.  I can hear everyone.

21            *MS. BOBET:*  I can hear all right, as well.  Thank you.

22   *BY MR. SHAPIRO:*

23   *Q.*  All right.  Then I'll continue.

24            Doctor, you would agree that your ethical duty as a

25   neuropsychologist is to come in and not be an advocate, but to

Stephen Kalat - Cross

1   tell the truth to the best of your ability?

2   *A.*   I do.

3   *Q.*   And you believe you have an ethical and moral obligation to

4   do that and not be an advocate for those that paid you; is that

5   correct?

6   *A.*   Yes.  I agree with that.

7   *Q.*   I had an opportunity to add your bills up in this case.

8   And up to September 4, 2020, your bills total $23,362; am I

9   accurate?

10   *A.*   I thought it was closer to 20.  But I think there was a

11   $15,000 -- 14,000 something initial charge and then subsequent

12   charges.

13   *Q.*   And that was up through September 4.  What have your bills

14   been with your trial preparation and for appearing at trial?

15   *A.*   I have not billed for those, but I would think yesterday --

16   that I have not billed fully for consultation, trial prep with

17   attorneys, and I haven't billed for my participation in trial

18   today.

19   *Q.*   How much more do you think that will be?

20   *A.*   I think it could easily be $5,000.

21   *Q.*   And then I notice you didn't bill yet for your supplemental

22   report of September 14.  Any idea what that would be?

23   *A.*   No.  I didn't know that I hadn't billed for that.  Thank

24   you for reminding me.

25   *Q.*   No problem.  So roughly 28, $29,000 by the time all is said

Stephen Kalat - Cross                                    802

1   and done, billing on a case like this?

2   *A.*   I think it has to do with the amount of records, the -- and

3   the amount of additional records that have come across my way,

4   including depositions and requests for medical reports.

5   *Q.*   How much do you charge per hour when you're doing

6   medical/legal services?

7   *A.*   400 per hour.

8   *Q.*   How much do you charge when you're coming to testify at a

9   deposition or trial?

10  *A.*   600 per hour minimum, four hours for trial.

11  *Q.*   Okay.  How much do you charge --

12  *A.*   I'm sorry.  Go ahead, please.

13  *Q.*   I thought I heard somebody say something.

14        How much do you charge for an individual psychotherapy

15  session with a patient?

16  *A.*   In a clinical evaluation -- in a clinical evaluation and

17  treatment, typically $250 per hour.

18  *Q.*   And how much do you charge when you're testing as a

19  neuropsychologist?

20  *A.*   Outside of legal/medical, it would be 250 an hour.

21  *Q.*   So doing the medical/legal work is somewhat much more

22  lucrative for you; isn't it?

23  *A.*   It is, and more challenging.  No one looks over my work,

24  and nowhere do I have to dot the I's and cross the T's, as with

25  medical/legal work and someone pointing out an error.

Stephen Kalat - Cross                                                803

1    *Q.*  So I want to ask you about when you meet with a patient

2    like Ms. Houston and you tell her that there is no

3    patient-doctor relationship, this you're not treating them,

4    that you're hired by the defense, and you're going to come in

5    and testify at trial about your findings, that isn't very

6    nurturing for a patient-doctor relationship, is it?

7    *A.*  Well, it's not a formal doctor-patient relationship in

8    terms of being a treating doctor; so, no, it's not -- I expect

9    that time -- at times, patients come in, they're feeling

10   concerned or challenged; but I always ask nowadays -- I always

11   ask the same question at the end of the evaluation, which is,

12   "Did you feel well treated and respected during your

13   evaluation?"  And the answer is always, "Yes."  Sometimes it's,

14   "Absolutely."

15   *Q.*  I'm not questioning how you treat patients, but my thought

16   is -- I want to see if you agree with this -- that you're in an

17   adversarial relationship with these patients that you're being

18   asked to evaluate when you're retained by the defense; aren't

19   you?

20   *A.*  Potentially.  It is an adversarial -- the plaintiff-defense

21   relationship is adversarial.  I try to accomplish an alliance

22   with patients -- a working alliance so that we can collect

23   data; but I would agree that there could be some effect on the

24   patient's performance.

25   *Q.*  Okay.  Doctor, the Washington case, the Grand Junction case

Stephen Kalat - Cross

1    that we did a few years back, had exactly the same question as

2    this case; didn't it?  Whether there was a traumatic brain

3    injury or post-traumatic stress disorder.  I'm accurate, aren't

4    I, Doctor?

5    A.  That, I do not recall exactly.  I recall being in trial

6    with you, but I don't remember the exact questions being asked.

7    Q.  Do you remember, that was a case where Ms. Washington had a

8    fractured neck with a halo collar for weeks to months and later

9    began to notice cognitive symptoms?  And you determined that

10   there was no traumatic brain injury; and, in fact, it was

11   post-traumatic stress disorder causing cognitive difficulties?

12   A.  So I -- I don't remember the details of that case in that

13   way.  I would have had to ask you to prepare me to review that

14   prior to trial so that I could answer these questions.  I'm not

15   really able to answer these questions, but I do recall the

16   trial.  And my criteria for diagnosing mild traumatic brain

17   injury has not changed.  It's based on the National Academy of

18   Neuropsychology, "Diagnosing Mild Traumatic Brain Injury," by

19   Ruff and colleagues, 2009.  Those were my criteria -- those

20   were my criteria then; those are my criteria now.  Those

21   criteria have not changed.

22   Q.  Thank you.  So you saw Ms. Houston on two occasions for a

23   total of about five hours in August of 2019; correct?

24   A.  Excuse me.  Let me just refer to my --

25   Q.  Certainly.  Please feel free to refer to whatever you need.

Stephen Kalat - Cross

1    Okay.

2    A.   Thank you.

3    Q.   You'd agree, wouldn't you, that the crash that Ms. Houston

4    was involved in was very significant, with very -- with

5    sufficient forces to shake and jostle the brain and cause

6    damage?

7    A.   I don't know what the velocity was.  There certainly was a

8    collision and -- with airbag deployment.  That usually

9    mitigates traumatic brain injury effects -- or potential

10   traumatic brain injury effects.  There was -- but there was no

11   report of concussive symptoms or traumatic brain injury

12   symptoms.

13   Q.   My question was, this was a significant crash?

14   A.   It certainly was.  It resulted in an open right ankle

15   fracture.

16   Q.   Okay.  You would also agree, wouldn't you, that there are

17   rotational forces that occurred from this crash from the point

18   of the impact that led her off of the road to the left, would

19   have created rotational forces to her body, head, and neck?

20   A.   So that's a speculation I can't join with you on.  I know

21   that -- I believe, to the best of my knowledge, that the direct

22   impact on collision, which is why there was an airbag

23   deployment, is my interpretation of that.  And I'm not aware of

24   the rotational forces.

25   Q.   Well, let me ask you a question this way:  Rotational

Stephen Kalat - Cross

1    forces to the neck and brain are responsible for more

2    significant injuries than if it was a straight front-to-back

3    impact; correct?

4    A.   Yes.  That would be accurate.  And I would defer to an

5    expert forensic engineer to review the actual forces.

6    Q.   Okay.  How long -- how many patients do you have that you

7    treat for post-traumatic stress disorder?

8    A.   At this time, none.

9    Q.   Okay.  What's the longest patient that you've had for

10   post-traumatic stress disorder?

11   A.   I can't recall.

12   Q.   Is it more than ten years?

13   A.   I'm sorry.  Has it -- are you asking, has it been more than

14   ten years?

15   Q.   No.  Have you treated a patient with post-traumatic stress

16   disorder for more than ten years?

17   A.   No.

18   Q.   Okay.  And you don't have any post-traumatic stress

19   disorder patients in your practice at this point?

20   A.   That's correct.

21   Q.   Would you agree, Doctor, that women are susceptible to

22   having brain injuries, as their necks are not as strong as men;

23   and, therefore, they cannot hold held their heads as well when

24   they're in trauma such what we're dealing with in this case?

25   A.   Yes.  There is some old studies on that, and I think that's

807

Stephen Kalat - Cross

1   correct.

2   Q.  Would --

3   A.  Although I would state that women are more likely to

4   sustain a traumatic brain injury, it may be due to the neck;

5   but it also may be due to other factors.

6   Q.  We don't know, but there is a difference between men and

7   women.  Correct?

8   A.  Yes, I believe there is.

9   Q.  And tell me what you understand of the injury to

10  Ms. Houston's leg and the continual issues that she has to this

11  day?

12  A.  I did not focus on that.  In fact, I typically don't.  I

13  review but don't summarize those issues because that's not my

14  area, and that's not the question that I'm being asked.  My

15  recollection is that she had an open right ankle fracture, that

16  she's had persisting cognitive pain.  At one point there was

17  some question whether she had complex regional syndrome, and

18  then I think that was determined not to be.  And that's all I

19  recall.

20  Q.  Okay.  Dr. Gustavson testified yesterday that the fact that

21  her pain levels are still very high, wax, wane -- go up and

22  down -- continue to traumatize her from the event of this

23  crash; do you agree with that?

24  A.  I'm not sure I would call it traumatized, but I -- I think

25  yes, affect her negatively.  Yes.

Stephen Kalat - Cross

1    *Q.*  And would continue to remind her about this catastrophic

2    life-changing incident that she had on December 1, 2016; do you

3    agree?

4    *A.*  So can you repeat the question?  Because I'm trying to

5    think about the answer for that.  The question --

6             *MR. SHAPIRO:*  Terri, can you read that back, please?

7             *THE WITNESS:*  Your Honor, I very much appreciate we're

8    doing this by zoom.

9             *MS. BOBET:*  Are you able to hear me?

10            *MR. SHAPIRO:*  Yes.

11            *MS. BOBET:*  I made an objection like three questions

12   ago.  One second.

13            I'm going to ask the court reporter to read back -- I

14   guess two questions ago.

15            It was a question referring to Dr. Gustavson's

16   testimony.  At that point I attempted to object to

17   mischaracterization of evidence, but it became apparent that

18   you could not hear my objection.

19            *THE COURT:*  The objection is overruled.  Let's

20   continue.

21            *MR. SHAPIRO:*  Okay.  Terri, can you read that question

22   back that we were at?

23            (Question read back by the reporter.)

24            *THE WITNESS:*  I would say that unless Dr. Gustavson

25   has recently interviewed her, then he's in the same position I

Stephen Kalat - Cross

1    am, which is, I haven't seen her for some time.  I saw her in

2    August of 2019, so I would not be able to speculate and answer

3    that question either in the affirmative or the negative.

4    *BY MR. SHAPIRO:*

5    *Q.*  Do you think the fact that she continues to have

6    significant chronic pain from either nerve complex regional

7    pain, mechanical pain, that that is significant in her

8    psychological condition, as well as her cognitive situation?

9    *A.*  I think that chronic pain can have a negative effect on

10   depression, and so most likely it does have negative effect.

11   *Q.*  Doctor, you would agree that crashes of this nature are

12   common in causing post-traumatic stress disorder; correct?

13   *A.*  Yes, they can be.

14   *Q.*  Seeing the bone coming out of the skin that was fractured

15   would certainly be something that would traumatize a person?

16   *A.*  Well, I --

17   *Q.*  Right?

18   *A.*  Yes, that would be traumatic.  As well as her belief that

19   there was a fire in her vehicle and in any decisions she made

20   that this had been a life-threatening event.

21   *Q.*  Okay.  You were the only doctor that did a full battery of

22   tests on Ms. Houston; correct?

23   *A.*  Yes.  I think that's correct.

24   *Q.*  We know Dr. Jones did an abbreviated battery, correct,

25   before you?

810
Stephen Kalat - Cross

1   *A.*  He did a briefer psychological battery; but I don't believe

2   I would characterize it as a neuropsychological evaluation.

3   *Q.*  Okay.  And in his battery, he found cognitive deficits, as

4   well; correct?

5   *A.*  No.  He found overreporting, that she sustained a severe

6   traumatic brain injury.  He found test results that were

7   completely inconsistent with mild traumatic brain injury.  And

8   he did not conduct any validity testing, which is a standard of

9   care in the field; so that his was completely invalid.

10  *Q.*  His findings determined that she had cognitive deficits;

11  didn't they, Doctor?

12  *A.*  His findings indicated that without validity testing, she

13  presented as having a severe traumatic brain injury in a level

14  of performance that wouldn't be seen with people unless they're

15  in 24-hour institutional care.

16  *Q.*  You did a full battery of tests with validity testing;

17  right?

18  *A.*  I did.

19  *Q.*  Ms. Houston passed all of the validity or effort tests;

20  didn't she?

21  *A.*  She passed all of the cognitive performance validity tests;

22  yes, she did.

23  *Q.*  And your testing did find cognitive deficits that she was

24  complaining of; correct?

25  *A.*  Yes.  That's correct.

Stephen Kalat - Cross

1   *Q.*  All right.  Loss of consciousness is not necessary for a

2   traumatic brain injury diagnosis; correct?

3   *A.*  Yes, I think that's what I testified to earlier.

4   *Q.*  Hitting your head is not necessary for a diagnosis of

5   traumatic brain injury; correct?

6   *A.*  That's correct.

7   *Q.*  You need an alteration of consciousness, which would be a

8   dazing or confusion?

9   *A.*  Yes.  At minimum.

10  *Q.*  And you determined --

11  *A.*  I would say "dazing" was taken out of the World Health

12  Organization criteria, and they more specifically identify

13  organic confusion.

14  *Q.*  Say that again.  You pixelated.

15  *A.*  The World Health Organization criteria took "dazed" out of

16  the criteria because high rates of individuals in personal

17  injury experiences who didn't sustain a traumatic brain injury

18  report being dazed.  They put in organic confusion.

19  *Q.*  What is organic confusion?

20  *A.*  Organic confusion would be an individual who -- may I refer

21  to my report?

22  *Q.*  Yeah.  Sure.

23  *A.*  If I need to, I can switch to headphones.  That may be

24  better.

25  *Q.*  All right.  Doctor, you were looking at your report; and I

Stephen Kalat - Cross                                    812

1   forgot what you were looking for.

2   A.   I almost did too.

3         I think it has to do with the criteria for traumatic

4   brain injury, and you asked me a question about organic

5   confusion.

6   Q.   Yes, I did.

7   A.   Did the patient -- well, it's the patient being confused

8   about what to say or what just happened or confused about what

9   questions are being asked or confused about -- yes -- again,

10  what just happened to them.  That's -- those are -- those are

11  signs of organic confusion.

12  Q.   All right.  So Doctor, factually, with these three items,

13  would they raise questions about organic confusion:  She is

14  slow to respond to questions from the emergency medical

15  providers, she cannot recall the point of impact until she hits

16  the house, and she complains of being lightheaded and lethargic

17  at the scene?  Wouldn't you agree that any of those three would

18  be a factual indication of organic confusion or of an

19  alteration of consciousness?

20  A.   So I think that they could be interpreted -- some of them

21  could be interpreted that way.  The lapse I think had to do

22  with -- is more likely due to the airbag deployment, because

23  that is often reported by patients during an airbag deployment,

24  the interruption of ongoing experience.  The lethargic and the

25  slow to answer could be -- slow to answer, in particular, could

813

Stephen Kalat - Cross

 1   be related to an organic confusion.  Could be.

 2   *Q.*  Okay.  And when you're making a brain injury diagnosis,

 3   you're like a chef in a kitchen -- you're taking all of the

 4   ingredients and looking at them and see if it makes sense at

 5   the end that you have it all together; isn't that accurate?

 6   *A.*  Yes, including whether the patient displayed concussive

 7   symptoms in the first three days after the accident, when

 8   concussive symptoms are at their most severe, or the first two

 9   weeks after an accident, in which the concussive symptoms would

10   be at their most severe.

11   *Q.*  Okay.  Doctor, do you own a copy of the book

12   *Neuropsychological Assessment,* Fifth Edition by Drs. Lezak,

13   Howelson, Bigler, and Tranel?

14   *A.*  Yes.

15   *Q.*  Do you have it handy, by any chance?

16   *A.*  I can go to my bookshelf and get it.  Do you want me to?

17   *Q.*  No.  I'm going to ask you questions and see if you agree.

18   I think you probably will, and that's why I don't want to take

19   the time to do that.

20          You would agree, wouldn't you, that that textbook is

21   authoritative in the field?

22   *A.*  I -- I have problems with some of -- since Dr. Bigler

23   joined the cast of authors, I have some problems with how

24   things are described.  But, yes, I would say the field tends to

25   see it as an authoritative textbook.

Stephen Kalat - Cross

1    *Q.* If I recall correctly, the Colorado Neuropsychological

2    Society brought Dr. Bigler in from Utah to speak to your -- the

3    group that you've been a member of for a long time.  If I

4    recall, you were even there; right?

5    *A.* I don't know if I was there for Dr. Bigler's presentation

6    to Colorado Neuropsychological Society, but I've met

7    Dr. Bigler, and I saw him present at National Academy of

8    Neuropsychology.  He's very focused nowadays on avant-garde MRI

9    methods.

10   *Q.* I would agree.  Doctor, this is a quote from page 204, and

11   I want to see if you agree.

12   *A.* May I -- I would like to read along with you, because

13   sometimes I feel like it's important.

14           *MR. SHAPIRO:*  Sure.

15           *MS. BOBET:*  For the record, the United States does not

16   have a copy of this book that we're referring to.

17           *THE WITNESS:*  Okay.  You're talking about page 204?

18   *BY MR. SHAPIRO:*

19   *Q.* Yes, that first full paragraph.  And let me read this, and

20   I want to see if you agree or disagree.

21           "When the patient has sustained other injuries,

22   particularly those requiring significant amounts of medication

23   for pain or procedures such as surgery or casting to treat

24   orthopedic injuries that keep the patient from resuming a full

25   schedule of activities, the cognitive problems may not become

Stephen Kalat - Cross

1    disruptive or even evident for days or in some cases for weeks

2    after the accident.  Patients who take a few days from their

3    normal responsibilities after an accident may not notice mental

4    impairments until returning to work or preparing meals,

5    shopping, and planning for a family.  Thus, it is not uncommon

6    to find no notes reporting altered mental status in the

7    emergency room record or hospital chart, even when the patient

8    is later observed to suffer from fairly debilitating mental

9    dysfunction."

10           Do you agree with that, Doctor?

11           *MS. BOBET:*  I'm going to object.  We don't have this

12   document in front of us here.  I might ordinarily make a

13   completeness objection, but hasn't been disclosed as something

14   that might be used, and I don't have it to look.

15           *THE COURT:*  The question has to be phrased first

16   whether or not he agrees that you read it correctly, then he

17   may answer the question, and that subsequent objection is

18   overruled.

19           *MR. SHAPIRO:*  Thank you.

20   BY MR. SHAPIRO:

21   *Q.*  Doctor, did I read that correctly?

22   *A.*  I believe you did.

23   *Q.*  Do you agree or disagree with it?

24   *A.*  I agree with it in part.  But I would say that the studies

25   of whether someone's diagnosed with a mild traumatic brain

Stephen Kalat - Cross

1    injury in the emergency room typically rely on the fact that

2    concussive symptoms are frequently observed in the emergency

3    room.  And they may not diagnose a mild traumatic brain injury,

4    but they typically describe the concussive symptoms.

5         I would agree with the part of the paragraph which

6    indicates if there is a heavy dose of pain medication, that

7    that may obscure whether or not the patient has concussive

8    symptoms or whether their reported experience is mostly due to

9    pain difficulties.

10        And, lastly, I would point out that Ms. Houston was

11   observed to be very depressed early on in her treatment, and

12   that was the more prominent -- those were the more prominent

13   symptoms reported.

14   Q.  When Ms. Houston was brought to St. Mary's Hospital, she

15   obviously had a very significant leg injury, with bone sticking

16   through the skin; and she was heavily pain medicated.  You

17   would agree, then, that that would be a difficult person to

18   determine whether the subtleties of mild TBI existed or not

19   because of the situation she was in with her orthopedic

20   injuries; correct?

21   A.  I would agree with that.

22   Q.  Thank you.  Doctor, I want to ask you about certain

23   symptoms that I know Ms. Houston has that you outlined.  And I

24   want to know, are these symptoms consistent with a TBI, as well

25   as post-traumatic stress disorder, as well as chronic pain, and

817

Stephen Kalat - Cross

1   as well as anxiety.  Okay?

2   *A.*  Okay.  I'll try.

3   *Q.*  Slower mental processing?

4   *A.*  Yes.  That could be consistent with any of those

5   conditions.

6   *Q.*  Intermittent word finding and naming problems?

7   *A.*  Yes.

8   *Q.*  Fatigue?

9   *A.*  Yes.

10  *Q.*  Processing new information?

11  *A.*  Yes.

12  *Q.*  Sleep difficulties?

13  *A.*  Yes.

14  *Q.*  Irritability?

15  *A.*  Well, I think that's more associated with depression; but,

16  yes, it could be -- they could co-exist.

17  *Q.*  Okay.  Hyperstimulation and overstimulation?

18          Did you hear that?

19  *A.*  Did I say she had that?

20  *Q.*  No.  I'm just asking the question.

21  *A.*  Is this a hypothetical?

22  *Q.*  This is a hypothetical, as well.  There are some that are

23  not in your report.

24  *A.*  Yeah.  So hypersensitivity and hyperstimulation I would

25  think is more due to PTSD, and not depression.  And it could --

Stephen Kalat - Cross

 1   it can be associated with a mild TBI, if the patient has

 2   reduced gating mechanisms, that they're more vulnerable to

 3   sensory stimulation.

 4   Q.   All right.  Social difficulties?

 5   A.   I see that as more related to depression.

 6   Q.   Phonophobia?

 7   A.   Phonophobia can occur in -- that hypersensitivity can occur

 8   in a number of conditions.

 9   Q.   All of those conditions I mentioned, or just some?

10   A.   More likely in mild TBI, but also in anxiety patients.

11   Q.   Photophobia?

12   A.   Again, same answer.

13   Q.   Tinnitus?

14   A.   Tinnitus can occur in a mild TBI; but it can also simply

15   occur due to an inner ear concussion or changes in auditory

16   abilities, which I don't think Ms. Houston had in this case.

17   Q.   There is a tremendous overlap, obviously, Doctor, between

18   all of those signs and symptoms and those multiple diagnoses;

19   correct?

20   A.   Yes, there is -- there is an overlap of signs and symptoms.

21   There is not -- but, yes, there is an overlap of signs and

22   symptoms.

23   Q.   You would agree, wouldn't you, that a complicating factor

24   in the post-traumatic stress disorder and the depression and

25   anxiety is chronic pain; accurate?

Stephen Kalat - Cross

1   *A.*  Can you repeat that question?  Is chronic pain what?

2   *Q.*  Is chronic pain a complicating factor when someone has

3   post-traumatic stress disorder and depression and anxiety?

4   *A.*  It can be.  Yes.

