IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02914-JLK-MEH

TRACY HOUSTON,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER FOR ENTRY OF JUDGMENT**

Kane, J.

    Tracy Houston filed this civil action against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671-2680, for damages arising out of a collision between her automobile and that of a United States Postal Service employee. Frances Terrell, the Postal Service employee, failed to stop as required by a stop sign and thus caused the collision between her automobile and that of Ms. Houston.

    The Court has jurisdiction over the parties and the subject matter. Liability is not contested. A bench trial was held from September 21, 2020, through September 25, 2020, on the remaining issues regarding damages. Due to the COVID-19 pandemic, evidence was taken via videoconferencing in the courthouse, with counsel in their respective offices and witnesses testifying from remote locations including Mesa County, Colorado, and Denver, Colorado. Because the trial was held via videoconference, I determined it appropriate to have counsel file separate proposed Findings of Fact and Conclusions of Law in lieu of traditional closing oral arguments. Accordingly, a complete trial transcript was prepared (ECF Nos. 74-78), following

1

which counsel submitted their proposed findings (ECF Nos. 81-82). After reviewing the transcript, the court records and prior rulings, exhibits and stipulations of the parties, and the separate Proposed Findings of Fact and Conclusions of Law, I have written and issue the following decision.

FINDINGS OF FACT

**A. Ms. Houston's Life Pre-Collision**

At the time of the collision, Ms. Houston was 54 years old with a life expectancy of 26.4 years. Born in Brighton, Colorado, she was raised on a farm on the outskirts of the town. At a very young age, her parents divorced, and she remained on the farm with her father and in close proximity to her paternal grandparents. Her mother left the state, returning to her home state on the East Coast and had very little contact, if any, with Ms. Houston thereafter. To a considerable extent, Ms. Houston received care and attention from her paternal grandmother. The period while living with both parents was not without difficulty, and Ms. Houston experienced both physical and mental abuse from her mother. Her father was employed throughout her childhood, and from about the age of eleven, Ms. Houston undertook the care of her sister and many household tasks normally performed by adults. She learned to cook and acquired other homemaking skills primarily from her grandmother. She also participated in farming tasks common to dry land farming including care of livestock and operating farm equipment. Her father had a number of brothers, and there were many large family gatherings on the farm and in her grandparents' home. At those events, she helped her grandmother preparing and serving meals and related tasks.

Ms. Houston dropped out of high school and worked in Brighton and nearby Fort Lupton, Colorado, as a waitress. Ms. Houston married and gave birth to a daughter. The marriage was short-lived, and she retained custody of the child whom she raised. She was an active member of the First Presbyterian Church of Brighton. Throughout her life and continuing to the present, Ms. Houston has been an active participant in religious activities. Following her divorce in her early twenties, she was treated for depression and received counseling under the auspices of the Brighton church.

As a single mother working to support her child and not receiving full and consistent payments for child support, she returned to high school and received a G.E.D. certificate, then went to Aims Community College and earned an associate's degree. Next, on a presidential scholarship, she attended Metropolitan State College (now Metropolitan State University) and was awarded a bachelor's degree in business management. She then attended graduate school at the University of Denver and received a master's degree in liberal arts. During her college years she supported herself and her daughter by purchasing and operating a small cleaning business in Brighton, performing contract work in accounting and administrative services, and providing one-on-one computer training for small businesses.

Following her graduation from the University of Denver, and largely through contacts she made at the University, Ms. Houston created and operated a consulting business as the sole proprietor. In this business, she provided consultation and placement to people seeking career development with particular emphasis on placement on corporate boards, both for-profit and non-profit organizations. She also provided consultation to corporate boards of directors in both genres. She wrote several articles and books on subjects related to her consulting business. Of special significance to her, she was a leader in a community action in Brighton, successfully

establishing a special high school for students at risk of dropping out or not achieving their potential in the local high school. Some years later, Ms. Houston remarried, and that marriage ended in divorce after a few years. No children were produced in this second marriage.

Having spent her youth in a rural environment, Ms. Houston moved to the Grand Junction area where she purchased a small acreage with a house and a mother-in-law apartment. She lived alone, raised primarily hay and alfalfa on the acreage and rented the mother-in-law apartment. It is not clear to me whether she actually implemented her plan to incorporate the apartment into her consulting business or whether those steps were not finalized before the collision. What is clear is that her consulting business was evolving and she intended to integrate hiking and camping so that subscribers would receive counseling and career development guidance while on these outdoor excursions.