5   *Q.*  Do you think it's better for a patient to have

6   post-traumatic stress disorder, anxiety, and depression, as

7   opposed to a traumatic brain injury, for their ability to

8   function on a day-to-day basis?

9   *A.*  I'm not sure how to answer that question.

10  *Q.*  Which has a better prognosis?

11  *A.*  Could you repeat the question, then?

12  *Q.*  Sure.  Which diagnosis would be better for a patient for

13  their ability to function, to their ability to recover,

14  traumatic brain injury or post-traumatic stress disorder with

15  anxiety and depression?

16  *A.*  Well, given that the research database shows that filed

17  TBI -- mild TBI tends to improve and remit, I would say a mild

18  concussion without loss of consciousness or post-traumatic

19  amnesia is very likely to remit and, therefore, might actually

20  be a better diagnosis to have than the kind of severe

21  depression and PTSD that Ms. Houston presents with.

22  *Q.*  What if it was a traumatic brain injury that leaves

23  somebody with the residual cognitive difficulties, and you

24  compare that to the PTSD and the anxiety and depression?

25  *A.*  I think that cognitive rehabilitation therapy can help mild

Stephen Kalat - Cross

1    TBI, but -- and, again, over time it tends to remit.  And at

2    one year, there are fewer -- very low frequency of patients who

3    have persisting symptoms; and when they do, it's considered to

4    be due to the PTSD or psychiatric condition, the depression, or

5    the influence of other factors.  So it's tough to say one is

6    better than the other.

7    Q.  They're all not very good; correct, Doctor?

8    A.  I would say that depression and PTSD are more treatable in

9    the end, and they're all not -- and mild TBI tends to remit.

10   So they're all not very good, but I would say chronic major --

11   chronic or recurrent major depression is a much more difficult

12   condition.

13   Q.  What if you have a combination of post-traumatic stress

14   disorder, mild traumatic brain injury, complex regional pain

15   syndrome, and general chronic pain issues -- and I'll add

16   depression and anxiety into it -- does that complicate the

17   ability to treat and help that patient get better?

18   A.  Well, sure.  They're all complications, but it really

19   hasn't been attempted in a systematic manner.  First and

20   foremost, she's not on the proper antidepressant medications.

21   Q.  You would agree, wouldn't you, Doctor, that post-traumatic

22   stress disorder changes the physiology of the brain?

23   A.  Yeah, I think there is some evidence of that.

24   Q.  And you indicated in your direct testimony that it's seen

25   more likely in more severe TBI; correct?

Stephen Kalat - Cross

1   *A.*   You --

2   *Q.*   Excuse me.  More severe post-traumatic stress disorder.

3   Excuse me?

4   *A.*   So when there is evidence of structural changes on PET

5   scans or physiologic changes on PET scans, that's usually among

6   the more PTSD cases.  But I think there is evidence of

7   cognitive dysfunction with PTSD, and that most likely parallels

8   something that is going on in the brain.

9   *Q.*   Okay.  And on page 10 of your first report, you indicated

10  that Ms. Houston's report on the post-traumatic stress

11  diagnostic scale was in the very severe range; correct?

12  *A.*   Yes.  She reported very severe symptoms.  That's a scale

13  without -- it's a scale without any validity indicators, so it

14  doesn't tell you -- that scale does not tell you whether there

15  is overreporting.

16  *Q.*   Would you agree, Doctor, that when you have post-traumatic

17  stress disorder and you have depression and anxiety, that it's

18  more difficult to treat when you have the two or three at the

19  same time?

20  *A.*   Yes.

21  *Q.*   You would agree, Doctor, that Ms. Houston sustained in this

22  crash, from your perspective as a neuropsychologist,

23  post-traumatic stress disorder, depression and anxiety?

24  Anything else from your neuropsychological perspective other

25  than those two or three diagnoses?

Stephen Kalat - Cross

1   *A.* Well, I believe Dr. Johnston indicated she thought the

2   anxiety was 25 percent pre-existing; and I found a history of

3   depression and character traits, personality traits, that

4   indicated long-standing problems with depression. But I would

5   agree with you that primarily it's major depression, PTSD, and

6   anxiety.

7   *Q.* And those are directly related to the crash in question;

8   and the United States government should be responsible for

9   paying for those injuries and the care, as well? Correct?

10           *MS. BOBET:* Objection. Calls for a legal conclusion.

11           *THE COURT:* Sustained.

12           *THE WITNESS:* I was going to object to the same thing.

13      Do you want me to do it anyway? I mean -- I would say

14   that --

15           *MS. BOBET:* The objection was sustained.

16           *THE WITNESS:* Thank you very much. I was going to

17   take it a different direction. Thank you.

18           *MR. SHAPIRO:* No problem.

19   *BY MR. SHAPIRO:*

20   *Q.* No problem. Doctor, you mentioned her medical records from

21   2005 and 2006 that indicate treatment when she was in her 20s

22   and treatment when she was getting divorced in 2005 and 2006.

23   Doctor, is there any indication in any records beyond 2005 and

24   2006 of any impact on her ability to function or any treatment

25   between 2005 and '6 and this crash?

823

Stephen Kalat - Cross

1   A.   There is no medical documentation that I'm aware of.

2   Q.   I think that's asked and answered.  Let me move on to this.

3           You suggested a number of treatments, and those number

4   of treatments you believe should be paid for by the United

5   States of America.  Is that correct?

6   A.   If you're asking --

7           MS. BOBET:  Objection.  That calls for a legal

8   conclusion.

9           THE COURT:  Overruled.

10          THE WITNESS:  If you're asking whether I believe

11  they're secondary to the accident, I believe that there was an

12  exacerbated depression, an increase in depression; there was

13  probably pre-existing anxiety, based on Dr. Johnston's report

14  and apportionment; and I think her PTSD is secondary to the

15  accident.  So a good portion -- a good portion of those

16  conditions are secondary to the motor vehicle accident and her

17  injuries.

18  BY MR. SHAPIRO:

19  Q.   And you indicated that a year of treatment still makes

20  sense, as you've indicated, with EMDR, exposure therapy,

21  desensitization therapy, antidepressant medication.  Should the

22  antidepressant medication be for more than a year?

23  A.   It could be, yes.

24  Q.   The desensitization therapy?

25  A.   Could it be more than a year?

Stephen Kalat - Cross

1   *Q.*  Yes, sir.

2   *A.*  Yes, it could be more than a year.

3   *Q.*  The exposure therapy?

4   *A.*  Those tend to be briefer therapies, so I would say a year

5   to a year and a half of treatment for depression and PTSD would

6   be most likely sufficient.

7   *Q.*  Okay.  Doctor, are you aware of patients that sustain PTSD

8   in the Vietnam War?

9   *A.*  Yes.

10  *Q.*  And many of those soldiers are still receiving treatment

11  today, aren't they?

12  *A.*  Yes.

13  *Q.*  So they had a year of treatments and obviously still need

14  treatment.  We want to make sure that Ms. Houston gets what she

15  needs.  So, Doctor, I cannot believe that you would think that

16  one year would solve all of these problems; do you?

17  *A.*  Well, I just admitted to you that a year to a year and a

18  half of treatment might be necessary.  But I think there is a

19  significant difference between Vietnam vets who were in a year

20  of duty with chronic traumatic exposures to very severe

21  life-threatening events and Ms. Houston and her PTSD which

22  arose from the motor vehicle accident -- which was a traumatic

23  exposure -- and the physical injury was a traumatic exposure,

24  and the decision of thinking she was going to die from fire in

25  her vehicle was a traumatic experience.  But I don't see the

Stephen Kalat - Cross                                                    825

1    need to think -- I don't have a need to think that she's going

2    to have life-long PTSD if she's properly treated.

3    Q.  Doctor, what about adding the continual severe chronic pain

4    that she has that is now going on over four years; doesn't that

5    complicate these issues and the recovery from these problems?

6    A.  It could, but I think she hasn't had the treatment; and we

7    can't see how much it improves with proper treatment with

8    antidepressant medication, probably, and cognitive behavioral

9    psychotherapy.

10   Q.  Would you agree, Doctor, that every day that she puts her

11   feet down on the floor in her bedroom when she gets up in the

12   morning and feels the pain from the severe injury to her foot,

13   that she's reminded of this catastrophic trauma?

14   A.  I think -- I don't know the answer to that.  I think that

15   she certainly is having chronic pain experience.

16   Q.  Doctor, you indicated in your report that you thought there

17   was eleven months before she repeated -- before she reported

18   cognitive issues; correct?

19   A.  I think it was seven.  I don't know if I said eleven; but

20   it was probably seven months when she saw Dr. Gustavson, she

21   reported cognitive issues consistent with PTSD.

22   Q.  Are you aware that that was incorrect?  Has it been made

23   aware to you that the reports were much earlier?

24   A.  Prior to seven months?

25   Q.  Yes, sir.

Stephen Kalat - Cross

1    *A.*   I believe I heard something about reporting some fogginess

2    at five months, but I don't know where that is.

3    *Q.*   What if I told you that she reported it within two months,

4    in February?

5            *MS. BOBET:*   Objection.   Mischaracterizes the evidence.

6            *THE COURT:*   Overruled.   You can bring that out in

7    cross, if you wish.

8            Go ahead.

9        *THE WITNESS:*   I'm not aware of such a thing, and I

10   haven't seen it in writing.

11       *MR. SHAPIRO:*   I am looking at Exhibit 83, and I'm

12   going to ask Ms. Waller to pull that up.   And I know we've

13   changed our thing, so she's going to need a little time to pull

14   up 83.

15           *THE WITNESS:*   Is that also in my booklet?

16       *MS. BOBET:*   We don't have an Exhibit 83.   This hasn't

17   been previously disclosed.   I'm not sure what this record is

18   going to be, but we'll likely object.

19       *MR. SHAPIRO:*   This is the record from Primary Care

20   Partners from February 1, 2017, that we've used already in this

21   case.

22           *MS. BOBET:*   We don't have a record in this -- I don't

23   know what page this is going to be; it hasn't been disclosed to

24   us; and we'd object to the use of it.

25           *MR. SHAPIRO:*   It has been disclosed to you, and we've

827

Stephen Kalat - Cross

1   used it with other witnesses in this case already.  This is

2   Primary Care Partners 002.

3            MS. BOBET:  Which witness was this used with before?

4   Is it an exhibit that includes Primary Cares Partners' records

5   selections, but I don't think it includes this page.  So our

6   objection is still standing.

7            THE COURT:  Overruled.  Go ahead, please.

8            MR. SHAPIRO:  Thank you.

9   BY MR. SHAPIRO:

10  Q.  Did you receive her records from Primary Care Partners,

11  Dr. Kalat?

12  A.  Kalat.  I did receive records from Primary Care Partners.

13  I don't know if I received this record.  I'd have to look.

14           MR. SHAPIRO:  Okay.  Can you highlight that paragraph

15  Ms. Waller.

16           Can you highlight the date of February 1.

17  BY MR. SHAPIRO:

18  Q.  Have you ever seen this record before, Doctor?

19  A.  I would have to review the records, but I -- that I have to

20  see whether I've reviewed it previously.  I reviewed all

21  records sent to me.

22  Q.  Okay.  So would you agree, Doctor, that this is a record

23  from February 1, 2017?

24  A.  Based on what you're showing me now, it appears to be a

25  record from February 1, 2017.

Stephen Kalat - Cross

1   *Q.* Would you agree that the paragraph highlighted indicates

2   that Ms. Houston is having a hard time mentally since the

3   accident in December.  She appears to be angry and anxious, and

4   she's told them that she's wanting to get a referral for a

5   psychologist?

6   *A.* I see that statement.  I did not interpret that -- I would

7   not interpret that as indicating cognitive dysfunction.  I

8   think she's having a hard time mentally and angry and anxious.

9   *Q.* Okay.

10   *A.* That suggests emotional reactions.

11   *Q.* Okay.  You're also aware, Doctor, in Dr. Cota's record from

12   May of 2017 that she was complaining of being foggy mentally;

13   correct?

14        You can take that down now, please.

15   *A.* I recall a reference to some mention of that, but I

16   don't -- I'd have to see that records.

17   *Q.* Okay.  And --

18   *A.* And I -- I'm sorry.  I don't doubt that at five months, she

19   was reporting feeling foggy.

20        *MR. SHAPIRO:* I won't take the time to put that up.

21        You know, let's put it up, just to make sure.

22        *MS. BOBET:* Is this from an exhibit, this document?

23        *MR. SHAPIRO:* Defendant's Exhibit 56 -- well,

24   Exhibit 56.

25        *THE WITNESS:* And is that from Primary Care Partners.

Stephen Kalat - Cross

1   *BY MR. SHAPIRO:*

2   *Q.*  No.  From Dr. Cota's records.  Rocky Mountain Orthopedics.

3   *A.*  I see.  Uh-huh.

4          *MS. BOBET:*  What page in this exhibit?

5          *MR. SHAPIRO:*  She's getting there.  032.

6          Can you highlight that part, please.

7   *BY MR. SHAPIRO:*

8   *Q.*  Do you remember seeing that, Doctor?

9   *A.*  I don't recall -- what date is that, on that?

10  *Q.*  May 17.

11  *A.*  I -- but the date, sir?

12  *Q.*  May 17, 2017.

13  *A.*  No.  I reviewed it, but I don't recall it.  And -- but it's

14  consistent with my theory of the case, which is, she began to

15  develop some cognitive symptoms.  But this looks like it's

16  post-surgery, and she's having ongoing symptoms.

17  *Q.*  Okay.  You indicated in your report on page 3 of your first

18  report that there were no cognitive complaints until eleven

19  months post-accident.  Doctor, that is simply incorrect; isn't

20  it?

21  *A.*  That would be incorrect based on the report of some foggy

22  thinking at, what, five or six months post-accident.

23  *Q.*  Yes.  And not the one in February that I just showed you,

24  as well, you would -- you do not agree that that indicates

25  cognitive issues?

Stephen Kalat - Cross

1    *A.*  No.  Because someone saying she's having a hard time

2    mentally and feeling anxious and irritable, that sounds to me

3    like logical reactions to her injury.

4    *Q.*  You indicated that the reports of post-traumatic stress

5    disorder were in the severe category.  Would you also agree

6    that her depression is in the moderate to severe category?

7    *A.*  I'm not sure what I said in my report; but I saw more

8    recent records which indicated to me that on the PHQ-9 she was

9    in the severe range of depression in 2019 -- December of 2019.

10   *Q.*  Doctor, on the tests that you performed, there were

11   numerous tests that were determined to be abnormal -- in other

12   words, showing impairments -- correct?

13   *A.*  Well, there were numerous tests that were in the

14   low-average range, and there were not -- hold on just a moment.

15   Let me check this for -- to answer your question properly.

16   *Q.*  I could do it a different way, if it helps.

17   *A.*  There were relative weaknesses on a number of tests, and

18   there were mildly impaired and mild to moderately impaired

19   tests, but not numerous ones.  There were a few mildly impaired

20   and mild to moderately impaired tests.

21   *Q.*  I counted, you know, probably in the range of ten, twelve

22   tests.

23   *A.*  Let me check.  I count about eight, because if you -- if

24   you're not careful, you can double count some under executive

25   function, but -- so I count about eight in the mildly impaired

Stephen Kalat - Cross

1   range or worse.  There was only one that was severely impaired.

2   Q.  Okay.  What was that?

3   A.  That was copying a complex figure, which I find to be

4   challenging myself.

5   Q.  As I understand it, Doctor, your position -- your opinion

6   is that Ms. Houston does not have a traumatic brain injury;

7   correct?

8   A.  That's true.  I don't believe she has a traumatic brain

9   injury.

10  Q.  But as a result of the crash, she has post-traumatic stress

11  disorder; correct?

12  A.  Yes.

13  Q.  Exacerbations of depression and anxiety; correct?

14  A.  Yes.

15  Q.  Chronic pain of a severe level?

16  A.  Based on the history in the records, she has significant

17  chronic pain.

18  Q.  Okay.  And your position on the post-traumatic stress

19  disorder and depression and anxiety is you're critical of the

20  care by some of the treaters in her treatment team; right?

21  A.  Somewhat.  I'm concerned about the lack of consistent

22  systematic treatment.  Yes.

23  Q.  Are you critical of the care by Dr. Gustavson?

24  A.  No, as far as it went.  But that was discontinued, in my

25  opinion, too soon by the patient.

Stephen Kalat - Cross

1    *Q.*  Dr. Johnston?

2    *A.*  And the question is whether I'm critical of Dr. Johnston's

3    care?

4    *Q.*  Are you critical of her care?  Yes.

5    *A.*  I was critical that she discounted the need for a proper

6    diagnosis, that she accepted what the patient told her.  And

7    that's a big error in mild traumatic brain injury treatment,

8    because it isn't -- because mild traumatic brain injury is

9    not -- as Michael Alexander of Harvard University said, it's

10   not accepting what the patient says when the actual incident

11   involved trivial or no brain injury, and it creates neurologic

12   disease where it does not exist.  So -- that's the statement by

13   Michael Alexander, M.D.  So I am critical of that.  I'm

14   critical of Dr. Johnston's discussion with the patient of

15   non-evidence-based treatments and the lack of a systematic

16   exposure therapy treatment for this patient.

17   *Q.*  Are you critical of the care of Dr. Lynn Price?

18   *A.*  I think Dr. Price was accepted -- I'm not critical of her

19   care.  She accepted what the patient indicated about having

20   sustained a closed-head injury and, really, was the first one

21   to identify closed-head injury as a diagnosis; but I think that

22   was based on what the patient reported.  And I would say that

23   referral for a psychiatric consultation would be helpful --

24   would have been helpful and would be helpful for this patient.

25   So with that caveat, I accept Dr. Price's care as being well

Stephen Kalat - Cross

1   intentioned.

2   *Q.*  How about Dr. Ellen Price?

3   *A.*  Ah, okay.  I'm sorry.  I was referring to Ellen Price, I

4   think.

5   *Q.*  Ellen Price is physical medicine and rehab; Lynn Price is

6   general family doctor.

7   *A.*  Hold on just a moment.  Let me check, because I get those

8   confused.  I'm very sorry about that.

9        So, yes, I was -- I was referring to Lynn Price --

10  *Q.*  Okay.

11  *A.*  -- in my earlier statements.  You know, she was following

12  what the patient said.  But I do think that the -- I believe

13  she's the one who is prescribing the Adderall, the amphetamine;

14  and I don't think that's the right way to go.  I think that

15  would have been necessary to refer to a psychiatrist to

16  evaluate.  And I think in her deposition she stated that she

17  thought if Dr. Gustavson didn't think there was a brain

18  injury -- which he did not -- then she didn't think there was a

19  brain injury; so I don't know why Adderall is being prescribed

20  to the patient.  But that's outside of my area, really, just --

21  I'm just commenting on that process.

22  *Q.*  I'm sorry, Dr. Ellen Price, are you critical of her care?

23  *A.*  No, I don't think so.

24  *Q.*  Okay.  Do you believe that the use of the psychostimulant

25  like Adderall has been harmful to Ms. Houston?

Stephen Kalat - Cross

1   *A.* Yes. Because it hasn't given her the proper treatment for

2   her depression.

3   *Q.* Do you believe that the cognitive therapy by Ms. Jacobson

4   has been harmful to Ms. Houston?

5   *A.* Harmful, no. It's a little misdirected. It does have an

6   iatrogenic component by supporting the plaintiff's incorrect

7   belief that she has traumatic brain injury.

8   *Q.* Would you agree, Doctor -- and this is something -- would

9   you agree with Dr. Gustavson that the deficits that you see in

10  Ms. Houston's test scores are related to the areas of the brain

11  that are not functioning properly or altered by the

12  post-traumatic stress disorder, depression, anxiety, and

13  chronic pain?

14  *A.* I think it's primarily related to the depression, because

15  that's what my cognitive test results and the statistical

16  analyses indicate, that depression is the -- is what the

17  profile primarily suggests. But, yes, I believe PTSD is a

18  problem, as well, contributing to cognitive dysfunction.

19  *Q.* Do you agree that the changes to the hippocampus, the

20  volumetric changes, the changes in the prefrontal cortex are

21  all of the areas that have been affected by the PTSD for

22  Ms. Houston and that those are correlated by your test results?

23  *A.* No. I don't agree with that, because I don't think that's

24  been documented.

25  *Q.* Is that where the changes would be based on the deficits

Stephen Kalat - Cross

1    that you found on your test?

2             THE WITNESS:  Mr. Shapiro, I think there is a problem

3    with --

4             MR. SHAPIRO:  The Government?

5             THE WITNESS:  -- counsel's audiovisual.

6             MS. BOBET:  Are you able to hear me?

7             MR. SHAPIRO:  Yes.

8             MS. BOBET:  Okay.  We made an objection.  It became

9    clear that it was not heard again.  We're going to hang up on

10   the audio line and dial back in, if you all would just indulge

11   us for just a moment.

12            MR. SHAPIRO:  Thank you.

13            MS. BOBET:  For the record, if you can still hear me,

14   my objection was going to be on the question about the brain

15   changes.  I think it, you know, mischaracterizes the evidence;

16   and I would note Ms. Houston hasn't had brain imaging to show

17   that.

18            THE COURT:  Overruled.  You may answer, Doctor.

19            THE WITNESS:  Okay.  Your Honor.  Thank you.

20            MS. BOBET:  I will try to when I'm making objection

21   also wave my hands, in case that happens again.

22            MR. SHAPIRO:  Thank you.

23            THE WITNESS:  I think what you're stating,

24   Mr. Shapiro, is a highly speculative conclusion that there is

25   actual volumetric changes in the brain.  I indicated in one of

Stephen Kalat - Cross

1   my reports that depression and PTSD can affect the size of the

2   hippocampus; and that with proper antidepressant treatment,

3   there is a reversibility of the -- of that shrunken

4   hippocampus.  To say that she has that is completely

5   speculative, because there is no MRI -- high-tesla MRI

6   documentation or volumetric analysis to indicate that that is

7   the case.

8   *BY MR. SHAPIRO:*

9   *Q.*  Those symptoms that you have reported in your test results

10  are consistent with the research indicating that those areas of

11  the brain are impacted by post-traumatic stress disorder;

12  accurate, Doctor?

13  *A.*  You'll have to repeat that question so I can try to answer

14  it.

15  *Q.*  Sure.

16          Terri, can you read that back, please.

17          (Question read back by reporter.)

18          *THE WITNESS:*  I think it could be, but I think the

19  suggestion that it is or that it's causal is highly

20  speculative.

21          *MR. SHAPIRO:*  Thank you for your time, Doctor.  Nice

22  to see you again.

23          *THE WITNESS:*  Nice to see you, Mr. Shapiro.

24          *MS. BOBET:*  A brief redirect, Your Honor.

25          *THE COURT:*  Yes.