Before the collision, Ms. Houston engaged actively in strenuous hiking, particularly on Colorado mountain trails and on trips to the Grand Canyon from the crest to the floor of the canyon and return. She was considered a leader who hiked "at a fierce pace" such that friends struggled to keep up on hiking expeditions. (9/23/2020 Tr. at 417:4-10). In addition to her hiking activities demonstrating leadership, organization, and inspiration to others, she actively engaged in gymnasium exercises, cycling, and swimming. Throughout her time in the Denver area and following her move to Grand Junction, Ms. Houston was always active as well in volunteer work.

For the ten years immediately preceding the collision Ms. Houston enjoyed a physically active life without physical disabilities, impairments, or any mental issues requiring treatment. She demonstrated herself to be dynamic in interpersonal relations and very active in physical exercise. There is an indication that from her early childhood, she experienced depression on a

recurring, if not entirely sustained basis (9/22/2020 Tr. at 321:9-23; 9/23/2020 Tr. at 488:19-489:9) but "she was not experiencing depression or adjustment or emotional difficulties at the time she got hurt" (9/22/2020 Tr. at 323:4-8). In sum, prior to the accident, she was active mentally, physically, and socially in a creative, healthful, and constructive lifestyle.

**B. The Collision and Ms. Houston's Initial Injuries**

Before trial the parties stipulated to the following:

1. At all relevant times, including the time of collision, Frances Terrell was an employee of the United States Postal Service (USPS), acting within the course and scope of her employment.

2. On December 1, 2016, at approximately 10:12 a.m., Ms. Houston was operating a 2002 Jeep Grand Cherokee traveling south on 24 Road at the intersection with H Road in Grand Junction, Colorado.

3. On December 1, 2016, at approximately 10:12 a.m., USPS employee Frances Terrell was operating a 2013 Subaru Impreza for the USPS, traveling east on H Road at the intersection with 24 Road in Grand Junction, Colorado.

4. On December 1, 2016, at approximately 10:12 a.m., there was a collision between the Jeep driven by Ms. Houston and the Subaru driven by Frances Terrell at the intersection of 24 Road and H Road in Grand Junction, Colorado.

5. After the collision, there were secondary impacts with fixed objects.

6. The United States admits that Frances Terrell was negligent and was solely at fault for the collision with Ms. Houston on that date.

7. The United States admits it is legally responsible for the negligence of Frances Terrell, in the same manner and to the same extent as a private individual under like circumstances.

8. Ms. Houston was not negligent and has no fault for the stated collision.

I accept the foregoing stipulations and consider them as established facts. Thus, I find the collision on December 1, 2016, was caused by the negligence of Frances Terrell. I also find that the collision was the proximate cause of injuries, damages, and losses suffered by Ms. Houston.

5

Ms. Houston's Jeep struck Ms. Terrell's Subaru at a speed of 40 miles per hour. The air bags in Ms. Houston's Jeep were deployed and the vehicle caromed into a building resulting in a second impact. (Photos of Property Damage, Pl.'s Trial Ex. 2; Photos of Damage to Jeep, Pl.'s Trial Ex. 3). The officer responding to the scene—Officer Shiflet—testified, and I so find by adopting his unchallenged statement under oath, that the collision was a "Pretty significant impact—accident. . . . I've seen collisions like that to where people have died. So a pretty good crash. We were concerned about both ladies' injuries initially." (9/21/2020 Tr. at 47:8-14). Officer Shiflet could see Ms. Houston's physical injuries, and she also complained to him at the scene of lightheadedness and lethargy. (9/21/2020 Tr. at 56:25-57.5).

Some of Ms. Houston's physical injuries were immediately apparent. Her right foot turned inward with a bone protruding out of the skin. She was bleeding. She was placed on a gurney and transferred to an ambulance which transported her to St. Mary's Hospital in Grand Junction. Upon examination at the hospital, Ms. Houston was found to have severe injuries to her right lower leg including displaced medial malleolus right tibia, an open fracture of the upper and lower end of the right fibula, a displaced transverse fracture of the right patella, a tibiotalar joint dislocation, right ankle sprain ligaments, and a displaced fracture of the right talus.