Stephen Kalat - Redirect

1                        **REDIRECT EXAMINATION**

2       *BY MS. BOBET:*

3       Q.  Dr. Kalat, why do you charge more for your time in

4       medical/legal cases like this one than in your clinical

5       practice?

6       A.  It requires a higher level of service; it demands a level

7       of comprehensive and careful focus and analysis; it's highly

8       demanding; it's subject to critique, which requires careful,

9       focused, and comprehensive review of information; it's a much

10      more -- these are much more complicated cases than you see in

11      the general clinical practice.

12      Q.  I want to just clarify one point.  It might help if you can

13      refer to your report on page 5., just to clarify the point

14      about what exactly you noted in the records happening eleven

15      months after the accident.  What was it that you noted

16      happening in the records from Ms. Houston's reporting eleven

17      months after the accident to Dr. Lynn Price?

18      A.  Dr. Price -- yes.  So Dr. Price indicated that she also --

19      that Ms. Houston also sustained a closed-head injury.  And that

20      was the first diagnostic impression in the record that she --

21      that the patient had sustained a closed-head injury, and that

22      was the first mention that I noted.

23      Q.  Okay.  And then we heard that perhaps at some time before

24      that there were symptoms, but not a report of a head injury.

25      Do I have that distinction right?

Stephen Kalat - Redirect

1   *A.*  I think so.  She reported to Dr. Gustavson that she had

2   some cognitive complaints, but those apparently were considered

3   consistent with her PTSD.  And the fogginess at six or seven

4   months, that's certainly a late-reported symptom; and I don't

5   see it as inconsistent at all with someone who had chronic

6   pain, sleep disturbance, depression, and PTSD.

7   *Q.*  Now, you were shown a number of records by Mr. Shapiro --

8   or Ms. Waller -- during your cross-examination.  Did any of

9   those medical records that they showed you change any of your

10  opinions in this case?

11  *A.*  No, it did not.

12  *Q.*  And in particular, the record from February 2017 -- which I

13  tried to take notes as best I could, not having the benefit of

14  having it in our pre-identified exhibits.  But I believe a

15  couple of things Ms. Houston was complaining of was being angry

16  and anxious.  Would those things showing up two months after

17  the accident, what would that signify in the context of the

18  opinion you've given?

19  *A.*  Well, it said she was having a hard time mentally and

20  anxious and irritable; and that's certainly consistent with her

21  psychological reaction, which I believe her had, to her

22  injuries.

23  *Q.*  And the last topic.  There was some discussion of the

24  records from the sort of abbreviated evaluation of Dr. Jones.

25  Do you recall from those records whether or not Ms. Houston

Stephen Kalat - Redirect

1  told him that she had a TBI?

2  A.  She told him that she had a severe TBI.  That's my

3  recollection.

4  Q.  And are you aware that he's indicated in subsequent sworn

5  testimony that he did not diagnose a TBI?

6  A.  I've heard that.  He reported levels of performance that

7  were so impaired -- as I said earlier, that would be the

8  performance of someone who needs 24-hour institutionalized

9  care.  It's completely inconsistent with her later testing, and

10  it indicates that because there was a lack of cognitive

11  performance validity testing, that this testing by Dr. Jones,

12  unfortunately, does not meet the standard of care in

13  neuropsychology and really shouldn't be included in

14  medical/legal deliberations.

15         MS. BOBET:  Those are all the questions I had.  Thank

16  you very much, Dr. Kalat.

17         MR. SHAPIRO:  Your Honor, can I briefly do one

18  question on recross?

19         THE COURT:  Well, all right.

20         MR. SHAPIRO:  You know, never mind.  Thank you.

21         THE COURT:  Doctor, thank you for your time,

22  especially under these difficult circumstances of this case.

23  So thank you very much for your time and your patience.

24         THE WITNESS:  Thank you, Your Honor.

25         THE COURT:  We'll be in recess.

Lawrence Goldman, M.D. - Direct

1          *MS. BOBET:*  One note on timing, if we might.  We're

2   still endeavoring everything we can to get our final witness

3   done through the end of the day, but it might behoove us to

4   take a shortened lunch break to allow him to come on the stand

5   a little bit earlier.

6          *THE COURT:*  Well, all right.  Let's -- it's 10 of.

7   Let's come back at a quarter of 1:00.

8          *MS. BOBET:*  Thank you.

9          *MR. SHAPIRO:*  Sounds good.  Thank you.

10         (Recess at 11:52 a.m.)

11         (In open court at 12:48 p.m.)

12         *THE COURT:*  Thank you, all.

13         Swear in the next witness, please.

14         *COURTROOM DEPUTY:*  Raise your right hand.

15      (**LAWRENCE GOLDMAN, M.D., DEFENDANT'S WITNESS, SWORN**)

16         *COURTROOM DEPUTY:*  Please state your name and spell

17   your first and last name for the record.

18         *THE WITNESS:*  Lawrence Barton Goldman.  G-O-L-D-M-A-N,

19   and Lawrence is with a W.

20         *MR. SCARPATO:*  Your Honor, may I inquire?

21         *THE COURT:*  Yes, please do.

22         *MR. SCARPATO:*  Thank you.

23                       **DIRECT EXAMINATION**

24   *BY MR. SCARPATO:*

25   *Q.*  Good afternoon, Dr. Goldman.  Could you please introduce

Lawrence Goldman, M.D. - Direct

1   yourself and let the Court know what type of medicine you

2   practice.

3   A.   My name is Lawrence Barton Goldman.  I go by Bart.  I'm a

4   medical doctor specializing in physical medicine and

5   rehabilitation.

6   Q.   And could you please -- well, I'll ask the first question.

7   Is that the same thing as a physiatrist?

8   A.   Yes.  That's the colloquial term for a physical medicine

9   and rehab specialist.

10  Q.   And could you please describe for the Court what that area

11  of practice entails.

12  A.   In the broad sense, it entails the evaluation, diagnosis,

13  treatment, and, substantially, rehabilitation of just about all

14  chronic conditions of which one can think.  That includes, in

15  terms of my training, musculoskeletal injuries; chronic pain;

16  complex regional pain syndrome -- or CRPS -- arthritis,

17  rheumatoid and osteoarthritis; amputations, traumatic brain

18  injury; inflammatory conditions; strokes; and on and on.  The

19  components of the treatment that are unique compared to other

20  allopathic or M.D. -- medical doctor -- specialties is, one, we

21  are very much functionally oriented in terms of helping

22  patients hopefully achieve the best possible function and

23  quality of life, no matter what their chronic condition may be,

24  if it cannot be cured.  And, secondly, we're probably the first

25  if not one -- one of the first, if not first, specialties to

842

Lawrence Goldman, M.D. - Direct

1    focus on the team or multidisciplinary or preferably

2    interdisciplinary approach.  So my training was comprised -- as

3    well as my treatment terms that I've help medically direct over

4    the last few decades -- comprised in training in not only all

5    types of physical and emotional rehabilitation techniques, but

6    physical therapy, occupational therapy, speech therapy,

7    psychology, neuropsychology, psychometric testing, social work,

8    diet, exercise physiology, neurosurgery.  Also rotated with

9    orthopedic surgeons quite a bit.  So we have a very broad scope

10   of practice in a very specialized sense.

11   Q.  So as part of that practice, to what extent, if at all, do

12   you have experience with treating the effect of psychological

13   symptoms on pain management and rehabilitation?

14   A.  Well, I've been -- I don't want to go into hearsay.  I've

15   been told I should be a psychiatrist, at times.  But treating

16   emotional and psychological complications or residual or

17   predisposing conditions involved in chronic pain is part and

18   parcel to just about every patient I treat unless --

19   occasionally I get someone who is very early on in their

20   course, and I'm able to help them reverse their condition

21   quickly so they don't become psychologically impacted.  But in

22   general, at least when someone has had chronic pain for more

23   than three to six months, the emotional and psychological

24   component is very difficult to parse out from the physical

25   component and generally plays an equal if not greater part in

843

Lawrence Goldman, M.D. - Direct

1   predicting how well the patient can rehabilitate.

2   Q.   And we're going to pull up on the screen what's been marked

3   and admitted as Exhibit 71, which is --

4        Well, I'll ask you, first, can you see that document

5   on your screen, Dr. Goldman?

6   A.   I can.

7   Q.   And do you recognize this document?

8   A.   Yes.  That's my curriculum vitae as of last September.  And

9   it's up to date as of that date, and there has not been too

10  much of a change to it since then.

11  Q.   And we have up your educational history.  Is that an

12  accurate summary of your educational history?

13  A.   It is.

14  Q.   Could you briefly summarize that education for the Court's

15  benefit.

16  A.   I graduated with highest honors from Penn State University

17  a long time ago and did graduate work in biophysics, exercise

18  physiology, nutrition until I matriculated to Hahnemann Medical

19  College in Philadelphia in 1980.  I also worked at the local

20  hospital during that time.  I began my education in medicine in

21  1980 at Hahnemann, which ultimately became part of Drexel

22  University after I left.  Graduated in 1984 in the upper

23  portion of my class and then matriculated to Temple University

24  Hospital internship and residency in Philadelphia in physical

25  medicine rehabilitation.  I completed that training in 1987,

Lawrence Goldman, M.D. – Direct

1    when I was co-chief resident, as well as appointed as a

2    clinical instructor on the faculty.

3            It was actually during that time, I think 1985, when I

4    saw my first CRPS patient and actually presented grand rounds

5    on it.  I also did extra rotations in CRPS at Jefferson Medical

6    College, which had one of the -- what really was the only

7    program in that part of the world at that time, under

8    Dr. Robert Schwartzman, who ultimately did go to Hahnemann,

9    after I left Hahnemann.  And I completed the residency and then

10   took my various boards, became fully board certified by the

11   Academy of Physical Medicine and -- Board of Physical Medicine

12   and Rehabilitation in 1988.  Passed my national medical boards

13   I think in 1984, as I recall.  I have been licensed in Colorado

14   in 19 -- since 1987.

15           I've had additional education in forensic medicine,

16   disability and impairment assessment.  I helped found the

17   American Board of Independent Medical Examiners and chaired the

18   examination committee in the early 1990s.  Helped create

19   (unintelligible) for the Division of Workers Compensation for

20   the state of Colorado, which proctors impairment evaluation and

21   keeps them up to date on various guidelines.  I also trained at

22   the University of California in Los Angeles in medical

23   acupuncture.  And I -- I was assistant clinical professor at

24   the University of Colorado Health Sciences Center in the

25   department of rehabilitation medicine through most of this time

Lawrence Goldman, M.D. - Direct

1    period up until around 2012, 2013.  So I've been teaching

2    doctors and folks out in the community throughout my whole

3    career.

4    Q.  Thank you, Doctor.  I see in your CV about a page and a

5    half of professional experiences.  And I'll not ask you to go

6    through all of those since it's been admitted, and we're trying

7    to get this trial done this week.  I'd just ask you to briefly

8    highlight those clinical experiences with particular emphasis

9    on any experience with relevance to the issues in this matter.

10   A.  Well, I was medical director of one of the first, if not

11   the first, non-surgically oriented spinal and chronic pain

12   rehabilitation centers, actually, in the country.  That was

13   sponsored through Spalding Rehabilitation Hospital and Swedish

14   Medical Center initially, and then came under the umbrella of

15   HCA and HealthONE.  I then became -- I was one of the founding

16   members of the Colorado Neurological Institute at Swedish

17   Medical Center and shared a number of committees, including

18   those that dealt with chronic pain and CRPS and neologic pain

19   and disorders, as well as fibromyalgia.

20        I then became medical director for the HealthONE

21   outpatient rehabilitation, physical therapy, occupational

22   therapy, and occupational health clinics in 1996; and then I

23   became medical director of all of the HealthONE outpatient

24   clinics a few years thereafter, up until 2003.  During --

25   again, during that time, I -- when I was the medical director

846

Lawrence Goldman, M.D. – Direct

1   from around 1991 to 1996 of the CRPS -- Complex Regional Pain

2   Center -- Complex Regional Pain Syndrome Center at the Colorado

3   Neurological Institute, which was an interdisciplinary program

4   in which we evaluated up to five to six patients initially

5   perfect week by an interdisciplinary group including

6   neurosurgeons, neurointerventionalists, orthopedic surgeons,

7   psychologists, psychiatrists, neurologists, physical

8   therapists, occupational therapists, et cetera.  So I had the

9   opportunity to directly or indirectly evaluate hundreds, if not

10  thousands, of patients that carried that diagnosis, sometimes

11  accurately and sometimes not.

12          And I've been teaching -- as I said, I've been

13  teaching physicians through the department of rehabilitation,

14  other physiatrists, up to around 2012, 2013.  Also, I was on

15  the faculty in terms of an instructor in family medicine and

16  occupational health and also trained nurse practitioners and

17  physician assistants.

18  Q.  Thank you, Doctor.

19  A.  I think that's enough.

20  Q.  Just so that I'm clear, you maintain a current clinical

21  practice; do I have that right?

22  A.  That's correct.  I see patients, now with COVID

23  precautions.  So I've been taking care of many patients, a

24  number of which carry the diagnosis of confirmed CRPS, for at

25  least a couple decades, as well as other chronic pain problems.

847

Lawrence Goldman, M.D. - Direct

1   And I still consult and evaluate and at times treat new

2   patients, depending on how much time my practice can provide

3   for them.  So I have a combined treatment and evaluation

4   consultative practice.

5   Q.  About how many CRPS patients would you say you've diagnosed

6   and treated over the course of your career?

7   A.  Well, that have met the diagnosis?  Hundreds and possibly

8   up towards 1,000, because I -- I generally am asked -- I'm

9   either evaluating or treating or both patients with that

10  diagnosis at least once or twice a month for my entire career,

11  but oftentimes at least weekly.  And then, again, in the 1990s,

12  I was personally evaluating or supervising the team that -- we

13  saw hundreds of patients over the course of five years,

14  probably over a thousand.  So it's something I've been

15  considered a specialist in in our community, for better or for

16  worse.  It's a difficult -- it's a difficult condition to

17  evaluate and treat, but it's something that I guess I became

18  very interested in back in my residency training.

19  Q.  And what experience do you have, if any, with pricing out

20  various rehabilitation measures, medications, and needs of

21  future care?

22  A.  In terms of utilization review and usual and customary

23  charges, and that type of assessment, to be clear?

24  Q.  Yes.

25  A.  I've been doing that and asked to do that for most of my

848
Lawrence Goldman, M.D. - Direct

1    career.  Certainly -- certainly, since the mid 1990s, it was

2    part of -- it was part of my duties as president of

3    Rehabilitation Associates of Colorado, which is the group that

4    employs me still.  I'm not president now, but I was the

5    founding president in the 1990s, in terms of helping get that

6    group off the ground.  But it was also part and parcel of my

7    duties as a medical director for Spalding Rehabilitation

8    Hospital, Swedish Medical Center, and then for HealthONE.  And,

9    then, I also had a -- I did consultancy during particularly the

10   early 1990s and have done so since then and am often asked by

11   various governmental and private agencies, as well as doctor's

12   offices, to consult in terms of setting up fee schedules.  It's

13   something that I'm asked to do a lot more than I'd like, quite

14   frankly; but it's something I have a lot of experience with.

15   Q.  Sure.  And you mentioned teaching over at CU.  Are you

16   familiar with Dr. Ellen Price?

17   A.  Yes.  She was actually one of my first resident physicians

18   in the -- would have been the late 1980s or early 1990s.  I

19   think she was my fourth or fifth resident; I can't really

20   remember.  It was a long time ago.  But Dr. Price and I have

21   been I think on very positive collegial terms for almost a few

22   decades now.  And we actually took the same course at UCLA in

23   terms of medical acupuncture, as I recall, and would share

24   patients and consulted with each other periodically over the

25   years.

Lawrence Goldman, M.D. - Direct

1    Q.  Okay.  Now, Dr. Goldman, we should mention, are you being

2    paid in connection with your work in this case?

3    A.  I hope so -- well, at least my group is submitting bills;

4    and I'm sure I will get paid, to some degree.

5    Q.  And what do you charge for a case review and preparation of

6    your expert report?

7    A.  The group pegs me at $625 an hour, and that's pretty much

8    what I'm charging.

9    Q.  And what is your charge for trial testimony?

10   A.  Well, it used to be a bundle, I -- it's changed -- around

11   in the $625 an hour.  I have to reserve a date and time

12   typically, because these testimonies move around; and I've had

13   to move patients both for today and Monday, that I was going to

14   see in the office.

15   Q.  Doctor, I'm afraid your audio may have cut out there for a

16   moment.

17           Terri is our court reporter.

18           Terri what was the last you were able to capture?

19           (Last question and answer read back by the reporter.)

20           THE WITNESS:  Can you hear me now?

21           So at any rate, my group charges $5,000 for a day of

22   my time that we set aside for trial.

23   BY MR. SCARPATO:

24   Q.  Is any of that compensation contingent on the opinions

25   you've rendered in this matter?

Lawrence Goldman, M.D. - Direct

1   *A.*  No.

2   *Q.*  Is any of that compensation contingent on the outcome of

3   this matter?

4   *A.*  No.

5          *MR. SCARPATO:*  Your Honor, we'd tender Dr. Goldman as

6   an expert in medicine, with subspecialties in the fields of

7   physical medicine, rehabilitation, pain management, the

8   diagnosis and treatment of complex regional pain syndrome.

9          *MR. SHAPIRO:*  No objection.

10         *THE COURT:*  The tender is accepted.  Please proceed.

11         *MR. SCARPATO:*  Thank you, Your Honor.

12  *BY MR. SCARPATO:*

13  *Q.*  So, Dr. Goldman, let's turn to this case.  Before we get

14  into the details, could you state briefly what you were asked

15  to do in this matter.

16  *A.*  I was requested to see Ms. Houston for independent medical

17  examination, which I did August 5, 2019.

18  *Q.*  To what extent, if at all, were you asked to review medical

19  records in this case?

20  *A.*  To a great extent.  I could start piling them up if it

21  would help, but I don't have a wide angle lens.

22         I received a lot of records, and I've received a lot

23  of records since.

24  *Q.*  Could you estimate for the Court the number of pages in

25  those medical records that you reviewed?

Lawrence Goldman, M.D. - Direct

1   A.  Well, I'm looking at them.  It's -- at 250 pages an inch,

2   thousands of pages.

3   Q.  Thank you.  And to what extent, if at all, were you

4   requested to review depositions or other expert reports in this

5   matter?

6   A.  I was -- I think I have been provided -- I wouldn't know

7   for sure, but I think I've -- I've been provided most of the

8   depositions of the providers and Ms. Houston.  And was asked to

9   review her video deposition, as well, and compare her

10  presentation with -- I actually wasn't asked to do anything in

11  particular.  I usually from your office would get everything

12  and just asked to submit an updated report.  I've never really

13  had interrogatories.  So I just assumed what I thought would be

14  important in terms of the scope of my expertise.

15  Q.  Thank you, Doctor.  And we'll get into these in some more

16  depth.  But just so everybody knows where we're headed with

17  this, I'd like to summarize your bottom-line conclusion from

18  your review in this case.

19          What conclusion, if any, did you arrive at with

20  respect to Ms. Houston's range of motion, overall physical

21  condition, and radiographic findings with respect to the

22  objective orthopedic injury she suffered?

23  A.  Well, the objective orthopedic injuries speak for

24  themselves.  I'm assuming -- I don't know, but I'm assuming the

25  Court has seen the X rays by now.  She had a comminuted

Lawrence Goldman, M.D. - Direct

1    fracture of her kneecap, which fortunately went on to heal

2    quite well.  But she had a more serious open fracture of her

3    ankle, which healed partially but not completely, with loss of

4    range of motion.

5           When I saw Ms. Houston and examined her ankle, she had

6    lost range of motion, particularly in terms of dorsiflexion --

7    which is, if this is the foot, it's bringing your toes up.  And

8    in terms of inversion and eversion, she had not lost as much as

9    I had anticipated, based on my review of the records, and I

10   thought still had some potential of regaining some more range

11   of motion and certainly strength.  But it was clear that she

12   had lost range of motion compared to her left ankle.

13          Otherwise, there weren't any -- there was some

14   coolness, as you would expect in the foot of someone with

15   chronic pain who wasn't weight-bearing as much on the limb.

16   But she didn't really meet any of the other clinical criteria

17   for CRPS, and it didn't appear that she had a significant

18   underlying neurologic injury when I had evaluated her.

19   Q.  So based on that picture, what conclusion, if any, did you

20   come to with regard to the severity of her overall residual

21   impairment?

22   A.  Well, again, it's important to clarify that there is a

23   differential between severity of x-ray findings and diagnosis

24   versus impairment versus disability.  And in this case, the

25   orthopedic injury -- the ankle -- was moderately severe; but

Lawrence Goldman, M.D. - Direct

1   the residual impairment actually was more in the mild category

2   overall, if you're qualitatively distinguishing impairment

3   between minimal, mild, moderate, or severe, keeping in mind --

4   just so you understand how I perceive this, I think it's

5   important to note the currency, if you will, that I'm dealing

6   with, in terms of whether it's dollars, deutsche marks, or

7   whatever.  From a physiatry perspective, moderate impairments

8   are typically in the realm of mild to moderate brain injury,

9   amputations, partial spinal cord injuries; and severe

10  impairments are major spinal cord injuries, major brain injury,

11  multiple limb amputations, et cetera.  So the impairment would

12  be in a mild category.  There is loss of range of motion that

13  will affect her balance and her standing and walking ability

14  that had a fair to good prognosis to improve, in my opinion,

15  but not to completely resolve.  That would correlate with an

16  overall mild disability.

17  Q.  Thank you.  Just so it's clear, I think you may have

18  mentioned it before, but what, if any, conclusion did you come

19  to regarding whether Ms. Houston presents with symptoms or for

20  other clinical findings of complex regional pain syndrome?

21  A.  The medical evidence objectively is -- objectively and even

22  to some degree subjectively -- is quite strong that that is not

23  a medically probable diagnosis in this case.

24  Q.  And what, if any, conclusion did you come to regarding

25  whether Ms. Houston can mitigate or manage any future

854

Lawrence Goldman, M.D. - Direct

1   limitations through continued strengthening and rehabilitation

2   efforts?

3   A.  Well, I think the prognosis, again, is at least fair to

4   good, in the absence of CRPS, that she can see some modest

5   further improvement, particularly in terms of strength, if the

6   focus of her ongoing rehabilitation and exercise is focusing on

7   that.  I think she could have some modest but not complete

8   improvement in range of motion, and Dr. Ellen Price has made

9   some suggestions that might be worth pursuing in that regard.

10  A lot would have to do with the focus of her treatment and

11  exercise program once this current process is concluded.  But

12  in rehabilitation, we look at improvement in terms of overall

13  function; and function can improve for many years, even in much

14  older people, even when the underlying orthopedic or neurologic

15  or whatever injury remains static.