### C. Ms. Houston's Ongoing Injuries & Treatment

After two surgeries encompassing five procedures on her right ankle and leg and spending twelve days in the hospital, Ms. Houston was transferred to Larchwood Inns, a rehabilitation facility where she received nursing care, assistance with personal care, and training in how to manage her disabilities. Upon discharge, she returned to her home and received in-

home care services from Home Care of the Grand Valley from December 23, 2016, to February 11, 2017.

I find she received excellent orthopedic care, but she is left with reduced range of motion, pain, and a nearly certain susceptibility to developing traumatically induced arthritis in the ankle and to a lesser extent in the right knee. Though not conspicuous, she walks with a limp, and rapid movement such as running is not likely. From that time forward and continuing to the present, Ms. Houston has exerted great effort in regaining her ability to walk and to place weight on her right leg. For a time, she was confined to a wheelchair, then a walker, and then walked with the assistance of a cane. In August 2017, eight months after being injured, she was able to walk without needing a cane; however, she continues from time to time to use a cane or walking staffs as she endeavors to resume hiking. For her, hiking is not a casual activity, but rather an integral part of her life activities. Added to hiking, Ms. Houston has resumed gym exercises and swimming. She rides her bicycle. She has also worked with and received physical therapy and instructions from physical therapists in order to regain her independence and reduce the pain, which varies in intensity but is her constant companion. She continues to need physical therapy.

Three of Ms. Houston's friends testified about changes they noticed in her when comparing their observations before and after the collision. Their testimony is persuasive. The witnesses, Penny Hagel, David Lester, and Robert McCarroll, describe her before the collision as a vibrant and active woman who was always ready to participate in activities. They testified she was able to have long discussions and was quick in her thought processes. She traveled and gave lectures, consulted, and wrote books, blogs, and articles.

After the collision, Ms. Hagel described Ms. Houston as being slower in gait, less physically active, quiet, tired, no longer vibrant, easily fatigued, and slower to talk and formulate

7

her sentences. (9/21/2020 Tr. at 145:8-146:12). Mr. Lester described Ms. Houston post-collision as not involved in her business activities and blogs. He stated the biggest differences to him were Ms. Houston's reduced ability to be physically active in the outdoors and that she was less spontaneous and less energetic. Her walks are significantly reduced from miles to distances of a few blocks. She struggles with discussions that take an extended amount of time. (9/22/2020 Tr. at 296:25-297:21). Mr. McCarroll testified to similar observations to the effect that Ms. Houston has slowed down and no longer has the same energy, vitality, and "shining eyes" as she once had. (9/23/2020 Tr. at 420:11-422:22). He commented that Ms. Houston was slower and not as active, that she tired easily, and she no longer is seen always with a book or notepad nearby. *Id.*

Perhaps the most eloquent expression of the consequences to Ms. Houston of this collision are found in her answer to her counsel's question: "Explain to [the] court what these injuries have taken from you or cost you." (9/24/2020 Tr. at 736:20-21). She replied:

> Well, there isn't one part of my life that hasn't been either disrupted or wiped out, except for the little bit of sense of myself that I have. My life was gutted, and I – I am left with a future that will be filled with uncertainty, medical visits, psychological visits, pain, probably not staying in my home as long as I would like. I don't know whether I have enough words to say what – what would encompass all that I've lost. It's devastating.

(*Id.* at 736:22-737:4). Ms. Houston specifies her claims as severe injury to her right ankle, moderate injury to her right knee, chronic pain, depression, anxiety, and Post Traumatic Stress Disorder (PTSD). She also complains of Complex Regional Pain Syndrome (CRPS) and Traumatic Brain Injury (TBI).

One refreshing aspect of this case is that there is no suggestion from any source that Ms. Houston is malingering or exaggerating her symptoms. Another positive point is that, while the many medical experts have some differences of opinion, they each espouse mutual respect, and most of the differences are matters of treatment choices. I find, from the totality of the evidence

8

and Defendant's admissions, Ms. Houston's claims of injury to her right ankle and knee, chronic pain, depression, anxiety, and PTSD are proven and accepted. But I find against Ms. Houston and in favor of Defendant on her claims of CRPS and TBI. I have considered expert testimony from both parties on the issue and find that Ms. Houston has not met her burden of proof on these claims. (9/22/2020 Tr. at 332:4-333:25; 347:5-21; 9/25/2020 Tr. at 853:17-23). It is clear to me that she has neither.