16  Q.  And what, if any, conclusion did you come to regarding

17  roughly how much her future care would cost?

18  A.  After taking into account some of Dr. Ellen Price's

19  additional recommendations and some of the other

20  recommendations of her treating physicians, I calculated that

21  future care would have charges in the realm of about $30,000.

22  Q.  And, finally, before we get into the details of all this,

23  what, if any, conclusion did you come to regarding the

24  propriety of future lumbar sympathetic block injections or

25  spinal cord stimulator treatment?

855
Lawrence Goldman, M.D. - Direct

1    *A.* Well, I did not think that Ms. Houston's response to her

2    first two sympathetic blocks, as well as in light of her

3    subsequent stress thermography results and not -- not being

4    able to tolerate her spinal stimulator implant trial -- which I

5    predicted. I didn't think it would work out well -- I don't

6    think additional lumbar sympathetic blocks are likely to be

7    very helpful or play much of a role in terms of her future

8    rehabilitation potential.

9    *Q.* And how about the future potential for a spinal cord

10   stimulator?

11   *A.* Well, I thought her prognosis was poor to guarded in that

12   regard before she underwent the trial, and she did tolerate the

13   trial. And aside -- aside from the fact that when dealing with

14   an orthopedic-type injury that generally doesn't respond well

15   to neurostimulation, the likelihood that she will need to

16   consider that type of treatment in the foreseeable future is

17   quite, quite low, well below medical probability prediction.

18   *Q.* Thank you. And when you say "did not tolerate," what do

19   you mean by that?

20   *A.* Well, the most recent records I received after Dr. Lewis

21   had proceeded with the spinal cord stimulator trial is that it

22   had to be removed fairly early, as it just -- it made her more

23   anxious and agitated. And, again, it wasn't likely to address

24   the kind of pain generators that I think the records and my

25   examination indicate. So she's, essentially, already proven

856

Lawrence Goldman, M.D. - Direct

1   nonresponsive to the technology, consistent with my

2   predictions.

3   Q.  And you mentioned you undertook an in-person examination of

4   Ms. Houston.  What did that entail?

5   A.  I saw her at my office and did a full physical examination

6   that was directed at her systems, as she outlined to me

7   verbally, as well as on her pain drawing.  So I looked at her

8   gait, I looked at her skin, her -- I checked her findings of

9   complex regional pain syndrome, in terms of sweating or hair

10  differences or nail differences, skin differences, temperature

11  difference, swelling.  She did have a little bit of swelling,

12  as I recall.  I could look at the record to be clear, to be

13  precise.  But I would expect a little bit of swelling around

14  the ankle, just in terms of the orthopedic injury she had.  She

15  had some coolness of the toes, but she did not have any of the

16  other findings of CRPS that we typically look for.  I checked

17  range of motion in the ankles bilaterally and in the knees.  I

18  checked her overall hip and lumbar function.  I -- we spent

19  sufficient time together for me to get a sense of her emotional

20  and cognitive overall presentation, checked vital signs, like

21  you would hopefully have whenever you see a doctor.

22  Q.  All right.  And I'm not sure that we've heard specific

23  testimony on this, and I think it may benefit the Court.  Do

24  you recall the specific range of motion in Ms. Houston's right

25  ankle when you examined her?

Lawrence Goldman, M.D. - Direct

1    A.  Well, having prepared for today's testimony, she had minus

2    5 degrees of active assist dorsiflexion in the foot.  And what

3    that means is -- it was somewhat gravity assisted -- but with

4    her seated and her foot almost flat on the ground, she would

5    bring her knee forward a little bit and bent the ankle.  It's

6    something we can all do in our chairs right now if you want.

7    And I checked -- and that was minus 5 degrees.  It didn't quite

8    come to neutral.  So getting that so it's flat would be very

9    helpful, but it's within a functional range of dorsiflexion.

10   And as I recall -- I'd have to double-check, but I think her

11   inversion was like 12 degrees, if I can look quickly --

12   Q.  Sorry to interrupt, Dr. Goldman.  I should say, you should

13   feel free to refer to your report if necessary to reflect --

14   refresh your recollection.  Just please let the group know when

15   you're doing so, so we all know what you're looking at.

16   A.  Okay.  I'm looking at my August 5, 2019, report, page 22,

17   an inversion was 12 degrees.  So if this is neutral, her

18   inversion was about 12 degrees and her -- the 12 degrees.  An

19   eversion was with 20 degrees.  So those, again, are functional

20   ranges, but not nearly as good as on her left ankle.

21   Q.  And so what implication, if any, does that range of motion

22   deficit have for the severity of Ms. Houston's impairment going

23   forward?

24   A.  Again, in the impairment range, it's -- impairment is

25   technically a quantified number, and there is lots of different

Lawrence Goldman, M.D. - Direct

1    ways to use it.  There is seven different editions, actually,

2    of the American Medical Association guides.  And except for the

3    first edition, I've helped teach all of them.  So the range of

4    motion impairment would be in the mild to moderate range.  The

5    overall functional impairment and disability would be in the

6    mild category.  What this means is she would have more problems

7    balancing on that leg; she would more problems on uneven

8    surfaces or slippery surfaces on that leg; it would probably

9    decrease her endurance tolerance for long walks or standing or

10   hiking.  But it was good enough that there was room for

11   improvement based on my palpating -- feeling how the joint

12   moved.  And in terms of getting stronger, it was good enough to

13   at least be able to resume or improve upon those activities to

14   a modest degree over the future, but not back to the degree

15   that she would have had were it not for the accident.

16   Q.  Thank you.  I'd like to switch gears a little bit and talk

17   about complex regional pain syndrome.  But I'd like to start

18   off with a general question, which is, in your experience as a

19   physiatrist, is it important to make an accurate diagnosis to

20   effectively manage a patient's condition?

21   A.  Yes.  It's somewhat common sense, and it's one of the

22   reasons Ms. Houston and most of us want to have our doctors

23   explain their diagnoses to them, because if you're not -- if

24   you're not able to make a medically probable diagnosis, you're

25   automatically in a 50 colon 50, or 50 percent, chance of being

Lawrence Goldman, M.D. - Direct

1    able to help the patient if you're not quite sure what you're

2    dealing with.  Because the human body only has so many symptoms

3    it can present for any given injury -- burning, stabbing,

4    aching, throbbing, coldness, et cetera.  And there is lots and

5    lots of different diagnoses or conditions that are both due to

6    external trauma, but as well as internal inflammation, that can

7    cause any of these symptoms.  And if you're not able to make a

8    very specific diagnosis, your ability to predict the benefits

9    versus risks of any treatment is highly compromise, if not

10   impossible.  So by definition, you're essentially experimenting

11   on the patient.

12   Q.  We've heard something mentioned in this case called

13   Budapest criteria, and I'm not sure that anybody has explained

14   for the Court what those are and what they do.  Could you

15   explain for the Court what the Budapest criteria are.

16   A.  The Budapest criteria are the clinical criteria that are

17   most commonly relied on, even now.  There have been some tweaks

18   to them.  And, again, I would have to look -- I know I quoted

19   it in one of my reports.  But they came out in the late 1990s

20   or early aughts.  And it was various numbers of the

21   International Pain Society and others, CRPS experts.  And it

22   upgraded the way that -- you have to meet a certain number of

23   symptomatic criteria in each category of vasomotor -- which is

24   kind of like blood flow -- sudomotor -- which tends to be more

25   sweating or skin resistance to electrical input -- trophic and

Lawrence Goldman, M.D. – Direct

1    color changes.  Trophic is skin or hair.  And you need to meet

2    a certain number of criteria to be considered in a medically

3    possible to medically probable CRPS diagnosis.  And then there

4    is also various criteria in each of those categories in terms

5    of clinical signs that you need to meet in order to make the

6    diagnosis more clinically probable.  So it's a combination of

7    an inventory of subjective symptoms and variables, subjective

8    to objective clinical findings on examination.  And that's the

9    basis, at least here in Colorado, that we tend to utilize to

10   determine if it makes sense to proceed with sympathetic blocks

11   or other testing.

12   Q.  And to what extent, if at all, did you review the records

13   in this case and conduct your in-person examination with an eye

14   towards identifying any of those criteria in Ms. Houston's

15   case?

16   A.  Well, once the diagnosis was raised, I just assume I need

17   to really scour the records several times to see how often

18   these various criteria or these symptoms or physical signs are

19   being documented, how consistently, because patients will tend

20   to vary on a day-to-day basis.  And this is how I set up the

21   CRPS center back in the '90s, so that even when patients were

22   not presenting with compelling physical evidence at the time --

23   on the day that they were at the clinic -- maybe they were

24   having a good day -- we would certainly weigh very heavily how

25   consistent the documentation of these criteria were.  Keeping

Lawrence Goldman, M.D. – Direct

1    in mind that when my center was in operation, it was even

2    before the Budapest criteria; but the criteria we actually came

3    up with at our center ended up being adopted by the Colorado

4    Division of Workers Compensation medical treatment guidelines,

5    as well as were incorporated to some degree in the Budapest

6    criteria.  So I did, you know, focus on those signs and

7    symptoms and would typically put them in bold font when I was

8    preparing my reports so I could see them very easily; but there

9    really weren't too many.  They were -- there was some coolness

10   noted and swelling; but, of course, you would see that with any

11   type of injury such as a broken ankle that didn't heal

12   completely that Ms. Houston had.  But she really didn't have

13   any of the other findings documented hardly at all, if at all;

14   and they weren't present on my examination of her either.

15   Q.   And you also discussed some reduced range of motion.  Is

16   reduced range of motion one of the things that you look for

17   under the Budapest criteria?

18   A.   Of course, but it's reduced range of motion that can't be

19   explained by any other more medically obvious injury.  In this

20   case, we have a pretty medically obvious injury.  Having seen

21   so many cases of CRPS, it's actually a diagnosis that I can

22   often -- between seeing the patient in the waiting room and

23   getting them back to my room, it's something I can pretty much

24   make pretty accurately within a few minutes.  And Ms. Houston

25   presented, certainly, with a foot -- a right foot that noted

Lawrence Goldman, M.D. – Direct

1    the residual of a right ankle fracture that had incompletely

2    healed, in terms of range of motion; but she did not have the

3    type of loss of range or motion or other signs that you would

4    typically see in CRPS, which tend to be much, much more severe.

5    Q.  And could you explain for us what a thermography exam is.

6    A.  Thermography is, essentially, if you will, a type of

7    infrared or very temperature-sensitive type of visualization

8    and photographing of the temperature -- the skin temperature on

9    the surface of the patient's body.  And it's much more

10   sensitive than, say, the infrared sights that one might use

11   with infrared binoculars to be able to see at night or infrared

12   scopes.  It can delineate within a -- you know, within a

13   point -- within decimals of a degree.  And you can correlate

14   that with different color schemes.  Typically red and orange is

15   much hotter or warmer; and purple, as you get to blue, it's

16   much colder, to deep violet.  And it gives us an idea about how

17   a patient's vasomotor, and to some degree sudomotor -- but

18   mostly vasomotor -- component of the autonomic nervous system

19   is affecting the patient's skin temperature.

20   Q.  And we were going to call up a thermography exam that was

21   completed in this case, but I understand that the photograph on

22   that are full-body scans, about which Ms. Houston is

23   understandably personally sensitive.  And so I just ask you,

24   Doctor, did you have an opportunity to review a thermography

25   exam completed for Ms. Houston; and if so, what conclusion did

Lawrence Goldman, M.D. - Direct

 1   you draw from it?

 2   *A.*  Yes, I did.  Again, one of the papers I helped author in

 3   the 1990s by Dr. Gulevich -- Steven Gulevich -- my neurology

 4   colleague, and Dr. Tim Conwell, my thermography colleague, were

 5   the primary authors, actually looked at these issues.  And I

 6   had been taught how to interpret the thermograms for the paper.

 7   It was generated through hundreds of patients we'd seen at the

 8   CRPS center.

 9          So I did look at Dr. Kane's -- and that's K-A-N-E --

10   thermogram interpretation and at the images.  And they were --

11   they were essentially symmetrical.  There was just a little bit

12   of coolness noted in the right foot.  It was mostly around

13   where the ankle -- the injury was, where you would expect to

14   see some decreased circulation.  There was good demarcation --

15   you like to see that there is more warmth in the center of the

16   limb, and it get cooler towards the outer part of the limb,

17   just like our toes tend to get colder before our foot does,

18   say, if you were at a cold football game or out in the snow or

19   whatever.  And it tends to be in a distribution that correlates

20   with the nerve distribution, what we call the dermatomes.  And

21   we saw that as well in Ms. Houston's thermogram.

22          And then the third component that we look at is what

23   is called a stress component.  And when it's done well -- and

24   it was in this case -- that involves putting the opposite

25   foot -- in this case, the left foot -- into some cool water, 50

864

Lawrence Goldman, M.D. - Direct

1    to 55 degrees.  And you can see on the thermogram -- on the

2    colored portions that the left toes do get colder, as you would

3    expect, because they're in cold water.  And when patients have

4    a full-blown what we call CRPS type 1, or used to be called

5    reflex sympathetic dystrophy, you will see a paradoxical

6    warming of the affected foot.  Typically, in normal human

7    beings, if you put one limb into cold water, the other one will

8    get colder, because the body is set up to shunt water if it

9    feels it is exposed to hypothermia, or freezing weather, it

10   wants to shunt blood away from your hands and from your feet,

11   towards your heart, your kidneys, your brain, because that's a

12   better survival strategy.  It will keep you alive longer.  And

13   it's a very atypical pattern which you will see in full-blown

14   and obvious CRPS, that, instead, it will warm up.  And most

15   people do not have enough autonomic and unconscious control of

16   their nervous system to will their limb to warm up.  It's a

17   very reliable and very sensitive and specific finding for CRPS,

18   and that was not seen in Ms. Houston.  She had a typical

19   physiological response to the stress.  So the thermogram was

20   essentially normal on all accounts.

21   Q.  And to what extent, if at all, is a thermography result by

22   itself indicative of a diagnosis of CRPS?

23   A.  It's a good -- a well done stress thermogram is a very

24   important piece of evidence that I weigh from a medical

25   perspective, if it's well done, heavily; but it's not what we

Lawrence Goldman, M.D. – Direct

1   call pathognomonic or -- it's not going to -- if you have an

2   abnormal thermography, that's not enough to declare CRPS.  And

3   if you have a normal one, that doesn't mean that the patient

4   doesn't have CRPS.  But based on the study that I was involved

5   in, the likelihood drops to less than 10 percent, from a

6   predicted value perspective.  So I would not make a diagnosis

7   solely on the basis of a thermogram.  What is most important is

8   how that correlates with other clinical findings, symptoms,

9   documentation, and oftentimes under studies, such as the triple

10  phase bone scan that had been recommended for Ms. Houston, but

11  she wasn't comfortable undergoing it.

12  Q.  Could you explain to the Court what a triple phase bone

13  scan is, and why it may or may not be helpful in diagnosing

14  CRPS?

15  A.  Well, I am glad to, because that was actually what my grand

16  rounds was about in 1985, I think, at Temple University.

17  Because that was one of the only tests we had for CRPS back

18  then, so it was big news at the time.

19          And a triple phase bone scan -- a bone scan is where

20  you inject a very tiny amount of usually technetium isotope.

21  And I know that Ms. Houston was not comfortable with this,

22  because she didn't want radiation in her body.  But it's

23  actually less radiation exposure than a chest X ray, as a point

24  of reference.  You don't need very much.

25          And if you have what we call osteoblastic -- or

Lawrence Goldman, M.D. - Direct

1   increased blood flow or bone formation -- it will light up a

2   fracture -- a stress fracture now, that's a basic bone scan, in

3   which you inject it, and you wait an hour to three hours, and

4   then take the pictures.  The triple phase looks at the two

5   initial phases, the injection phase and then the blood-flow

6   phase.  Because the blood-flow phase -- in certain cases of

7   CRPS you'll see increased blood flow, typically in an area --

8   in this case, in the foot -- that is distal or further away

9   from the injury.

10          So in this case, if the injury is in the ankle -- I'm

11  going to point to my wrist here.  If I put my foot up here,

12  it's going to screw everything up for everybody.  If the injury

13  is to the ankle, you find most of your bone findings in CRPS in

14  the joints distal to the ankle, out in the fingers.  So you're

15  looking for abnormal increased uptake primarily in the joints

16  distal to the injury, particularly in the second and the third

17  or static phases of the bone scan.

18          In a case where someone is not using their limb very

19  much, the whole limb may be -- actually have less uptake.  Or

20  in someone who has had a fracture or surgery, even after that

21  has healed, that fracture line will still light up for years

22  afterwards.  So you need to understand the clinical phase and

23  presentation of the patient in addition to just being able to

24  look at the pictures.

25  *Q.*  I'd like to shift gears, still within the CRPS realm, and

867

Lawrence Goldman, M.D. - Direct

1   ask, are you aware that Dr. Kenneth Lewis has diagnosed and

2   treated Ms. Houston for CRPS in this case?

3   A.  I am.  I read his deposition, his report.  It appears that

4   he's withdrawn that diagnosis as of the failed stimulator

5   trial.  But I am aware that up until that time, it was his

6   belief that she -- that that was the explanation for her pain.

7   Q.  And based on the review of the record that you've just

8   described, do you agree with Dr. Lewis' approach to CRPS?  And

9   please feel free to explain your answer.

10  A.  I understand Dr. Lewis' approach.  It's actually an

11  approach that we would take, actually, in the early 1980s.

12  Okay?  Like when I was in medical school -- actually, before

13  medical school.  Maybe in the 1970s, when we didn't have any

14  real good tests besides the sympathetic block; and that's now

15  been shown not to be a great test.

16        But Dr. Lewis essentially takes a diagnosis of

17  exclusion, that if you can't find out any other -- this is my

18  interpretation.  I assume he will speak for himself.  But my

19  interpretation of his records is he overly relying on the

20  patient's complaints of pain, and not necessarily in a very

21  specific or discerning fashion, and, essentially, is utilizing

22  the diagnosis as one way to rationalize the procedures the

23  patient is undergoing.  Because when you do a stimulator

24  implant or a sympathetic block, you have to have certain

25  diagnostic codes to go with it, or we're not reimbursed or not

868
Lawrence Goldman, M.D. – Direct

1   authorized.  But I would respectfully and strongly disagree.

2   Dr. Lewis' approach would essentially make almost every patient

3   I've ever seen with chronic pain a CRPS patient.  And,

4   fortunately, although I do have a lot of CRPS patients, most of

5   them don't carry that diagnosis.

6   Q.  And you mentioned sympathetic blocks and a stimulator

7   trial.  And my question to you is:  What in your opinion were

8   the treatments Ms. Houston received from Dr. Lewis as a result

9   of the CRPS diagnosis, and were those treatments appropriate?

10  A.  I think that performing the two sympathetic blocks was

11  reasonable.  The second one was a little borderline, since the

12  first one was so inconclusive.  But almost every patient with

13  chronic pain, particularly chronic pain in the limbs, is going

14  to have a sympathetic pain component.  That's present in almost

15  100 percent of any patient with chronic pain, critically, of

16  the limbs.  However, the other treatments, particularly the

17  stimulator trial, just were not indicated.  She did not meet

18  criteria at any time, in my -- you know, particularly,

19  objectively.  And I think Dr. Ellen Price's consultations and

20  those of other doctors who were looking at the objective

21  criteria support my opinion.  She didn't meet that criteria,

22  and it was not a reasonable thing to try.  Particularly, if

23  someone is that concerned about having a little bit of

24  technetium isotope in her body -- and I honor that concern.  If

25  my patients feel that way, I honor that.  But if they're not

869

Lawrence Goldman, M.D. - Direct

1   comfortable with that, they're not going to be comfortable with

2   having a lot of electrodes and batteries and stuff implanted in

3   their body like a bionic woman.

4   Q.  We heard during the testimony this week a phrase,

5   sympathetically mediated pain.  Can you explain what that is.

6   A.  Yes.  And it's important to clarify that there is a

7   component that would be considered more of an adjective versus

8   a noun, if I can be clear.  So the adjective is that there is

9   three parts to the autonomic nervous system:  There is the

10  somatic motor -- I consciously want to move my hand, I can move

11  it -- there is the somatic sensory -- I touch my hand, and I'm

12  conscious of that -- and then there is the autonomic -- or I

13  like to tell my patients automatic.  And that's the part of the

14  nervous system that controls all of this unconscious activity

15  that allows our bodies to stay alive, like body temperature and

16  heart rate and digestion and sweating.  If we were conscious of

17  those activities, we wouldn't be able to get anything else

18  done.

19          And the autonomic nervous system is divided into

20  sympathetic and parasympathetic nervous systems.  The

21  parasympathetic nervous system is the rest-and-relax and

22  rest-and-digest nervous system.  And the sympathetic is the

23  flight or fight.  Now, when anybody has pain that is there and

24  it's very significant, you're always going to get fight or

25  flight or sympathetic surge.  And if the pain stays present for

Lawrence Goldman, M.D. - Direct

1   many months, there is always going to be increased sympathetic

2   tone, unless the patient has learned techniques to decrease

3   that sympathetic tone and to increase their parasympathetic or

4   stress reduction ability.  So every patient, in my experience,

5   has a component of sympathetically mediated pain.

6          Now, when we say that sympathetically mediated pain is

7   the primary diagnosis, that means you've ruled out CRPS, you've

8   ruled out just about any other major reason for the ongoing

9   pain, the pain is in a very specific distribution that is

10  typically associated with a much colder limb and much higher

11  pain levels than what Ms. Houston presents with.  And those

12  patients typically will get close to 100 percent relief from

13  their sympathetic blocks, lasting six weeks or longer, with

14  improved function that allows them ultimately to substantially

15  improve that pain.  So Ms. Houston does not meet a diagnostic

16  criteria for primary sympathetically mediated pain as a noun.

17  However, she does have, as I put in my report, a partially

18  sympathetically mediated pain component to her orthopedic

19  injury, just like just about every other patient I've ever

20  treated with chronic orthopedic or other injuries has.

21  Q.  Thank you.  And I just I would like to be clear about one

22  thing -- well, two things, really.  The first is, based on your

23  review of the records and your in-person examination of

24  Ms. Houston, would further lumbar sympathetic block injections

25  be a reasonable and necessary treatment for Ms. Houston in the

Lawrence Goldman, M.D. - Direct

1    future?

2    *A.*  No.

3    *Q.*  And the second thing:  Based on that same review, would

4    further spinal cord stimulator trials be a reasonable or

5    necessary treatment for Ms. Houston in the future?

6    *A.*  No.

7    *Q.*  And how about a spinal cord stimulator implant -- permanent

8    implant?

9    *A.*  That would be even worse.

10   *Q.*  Thank you, Doctor.

11          I'd like to move on from CRPS and other neuropathic

12   pain and talk about Ms. Houston's prognosis going forward and

13   some of your recommendations.