I find the testimony of Defense witnesses Dr. Bart Goldman and Stephen Kalat, Ph.D. and Ms. Houston's witnesses Dr. Lynn Price and John Gustavson, Ph.D. to be most persuasive. Ms. Houston's physical functioning and pain are likely to improve with appropriate treatment and medical supervision. (9/25/2020 Tr. at 853:7-16; 854:3-15). It is equally clear, however, that she will have some physical pain, loss of range of motion, and stiffness in her ankle as well as scars and additional arthritic changes and formations on a permanent basis.

To support her claim for future medical expenses, Ms. Houston presented testimony from a life care planning expert, Francine Mazone, and an accountant who based his calculations on Ms. Mazone's testimony. I find these opinions are not evidence-based and are replete with suppositions. As such, they are unpersuasive, and I reject them. Ms. Mazone has presented a worst-case scenario life plan that predicts the most treatment possible, including those that haven't been successful in Ms. Houston's case. I find this testimony lacking in analysis and constituting little more than an aggregation of the most dire predictions. As such it is highly inflated and predicts the most treatment possible.

**D. Ms. Houston's Mental Health Diagnosis and Treatment**

Before considering actual amounts in the assessment of damages endured by Ms. Houston, I must address the psychological aspects of PTSD as they apply to her. The evidence is clear that Ms. Houston was treated for PTSD more than ten years before the collision and that she also suffered before then from anxiety. I find there is no doubt that Ms. Houston has PTSD and that it is treatable. (9/23/2020 Tr. at 484:9-485:7; 9/25/2020 Tr. at 780:10-781:21; 787:19-22; 926:6-25). So, too, are her depression and anxiety. *Id.* According to the Diagnostic and Statistical Manual of Mental Disorders, "Individuals with PTSD are 80% more likely than those without PTSD to have symptoms that meet diagnostic criteria for at least one other mental disorder (e.g., depressive, bipolar, anxiety, or substance use disorders)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 280 (5th ed. 2013). I find the DSM-5 is recognized as authoritative. (*See* 9/23/2020 Tr. at 484:9-485:7). After the collision, Ms. Houston treated with Dr. Gustavson, a licensed clinical psychologist and neuropsychologist. She did not, however, complete the recommended treatment for PTSD with him, though that clearly is in her best interest. Indeed, it is likely that her depression and anxiety can be treated in conjunction with the treatment for PTSD. (9/21/2020 Tr. at 168:23-169:6; 9/22/2020 Tr. at 336:8-338:10). As stated by defense counsel, "Well-established, effective treatments are available to treat conditions Ms. Houston does have – depression, anxiety and PTSD. These treatments are likely to significantly improve Ms. Houston's psychological and cognitive functioning." (Def.'s Proposed Findings of Fact & Conclusions of Law at 23, ECF No. 82). I agree and find that Ms. Houston will require considerable treatment for her depression, anxiety, PTSD, and cognitive sequelae.

CONCLUSIONS OF LAW

**A. Categories of Damages and Statutory Caps**

Under Colorado law there are three categories of loss for which I may award damages in a personal injury action: (1) economic damages, including reasonable medical expenses, *see Kendall v. Hargrave*, 349 P.2d 993, 994 (Colo. 1960); (2) noneconomic damages, *see Van Schaack & Co. v. Perkins*, 272 P.2d 269, 272 (1954); and (3) damages for physical impairment or disfigurement, *see Cooley v. Paraho Dev. Corp.*, 851 P.2d 207, 210 (Colo. App. 1992). *See also* Colo. Jury Instr., Civ. 6:1. Pursuant to Colorado Revised Statutes §13-21-102.5(2)(b), noneconomic damages are intended to compensate for pain and suffering, inconvenience, emotional distress, and impairment of the quality of life. Psychological injuries such as PTSD, depression, and anxiety are relevant to the assessment of noneconomic damages. *See Dolenz v. U.S.*, 443 F.3d 1320, 1323 (10th Cir. 2006).