14          You mentioned strength rehabilitation.  Could you

15   comment for us on what you believe Ms. Houston needs for the

16   future?

17   *A.*  Well, she's, I think, doing the best she can within her

18   preferences in terms of treatment, keeping in mind that COVID

19   has gotten in the way of all of my patients' treatments right

20   now.  But I still think other ongoing treatment needs to be

21   much more progressive and aggressive in a very slow fashion.

22   I'm talking about grass coming up through the sidewalk, here;

23   I'm not talking about jackhammer stuff.  Okay?  In terms of

24   focusing more on function and pain tolerances and improving

25   balance and strength that will also help the osteopenia -- or

872

Lawrence Goldman, M.D. – Direct

1    loss of bone density -- as well as sarcopenia -- loss of muscle

2    density -- that has occurred in the limb.  And I made

3    suggestions in terms of periodic physical therapy, where the

4    point of the physical therapy isn't to have the patient

5    necessarily feel better at the time, but is to help them manage

6    their pain levels within, say, two points.  On a scale of one

7    to ten, if her pain levels are averaging a three or four, you

8    let them go up to a six or so and then have them come back

9    down.  And you try to increase the amount of time you can spend

10   at those levels, until the nervous system is retrained to

11   tolerate it better and to provide a supervised but much more

12   functional oriented type of treatment, exercises that

13   Ms. Houston can practice on her own or perhaps at a gym, once

14   they become safer to go to.  She may need a little bit of

15   limited equipment.  And then if Ms. Houston comes back every

16   week or every few months, oftentimes after she's mastered those

17   tasks, to have her program upgraded.

18          You can't really -- with a long-term chronic pain or

19   chronic orthopedic injury like this, you can't just, like, give

20   it all two or three times a week, all at once over a few

21   months.  You're not -- the body doesn't heal that quickly, and

22   you can only provide so much input into the body, based on

23   basic exercise physiology principles, for it to gain strength.

24   And at a certain point you have to back off and let the body

25   integrate whatever strength training it has and regain a little

Lawrence Goldman, M.D. - Direct

1   bit of mobility.  Because as the limbs get stronger, they're

2   also going to lose a little bit of range of motion.  And then

3   you have to go -- you have to go back and forth between phases

4   of strengthening and loss of range of motion, with range of

5   motion, a little bit of loss of strength, and you go back and

6   forth generally every one to three months over a year or two.

7   So that's the type of program that has worked best for my

8   patients with this type of chronic pain, and many types of

9   chronic pain, although the program has to be customized for

10  each patient.

11  Q.  And would any of the treatments that you envision for

12  Ms. Houston be aimed at increased functioning for her knee, or

13  is this all in the ankle?

14  A.  It is aimed, actually, for the whole body, but primarily

15  the ankle and secondarily the knee.  The better the ankle gets,

16  the better the knee gets.  But we also want to have optimal hip

17  range of motion and lumbar core strength so that she's as

18  stable as possible under any circumstance.  And I also

19  recommended some biofeedback and, again, some of the stress

20  management approaches that would help improve her

21  parasympathetic tone and decrease her stress response.

22  Q.  And you mentioned the frequency of physical therapy visits.

23  How, if at all, would the frequency of those physical therapy

24  visits be influenced by, A, their effectiveness, and, B,

25  Ms. Houston's age, as she progresses in her life?

Lawrence Goldman, M.D. - Direct

1    A.  Well, all treatment, at least that I'm recommending as a

2    medical medicine specialist, needs to be correlated with if not

3    directly linked to some functional improvement.  Again,

4    oftentimes at this stage in a patient's recovery, they will

5    notice functional improvement before pain levels come down, and

6    not the other way around.  And it's not uncommon for function

7    to improve somewhat, but pain to go up a little bit, as well,

8    and then go back and forth, as I discussed.

9         When we get older, it does -- you need more recovery

10   time, which is why just trying to give all of the treatment and

11   do all of the strengthening at once just doesn't work.  Even

12   with young athletes -- and I didn't comment earlier that I do a

13   lot of sports medicine, in fact, mostly with endurance

14   athletes.  You can't just give them constant strengthening or

15   keep increasing their endurance.  You have to have recovery

16   time, because the body actually gets stronger during the

17   recovery, or integrative periods, not when you're doing the

18   exercise themselves, which are sort of breaking the body down a

19   little bit.  And you need to allow a little bit more recovery

20   time in between the initial therapy sessions and the follow-up

21   therapy sessions so that you don't overtrain Ms. Houston.

22   Q.  This is perhaps an obvious question, but I'm not sure that

23   anyone has testified to it directly.  Regardless of any injury

24   or traumatic event, to what extent does physical functioning

25   increase or decrease with age?

Lawrence Goldman, M.D. - Direct

 1   *A.*  Well, sadly, as we get older, the name of the game is to

 2   decrease -- is to slow down the decrease.  Now, if you're very

 3   deconditioned and/or, you know, very sedentary or -- you will

 4   see a big jump -- and I've had patients who actually exceeded

 5   their pre-injury status, at least for a while, because they

 6   were so deconditioned before their injury or sedentary.  But as

 7   we get older you're going to expect to see a certain amount of

 8   decrement or decrease in function in all of us.  We want it to

 9   be as slow as possible.

10          But when we look at someone in terms of predicting

11   their disability or impairment, it needs to be compared to what

12   one would have anticipated even if an accident or a trauma did

13   not occur and compare it to that baseline in terms of what we

14   would expect as of, say, September 25, 2020.  Again, if I have

15   really deconditioned patients, I can get them better than they

16   were before their trauma if, you know -- like, five years ago.

17   But most of the time it's very hard to get any of us better

18   than we were ten years ago.  Not that I wouldn't try, but it's

19   just really hard.

20   *Q.*  So I'd like to ask you a couple questions about a life care

21   plan that was prepared in this case.  Were you able to review a

22   life care plan that was prepared on Ms. Houston's behalf?

23   *A.*  Yes.  There was a life care plan by, I think, Ms. Mazone --

24   or Mazone and Associates; and then there was a supplemental

25   addendum to that life care plan that I saw and reviewed.

Lawrence Goldman, M.D. - Direct

1    *Q.* And just for your information, there was another supplement

2    that we received this week, which you may or may not hear about

3    on cross-examination.  What is your -- what's your overall

4    assessment of Ms. Mazone's life care plan in this case?

5             *MR. OGBORN:* Objection.  Foundation.

6             *THE COURT:* Overruled.

7             *THE WITNESS:* Having helped create life care plans for

8    many of my patients and consulted on them and reviewed them

9    frequently in my career, it is a worst-case scenario life care

10   plan that predicts that the patient will require the most

11   treatment possible, sometimes including treatments we've

12   already discussed that I don't think were ever medically

13   reasonable or necessary, such as stimulator implant.  It tends

14   to, in my opinion, overutilize treatment in terms of

15   recommending therapy every year for the rest of her life.  I

16   don't think that's going to be necessary for this type of

17   injury.  So it was an inflated life care plan, but it's

18   something -- I mean, there is certainly kernels of accuracy in

19   there, things that I agreed with.  And it's not uncommon in my

20   experience for a life care plan that is being submitted as part

21   of this type of process.  It's just not accurate.  That's all.

22   *BY MR. SCARPATO:*

23   *Q.* I didn't mean to step on your answer.  Was there anything

24   else that you needed to add?

25   *A.* No, that's it.  Sorry.

877

Lawrence Goldman, M.D. – Direct

1   Q.  You mentioned that there was a line item in that life care

2   plan for physical therapy.  And we heard this week -- I'm sure

3   Mr. Ogborn will correct me if I'm summarizing this incorrectly.

4   But we heard this week that the original recommendation of

5   three physical therapy appointments a week for the rest of

6   Ms. Houston's life has been reduced to, I believe, one or two

7   visits a month for the rest of Ms. Houston's life; and I'm

8   wondering what your reaction is to that suggestion.

9   A.  Well, I think it's a move in a more rational direction.

10  It's still not a rational way to provide therapy, and it's

11  still recommending -- if therapy is going to be helpful, you're

12  not going to need nearly that much treatment.  What I typically

13  see is patients benefit in a kind of tapered fashion somewhere

14  between one to three years following conclusion of a process

15  such as this.  Then they can focus more on their

16  rehabilitation.  That initially they may benefit, again, from

17  three -- even possibly six -- usually three sessions to upgrade

18  her program, and then have the patient come back a week or two

19  later for one session, to see if she's doing it correctly, then

20  come back a month later or six weeks later.  And then as you

21  get towards the second -- and then you repeat that every three

22  months.  But as you get towards the second year, it's usually

23  maybe two or three sessions spread out over a few months and

24  then -- and then, again, repeated six months later.  And then

25  the third year, a handful of sessions.  Because the point of

Lawrence Goldman, M.D. – Direct

 1   therapy is to help teach.

 2           Rehabilitation is primarily an educational endeavor,

 3   when you come down to it.  And it's to teach the patient how to

 4   become more self-sufficient and progress their own program and

 5   be more understanding of their body and what is entailed with

 6   the therapy.  It's not meant to make patients dependent on

 7   treatment and to focus just purely on symptomatic relief -- not

 8   that that's not important.  But, again, the paradox of treating

 9   patients with chronic pain is often, function gets better

10   before symptoms do, not vice versa.  That's the opposite of

11   what we see with acute and subacute injuries.  And acute and

12   subacute injuries in the first few months, or right after

13   surgery, people will often symptomatically get better before

14   they get functionally better, but not when you're dealing with

15   a complex biopsychosocial chronic pain condition, such as the

16   case here.

17   Q.  There is also a suggestion in the life care plan that there

18   would need to be a yearly budget for a home health aide.  And

19   perhaps we heard a revision that maybe that should start ten

20   years from now, so that's not entirely clear to me at this

21   point.  Based on your review and knowledge of this case, do you

22   believe a home health aide would be necessary, within a

23   reasonable degree of certainty, for Ms. Houston in the future?

24   A.  I think that is highly unlikely that that will ever meet

25   medically reasonable and necessary criteria, at least with

Lawrence Goldman, M.D. - Direct

1    respect to this accident.  We're just not talking about the

2    kinds of health conditions, at least that I evaluate and treat,

3    in which my patients do require that.  Those are much more

4    serious and often diffuse injuries.  And, in fact, I think the

5    more Ms. Houston needs to do on her own, in a reasonable

6    graduated sense, the more that that actually helps her heal.

7    Q.   And Ms. Mazone's supplemental life care plan also includes

8    a suggestion for right ankle -- I'm going to try to get the

9    word right -- a right ankle arthrodesis or a right ankle

10   arthroplasty.  And I'll inform you that Dr. Cota testified

11   earlier this week that those surgeries are potential treatments

12   for post-traumatic arthritis.  In your experience as a

13   physiatrist, what, if any, thoughts do you have about whether

14   those surgeries are indicated?

15           MR. OGBORN:  Objection.  Foundation.

16           THE COURT:  Overruled.

17           THE WITNESS:  May I go?  Things cut out.  May I

18   answer?

19           THE COURT:  You may answer the question.

20           THE WITNESS:  Okay.  Those fall into a worst-case

21   scenario medical possibility but not probability.  And I think

22   we need to do everything possible -- and I think the

23   rehabilitation plan I made in good faith -- or recommended --

24   will accomplish that.

25           Right now, again, reviewing Dr. Cota's deposition

Lawrence Goldman, M.D. - Direct

1   testimony and reports from before, that is a treatment for

2   post-traumatic arthritis.  But we're talking about severe

3   levels of post-traumatic arthritis, someone who has much more

4   pain and much less function than not only Ms. Houston has now

5   but I would expect her to have.  It's a last -- it's a

6   last-ditch approach that will probably not help her pain that

7   much and worsen her function, because when you do that kind of

8   fusion, you -- if you're talking about the arthrodesis --

9   that's a triple arthrodesis diffusion -- you lose all of your

10  range of motion.  You have -- the foot is in just one position.

11  And that creates problems for the rest of the body and will

12  certainly make her less functional than she is now.  And you

13  may alleviate some of her ankle pain; but having rehabilitated

14  many, many patients who have had this surgery, it's -- the

15  surgeons themselves are not very enthused about this, in

16  general, because they -- they start having more knee and back

17  problems, sacroiliac regional problems.  It's a poor choice.

18          Ankle arthroplasty is still an evolving technology.

19  And it's very tricky, because you need to have exceptional

20  tendon and muscle strength and coordination around the ankle

21  for that to work.  And a replacement joint is never as good as

22  the joint that you were born with, because you lose what we

23  call the gamma effort -- but you lose your innervation, you

24  lose your sense of where the joint is in space when you close

25  your eyes, so your balance isn't as good.

Lawrence Goldman, M.D. – Direct

1           So in my experience, with the type of X rays that I

2   reviewed and the recs or reports I reviewed, and my examination

3   of the patient, those recommendations are a worst-case

4   medically possible scenario that I think is highly unlikely to

5   be necessary in the long term.

6   *BY MR. SCARPATO:*

7   *Q.*  Thank you, Doctor.  And you mentioned Ms. Houston's recent

8   functioning.  Were you able to review the records from her

9   recent PT sessions that she's had in the last few months?

10  *A.*  I think so.  Yes.

11  *Q.*  And from your review of those records, what do they

12  indicate about her recent pain scores and her prognosis in

13  future PT sessions?

14  *A.*  Well, the pain scores are stabilizing now to three slash

15  ten on a scale of one to ten.  And how I define that is, zero

16  is no pain; one to two out of ten is typically a temporary

17  distracting type of pain; three to four is more consistently

18  distracting, but typically doesn't prevent most activities;

19  when you get up to nine or ten, you're in the suicidal range

20  or -- childbirth without anesthesia, or kidney stones.

21          So compared to when I saw Ms. Houston over a year ago,

22  her pain levels have come down from a five -- four to five

23  level, stabilizing to a three -- three to four level.  Not so

24  sure that has to do with the therapy she's had versus the

25  passage of time; but it's a good sign and supports the

Lawrence Goldman, M.D. - Direct

1    prognosis that I'm making in this case.

2    Q.  So I'd like to finish up on our last topic by going through

3    some of the individual recommendations that you've made for

4    Ms. Houston's future care.  And my first question for you on

5    that topic is, were you able to discuss these recommendations

6    with Ms. Houston during your in-person examination?  And if so,

7    how did she react?

8    A.  I did, at least the recommendations in my first report.

9    I've added to them somewhat since then, so I couldn't discuss

10   those with her.  But Ms. Houston had just started seeing

11   Dr. Ellen Price, who I've already established is a colleague

12   and someone I actually helped train; and we were actually both

13   very encouraged and excited by that movement towards what I

14   thought would be a more functional and high-quality physical

15   medicine rehabilitation approach.

16   Q.  I'm sorry to interrupt.  When you say "we," who are you

17   referring to?

18   A.  Ms. Houston and I.

19   Q.  Thank you.  Please continue.

20   A.  And so I did discuss the recommendations I made in that

21   first report, in terms of, you know, becoming more activated

22   and taking a more holistic but active mind-body approach.

23   There is active and passive mind-body approaches.  I wanted her

24   to be more active, and Ms. Houston seemed enthused along those

25   lines.

883

Lawrence Goldman, M.D. - Direct

1   *Q.*  Did Ms. Houston strike you as a doer, in your interview

2   with her?

3   *A.*  As a doer, as compared to be very passive?

4   *Q.*  Yes.

5   *A.*  Is that -- am I clarifying?

6            She had components of both.  I -- she had -- she

7   seemed, in terms of her languaging and her presentation when we

8   discussed her treatment and her response to pain, she tended

9   more towards passive than active approaches; and I think that's

10  borne out in terms of how her treatment evolved.  But I'm still

11  optimistic that she'll become more activated once we get

12  through this process.

13  *Q.*  Was that because of her enthusiasm in response to your

14  recommendations for future treatment?

15  *A.*  In terms of the prognosis, or my impression of her just

16  being a doer versus a non-doer?

17  *Q.*  In terms of your prognosis.

18  *A.*  Yes.  That contributed to my prognosis.  But my prognosis

19  is heavily predicated just on my evaluating and treating so

20  many patients with not completely healing or chronic pain

21  following these type of ankle fractures, knee fractures.

22           Most people, again, particularly as they get more

23  activated and get moving on in their lives, they don't become

24  perfect.  It's not like everything disappears.  I'm not talking

25  about any kind of malingering or anything like that at all.

Lawrence Goldman, M.D. - Direct

 1   I'm just saying that once they can focus more on the

 2   rehabilitation and not the disability issues at hand -- that

 3   are necessitated by the process -- they get stronger.  If they

 4   can stay on the program, the majority -- vast majority of the

 5   patients I've been able to treat or follow do better.

 6   *Q.*  And I'd like to discuss those line items now, but one quick

 7   preliminary question, which is, Doctor, are you able to hear

 8   me?  Am I speaking up enough?

 9   *A.*  You are.  Yes.

10   *Q.*  I want to be sure -- thank you.  We've been dealing with

11   technological issues all week, so I appreciate that.

12          So let's break down some of those line items and the

13   associated costs which you've recommended to Ms. Houston in

14   this case.

15          To what extent, if at all, did you recommend physical

16   therapy sessions going forward; and what frequency of

17   recommendation -- of sessions would that be; and what is the

18   estimate for that cost?

19   *A.*  If I may consult with page 27 of my original report, just

20   so I don't misspeak.

21   *Q.*  Please.

22   *A.*  Thank you.  I recommended 15 sessions at the outset.

23   That's kind of a standard maintenance plan over a two-year time

24   frame that we often apply as a baseline in our field.  And I

25   recommended that over two years.  And, again, kind of in a one

Lawrence Goldman, M.D. - Direct

1    to three sessions at first to learn some new skills, then the

2    patient has to go do her homework, and then that may take a

3    week, or oftentimes one to three months, come back, have

4    another one to two sessions.  So that was estimated in a charge

5    range of $3,000, keeping in mind that it can vary from

6    community to community and in terms of -- and payment

7    mechanisms, and all that.

8    Q.  And to what extent, if at all, did you recommend pool

9    therapy and aerobic and strength training?

10   A.  I thought that pool therapy -- again, double-checking --

11   but pool therapy is a good what we call active recovery

12   technique.  So it shouldn't be the primary focus, because if

13   one makes pool therapy their primary focus, they get very

14   functional in water-based tasks, but not necessarily land-based

15   tasks.  But it's a great way in between more intense sessions

16   of rehabilitation or therapeutic exercise to keep the body

17   moving and improve their aerobic capacity, without stressing

18   the body and the ankle as much.  And it also helps with

19   balance, to some degree.  So I had suggested access to a

20   recreational center, which, again, at this point may need to be

21   deferred for -- it depends.  We have some recreational centers

22   open here in Denver now.  The virus -- the COVID virus doesn't

23   propagate through water.  The main issue is being safe going in

24   and out of the facility and not having too many people in the

25   facility.

Lawrence Goldman, M.D. - Direct

1      But, ultimately, having access to a recreational

2  center or a pool for the next couple of years I thought was a

3  good idea.  It just depends -- most centers or health clubs,

4  it's anywhere from 500 to $1,000 a year.  I averaged at 750 a

5  year.  And she certainly needs to start working more on her

6  aerobic capacity, and the pool is one place to start.  Because

7  if you don't have strong heart and lungs, you're not going to

8  get optimal blood flow to allow your muscles -- you know, to

9  allow yourself to manage the symptoms and pain; and you're

10  also -- won't have as good of benefit in terms of your strength

11  training.

12  Q.  Thank you.  And to what extent, if at all, did you

13  recommend an electrodiagnostic reevaluation for superficial

14  peroneal neuritis?  And I think you may need to define some of

15  those terms for us.

16  A.  Well, I thought that at the time.  Okay?  This was a year

17  ago.  I don't think she really needs that now, now that we're

18  seeing how she's responded to additional treatment; so it may

19  be a moot point.  But I will expound further, if you'd like.

20  Q.  I'll -- just very briefly, if you would.

21  A.  All right.

22  Q.  So we understand what you're talking about.

23  A.  When I saw the patient, if she did have any type of

24  sympathetically mediated pain or CRPS, in this case it would be

25  what we call CRPS type 2, due to what I thought the most likely

887

Lawrence Goldman, M.D. - Direct

1    culprit would have been an irritation or injury to the

2    superficial peroneal nerve -- which is a nerve that goes across

3    the top of the foot.  In this case it would be sort of like the

4    radial nerve in our hand.  Okay?

5            And an electrodiagnostic examination -- which she's

6    undergone -- is a kind of test that I'm trained in doing, that

7    I train doctors in, and I've done thousands of -- that tests

8    the nerves to see if there is any deficits there.  So I had

9    recommended that.  And then the typical cost for a limited

10   exam -- not cost.  I should say charge.  The cost is less --

11   but the charge would be in the $750 range.  But I don't think

12   that particular recommendation is necessary at this point,

13   based on how her situation has evolved over the last year.

14   Q.  And to what extent, if at all, would you recommend an

15   increase in her dosage of gabapentin or Cymbalta?

16   A.  I thought that those were also things that could be looked

17   at in terms of further improving her mood or pain threshold and

18   her sleep quality -- sleep architecture.  It needs to be

19   titrated.  And gabapentin needs to be titrated slowly.  But I

20   thought there was an opportunity for some further symptomatic

21   improvement along those lines that would be a lot less risky

22   than, like, a spinal stimulator implant.

23   Q.  When you say "titrated," what do you mean by that?

24   A.  You need to move the dose up and down slowly and in small

25   increments when you're dealing with gabapentin, particularly in

Lawrence Goldman, M.D. - Direct

1   older people.

2   *Q.*  And --

3   *A.*  You may need -- just to clarify, you may need -- you may go

4   to a doctor, and he'll give you medicine, and he'll say, check

5   in with me in a month, or whatever, or we'll see how you are

6   doing in three months.  With this, you may need to see the

7   patient once a week or every few weeks.

8   *Q.*  And to what extent, if at all, did you make a

9   recommendation for lifetime access to orthotic insert

10  revisions?  And if so, what was your estimated cost for that?

11  *A.*  Well, I was utilizing a vendor that is highly advertised,

12  but that I've used with my patients.  And I have no

13  relationship with, except I bought orthotics from them, as

14  well -- full disclosure -- but I paid for them.  And it's Good

15  Feet, because you do get a lifetime guarantee.

16        Orthotics or foot inserts should be looked at like a

17  brace or braces for the teeth.  Where people go wrong with them

18  is, they tend to get one set, and they work or they don't work,

19  and they just stay with it.  If you're making progress with

20  your rehabilitation, the foot muscles are going to wake up

21  more, and the foot is going to change in its conformation, in

22  its geometry.  So most people actually need to have their

23  orthotics advanced and changed sometimes every month, every few

24  months for the first year or two.  And that's very expensive if

25  you're just doing customized casting of the foot every time,

889

Lawrence Goldman, M.D. - Direct

 1   and it doesn't work as well.  So I recommended access to the

 2   Good Feet program.  That's what I use with my patients, and it

 3   just works a whole lot better.  And, ultimately, you get the

 4   patient -- hopefully, they get enough foot strength that they

 5   can walk in their bare feet much better.  I don't think,

 6   necessarily, that's going to happen with Ms. Houston.  But the

 7   idea is to keep progressing the foot, just like you would if

 8   you were putting braces on an adolescent.