It perhaps is not required to state the obvious, but when liability is admitted and the entire trial is limited to a determination of damages, the law provides that the plaintiff has the burden of proof, Colo. Jury Instr., Civ. 6:1, and the standard thereof is one of persuasion; that standard is that the fact is more likely true than not. There is an exception to this assignment of the burden of proof: when the defendant raises an affirmative defense, the burden of proof rests with the defendant regarding the defense. *Id.* at 5:2. The sole affirmative defense raised is failure to mitigate damages.

**B. Effect of a Plaintiff's Preexisting Conditions on Damages**

The eggshell plaintiff doctrine is a rule deeply rooted in the common law of torts. *See* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts,* §43, at 292 (5th ed. 1984). The rule

provides that a tortfeasor takes her victim as she finds her. The rule means that in the calculation of damages the tortfeasor is fully liable for any damages resulting from a wrongful or negligent act, even if the victim had preexisting conditions making the consequences of that act more severe than it would have been for a person without that condition. The Seventh Circuit Court of Appeals has bluntly described such a circumstance as the tortfeasor's "bad luck." *Schmude v. Tricam Industries, Inc.*, 556 F.3d 624, 628 (7th Cir. 2009).

The Colorado Supreme Court made clear in *Schafer v. Hoffman,* 831 P.2d 897, 901 (Colo. 1992), that the doctrine is not limited to preexisting conditions; it also applies if the victim is predisposed or more susceptible to injury or illness than the average person. When a tortfeasor introduces evidence of a plaintiff's circumstances prior to the commission of the tort, the applicable Colorado jury instruction provides: "In determining the amount of plaintiff's actual damages, you cannot reduce the amount of or refuse to award any such damages because of (*insert appropriate description, e.g. physical frailties, mental condition, illness, etc.)* of the plaintiff that may have made (him) (her) more susceptible to injury, disability, or impairment than an average or normal person." Colo. Jury Instr., Civ. 6:7. The Colorado Court of Appeals has extended the thrust of *Schafer*, finding the foregoing jury instruction appropriate when there is *any* evidence that a plaintiff had (1) a dormant or asymptomatic preexisting condition or (2) a symptomatic preexisting condition if there is evidence that the harm resulting from the tortious conduct is greater than it would have been in the absence of the preexisting condition. *McLaughlin v. BNSF Railway Co.,* 300 P.3d 925, 935 (Colo. App. 2012).

Clearly the rule applies equally to psychological harm as to physical injury. Last year, Chief Judge Tymkovich disagreed with defendants who argued that an eggshell plaintiff instruction is inappropriate in cases involving psychological or emotional injury alone. *O'Neal v.*

*Board of County Commissioners of the County of Fremont,* 2020 WL 2526782, at *10 (D. Colo. May 18, 2020). The foreseeability of the injury is also not relevant to the calculation of damages. *Schafer*, at 831 P.2d at 901.

### C. Ms. Houston's Damages[1]

*Past Medical Expenses*

Defendant objects to some of Ms. Houston's past treatment choices and offers as a defense that Ms. Houston failed to mitigate her damages because she did not follow the advice of a competent physician or pursue treatment in a reasonable manner. (Def.'s Proposed Findings of Fact & Conclusions of Law at 35, ECF No. 82). Consequently, Defendant argues that $75,003.70 of her total claim for past medical expenses of $257,111.13 should be excluded to reduce the amount awarded to $182,107.64. I find Defendant has not met its burden of proof that Ms. Houston failed to mitigate her damages. That she did not complete an MRI exam because of the onset of claustrophobia making her confinement in the machine's narrow tube impossible is neither an intentional act nor indicative of a failure to mitigate. Likewise, receiving recommendations from various health professionals that were mutually conflicting or inconsistent and electing some and discontinuing others is not a failure to mitigate. I find Ms. Houston was actively participating in her recovery and making reasoned choices about which treatment modalities she should pursue. Her actions and decisions are anything but a failure to mitigate. Accordingly, I find her past medical expenses total $257,111.13.

---

[1] Ms. Houston did not seek damages for lost earnings or lost earning capacity. (Pl.'s Resp. to Def.'s Consolidated Motion in Limine at 2-3, ECF No. 61).