 9   Q.  What is your estimated cost for that Good Feet

10   subscription?

11   A.  Though -- it depends -- if she wears slippers a lot -- I

12   had estimated -- you tend to get an activator or a much firmer

13   insert that patients wear for about a half hour in the morning

14   before they put a sock or insert on.  And if you get those two

15   different inserts, it's usually around $900.  If she wears

16   slippers a lot, that could go up by another $200; but it's a

17   one-time cost.

18   Q.  And to what extent, if at all, did you recommend that

19   Ms. Houston try different types of pedals for her bicycle?  And

20   if you did make that recommendation, what's your estimated

21   cost?

22   A.  Well, I recommended that she -- in order to ride bikes, she

23   needs a pedal with more what we call float.  And that means you

24   have more -- you -- you're not as locked in.  She needs

25   float -- actually, her foot is in a good position to ride

Lawrence Goldman, M.D. - Direct

1    bikes.  It's a little bit toed down; and that's good, all

2    things considered.  And I think I recommended Speedplay has

3    some of the most float.  You can also get other types of pedals

4    that are pretty close.  You can get Look and Shimano pedals

5    that are pretty close in time.  And those are generally --

6    unless she's starting to race and wants a carbon pair, titanium

7    pair, they're about $130.

8    Q.  And to what extent, if at all, did you recommend

9    Ms. Houston undergo acupuncture sessions?  And if you did, what

10   is the estimated cost?

11   A.  It was something that Dr. Ellen Price was discussing.  And

12   Ms. Houston had some aspects of her presentation that in my

13   experience may have counteract -- may counteract how well

14   acupuncture would work; but I provided the benefit of the doubt

15   and suggested that she be given a trial.  I need to look

16   exactly how many sessions.  But I think that -- I wasn't

17   opposed to a trial.  It's fairly low risk.

18          In general, when I recommend acupuncture, I recommend

19   that it be supplemented by a more active type of mind-body

20   approach.  In this case, tai chi.  I don't want to get too

21   woo-woo here.  But tai chi has been shown in fairly charge

22   studies to improve balance, particularly in those of us who are

23   getting older, and to improve strength.  And it's an ideal

24   approach that would actually augment and improve the outcome

25   from the acupuncture, because it's working on similar systems

Lawrence Goldman, M.D. - Direct

1    of the nervous system and the musculoskeletal system.  So I

2    very rarely recommend a passive type of treatment, such as

3    injections or medicines or, in this case, acupuncture, without

4    it being augmented by a more active functionally specific type

5    of approach.

6    Q.  And the next couple of line items do have to do with

7    cognitive therapy.  And so I'd like to ask, first, a

8    foundational question, which is, how in your practice have you

9    gained experience with these sorts of treatments?

10   A.  Well, I was trained in them in terms of -- again, when

11   you're a physical medicine rehabilitation specialist, you have

12   to need to have enough knowledge about the techniques all of

13   your team members are using in order to provide overall

14   guidance and also have a sense of equality and efficacy.  So

15   I've been trained and rotated with psychologists and

16   psychiatrists, not only since medical school, but especially in

17   almost all of my rotations at Temple University Hospital.  And

18   I've been working with such specialists, and I utilize those

19   techniques with my patients.  I tend to use cognitive

20   behavioral therapy; or if they're more meditatively minded,

21   I'll use mindfulness cognitive behavioral therapy, as well as

22   behavior modification techniques.  I've had specific training

23   from the national institutes of health and behavior

24   modification, actually, when I was in high school.  So it's

25   part and parcel -- emotional and stress management is part and

892

Lawrence Goldman, M.D. - Direct

 1    parcel of almost every patient I take -- patient care plan that

 2    I provide.

 3    Q.   Thank you.   And with that explanation, to what extent did

 4    you recommend cognitive behavioral therapy sessions?   And if

 5    you did make that recommendation, what is your estimated cost

 6    for it?

 7    A.   Well, I'm thinking -- if I'm looking down at my report --

 8    and I'm thinking that may have come in my addendum report, to

 9    be specific.   So may I just double-check that?

10    Q.   Yes.

11    A.   If I had to guess, I would probably say, give it go with at

12    least ten sessions -- six to ten sessions, and utilize that as

13    a basis to see if we're starting to see what we call

14    transformation or a cognitive shift, in which the patient

15    becomes less identified with their pain and diagnosis and less

16    reactive to it and can better even -- focus on the functional

17    rehabilitation that I've been talking about.   And if I had --

18    if I said ten sessions, it's -- it would probably be in the

19    $2,000 or so range.   But I'm just looking at my October 22

20    report, where I think I might have some of these.

21          Yeah.   I said ten cognitive behavioral, fifteen

22    acupuncture sessions.   $1,000 for the acupuncture, and about

23    $2,000 for the cognitive.

24    Q.   And to what extent, if at all, did you recommend EMDR

25    sessions; and if you did, what is the estimated cost for that?

Lawrence Goldman, M.D. - Direct

1    *A.*  EMDR is a type -- a sophisticated biofeedback mechanism

2    that actually looks at rapid eye movements and is used as a

3    desensitization technique for post-traumatic stress, which is

4    one of the issues for Ms. Houston.  And I thought up to ten

5    sessions -- which, again, would be in the $2,000 range -- was

6    reasonable to attend.

7    *Q.*  And to what extent, if at all, did you recommend follow-up

8    visits with Ms. Houston's rehabilitation doctor; and if you did

9    make that recommendation, what is the estimated cost?

10   *A.*  Most likely -- you know, if Dr. Price was doing the

11   acupuncture -- Ellen Price -- then she would be seeing

12   Dr. Price probably weekly for that time frame, but that's

13   included in the acupuncture cost.  Otherwise, she'd most likely

14   be following up with Dr. Ellen Price anywhere from one to three

15   months, to six months, depending on how she was progressing

16   over the coming years.  I estimated up to $3,000 for those

17   follow-ups.

18   *Q.*  And was that -- was that recommendation time limited at

19   all?  Like, would there have been a passage of time by which

20   those visits in your view would no longer be necessary?

21   *A.*  I estimated -- typically, three -- two to three years is

22   sufficient; but I allowed for up to five years.

23   *Q.*  And to what extent, if at all, did you recommend

24   Ms. Houston undergo a triple phase bone scan of the sort that

25   we had discussed earlier today with regard to CRPS?

Lawrence Goldman, M.D. - Direct

1   *A.*  Well, it was being raised in the records at the time that I

2   proposed this addendum in October of last year.  I thought that

3   was perfectly reasonable.  She had not had the thermogram yet.

4   And so at that time, it was made in the context of her not

5   having any objective confirmatory tests for CRPS; so I

6   supported it at the time.  I don't think it's necessary now.

7   I'm sure it will be hot where the ankle is broken; it will

8   probably be hot over the knee; it's very unlikely to be

9   positive in the rest of the foot.

10  *Q.*  And to what extent, if at all did, you make an allowance

11  for a lifetime need for gabapentin in your recommendations; and

12  if you did, what was your estimated cost for that treatment?

13  *A.*  I did allow for it, or something equivalent; and I allowed

14  $6,000.  It's a generic.  It's one of the more -- again, it's

15  probably the safest long-term medicine you can put a patient

16  with pain or for sleep or other disorders on.  It spares the

17  liver, which almost no other medicines do.  And so I allowed I

18  think another $6,000 for that.

19  *Q.*  So other than -- so in addition to gabapentin -- if for

20  whatever reason Ms. Houston is having trouble with side effects

21  from gabapentin, are there other medications that you believe

22  could be substituted for similar treatment and cost?

23  *A.*  Yes.  The closest one is pregabalin, which is a precursor

24  of gabapentin.  And that tends to have a bit more predictable

25  side effect profile as you increase the dose.  It costs maybe a

Lawrence Goldman, M.D. - Direct

1    bit more.  If you moved -- I'm not quite sure when it goes into

2    a full generic.  I haven't investigated that yet.  That might

3    add a few thousand dollars on to it in terms of her overall

4    lifetime, you know, to the degree we know what is going to

5    happen in our lifetime with healthcare.  But that would be a

6    good secondary medication to fall back on.

7    Q.  And if Ms. Houston is taking I think it's 1,800 milligrams

8    of gabapentin per day, in your experience with pain management,

9    is that a high dose, a low dose, something in between?  How

10   high of a dose is that?

11   A.  That is a pretty classic in between, slightly high dose.

12   Typically, when you're dealing with significant muscle,

13   fibromyalgia symptoms, you tend to need to be at least in the

14   900 to 1,200 milligrams and often higher.  When you're dealing

15   with any other, you know, increased pain, 1,800 is the typical

16   threshold.  With my patients who have confirmed full-blown

17   CRPS, I've had them on 2,400 to 3,600 a day.

18   Q.  And other than as you've testified today, would you make

19   any other changes to your recommendations that you've made in

20   your reports and as we've discussed this morning for

21   Ms. Houston's treatment going forward?

22   A.  I had an -- I discussed in terms of the last notes I

23   received from Dr. Ellen Price, who had suggested Botox

24   injections in the foot.  I'm not sure Ms. Houston would

25   tolerate that, but it's not an unreasonable idea, if she's

Lawrence Goldman, M.D. – Direct

1   having a lot of foot muscle spasm.  But it really needs to be

2   combined with the orthotic -- the orthotic prescriptions I

3   suggested.  It should allow progression of the orthotics and an

4   upgrade of her foot and therapeutic exercise.  So I think I in

5   my last note thought that a trying of those two sets of

6   injections would be reasonable.  And that would add some

7   additional cost on top of the I think $30,000 I originally

8   estimated.

9   Q.  Are you able to estimate at all the cost that would be

10  added for the Botox treatment that you've discussed?

11  A.  Well, we've got to deal with charges, as you know, not

12  costs.  And Botox can be expensive.  It is probably going to

13  add another $5,000 or so.  So I think we should amend my

14  testimony up towards the 35,000 or so dollar range.

15  Q.  So just to be clear, is it your testimony that the

16  reasonable amount for future necessary treatments for

17  Ms. Houston's condition is in the range of $35,000?

18  A.  I'd say 35,000 plus or minus $5,000.  There is so many

19  variables going on; but I think that's a good, safe range to

20  look at, for someone who has an incompletely healed fractured

21  ankle.

22  Q.  Are these treatments designed to increase Ms. Houston's

23  level of physical activity and function, or are they designed

24  for something else?

25  A.  They're meant to improve her function, which almost always

897
Lawrence Goldman, M.D. - Cross

1   is associated with better pain tolerance.  I don't think her

2   pain levels will ever get below -- much below a two to a three

3   most of the time, unless she's being very -- you know, taking

4   it easy and her foot is up.  You know, I foresee a future where

5   she has minimal pain to zero pain when she's not doing

6   anything; but, otherwise, it will help the pain somewhat.  But

7   she has some, you know, functional goals that I know she

8   misses.  And I think we can't get all of it back, but I think

9   we could get a bunch of it back.

10          MR. SCARPATO:  Thank you.  Doctor.  Those are my

11   questions.

12          THE COURT:  Cross-examination, please.

13                        **CROSS-EXAMINATION**

14   BY MR. OGBORN:

15   Q.  Good afternoon, Dr. Goldman.  We have not been introduced.

16   My name is Mike Ogborn.  How are you?

17   A.  I'm well.  How are you?

18   Q.  Doing well.

19   A.  Good.

20   Q.  I wanted to start just by kind of heading back and seeing

21   where you focus your time.  As I looked at your curriculum

22   vitae, I saw that you seem to be engaged in about five

23   different professional activities right now.  Some -- you

24   mentioned HealthONE.  And I think you're still an affiliate

25   consulting staff member there; is that true?

Lawrence Goldman, M.D. - Cross

 1   A.  I am on the staff at Swedish Medical Center.  Yes.

 2   Q.  The other one I have is Swedish Medical Center, so that's

 3   one thing?

 4   A.  Yeah.  They -- HealthONE owns Swedish.

 5   Q.  And that's just an -- just being on staff there.  That's --

 6   do you spend -- does that take up much of your professional

 7   time?

 8   A.  No.  Not -- not in terms of inpatient work, but I need to

 9   be on staff there in order to do my outpatient work.  That

10   takes up a bunch of my time.

11   Q.  The other one I saw was the Colorado Neurological

12   Institute, and it says that you're an affiliate member there.

13   I wasn't sure what that meant or how much time that took

14   professionally from you?

15   A.  Well, I think the Colorado Neurological Institute is no

16   longer, as of the last few years.  So it took a lot of, lot of

17   time for me in the 1990s and into the early aughts, but not as

18   much time since then.  I would work -- I still work with a lot

19   of the physicians who helped found that -- that entity or

20   people they brought on afterwards; but the entity itself I

21   think no longer exists.

22   Q.  Okay.  And I think I actually saw that on the website.

23   You're not a neurologist, are you?

24   A.  No.  I'm a physical medicine and rehabilitation specialist.

25   Q.  The other thing I saw on your curriculum vitae was

Lawrence Goldman, M.D. - Cross

1  Rehabilitation Associates of Colorado.  You mentioned that in

2  your direct testimony.  That is a place that you are still

3  working; correct?

4  *A.*  Yes.  That's the group that employs me.  So that's -- it's

5  through them that I do all of my outpatient clinical work.

6  *Q.*  And then the final thing that I saw was -- well, it really

7  wasn't on there, but it's what you're doing now, the

8  medical/legal consulting or -- or testifying.  Can you tell me

9  how much time you spend treating clients on Rehabilitation

10  Associates of Colorado, as compared to the medical/legal

11  consultant things that you do?

12  *A.*  In terms of my office time, it's mostly treating.  In terms

13  of the overall time during the week, the time would be probably

14  in the realm of two-thirds forensic and one-third treating, in

15  terms of the report preparation and all of the stuff that goes

16  with it.

17  *Q.*  And I'm guessing that the medical/legal consulting or

18  testifying is a bit more profitable in today's world than

19  treating?

20  *A.*  It depends.  I would say it's not as profitable as when I

21  do electrodiagnostic testing or injections, and it's -- it

22  reimburses better than when I'm taking care of Medicaid

23  patients.  That's true.  And medicare.

24  *Q.*  Most lawyers pay better than insurance companies?

25  *A.*  Pardon?

900

Lawrence Goldman, M.D. - Cross

1    *Q.*  Most lawyers pay better than insurance companies?  Forget

2    it.

3    *A.*  Not -- in the workers compensation side, not really; but --

4    it actually allows me to still be seeing patients, is the way I

5    look at it.  But there is no doubt that forensic is expensive,

6    and I'm privileged to be able to do it.

7    *Q.*  And in this case, you've -- obviously, you charge for your

8    time and what you do.  It will be about a $35,000 charge in

9    this case for your services; right?

10   *A.*  In terms of over the last year, yes, it's going to be in

11   that range.  This is in the top five expensive cases I think

12   I've been involved in.

13   *Q.*  Coincidentally, your charges are just about the same amount

14   you think Ms. Houston's future medical costs are going to be;

15   right?

16   *A.*  You know, I would give these charges to her if I thought it

17   would really get the job done.  I wasn't really thinking in

18   those terms, but what you said seems to be true.

19   *Q.*  As far what you did, I get the -- you reviewed a lot of

20   medical records in this case; correct.

21   *A.*  I have.  Yes.

22   *Q.*  You met with Ms. Houston one time?

23   *A.*  Yes.

24   *Q.*  About an hour long meeting.

25   *A.*  More or less.  It was an hour to an hour and a half.  I'd

901

Lawrence Goldman, M.D. - Cross

1   have to double-check, for sure.

2   Q.  Your estimate is fine for me.  And, then, you wrote three

3   reports; correct?

4   A.  Yes.  I wrote four reports, actually.

5   Q.  Okay.

6   A.  I --

7   Q.  The first report was on August 5, 2019?

8   A.  That's correct.

9   Q.  What I want to do is I'm going to bring that up on the

10  screen, here.  And you start off in your report with something

11  called disclosures and disclaimers.  And I want to run through

12  this real quick, Doctor.

13          It will be up on the screen; but if it's easier for

14  you to look at a hard copy you might have in front of you,

15  that's fine, as well.

16  A.  Yes, sir.

17  Q.  Okay.  Can you see the document, Doctor?

18  A.  Well, I don't see -- I see the beginning of my document,

19  but if you just refer to the page -- I think you're referring

20  to page 2 -- I think we'll be on the same page, literally.

21  Q.  Literally.  Yes, sir.  I am referring to page 2., and it's

22  paragraph A that I'm focused on.

23  A.  Yes.

24  BY MR. OGBORN:

25  Q.  Doctor, let me make sure I'm reading this correctly.  One

Lawrence Goldman, M.D. - Cross

1    of the first things you want -- you do when you're meeting for

2    an independent medical examination is to set forth some rules,

3    and these are the rules that you want your patient -- that you

4    want the person being examined to know; right?

5    *A.*  Yes.  I don't think of them as rules, but I -- yeah.

6    Boundaries, yes.

7    *Q.*  Good.  And the first thing, really, that you say in

8    photograph A is, "No doctor-patient treating relationship could

9    be undertaken in this matter."  Right?

10   *A.*  Correct.

11   *Q.*  So under no circumstances are you going to be a treating

12   physician for them?

13   *A.*  Typically not.  It's seen as a conflict of interest.  But

14   I -- I think I have to still make good faith recommendations,

15   but I just can't implement them.

16   *Q.*  The next sentence talks about recommendations, doesn't it?

17   "Any further recommendations that may or may not be forthcoming

18   for diagnostic testing or treatment would need to be discussed

19   by the patient with her/his private physicians and implemented

20   under the auspices if they are in agreement."  That's what your

21   first rule says; right?

22   *A.*  Well, that's part B.  Yes -- yes.  I put my recommendations

23   out there and ask the patient to discuss it in this case, with

24   her attorney, but also with her treating physician, such as

25   Dr. Ellen Price.

Lawrence Goldman, M.D. - Cross

1   *Q.*  Because at the end of the day, that treating physician is

2   with that patient certainly more than you are; correct?

3   *A.*  I mean, that's two questions.  It -- at the end of the day,

4   that's true, the patient sees their authorized treating

5   physician more frequently, obviously.  But it's mostly, again,

6   that I'm not empowered to implement the treatment

7   recommendations.  It's considered a conflict of interest.

8   *Q.*  And the treating physicians, it's ultimately on their

9   shoulders to monitor and make sure what is -- that the

10  treatments that are suggested are working and are appropriate

11  under circumstances; right?

12  *A.*  It's -- I think it's on all our shoulders.  But they're the

13  brunt; I would agree.

14  *Q.*  They're ultimately responsible for the patient's

15  well-being; correct?

16  *A.*  I think we all are; but I think they carry a primary

17  fiduciary relationship, if you will.  Mine would be secondary.

18  *Q.*  Doctor, I think we can agree on quite a bit in this case,

19  and I'm going to focus on what I hope we can agree on,

20  anyway --

21  *A.*  Okay.

22  *Q.*  -- in the beginning, here.

23          You knew that prior to this collision, Ms. Houston had

24  been -- moved to the Grand Junction area approximately a year

25  before; right?

904
Lawrence Goldman, M.D. - Cross

1  *A.*  Correct.

2  *Q.*  And in that year, she had no medical appointments except

3  for an annual exam with her family doctor.

4  *A.*  That, I don't know, because I didn't have any records for

5  the previous ten years; but I -- I accept your statement as

6  stated.

7  *Q.*  Did you -- and it's kind of where I'm going next, Doctor.

8  From 2006 to 2016, there were not a lot of medical records;

9  were there?

10  *A.*  I didn't receive any, which I thought was rather unusual.

11  I didn't receive any.

12  *Q.*  Based on all of those medical records you reviewed, and

13  based on your hour- to hour-and-a-half-long exam of

14  Ms. Houston, did you become aware of any issues either

15  cognitively or physically that she was addressing in the ten

16  years prior to this collision?

17  *A.*  No.  She subjectively indicated that there were none.

18  *Q.*  Seemed to be a healthy and active person; fair?

19  *A.*  That's -- that's what she indicated.  Yes.

20  *Q.*  This collision significantly altered that state of being

21  for her; would you agree with me on that?

22  *A.*  Well, it depends on how one defines "significant."  But

23  I -- I would definitely degree that it's altered her function

24  and quality of life.  Yes.

25  *Q.*  Would you agree with me that the collision caused a

905

Lawrence Goldman, M.D. - Cross

1    permanent life-long injury for Ms. Houston?

2    A.   Yes.

3    Q.   That as part of that life-long injury, she will suffer from

4    loss of range of motion, as well as stiffness?

5    A.   Yes.

6    Q.   Would you agree with me also, Doctor, that as a result of

7    that injury, she will suffer from arthritis -- osteoarthritis?

8    A.   She will have more of it than she would have otherwise.

9    Q.   And, in fact, Doctor, are you aware that that has already

10   started in the injured ankle?

11   A.   Yes.  I had the opportunity to review many, if not all, of

12   her films, and I made notation thereafter.  Still mild, but

13   it's there.

14   Q.   It's mild, but that X ray was only two years after the

15   injury occurred.  Right?

16   A.   Yes.  But when it's really bad, I tend to start seeing it

17   within the first year.  So it's not the best situation; it's

18   not the worst.

19   Q.   Okay.  You would agree with me, though, that as Ms. Houston

20   ages, that is more than likely going to get worse and cause

21   additional pain?

22   A.   Yes.  And hopefully my recommendations will slow that down,

23   but that will probably happen still.

24   Q.   Your recommendations, which we agree she should go to her

25   treating physicians and talk to them about, because they're

Lawrence Goldman, M.D. - Cross

1   going to be responsible; right?

2   A.  Well, yes, that's -- again, technically, I'm not allowed to

3   treat her, in terms of what the boundaries for independent

4   medical examination are.  Even if I see a plaintiff-referred

5   patient, I'm not allowed to treat them.

6   Q.  As we talk about this osteoarthritis, Dr. Goldman, can we

7   also agree that that post-traumatic osteoarthritis is

8   responsible in and of itself for causing plaintiff to suffer a

9   mild to moderate impairment causing a disability?

10  A.  It's a mild to moderate impairment of the ankle, resulting

11  in a mild disability.  Yes.

12  Q.  In other words, a permanent physical impairment; you would

13  agree, that's what Ms. Houston will suffer from?

14  A.  Correct.

15  Q.  I don't -- I don't know if we can agree on this.  Do you --

16  so I'm going to ask you, Doctor --

17          You can take that document down.

18          Do you believe that Ms. Houston suffers from chronic

19  pain?

20  A.  Yes, I do.

21  Q.  And in your opinion, Doctor, is that pain going to be there

22  at I think you said the two to three level at least for the

23  rest of her life?

24  A.  Yes.  At least when she's active.

25  Q.  Doctor, would you agree with me that that pain -- and I'm

Lawrence Goldman, M.D. - Cross

1   going to break that pain down now a little bit, because you did

2   that in some of your direct examination -- is that pain based

3   on physical inabilities that exist within the structure itself

4   of the ankle?

5   *A.*   Yes.

6   *Q.*   Would you also agree that there is a nerve component to

7   that or a sympathetic component?

8   *A.*   Very low grade.  It's very minor; but, yes.

9   *Q.*   Okay.  So both of those components are present?

10  *A.*   Yes.  I'd say 90 -- 90 percent orthopedic mechanical --

11  there may be 80 percent -- I don't know.  If I had to break it

12  down, I'd say 60 percent orthopedic mechanical, 30 percent or

13  so emotional, and 10 percent sympathetically mediated.

14  *Q.*   Would you also -- Doctor, one more thing I think we can

15  agree upon -- because I'm taking it right out of your report --

16  is that plaintiff is showing positive signs for subpatellar

17  chondromalacia?

18  *A.*   Chondromalacia.  I'm sorry, but I have to use those words.

19  I borrowed so much money to learn how to do it.

20          Yeah, she's got still some tracking and irritation of

21  the kneecap as it tracks over her thigh bone and her femur; and

22  so she has more cartilage wear and tear.

23  *Q.*   And, actually, you can see that on some of her scans;

24  correct?

25  *A.*   Correct.

908

Lawrence Goldman, M.D. - Cross

1  Q.  And what it is, is the cartilage on the underside of the

2  kneecap has thinned out or is degrading; is that fair?

3  A.  Yes.  I think it's stabilized, again, both in terms of her

4  pain and her range of motion.  And if we keep her -- we call it

5  the vastus medialis.  If we keep the medial part of her

6  quadricep strong, that will be a minimal residual for her,

7  fortunately.

8  Q.  How do you keep this strong?

9  A.  I actually have to do that, because I've had that problem

10 since med school.  So the two best ways are, you can do

11 straight-leg raising, lying on your back, moving into ankle

12 weights.  And you can do what is called terminal extension on

13 weight machines or on a seat with a TheraBand, where you're

14 just straightening the leg in the last 30 degrees.  So what

15 you're trying to do -- it's in the last 30 degrees -- if this

16 was the leg, it is in the last 30 degrees that medial part of

17 the quadriceps kicks in.  So you need to do that kind of

18 exercise and build up a certain amount of resistance.  You need

19 to do that typically about twice a week.  And you have to get

20 up to a certain level, so it can take a few months.  But, you

21 know, her pain levels in the knee were pretty minimal when I

22 saw her, and it's reported in the records, but it's something

23 that I would still recommend that she do.

24 Q.  Would you say it's more likely than not that that's going

25 to cause some arthritis in her knee as she ages?

Lawrence Goldman, M.D. - Cross

1   *A.*  Minimal, based on how the X rays look and how she -- and

2   how she presented with range of motion.  Minimal.  I mean,

3   everything is cumulative so -- I don't know if I've -- since I

4   got older, I don't think I ever said nothing -- everything

5   contributes to everything.  But in this case, if the knee was

6   the biggest of her problems, we wouldn't be here, you know.

7   *Q.*  You talked about these exercises to help strengthen that.

8   Is walking also good to help strengthen the muscle to help keep

9   that knee in a good place?

10  *A.*  Not necessarily.  I think walking is good for a lot of

11  different things, but it depends.  If you're doing the

12  exercises, then walking makes it better.  If you're not doing

13  the exercises, then walking, particularly up and down hills,

14  can make it worse.  So the main thing -- again, one of the

15  things I've harped on in my reports is, we really have to shift

16  the focus of the rehabilitation towards more building muscle

17  and strengthening, and then a lot of other things can fall into

18  place, in terms of better range of motion and symptoms.

19  *Q.*  And part of that -- building muscle that you're talking

20  about, part of that is learned as a part of physical therapy;

21  correct?

22  *A.*  If the physical therapy chooses to emphasize that, yes.

23  Unfortunately, in this case, I don't think that was as strong

24  of an emphasis; but there is still hope for the future.

25  *Q.*  Physical therapy is really kind of, in my mind, two

Lawrence Goldman, M.D. - Cross

1    components.  And let me see if you agree with this:  One is the

2    learned behavior, where you're learning how to strengthen the

3    muscles that need to be strengthened to help you improve.  And

4    there is also active physical therapy, like an edema rub, or

5    something like that, where it's hands on.  Do you agree with my

6    different parts of this; one you are doing, and one someone

7    else is doing?

8    A.  I think that's a first go at it.  Actually, the hands-on is

9    considered passive.  And the active component is more the

10   exercise; and then there is a cognitive component, which is

11   instruction in the exercise, as well as techniques that you can

12   do your own self-massage or edema reduction.  And then there is

13   a neuromusculature facilitation component, in terms of

14   coordination, a balance component, an aerobic component, and

15   you kind of get the picture.

16          And when you're dealing with chronic pain, you also

17   have to have a pain management component, which is where a lot

18   of physical therapists don't have the same kind of training as

19   back in the day.  But, again, it's something that is still

20   available in the community if you look for.

21   Q.  You and I will always agree on that:  Good physical

22   therapists are hard to find.  But there is a lot to physical

23   therapy, I guess, we can both agree on that?

24   A.  That is correct.

25   Q.  And it's a good way to make sure you keep your range of

Lawrence Goldman, M.D. - Cross

1    motion going as well as you can?

2    *A.*  It's --

3    *Q.*  Is that --

4    *A.*  Almost everything -- its just like going to school -- it's

5    like going to med school or law school or high school.  Most of

6    the learning comes with the homework.  All right?  It's not in

7    class.  If the class stimulates you, the professor stimulates

8    you, you've still got to go to the library, you've still got to

9    do the work.  So, I mean, I think that's where one of the major

10   misconceptions of physical therapy is that, you know, it's just

11   something that you have to keep having and having.

12           And there are conditions that require that.  Like,

13   when I'm dealing with my spinal cord injury patients, they

14   can't move their leg.  They have to have someone come do that.

15   But most therapy is more contingent on how the patient follows

16   through than the therapy session itself.

17   *Q.*  Finally, Doctor, would you agree that -- and I'm going to

18   go back to the knee here -- as a result of her condition, it is

19   more likely than not that she will suffer a chronic mild

20   lateral collateral ligament strain?

21   *A.*  It will be very minimal -- you're talking about the knee, I

22   believe?

23   *Q.*  Yes.

24   *A.*  Yeah.  I see that as come and go, just like the symptoms of

25   the chondromalacia we were talking about.  I think what I can

Lawrence Goldman, M.D. - Cross

1    say is that, what goes on in the knee, there is going to be

2    some minimal residual impairment; and there is a good prognosis

3    to be quite stable and not interfere with her quality of life

4    hardly at all.  What I diagnosed in terms of the lateral

5    collateral ligament, the reason that's bothering her is because

6    the inside muscle of the knee isn't as strong as it needs to

7    be; and she's using her lateral muscles, which are stronger in

8    all of us.  So that is why we want to do the terminal

9    extension.

10           So if she doesn't do any exercise, I would probably

11   concede that she will have chronic lateral collateral ligament

12   problems; but if she does follow through with the exercise

13   regimen, I think that will resolve.

14   Q.  Doctor, do you agree with -- well, let me ask you this:  Do

15   you believe, based on the work you've done in this case, that

16   Ms. Houston suffers from cognitive deficits?

17   A.  I -- you know, I've seen Dr. Gustavson's reports.  I think

18   she manifests cognitive issues at times due to emotional

19   diagnoses and maybe sometimes due to her medicines.  I don't

20   think it's due to a traumatic brain injury.

21   Q.  Okay.  And, actually, I'm looking -- what I'm doing is I'm

22   pulling right from page 26 of your August report.  And I

23   believe what you say there, Doctor, is that you are of the

24   opinion that her present cognitive and emotional status likely

25   represents an exacerbation or aggravation of a pre-existing

Lawrence Goldman, M.D. - Cross

1   psychological diagnosis.

2   *A.*   Yes.

3   *Q.*   Okay.  Is that still your opinion?

4   *A.*   Yes.

5   *Q.*   This pre-existing psychological diagnosis, what doctor

6   diagnosed cognitive deficits prior to 2016?

7   *A.*   Nobody diagnosed cognitive deficits.  But there is a

8   certain element of cognitive deficit and distraction that

9   occurs with almost all chronic pain, depression, anxiety types

10  of conditions.

11  *Q.*   Okay.  Let's focus on depression and anxiety.  Do you --

12  did you perceive that Ms. Houston was depressed prior to 2016?

13  *A.*   I know she had been diagnosed with that condition in the

14  past.

15  *Q.*   Do you know when and who?

16  *A.*   If I can look at earlier pages of that August -- I mean,

17  the August 5, 2019, report.

18  *Q.*   Doctor, I think if I can direct you to page 5, you're going

19  to go right to where you want to go.

20  *A.*   Yeah.  I'm on page 4 and page 5.  So in October 2003, she

21  had a six-month history of sleeplessness, anxiety, headache.

22  She had had previous counseling for eight years and had two

23  years' treatment with Paxil, an antidepressant.  There were

24  some issues in 2005 discussing Axis II or -- which is

25  personality disorder -- issues and anger issues.  So that is

Lawrence Goldman, M.D. - Cross

1   where I derived those opinions.

2   *Q.*  And that is really where my question is going to go,

3   Doctor.  Your opinion of prior depression, does it come from

4   those 2005 medical record entries?

5   *A.*  Well, 2003 through 2005, and it's talking about eight

6   years; so we're talking about ten years or whatever of

7   treatment along those lines.  And then I don't have any

8   records, as I said, for ten years.

9   *Q.*  I'm sorry, Doctor.  2003 to 2005 is ten years?

10  *A.*  Well, because there was a notation, I think, that I read

11  that she had been -- had had counseling for eight years as

12  of -- you know, in the past, in the 2003 notes.  So it's more

13  than just one or two little instances.  Ms. Houston was dealing

14  with some real emotional challenges in the 1990s and at least

15  in the aughts, as we call them.

16  *Q.*  Doctor, in the decade before this collision, is there

17  anything you relied upon during that decade to reach your

18  opinion of impression?

19  *A.*  I did -- I had sufficient documentation and notes that

20  there was pre-existing history of depression and anxiety.  And,

21  again, I didn't receive any records.  I think it's unusual,

22  because she is someone who seems to take good care of herself,

23  that there are no medical notes for ten years.  But I can only

24  do what I do.

25  *Q.*  Okay.  All I'm doing here, Doctor, is I'm trying to find

Lawrence Goldman, M.D. - Cross

1    the basis from where you made that statement on page 26.  I

2    just want to know, was it all this previous stuff in 2003,

3    2005; or was there something after 2006 that you relied upon?

4    *A.*  No.  It was based on these notes from 2003 to 2005 that

5    discussed eight to ten years of prior ongoing treatment of

6    these conditions.  And when you're treated that long, they tend

7    to -- they tend to be more remitting.  It's unusual that they

8    just totally go away, particularly during what has happened in

9    our country in the last ten or so years, fifteen years.  So

10   that's how I extrapolated that information.

11   *Q.*  Well, okay.  Are you suggesting, then, that there must have

12   been other treatment out there, you just don't know about it,

13   and that's what you're basing your opinion on?

14   *A.*  I'm basing my opinion based on those records.  I'm noting

15   that I don't understand why I don't have records for the

16   previous ten years.  It just seems unlikely, based on my

17   understanding of Ms. Houston as a compliant patient, more or

18   less, that she would have no medical treatment for ten years;

19   but it is what it is.  You know, it's hard to get ahold of

20   records sometimes.  I get it.

21   *Q.*  At the end of the day -- and I think I understand your

22   basis now.  At the end of the day, what you say, though, is

23   that her cognitive -- her current cognitive and emotional

24   status represents an exacerbation or aggravation of a

25   pre-existing psychological diagnosis?  And the diagnosis back

Lawrence Goldman, M.D. - Cross

1    in 2003, 2005 -- let me ask you this:  Based on that

2    aggravation, or exacerbation, as you call it, will her current

3    cognitive and emotional status ever improve, or is this

4    exacerbation a life-long problem, as well?

5    A.   I don't have enough information to know.  I think what is

6    most pertinent to the accident is the post-traumatic stress

7    disorder.  And the records indicate that in terms of painful

8    prior emotional, marital experiences, that there were some

9    elements of post-traumatic stress in her past.  And I think at

10   this point -- I think it's likely to be a mixed picture,

11   because more often than not, psychological issues tend to be.

12   But I think there is probably some element of ongoing

13   permanency in terms of post-traumatic stress, although I would

14   probably defer to Dr. Kalat or others in that regard.

15   Q.   Fair enough.  One thing I wanted to be clear about, though,

16   Doctor, in any of those past records, you did not see any

17   mention of a diagnosis of PTSD, did you?

18   A.   No.  But I saw a description of experiences that are often

19   associated with that.  Like, she underwent EMDR, which is,

20   again, a classic treatment for PTSD.  And it was in the

21   context, again, of, you know, some really unpleasant

22   experiences that -- I tried not to go into more detail than

23   necessary, because I -- I know it's sensitive.

24   Q.   We talk about -- I know you don't attribute much of

25   Ms. Houston's pain to sympathetic pain or -- is it fair to say

Lawrence Goldman, M.D. - Cross

1  that's, like, nerve pain?

2  A.  It's -- it's the way the human body is.  It's impossible to

3  have any pain without nerve pain, or we wouldn't even know

4  about it.  Right?

5  Q.  Right.

6  A.  We would have no connections.  So all pain, even if it's

7  predominantly involving the muscles or bones, involves a

8  component of nerve pain.  That's -- I'm sure everybody who is

9  here in attendance today has had pain at one point in their

10  life, and it's very unlikely it didn't involve the nerves.

11  It's just -- they're more the conduit than they are the pain

12  generator, is the best way to put it.

13  Q.  These sympathetic nerve blocks, that's not just used for

14  CRPS.  It can be used for any type of sympathetic nerve pain or

15  any sympathetic pain; right?

16  A.  Yes.  I've seen them used in that way.  I'm not sure that's

17  such a great idea.  But if you get enough of a response and the

18  patient makes some progress in rehab, then I'm always happy to

19  make that concession and be glad for a good outcome.

20  Q.  Yeah.  I mean, that's really what you're trying to do.

21  You're trying to treat the symptoms and get a benefit so pain

22  is diminished or hopefully goes away altogether, in whatever

23  treatment --

24  A.  Yes.  So an example -- you know, we talk about muscle

25  strain.  This isn't like a whiplash kind of condition.  But you

Lawrence Goldman, M.D. - Cross

1   have a muscle strain, and then you have something called

2   myofascial pain with trigger points.  Myofascial pain by

3   definition has more sympathetically mediated pain than a

4   typical strain, but they'll both have some.  And that's why you

5   can do a sympathetic block or even an epidural steroid and have

6   trigger points respond for a while, even though you're

7   injecting something into the spine, and the trigger points are

8   out in the shoulders.  So it's part and parcel of all pain

9   conditions.

10  *Q.*  And Doctor, in addition to sympathetic nerve blocks, that

11  spine stimulator, that can also be used not just on CRPS, but

12  on any sympathetic pain; correct?

13  *A.*  Well, of course, you can use it on anything; but it doesn't

14  mean you should.

15  *Q.*  And --

16  *A.*  It probably won't work, and it may put the patient at risk.

17  But, yes, there are doctors who would agree with you.  I don't

18  know if I would totally agree with that statement.

19  *Q.*  And I get it.  I mean, doctor's opinions on how to treat

20  are varied, aren't they?

21  *A.*  Yes.  But some have more perspective and experience and

22  wisdom than others.  It's not all the same.

23  *Q.*  Okay.  I'm sure you'd be surprised to learn that Medtronic,

24  one of the manufacturers of spinal stimulators, would prefer

25  that doctors use it for all sympathetic pain, not just CRPS.

919
Lawrence Goldman, M.D. – Cross

 1    *A.*  I think they think that -- I don't want to overstate.  It's

 2    like taking your daily vitamin.  We can all be better off with

 3    stimulation, I'm sure, but -- I'm being glib.  I have worked

 4    with Medtronic.  They were actually some of the people I worked

 5    on, on research on using stimulators; but I was at the CRPS

 6    Center.  And, yeah -- you know, there are various biases here.

 7    But I -- it tends to work the best -- the literature is very

 8    clear, when it does work, it works the best when you're dealing

 9    with failed back surgery syndrome, with single-root radiculitis

10    due to arachnoiditis.  And this is like off the -- you know,

11    it's not what we're dealing with today.  But once you get past

12    that one indication -- yes, you can use it, and Medtronic would

13    prefer us to use it, it doesn't work hardly at all, in my

14    experience.  So that's my experience, and I've had hundreds of

15    patients undergo it or be referred for one.

16    *Q.*  Yeah.  And, obviously, what I'm doing now is I'm looking at

17    some of these life care plan items and walking through that,

18    and say, look, this is a possibility.  You may have a

19    disagreement with that treatment modality -- but there are a

20    lot of different opinions out there about treatment modalities,

21    aren't there?

22    *A.*  There are.  But outside of the people who do the procedure,

23    I think most of medical community is concurrent with Meyer,

24    agrees with my approach.  Because what we know about chronic

25    pain is that it tends to centralize into the body so that if it

Lawrence Goldman, M.D. - Cross

1   does involve the nerves -- if it involves the muscles, it's not

2   going to respond very well to stimulation, will often make it

3   worse, which I think -- it makes you more uncoordinated.  It

4   blocks the nerve signals.

5        If you're dealing with true nerve pain -- and we're

6   not right here -- but if you're dealing with true nerve pain,

7   you're dealing with pain that is typically centralized to the

8   spinal cord and brain; and the stimulater can't there.  And the

9   neurologic system is too plastic, it will override it.  So it's

10  not -- I am hopeful and prayerful that we will have much better

11  ways to treat chronic pain for all of my patients in the

12  future.  I'm very excited about genetic stuff, but it's

13  preliminary.  I think when we look back ten years, twenty years

14  from now, stimulators are going to be considered very primitive

15  and hardly ever used.  That's --

16  Q.  I hope you're right.  What does the gabapentin treat?  What

17  is that being provided for?

18  A.  Gabapentin provides a lot of different treatments.  It

19  essentially blocks the calcium channels in the membranes, both

20  in the muscles and the nerve membranes.  It's called a membrane

21  stabilizing medication.  So that's why it's used -- initially,

22  it was developed for treatment of seizures.  So what it

23  essentially does is turn down the irritability of both muscle

24  cells -- because it's actually used in fibromyalgia and

25  myofascial pain and back pain, as well as in nerve cells.  And

Lawrence Goldman, M.D. - Cross

1   it's one of the few drugs that also increases what we call

2   stage five or deep sleep, which is where the body mostly heals.

3   Most medications we use for sleep actually decrease deep sleep.

4   So gabapentin is actually working on parts of the brain that

5   help it get into a better circadian rhythm and heal the body

6   better.

7   Q.  You indicated -- the reason I'm going to gabapentin,

8   Doctor, is because it's one of the drugs that you suggested

9   would be useful for Ms. Houston's lifetime; fair?

10  A.  Yes.

11  Q.  And it will -- I mean, as long as it's being effective,

12  obviously, it will be a lifetime drug for her?

13  A.  I think we need to allow for that possibility, probability.

14  I just -- I think most of my patients tend to not need the

15  medication after three to five years, with the treatment plan I

16  recommended, but I -- I didn't want to -- I didn't want to

17  overproject in terms of prognosis, so I think we should assume

18  that may be the case.

19         THE COURT:  Hold on a minute.

20  BY MR. OGBORN:

21  Q.  If you were treating, you would --

22         COURTROOM DEPUTY:  One moment, counsel.

23         THE COURT:  We need to give the court reporter a

24  break.  She's tired right now.  We'll take a recess for

25  15 minutes.

Lawrence Goldman, M.D. - Cross

1          (Recess at 3:13 p.m.)

2          (In open court at 3:31 p.m.)

3          THE COURT:  This trial system of videoconferencing has

4   made me forget to check about my court reporter, and I want to

5   apologize to her for keeping her going to the point of

6   exhaustion.  But she's rested now, so we'll get back again.

7          I am sorry, Terri.  Please forgive me.

8          Please go ahead.

9          COURTROOM DEPUTY:  We have lost the plaintiff.

10         MR. OGBORN:  Can you hear me?

11         COURTROOM DEPUTY:  I can hear you.  I can't see you.

12         MR. OGBORN:  I show that we are frozen.

13         Can you see me now?

14         THE COURT:  There we go.

15   BY MR. OGBORN:

16   Q.  Dr. Goldman, just a few more areas here I want to cover

17   with you.

18         I think -- in your direct examination, you talked

19   about cognitive therapy in the future.  And that was when you

20   were talking about needs that Ms. Houston will have going into

21   the future.  And you said, I have allowed for six to ten

22   sessions, and you'll see if there is a cognitive shift.  Help

23   me understand what a cognitive shift is.

24   A.  Yes.  I was referring to cognitive behavioral therapy,

25   which is different than just pure cognitive therapy.

923

Lawrence Goldman, M.D. - Cross

1    *Q.*  Okay.

2    *A.*  Cognitive behavioral therapy is addressing various -- for

3    want of a better word -- emotional patterns, in which we all --

4    I mean, we're all subject to varying degrees of listening.  We

5    often think in terms of words or sounds, and sometimes we get

6    distracted by them.  And if they're not very happy sounds or

7    words, we can not really see our reality as constructively as

8    possible.  So it's a type of psychotherapy, actually, that uses

9    also elements, behaviors, and to help patients begin to not see

10   their thoughts, whether they're visual or sound or words or

11   whatever -- not see their thoughts as the same thing as who

12   they are, and not see their perceptions as the exact same thing

13   as who they are, and to make a shift going from being in a more

14   passive, dependent, and identified state of mind that has very

15   little self-reflection, into someone who can at least step back

16   for a moment and watch their thoughts and not identify with

17   them and not react to them.  And that creates a space for

18   further development, for learning, and for moving forward in

19   terms of both emotional, cognitive, and even pain management

20   growth.

21   *Q.*  Would -- and so when you refer to this cognitive shift,

22   it's a -- it's a perception that you're looking to have changed

23   over those six to ten sessions?

24   *A.*  It's a -- it's partly perceptive -- it's how ones perceives

25   the changes.

Lawrence Goldman, M.D. - Cross

1    *Q.*  Okay.

2    *A.*  And it moves from being unaware and just -- whatever our

3    feelings are, just being at the mercy of our feelings, which

4    can be ingrained in an unconscious way, as well as conscious,

5    and getting more mastery of those feelings, being less reactive

6    to them.

7           Getting through pain, chronic pain, or any life

8    adversity often involves a certain amount of suffering, but

9    also the opportunity for growth and learning.  And I'm sure

10   everybody who on this -- listening right now can reflect on

11   ways that that has happened.  Sometimes it's through adverse

12   circumstances, sometimes it's through a teacher -- a

13   challenging teacher; but that's what I'm referring to in a way

14   in terms of a cognitive shift -- cognitive behavioral

15   identification shift.

16   *Q.*  And is there a specific symptom, or is this more general,

17   that you're trying to address with this recommendation?

18   *A.*  It can -- it feels -- there is two basic types of

19   psychological intervention.  One is the classical Freudian or

20   Jungian psychotherapy, where we're trying to get a sense in

21   terms of interpreting our dreams, interpreting -- shining light

22   on our unconsciousness.

23          And then there is behaviorism, B. F. Skinner, which

24   is, you know, if you get reinforced a lot, you do something;

25   and if you get punished a lot, you don't do it.  And they both

Lawrence Goldman, M.D. - Cross

1    play a role.  And you can apply both of those approaches -- the

2    psychotherapy approach gives you an idea about what helps to

3    motivate a patient or what tends to demotivate them more so

4    that you can then reinforce the appropriate behavioral changes

5    that allows them to heal and move past where they are in life

6    and to gain the skills and to heal further.  So you can use

7    this for almost any type of mind-body, emotional, physical

8    dysfunction, if you're very identified with your current state

9    of being but wish to move past it.

10   Q.  Given that explanation, Doctor, it seems to me that for

11   somebody who suffers from chronic pain, like Ms. Houston, that

12   this would be a beneficial therapy going into the future.  Why

13   do you limit it to ten sessions?

14   A.  Most of the research shows that when it's going to help and

15   the patient is embracing it, they'll get the vast majority of

16   the benefit and be making that shift in ten or so sessions.

17   Otherwise, they start becoming dependent on -- on their

18   therapist and vice versa -- we call that co-dependency -- and

19   then the therapy sessions become counterproductive.  They

20   almost reinforce seeing oneself as being in a disabled state of

21   mind more than is necessary.

22        So it's just based on my experience.  Sometimes people

23   need up to 15.  But lifetime treatment actually leads to more

24   disability and more compromise of the patient's sense of agency

25   and self.

Lawrence Goldman, M.D. - Cross

1   Q.  We have a lot of overlapping symptoms leading to different

2   diagnoses in Ms. Houston's case, don't we?

3   A.  Yes.  We call that multifactorial chronic pain.  And that's

4   the way most pain is, for most people.  It's usually not a

5   one-trick pony.

6   Q.  And if we look at kind of the conclusions I think you've

7   reached as far as diagnoses, Ms. Houston suffers -- Ms. Houston

8   suffers from PTSD?

9   A.  That diagnosis has been rendered.  And, again, I'll defer

10  to Dr. Kalat and others, but I think so.  I think that's

11  pertinent.

12  Q.  And I'm asking about your opinion.

13  A.  Yes.

14  Q.  Let me be specific.  As a result of the December 1, 2016,

15  collision -- so as a result of that collision, Ms. Houston

16  suffers from PTSD?

17  A.  Yes.  At least as of when I saw her.  I think that is a

18  component of her emotional reaction.

19  Q.  Okay.  And as a result of the December 1, 2016, collision,

20  Ms. Houston suffers from depression and anxiety?

21  A.  I think those diagnoses have been rendered.  Yes.

22  Q.  Do you agree with those diagnoses?

23  A.  I agree.  I'm not sure how much is apportioned to

24  pre-existing, co-existing, and all of that; but I think they're

25  playing a role.

Lawrence Goldman, M.D. - Cross

1   Q.   Would you agree with me, though, pre-existing would be

2   pretty minimal if she was asymptomatic or not getting treated

3   for a decade before this collision?

4   A.   If she was having absolutely no emotional distress for ten

5   years before this collision, then I would agree with that

6   statement.

7   Q.   Okay.  Doctor, as a result of the December 1, 2016

8   collision, Ms. Houston suffers from chronic pain?

9   A.   Yes.  Mild; but chronic, nonetheless.

10  Q.   And there is a couple of factors to that.  Not only in the

11  chronic pain is it the pain that exists in the moment, but

12  there is also something to take into account there with the

13  fact that the pain never goes away, it is constant.  Would you

14  agree?

15  A.   At the -- yes.  As it stands right now, yes.

16  Q.   So temporally, she hurts right now.  But when that pain

17  goes from Monday morning all the way for a week, that pain, it

18  has a buildup factor.  Am I making sense to you?

19  A.   Yes.  And that's true of all of my patients with chronic

20  pain.

21  Q.   Sure.  Sure.

22  A.   It's a lot different when you have a six or seven out of

23  ten pain than a two or three.  It's a huge difference.  The

24  average American has a two to three out of ten pain, if not

25  more.  99 percent of Americans will have experienced that in

928

Lawrence Goldman, M.D. – Cross

1   the last few days.  And I understand it's more persistent here;

2   but it has to be put in context, I think.

3   Q.  As a result of the December 1, 2016, collision, Ms. Houston

4   suffers from sleep dysfunction, insomnia?

5   A.  I think that's -- the collision is contributing to that.

6   Again, there is evidence in the past that she's had that; but

7   I'm sure it's contributing to it right now.

8   Q.  Dr. Goldman, as a result of the December 1, 2016,

9   collision, Ms. Houston has suffered and will continue to suffer

10  from cognitive deficits?

11  A.  I don't think that is likely to be the case as time passes

12  and some of the interventions I've recommended are pursued with

13  enthusiasm.  I think there will be minimal.  And, again,

14  they're part and parcel cognitive deficits that any of us have

15  when we're distracted or go through various life circumstances;

16  and they'll wax and wane.

17  Q.  Dr. Goldman, in coming to your conclusions, you've been

18  somewhat critical of some of the treating physicians of

19  Ms. Houston; would you agree?

20  A.  Yes.  In certain instances, I agree.

21  Q.  For example, Dr. Lynn Price, who testified earlier in this

22  trial, you accused her of mislabeling Ms. Houston's conditions?

23  A.  Well, I -- I think that's part of my critique.  It's not a

24  critique of her care, but it's a critique of the foundation for

25  her diagnoses in this case.

929
Lawrence Goldman, M.D. - Cross

1   Q.  You anticipated my next question.  The care that Dr. Lynn

2   Price has provided is really treating the symptoms rather than

3   a label of the condition; is that fair?

4   A.  I don't think so.  Not how I interpret her notes.  And once

5   one mislabels a patient and they identify with that label, it

6   becomes much harder to treat those symptoms.  So I can't speak

7   for what Dr. Price's perspective is.  All I can say is that the

8   records are clear that she essentially accepted at face value

9   diagnoses of CRPS and traumatic brain injury based on

10  Ms. Houston's subjective representation, without having the

11  benefit of reading all of these records.  And those are serious

12  diagnoses.  It's -- it's just as bad to overdiagnose as to

13  underdiagnose, in a way.

14  Q.  Would you agree, though, that just because something is

15  labeled as CRPS or as TBI, traumatic brain injury, it doesn't

16  really matter what the label is, as long as you're treating

17  what the symptoms are?  And in this case -- well, let me stop

18  there.

19  A.  No.  I substantially disagree with that statement.

20  Q.  Okay.  Would you agree that Ms. Houston has some symptoms

21  that at least at one point in time could have been -- a

22  differential diagnosis in her case would have been CRPS?

23  A.  No.  She actually never presented with sufficient symptoms

24  even to make that a medically possible diagnosis, actually.  Or

25  it would -- well, I would say medically probable.  Again, she

Lawrence Goldman, M.D. - Cross

1    didn't -- she only met at most one or two of the ten or

2    thirteen Budapest criteria.  It was actually not a reasonable

3    consideration, if someone has experience with the diagnosis.

4    Q.  And that's really your criticism of Dr. Lewis; correct?

5    A.  Well, I mean, Dr. Lewis is being quite forthright in

6    saying, if their symptoms -- you know, it doesn't appear that

7    he is that sensitive to what might be causing them in terms of

8    what he wants to try out on a patient.  I disagree with that

9    philosophy of treatment.  It's not a sustainable type of

10   treatment pattern in most patients.

11   Q.  Also critical of Jacob Jones -- Dr. Jacob Jones, Ph.D., who

12   did an eval for Social Security?

13   A.  Well, my --

14        MR. SCARPATO:  I'm sorry.  Objection, Your Honor.

15   This is beyond the scope of Dr. Goldman's direct testimony.  If

16   we're going to finish by 5:00 p.m., I think we need to keep

17   this on track.

18        THE COURT:  The objection is overruled.

19        THE WITNESS:  Well, Dr. Jacobs made the same, in my

20   opinion, mistake in terms of just accepting the diagnosis of

21   traumatic brain injury and -- I have to look closely at his

22   report in terms of CRPS.  But it was based primarily on

23   Ms. Houston's subject history to him, and it did not appear

24   that he had reviewed any of the records that I had access to.

25

Lawrence Goldman, M.D. - Cross

1    *BY MR. OGBORN:*

2    *Q.*  You agree that he ran his own objective tests to reach his

3    conclusions?

4    *A.*  He did an MMPI.  I don't think he did sufficient testing to

5    support his diagnosis.

6    *Q.*  Also critical of Dr. James, I believe it was, regenerative

7    medicine in this case; correct?

8    *A.*  I would need -- I think he played a relatively minor role.

9    Is this in terms of, if I can ask, the platelet-rich plasma and

10   stem cell injections?

11   *Q.*  Yes, sir.

12   *A.*  I understand his making that recommendation.  I'm not

13   critical of him; but just saying that the likelihood of those

14   recommendations to make much of a difference, based on my

15   knowledge of the literature and my experience, is quite low.

16   *Q.*  You would agree with me, though, that as it is being used

17   more often, more and more people are finding benefit from that

18   type of therapy?

19   *A.*   Well, that's half -- I would say, when you use anything

20   more often, more people find benefit; but more and more people

21   are also not finding benefit.  And so far, even in my own field

22   of physical medicine and rehabilitation, which specializes in

23   regenerative medicine, it's considered controversial and

24   investigative.  So it's not -- the data does not support using

25   those approaches for the diagnoses that are medically probable

932

Lawrence Goldman, M.D. - Redirect

1    in Ms. Houston's case.

2    *Q.*  I believe, Dr. Goldman, you're also critical of Dr. Ellen

3    Price, your one-time person you worked with, for mentioning

4    ketamine.  I think you said that it was -- the

5    recommendation --

6    *A.*  I thought that was -- oh, that -- that is Ellen?  Yeah.

7    Well, yes, I've had some really unfortunate experience with

8    patients that I've evaluated or treated that have undergone

9    ketamine.  It's simply not ready for prime time; it has

10   serious, serious side effects; and it's not indicated for the

11   diagnoses we're talking about with Ms. Houston.  I agree with

12   much -- most of what Dr. Ellen Price has recommended; but in

13   that instance, I would strongly disagree with that

14   recommendation.

15           *MR. OGBORN:*  I have no further questions.  Thank you.

16           *THE COURT:*  Redirect.

17           *MR. SCARPATO:*  Thank you, Your Honor.

18                      **REDIRECT EXAMINATION**

19   *BY MR. SCARPATO:*

20   *Q.*  Dr. Goldman, I would like to start off with some of the

21   early records in this case that Mr. Ogborn discussed with you

22   from, I believe, Kaiser Permanente.  Do you recall that

23   questioning?

24   *A.*  I do.

25   *Q.*  And I'd like to call up onto the screen what has been

Lawrence Goldman, M.D. - Redirect

933

1    marked, stipulated, and admitted as Exhibit 54, which is

2    excerpts from those records.  And we have called up page U.S.A.

3    Kaiser 000064.

4        Do you see the diagnoses -- the reason for visit and

5    diagnoses set out on this page?

6    A.  I do.

7    Q.  What are those?

8    A.  Anxiety and depression.

9    Q.  And was this record a record you were able to review as

10   part of your work in this case?

11   A.  Yes.  It's summarized in my report.

12       MR. SCARPATO:  And if you could go to the next page,

13   please, Ms. Robinson.

14   BY MR. SCARPATO:

15   Q.  And on the next page, we have some test highlighted.  And

16   that text reads, "Unable to return to sleep.  Discussed PTSD

17   diagnosis.  Patient has symptoms associated with PTSD.  Rule

18   out for PTSD."  Did I read that correctly?

19   A.  Yes.

20   Q.  And was this a record you were able to review as part of

21   your work in this case?

22   A.  Yes.  Reviewed and summarized.

23   Q.  Thank you.  Were there any records that Mr. Ogborn talked

24   with you about in his cross-examination today that you were not

25   able to review in this case?

934

Lawrence Goldman, M.D. - Redirect

1   *A.*  I don't think so.  I mean, I don't know -- well, in terms

2   of answering your question, no, I -- I think I've seen the

3   records he spoke of.

4   *Q.*  And Mr. Ogborn asked you some questions about Ms. Houston's

5   medical care before this accident and her medical care after

6   this accident.  And the question I want to ask you about with

7   respect to that questioning was, you mentioned in your direct

8   something about getting out of this process and how it might

9   affect Ms. Houston's functioning in the future.  Could you

10  explain what you mean by that?

11  *A.*  Well, I want to frame my response in the context that I'm

12  not the treating physician.  And what I'm going to say is not

13  from just the perspective of an examiner, but in terms of my

14  own patients and just the nature of the human mind.

15          We're right now in a situation that we call the

16  disability validation phase.  And by necessity -- it doesn't

17  mean that the patient doesn't have real problems, it doesn't

18  mean that there aren't real issues, and I think I've testified

19  in good faith what I think those issues are.  But it's very

20  hard to rehabilitate somebody when they're focused more on the

21  disability.  It's almost goes back to that cognitive shift I

22  referred to in my discussion regarding cognitive behavioral

23  therapy.  If one is focused on their pain, their mind is just

24  going to keep coming back to it.  It's going to be overly

25  distracting.  And so whenever you can get individuals to focus

Lawrence Goldman, M.D. - Redirect

1    on function, something besides the pain, it doesn't mean the

2    pain goes away, but they suffer less, and they can function

3    better.  It's just a very basic premise.  Now, once we get

4    through this type of process -- it's very stressful for

5    patients to go through a litigation.  And it's not that their

6    pain goes away -- I've seen hardly any people where all of a

7    sudden their pain just goes away.  I have seen it sometimes.

8    It's a few years down the road.  But just taking the stress out

9    of this usually drops pain levels by one or two points.  And

10   then they can focus on rehabilitation, not disability

11   presentation.

12          And it's just like -- I mean, we're seeing it right

13   now -- I use this as a corollary.  But in studies showing, for

14   example, in the National Football League, when individuals go

15   out to play a game, and they're more focused on not getting

16   hurt if they're injured, versus focusing on getting a

17   touchdown, their injury rate goes up.  And you're sort of

18   seeing that right now with the NFL, in terms of what is going

19   on with the COVID bubble and everything else with so many

20   injuries.  It's really hard to achieve a goal if one is too

21   fearful.  You should be aware; you need to respect the

22   potential for injury; it's a matter of putting things more in

23   balance and context.  So, typically, once we get past this

24   phase, and I make reasonable multidisciplinary medical

25   interventions, and patients are able to pursue them, and they

936

1    do so enthusiastically, it's not like they're perfect, but they

2    do get a lot better.

3    *Q.*  My last question to you, Doctor, are you optimistic for

4    Ms. Houston's potential for further recovery in the years

5    ahead?

6    *A.*  I really am.  My sense of the time I spent with her is I

7    think she really does want to get better.  But she's also

8    fearful, what if she doesn't?  And she also has a tendency to

9    prefer the very passive side of holistic care -- I'm very big

10   into holistic and complementary medicine.  I have to use all

11   kinds of tricks and approaches to help patients that classical

12   allopathic and technological medicine doesn't always help them

13   with.  But I do think that she does want to be well.  And I do

14   think that given the opportunity and moving into the next phase

15   -- the next chapter of her life, I think she will -- she will

16   get better.

17           *MR. SCARPATO:*  Thank you, Doctor.  Those are my

18   questions.

19           *THE COURT:*  Thank you, Doctor.

20           May this witness be excused?

21           *MR. SCARPATO:*  Yes, Your Honor.

22           *THE COURT:*  May the witness be excused, Mr. Ogborn?

23           *MR. OGBORN:*  Sorry, Your Honor.  Yes.  We have no

24   objection to the witnesses being excused.

25           *THE COURT:*  All right.  You're excused, Doctor.  Thank

 1    you very much.

 2              THE WITNESS:  Thank you.

 3              THE COURT:  Does that conclude your witnesses?

 4              MR. SCARPATO:  Yes, Your Honor.  And thank you for the

 5    opportunity to be heard over this preceding week and in these

 6    unique circumstances.

 7              THE COURT:  Are you resting now?

 8              MR. SCARPATO:  Yes, Your Honor.

 9              THE COURT:  The Government is resting?

10              THE WITNESS:  Yes.

11              THE COURT:  Plaintiff, any rebuttal?

12              MR. OGBORN:  No rebuttal witnesses from the plaintiff,

13    Your Honor.

14              THE COURT:  All right.  Now, gentlemen, this is how I

15    want to proceed:  You've indicated that you want to submit --

16    and I want this -- to have proposed findings of fact and

17    conclusions of law.  You will need the transcript, and you've

18    ordered that, and that's fine with me.  I will also get a copy

19    of the transcript, and I will review your proposed findings and

20    conclusions.

21         I don't think it makes sense to do a closing argument

22    at this point.  Rather, I want you to both look at the proposed

23    findings that you've made; and if you choose to make any sort

24    of closing argument when you submit those, then let me know.

25    And we'll either do it orally, or you can do it in writing,

938

1     depending upon what your recommendations are at that point.

2             Now, in the meantime, when these cases, both jury and

3     bench trials, come to the close of the evidence, we usually at

4     that point collect, and we have counsel stipulate as to the

5     custody and disposition of all the trial exhibits.  But I don't

6     see how we do that now, because you still need them.  So this

7     is what I'm ordering -- and I want you to pay close attention

8     to this order, because it isn't -- it isn't typical because of

9     what we're doing with -- nothing about this case has been

10    typical with the teleconferencing, but --

11            At any rate, this is what we want to do:  Counsel for

12    each party shall retain custody of all exhibits, depositions,

13    transcripts, and papers identified, offered, or admitted at

14    trial until such time as you submit the proposed findings of

15    fact and conclusions of law.  The exhibits, deposition

16    transcripts, or papers used in your proposed findings should be

17    submitted at that time to me -- not filed with the court, but

18    submitted for my review.  Then if there is any appeal to be

19    taken, you shall have custody of the remaining parts of the

20    exhibits and transcripts and keep those for the purposes of the

21    appellate court.

22            Does that make sense to you?

23            MR. OGBORN:  Yes, Your Honor.

24            MR. SCARPATO:  Your Honor, may I please just read back

25    my notes to you to make sure that we have it properly on our

939

1  side?

2  　　　　THE COURT:  Sure.

3  　　　　MR. SCARPATO:  What I have for the order is that

4  counsel for each party, pending submission of proposed findings

5  of fact, conclusions of law, are to retain trial exhibits,

6  documents referenced at trial, and deposition transcripts.  And

7  then upon submission of the findings of fact and conclusions of

8  law, the parties are to submit those materials used for those

9  proposed findings to your chambers, the remainder to be

10  retained in our custody for purposes of any appeal.  Do I have

11  that down?

12  　　　　THE COURT:  That's correct.

13  　　　　MR. SCARPATO:  Thank you, Your Honor.

14  　　　　THE COURT:  We don't know when the transcript is going

15  to be ready, but how much time do you want after that?  I would

16  suggest 20 or 30 days, but I'll leave it up to you.

17  　　　　How much time do you want after you receive the

18  transcript?

19  　　　　MR. SHAPIRO:  Amanda, can you hear us?

20  　　　　MS. HOOD:  Yes.  I think 21 days is sufficient.

21  　　　　MR. SCARPATO:  Your Honor, I think we would appreciate

22  30 days; but if your ruling is 21, we will make that happen.

23  　　　　THE COURT:  What's your pleasure, Mr. Ogborn?

24  　　　　MR. OGBORN:  I don't have any objection to the

25  Government's request of 30 days.

1          *THE COURT:*  Let's do 30 days from the date of receipt

2     from the date of the transcript.  And the court reporter will

3     notify me with a copy of the transcript at that time that it's

4     submitted to you.  And we will enter at that point into the

5     court record the due date, which will be 30 days from that

6     date.  In the meantime, we'll stand in recess on this case.  Is

7     that all clear?

8          *MR. SHAPIRO:*  Your Honor, thank you for the

9     opportunity, and it's been an honor.

10         *THE COURT:*  Well, this is the first time I've ever

11    tried to do one of these *Star Wars* kind of trials.  And I have

12    another one the last week in October.  I frankly appreciate the

13    cooperation that I've received from all of you, but I would

14    love to go back to the old-fashioned way and see this terrible

15    pandemic over with.  But if you watch TV, you'll realize that

16    it's not doing any harm to anybody anyway, so . . .

17         If you believe that, I have some stock in the Brooklyn

18    Bridge I'd like to sell you, too.

19         *MR. SHAPIRO:*  Is this the first one civilly that's

20    happened?

21         *THE COURT:*  This is my first one, but Judge Jackson

22    has tried a couple, and I believe Judge Martinez has, as

23    well -- Judge Brimmer has too.  So this is my first one, but

24    you're still making history, gentlemen.

25         Thank you very much.

1          *MR. SCARPATO:*  Thank you, Your Honor.

2          (Recess at 4:03 p.m.)

3                    **I N D E X**

4   **Item**                                          **Page**

5

6     STEPHEN KALAT
          Direct Examination By Ms. Bobet            766
          Cross-examination By Mr. Shapiro           799
7         Redirect Examination By Ms. Bobet          838
      LAWRENCE GOLDMAN
8         Direct Examination By Mr. Scarpato         841
          Cross-examination By Mr. Ogborn           898
9         Redirect Examination By Mr. Scarpato       933

10

11                  REPORTER'S CERTIFICATE

12          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
13
            Dated at Denver, Colorado, this 2nd day of October,
14   2020.

15

16

17                         *Therese Lindblom*

18          _____

19                  Therese Lindblom,CSR,RMR,CRR

20

21

22

23

24

25