*Future Medical Expenses*

I find Dr. Goldman's testimony regarding future treatment needs to be most credible. Dr. Goldman is a medical doctor specializing in physical medicine and rehabilitation, who was previously the Medical Director of the Complex Regional Pain Syndrome Center at the Colorado Neurological Institute. (9/25/2020 Tr. at 841:3-846:11). As Dr. Goldman testified, and I accept, Ms. Mazone's testimony regarding potential arthrodesis or arthroplasty as a future medical cost is untenable. Those treatments "fall into a worst-case scenario medical possibility but not probability." (*Id.* at 879:20-21). The burden of proof on Ms. Houston is by a preponderance, making an assertion more likely so than not so. A possibility does not meet that standard. Dr. Goldman's testimony reasonably establishes that Ms. Houston will need approximately fifteen physical therapy sessions; pool therapy and aerobic and strength training; acupuncture; continuing treatment and medication for pain management; a lifetime of orthotic shoe inserts; specialized bicycle pedals; antidepressant medication; and psychological counseling and treatment for PTSD. (*Id.* at 885:8-892:23, 896:10-18). I find the reasonable cost for these future medical expenses is $40,000. (*Id.* at 896:15-21).

*Noneconomic Damages*

Ms. Houston has already endured and will continue to endure pain for the rest of her life. She has lost stamina and will require more rest and physical inactivity than before the collision thus constituting a significant impairment of her quality of life. The statutory cap of $468,010 is determinative. Colo. Rev. Stat. § 13-21-102.5(3)(a), (c)(I)-(III). There is a statutory provision to increase that cap to $936,030 where the court finds by clear and convincing evidence a justification for that increase, but I find no circumstance in this case meets the standard or what I

perceive to be its legislative intent. *Colwell v. Mentzer Investments, Inc.*, 973 P.2d 631, 639 (Colo. App. 1998).

There is no doubt Ms. Houston sustained significant physical injuries as well as difficult and discomforting mental and emotional injuries, particularly PTSD. And there is no doubt that despite her pain and disability, Ms. Houston has made commendable efforts to seek treatment and to engage in self-help in order to adjust to her changed life as a result of the collision. She continues to suffer pain and mental problems with memory and concentration losses attending. (That she believed she suffered a traumatic brain injury and reported it to her doctors is understandable, even though it is inaccurate.)

Ms. Houston's counsel argues for imposition of the statutory cap of $468,010, but there is no supporting material for that amount. I find counsel's recommendation is an exercise in *ipse dixit*. On the other hand, Defendant has suggested a noneconomic damages award of $300,000. That amount bears some consonance with the amounts awarded for past and future medical expenses and as such, it is not pure supposition.

*Physical Impairment and Disfigurement*

Under Colorado law, damages for physical impairment and disfigurement are in a category separate and apart from other noneconomic damages. *Pringle v. Valdez*, 171 P.3d 624, 630-31 (Colo. 2007). Ms. Houston is, and in all likely prognostications will be for life, limited in the range of movement of her ankle. She has and will continue to have a limp and have difficulty in closely confined movements such as getting in and out of an automobile or climbing up or down a ladder or steep stairs. Her surgeries have produced lasting scars that disfigure her. While these scars are not facial ones, Ms. Houston continues both as part of her therapy and her

lifestyle to exercise in a gym and swimming pool where these scars will indeed be visible. Considering Ms. Houston's physical impairments and disfigurement and the level of active exercise she engages in, I find a damages award for physical impairment and disfigurement of $300,000 is fair and reasonable.

## ORDER FOR ENTRY OF JUDGMENT

Accordingly, for the foregoing reasons and findings of fact and law I find Ms. Houston is entitled to damages totaling $897,111.13 in categories as follows:

| | | |
|---|---|---|
| I. | Future medical expenses | $40,000.00 |
| II. | Past medical expenses | $257,111.13 |
| III. | Non-economic damages | $300,000.00 |
| IV. | Physical impairment and disfigurement | $300,000.00 |
| **TOTAL:** | | **$897,111.13** |

The Clerk of Court is, therefore, DIRECTED to enter judgment in favor of Plaintiff Tracy Houston and against Defendant United States of America in the amount of $897,111.13, with post-judgment interest as permitted under statute.

DATED this 17th day of February, 2021.

_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE